UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a          CASE NO. 05-80393-CIV-HURLEY
Delaware corporation, f/k/a STELOR     Magistrate Hopkins
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,
_____/

## NOTICE OF FILING DECLARATION OF STEVEN A. SILVERS

Defendant, Steven Silvers, hereby gives notice of filing the Declaration of Steven A. Silvers

in support of his Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction dated

May 20, 2005.

                                   Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.     KOZYAK TROPIN & THROCKMORTON, P.A.
Co-Counsel for Defendant                    Counsel for Defendant
200 S.E. First Street, Suite 708            2525 Ponce de Leon, 9th Floor
Miami, FL 33131                             Coral Gables, Florida 33134
Telephone: (305) 374-1920                   Telephone: (305) 372-1800
Adam T. Rabin, Esq.

By: _____
      Kenneth R. Hartmann
      Florida Bar No: 664286
      Gail M. McQuilkin
      Florida Bar No. 969338

3339/101/253510.1

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was hand-delivered this 20th day of May, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq., Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove, Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

By: _____
Kenneth R. Hartmann

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 • TEL. (305) 372-1800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

       Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

       Defendant,

_____/

CASE NO. 05-80393-CIV-HURLEY
Magistrate Hopkins

## DECLARATION OF STEVEN A. SILVERS

I, Steven Silvers, make this Declaration based on personal knowledge.

1.     I reside in Palm Beach County, and have a business address at 8983 Okeechobee Blvd., Suite 202, PMB 203, West Palm Beach, FL 33411.

2.     Throughout the 1980s, I developed an animated character concept designed to appeal to children. In 1996, I published the book "Googles and the Planet of Goo," which I authored. I wrote the book while incarcerated for a conviction on federal charges as a way to stay connected to my children. Exhibit "A" shows the front and back covers, and some pages from the book.

3.   The book features a family of Gootians, alien creatures from another planet who are forced to come to earth. The characters are cute, lovable and smart; they use a unique vocabulary and espouse maxims for life on earth (or any other planet), all designed to further the "edutainment" and development of young children. Our motto since early on has been "Teaching children of today, visions of tomorrow."

4.     I have marketed and promoted the characters through a variety of mediums. The characters staged live appearances and musical shows; plush toys were developed as well as stickers for school notebooks and the like.

5.     In 1997, I registered the domain name Googles.com to promote the characters and related products on the internet, and operated a website for that purpose. The same year I obtained a federal trademark registration for "Googles" for use with children books. I have subsequently registered hundreds of domain names and trademarks for the characters and related "Goo" terms, for use with children's education and entertainment, and related products.

6.     I have also created, and overseen the creation of, numerous songs featuring the characters and Googles themes. I own numerous copyrights for Googles related drawings and literary works. I also own design patents for a "Googles" shoe, the GooShoe, and alien figurines, The Googles.

7.     In May 2002, after my then licensee experienced unrelated problems, I licensed the intellectual property described above ("Googles IP") to Stelor Productions, Inc. (Exhibit "B"). I have not been advised of Stelor Productions, Inc.'s assignment of its rights under the License Agreement to Stelor Productions, L.L.C. and have not consented to such a transfer. I first learned that Stelor Productions, L.L.C. claims the status of licensee when served with this lawsuit. Both Stelor entities are referred to herein as "Stelor."

8.     In May, 2002, as additional consideration for the License Agreement, I entered into a Letter Agreement with Stelor for consulting services. The Letter Agreement (Exhibit "C") specifically provides that, if Stelor fails to compensate me for consulting services as required, I may terminate the License Agreement; Exhibit "C," ¶ 1(c).

2

9.     Under the Letter Agreement, ¶1(b), Stelor is required to provide a written agreement granting me 1,000 options for Stelor stock, with the number of options to increase if Stelor's option plan changes. Stelor has not provided this agreement to me. In fact, Stelor has even refused to provide me a copy of its then existing option plan, or any option plan, which is necessary to determine if I am entitled to more options.

10.    Under the Letter Agreement, Stelor is also required to compensate me by paying my health insurance premiums. As of the date of the Settlement Agreement discussed below, Stelor had failed to do so, paying only a portion of what it owed.

11.    Under the Letter Agreement, Stelor is required to reimburse my expenses, including domain name registration fees and consulting related travel. As of the date of the Settlement Agreement discussed below, Stelor had failed to do this.

12.    Under the License Agreement, Stelor is allowed to market and sell products and services utilizing the Googles IP ("Licensed Products"). Related requirements include: providing samples of Licensed Products for my inspection and maintaining "high quality"; paying royalties for such sales; providing detailed royalty statements each quarter; and permitting me to audit Stelor's books and records. Stelor is also required to identify and provide me with a quarterly list of all sublicenses it grants regarding Licensed Products.

13.    Stelor markets and sells a variety of Licensed Products. Stelor has since at least 2004 been marketing Googles-based music through Itunes, by which a customer pays to download songs contained in the two Googles compact discs, "The Googles From Goo/One GooWorld" and "Un GooMunndo/The Googles From Goo," (total of 30 songs). For example, attached as Exhibit "D" is a receipt an associate provided to me reflecting the purchase and download of the entire "One

3

GooWorld" compact disc in August, 2004. Stelor never provided a royalty statement reflecting any sales for 2004 or paid any royalties for such sales. In fact, Stelor has consistently maintained that there have been no sales of Licensed Products.

14.     Stelor is also merchandising various Googles-related items, such as clothing, coffee mugs, hats, mouse pads, etc. through an internet store called CafePress.com. I learned of this in 2004. Stelor has never provided a royalty statement reflecting any sales of this Licensed Product or pay any royalties for such sales. Stelor never provided samples of this merchandise. However, I recently inspected the Googles merchandise sold on CafePress.com. Incredibly, Stelor is placing a notice on the merchandise where Stelor claims it is the copyright owner of my characters and drawings, for which I hold the copyrights.

15.     Most significantly, Stelor has used the Googles IP to attract users to its websites, and developed a valuable database of customers and potential customers for the Licensed Products. None of this commercial activity has been reflected in any royalty statements, and I have received no royalties for this. Because I have been denied an audit, I cannot determine whether Stelor, as is typical in the internet industry, monetizes the traffic channeled through the Googles IP domain names, and the information derived from such traffic.

16.     In connection with the Licensed Products described above, as of the date of the Settlement Agreement, Stelor had not:

        a.      Provided any detailed royalty statements, as specified in the License Agreement. In fact, Stelor has not provided any statements at all for the 3rd and 4th quarters of 2004; copies of Stelor's non-royalty statements which do not comply with the License Agreement, III(C), are attached as Exhibit "E."

4

b.      Paid any royalties;

c.      Provided me with all samples of the Licensed Product; and

d.      Provided any information regarding sublicenses for the  Licensed Product described above. (If Stelor failed to obtain such sublicenses while allowing others to market and sell Licensed Product, then it is failing to protect the Googles IP as required by the License Agreement).

17.     After learning, on my own, of Stelor's commercial efforts, I requested an audit. Correspondence reflecting my initial request, on November 5, 2004, and the repeated requests by my attorneys, is attached as Exhibit "F." Stelor initially refused to allow an audit, and then admitted I was entitled to the audit but objected to my choice of accountant and imposed a series of other conditions. As of today, six months after I requested it, Stelor claims it will permit an audit but still has refused to provide a  date for the audit.

18.     Under the License Agreement, Stelor is required to protect the Googles IP.  In this regard, Stelor failed to renew several of the licensed domain name registrations, allowing others to obtain registration rights for these domain names. And, Stelor failed to oppose other partys' federal registration of the "Googles" mark for a variety of goods.

19.     Stelor is required under the License Agreement to obtain product liability insurance and include me as a named insured.  It did not do so.

20.     As a result of Stelor's failure to abide by the License Agreement and the Letter Agreement's compensation requirements, I gave notice of Stelor's default, which allows Stelor to cure prior to actual termination of the License Agreement.  A copy of my attorney's letter dated November 12, 2004 is attached as Exhibit "G."

21.     Stelor had a 60-day period to cure its defaults.  It failed to do so.  Accordingly, I terminated the License Agreement on January 13, 2005.  (Exhibit "H").

22.     Prior to the first termination , Stelor sued me.  The suit was frivolous.  However, when Stelor promised to cure its defaults, and pay advances against future royalties, we settled the case.  The Settlement Agreement (filed under seal) reflects Stelor's promise to cure many of the defaults.  In return, I withdrew the termination.  I did not agree to, and did not withdraw the notice of default, because Stelor had yet to cure the defaults.

23.     The Settlement Agreement is dated January 28, 2005.  Stelor did cure some defaults; it paid the expenses and insurance premiums it owed under the Letter Agreement, although it delayed doing so.  It cleaned up some of the registrations for the Googles IP.  However, as of April 27, 2005, Stelor had still failed to:

a.      Pay any royalties;

b.      Provide proper royalty statements, or any statements for the last two quarters of 2004 and the first quarter of 2005;

c.      Provide a date for me to audit Stelor's books and records despite my attorneys' repeated requests, spanning six months (Exhibit "F");

d.      Obtain insurance, naming me as an insured;

e.      Provide an agreement for my stock options, or provide Stelors' stock option plan;

f.      Pay the health insurance premium compensation of the settlement (a royalty advance) due on April 1, 2005.  Stelor had also failed to timely pay for the past due health insurance

6

compensation, far exceeding the time requirements of the Settlement Agreement before finally paying;

g.      Provide samples of any Licensed Product (other than the two Googles' music compact discs, provided after the Settlement Agreement), in violation of the License Agreement.

h.      Provide copies of any pleadings or materials filed with or received from the USPTO, as required by the Settlement Agreement.

24.     By April 27, 2005, I concluded that Stelor's failure to respect its obligations was no longer tolerable. Stelor has repeatedly breached the License Agreement, Letter Agreement and now the Settlement Agreement. I have been denied an audit for almost six (6) months. I see Licensed Product on the market, and am aware of sales yet Stelor pays no royalties, and provides non-conforming royalty statements. I have other opportunities to exploit the Googles IP, and expect to generate substantial income immediately. I therefore terminated the License Agreement on April 27, 2005. (Exhibit "I").

25.     After the License Agreement was terminated, Stelor belatedly tried to cure its numerous defaults. (Exhibit "J"). It provided the first ever royalty statement reflecting income (although it was not certified as required, and like past statements is not in conformity with the License Agreement). It claimed to have sent a letter (not received by me) agreeing in principle to a grant of options, but Stelor has never provided a contract or a written plan. It offered to produce samples of the Licensed Product for the first time. It belatedly sent copies of checks (not the actual checks) for advance royalties and overdue health insurance premiums. It obtained insurance after the termination. (Exhibit "K"). This is all too little, too late. I want to divorce Stelor, and I am entitled to do so under the agreements.

**I HEREBY DECLARE** under penalty of perjury that I have read the foregoing Declaration

and that the facts stated in it are true.

Dated: May 20, 2005

_____
Steven A. Silvers

3339/101/253342.1

# EXHIBIT "A"





# GOOGLES

# AND

# THE

# PLANET OF GOO

## VOLUME I

by: Steven A. Silvers

---

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey  07083**

Printed in the United States
of America by:

**Morris Publishing**
**3212 E. Highway 30**
**P.O. Box 2110**
**Kearney, Nebraska  68847**

First Printing:  May, 1996

ISBN: 1-57502-184-6

Library of Congress Catalog Card No.: 96-94384

The Googles logo,  children's books, and illustrations are the products and trademark of:


**The Googles Children's Workshop, Inc.**

An affiliate of:

**SAS Entertainment Group.**

Produced, published, and contributed by:

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey 07083**
**(908) 688-3995**

Copyright 1995 by:  **Steven A. Silvers**

Written by:  **Steven A. Silvers**

Cover design & layout
by:   **Kenneth R. Rayburn**

Cover artwork & solar system
illustration by:  **Hendrick A. Gil**

Edited by:  **Cindy Greenfield**

**ALL RIGHTS RESERVED.**  No portion of this book may be used or reproduced in any manner without the expressed written permission from the publisher.  For further information, kindly forward your inquiry to the address noted above.

# DEDICATION

This children's book and the entire Googles edutainment concept is dedicated to my two wonderful children.

**Renee** is the beautiful daughter I've had the wonderful pleasure and enjoyable experience of having raised into womanhood as a single parent.

While **Joshua**, on the other hand, is the son I've always yearned for and truly hope I will one day get to know.

This work is dedicated to the both of you.

Love, Dad!

# SPECIAL THANKS TO:

## My dad

## Michael L. Silvers

## and

## my dearest friend,

## Marsha Perry Genaro,

## for

without their efforts, dedication, and perserverance this wonderful children's edutainment book would not have been published.

# AUTHOR'S NOTE

## SOMETHING NEW & REFRESHING!
## SOMETHING EXCITING & EDUTAINING!

That is what parents and children are saying about our innovative children's edutainment reading book.

The Googles concept was created as a means to provide children with a fun-filled method of expanding their vocabulary.

In this first of several Googles adventures, your child will learn and recognize many new words.

Along with vocabulary enrichment your child will also learn, through application of the imagination, identifiable lessons in conceptual awareness and social interaction.

To further assist your child in learning new words, a dictionary appendix is conveniently provided at the end of each

book which corresponds to the *italicized* words in the original text. This method of learning prevents the child from the tedious task of having to refer to a regular dictionary to find the meaning of the new words he/she is about to learn.

A phonetic pronunciation of each *italicized* word is also provided.

We sincerely hope your child will enjoy reading all about the adventures of Googles, Giggles, and Goggles from the imaginary planet of Goo.

We welcome your comments and/or suggestions about our innovative children's edutainment reading and vocabulary enrichment learning technique.

Kindly direct your correspondence to:

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey  07083**

# CHAPTER 1

---

## Googles Comes To Earth

Once upon a *millennium* ago there was a planet called Goo. On this planet lived three little creatures who would one day visit Earth where they would learn and play with the many children there.

Before we begin our journey to this far away planet and the story of how the Gootians: Googles, Giggles, and Goggles came to visit Earth, we must first learn something about the solar system as it

Steven A. Silvers                                    2

exists today.

The universe is composed of all things that exist in the world, including the sun, moons, stars and planets contained in it.

There are nine planets in our solar system: Mercury, Venus, Earth, Mars, Jupiter, Saturn, Uranus, Neptune, Pluto, and the (imaginary) planet of Goo.

To further understand the *composition* of the solar system and how far away your new friend, Googles, has traveled to visit us, please refer to the *illustration* provided on the last page of this book.



# EXHIBIT "B"

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

### WITNESSETH

**WHEREAS,** LICENSOR is the sole and exclusive owner of the **GOOGLES** characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

**WHEREAS,** LICENSOR is the sole and exclusive owner of the **GOOGLES** trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

**WHEREAS,** LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

**WHEREAS,** LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

**WHEREAS,** LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

**WHEREAS,** LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

**NOW, THEREFORE,** in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

    **A.**      LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

E.     All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.     Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.     LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.     In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit.  If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month.  Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year.  That period end date shall represent the new period start date for future audits for underpayment discrepancies.  In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.     All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.     In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.     LICENSOR represents and warrants that:

(i)     the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)     the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)     LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

(iv)        the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v)        except as set forth in Schedule B attached hereto, **LICENSOR** has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.  **LICENSEE** represents and warrants that:

(i)        the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of **LICENSEE** and this Agreement is a valid and binding obligation of **LICENSEE**, enforceable in accordance with its terms;

(ii)        the execution, delivery and performance by **LICENSEE** of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which **LICENSEE** is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on **LICENSEE**; and

(iii)        it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.    Disclaimer of Warranties.  EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.    **LICENSEE** shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A.    The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.    The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by **LICENSEE** and in conformity with a standard sample provided by **LICENSEE**.

C.    Prior to the commencement of manufacture and sale of the Licensed Products, **LICENSEE** shall submit to LICENSOR **for his input**, at no cost to **LICENSOR**, a reasonable number of samples of all Licensed Products which **LICENSEE** intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A.    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII.  INTELLECTUAL PROPERTY PROTECTION

A.      LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.      LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.      LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.      LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.      Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A .     **Right to Terminate on Notice**. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B .    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR.  In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X.  POST TERMINATION RIGHTS

A.    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI.  INFRINGEMENTS

A.    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit.  Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII.  INDEMNITY

A.    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.

6



B.     LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.     With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.     IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES.  THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.     EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV.  FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII.  AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII.  WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of **LICENSEE** and/or with the consent of **LICENSOR**, which shall not be unreasonably withheld or delayed.  By way of example and not limitation, **LICENSEE** may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII.  RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and          executed          between          the          above          mentioned          parties



IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                    STELOR PRODUCTIONS, INC.

Steven A. Silvers                                    By: _____
Title: Owner/LICENSOR                                Printed Name: _Steven A. Esrib_
Dated: _5/09/02_                                     Title: _President_
                                                     Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*Succession*
*Rights of Survivor*

5/9/02

In the event of the Death of Licensor all of the Licensor's rights under this agreement shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

11

# EXHIBIT "C"

# Exhibit B

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

    This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

    1.    <u>Engagement of Consultant.</u>

    a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

    b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

    c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

    2.    <u>Relationship of Parties.</u> The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

EXHIBIT

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    Duties of Consultant.   Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and/or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    Duties of Company.

a. Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.    <u>Term and Termination.</u>

a.    Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.    Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.    Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.    Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.    <u>Proprietary Information; Proprietary Rights.</u>

a.    In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

b.      The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.      The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.      Limitations of Liability. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.      Miscellaneous.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS     Date 5/09/02

Stelor Productions, Inc.

By:          Date 5/9/02
Name: Steven A Esrig     Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

# EXHIBIT "D"



## Purchase History

🔒 Secure Connection

Date: 08/31/04 09:27 AM
Order: M20839652
Invoice: 9330284724

| Item | Artist | Type | Downloaded | Price |
|---|---|---|---|---|
| (God Must Have Spent) a Little More Time On You | *NSYNC | Song | 08/31/04 09:44 AM | $0.99 |
| One GooWorld | The Googles from... | Playlist | | $9.99 |
| We're the Googles | The Googles from... | Song | 08/31/04 09:56 AM | |
| GooMorning | The Googles from... | Song | 08/31/04 10:02 AM | |
| GooBye | The Googles from... | Song | 08/31/04 10:08 AM | |
| I Feel Good About Myself | The Googles from... | Song | 08/31/04 10:15 AM | |
| Zoomin' | The Googles from... | Song | 08/31/04 10:24 AM | |
| GooFriends | The Googles from... | Song | 08/31/04 10:32 AM | |
| Rain | The Googles from... | Song | 08/31/04 10:43 AM | |
| GooBop | The Googles from... | Song | 08/31/04 10:49 AM | |
| Trees | The Googles from... | Song | 08/31/04 11:01 AM | |
| Recycle...Don't Litter | The Googles from... | Song | 08/31/04 11:10 AM | |
| I Love Fruit | The Googles from... | Song | 08/31/04 11:17 AM | |
| It's Gotta Be a Goo Thing | The Googles from... | Song | 08/31/04 11:29 AM | |
| Responsibility | The Googles from... | Song | 08/31/04 11:37 AM | |
| GooNight | The Googles from... | Song | 08/31/04 11:51 AM | |
| One GooWorld | The Googles from... | Song | 08/31/04 12:01 PM | |
| Underneath Your Clothes | Shakira | Song | | $0.99 |
| Underneath Your Clothes | Shakira | Song | 09/01/04 06:59 PM | $0.99 |

Subtotal: $12.96
Tax: $0.00
Credit Card Total: $12.96

Done

# COMPOSITE EXHIBIT "E"

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 6/1/02 to 6/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____   Date 11/18/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/02 to 9/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____   Date 11/18/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 1/1/03 to 3/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 10/1/02 to 12/31/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

FROM : SILVERS ENT          FAX NO. : 5617849959          May. 19 2005 12:16PM  P4

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/03 to 9/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 4/1/03 to 6/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| May-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Jun-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 1/1/04 to 3/31/04

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 4/28/04

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 10/1/03 to 12/31/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 12-23-03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 4/1/04 to 6/30/04

| Month | Description | | | | | | | | | | | | | | | | | | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | | | | | | | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | | | | | | | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | | | | | | | 6% | 0 |
| TOTAL | | | | | | | | | | | | | | | | | | | | |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____  Date 7-1-04

Stelor Proprietary and Confidential

# EXHIBIT "F"

Kozyak Tropin & Throckmorton, P.A

2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Overnight Delivery
Federal Express Tracking No. 7903-2948-5586

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products. In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.    All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent, that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.    All sublicenses;

3.    All copyright and trademark registration applications and registrations;

4.    All domain name registrations;

5.    All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.    Proof of insurance as required under Paragraph XIV.

Page 2

     In addition, Mr. Silvers is requesting that a number of samples of all Licensed Products manufactured, or in production be produced during this audit.

     You, or your counsel, should schedule and coordinate the audit through us by providing us with a date and location.

                       Very truly yours,

                       Gail A. McQuilkin

c:    Steven Silvers
      Kenneth R. Hartmann, Esq.

/245617.1

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 3/2/2005 4:42:32 PM |
| **Subject:** | Googles |

Kevin -

Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is **not** to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to **send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.** This really needs to get done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

**REDACTED**

# REDACTED

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | <GAM@kttlaw.com> |
| **Date:** | 3/5/2005 10:17:04 AM |
| **Subject:** | Googles |

Gail,

I have the following information in response to your recent email.

1. I understand you received the checks.

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement.

5. Stelor will confirm in writing that no one's available options have increased.

6. Stelor will provide written confirmation.

7. Stelor will provide a date prior to March 15, 2005.

8. There are no such samples, as Stelor is not yet offering any product for sale.

9. Stelor will provide proof regarding the applications, registrations and names.

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible.

**REDACTED**

Kevin

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Aragon, Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

    Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is not to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination.  This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy. This really needs to get done asap for everyone's benefit.

4. Silvers is owed  for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6.  Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

## REDACTED

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - Re: Googles

**From:**     GAIL A MCQUILKIN
**To:**        Kevin C. Kaplan
**Date:**      3/5/2005 11:12 AM
**Subject:**  Re: Googles

Kevin -

REDACTED

1. I understand you received the checks.  **Yes we did.**

2. Stelor finds the chart confusing.  Please just provide us with
receipts or proof of the actual payments, and Stelor will provide the
reimbursement.  **There is nothing in the least bit confusing about the chart.   Stelor has three days to
get us the check.  FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed
for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb
(which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with
Aurora, and is committed to taking care of this issue expeditiously.
Please allow Stelor a few more days to do so.  **They have three days.**

4. Stelor has no record of receiving the receipts.  Please provide us
with copies, and Stelor will provide the reimbursement.  **He has provided these three times already.  They
have three days to pay.**

5. Stelor will confirm in writing that no one's available options have
increased.  **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation.   **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005.  **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product
for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations
and names. **They have three days**

10.  By the same token, Stelor requires proof that Silvers changed the
correspondent information.  As of my last conversation with Larry
Hefter, he was unaware that had been done.  Please provide us with this
proof as soon as possible.  **There is nothing in the agreement that obligates us to do this, and
everything was changed electronically so there is nothing to provide.  Stelor knows how to go
online to the USPTO office to view the changes.  It will take all of ten minutes to do this.  I talked
to Larry and showed him the e-mail I had sent him, and he knows about the changes.**

REDACTED

REDACTED

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 3/5/2005 10:15:01 AM >>>
Gail,

I have the following information in response to your recent email.

1. I understand you received the checks.

2. Stelor finds the chart confusing. Please just provide us with
receipts or proof of the actual payments, and Stelor will provide the
reimbursement.

3. Stelor is just trying to work through the pending issues with
Aurora, and is committed to taking care of this issue expeditiously.
Please allow Stelor a few more days to do so.

4. Stelor has no record of receiving the receipts. Please provide us
with copies, and Stelor will provide the reimbursement.

5. Stelor will confirm in writing that no one's available options have
increased.

6. Stelor will provide written confirmation.

7. Stelor will provide a date prior to March 15, 2005.

8. There are no such samples, as Stelor is not yet offering any product
for sale.

9. Stelor will provide proof regarding the applications, registrations
and names.

10. By the same token, Stelor requires proof that Silvers changed the
correspondent information. As of my last conversation with Larry
Hefter, he was unaware that had been done. Please provide us with this
proof as soon as possible.

I appreciate your view on providing information to Bridges. I will get
back to you on that quickly.

Kevin

*****************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,

Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*****************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains
information from the law firm of Aragon, Burlington, Weil, Schwiep,
Kaplan & Blonsky, PA, which may be confidential or privileged. The
information is intended to be for the use of the individual or entity
named above. If you are not the intended recipient, please immediately
delete this e-mail and be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited.

-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

    Here are the issues we need to resolve under the settlement
agreement:

1.  Silvers is owed two checks for $5000 each for Feb and March. The
checks going forward need to be to me by the 1st of the month.

2.  Attached is the chart showing payments made by Silvers on his
insurance premiums during the life of the consulting agreement. The
only two payments Stelor is not to reimburse him for are Dec 2004 and
Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1.
He is now owed for March 2005 too. By my calculation the total it comes
to $5,141.96.

3.  Health insurance termination.  This is very critical to Silvers so
that he can continue with health care coverage. Silvers is trying to
convert to an individual plan through NHP, Aurora's insurance company.
That will reduce the premiums by a couple hundred dollars a month. But
to do that Aurora needs to send to Neighborhood Health Partnership on
Aurora official letter head, addressed to "Premium Services" informing
them that April 1, 2005, Aurora will no longer be offering health
insurance benefits to "ANY" of their employees, and that they have
informed Steven A. Silvers of this event and that he has 63 days within
which to secure a non-group conversion policy. This really needs to get
done asap for everyone's benefit.

4.  Silvers is owed  for domain name registration renewals. He
submitted the receipts for these to Stelor already for $318.00.

5.  Options.  Under the consulting agreement Silvers was entitled to
1,000 options for Stelor stock under Stelor stock option plan, and

another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

## REDACTED

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - dates for audit

**From:**      GAIL A MCQUILKIN
**To:**        kkaplan@bwskb.com
**Date:**      3/22/2005 11:55 AM
**Subject:**   dates for audit

Kevin -

   We need to set up the date for the auditor to go to Stelor.  These are they dates  they have open.  Let me know today which dates works best.  Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st, or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**GAIL A MCQUILKIN - RE: dates for audit**

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | "GAIL A MCQUILKIN" <GAM@kttlaw.com> |
| **Date:** | 3/23/2005 9:24 AM |
| **Subject:** | RE: dates for audit |

Gail,


Can you send me over the documents confirming the scope of your proposed audit.   Is there an engagement letter or other correspondence?  We'll call you at 11 today.


Kevin


*******************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

  Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@abwlaw.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Tuesday, March 22, 2005 11:55 AM

**To:** Kevin C. Kaplan
**Subject:** dates for audit

Kevin -

   We need to set up the date for the auditor to go to Stelor.  These are they dates they have open.  Let me know today which dates works best.  Otherwise I will just select one.  Thanks.

Thursday March 31st, Friday April 1st, or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - RE: dates for audit

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 3/23/2005 9:47 AM |
| **Subject:** | RE: dates for audit |

The scope of the audit based on Silvers' rights under the license agreement is : "Stelor's books and records and all other dcouments and material in the possession of or under the control of Stelor with·respect to the subject matter of the License Agreement." I think that just about covers everything that Stelor has relating to the Googles project. FYI - based on our settlement, the results of the audit are for attorney eyes only.

**REDACTED**

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 03/23/05 9:22 AM >>>

Gail,


Can you send me over the documents confirming the scope of your proposed audit.  Is there an engagement letter or other correspondence?  We'll call you at 11 today.



Kevin


*******************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

  Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel· (305) 858-2900

Fax: (305) 858-5261

## GAIL A MCQUILKIN - audit

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     4/22/2005 1:34 PM
**Subject:**  audit

Kevin -

The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - RE: audit

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 4/22/2005 4:20 PM |
| **Subject:** | RE: audit |

I'd have to clear off some appointments but it may be possible. What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint. Are you available Monday afternoon to come over and look?


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit


Kevin -

The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit. He needs to schedule the date for his visit. Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit. Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**GAIL A MCQUILKIN - RE: audit**

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | "GAIL A MCQUILKIN" <GAM@kttlaw.com> |
| **Date:** | 4/22/2005 5:27 PM |
| **Subject:** | RE: audit |

I've forwarded it on to Steve, but haven't heard back yet.  He may come down Monday too.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 4:21 PM
**To:** Kevin C. Kaplan
**Subject:** RE: audit

I'd have to clear off some appointments but it may be possible.  What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA

2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint.  Are you available Monday afternoon to come over and look?


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit


Kevin -

   The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - Re: Inc

**From:**     GAIL A MCQUILKIN
**To:**       Kevin Kaplan
**Date:**     4/25/2005 9:43 AM
**Subject:**  Re: Inc

Kevin -

No, I cannot be there tomorrow.  Please let me know what is in the boxes so I can at least determine if it is relevant.  I need the date for the audit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/25/05 9:21 AM >>>
Gail,

Steve plans to be in Miami tomorrow.  Can you meet at our office at 2:00 p.m.?  Please confirm.  We will have the Stelor information for your review.  We expect you will have a draft of the complaint for our review.

In terms of schedule, I am leaving town on Friday for vacation.  Stelor and I plan to have the complaint filed (or ready to be filed) before I leave.  Please help us with that goal by circulating your draft.

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

# EXHIBIT "G"

LAW OFFICES

# KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134—6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.    Failure to pay royalties under paragraph III (A);

b.    Failure to provide a written certified royalty statement under paragraph III (C);

c.    Failure to provide a list of all sub licenses under paragraph III (C);

d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell; and all promotional and advertising materials associated with those products under paragraph VI (C);

g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

     i.     Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

     j.     Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

     k.     Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

     l.     Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

     a.  Failure to pay Mr. Silvers consultancy fees and expenses;

     b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

     c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

     d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:     Steven A. Silvers
       Laurence Hefter

/245815.1

# EXHIBIT "H"

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0655
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2


Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuillkin

c:     Steven A. Silvers
       Laurence Hefter
       Yano A. Rubinstein
       William Borchard

/248587.1

# EXHIBIT "I"

LAW OFFICES

# KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7929-0844-8480

April 27, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

     Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

    On November 12, 2004, we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached. Because Stelor did not cure those breaches, on January 13, 2005 we served on Stelor a notice of termination of the License Agreement, a copy of which is attached.

    On January 28, 2005, Stelor and Silvers entered into a Settlement Agreement in which Silvers agreed to withdraw his notice of termination provided Stelor perform its obligations under the Settlement Agreement. Stelor, however, has:

- failed to provide Silvers with unit interests in Stelor LLC under paragraph 9;

- failed to pay Silvers monthly installments on royalty advances on the first of every month under paragraph 10 (a);

- failed to pay on April 1, 2005 the monthly advance on royalties required by Silver to maintain his insurance coverage through the Aurora Collection under paragraph 10 (b);

- failed to cooperate in the audit of the books and records of Stelor under paragraph 14; and

- failed to provide Silvers samples of Licensed Products that are being offered for sale under paragraph 15.

Furthermore, although Stelor has provided a written statement that it is not offering any

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 12, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchandise of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

251939.1

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

    Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

    We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

    a.    Failure to pay royalties under paragraph III (A);

    b.    Failure to provide a written certified royalty statement under paragraph III (C);

    c.    Failure to provide a list of all sub licenses under paragraph III (C);

    d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

    e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

    f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

    g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

    h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

     i.     Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

     j.     Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

     k.     Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

     l.     Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

     a.  Failure to pay Mr. Silvers consultancy fees and expenses;

     b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

     c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

     d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:     Steven A. Silvers
       Laurence Hefter

/245615.1

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

     Re:   Silvers/Stelor License Agreement

Dear Mr. Esrig:

     As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

     Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

     Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

     Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2


Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Yano A. Rubinstein
      William Borchard

/248587.1

# EXHIBIT "J"

04/29/2005  15:45    3058585261              BURLINGTON WEIL                          PAGE  02

**BURLINGTON · WEIL · SCHWIEP · KAPLAN ⟨&⟩ BLONSKY, P.A.**

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: DBLONSKY@BWSKB.COM   WWW.BWSKB.COM

April 29, 2005

## VIA FACSIMILE AND U.S. MAIL

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

     Re:    <u>Silvers/Stelor</u>

Dear Gail:

     I write in response to your letter dated April 27, 2005 to Steven Esrig of Stelor Productions purporting to terminate the License Agreement. It is the position of Stelor that the License Agreement and the Settlement Agreement remain enforceable and binding documents and that the purported grounds for termination are all invalid and improper. We will respond to each of those grounds in turn.

     First, Stelor has only recently converted to an LLC and Mr. Silvers has been provided an option letter for unit interests, to which he has not responded.

     Second, monthly installments on royalty advancements have been paid. Indeed, enclosed are copies of royalty advancement checks for April and May that we are prepared to release upon withdrawal of the notice of termination.

     Third, monthly advances on royalties to maintain insurance coverage have also been paid. Enclosed are checks for April and May that we are prepared to release upon withdrawal of the notice of termination. It must be noted, however, that, despite demand, Mr. Silvers has never confirmed the amount of insurance to be paid. As a show of good faith, Stelor has nonetheless paid the maximum each month, but such confirmation must be provided forthwith.

     Fourth, Stelor has cooperated in the audit of the books and records. In fact, just a week ago, on April 22, 2005, you sent an email to Kevin Kaplan stating that "[t]he auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." We have received no such letter. Whenever Stelor receives such a letter, it will cooperate.

     Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn and it is understood that the agreements remain in place.

Gail A. McQuilkin, Esq.
April 29, 2005
Page 2

Finally, no royalties are owed to your client and the advances paid far exceed royalties that have been accumulated. A royalty statement is enclosed reflecting full payment of any amounts due. To the extent that there are any concerns, they can be raised with us. However, there is simply no basis for termination. Instead, the continuing failure of Mr. Silvers to meet his obligations under paragraph 2 of the Settlement Agreement, which has been the subject of prior correspondence, is a breach that he needs to be cured immediately.

Mr. Silvers is obliged to honor the License Agreement and the Settlement Agreement. We hereby demand receipt of written notice by Noon on Monday, May 2, 2005 that the notice of termination has been withdrawn and that Mr. Silvers agrees to abide by his contractual agreements. We also demand written assurance that Mr. Silvers will make no efforts to interfere in any manner with the business of Stelor. Furthermore, Mr. Silvers needs to agree to the submission to the federal court of a consent decree confirming the enforceability of the agreements and the rights that have been conveyed to Stelor. Failing receipt of such notice and assurances, Stelor will initiate an action seeking to enforce the agreements through declaratory and injunctive relief.

All rights and remedies are reserved. Govern yourselves accordingly.

Sincerely,

Daniel Blonsky

DFB:gr
Enclosures
cc: Client (w/ encls.)
    Kevin C. Kaplan, Esq. (w/ encls.)

BURLINGTON WEIL

PAGE 04

**2751**

04/29/2005  15:45      3058585261

## STELOR PRODUCTIONS, INC.
PO BOX 8000
GAITHERSBURG, MD 20885

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

TO THE
DER OF    Silvers Entertainment Group                                     $ **5,000.00

Five Thousand and 00/100************************************************************      DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MO    Advance Against Royalty April 05

⑆002751⑆ ⑆052002166⑆    ⑆17597405⑆

---

LOR PRODUCTIONS, INC.                                                    04/28/05    2751
    Silvers Entertainment Group                                            5,000.00
04/28/05                          Bill #roymay

5,000.00

Citibank Checkin  Advance Against Royalty April 05



04/29/2005  15:45    3058585261     BURLINGTON WEIL           PAGE  05

2752

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

TO THE
ORDER OF:   Silvers Entertainment Group               $ **5,000.00

Five Thousand and 00/100***************************************************************

DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

VID   Advance Against Royalty May 05

⑈002752⑈ ⑆052002166⑆   ⑈1759740⑈

---

LOR PRODUCTIONS, INC.
   Silvers Entertainment Group                    04/28/05         2752
04/28/05                  Bill #royapril                           5,000.00

Citibank Checkin  Advance Against Royalty May 05                  5,000.00



04/29/2005  15:45    3058585261    BURLINGTON WEIL    PAGE  06

2753

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20038-0967
7-216-520

04/28/05

TO THE
ER OF    Silvers Entertainment Group    $ **1,000.00

One Thousand and 00/100********************************************************    DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MD    Royalty/insurance advance, Apr '05

⑈002753⑈ ⑆052002166⑈    ⑈175974051⑈

.OR PRODUCTIONS, INC.
Silvers Entertainment Group                    04/28/05    2753
04/28/05                    Bill #052005                    1,000.00

Citibank Checkin  Royalty/insurance advance, Apr '05                    1,000.00



04/29/2005  15:45    3058585261                    BURLINGTON WEIL                         PAGE  07

                                                                                                   2755

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

                                          CITIBANK, F.S.B.
                                      WASHINGTON, DC 20036-2967
                                              7-216-520                            04/28/05

Y TO THE        Silvers Entertainment Group
DER OF                                                                      $ **1,000.00

One Thousand and 00/100*********************************************************    DOLLARS

    Silvers Ent. Group
    8983 Okeechobee Blvd
    PMB 203 Suite 202
    West Palm Beach, FL 33411

EMO    Royalty/insurance advance May '05

        ⑈002755⑈ ⑆052002166⑆        ⑈17597405⑈

---

LOR PRODUCTIONS, INC.
    Silvers Entertainment Group                          04/28/05              2755
    04/28/05                      Bill #042005                                1,000.00

Citibank Checkin  Royalty/insurance advance May '05                          1,000.00



PAGE  08

04/29/2005  15:45    3058585261                          BURLINGTON WEIL

### Royalty Statement
### Silvers Entertainment Group
### January 1, 2005 – March 31, 2005

| Transaction | Net Revenue | Royalty Rate | Royalty Amount | Pre-paid Royalty Balance |
|---|---|---|---|---|
| February advance against royalties | | | $5,000 | $5,000 |
| February advance against royalties for insurance premiums | | | $1,000 | $6,000 |
| Net revenue from licensed properties (iTunes) | $47.35 | 6% | $2.84 | $5,997.16 |
| Net revenue from derivative properties (iTunes) | $1.47 | 3% | $0.04 | $5,997.12 |
| March advance against royalties | | | $5,000 | $10,997.12 |
| March advance against royalties for insurance premiums | | | $1,000 | $11,997.12 |

# EXHIBIT "K"

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

CSR TF STELO-1 | DATE (MM/DD/YYYY) 04/28/05

**PRODUCER**
PJ Insurance Exchange, Inc.
75_ Rockville Pike, #1A
Rockville MD 20852
Phone: 301-279-5500  Fax: 301-424-2829

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**INSURERS AFFORDING COVERAGE** | NAIC #

**INSURED**
Stelor Productions
Greg Langsford
14701 Mockingbird Drive
Darnestown MD 20874

INSURER A: Hartford Fire Insurance Co.
INSURER B:
INSURER C:
INSURER D:
INSURER E:

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| LTR | INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | GENERAL LIABILITY [X] COMMERCIAL GENERAL LIABILITY [ ] CLAIMS MADE [X] OCCUR | 42SBABW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $300000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [X] PROJECT [ ] LOC | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | | AUTOMOBILE LIABILITY [ ] ANY AUTO [ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [X] HIRED AUTOS [X] NON-OWNED AUTOS | 42SBABW8494 | 04/25/05 | 04/25/06 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ $ |
| A | | EXCESS/UMBRELLA LIABILITY [ ] OCCUR [ ] CLAIMS MADE [ ] DEDUCTIBLE [X] RETENTION $10,000 | 42SBABW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS / OTHER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | OTHER | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Certificate holder is additional insured as respects operations by the insured.

**CERTIFICATE HOLDER**
STESTEV

Steven A. Silvers
PMB 203
8983 Okeechobee Blvd., Ste 202

**CANCELLATION**
SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 10 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.
AUTHORIZED REPRESENTATIVE