UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

CASE NO. 05-80393-CIV-HURLEY
Magistrate Hopkins

## SILVERS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The preliminary injunction motion filed by Stelor Productions, LLC ("Stelor") is fatally flawed as a matter of law and should be denied. As a threshold matter, the Court lacks subject matter jurisdiction to hear this case, because the amount in controversy, as defined in the License Agreement, is below the $75,000 benchmark for diversity jurisdiction. And, Stelor has failed to specifically allege the citizenship of its members, a requirement for determining diversity in cases brought by limited liability companies. Stelor's complaint, in fact, raises questions as to whether the Plaintiff even has standing in this dispute.

Further, Stelor is not entitled to injunctive relief as a matter of law because, rather than seeking to maintain the status quo, Stelor seeks to compel specific performance of a terminated contract. Under the cases, injunctive relief is not available; Stelor's only remedy based on a terminated contract is for damages. Finally, Stelor cannot possibly meet the heightened burden of obtaining a mandatory injunction - - compelling specific performance - - because it cannot

demonstrate a likelihood of success on the merits in light of its litany of breaches and failure to perform its obligations under the very agreements it seeks to revive and enforce.

## BACKGROUND

Steven A. Silvers ("Silvers") created and owns a spectrum of intellectual property consisting of unique alien characters, story lines, graphic images and music based on his original book "Googles and the Planet of Goo" and corresponding trademarks, domain names, copyrights and patents (collectively "Googles IP").[1] For many years, Silvers has used the Googles IP to market and promote a variety of products and services directed to children and children's education, using the Googles characters' adventures on earth to illustrate and develop life lessons for the younger set. Silvers' approach is exemplified by the Googles.com slogan: "Teaching children of today, visions of tomorrow."

In May, 2002, after Silvers' then licensee had unrelated problems, Silvers granted a license to use the Googles IP to Stelor. Stelor is a mere licensor, and may only use the Googles IP subject to its compliance with the License, Distribution and Manufacturing Agreement dated June 1, 2002 (Exhibit "A"). Silvers and Stelor also entered into a Letter Agreement dated June 1, 2002, whereby Silvers provided consulting services to Stelor in return for compensation by Stelor (Exhibit "B").

### Stelor's Breaches and Termination

Despite claiming to invest vast sums and enormous energy into developing and exploiting the Googles IP (which cannot be substantiated without an audit), Stelor has paid little attention to its obligations under the License Agreement. Specifically, Stelor failed to pay royalties or provide proper royalty statements, failed to allow an audit, failed to properly register and protect various

---

[1] The facts cited here are drawn from the Declaration of Steven A. Silvers, filed concurrently.

2

elements of the Googles IP, failed to obtain insurance, failed to provide samples of goods and services merchandised under the Googles IP ("Licensed Product"),failed to maintain quality control over Licensed Products, and failed to provide lists of sublicenses. Silvers discovered Stelor had registered his trademarks in Stelor's name and claimed copyrights in his works, allowed domain name registrations to lapse, and failed to oppose applications for similar marks. The list of Stelor's shortcomings goes on and on.

Stelor, consistent with its disregard of the License Agreement, also breached the Letter Agreement by failing to compensate Silvers. Per its terms, Stelor's breaches of the compensation provisions of the Letter Agreement are grounds to terminate the License Agreement. (Exhibit "B, ¶C).

Fed up, Silvers retained counsel to persuade Stelor to meet its obligations. When Stelor refused, Silvers provided notice of default on November 12, 2004, initiating a 60 day cure period. Stelor's failure to cure led to Silvers' termination of the License Agreement on January 13, 2005. Throughout this process, Silvers went by the book and in accordance with the terms of the License Agreement, providing the requisite notice and cure period.

As the termination issue came to a head, Stelor filed suit to preempt it (why Stelor insists on filing lawsuits instead of simply complying with the agreements remains a mystery). The Stelor suit ("Stelor I") primarily sought to prevent Silvers from having discussions with Googles Inc., the target of numerous proceedings initiated by Stelor with the United States Patent and Trademark Office and the National Arbitration Forum, a forum for resolving domain name disputes.[2]

---

[2]While Silvers had not had discussions with Google Inc., he could have. Silvers owns the Googles IP, and can freely sell or assign it should he choose to do so. Stelor is a mere licensee with no ownership rights. *See* Exhibit "A," Recitals, and ¶¶VIII(B), (C) and (D). Conceptually,

3

While Stelor I was pending, the parties tried to resolve the issues between them. They reached a settlement[3], whereby Stelor promised (once again) to cure its breaches under the License Agreement and the Letter Agreement, and agreed to additional obligations. Silvers, in return for Stelor advancing a small amount of royalties, withdrew his termination, and agreed to certain protocols for administering the trademarks and domain names. Silvers did not, in entering into the Settlement Agreement, assume any obligations not already set forth in the License Agreement. And he did not withdraw his notice of default that underpinned the termination. The threat of termination still loomed, in that now Stelor was also required to comply with the Settlement Agreement to avoid termination. (*See* Settlement Agreement, Recitals, and numerous references to "as long as the [License Agreement] is in effect").

Despite the settlement and Stelor's renewed promises, Stelor still disregarded its obligations. As of April 27, 2005, three (3) months after the settlement, Stelor had refused to schedule an audit, failed to pay royalties, provide certified and conforming royalty statements, provide samples, obtain insurance, correct improper legal notices or compensate Silvers under the Letter Agreement. Stelor had also breached new obligations it assumed under the Settlement Agreement by paying some advance royalties late, not paying others at all, and not providing copies of U.S.P.T.O. proceedings.

Stelor's refusal to provide a date for the audit was the last straw. Silvers has requested a date for the audit no less than seven times since November, 2004. (Silvers Decl., Exhibit "F"). Yet, while appearing to be cooperative, Stelor just would not provide a date. Thus, on April 27, 2005, Silvers terminated Stelor again. For good.

---

Stelor is a tenant in a building and has (had) the right to use space, but Silvers owns the building.

[3]This has been filed under seal as an exhibit to the complaint.

4

The License Agreement addresses the possibility of termination and contains safeguards to prevent termination based on technical breaches. A significant protection for Stelor is the post-termination provision, Exhibit "A," ¶X, allowing Stelor six (6) months to use the Googles IP to merchandise its existing inventory of Licensed Product. Thus, Stelor can recoup its investment if it is diligent in marketing the Licensed Product during the post-termination period.

## THE PRELIMINARY INJUNCTION ISSUES AND APPLICABLE STANDARDS

Stelor's motion glosses over the most significant fact underlying this dispute - - Silvers has terminated the License Agreement. Silvers is admittedly not complying with the License Agreement because he is no longer bound by it. This is not about Silvers' breach of contract. Stelor's request to compel Silvers to perform his obligations under a terminated agreement, via injunctive relief, necessarily involves nullifying the termination and reinstating the agreement. Obviously, the court cannot "enforce the terms of the License Agreement" as Stelor requests (Motion at p. 14), if the agreement is inoperative.

The central issue, therefore, is whether the Court should void Silvers' termination and reinstate the License Agreement. To do this, the Court would have to change the status quo, rather than preserve it. Stelor in essence seeks to revive the agreement and have the Court compel Silvers to comply with it. This would be a mandatory injunction because it seeks specific performance.[4] A related issue therefore is whether Stelor can meet the heightened burden required to obtain specific performance by way of injunctive relief.

---

[4]See Stelor's proposed order, which seeks to compel Silvers to "act in compliance with the terms of the License Agreement" and take a variety of affirmative actions, including to "restore" Stelor's ability to administer Silvers' domain names.

5

## Injunctive Relief is Unavailable

It is hornbook law that, once a contract has ended, the remedy of a mandatory injunction compelling specific performance is unavailable.

> . . . [A]s the contract provides, the agreement of the parties has been terminated. The remedy of specific performance necessarily is based upon the theory that there is a contract extant which a court decree may direct to be performed. When, as in this case, the parties have stated in clear language that upon the happening of a certain event their contract is to be deemed cancelled and thereafter the event which they had in mind occurs, any claim for specific performance is inconsistent with the cancellation provisions of the contract.

*Dillard Homes v. Carroll*, 152 So.2d 738, 740 (3d DCA 1963). *See also, Collins v. Pic-Town Water Works, Inc.*, 166 So.2d 760, 762 (2d DCA 1964) ("Thus the contract was terminated and was no longer enforceable by injunction or specific performance.")

Preliminary injunctive relief is an extraordinary remedy. It is unavailable based on a terminated contract. Stelor's sole available remedy is for money damages. For example, in *Jacksonville Elec. Auth. v. Beemik Bldrs. & Const., Inc.*, 487 So.2d 372 (1ˢᵗ DCA 1986), the defendant terminated a construction contract, and the contractor sought an injunction; the court found that, in light of the terminated contract, the contractor's sole remedy consisted of damages, and that irreparable harm could not exist. Similarly, in *Airlines Reporting Corp. v. Incentive Int'l Travel, Inc.*, 566 So.2d 1377, 1379 (5ᵗʰ DCA 1990) the court vacated an injunction based on a terminated contract and remanded to determine whether the plaintiff's sole remedy - - money damages - - was available.

Once an agreement has expired or terminated a court cannot, as a matter of law, enjoin a party to perform the agreement. *Florida Power Corp. v. Town of Belleair*, 830 So.2d 852, 854 (2d

6

DCA 2002) (trial court cannot, by injunction, extend the terms of a contract after its expiration).

Granting the relief sought by Stelor would violate this principle, by requiring Silvers to perform what

he is allegedly required to do under a terminated and inoperative agreement. Rather than maintain

the status quo, such an injunction would radically disturb the status quo, by extending the terms of

the agreement beyond its life span.

Stelor obviously disputes Silvers' termination of the License Agreement but that is an issue

for trial, not a preliminary injunction. And, an attempt to enjoin the termination - - what Stelor

actually seeks - - is equally ill suited for injunctive relief. *Shearson Lehman Hutton, Inc. v. Meyer*,

561 So.2d 1331, 1332 (5th DCA 1990) (injunctive relief not available to prevent termination of

agreement as only remedy is damages).

This rule did not descend from the clouds. When a party to a contract terminates the contract,

the courts recognize the futility of coerced performance. This very issue arises regularly in this

district, thanks to forum selection clauses used by Burger King and other franchisors. Typically, the

franchisor terminates the franchise, and seeks to enjoin the franchisee's post-termination use of the

previously licensed trademarks. The franchisee's inevitable attempt to use the trademarks post-

termination, based on a claim of wrongful termination, is always denied. For example, in *Burger

King Corp. v. Hall*, 770 F. Supp. 633, 638-39 (S.D. Fla. 1991) the court held the terminated

franchisee's claim for wrongful termination was redressable only by damages, not by allowing the

continued use of the franchisor's trademarks.

> While Hall does not dispute that her present use of the BKC
> Marks is without BKC's license or consent, she does contend that her
> franchise was wrongfully terminated since her alleged damage claims
> against BKC exceed the total of unpaid royalties and advertising
> contributions she refused to pay.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 · TEL. (305) 372-1800

> As a matter of law, however, a terminated franchisee's remedy for wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks. Thus, while a terminated franchisee may seek money damages for any injuries resulting from the alleged wrongful termination of its franchise, it may not continue to use the franchisor's trademarks without authority in violation of law. See Burger King Corp. v. Austin, No. 90-0784-Civ-Hoeveler (S.D. Fla. Dec. 26, 1990); Cl-Ware Rayco, Inc. v. Perlstein, 401 F. Supp. 1231, 1234 (S.D.N.Y. 1975).

*Burger King Corp. v. Hall*, 770 F. Supp. at 638. Same result in *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1003 (S.D. Fla. 1992) (terminated franchisee's remedy for wrongful termination is an action for damages and not the continued unauthorized use of its franchisor's trademarks) (citing *Burger King Corp. v. Austin*, Bus. Fran. Guide CSCH) ¶9788 (S.D. Fla. 1990). The case of *Burger King Corp. v. Agard*, 911 F. Supp. 1499 (S.D. Fla. 1995) involved an expired license under a franchise relationship, but adhered to the rule: "[O]nce a license contract is terminated, there is no doubt the ex-license has no authorization or consent to continue use of the mark. After the license has ended, the ex-licensee must stop use of the mark." *Id. at* 1503.

Here, Silvers granted Stelor the right to use the Googles IP and, after three years, has not seen a dime. He has the right to terminate the agreement based on Stelor's breaches. If he improperly terminated the agreement, he should be held accountable by paying damages (if any). But Stelor should not - - and cannot under the cases - - be to allowed to use the Googles IP post-termination. The injunctive relief requested by Stelor would have the court ignore the termination, and allow Stelor to use Silvers' trademarks (and other elements of the Googles IP) based on a wrongful termination claim. Such a result would fly in the face of the no injunction rule and the Burger King line of cases.

8

## **Heightened Standard**

Stelor's request for specific performance faces a higher standard than the typical request for injunctive relief. "A mandatory preliminary injunction requiring defendant to take affirmative action is proper only in 'rare circumstances.'" *Burgos v. University of Central Florida Board of Trustees,* 283 F. Supp. 2d 1268, 1271 (M.D. Fla. 2003) (quoting *Harris v. Witters*, 596 F.2d 678 (5th Cir. 1979).[5]

A preliminary injunction is "prohibitory" if it bars conduct that would alter the status quo before a court has an opportunity to resolve the merits of the action. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir. 1995). By contrast, a "mandatory" injunction "command[s] some positive act." *Id.* In such a case, a heightened burden of proof attaches, and the injunction may issue "'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id.*; *accord Koppell v. New York State Bd. Of Elections,* 8 F. Supp. 2d 382, 384 (S.D.N.Y.), *aff'd,* 153 F.3d 95 (2d Cir. 1998) (per curiam). As put by one court:

> The injunctive relief sought by Norcom is mandatory rather than prohibitory: it would require CIM to undertake positive action by selling machines and parts to Norcom. *See New Pacific Oversees Group (USA), Inc. v. Excal Int'l Dev. Corp.,* No. 99 Civ. 2436, 1999 WL 285493, at *4 (S.D.N.Y. May 6, 1999).

*Norcom Elec. Corp. v. CIM USA, Inc.,* 104 F. Supp. 2d 198, 207 (S.D.N.Y. 2000). *See also, Cornell v. Sachs,* 99 F. Supp. 2d 695, 704 (mandatory injunction requires clear and convincing probability of success). Stelor's request for a preliminary injunction is subject to this high hurdle because, at

---

[5] Decisions of the Fifth Circuit prior to October 1, 1981 are binding on this Court. *Bonn v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981).

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 • TEL. (305) 372-1800

bottom, it seeks to alter the status quo by reviving an inoperative agreement and compelling Silvers to act as if the agreement still applied.

In light of the heightened standard Stelor must meet, Stelor's motion must be denied.

## STELOR IS NOT LIKELY TO PREVAIL ON THE MERITS

Stelor's complaint and preliminary injunction motion are riddled with procedural deficiencies precluding relief. Equally deficient is Stelor's ability to show it can prevail on the merits given its multi-faceted breach of the License Agreement, Letter Agreement and Settlement Agreement.

### Procedural Flaws

Stelor lacks standing to bring this case and has not pled, nor can it meet the requisites for subject matter jurisdiction. Silvers' former licensee is Stelor Productions, Inc. *See* License Agreement (Exhibit "A"). Under the agreement, Stelor is precluded from assigning its rights to another entity, absent Silvers' consent. ¶XXI, License Agreement, (Exhibit "A"). Silvers has not consented to an assignment, and Plaintiff does not allege to hold the license rights by assignment from Stelor Productions, Inc. Yet, this case is brought by another entity - - Stelor Productions, LLC. It appears, therefore, the Plaintiff lacks standing to bring this action.

If Stelor Productions, LLC is the proper plaintiff, then the complaint lacks allegations sufficient to confer subject matter jurisdiction. In the 11th Circuit, a limited liability company - - like plaintiff - - is deemed a citizen of any state of which any of its members is a citizen for purposes of diversity jurisdiction. *Rolling Greens MHP, LP v. Comcast SCH Holdings, L.L.C.,* 374 F.3d 1020, 1022 (11th Cir. 2004). And, it is up to the limited liability company/party invoking diversity jurisdiction - - Stelor - - to specifically allege the citizenship of all its members. *Id.* If any member resides in Florida - - Silvers' place of citizenship - - diversity is destroyed. Stelor has failed to

10

sufficiently plead its members' citizenship to establish jurisdiction as required by *Rolling Greens*.[6]
Until Stelor properly pleads these details, the Court cannot determine whether subject matter
jurisdiction exists.

### Stelor Cannot Prevail on the Contract Claim

Under the familiar preliminary injunction standard to obtain injunctive relief a movant must
show a substantial likelihood of success on the merits of the underlying claim. Stelor concedes that,
to prevail, it must establish "the existence of a contract." Motion at p. 10. This it cannot do, because
the License Agreement is terminated. This undisputed fact alone compels the denial of injunctive
relief. And, while Stelor can state a claim for wrongful termination, (which should be resolved at
trial, not here), Stelor cannot show it is likely to prevail on the merits of that claim.

As detailed in the accompanying declarations, Stelor has repeatedly breached every
agreement between the parties, been put on notice, and failed to cure the majority - - and most
significant - - of the breaches. Silvers had ample basis to terminate.

The Non-Audit- Silvers is absolutely entitled to audit Stelor's books up to twice a year.
Exhibit "A," ¶IV. No right is more important to a licensor relying on an exclusive licensee to pay
royalties and successfully develop licensed rights. Not counting Silvers' verbal requests (ignored
by Stelor), he formally requested an audit on November 5, 2004. Since then, through the course of
the Stelor I litigation, the Settlement Agreement negotiations and to the present, Silvers has
repeatedly demanded the audit. After Stelor finally agreed to allow it, it sought to impose conditions
(identity of the accountant, the scope, etc.), but never provided a date. The audit requests (Silvers

---

[6]Stelor also cannot meet the amount in controversy requirement of $75,000, because
damages are limited by the License Agreement, ¶XIII(B) and fall below the requirement amount.

11

Decl., Exhibit "F") clearly show Silvers repeatedly requested a date. Not once did Stelor provide one. Even Stelor's belated, post-termination "cure" attempt (Silvers Decl., Exhibit "J") does not cure the problem, because it still is silent on a date. Stelor's books are at Stelor's office in Maryland; Silvers cannot conduct an audit without the green light and a date from Stelor. Stelor's refusal to provide a date, six months after the initial request, breached the License and Settlement Agreements.

Why is Stelor's failure to allow the audit a big deal, and a basis for termination? Because Silvers is not required to accept Stelor's word - - reflected in the non-royalty statements - - that no Licensed Product is being marketed. And, it is clear Stelor is not playing straight.

"Non-Merchandising" the Googles IP - Since mid 2004, Stelor has sold Googles music on Itunes, over the internet. Keva Labossiere Decl., ¶¶6-9, Exhibit "E." Internet consumers can purchase and download 30 songs and two compact discs. *Id*. The publisher is Stelor Productions. *Id*. A receipt for one of the CDs, provided to Silvers by an associate, reflects a purchase price of $12.96, with a purchase date of August 31, 2004. Silvers Decl., ¶13, Exhibit "D." This activity is not reflected on any royalty statements. Silvers Decl., Exhibit "E." Stelor has not paid a penny in royalties. Silvers Decl., ¶16. Sales of the Googles music continues on Itunes. Labossiere Decl., ¶10, Exhibit G.

This is not a technical breach by Stelor. It gives to the heart of the Licensor/Licensee relationship. Concealing sales of $100 is just as bad as covering up sales of $1,000,000. If the Googles IP takes off and grow to "Barney" level success, Silvers does not want, and should not have to work with, a sloppy or dishonest exclusive licensee. And, while it is a material breach if only a few songs and CDs were sold, it appears the Googles music has been very successful. The absolutely.net website lists one Googles song as the No. 3 seller in children's music in the

12

Netherlands; the United Kingdom lists a Googles song at No. 29 and another at No. 65. Labossiere Decl., ¶12-13, Exhibit "H." In Spain, a Googles song is listed in the top five. These songs were released on Itunes in mid 2004. *Id.*

Silvers also learned in 2004 that Stelor arranged for Licensed Product to be sold on the internet. As reflected in the Labossiere Declaration, Googles merchandise such as clothing, hats, coffee mugs, mouse pads, etc. are offered by CafePress.com. The web pages (Keva Labossiere Decl., Exhibit "A") reflect the activity began in 2002.[7] The Googles products use Silvers' characters and drawings, and are undisputedly Licensed Product. Anyone can buy this merchandise on the internet. Yet, Stelor never provided samples, reported or paid royalties.

Further troubling is Stelor's claim, on the CafePress.com store, that it holds the copyright for the Googles characters and images. Labossiere Decl., Exhibit "B." This is false; Silvers owns these copyrights and licensed them to Stelor. This is the same problem that led Silvers to provide notice and eventually terminate Stelor - - it consistently claims to own what it licenses. The CafePress.com merchandise demonstrates that Stelor has violated and continues to violate the License Agreement and Settlement Agreement.

Non-Royalty Statements - Stelor's royalty statements disclose no merchandising. Notably, Stelor is required to submit a quarterly report relating all manner of details, i.e. country of sale, description, quality, item, allowance, and discounts. Exhibit "A," ¶III(C). And Stelor must provide

---

[7]Given the expedited hearing, Silvers has not had the opportunity to take discovery providing more details about Stelor's merchandising, including the volume of sales and revenue generated. Particularly interesting would be discovery directed at Stelor's monetizing of the domain name traffic, which is substantial and highly valuable.

a report even if no "sales" occurred. *Id*. Thus, even if Stelor gave away the Licensed Product, it must report it to Silvers.[8]

Stelor breached by never complying with the royalty report provision. Silvers Decl., ¶16, and Exhibit "E." The "reports" for the period June 2002 through June 2004 were all late, incomplete and failed to conform with the License Agreement. No reports were provided for the 3rd and 4th quarters of 2004, the same period we know Stelor merchandised Licensed Product. The post-termination "cure" report is also non-conforming, and is not certified as required.

Non-Samples - Stelor has not provided Silvers with a single sample of the Licensed Products, other than two Googles music compact discs provided after the Settlement Agreement. These, of course, have been available to consumers and for purchase on the internet since 2004. Stelor's offer to provide samples, post-termination, is ineffective. It had from November 12, 2004, the date Silvers put Stelor on notice, to cure this default. Silvers has been reduced to learning how Stelor markets his Googles IP on his own, or from others in the field. Stelor's delay and continued promises (but no production) of samples violates the License and Settlement Agreements.

Non-Sublicenses - Stelor is required to identify, on a quarterly basis all parties with sublicenses for the Licensed Product. Presumably, Stelor has not allowed the Licensed Product to be merchandised on Itunes or CafePress.com without securing the necessary sublicenses.[9] And, who knows what other deals Stelor has, given the non-audit. Yet Stelor has not disclosed a single

---

[8]This, of course, would breach Stelor's obligation under the License Agreement, ¶V(B)(iii), to exploit the Licensed Goods in a commercially reasonable manner.

[9]Again, if Stelor was so lax that it allowed others to use and market the Googles IP without a sublicense, it has violated ¶¶V(B)(iii) and VI(B) of the License Agreement.

sublicense since inception. Stelor had notice since November 12, 2000 and failed to cure. This violates the License and Settlement Agreements.

Non-Protection - Stelor is obligated to protect the value and distinctiveness of the Googles IP. Exhibit "A," ¶VIII(A). Yet Stelor allowed numerous "Goo" domain names to lapse, and stood by while other parties obtained the rights. Stelor similarly failed to oppose trademark applications by others, who now have registrations for the "Googles" mark in other fields. Silvers Decl., ¶18.

Non-Insurance - Stelor is required to obtain insurance, naming Silvers as an additional insured. Exhibit "B," ¶XII and Schedule "A." The purpose of this provision, in addition to protecting Silvers individually, is to protect Silvers indirectly by creating a safety net for his exclusive licensee. Stelor has had since June, 2002 to obtain the insurance, but never did. This is a breach of the License Agreements. Stelor's attempt to "cure" by doing so after the April 27, 2004 termination is insufficient. The policy was obtained after the termination. (See Silvers Decl., Exhibit "K"). Moreover, the policy does not conform to the requirements of the License Agreement, which calls for coverage of $2 million per occurrence, not the $1 million Stelor obtained. This is par for the course; Stelor cannot or just won't get it right.

The Non-Option Agreement - Since June 2002, Stelor has been obligated to provide a written option agreement reflecting Silvers' right to purchase Stelor stock. (Exhibit "B," ¶1(b). It never has. Stelor has, like with its other obligations, made promises and promises, offered excuse after excuse. As termination loomed, Stelor again promised to provide an agreement based on its board approving it. But, Silvers does not need or want more promises or the Stelor board approval. Stelor is already obligated to provide a enforceable agreement to Silvers reflecting his options. Stelor is also required to provide its written option plan so Silvers can verify the number of options to which he is entitled.

15

This has never been provided either. Stelor's inexplicable delay and inability to provide the option agreement breached the Letter Agreement and the Settlement Agreement.

Stelor's post-termination attempt to cure (Silvers Decl., Exhibit "J") cured nothing. No agreement is forthcoming- - just another excuse (the "recent" conversion to a LLC). In fact, Stelor formed its LLC in 2002, and converted to the LLC months ago, according to the Delaware Secretary of State. (Exhibit "C"). Stelor had had three years to comply with this requirement. The Letter Agreement, which created the obligation, has already expired by its terms. Silvers is through waiting.

Non-Payment of Health Insurance - Silvers was obligated under the Letter Agreement to pay for Silvers' health insurance premiums. This is a particularly important term, as Silvers has a serious medical condition. During the term of the Letter Agreement, Stelor failed to pay Silvers' premiums. (Silvers Decl., ¶10). In the settlement, Stelor agreed to make this up, and pay an advance royalty of $1,000 per month toward Silvers' premiums starting on February 1, 2005.

Stelor paid the past due amounts, although it did so past the date required by the Settlement Agreement. But this "cure" immediately turned into another default when Stelor was late with payments due under the settlement, and finally failed to make one altogether. (Silvers Decl., ¶23). Thus, Stelor again breached the Letter Agreement and Settlement Agreement.

### Silvers' Termination of Stelor is Justified

Silver's right to terminate Stelor is grounded in the parties' agreements. The Letter Agreement expressly provides that Stelor's failure to provide an option agreement or pay health insurance premiums gives Silvers that right. Exhibit "B," ¶¶1(b) and 1(c). Similarly, the License Agreement, Exhibit "A," ¶1X(A), gives Silvers the right to terminate if Stelor breaches a material

16

provision. Surely, Stelor's failure to account to Silvers for merchandising of Licensed Products, non-conforming royalty statements, failure to provide samples, failure to identify sublicenses, failure to schedule an audit, etc. are material breaches. And, if Stelor really is allowing others to merchandise the Licensed Goods without generating income for Silvers, Stelor is breaching material provisions of the License Agreement, Exhibit "A," ¶V(B)(iii), requiring it to use commercially reasonable efforts to market the Licensed Goods, and ¶VI(B) requiring quality control.

## CONCLUSION

A license agreement creates a unique relationship. The licensor giveth, and the licensor can take away under proper circumstances. Silvers' termination was proper under the circumstance here. Even if Silvers is ultimately judged to have improperly terminated the agreement which is unlikely, injunctive relief is not available for Stelor to reinstate the License Agreement and compel Silvers to act under its terms.

Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.     KOZYAK TROPIN & THROCKMORTON, P.A.
Co-Counsel for Defendant             Counsel for Defendant
200 S.E. First Street, Suite 708     2525 Ponce de Leon, 9th Floor
Miami, FL 33131                      Coral Gables, Florida 33134
Telephone: (305) 374-1920            Telephone: (305) 372-1800
Adam T. Rabin, Esq.

By: _____
    Kenneth R. Hartmann
    Florida Bar No: 664286
    Gail M. McQuilkin
    Florida Bar No. 969338

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was hand-delivered this 20th day of May, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq., Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove, Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

By: _____

Kenneth R. Hartmann

3339/101/253141.1

18

# EXHIBIT "A"



# Exhibit A

## LICENSE, DISTRIBUTION
## AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (**LICENSOR**), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (**LICENSEE**), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

### WITNESSETH

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

**WHEREAS, LICENSOR** has the power and authority to grant to **LICENSEE** the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

**WHEREAS, LICENSEE** has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

**WHEREAS, LICENSEE** desires to obtain from **LICENSOR** an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

**WHEREAS, LICENSEE** has agreed, pursuant to a letter agreement, to act as a consultant for **LICENSOR**; and

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

### 1. LICENSE GRANT

A.    LICENSOR hereby grants to **LICENSEE**, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to **LICENSOR**), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

**EXHIBIT**

B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.    LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.    INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV.    FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

E.        All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to **LICENSEE** under this or any other agreement between the parties.

F.        Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.        **LICENSOR** shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, **LICENSEE's** books and records and all other documents and material in the possession of or under the control of **LICENSEE** with respect to the subject matter of this Agreement at the place or places where such records are normally retained by **LICENSEE**.

B.        In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed **LICENSOR** from what was actually paid, **LICENSEE** shall have the opportunity to conduct its own audit.  If **LICENSEE** agrees to the amount, if any, of any discrepancy, **LICENSEE** shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month.  Upon settlement of any underpayment discrepancy, no further audit by **LICENSOR** shall be requested that year.  That period end date shall represent the new period start date for future audits for underpayment discrepancies.  In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), **LICENSEE** shall also reimburse **LICENSOR** for the cost of auditing fees in connection therewith.

C.        All books and records relative to **LICENSEE's** obligations hereunder shall be maintained and kept accessible and available to **LICENSOR** for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.        In the event that an investigation of **LICENSEE's** books and records is made, certain confidential and proprietary business information of **LICENSEE** may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by **LICENSEE** and shall not be used by **LICENSOR** or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of **LICENSEE** unless required by law, except **LICENSOR** may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of **LICENSEE**. It is understood and agreed, however, that such information may be used by **LICENSOR** in any proceeding based on **LICENSEE's** failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.        **LICENSOR** represents and warrants that:

(i)        the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of **LICENSOR** and this Agreement is a valid and binding obligation of **LICENSOR**, enforceable in accordance with its terms;

(ii)        the execution, delivery and performance by **LICENSOR** of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which **LICENSOR** is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on **LICENSOR**;

(iii)        **LICENSOR** owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the **LICENSOR** to the **LICENSEE** as contemplated herein.

      (iv)     the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

      (v)     except as set forth in Schedule B attached hereto, **LICENSOR** has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

      B.  **LICENSEE** represents and warrants that:

      (i)     the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of **LICENSEE** and this Agreement is a valid and binding obligation of **LICENSEE**, enforceable in accordance with its terms;

      (ii)     the execution, delivery and performance by **LICENSEE** of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which **LICENSEE** is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on **LICENSEE**; and

      (iii)     it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

      C.    <u>Disclaimer of Warranties</u>. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

      D.    **LICENSEE** shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

      A.    The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

      B.    The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by **LICENSEE** and in conformity with a standard sample provided by **LICENSEE**.

      C.    Prior to the commencement of manufacture and sale of the Licensed Products, **LICENSEE** shall submit to **LICENSOR for his input**, at no cost to **LICENSOR,** a reasonable number of samples of all Licensed Products which **LICENSEE** intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

      A.    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

      B.    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.



## VIII. INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A.    **Right to Terminate on Notice.** This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B. **LICENSEE** shall have the right to terminate this Agreement at any time on thirty (30) days written notice to **LICENSOR**. In such event, all moneys paid to **LICENSOR** shall be deemed non-refundable and **LICENSEE**'s obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to **LICENSOR** are less than one hundred thousand dollars ($100,000.00), **LICENSOR** has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, **LICENSEE** shall provide **LICENSOR** with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, **LICENSEE** shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. **LICENSEE** shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as **LICENSEE** is actively selling its inventory of articles and products. At the conclusion of **LICENSEE'S** efforts in this regard, **LICENSEE** agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the **LICENSEE** is still handling the articles and products of **LICENSOR**.

C. Upon the expiration or termination of this Agreement, all of the license rights of **LICENSEE** under this Agreement shall forthwith terminate and immediately revert to **LICENSOR** and **LICENSEE**, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to **LICENSOR**.

D. Upon termination of this Agreement for any reason whatsoever, **LICENSEE** agrees to immediately return to **LICENSOR** all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, **LICENSEE** shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A. **LICENSEE** agrees to indemnify and hold harmless **LICENSOR**, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against **LICENSOR** based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by **LICENSEE** in accordance with the terms of this Agreement.

## XVI.  JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII.  AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII.  WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX.  SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX.  NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI.  ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of **LICENSEE** and/or with the consent of **LICENSOR**, which shall not be unreasonably withheld or delayed. By way of example and not limitation, **LICENSEE** may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII.  INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII.  RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and    executed    between    the    above    mentioned    parties

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                          STELOR PRODUCTIONS, INC.

Steven A. Silvers                          By: _____
Title: Owner/LICENSOR                      Printed Name: _Steven A. Esrib_
Dated: _5/08/02_                           Title: _President_
                                           Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02



## "SCHEDULE A"

## LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement:  A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

## LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

## LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

## DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

## TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

## TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term.  This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

same terms and conditions provided for herein, unless **LICENSOR** provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

**LICENSEE** shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*Succession*
*Rights of Survivor*

5/9/02

*In the event of the Death of Licensor all of the Licensor's rights under this agreement shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.*

*Steven A. Silvers*
5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

# EXHIBIT "B"

# Exhibit B

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    <u>Engagement of Consultant.</u>

a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    <u>Relationship of Parties.</u> The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

**EXHIBIT**

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    Duties of Consultant.    Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and/or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    Duties of Company.

a.    Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.    Term and Termination.

a.    Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.    Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.    Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.    Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.    Proprietary Information; Proprietary Rights.

a.    In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

b.     The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.     The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.     <u>Limitations of Liability</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.     <u>Miscellaneous</u>.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS      Date 5/09/02

Stelor Productions, Inc.

By
Name: Steven A Esra      Date 5/9/02      Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

# EXHIBIT "C"

Division of Corporations - Online Services



# State of Delaware
## The Official Website for the First State



| Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites |

| State Directory | Help | Search Delaware | | | Citizen Services | Business Services | Visitor Info |

**Department of State: Division of Corporations**

| HOME | Frequently Asked Questions   View Search Results |
| **About Agency** | |
| Secretary's Letter | |
| Newsroom | |
| Frequent Questions | |
| Related Links | |
| Contact Us | |
| Office Location | |

**Entity Details**

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status

**THIS IS NOT A STATEMENT OF GOOD STANDING**

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

|  | | Incorporation Date / | |
| File Number: | **3495292** | Formation Date: | **02/25/2002** (mm/dd/yyyy) |
| Entity Name: | **STELOR PRODUCTIONS, LLC** | | |
| Entity Kind: | **LIMITED LIABILITY COMPANY (LLC)** | Entity Type: | **GENERAL** |
| Residency: | **DOMESTIC** | State: | **DE** |

**REGISTERED AGENT INFORMATION**

| Name: | **CORPORATION SERVICE COMPANY** | | |
| Address: | **2711 CENTERVILLE ROAD SUITE 400** | | |
| City: | **WILMINGTON** | County: | **NEW CASTLE** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **(302)636-5401** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ⃝ Status ⃝ Status,Tax & History Information   Submit

Back to Entity Search

To contact a Delaware Online Agent click here.

site map | about this site | contact us | translate | delaware.gov

MAR-15-2005 10:05 FROM:WEST&FE...BERG,PC    301-951-1525    TO:3( /98 9000    P.002

**STATE OF DELAWARE
CERTIFICATE OF CONVERSION
FROM A CORPORATION
TO A LIMITED LIABILITY COMPANY
PURSUANT TO SECTION 266
OF THE DELAWARE GENERAL
CORPORATION LAW**

**(STELOR PRODUCTIONS INC.
TO
STELOR PRODUCTIONS, LLC)**

1. The name of the corporation immediately prior to filing this Certificate is Stelor Productions Inc.

2. The date the Certificate of Incorporation was filed on is February 25, 2002.

3. The original name of the corporation as set forth in the Certificate of Incorporation is Stelor Productions, Inc.

4. The name of the limited liability company as set forth in the formation is Stelor Productions, LLC.

5. The conversion has been approved in accordance with the provisions of Section 266.

6. The conversion shall be effective as of 11:59 p.m. on <u>March 14</u>, 2005.

IN WITNESS WHEREOF, the undersigned officer of Stelor Productions Inc. has signed this Certificate on this 7<u>th</u> day of <u>March</u>, 2005.

Stelor Productions Inc.

By: _____
Steven A. Esrig, President and
Chief Executive Officer

Steven A. Esrig

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:19 PM 03/14/2005
FILED 02:19 PM 03/14/2005
SRV 050210946 - 3495292 FILE