UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80393 CIV HURLEY/HOPKINS

STELOR PRODUCTIONS, L.L.C., a
Delaware limited liability company,
f/k/a STELOR PRODUCTIONS, INC.,

         Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

         Defendant.

_____/

### DECLARATION OF STEVEN A. ESRIG

I, Steven A. Esrig, hereby declare as follows:

1.      I am the President and CEO of Stelor Productions, L.L.C. ("Stelor"). I have been employed by Stelor since its inception, and I have held my current position for more than two years. The facts stated herein are based upon my own personal knowledge and/or on corporate records and documents maintained by Stelor in the ordinary course of business.

2.      Pursuant to the License, Distribution and Manufacturing Agreement ("License Agreement") dated June 1, 2002 between the parties, Stelor has an exclusive license in all of the intellectual property associated with the GOOGLES characters. *See* License Agreement, Verified Complaint ("Cmpl.") Ex. A, at 1 & Schedule A. The term of the License is 30 years, with an option for 10 additional years.

3.      Stelor's exclusive license under the License Agreement specifically extends to websites and domain names including: GOOGLES.COM.

Dockets.Justia.com

**STELOR'S LAUNCH**

4.    Pursuant to the License Agreement, Plaintiff has developed a proprietary, child-safe website – www.googles.com.  Already, the googles.com website has been enjoying tens of thousands of hits each day, and there are more than 600,000 registered users.

5.    The website was originally developed by Silvers in 1997, and has been in operation for nearly eight years.  I began working on the development of the project in 2001 as a consultant, and have been involved ever since.  Stelor has continued to develop the property and to run the website since its formation and execution of the License Agreement in 2002.  In addition to devoting all of my waking hours to the Project, and the continued work of Stelor's staff, more than $4 million dollars has been invested by Stelor in the Project's development.

6.    As the culmination of these efforts, Stelor is set to launch in four weeks a major development in the website and its products.  Stelor's entire business hinges on the success of the upcoming launch.  This is the culmination of the more than $4 million dollars and four years of development efforts in which Stelor has invested.  All of Stelor's resources have been committed to the launch, and unless the launch proceeds, Stelor's business will likely be destroyed.  We are out of business if the website is not immediately reactivated.

7.    The launch is of a new interactive feature for the website, called Gootopia.  The key aspect of the website is Stelor's successful development of a proprietary security system for the Internet.  If children are going to interact with each other and the world, it has to be in an environment that is safe.  It has to be virtually impenetrable and yet accessible (to children).  Stelor programmers have successfully created a proprietary way of doing this and it is to be the center piece of the upcoming launch of the new interactive feature, called Gootopia, on its existing website.

8.      All of Stelor's products are designed for use on this website.  The format will allow maximum contact between children and the characters.  Web casts, broadcasts, live shows, and narrow casts have been created to reach children worldwide.  Show formats involve interactivities like huge web based scavenger hunts, multi-person gaming, and free advice from renowned experts for kids.  The site will take them to hundreds of other safe locations approved by their guardians.  The site also features safe chat, email, and original music.

9.      Although Gootopia is a new development, the critical component of the launch is the existing site--googles.com.  Stelor's exclusive access to that site is the heart of its business and the License Agreement.  Given the thousands of daily hits on our googles.com site, the fundamental concept is to build from the success of the existing website, inviting its regular visitors to try the new, safe features of Gootopia.  Stelor's launch cannot successfully proceed without the foundation of the googles.com website, the ongoing traffic that site enjoys, and the more than 600,000 registered users to date.

10.      Stelor's efforts to promote this launch have reached a critical point.  In addition to the millions of dollars and years of development already invested, Stelor has recently spent almost $200,000 in one vital pre-launch activity alone.  Stelor is a Platinum Exhibitor with the Licensing Show in New York City, June 21-24, 2005.  Stelor's immediate neighbors include: Disney, Nickelodeon, and DreamWorks Entertainment.  Hours have gone into the preparation of the booth (design panels included) and 14 people have been trained to interact with the thousands of industry leaders attending.  Live Google Characters will be in the parade and attending the show.  Stelor has engaged a number of the top PR firms in the US to maximize our exposure.  And one of the most recognized IP representatives has been engaged to bring us in touch with only the top licensees.

## THE IRREPARABLE HARM SILVERS HAS CAUSED

11.     Silvers' conduct following commencement of this action, however, has brought the development of Stelor's business to a screeching halt.  Incredibly, Silvers shut down the googles.com website.  He has redirected the site and taken Plaintiff's proprietary intellectual property.  Stelor no longer has access to our site, and our site is no longer in operation.

12.     Silvers has redirected our website to point to a meaningless advertising page. When a user goes to the website now, a screen appears stating "Coming Soon!" followed by a block of unrelated advertising.  A true and correct copy of the page is attached as Exhibit "A" hereto.

13.     The number of hits on the website has dropped to zero!  The over 600,000 people who had successfully registered are no longer available.  The 1,800 new names Stelor had gathered from an initial Gootopia Tour Demo (in just 8 days) are gone as well.  We are unable to even tell them where we have gone, as we always emphasize the Googles not Stelor Productions on the site.  Stelor simply cannot proceed with its launch without access to this website.

14.     Silvers' extreme, wrongful actions threaten the very viability of Stelor's business. Silvers has essentially put Stelor out of business.  Without our website content, Stelor cannot display its product and meet with potential licensees.  We cannot demonstrate our product to our users and their customers.  We cannot launch and protect pending expansions to our brand. Advertisements that have been placed promoting the website for an upcoming trade show have been rendered useless and, as a result, Stelor's reputation has been damaged and it has lost industry goodwill.  Moreover, its ability to prepare and submit materials for that trade show has been compromised.  Yesterday, Stelor was actively advancing the business on all fronts.  Today, we can do nothing.

15.     Furthermore, Stelor developed the content and exclusively operated the website devoted to the "Googles" characters, offering a variety of services and features geared to delighting children and their parents.  The website is the public's window into the Googles' world.  Being able to operate and modify this website is among Stelor's most important priorities.  Yesterday, the website was filled with intellectual property and content created by Stelor.  Today, as a result of Silvers' dishonesty and maliciousness, the intellectual property has been taken from Stelor's control and the website has been destroyed, replaced with a message created by Silvers, presumably.

16.     Unless Stelor immediately regains access to the website and can proceed with its launch without further interference, its business will likely be destroyed and it will suffer indeterminate and immeasurable losses.  Besides destroying our existing business, the unique opportunity available to Stelor just weeks ago will be entirely lost, along with the incalculable business that would have flowed from that opportunity.

17.     In short, Stelor has invested all of its available resources into this effort and the approaching launch.  It lacks the financial ability to stay afloat unless the launch proceeds now.  Absent immediate action, Stelor's entire investment of over $4 million and the incalculable revenues from the launch will be lost.

18.     Nor is there any conceivable reason for Mr. Silvers' actions, other than his apparent desire to pursue a lawsuit against Google, Inc. himself.  Google, Inc. is attempting to move into the children's market, infringing the rights of the senior googles.com mark and domain name.  Pursuant to the Settlement Agreement and License Agreement, the exclusive right to bring an infringement action against Google, Inc. belongs to Stelor, although Silvers is obligated to cooperate and would enjoy a handsome percentage of any recovery.  License

Agreement ¶ VIII(A); Settlement Agreement ¶¶ 2, 18 & 19.  Paragraph 18 of the Settlement Agreement, moreover, specifically authorizes and requires injunctive relief, should either party attempt independently to proceed against Google, Inc.  Incredibly, that is exactly what Silvers has done, filing his own lawsuit against Google, Inc. just days after his unlawful termination of Stelor's license. The Google, Inc. action is pending in this district under Case No. 05-80387-CIV-RYSKAMP/VITUNAC.

19.    Silvers is fully aware of Stelor's launch, and has continued to express his approval of Stelor's project.  On April 12, 2005 – just days before Mr. Silvers' purported termination letter – his counsel advised that Silvers "really is very happy with the project and excited about the launch and upcoming show.  He knows the success of the project is the result of the work and investment made by everyone over there."  Email from Gail McQuilkin, attached hereto as Ex. "B".  In fact, if Stelor's launch is successful, Silvers stands to benefit substantially based on his continuing financial interest in the business.

20.    Importantly, Silvers also understands the irreparable harm he can cause by purporting to terminate the Agreements and seize the related property before the Court can decide the issues.  Indeed, Silvers previously wrote "to assure Stelor, with the exception of a material breach by Stelor *and ruled as such by a court of competent jurisdiction (as required by our existing agreements* at which time all rights shall revert back to me . . . , that at such time *and only at such time* shall I then determine what would be in the best interest of my Intellectual Property . . . . This shall once and for all alleviate any fear or concern by [Stelor] that I would do something to intentionally harm 'my dream'."  A true and correct copy of Silvers' November 5, 2003 Official Notice is attached hereto as Exhibit "C" (emphasis added); the quoted section is on page 4, and is marked in the margin.

21.    Silvers, however, has intentionally set out to cause the very harm he promised he would never cause.

### SILVERS NEVER PROVIDED THE REQUIRED NOTICE OF TERMINATION OR OPPORTUNITY TO CURE UNDER THE LICENSE AGREEMENT

22.    As this Court is aware, the parties have a history of disputes regarding the License Agreement, which required Stelor to file a prior lawsuit before this Court on or about October 18, 2004.  While that lawsuit was pending, Defendant Silvers purported to terminate the License Agreement by letter dated January 13, 2005.  Cmpl. Ex. C.  Importantly, at the time, Defendant Silvers himself recognized that, under the License Agreement, he was required to provide 60 days notice of termination and an opportunity to cure, before termination could become effective.  The parties' rights and the procedural requirements for termination are specifically set forth in Paragraph IX of the License Agreement, which provides:  **"Right to Terminate on Notice.**  This Agreement may be terminated by either party upon *sixty (60) days written notice* to either party in the event of a material provision of this Agreement by the other party, provided that, during the *sixty (60) day period,* the breaching party fails to cure such breach."  Cmpl. Ex. A (emphasis added).  Thus, prior to sending his January termination letter, Mr. Silvers' counsel sent a letter in or about November 12, 2004 detailing the alleged breaches.  Cmpl. Ex. C.

23.    That dispute, however, was entirely resolved by the parties, pursuant to the Confidential Settlement Agreement executed on January 28, 2005 ("Settlement Agreement"), which has been filed under seal in this action.  In connection with that Settlement Agreement, the parties filed a stipulation of dismissal with prejudice in the prior lawsuit, and that lawsuit was accordingly dismissed with prejudice.  *See* Stipulation of Dismissal and Order, attached hereto as Exhibit "D".

24.     Among other provisions in the Settlement Agreement, it provides in paragraph 3 that: "Silvers withdraws his notice of termination of the License Agreement, and reaffirms his obligations under the License Agreement."   In addition, paragraph 24 of the Settlement Agreement confirms that the License Agreement remains in full force and effect, and is not superseded by the Settlement Agreement.

25.     Critically, therefore, the Termination provision contained in Paragraph IX of the License Agreement continues to apply.  That provision could not be more clear: it expressly and explicitly requires *60 DAYS NOTICE IN WRITING* and an opportunity to cure, before the License Agreement can be terminated.

26.     Defendant Silvers failed to provide any advance notice, let alone the required 60 days' written notice, of the alleged termination or any opportunity to cure.  Instead, he purported to terminate the License Agreement by letter dated April 27, 2005 ("Termination Letter"), effective immediately.  Cmpl. Ex. C.  Silvers provided no opportunity to cure.  In fact, Silvers rejected Stelor's tender of payments – including an advance payment for May – and no payments were late in any event.  *See* Cmpl. Exs. D & E.   Indeed, as the Verified Complaint and Emergency Motion filed by Stelor describe, Silvers instantaneously engaged in a course of conduct to seize control of the intellectual property granted exclusively to Stelor under the License Agreement.

27.     Silvers' purpose can be nothing other than to destroy Stelor's business, and avoid having to share an anticipated recovery from Google, Inc.

### THE CLAIMED BREACHES ARE TOTALLY UNFOUNDED

28.     In fact, the five alleged breaches referenced in the Termination Letter are entirely unfounded and pretextual in any event, and were not even 60 days old as of the date of the April

27th Letter. The reality is that Stelor has devoted tremendous effort to ensure its compliance with the Agreements, but Silvers – not Stelor – has consistently and repeatedly failed to perform the express conditions precedent to Stelor's performance. If any party had a basis for termination, it was Stelor!

      a.     For example, Silvers claims Stelor failed to provide unit interests in Stelor LLC under Paragraph 9 of the Settlement Agreement. That requirement addressed a pending change in Stelor's corporate structure from a Delaware corporation to a Delaware limited liability company. The conversion, however, was not even completed until March 15, 2005! Stelor is still preparing, but has not completed the LLC Membership Unit Certificates, the Membership Unit Restricted Stock Agreements and the Membership Unit Option Agreements. We have not issued these documents to any shareholder or option holder. Section 9 does not include a time frame for compliance, but Stelor expected and intended to provide Mr. Silvers an LLC Option Agreement as soon as and at the same time as those documents were provided to all other option holders. Silvers' suggestion that he was unaware of, and never consented to, Stelor's conversion to a limited liability company is incredible. He specifically acknowledged the change in Paragraph 9 of the Settlement Agreement. His counsel, indeed, remarked during her visit to Stelor's offices in February of 2005 that the change was an excellent idea! (Also, no owner of any membership interest in Stelor resides in Florida. Mr. Silvers has options, but no membership interest.)

      b.     Similarly, Silvers claims Stelor failed to pay monthly installments on royalty advances under paragraph 10(a) of the Settlement Agreement. That

provision requires a $5,000 payment on the first of each month beginning February 1, 2005.  Silvers neglects to mention that the payments have been made and accepted by Silvers for February and March.  In fact, those payments were not delivered until April 14, 2005, because Silvers failed to satisfy the express conditions precedent to Stelor's performance under the Settlement Agreement. Of course, Silvers readily accepted those payments.  Our counsel's cover letter forwarding the checks on April 14 is attached as Exhibit "E" hereto, along with Silvers' counsel's acknowledgment of having received and accepted the checks as Exhibit "F".  With respect to the April payment, as Silvers' counsel also confirmed, it was actually paid in *early* April, but Silvers required it to be re-cut, made out to Silvers Entertainment rather than himself!  A true and correct copy of the exchange of emails between Stelor and Ms. McQuilkin is attached hereto as Exhibit "G".  Silvers then rejected the re-cut April payment when it was tendered on April 29, 2005, along with the May 2005 payment.  *See* Cmpl. Exs. D & E.

        c.     With respect to the allegation that Stelor failed to pay the amount required by Silvers to maintain his insurance coverage, those payments were made along with the royalty advances as described above.  In addition, Silvers has only himself to blame for any claimed delay related to those payments:  paragraph 10(b) of the Settlement Agreement requires Stelor to pay only "that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), . . . not [to] exceed $1,000 per month."  Paragraph 10(c), moreover, makes clear that "Such reimbursements will be provided to Silvers within 15 days of Stelor

receiving evidence of paid premiums." Stelor has repeatedly requested that basic and readily obtainable information from Silvers. To date, however, Silvers has failed and refused to provide the required "evidence of paid premiums". Accordingly, Stelor is not obligated to make any such payment to Silvers, even though Stelor has previously gone ahead in good faith and done so.

      d.     Silvers next claims that Stelor failed to cooperate in an audit of books and records of Stelor under paragraph 14. Again, Silvers provided no required notice or opportunity to cure. In fact, Silvers' counsel advised in early April that they would defer the audit. Silvers did not renew his request for the audit until his counsel sent an email dated April 22, 2005 – *5 DAYS BEFORE THE TERMINATION LETTER!* A true and correct copy of the email is attached hereto as Exhibit "H". The email, moreover, advises that the "auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." It then asks for "a date in the next two weeks". Silvers, however, never provided the auditors' letter and refused to give Stelor two weeks to provide a date. Instead, apparently having tried to set Stelor up, his Termination Letter was sent 5 business days' later.

      e.     In addition, Silvers obviously failed to provide the required notice for his claim that Stelor has failed to provide samples of Licensed Products that are being offered for sale. Silvers' counsel, however, herself reviewed those samples when she visited Stelor's offices in Maryland in February of 2005. In fact, she took samples back with her. We made those samples available yet again to Silvers, when our counsel advised Silvers' counsel by email dated April 26,

2005 – a day before the termination letter – that the samples were in his office and available for review by Silvers' counsel. Silvers' counsel responded that "I cannot get into this with you right now. I assure you I will get back to you and Stelor by Friday." A true and correct copy of those emails is attached hereto as Exhibit "I"[1]. That response, apparently, was totally disingenuous. Silvers' counsel "got back to" us that Friday by sending the Termination Letter.

     f.     Finally, to the extent Silvers' claims it failed to provide accurate royalty information, again the required notice was obviously not provided. In addition, Stelor has prepared a royalty report to Silvers for the first quarter of 2005. The report was completed at the end of April, and was included in the letter to Silvers' counsel dated April 29, 2005. Cmpl. Ex. D. Additionally, to the extent Silvers claims that Stelor's prior written statement regarding royalties was inaccurate, Stelor has advised Silvers' counsel that it was only just made aware that an on-line shop at CafePress.com was carrying Googles merchandise, without Stelor's authorization or knowledge. We were previously unaware of the existence of this shop, and suspect that it was established by someone outside of Stelor using our company information. After further analysis, we discovered the shop was established in September of 2002 and had sold one (1) coffee cup in December, 2002, for $10.99. On March 31, 2005, we purchased two (2) of each item from the shop to review the quality of the merchandise. These items – again – are with our counsel and were made available to Silvers' counsel for review, as

---

[1] Certain of the emails with Silvers' counsel have been redacted, since at the time the parties were working jointly to initiate litigation against Google, Inc. Their communications in that regard are privileged and confidential.



referenced in the April 26th email. Ex. G. Stelor has received no revenue from this outlet; accordingly, no royalty payments would be due in any event.

g.    Silvers claims – for the first time in his Declaration and Opposition served on Friday, May 20, 2005 – that Stelor did not have required insurance in place until after his termination. That is false. True and correct copies of Stelor's certificates of insurance for the periods July 1, 2004 to July 1, 2005, and thereafter, are attached as Exhibit "J" hereto.

h.    Finally, to the extent Silvers raises various allegations related to a Letter Agreement dated June 1, 2002, that Agreement expired by its own terms on or about November 30, 2004 (after the stated term of 30 months)! Par. 5(a), Cmpl. Ex. B.

29.    Nevertheless, notwithstanding the clear notice provisions in the License Agreement, and the total lack of factual foundation for the claimed defaults, Silvers sent the Termination Letter and has engaged in a course of conduct designed to steal all the GOOGLES intellectual property, as well as Stelor's own proprietary material to which Silvers has no right under any circumstances.

I declare under penalties of perjury that the foregoing is true and correct. Dated this 22nd day of May, 2005.

_____
Steven A. Esrig



# Coming Soon!

www.googles.com

## This Web page is parked free, courtesy of GoDa...

▶ **Save on:** Domain names, Web hosting, email accounts, secure SSL certificates, ecommerce products A...



$3.99 NO QTY LIMIT  Get a new domain name, transfer or renewal for only $3.99* with each and every new non-domain product you buy!

### Domain Names
.COMs just $8.95*/yr

▶ **Compare us:** Learn more...

### Domain Transfers
From $7.95* Includes FREE 1-year extension

▶ **NEW!** Rapid Transfer System!

ICANN ACCREDITED

**Search for a domain name NOW!**

www.  [            ]  [.com ▾]  [ GO ]

.com .us .biz .info .net .org .ws .name .tv .cc .de .jp .be .at .uk .nz .cn .tw

*Plus ICANN fee of 25 cents per domain name year.

▶ **Get more FREE** with each and every domain name! Learn more...

Tur...
Wel...

Pla...
$3....
▶ FREE...
   Email...
▶ FREE...
   Supp...
▶ New!...
   Dedic...
   Dedic...
   Click...

▶ **Learn more about:** Private domain registrations, domain backordering **PLUS,** buy used domain nam... prices slashed AND MORE!



## Click 'n build your own site online, in just minutes
**Includes Hosting & Email FREE!**

**Complete creative packages from $2.49/month!**

▶ Choose the plan that's right for you!



Big or Small BUSINESS

### GoDaddy.com has everything you need to succeed on the Web

▶ I'm interested in: Selling products online, securing my site, hosting, reseller programs



DOM...
AFTER...

Discov...
premier...

▶ Lowest...
   largest...
▶ Powerf...
▶ 24/7 ex...
▶ Plus, jo...
   just $4....
   Lear...
   See To...

## Radio Go Daddy is on the air!
**Live every Wednesday at 7 pm (PST)/10 pm (EST).**
Listen online; or tune in on Sirius and XM satellite radio, and select AM station...

Coming Soon!                                                                                          Page 2 of 2



Miss the live broadcast? <u>Download the show.</u>

▸ **Visit RadioGoDaddy.com to:** Listen to the Previous Show, Strange Domains, and More!

▸ **Visit GoDaddy.com for:** New product releases, 24/7 Technical Support, 24/7 Domain Support, care
OR view full product catalog

Copyright © 1999 - 2005 Go Daddy Software, Inc. All rights reserved.

**Kevin C. Kaplan**

**From:**      GAIL A MCQUILKIN [GAM@kttlaw.com]
**Sent:**      Tuesday, April 12, 2005 4:35 PM
**To:**         Kevin C. Kaplan
**Subject:** follow up

Kevin -

I appreciate our conversation today. As you requested here is an update
be kept extremely confidential and I am leaving out names for that purpose.

Finally, you know how important I feel it is for us to stay aligned. This is easily accomplished if your client will just comply with the settlement, especially the financial part. I don't make threats or posture, my time is too expensive to waste on that. I communicate only what I must when I must to protect my clients interests. I agree that this has gotten silly, and I am sure the board would rather focus its discussions on the upcoming launch and trade show than obsessing over these rather small advances to my client. I have spent considerable time getting my client to focus on what your client has and will accomplish rather than what they have not done, although his list in that regard is long. He really is very happy with the project and excited about the launch and upcoming show. He knows the success of the project is the result of the work and investment made by everyone over there. But, he needs to feel he is being treated fairly, and frankly it doesn't take much by your client to instill that in him.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

5/21/2005

**Stelor Productions, Inc.**
**Attn: Steve Esrig, CEO/President & Board of Directors**
**14701 Mockingbird Drive**
**Darnestown, Maryland 20874**

November 5, 2003

Re:    Official Notice

Dear Steve and Stelor Board Members:

Pursuant to our recent conversation on Saturday, November 1, 2003, and my promise to you, prior to embarking upon any adversarial course of action, that I would give you and the Stelor Board the courtesy of laying out to you the material breaches of our existing agreements that I am now alleging and for which are in need of your immediate attention.

Additionally, I am seeking clarification of certain portions of our existing agreements that need to be addressed immediately as well.

After meeting with you several weeks ago, it is my understanding that Stelor has taken a position that I have a duty to provide Stelor with the password interests/rights to my "public" domain names surrounding the Googles' Intellectual Property, especially that of www.googles.com.

It is also my understanding that you have "verbally" informed me that until this matter is properly resolved that I shall receive no further compensation as required by the existing Consulting and Licensing Agreements executed between Stelor and myself dated May 9, 2002.

As I recall, your exact words to me when we last met, was that I've been "officially cut off" from any further compensation and that your hands were tied regarding this matter.  You even mentioned that the Board was adamant about you giving me a check for  my August Consulting Fees and that as a result of your doing so, you lost your signature powers to write any more checks to me or anyone else thereafter.

Contrary to what you or the Board may be thinking at this time, I would like to find a common ground, if at all possible, to  swiftly resolve

these and other matters surrounding my existing agreements with Stelor, both fairly and expeditiously.

Accordingly, my legal position is as follows:

1).    Stelor shall agree to immediately provide me with my September and October consulting fees, currently in arrears and as called for by the Consulting Agreement with Stelor.  Stelor shall continue to make timely payments to me, as called for, through the remainder of the Consulting Agreement period, barring any bona fide future breaches that Stelor may hereafter allege and for which have been deemed "material" in scope and ruled as such by a court of competent jurisdiction as called for in the Consulting Agreement,

2).    Stelor shall agree to continue to pay, as required, my insurance premiums through the remainder of the Consulting Agreement with the same caveat as noted at [letter #1 above];

3).    Stelor shall agree to provide me with all required "Royalty Statements" as noted in my Licensing Agreement, regardless of whether or not there are royalties due and owed to me as the Agreement clearly sets forth.  Since I've yet to receive any such statements, it is advised that "all" past statements be properly provided to Mr. Silvers as mandated within the next 30 days.  This, as you are well aware, can be construed as a material breach by me according to the existing Licensing Agreement with Stelor,

4).    Stelor shall agree to immediately reimburse me for the total funds that I've allocated for registration fees and renewal registration fees of the Googles.com and related Googles' domain names, since the execution of the Agreements and as required by Stelor to perfect.  I have, on numerous occasions, requested that these fees to be reimbursed to me, both verbally and in e-mail format and I've yet to receive any such reimbursements for said fees due and owed to me.  This figure is now pushing $2,000.00 to date (all of which can be substantiated via invoice data).

-2-

5).    Stelor shall agree to immediately update the Googles.com web site noting me as the "creator of the Googles from Goo" as it once appeared and without explanation has since been removed and as of this writing is still not listed anywhere on the Googles.com web site.  I believe this caveat is also clearly outlined in our existing Licensing Agreement that is currently in place between me and Stelor.

6).    Stelor shall agree to immediately transfer the 19 domain names that were agreed upon to be transferred to me upon the execution of the Asset Purchase Agreement between Stelor and Aurora and as of this date still remain under Stelor Productions' control.  These names, as you are fully aware, belong to me with Stelor being listed as the Administrative and Technical contacts and I listed as the Registrant and Billing contact.    I have repeatedly requested, in e-mail format and verbally to you on many occasions that Stelor needed to transfer these (19) domain name to my "Godaddy" domain hosting account.

I have also informed you, personally, that certain domain names have been left to expire without my ever having the benefit of knowing which ones Stelor had arbitrarily allowed to expire and how I recently found out they are no longer available to be renewed due to some other individual(s) having already renewed them.  This was done without my ever having knowledge of any of this or my being made privy to any of this. An explanation on this matter is seriously warranted.

7).    I have recently found out that Stelor has registered the names www.goopets.com  and www.goopetz.com.  The exact dates of these registrations are:  created on July 9, 2003 (less than 4 months ago) and they were registered through GoDaddy.com, and the Registrant is noted as:  Stelor Productions and the Adm. and Tech contacts are noted as:  Steven A. Esrig.  This is another material breach of the Agreement because it calls for ALL domain names, including any that have the "Goo" or "Googles" prefix to be registered in my name, NOT Stelor's and I am to be listed as the Registrant, NOT STELOR or you.  You knew this to be true and yet you or someone in your organization with your blessings registered these domain names, because they had to be paid for with your credit card or Stelor's credit card, very well knowing

-3-

this to be in violation of our existing agreements. No excuses on this one. We're talking only a few months ago. I'm terribly disappointed in this move. You talk about a trust factor. What shall I say about this? I have the printed copies of the Registration Forms that I took off the Internet if you care to review them.

These are the initial main issues that we need to immediately resolve so that the Googles' project can continue on its course of, hopeful, success for all parties concerned.

I am likewise further informing Stelor as follows:

1).    You and the Board have expressed a concern that I may attempt, now or perhaps at some point in the future, to exercise my authority, given the fact that I currently control the Googles.com and other Googles' related domain names that I own. Authority that may include the shutting down of the Googles.com web site.

2).    I am willing, assuming that we can amicably resolve the aforementioned issues, to assure Stelor, with the exception of a material breach by Stelor and ruled as such by a court of competent jurisdiction (as required in our existing agreements) at which time all rights shall revert back to me as called for in our existing agreements, that at such time and only at such time shall I then determine what would be in the best interest of my Intellectual Property and the rights associated with same. Having said this, I am willing to have this caveat reduced to writing and added as an addendum to his existing agreements. This shall once and for all alleviate any fear or concern by you or the Board that I would do something to intentionally harm "my dream".



Further listed below are clarifications regarding the existing agreements executed between myself and Stelor. They are noted as follows:

1).    I would like a clarification as to the clause noted at [page 2, number 3.c.] of my Consulting Agreement, regarding a "right of first refusal".... It appears that this clause is in conflict with the one just above it at [page 2, number 3.b.].    These two clauses are in direct conflict with one another. On one hand it stipulates that I can not engage in any business if such business competes in any material way

-4-

with Stelor's ongoing business dealings surrounding the Googles' project as it relates to children. However, in the second clause it gives the rights to make available to Stelor, on a "right of first refusal" basis other projects that I may create or develop by myself or with other third parties or that I may acquire or joint venture with other third parties, which shall be presented to Stelor and within 120 days Stelor shall either accept or reject such other projects presented by me. However, the agreement doesn't clarify what rights Silvers may have in the event that Stelor shall decline to participate in any of the Intellectual Properties presented to Stelor for which it chooses to reject or decline nor does it stipulate in the event that Stelor decides to accept, under what terms and conditions and how long Stelor may have to develop and bring to market such other Intellectual Properties presented to them by me. These two clauses are at best ambiguous; thus in need of clarification.

I shall be seeking the following clarification. In the event that I bring to Stelor a project that I have either developed or joint ventured with another party, or that I shall represent on behalf of another party, and within 120 days of such formal presentation, Stelor is unable to fund, market, develop and bring to market said project within a reasonable period of time thereafter, not to exceed six (6) months from time of introduction to complete the contractual phase of the project with certain performance caveats then Stelor shall agree that I shall have the right to take the project elsewhere without owing Stelor any further obligation. This goes for any and all projects whether they are related to preschool children or older children.

    2).   I would further like a clarification as to the clause in my Consulting Agreement noted at: [Number 2. Relationship of Parties….wherein it stipulates that "during the term of this agreement, Licensor shall not initiate or maintain any relationship or conversations with Licensee's current or prospective clients, vendors, any company relationships with the media (press etc.) without prior express written request by Licensee"]. I maintain that I have previously had both business and personal relationships with several of Stelor's current clients and vendors, prior to the execution of both the existing

-5-

Consulting and Licensing Agreements with Stelor. These relationships should not be part and partial to this clause or at best, should I choose to communicate with any of these relationships on a personal basis whether in person or via other current means of communication that I shall not be prevented from doing so. It is hard to conceive that such a "gag order" would be enforceable given the circumstances of this issue. All I'm requesting is a clarification of this clause so that I may continue to maintain my personal relationships with those individuals that could be construed as current vendors or clients of Stelor without further fearing retaliation by Stelor for my doing so. This seems ludicrous, at best, especially in view of the fact that I have been granted, by Stelor, the title of "Executive Creative Consultant" according to the existing Consulting Agreement and as such I am being granted the ability to offer my creative input to the Stelor and thus I should not be prevented from having conversations with those directly and/or indirectly involved with the creative process in bringing to market the successful launching of the "Googles from Goo" intellectual property. It should be duly noted that this caveat is also listed in Mr. Silvers Licensing Agreement at: [page 5, at VIII. E].  I shall agree that my conversations with such entities covered by this clause be strictly related to personal and unrelated Googles business unless otherwise authorized.

4).    I would also like a further clarification as to the clause in my existing Licensing Agreement noted at: [page 7, Indemnity clause, at letter C.], wherein it clearly stipulates that I shall have the express right, in the event that Stelor shall decline to pursue upon notice by me, to properly protect and defend against other such third parties or entities, any trademark, patent, or any other intellectual property rights afforded me in order to protect my intellectual property known as the Googles from such other violators. It seems clear that according to this clause that I shall have the right, at my "sole expense to defend if necessary, or file suit if desired, made by or filed against another party...." Thus, should I inform Stelor of a concern that I may have surrounding the proper protection of his intellectual property rights, and should Stelor decline to institute such proceedings against such third party or parties, then I, at my sole expense, shall have the right to defend and pursue such claims and/or suits.

-6-

It has been brought to my attention that Stelor does not share the same legal view in this regard. Thus the need for a clarification of this issue as well. I shall agree that should I decide to bring suit against any third party or other entity that may become or shall threaten the existence of the Googles' intellectual property and all of its surrounding rights, that I will timely inform the Board of my intentions and in the event Stelor is not able nor interested in pursuing such litigation, then Stelor shall waive all rights to same and shall have no further obligation to fund such litigation. However, in the event that Stelor shall inform me of it's intentions to move forward with such litigation within a reasonable period of time, then I shall respect Stelor's position and either try and work something mutually agreeable between all parties concerned or in the event there is a favorable judgment and outcome of such litigation then Silvers shall agree to provide Stelor, after all reasonable expenses have been allocated, a participation, to be shared with all of it's shareholders, of 20% of my net proceeds of any such litigation.

5). I would like an updated clarification as to the status of the pending trademark filings and applications that have or should have been perfected on my behalf and I am further seeking copies of all such filings for my records and for which I believe I am entitled to with an understanding by Stelor that any and all future filings should be copied and immediately forwarded to me for my review and input.

As the Licensor of the Googles from Goo intellectual property, I believe that I am entitled to copies of any and all legal documents executed on my behalf by Stelor in a timely fashion. To date, I've received no such copies.

6). According to my existing Consulting Agreement, Stelor has agreed to provide me with health insurance coverage during the term of my Agreement. The clause reads at [page 1 of said Consulting Agreement, at number 1.b.] that: "Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300.00 per month during the term of this Agreement." I am questioning why, if the "existing health plan is still being made available by Aurora" that I have had to pay an

-7-

assessed increase of $144.00 each month when it clearly stipulates in the agreement that Stelor shall reimburse the Aurora Collection for the existing health plan if available during the term of this agreement? Why have I had to allocate each month for the past eleven (11) months now, the sum of $144.00 when clearly I shouldn't have had to do so? I am seeking reimbursement of all such funds that I've laid out and for which I clearly should not have had to do so and for the remainder of the Agreement that Stelor will take care of the full coverage as called for by the Agreement.

7).    Last on this clarification list is the issue of "Reversionary Rights". I have brought to your attention on many occasions, supported by documentation and as clearly noted in our existing Agreements and those executed between Stelor and Aurora the highly sensitive issue of reversionary rights, when and if there is a "material" breach found in my favor by a court of competent jurisdiction and as clearly outlined in our Licensing Agreement. However, the issue here is that Stelor has seen fit to grant this right to both myself and Aurora. Thus, clearly creating a conflict. Please note that my Licensing Agreement was executed on May 9, 2002. In this Agreement Stelor granted me "Reversionary Rights" noted therein at:    [page 6, at X. Post Termination Rights, letter C.] wherein it states:  "Upon the expiration or "termination" of this Agreement, "all the license rights of Licensee under this Agreement shall forthwith terminate and immediately revert to Licensor and Licensee, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to Licensor."

Of course this reversionary right only goes into effect if and when a material breach is alleged by me and such is ruled in my favor by a court of competent jurisdiction as the existing Agreement mandates.

However, in an Agreement signed and executed between Stelor and Aurora dated just 14 days after I executed my Licensing Agreement with Stelor, the exact date is May 23, 2002, Stelor proceeded to grant

-8-

Stelor the same "Reversionary Rights" which was otherwise unlawful to do so.

Please note the clause at: [page 6, of the Stelor/Aurora Asset Purchase Agreement, at number 11. Reversionary Rights, wherein it reads as follows: "In the event that Buyer (Stelor) is unwilling or unable to fulfill its financial obligations to Steven A. Silvers under the terms of any of Sellers' (Aurora) agreements with Silvers that are assumed by Buyer as a result of this transaction, Buyer will give written notice to Seller. If the breach is not cured or waived by Silvers within a reasonable period of time after receiving written notification by Silvers and Seller thereafter assumes such liability to Silvers, all rights assigned herein by Seller to Buyer shall revert back to Seller without obligation by Seller to Buyer. Buyer shall execute such documents as are necessary to affect the intent of this clause concerning reversionary rights without unreasonable delay."

Accordingly, it seems patently confirmed that these two agreements are in clear conflict with one another and it is my stern position that in the event of an alleged breach between myself and Stelor; for which I should prevail, that my "reversionary rights" clearly supercede those granted to Aurora by Stelor.

I hereby seek clarification as to why these "Reversionary Rights" were granted to Aurora when, in fact, they were granted to me fourteen (14) days prior to the execution of any Agreement with Aurora?

In closing, I would like to reiterate the fact that I prefer not to assert any adversarial position at this time with Stelor. I only desire what I am entitled to according to the mandates outlined in our Agreements. Nothing more and nothing less. If after reading and reviewing this letter with your Corporate Counsel, they choose not to advise you to do the right thing as called for and as I've clearly outlined in this lengthy letter, then I am fully prepared to seek a formal breach against Stelor for the many violations I've cited above and we will let the chips fall where they fall. This is not to be taken as any threat. I'm tired of all of this anxiety that I've had to endure all of these months and it's time to

-9-

put an end to it once and for all.

I would also state that once you take the "visionary" out of the "vision" you are doomed to fail.

I assure you, if you place me in an "active" role, that I am fully prepared to execute come the first of the year, and place me in charge of the creative process of the project, allowing me to do what I do best, and working with all those you have thus far entrusted, except me, with the creative process and the creative delivery of the project, within (6) months time you will see miracles unfold. I can guarantee this! If you choose to continue to exclude me from the creative process, as has been the case these past 17 months, then the consequences will fall on your shoulders not mine. Either way, I'm fully prepared to act. I hope and trust you choose the former chartered course of action.

In Stelor's response to this letter kindly be specific as to addressing each and every clause as requested by me so that we can have a clear understanding as to Stelor's position regarding the issues outlined above.

Should you care to contact me to discuss this matter further I can be reach at: 954-445-6788, otherwise I shall expect your reply within the next 10 days as I'm leaving to go out of the country on November 15, and I won't be returning until December 25, 2003.

In the event that I don't have your response within the next 10 days as requested, then my options will be limited and I shall proceed accordingly.

-10-

Also, please take notice that my new mailing address has once again changed and you should direct all future correspondence to me at:

Steven A. Silvers
8983 Okeechobee Blvd.
Suite #202, PMB 203
West Palm Beach, FL 33411-1826

Sincerely,

Steven A. Silvers

*This document is being sent in accordance with our Agreement requirements dated May 9, 2002 by way of FedEx (Tracking Number: 842190092180.)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-80954-CIV-HURLEY

STELOR PRODUCTIONS, INC.,
    plaintiff,

vs.

STEVEN A. SILVERS,
    defendant.

_____/



**CLOSED CASE**

## ORDER OF FINAL DISMISSAL WITHOUT PREJUDICE AND CLOSE-OUT

THIS CAUSE is before the court upon the parties' joint stipulation for dismissal without prejudice filed February 8, 2005. Having considered the stipulation, it is hereby

**ORDERED AND ADJUDGED:**

1. This case is **DISMISSED WITHOUT PREJUDICE,** with each side to bear its own costs and attorneys' fees.

2. There being nothing further for the court to resolve, it is further ordered that the Clerk of the Court shall enter the case as **CLOSED** and terminate all pending motions as **MOOT.**

DONE and SIGNED in Chambers at West Palm Beach, Florida this _14_ day of February, 2005.

Daniel T. K. Hurley
United States District Judge

Copies furnished:
Adam T. Rabin, Esq.
Kenneth R. Hartmann, Esq.
Yano Rubinstein, Esq.



FILED by _MC_ D.C.
ELECTRONIC

**Feb 8 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, INC.,
a Delaware corporation,

      Plaintiff,

v.

STEVEN A. SILVERS,
a resident of Palm Beach County, Florida

      Defendant.

CASE NO. 04-80954-CIV-HURLEY
Magistrate Judge James M. Hopkins

---

## JOINT STIPULATION FOR DISMISSAL,
## WITHOUT PREJUDICE, OF ALL CLAIMS

    Plaintiff, Stelor Productions, Inc. and Defendant Steven A. Silvers, hereby jointly stipulate,

pursuant to Fed.R.Civ.P.41(a)(1), to the dismissal, without prejudice, of all claims asserted by each

party against the other party in this action.

    Respectfully submitted,

Adam T. Rabin
DIMOND KAPLAN & ROTHSTEIN, PA
200 S.E. First Street, Suite 708
Miami, FL 33131
T: 305-374-1920
Co-Counsel for Defendant

Kenneth R. Hartmann  (FBN: 664286)
Gail A. McQuilkin  (FBN: 969338)
KOZYAK TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
T: 305-372-1800 / F: 305-372-3508
Counsel for Defendant

Yano L. Rubinstein, Esq.
SUMMERS RUBINSTEIN
580 California Street, 16th Floor
San Francisco, California 94104
Counsel for Plaintiff

3339/101/249255.1

1 of 1



BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: KKAPLAN@BWSKB.COM    WWW.BWSKB.COM

April 14, 2005

**VIA HAND-DELIVERY**

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

      Re:   Stelor Productions, Inc. v. Silvers,
             Case No. 04-80954-CIV-HURLEY/HOPKINS

Dear Gail:

      Attached please find the three Stelor checks.

                Sincerely,

                Kevin C. Kaplan

KCK:mjp
Enclosure

STELOR PRODUCTIONS, INC.
P.O. BOX 8000
GAITHERSBURG, MD 20883

2621

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0987
7-216-520

03/07/05

PAY TO THE
ORDER OF __ Kozyak Tropin & Throckmorton Trust Accoun __ $ ***2,000.00

Two Thousand and 00/100**************************************************** DOLLARS

Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134

MEMO  TRUST ACCOUNT- Royalty/insurance advanc

⑆00 2⑈ 2 1⑈   ⑆:05 200 2 1⑈6⑈:   ⑆1 7 5 9 7 1 0 5⑈⑈

STELOR PRODUCTIONS, INC.
Kozyak Tropin & Throckmorton Trust Accoun
02/28/05                      Bill #roy

2621

03/07/05
2,000.00

STELOR PRODUCTIONS, INC.
PO BOX 8000
GAITHERSBURG, MD 20883

2623

CITIBANK, F.S.B.
WASHINGTON, DC 20068-0987
7-218-520

03/07/05

PAY TO THE
ORDER OF  Kozyak Tropin & Throckmorton Trust Accoun

$**318.00

Three Hundred Eighteen and 00/100***********************************  DOLLARS

Kozyak Tropin & Throckmorton
2525 Ponce de Leon
Coral Gables, FL  33134

MEMO  TRUST ACCOUNT Domain name registrations

⑈002623⑈ ⑈052002466⑈  1759074050

STELOR PRODUCTIONS, INC.
Kozyak Tropin & Throckmorton Trust Accoun
02/28/05  Bill #DOMAIN

2623
318.00

03/07/05



**STELOR PRODUCTIONS, INC.**

PAY TO THE
ORDER OF   Kozyak Tropin & Throckmorton Trust Accoun

Four Thousand and 00/100***************************************

$ **4,000.00**

Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL  33134

MEMO  TRUST ACCOUNT Insurance Reimbursement

2622

03/07/05

DOLLARS

2622

4,000.00

03/07/05

**STELOR PRODUCTIONS, INC.**
Kozyak Tropin & Throckmorton Trust Accoun
02/28/05                                Bill #INS

Citibank Checkin  TRUST ACCOUNT Insurance Reimbursemen          4,000.00

**Kevin C. Kaplan**

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN [gam@kttlaw.com] |
| **Sent:** | Sunday, April 17, 2005 4:38 PM |
| **ɔ:** | Kevin C. Kaplan |
| **ubject:** | Re: Inc |

Kevin -

   Got the checks.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "kevin kaplan" <kkaplan@bwskb.com> 04/17/05 4:00 PM >>>
Gail,

I've left you a bunch of messages but haven't heard back. Please confirm you received the
checks, and let me know when you're available for a call tomorrow. Steve has some issues
to discuss. By the way, for efficiency of our ongoing communications, I have no problem
with Steve talking to you directly and authorize you to talk to him directly even if I am
unavailable.

Kevin

*****************************************

Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
   Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax:  (305) 858-5261
kkaplan@bwskb.com

*****************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the
law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or
privileged. The information is intended to be for the use of the individual or entity
named above. If you are not the intended recipient, please immediately delete this e-mail
and be aware that any disclosure, copying, distribution or use of the contents of this
information is prohibited.


Sent wirelessly via BlackBerry from T-Mobile.

**Kevin C. Kaplan**

**From:**   GAIL A MCQUILKIN [GAM@kttlaw.com]
**Sent:**   Friday, April 08, 2005 10:44 AM
**To:**     Kevin C. Kaplan
**Subject:** silvers

Kevin -

Can you please resolve these pending issues -

Settlement Agreement:

1.  Check for reimbursement of health insurance payments

2.  Checks for Feb, March and April advance against royalties for health insurance

3. Reimbursement for domain name renewal costs

4. Options

5. All checks are to be made out to Silvers Entertainment Group. THe check we received for April was made out to Steven Silvers.  Why do we have to keep telling Stelor this?

License Agreement:

1. Royalty statements are due for the 3d and 4th quarter of 2004, and first quarter of 2005.

2. We need to see the Products Liability Insurance has Silvers names as an insured.

3. We need to see all promotional materials Stelor intends to use.

4. Stelor is suppose to place on all materials the phrase "created by Steven A. Silvers."  Stelor persists on placing those words in tiny font and using the phrase "based on a concept created by" rather than "created by" as required.  We went though this once before and Stelor agreed to change it, but still they keep doing it.

5. There are still issues relating to the list of trademarks and domain names, but I will address those with Larry Hefter.

Let me know about all this.

Gail.

5/21/2005

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**Subject: Re: Silvers royalty advance check**
**Date: Saturday, April 9, 2005 2:42 PM**
**From: GAIL A MCQUILKIN <gam@kttlaw.com>**
**To: <julie@stelorproductions.com>**

Not a problem at all.  Let me know about the health insurance.  Going forward the
simplist way to do this is to combine the 5k and 1k amounts into one 6k check.  In case
you do not know this, these payments are an advance against future royalties.  Make sure
you are booking these correctly and keeping track of the amounts so that when royalties
begin to be paid by Stelor they are offset by these amounts.  Thanks for your help.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Julie" <julie@stelorproductions.com> 04/09/05 10:17 AM >>>
Gail,

I just got your email at home.  I had already left the office for the day
yesterday when you sent your email- I can have the check there on Tuesday
morning - will that be alright?  I'll ask Steve about the health insurance.

Thanks for understanding!  You have a great weekend yourself!

Regards,

Julie
----- Original Message -----
From: "Gail A. McQuilkin, Esq." <gam@kttlaw.com>
To: "Julie DePue" <julie@stelorproductions.com>
Sent: Friday, April 08, 2005 6:15 PM
Subject: Re: Silvers royalty advance check


No problem, stuff happens.  You can send it for Monday delivery.  There
should also be a check for $1000 to cover his health care premiums.  Ask
Steve if you can send that too.  Thanks.  Have a good weekend.
-----Original Message-----
From: "Julie DePue" <julie@stelorproductions.com>
Date: Fri, 08 Apr 2005 17:48:42
To:<gmcquilkin@tmo.blackberry.net>
Subject: Silvers royalty advance check

Dear Gail,

 Steve just told me about the error on Silvers check  I am so sorry!  Its
completely my fault  I have been sort of put back into the accountants chair
rather abruptly and just went a little too fast through my tasks.

 Id be happy to cut another check and send it Fed Ex Saturday delivery if
you want.  Please let me know as soon as you can, and where youd like it
sent.

 Sorry for the trouble,

 Julie DePue

Page 1 of 2

Stelor Productions

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
(305)372-1800 office
(305)372-3508 fax
gam@kttlaw.com

# Stelor Productions
## Transactions by Vendor
### January through December 2005

05/20/05

| Type | Date | Num | Memo | Clr | Amount |
|------|------|-----|------|-----|--------|
| **Kazyak, Tropin & Throckmorton, PA.** | | | | | |
| Bill Pmt -Check | 03/07/05 | 2621 | TRUST ACCOUNT- Royalty/Insurance advance | * | 2,000.00 |
| Bill Pmt -Check | 03/07/05 | 2622 | TRUST ACCOUNT Insurance Reimbursement | * | 4,000.00 |
| Bill Pmt -Check | 03/07/05 | 2623 | TRUST ACCOUNT Domain name registrations | * | 318.00 |
| **Silvers Entertainment Group** | | | | | |
| Check | 02/11/05 | 2555 | VOID: Advances Against Future Royalties-Feb05 | ✓ | 0.00 |
| Bill Pmt -Check | 02/28/05 | 2587 | VOID: consulting | ✓ | 0.00 |
| Bill Pmt -Check | 03/08/05 | 2624 | Advance against Royalty, Feb 05 | ✓ | 5,000.00 |
| Bill Pmt -Check | 03/08/05 | 2625 | Advance against Royalty, Mar 05 | ✓ | 5,000.00 |
| Check | 04/08/05 | 2711 | Advance Against Royalties | * | 5,000.00 |
| Bill Pmt -Check | 04/28/05 | 2751 | Advance Against Royalty April 05 | ✓ | 5,000.00 |
| Bill Pmt -Check | 04/28/05 | 2752 | Advance Against Royalty May 05 | ✓ | 5,000.00 |
| Bill Pmt -Check | 04/28/05 | 2753 | Royalty/Insurance advance, Apr '05 | ✓ | 1,000.00 |
| Bill Pmt -Check | 04/28/05 | 2755 | Royalty/Insurance advance May '05 | ✓ | 1,000.00 |
| **Steven A. Silvers** | | | | | |
| Check | 02/01/05 | 2527 | VOID: Advances Against Future Royalties | ✓ | 0.00 |
| Bill Pmt -Check | 04/04/05 | 2685 | VOID: Advances against future royalties | ✓ | 0.00 |
| | | | | | 33,318.00 |

**Kevin C. Kaplan**

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN [GAM@kttlaw.com] |
| **Sent:** | Friday, April 22, 2005 1:35 PM |
| **To:** | Kevin C. Kaplan |
| **Subject:** | audit |

Kevin -

The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**Kevin C. Kaplan**

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN [gam@kttlaw.com] |
| **Sent:** | Tuesday, April 26, 2005 8:20 PM |
| **To:** | Kevin C. Kaplan |
| **ibject:** | Re: Stelor/Silvers/Inc |

Kevin -

    I cannot get into this with you right now.   I assure you I will get back to you and
Stelor by Friday.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/26/05 12:35 PM >>>
Gail,


As we discussed, we were impressed and pleased when we received your recent email




`s I have advised you, the Stelor information is in my office, and we have been attempting
` set up a time for you to review it.

******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

    Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

NOV-17-2004(WED) 16:45    GUILD INSURANCE BROKERS    (FAX)204 728 1515    P. 002/002

# AVIVA INSURANCE COMPANY OF CANADA

## CERTIFICATE OF INSURANCE

This is to certify that the following policies have been issued by the Insuring Company and are in full force and effect as of the date of this certificate and in favour of Named Insured:

    Team Tools Ltd. and Ultra Media Inc. et al
    PO Box 20162
    Brandon MB R7A 6Y8

If the insurance provided under the said policy(s) is altered, cancelled or changed in a manner as to affect this certificate of insurance the Insuring Company hereby agrees to give fifteen (15) days written notice of such alteration, change or cancellation to:

    Steven A. Silvers & Stelor Productions, Inc.
    14701 Mockingbird Drive
    Darnestown, MD 20874
    Attention: Julie DePue or Marty Jeffery

| Policy Number | Policy Term | Kind of Insurance or Operations Covered | Limits of Liability or Amount Insured | |
|---|---|---|---|---|
| CMP81108401 | July 1, 2004 to July 1, 2005 | Commercial General Liability | $2,000,000 | Each occurrence limit |
| | | | $2,000,000 | Products-Completed Operations Hazard Aggregate Limit |

Note: Steven A. Silvers and Stelor Productions, Inc. is hereby added as additional insured but only with respect to the vicarious liability of the Named Insured.

Canadian Currency Clause Applies

This document is furnished as a matter of courtesy and only as information of the fact that Policies have been concurrently prepared. It is not a contract, confers no right upon any person and imposes no liability on the insuring company.

AVIVA Insurance Company of Canada          November 17, 2004          900 - 201 Portage Avenue
                                              Dated                    Winnipeg, Manitoba R3B 3K6

Authorized Representative
Guild Insurance Brokers Inc.

## ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| CSR TT STECO-1 | 04/28/05 |

**PRODUCER**

The Insurance Exchange, Inc.
751 Rockville Pike, #1A
Rockville MD 20852
Phone: 301-279-5500   Fax: 301-424-2829

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**INSURED**

Stoloy Productions
Greg Langsford
14701 Mockingbird Drive
Darnestown MD 20874

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Hartford Fire Insurance Co. | |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADDL INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X X | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS MADE X OCCUR | 42SBABW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $2,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PROJECT LOC | | | | GENERAL AGGREGATE | $4,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $4,000,000 |
| A | | **AUTOMOBILE LIABILITY** ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | 42SBABW8494 | 04/25/05 | 04/25/06 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN AUTO ONLY: EA ACC AGG | $ $ |
| A | | **EXCESS/UMBRELLA LIABILITY** OCCUR CLAIMS MADE DEDUCTIBLE X RETENTION $10,000 | 42SBABW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | WC STATUTORY LIMITS | OTH-ER |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | **OTHER** | | | | | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**

Certificate holder is additional insured as respects operations by the insured.

| CERTIFICATE HOLDER | STESTEV | CANCELLATION |
|---|---|---|
| Steven A. Silvers EMB 203 9983 Okeechobee Blvd., Ste 202 West Palm Beach FL 33411 | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL **10** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

**ACORD 25 (2001/08)**                                                                 © ACORD CORPORATION 1988