UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80393 CIV HURLEY/HOPKINS

STELOR PRODUCTIONS, L.L.C., a
Delaware limited liability company,
f/k/a STELOR PRODUCTIONS, INC.,

        Plaintiff,
vs.

STEVEN A. SILVERS, a Florida resident,

        Defendant.
_____/

**PLAINTIFF'S REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Respectfully submitted,

BURLINGTON, WEIL, SCHWIEP,
  KAPLAN & BLONSKY, P.A.
Attorneys for Plaintiff
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261
Kevin C. Kaplan, Esq.
Florida Bar No. 933848
Daniel F. Blonsky, Esq.
Florida Bar No. 972169
David J. Zack, Esq.
Florida Bar No. 641685



## Introduction

Without this Court's immediate intervention, Plaintiff will be out of business. The cause of Stelor Productions, L.L.C.'s demise—and the loss of $4 million in investment and far more in future profits—will be the flagrant breach of contracts by the Defendant Steven A. Silvers. A convicted drug trafficker, Silvers has repeatedly shown his utter contempt for the law and unambiguous contractual provisions granting Stelor the exclusive right to control, exploit, use, and protect the valuable Googles intellectual property. Silvers has wrongfully closed down Stelor's website and filed a trademark infringement suit against Google, Inc. Silvers' actions were without any authority and in direct contravention of agreements with Stelor executed as recently as a few months ago. The overwhelming evidence that Silvers—in his own words—"is admittedly not complying with the License Agreement," Opposition at 5, requires an injunction.

This case is a paradigm for a preliminary injunction restoring the parties to their position before Silvers' unlawful termination notice, unilateral shut down of Stelor's website, and *ultra vires* lawsuit against Google, Inc. Silvers' purported termination of the License Agreement is unquestionably null and void. First, Silvers indisputably failed to comply with Paragraph IX of the License Agreement requiring written notice *and* 60 days for Stelor to cure the breach. Second, as even a cursory review of the undisputed record demonstrates, the alleged grounds for termination are totally pretextual. In truth, despite massive interference by Silvers, Stelor has fully complied with all of its contractual obligations. Third, Silvers has contractually ceded to Stelor the *exclusive* right to take action against Googles, Inc. for trademark infringement.

Stelor is the victim of Silvers' outrageous, concerted effort to destroy its business and steal the Googles intellectual property licensed to Stelor. The law abhors such brazen self-help in contract disputes. The undisputed record and law mandate a preliminary injunction requiring Silvers to reactivate the website and to dismiss his unauthorized lawsuit against Google, Inc.

## I.

## STELOR HAS A SUBSTANTIAL LIKELIHOOD OF IRREPARABLE HARM

A.   **Stelor's Likelihood of Irreparable Harm Is Uncontested and Obvious.**

Silvers essentially concedes that Stelor will suffer extraordinary harm absent a preliminary injunction. Silvers does not contest the critical importance of the googles.com website to Stelor's business. Silvers does not in any way even address the significance of the pending launch to the future viability of Stelor's business. Nor could he. The harm to Stelor if

1

the situation is not returned to the status quo at the time this dispute arose will be dramatic and irreparable.

As set forth in the accompanying Declaration of Steven Esrig ("Decl.")[1], Stelor's CEO, Plaintiff has spent several years and devoted millions of dollars to the development of the GOOGLES intellectual property. Plaintiff is set imminently to launch a newly developed, proprietary, child-safe feature for its website. The cornerstone of that launch is the existing "googles.com" website. Silvers' actions following commencement of this action – his redirecting of the website and taking of Plaintiff's proprietary intellectual property – have brought Plaintiff's pending launch to a screeching halt.

Under these circumstances, the very viability of Stelor's business is threatened. Unless Stelor immediately regains access to the website and can proceed with its launch, its business will be destroyed and it will suffer indeterminate and immeasurable losses. The unique opportunity available to Stelor just weeks ago will be entirely lost, along with the incalculable business that would have flowed from that opportunity. Decl. ¶¶ 6-10.

**B.    The Irreparable Harm Here Requires Injunctive Relief Under the Law.**

Nor can Silvers legitimately argue that Stelor must watch its business burn, while the invalidity of Silvers' termination is litigated at leisure over the succeeding months (or longer). Silvers' Opposition simply ignores the established line of authority recognizing and mandating the need for injunctive relief under such circumstances.

The case of *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.* 60 F.3d 27 (2d Cir. 1995), which Silvers' Opposition cites with approval, directly supports Stelor's position here. In *Saban*, the court upheld a preliminary injunction in circumstances analogous (if less compelling) than those present here. The plaintiff contracted with the defendant for a right of first refusal to publish children's books based on the defendant's intellectual property. Defendant breached the contract by refusing to permit plaintiff to publish books based on defendant's popular "Mighty Morphin Power Rangers" characters, granting licenses to other publishers instead. *Id.* at 31-31. The *Saban* court upheld a preliminary injunction *requiring* the defendant to license to the plaintiff rights to publish a children's book about the characters and to refrain from licensing books regarding the characters to others. Finding the damages to this new

---

[1] A Declaration of undersigned counsel, Kevin Kaplan, is also submitted merely to authenticate a few documents, and will be referred to as "Kaplan Decl."

2

line of business for the plaintiff as a publisher of children's books "beyond ready calculation," the Court affirmed issuance of the injunction. *Id.* at 38.

A long line of additional cases directly supports injunctive relief here, where a business' destruction is threatened. *E.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998) (threat of lost profits and damage to reputation, where no realistic way to determine damages, constitutes irreparable harm); *U.S. v. Bowman*, 341 F.3d 1228, 1237 (11th Cir. 2003) (potential harm to business from loss of goodwill and inability to sell its products constitutes irreparable harm); *Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 958 & n.2 (11th Cir. 1981) ("A substantial loss of business may amount to irreparable injury if the amount of lost profits is difficult or impossible to calculate"); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (damage to a business resulting from "the loss of customers and goodwill is an 'irreparable' injury"); *see also Reuters v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir. 1990) (reversing lower court order and mandating entry of preliminary injunction requiring wire service to provide news picture service under the terms of its contract based on irreparable harm caused by loss of service to plaintiff); *Ferry-Morse Seed Co., v. Food Corn*, 729 F.2d 589, 592 (8th Cir. 1984) (affirming preliminary injunction requiring delivery of seed corn, as the competitive disadvantage suffered by plaintiff from the loss of the unique seed demonstrated "a classic situation for preliminary injunctive relief.") *Green Stripe, Inc. v. Berny's Internacionale, S.A. de C.V.*, 159 F. Supp. 2d 51 (E.D. Pa. 2001) (granting preliminary injunction requiring delivery of grapes to avoid irreparable harm of being forced out of Mexican grape market and loss of contracts with customers).

Defendant's cases, moreover, are entirely distinguishable. In fact, the primary case on which Silvers relies – *Burger King Corp. v. Hall*, 770 F. Supp. 633, 638-39 (S.D. Fla. 1991) – was effectively overruled by the Eleventh Circuit's decision in *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998). The *Robertson* Court rejected *Hall's* finding that the "question of alleged wrongful franchise termination [was] irrelevant," and instead directly addressed the propriety of the alleged termination for purposes of injunctive relief. *Cf. Burger King Corp. v. Majeed*, 805 F. Supp. 994 (S.D. Fla. 1992) (court found that franchisee had failed to comply with license agreement). In addition, unlike the facts in this case, many of Silvers' cases involved contracts that had already been terminated by their own terms (not by one of the parties), or were terminable at will. *See Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1501 (S.D. Fla. 1995) (license expired by its own terms); *Florida Power Corp. v. Town of Belleair,*

3

830 So. 2d 852 (Fla. 2d DCA 2002); *quashed*, 897 So. 2d 1261 (Fla. 2005);[2] *Collins v. Pic-Town Water Works, Inc.*, 166 So. 2d 760 (Fla. 2d DCA 1964) (contract terminable at will). In other cases, injunctive relief was denied for reasons irrelevant to the present dispute. *See Harris v. Wilters*, 596 F.2d 678 (5th Cir. 1979) (inmate had other avenues for relief); *Burgos v. Univ. of Cent. Fla. Bd. of Trustees*, 283 F. Supp. 2d 1268 (M.D. Fla. 2003) (plaintiff had no constitutionally protected right to vindicate); *Koppel v. New York Bd. of Elec.*, 8 F. Supp. 2d 382 (S.D.N.Y. 1998), *aff'd.*, 153 F.3d 95 (2d Cir. 1998) (challenge to election law not likely to succeed on the merits); *Shearson Lehman Hutton, Inc. v. Meyer*, 561 So. 2d 1331 (Fla. 5th DCA 1990) (terminated employee had adequate remedy at law); *Dillard Homes, Inc. v. Carrol*, 152 So. 2d 738 (Fla. 3rd DCA 1963) (contract limited relief to liquidated damages); *Jacksonville Elec. Aut. V. Beemik Builders & Con., Inc.*, 487 So. 2d 372 (Fla. 1st DCA 1986) (inadequate proof of irreparable harm); *Airlines Reporting Corp. v. Incentive Int'l Travel, Inc.*, 566 So. 2d 1377 (Fla. 5th DCA 1990) (failure to demonstrate clear legal right preventing termination of contract); Finally, Silvers cites *Norcom Elec. Corpo. v. CIM USA, Inc.*, 104 F. Supp. 2d 198 (S.D.N.Y. 2000), which granted a preliminary injunction requiring a distributor to sell spare parts to the plaintiff. *See also Cornwell v. Sachs*, 99 F. Supp. 2d 695 (E.D. Va. 2000) (granting preliminary injunction to prevent irreparable harm from false statements).

C.   **Stelor Seeks an Injunction Solely to Restore the Status Quo.**

Defendant also inaccurately describes this as a motion seeking a "mandatory injunction" that would change the status quo. Stelor seeks only to restore the status quo, as it existed at the commencement of this action. Courts have long recognized that where a defendant's actions have altered the status quo relationship of the parties, a preliminary injunction requiring compliance with the contract merely preserves the status quo. As noted by the *Ferry-Morse Seed Co.* court in granting preliminary injunctive relief, it was the breaching party who "destroyed the status quo." 279 F.2d at 593. Silvers misconceives the purposes of preliminary injunctive relief

---

[2] *Belleair* involved a contract that, by its terms, had expired. Not only is that holding thus distinguishable, it has been overruled by the Florida Supreme Court! Unrecognized by Silvers, the Florida Supreme Court overturned the appellate court's holding that the contract could not be judicially extended to permit continued payments of franchise fees to cover an interim period. The Florida Supreme Court held that the circumstances and the equities of the case "may render such action necessary and proper." 897 So. 2d 1261 (citing *Florida Power Corp. v. City of Winter Park*, 887 So. 2d 1237 (Fla. 2004)). *Belleair* thus confirms the authority of this court to fashion appropriate injunctive relief in this case.

in arguing that the "status quo" to be preserved should be his reckless attempt to destroy Stelor's business by shutting down its website and jeopardizing its pending launch. As this Court's predecessor Court held in *Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (citations omitted and emphasis added), the court held that the fundamental analysis is whether the preliminary injunction will prevent irreparable injury, not whether it meets some narrow and self serving definition of status quo proffered by the defendant:

> It must not be thought, however, that there is any particular magic in the word "status quo." The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. ***If the current existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent injury, either by returning to the last uncontested status quo between the parties by issuance of a preliminary injunction,*** or by allowing the parties to take proposed action that the court finds will minimize irreparable injury.

The Court must not let Silvers' ritualistic invocation of the term "status quo" obscure the fact that the preliminary injunction will simply place the parties at the "last uncontested status quo between the parties," *id.*, and will preserve the court's ability to render a meaningful decision. *See also International Assoc. of Machinists and Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A.*, 924 F.2d 1005 (11th Cir. 1991)(affirming preliminary injunction against unilateral changes to working conditions and restoring prior conditions).[3]

## II.

## THE HARM TO STELOR CLEARLY OUTWEIGHS ANY HARM TO SILVERS

The destruction of Stelor's business outweighs any harm a preliminary injunction may cause Defendant. Defendant voluntarily gave up his rights to develop the GOOGLES characters when he entered into the License Agreement in May of 2002. For three years, he has allowed Stelor at great expense (approximately $4 million) to proceed with the development of the intellectual property. Indeed, as recently as April 12, 2005 – just days before the termination –

---

[3] As the record demonstrates, moreover, Stelor has satisfied even a heightened standard for injunctive relief. Stelor has made a "clear showing" of entitlement to the requested relief, *and* that serious damage will result if an injunction is not granted. *Saban*, 60 F.3d at 38.

5

Defendant expressed through counsel his happiness with the project and excitement about the launch. Decl. ¶ 19 and Ex. B.. Silvers also specifically recognized the extreme and irreparable harm he would cause to Stelor if he attempted to terminate Stelor's rights and seize the intellectual property before a court could address the issue. Decl. ¶ 20 and Ex. C at 4. And, he "assured" Stelor in writing that he would not do that. *Id.*

Nor does Silvers argue to the contrary. His voluminous papers contain not one shred of evidence or argument suggesting any harm he might suffer should he be ordered to refrain until this matter can be decided by the Court from interfering with Stelor's continued use and development of the rights Stelor has had since 2002. In fact, if Stelor's launch is successful, Silvers stands to benefit handsomely anyway based on his continuing financial interest in the business. Decl. ¶ 18.

Requiring Defendant to refrain from interfering with Stelor's rights until this dispute can be finally resolved is, on balance, appropriate. *Saban*, 60 F.3d at 38.

### III.

### THE GOOGLE ACTION

Silvers unilateral filing of an action against Google, Inc. requires injunctive relief. Paragraph 18 of the Settlement Agreement specifically recognizes that "there is no adequate remedy of law" and that "injunctive relief will be necessary" if either party proceeds "without the other party" in "the disputes with Google, Inc." The provision is broad, including informal negotiation and settlement. Silvers' unilateral filing of the Google Action flatly violates this provision and requires entry of immediate injunctive relief "to maintain the rights" of Stelor. Settlement Agreement ¶ 18; *see American v. Makarewicz,* 122 F.3d 936, 940 (11th Cir. 1997) (enforcing parties' agreement mandating injunctive relief).

### IV.

### STELOR HAS A VERY SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

It is undisputed that Silvers terminated his License Agreement with Stelor without satisfying an explicit requirement to give 60 days' written notice and an opportunity to cure. Accordingly, the termination is improper as a matter of law, and judgment should be entered for the Plaintiff. In addition, the allegations of minor breaches have either been cured already or are entirely unfounded.

A.  **Silvers' Termination Fails to Satisfy the Agreement's Express Notice Requirements.**

Paragraph IX of the License Agreement expressly provides as follows: "**Right to Terminate on Notice.** This Agreement may be terminated by either party upon *sixty (60) days written notice* to either party in the event of a material breach of this Agreement by the other party, provided that, during the *sixty (60) day period*, the breaching party fails to cure such breach." Cmpl. Ex. A (emphasis added). There is nothing ambiguous or in any way unclear about that provision. Nor is there anything ambiguous about Silvers' blatant failure to comply with it.

Courts strictly enforce contractual notice and cure provisions. The Court's recent decision in *Florida Recycling Servs. V. Greater Orlando Auto Auction, Inc.*, 898 So. 2d 129 (Fla. 5th DCA 2005), is directly applicable. There, the parties' contract contained a similar termination provision, "requiring a party wishing to terminate the contract to do so by giving a notice of breach and opportunity to cure in writing, followed by a notice of termination." *Id.* One of the parties terminated the agreement without satisfying that requirement. The trial court upheld the termination, finding that it was justified based on the other party's failure to provide adequate services. On appeal, however, the Court reversed, holding that the contract "clearly required a written notice of breach, and a written notice of termination". *Id.* As the Court explained:

> If the provisions of a contract are unambiguous, courts may not violate the clear meaning of the words in order to create an ambiguity, and certainly may not rewrite the contract. If possible, courts should give effect to each provision of a written instrument in order to implement the true meaning of the document. Here, the language chosen by the parties for their contract clearly required a written notice of breach, and a written notice of termination. . . . There is, therefore, no valid reason that has been brought to our attention why the deal made by [the parties] should not be construed and enforced as written.

*Id. See also Gaylis v. Caminis,* 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984) (enforcing notice and cure provisions in contract for purchase of townhouse); *Mori v. Matsushita Elec. Corp.,* 380 So. 2d 461, 463 (Fla. 3d DCA 1980) (refusal to allow required cure period constitutes anticipatory breach); *Alliance Metals, Inc. v. Hinely Indus., Inc.,* 222 F.3d 895, 905 (11th Cir. 2000) (enforcing notice and cure provision in employment contract).

That same rationale applies here. Silvers indisputably has failed to satisfy the License Agreement's explicit notice requirement. Accordingly, his termination is improper as a matter of law, and Stelor is substantially likely to prevail on the merits.

Silvers' attempt to travel under a November 2004 default letter – sent more than five (5) months before the defaults alleged in his April 27, 2005 Termination Letter – is preposterous, and is specifically prohibited by the provisions of the Settlement Agreement. Thus, Paragraph 3 of the Settlement Agreement expressly provides as follows: "The License, Distribution and Manufacturing Agreement: Silvers *withdraws his notice of termination* of the License Agreement, and *reaffirms his obligations* under the License Agreement." Again, this provision is clear and ambiguous.

Paragraph 3 explicitly withdraws any and all prior or purported terminations, reinstates the License Agreement, and *reaffirms* all of Silvers' obligations under the Agreement. A critical obligation thus *reaffirmed* is the obligation under Paragraph IX of the License Agreement to provide 60 days' notice of termination and an opportunity to cure. There is no carve-out or reservation of rights with respect to that important protection. Silvers' suggestion that he somehow preserved a right, willy-nilly and without any notice or opportunity to cure, to terminate the License Agreement at any time based on the occurrence of any alleged default, past or present, is a sheer fabrication and inconsistent with this provision of the Agreement.[4]

Accordingly, Silvers' termination is invalid as a matter of law, and Stelor has a tremendously high likelihood of success on the merits.

**B.    The Alleged Defaults Are Entirely Unfounded In Any Event.**

In addition, the allegations of default are entirely unfounded in any event -- a pretext to justify his wrongful termination. Silvers himself appears to recognize the utter weakness of the defaults alleged in his Termination Letter. Tellingly, his Opposition tries to recast and embellish upon those supposed defaults. Silvers argues as if he can terminate first, and then later prepare a rolling list of claimed defaults, while seizing all of Stelor's intellectual property and rights and leaving Stelor to litigate at Silvers' leisure as its business crumbles.[5]

---

[4] Silvers' actions in entering into the Settlement Agreement, accepting payments in mid April, and otherwise moving forward with the relationship clearly constitute a waiver of and estoppel to assert the prior notice of default, even if not expressly withdrawn in the Agreement. *See Rissman v. Kilbourne,* 643 So. 2d 1136, 1139 (Fla. 1st DCA 1994) (mortgagee estopped from claiming past due payments); *Smith v. Landy,* 402 So. 2d 441, 441 (Fla. 3d DCA 1981) (acquiescence to late payments estopped mortgagee from accelerating debt and foreclosing).

[5] Silvers' claim of default under a separate Letter Agreement dated July 1, 2002 is also ridiculous. By its express terms, that Agreement expired on November 30, 2004. Cmpl. Ex. B, Par. 5.

8

- With respect to the alleged breaches detailed in the Termination Letter, Silvers first claims Stelor failed to provide Silvers unit interests after Stelor's conversion to a limited liability company. This claim is especially curious given the argument in the Opposition that Silvers had no notice and never consented to any transfer by Stelor from a corporation to an LLC. Again, Silvers ignores an express provision in the Settlement Agreement -- this one tilted "<u>LLC Acknowledgement</u>" – stating that "[t]he Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC. Any options granted to Silvers from the Stelor, Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC." In light of this provision, Silvers' attempt to claim that Stelor has somehow improperly assigned its rights to another entity highlights his utter disregard or misapprehension of the explicit terms of the Agreements. Since the conversion was just completed in March, the required documentation is still being prepared, has not yet been provided to any shareholder or option holder, and there is no conceivable breach in any event. Decl. ¶ 28(a).

- With respect to the April royalty payment for $5,000, Silvers' own counsel confirmed the payment was timely made, but that Silvers insisted the check be re-issued with different payee information. Decl. ¶ 28(b) & Exs. E, F, and G.

- With respect to the allegation that Stelor failed to pay the amount required by Silvers to maintain insurance coverage, any delay related to that payment was entirely Silvers' fault. He has failed to satisfy his obligation pursuant to paragraphs 10(b) & (c) of the Settlement Agreement to provide "evidence of paid premiums." Accordingly, Stelor is not obligated to make any such payment to Silvers, even though Stelor did so in good faith. Decl. ¶ 28(c)

- Silvers' audit claim is equally bogus. In early April, his counsel decided to defer the audit. Counsel later renewed the request to schedule an audit by email, sent April 22, 2005, just ***5 DAYS BEFORE THE TERMINATION LETTER!*** The email advised that the "auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit," then asked for "a date in the next two weeks". Silvers, however, never provided the auditors' letter and unilaterally declared a termination just one week later, notwithstanding the two-week period specified in the email. The claim is characteristically disingenuous. Those circumstances simply do not constitute a breach by Stelor. Decl. 28(d) & Ex. H; Kap. Decl. ¶ 7.

- With respect to the product samples, Silvers' counsel herself inspected them at Stelor's offices in Maryland in February of 2005. As demonstrated by an exchange of emails with Silvers' counsel on April 26, 2005, Decl. Ex. I, Stelor again made the samples available for

9

inspection at its counsel's offices. The response of Silvers' counsel was totally duplicitous: "I cannot get into this with you right now. I assure you I will get back to you and Stelor by Friday." Silvers' counsel "got back to" Stelor that Friday by sending the Termination Letter. *Id.*

- Finally, to the extent Silvers claims that Stelor failed to provide accurate royalty information, Stelor sent a report at the end of April – within a month after the close of the first quarter of 2005 – can hardly be characterized as a breach. Additionally, regarding Silvers' claim that Stelor's prior written statement regarding royalties was inaccurate, Stelor advised Silvers' counsel that it was just recently made aware that an on-line shop at CafePress.com was carrying Googles merchandise, without Stelor's authorization or knowledge. Anyway, Stelor has received no revenue from this outlet; accordingly, no royalty payments are due. Decl. ¶ 28(f).

Not only did Silvers fail to provide the required notice, but the alleged defaults on which his wrongful termination is based are pure fiction.

## V.

### SILVERS' SO-CALLED PROCEDURAL ISSUES

Silvers' suggestion that jurisdiction over this matter may be improper is absurd. On the contrary, Paragraph 17 of the Settlement Agreement provides that "[t]he Parties agree to submit to the exclusive continuing jurisdiction of the United States District Court, Southern District of Florida, for enforcement of all provisions of this Agreement." No doubt if Stelor had brought this enforcement action in any other court, Silvers would be invoking this provision to dismiss the action! Diversity exists, moreover, as no owner of any membership interest in Stelor resides in Florida. (Mr. Silvers has options, but no membership interest). Decl. ¶ 28(a).[6]

### CONCLUSION

For the foregoing reasons, Stelor's Motion for Preliminary Injunction should be granted. Injunctive relief is clearly warranted and required under the circumstances. Stelor should not be forced to sit and watch its business burn because Silvers has rashly and wrongly attempted to terminate the License Agreement. An injunction restoring the parties to the status quo as of the commencement of this dispute should immediately be entered.

---

[6] The amount in controversy requirement in actions for injunctive relief is the value of the benefit flowing to the plaintiff from the requested injunction. *See Morrison v. Allstate Indemnity Co.*, 228 F.3d 1255, 1268 (11th Cir. 2000); *see Occidental Chem. Corp. v. Bullard*, 995 F.2d 1046, 1047-48 (11th Cir. 1993). That obviously exceeds $75,000 here. Decl. ¶¶ 16 and 17.

Respectfully submitted,

BURLINGTON, WEIL, SCHWIEP,
  KAPLAN & BLONSKY, P.A.
Attorneys for Plaintiff
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261

By: _____
Kevin C. Kaplan, Esq.
Florida Bar No. 933848
David J. Zack, Esq.
Florida Bar No. 641685

### CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true copy of the foregoing is being served by Telefax and United States mail this 23rd day of May 2005, upon Gail A. McQuilkin, Esq. and Kenneth Hartmann, Esq., Kozyak Tropin & Throckmorton, P.A., counsel for Defendant, 2525 Ponce de Leon, 9th Floor, Miami, Florida 33134; and Adam T. Rabin, Esq., Dimond Kaplan & Rothstein, P.A., Trump Plaza, 525 S. Flagler Drive, Suite 200, West Palm Beach, Florida 33401.

_____
Kevin C. Kaplan
David J. Zack