UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a           CASE NO. 05-80393-CIV-HURLEY
Delaware corporation, f/k/a STELOR      Magistrate Hopkins
PRODUCTIONS, INC.,

     Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

     Defendant,

_____/

### NOTICE OF FILING MAY 23, 2005 HEARING TRANSCRIPT

    Defendant, Steven Silvers, hereby gives notice of filing the attached hearing transcript of the

hearing before the Honorable Magistrate Judge James Hopkins held on Monday, May 23, 2005 at

11:00 a.m.

                    Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.  KOZYAK TROPIN & THROCKMORTON, P.A.
Co-Counsel for Defendant            Counsel for Defendant
200 S.E. First Street, Suite 708       2525 Ponce de Leon, 9th Floor
Miami, FL 33131                   Coral Gables, Florida 33134
Telephone: (305) 374-1920          Telephone: (305) 372-1800
Adam T. Rabin, Esq.

                  By: _____
                       Kenneth R. Hartmann
                       Florida Bar No: 664286
                       Gail M. McQuilkin
                       Florida Bar No. 969338

3339/101/254139.1



## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed this

8th day of June, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq.,

Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove,

Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

By: _____

Kenneth R. Hartmann

3339/101/254139.1

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO:   05-80393-CIV-HURLEY/HOPKINS

**COPY**

STELOR PRODUCTIONS,

       Plaintiff,

vs.

STEVEN SILVERS,

       Defendant.
_____/

FEDERAL COURTHOUSE
FORT PIERCE, FLORIDA
MAY 23, 2005

The above-styled case came on for hearing before
the Honorable Judge James Hopkins, Presiding Judge at
the Fort Pierce Federal Courthouse, Fort Pierce,
Florida the 23rd, day of May, 2005.

**Page 2**

Thereupon, the following proceedings were had:

THE COURT:  Calling Stelor Productions versus
Steven Silvers.  Counselors, please announce your
appearances.

MR. KAPLAN:  Good morning, Judge.  Kevin Kaplan
for the plaintiff, Stelor Productions, with me is
Steven Esrig, who is the CEO of Stelor.

MR. HARTMANN:  Your Honor, on behalf of Steven
Silvers, Ken Hartman of Kojak, Broden, and Crawford in
Miami.  With me is Adam Rabin, co-counsel in the case.
Mr. Silvers could not be here today, he is here in
spirit.

THE COURT:  And when you say Mr. Silvers can't be
here today, what is his status?

MR. HARTMANN:  He was traveling earlier, over the
weekend.  He got back late last night, and he had a
doctor's appointment today.  He is scheduled for major
surgery, for a medical condition he has, coming up,
so, he's in and out with the doctors right now.

THE COURT:  And are you willing to proceed in his
absence?

MR. HARTMANN:  Yes, of course.  We thought about
getting a continuance, and then we said let's just go
ahead and do it.

THE COURT:  Very well.

**Page 3**

MR. HARTMANN:  Thank you, Your Honor.

THE COURT:  I apologize for the delay this
morning.  The marshal's van broke down on the way to
court this morning.  This substantially delayed
everything on the docket, but here we are.  Are we
ready to proceed today?

MR. KAPLAN:  We are, Your Honor.

MR. HARTMANN:  We're ready, Judge.

MR. RABIN:  Yes, Your Honor.

THE COURT:  Very well.  Since it's, as I
understand, the plaintiff's burden, you may proceed.

MR. KAPLAN:  Thank you, Judge.  May I please the
court, thank you for scheduling us in on relatively
short notice.  We appreciate it.  First up, Your
Honor, I wanted to make sure you had the binder of
material that I had delivered this morning.  There
have been some recent filings.  The defendant's
opposition was just served on us Friday afternoon.

THE COURT:  I have this binder.  Is that what
you're referring to?

MR. KAPLAN:  That is.

THE COURT:  A binder with attachments?

MR. KAPLAN:  That's correct, Judge.  The binder
includes a reply memo that we prepared over the
weekend and filed this morning.  It's behind tab four.

**Page 4**

As well as a supplemental declaration from Mr. Esrig
behind tab five.  We also have copies of the cases,
for convenience sake, that were cited in our initial
motion behind tab three and in the reply, which I'll
be referring to a little bit.  Judge, this is the
second suit between these parties.  You may recall the
first suit was pending in the fall and the early part
of this year, before this court as well.  There were a
few hearings you presided over.  That lawsuit was
resolved.  The parties entered into a written
settlement agreement.  The settlement agreement
provided some framework for continuing on in the
relationship, but, critically, it reaffirmed the
license agreement that had been in effect between
these same parties before.  That settlement
agreement's been under seal.  It's also in the binder
behind tab two.  We're here today because the
defendant, Mr. Silvers, has unilaterally, and without
any notice whatsoever, declared a termination of the
license agreement, and he's also gone ahead and
engaged in self-help.  We were advised of the
termination, again, without any notice, by letter
dated April 27th, from Mr. Hartmann's colleague,
partner Gail McQuilkin.  We immediately filed this
lawsuit.  It was filed May 4th.  Subsequent to the

```
 1        date of filing of the suit, or starting at or about
 2    that time, Mr. Silver has taken a series of actions,
 3    that, essentially, seem to destroy the business of
 4    Stelor.  Without any opportunity for the court, or
 5    anybody, to decide whether the termination of the
 6    license agreement was valid.  As Your Honor may recall
 7    from the prior suit, the business that we're fighting
 8    over revolves around a set of intellectual property.
 9    It's a set of characters designed for children called
10    the Googles from Goo.  It was created by the
11    defendant, Silvers, licensed to the plaintiff.  We're
12    suing for the license agreement.  Stelor, under the
13    agreement, is the exclusive licensee of all aspects of
14    that property.  And the key to the property, and the
15    key to what Stelor has been doing since 2002, is the
16    web site of Googles.com.  Stelor is about in a month
17    from now, June 21st at a major trade show in New York
18    City --
19        THE REPORTER:  What was that date again?
20        MR. KAPLAN:  June 21st.  Stelor's about to unveil
21    the launch of the major development it's been working
22    on since 2002, and in which it's invested more than
23    four million dollars, substantial time, and effort.
24    The launch, Judge, the development is really two-fold.
25    First, it's a proprietary new technology, that
```

```
 1        Stelor's developed itself, it wouldn't be Mr. Silver's
 2    property in any event, that makes this website and all
 3    of it's content safe for kids.  There's nothing like
 4    that out there.  It protects kids from pornography,
 5    and predators, and all of the things that parents are
 6    concerned about exposing their children to on the
 7    internet.  In addition, with the benefit of this new
 8    feature, the site's also, the launch is gonna involve
 9    a roll out of substantial new content for the site.
10    Stelor's developed about one hundred and sixty-five
11    characters, story lines, and related features.  It's
12    gonna be a sophisticated, interactive website that's
13    safe for kids.  The problem, Judge, the reason that
14    we're here today, on a preliminary injunction motion,
15    is because Mr. Silvers, who maintained the domain name
16    and the active passwords for that website, has shut it
17    down.  He redirected the website.  Stelor has no
18    further access to it.  When the user opens it up, all
19    you see is page of unrelated advertising that's
20    attached to Mr. Esrig's declaration on tab A.  And
21    without that website, Judge, Stelor cannot proceed
22    with it's launch.  Not only is the website down, but
23    the proprietary feature that makes this website kid
24    safe, that's been seized by Mr. Silvers, too.  It was
25    maintained along with the website in a secure place,
```

```
 1        at least Stelor thought it was secure, but that's now
 2    been seized by Mr. Silvers as well.  What we're asking
 3    the court to do is to enter an injunction, put the
 4    parties back in the place they were at the time this
 5    lawsuit was filed, essentially, restore the status
 6    quo, give Stelor access to their website back, and
 7    allow them to proceed with what they need to do with
 8    respect to this upcoming launch, without interference
 9    from Mr. Silvers.  We're prepared to have the court
10    address the underlying merits of the case on an
11    expedited basis.  In fact, we're anticipating filing a
12    very early summary judgment motion because we think
13    that's how clear cut the issues are.  We're not able
14    to file that until this week under the twenty day
15    requirement.  I'd like to address the critical
16    elements of preliminary injunctive relief for purposes
17    of this case, and, really, I think it turns on two
18    things.  Stelor's substantial likelihood of success on
19    the merits of the case.  Indeed, even at the
20    heightened standard for injunctive relief applies as
21    the defendants have suggested, they claim we're asking
22    the court to mandate that Mr. Silvers take some
23    action.  We're really not, we're just trying to
24    restore the status quo that Mr. Silvers, because of
25    his lightening speed actions after the filing of the
```

```
 1        suit was able to change, but we satisfy that
 2    heightened standard as well.  This record makes a
 3    clear showing of Stelor's entitlement to relief, and
 4    then, I'm also gonna focus on the irreparable harm
 5    issue, which, as a matter of fact, the defendants
 6    don't contest.  They've got a legal argument, which
 7    I'll address, based on a set of cases from the
 8    southern district that were rejected by eleventh
 9    circuit decision, and a Florida DCA opinion that was
10    expressly overruled by not one, but two Florida
11    supreme court decisions as recently as March of 2005,
12    but let me start with the substantial likelihood of
13    success on the merits, Judge.  As a matter of law, the
14    termination is invalid.  The termination, the license
15    agreement, itself, which is in my binder behind tab
16    1A, it was attached to a complaint.  It's got an
17    express provision dealing with termination.  It's
18    article 9, paragraph 9 of the agreement, and I'd just
19    like to read it quickly.  Right to terminate on
20    notice, in bold.  This agreement may be terminated by
21    either party upon sixty days written notice to the
22    other party.  In the event of a breach of a material
23    provision of this agreement, provided that during the
24    sixty day period, the breaching party fails to cure
25    such default.  Nothing could be clearer.  There's no
```

1  ambiguity or uncertainty whatsoever, with respect to
2  that provision.  It requires sixty days written notice
3  of termination with an opportunity to cure.  And the
4  reason for that is obvious.  There's a lot of
5  complexity and detail to this.  It's a complicated
6  relationship, and the parties need an opportunity, if
7  one believes there's been a breach or a default, to
8  try and resolve the issue themselves, and if not
9  possible, to come into the court and ask for relief in
10  that interim period before the agreement's terminated.
11  And we're dealing with a termination here based on a
12  failure to pay five thousand dollars, compared to a
13  multi-million dollar intellectual property.  A four
14  million dollar, four year investment that Stelor's
15  made, that's why that provision is so important.
16  There's no dispute, the first letter that came since
17  the prior lawsuit was dismissed, and since the written
18  settlement agreement was entered into on January 28th,
19  2005.  The first letter was the April 27th letter
20  advising of the default, and terminating the agreement
21  effective immediately.  In fact, a lot of the alleged
22  defaults are only a matter of weeks old.  They haven't
23  even occurred within a sixty day period.  Now, the
24  settlement agreement critically withdrew a prior
25  notice of termination that had been served, to the

1  extent, the defendant tries to travel under that prior
2  notice, where he did comply with that notice provision
3  in the agreement.  They can't do that.  They sent a
4  letter back in November 2004.  They then declared a
5  termination about sixty days following that November
6  notice letter, but, of course, the settlement
7  agreement was entered into afterwards, and the lawsuit
8  was dismissed with prejudice.  The settlement
9  agreement itself, behind tab 2, states expressly in
10  paragraph 3, it's on page two of that agreement, that
11  Silvers withdraws his notice of termination of the
12  license agreement, and reaffirms his obligations under
13  the license agreement.  So, termination, prior
14  termination, the notice letter, no longer effective,
15  and all of Mr. Silver's obligations under the
16  agreement are expressly reaffirmed including the
17  obligation to provide sixty days advance notice,
18  which, as I described, is critical to provide an
19  opportunity to resolve and work out these issues
20  before Stelor's multi-million dollar project, which is
21  about to launch, crumbles to the ground as a result of
22  a unilateral termination by Mr. Silvers.  And if I
23  could, Judge, I just want to emphasize that these
24  provisions, notice provisions, are strictly enforced
25  by the Florida courts.  We cited in our reply, a case

1  called Florida Recycling, which is behind tab 23 of
2  the binder, I know Your Honor is gonna get through our
3  papers at some point, I understand you'll need to take
4  this under advisement, but that case holds that these
5  provisions are strictly enforced and must be applied
6  by the courts, not satisfied here, and there's no
7  basis for getting around that requirement.  I'd like
8  to just quickly, very quickly, address the claim to
9  faults, and there's been some change.  By the time we
10  got the opposition papers, their list of alleged
11  defaults, has rolled on beyond what was in the
12  original termination letter, and again, that's not
13  right.  They gotta provide notice of the defaults, and
14  they can't continue to create a rolling list of
15  defaults into the future as we litigate the issue.
16  The first thing they contend is that Stelor,
17  previously a corporation, converted to a limited
18  liability company, and that they didn't consent to
19  that, so it's somehow invalid and vesicates the
20  license agreement.  Judge, in the settlement
21  agreement, in paragraph 9, a provision entitled LLC
22  acknowledgement, it states that the parties
23  acknowledge that Stelor Inc., a Delaware C
24  Corporation, is in the process of converting to a
25  Delaware LLC.  It provides that any options granted to

1  Silvers will be converted to unity interests in the
2  LLC.  This is just an example, Your Honor, of the
3  defendant's clear disregard for the express terms of
4  this agreement, and they shouldn't be allowed to do
5  that.  The LLC conversion was just completed in March,
6  mid March.  Stelor's working on the papers, they
7  haven't been provided to anybody, and as soon as
8  they're ready, they were intended, and expected, to be
9  provided to Mr. Silvers.  They also claim that you
10  refuse to respond to their request for a date to
11  conduct an audit of Stelor.  They're allowed to do
12  that, they've got to provide thirty days notice under
13  the license agreement, and they had asked, but Mr.
14  Silver's counsel, Gail McQuilkin, told us in early
15  April that she was gonna defer the request for an
16  audit.  The reason, Your Honor, was we were working
17  jointly to prepare a lawsuit against Google Inc. that
18  came after the Googles.com website, in which we were
19  gonna bring together, although it's Stelor's right to
20  do that alone under the agreement.  I'm gonna come to
21  what they've done.  They filed that lawsuit their
22  selves, on May 4th, it's pending before Judge
23  Reisenham (phonetic), and we want to address that in
24  our injunction as well, but in the meantime, Ms.
25  McQuilkin said don't worry about the audit, we'll get

Page 13

1  to it later.  On April 26th, Your Honor, one week
2  before we got the notice of termination, she advised
3  us again, by e-mail, that she wanted to conduct the
4  audit, and a copy of the e-mail is attached to Mr.
5  Esrig's declaration behind tab 5 of the binder, behind
6  exhibit H.  In that e-mail, to me, she says the
7  auditor is preparing a letter that will outline the
8  documents and records he needs available to do the
9  audit, and she asks for dates in the next two weeks,
10  not even a two week period that expired before the
11  default letter.  Critically, of course, we needed that
12  letter to know what the auditor wanted, what we needed
13  to make available, and it never came.  They also
14  complain about an allegedly missed April royalty
15  payment, and as we, as exhibit G to Mr. Esrig's
16  declaration, an e-mail from Gail McQuilkin confirms in
17  item five, they got a check for April, but it was made
18  out to Steven Silvers individually as opposed to a
19  company he wanted it to be made out to, so they asked
20  us to recut it, which we did, and tendered it to them
21  at the end of April, and they refused to accept it.
22  Similarly, they complain there's no insurance for
23  Stelor, product liability insurance, that's in Mr.
24  Silvers's affidavit.  The certificates are attached to
25  Mr. Esrig's affidavit that show that insurance has

Page 14

1  been in force continually, and is still in force now,
2  at the time of the purported termination.  Product
3  samples.  They claim we didn't provide product
4  samples.  Ms. McQuilkin, after the settlement
5  agreement, came to Stelor's offices in Maryland in
6  February and reviewed those samples herself, took
7  some, but not all, back with her, and, again, I
8  advised them by e-mail dated April 26th, before the
9  termination, that they could come to my office, I had
10  the samples available for them to look at again, and
11  that's behind tab I, exhibit I, in Mr. Esrig's
12  declaration.  Royalty information was provided timely,
13  it's got to be done on a quarterly basis.  The first
14  quarter for 2005 just ended.  We provided it within
15  thirty days as we're required to do, and they object
16  to that as well.  To the extent they want to rely on
17  letter agreement, Judge, that was entered into at the
18  same time as a license agreement, it alleged breaches
19  of that.  That's expired by it's own terms, it's
20  attached as exhibit B to our complaint.  It had a
21  thirty month term, which expired in November of 2004
22  by my calculation.  I think it's clear from this
23  argument, and from this record, and, again, Mr.
24  Silvers isn't here to contest it, and his affidavit,
25  his declaration doesn't effectively contest these

Page 15

1  points.  They didn't comply with the express notice
2  requirement, and we're gonna prevail on all of the
3  alleged breaches.  As a matter of law, based on the
4  notice issue, Stelor is likely to prevail on the
5  merits of the case.  Unfortunately, if we litigate
6  this over the course of the next succeeding months,
7  Stelor's also gonna suffer irreparable harm.  If it
8  can't proceed with the launch, and it cannot proceed
9  with the launch unless an injunction is entered and we
10  get the website back, Stelor will lose it's business.
11  It's been working for four years on this launch.  The
12  launch is the culmination of all of Stelor's efforts.
13  It does not have the financial and other resources to
14  stay alive if the launch doesn't proceed.  A little
15  demonstrative exhibit if I can approach, I'm not sure
16  Your Honor can see from there.  That's what the booth
17  will look like at the upcoming trade show.  A hundred
18  thousand dollars have been spent on the development of
19  this.  It's a twenty foot by twenty-six foot booth.
20  It's extremely effective and important.  It's got the
21  website all over it.  Judge, the reason that the
22  website is so critical --
23      THE COURT:  Can I take a look at it?
24      MR. KAPLAN:  Sure.  The reason the website is so
25  critical is because the site itself ahs been up for

Page 16

1  about seven years, and it enjoys a steady and
2  substantial volume of traffic.  There are tens of
3  thousands of kids on that website everyday, Judge, and
4  in fact, Stelor's got six hundred thousand registered
5  users from that site already.  They need to have that
6  foundation in order to make this launch successful.
7      THE COURT:  How many registered users?
8      MR. KAPLAN:  Six hundred thousand, and, again,
9  that's all confirmed by Mr. Esrig's declaration.  You
10  can't just start from scratch with a new website that
11  nobody knows about.  That's a recipe for disaster of
12  this launch.  They need to have that website, along
13  with the property, the proprietary technology that
14  makes the website safe that is tied to it.  Now, as I
15  said before, none of this showing of irreparable harm
16  is disputed by defendant Silvers as a matter of fact.
17  There's nothing in Mr. Silvers's declaration that says
18  that's not right, you're not gonna suffer this harm.
19  There's nothing in their papers that contests it on
20  the facts, they make a legal argument.  In fact, Mr.
21  Silvers, himself, recognized in a letter that's
22  attached a s exhibit C to Mr. Esrig's declaration,
23  that if he were to engage in this kind of self help
24  and shut the website down before a court
25  determination, he would cause irreparable harm to

1  Stelor. He says, he cites his authority that includes
2  shutting down the Googles.com website, and then he
3  assures Stelor, in the following paragraph, that with
4  the exception of a material breach by Stelor, and
5  ruled as such by a court of confidant jurisdiction, as
6  required in our existing agreement, at such time, and
7  only at such time, shall I then determine what would
8  be in the best interest of my intellectual property,
9  and he emphasizes, at the bottom of that paragraph,
10  this shall once and for all alleviate any fear or
11  concern by you or the board that I would do something
12  intentionally to harm my domain. He knows what he is
13  doing, Judge. He is intentionally and irreparably
14  trying to harm Stelor, to put them out of business.
15  Now, their argument is okay, maybe the termination's
16  invalid, maybe it's not, we think it is valid, but
17  Stelor's only recourse is to litigate this issue in
18  front of the court over the succeeding months and
19  maybe get damages at the ned of the day, but in the
20  meantime, Stelor's got to stand by and watch it's
21  business burn to the ground. Judge, that's not the
22  law in this circuit, and it's not the law in Florida.
23  They relied primarily on a line of cases involving
24  Burger King franchises. They cite a case called
25  Burger King v. Hall. It's a district court decision

1  from Judge Kiho (phonetic) in the early nineties.
2  But, critically, there's a case out of the eleventh
3  circuit called McDonald's v. Robertson, that's behind
4  tab 32 in our binder, cited in our initial motion and
5  in our reply that specifically rejects the district
6  court's decision in Burger King, to the extent, that
7  decision says the validity of the termination is
8  irrelevant to th issue for injunction, and there's no
9  irreparable harm. The McDonald's court makes clear
10  that that question is relevant and it required that a
11  showing, relating to the validity or not of that
12  termination, be made before the court and decided in
13  connection with an injunction motion, and that court
14  also made clear that the loss of a business in the
15  mean time, and not even a total loss of the business,
16  but just of ceratin customers and good will and damage
17  to reputation, as long as it couldn't be quantified or
18  measured, was irreparable harm requiring an
19  injunction. That court expressly disagreed with the
20  Burger King cases on which they relied, and those
21  Burger King cases are entirely distinguishable on
22  their facts. In those situations either the franchise
23  agreement had expressly expired by it's own terms, and
24  a franchise, in effect, tried to hold over, and that's
25  not the situation here, or the franchisee clearly had

1  failed to make royalty payments, and not just one or
2  two missed payments, but failed to make payments for a
3  year. In one of the cases three years, and the other
4  case, and that's a vastly different situation than
5  here, where we've showed our high likelihood of
6  success on merits. There's a case out of the second
7  circuit, as well, called Tom Doherty v. Sevan
8  (phonetic), behind tab 41 in our binder, 1995 case,
9  that couldn't be more on point, Judge. In fact, it's
10  a more extreme injunction than we're seeking. That
11  case about the Power Rangers, I never really watched
12  that, but my kids do a little bit. A publisher had an
13  option, from a creator of children's characters, to
14  publish children's books. Both of the entities at the
15  time the option was entered into were relatively
16  unknown so it made sense ot everybody, and then the
17  creator came up with this Power Rangers character that
18  was a tremendous success. He tried to license it to
19  other people, not to the publisher, for vast sums of
20  money, and the second circuit, on a preliminary
21  injunction motion, Your Honor, required the license to
22  be provided to the publisher and held that the creator
23  could not license the property to anybody else, on a
24  preliminary injunction motion. They cite that case
25  with approval in their papers, Judge. Clearly, what

1  we're seeking here is much less extreme than the
2  relief the court authorized in the Tom Doherty case.
3  An eighth circuit case, Ferry v. Morse (phonetic),
4  also cited in our, Ferry Morse also cited in our
5  papers, issues an injunction requiring a supplier to
6  provide corn seed to a distributer, and that case
7  critically says that order essentially is required to
8  maintain the status quo because the distributer
9  relationship had been ongoing even though it requires
10  seed to be provided. That's all we're seeking here.
11  We want to maintain the status quo of this
12  relationship, and move forward. Now, they also cite a
13  Florida case, Florida Power Corp. v. Belair
14  (phonetic), cited by the second DCA 2002, it's tab 22
15  in my binder. They are, the lower court issued an
16  injunction holding a franchise agreement, Florida
17  Power Corporation was providing electricity in certain
18  cities. The agreement expired by it's terms, and the
19  lower court enjoined the continuation of that
20  agreement while the parties tried to work things out
21  in the interim. The injunction was overturned by the
22  appellate court. That's the case they cite, and in
23  March of 2005, the Florida Supreme Court reinstated
24  the injunction, and held that it was appropriate. In
25  fact, it's not one, but two Florida Supreme Court

1 decisions, the '05 case involving that decision, and
2 also in 2004 decision related to a different city.
3 The '04 decision says we disapprove Belair to the
4 extent that it provides the courts cannot extend the
5 terms of expired franchise agreements that cover an
6 interim period during which a holdover utility and the
7 local government resolved the status of their
8 relationship going before, going forward. As
9 explained above, the conduct and interaction of the
10 parties and balance of equities involved may render
11 such action necessary and proper. To exclude such a
12 remedy within the reach of the courts would upset the
13 balance of the relationship. That's exactly the
14 situation here, although, less extreme because the
15 license agreement has not expired by it's own terms.
16 It's been invalidly terminated by Mr. Silvers.
17         THE COURT: What's your view of what the
18 controlling law is on this issue? Is it federal law
19 or state law on this issue?
20         MR. KAPLAN: I think that's a valid point. I
21 think it's federal law, Judge. I think it's the
22 McDonald v. Robertson case. We didn't find any case
23 law that really squarely addressed that issue, we
24 would have cited it to you, but even if you look at
25 the Florida cases, that Supreme Court decision in

1 Belair, I think directly supports the issue of
2 injunctive relief here. they don't even address that,
3 but there's no doubt that it supports the issue of
4 some injunctive relief here. There's no --
5         THE COURT: Why do you think that the federal law
6 in McDonald is the controlling law? Even if there is
7 no difference between Florida law and federal law, why
8 do you think that federal law controls this issue?
9         MR. KAPLAN: I think it's a procedural issue.
10 The standards to be applied in connection with issuing
11 injunctive relief. My analysis is it's a procedural
12 issue, and we've also got an eleventh circuit case,
13 McDonald v. Robertson, right on point, that I think
14 this works. If not obligated to follow, at least is
15 very persuasive authority. Certainly some of the
16 legal issues, like the validity of the termination,
17 are a matter of Florida law, and I cited the one
18 Florida case, there's a couple others cited in our
19 reply that clearly mandate that notice provision,
20 express notice provision. The balance of harms,
21 there's no harm whatsoever to Mr. Silvers for moving
22 forward. Let's be clear, he hasn't had, he hasn't
23 done anything with this intellectual property, at
24 least since 2002, when the license agreement was
25 entered into. Requiring him to keep his hands off for

1 a few additional months while this issue is litigated
2 by the court, have to have it expedited, imposes no
3 harm to him whatsoever. On the contrary, he stands to
4 profit. If the launch is successful, and Stelor
5 firmly believes it will be, then Mr. Silvers has got
6 an interest in royalties. He'll handsomely profit
7 from that. Beyond that, just a few days ago I got an
8 e-mail from Ms. McQuilkin advising how happy Mr.
9 Silvers was with the project and the impending launch,
10 it's tabbed exhibit B to Mr. Esrig's declaration, and
11 I've adapted it because, as I say, there were a bunch
12 of communications relating to this Google lawsuit that
13 we were gonna bring. She says I agree this has gotten
14 silly, the issue is going back and forth about the
15 license agreement, and I'm sure the board, Stelor's
16 board, would rather focus it's discussions on the
17 upcoming Launch and trade show, and then she
18 continues, with respect to her client, he really is
19 very happy with the project and excited about the
20 launch and upcoming show. He knows the success of the
21 project is a result of the work and investment made by
22 everyone over there. He's got no issue with the
23 project or it's moving froward, and there's not one
24 word mentioned in the termination letter about the
25 content for the launch, the other unfounded issues

1 that I ticked off a moment ago. Now, lastly, Judge, I
2 need to address the Google action. On May 4th, the
3 same day we filed our lawsuit, Mr. Silvers and the
4 same lawyers filed an action against Google Inc. The
5 big search engine company that's got a website. Now,
6 this is, again, specifically covered in all of the
7 agreements. The license agreement gives Stelor the
8 exclusive right to protect the intellectual property
9 and take all action, and the settlement agreement,
10 critically, in paragraph eighteen, provides that any
11 action with respect to Google Inc. is gonna be done
12 jointly, and not only that, it says if either party
13 does anything unilaterally, with respect to Google
14 Inc, that warrants immediate injunctive relief. The
15 parties hereby agree, there's no adequate remedy of
16 law in the event that either party negotiates or
17 settles the dispute with Google Inc. without the other
18 party. The breach of that will create irreparable
19 harm and injunctive relief will be necessary to
20 maintain the rights of the non-reaching party. Judge,
21 not only have they been in communication with Google
22 Inc., they filed a lawsuit that's all right to bring,
23 and the cases make clear, there's a case called
24 American Express, out of the eleventh circuit,
25 Machrovich (phonetic), that's behind tab 45, that

Page 25

1    makes clear that the parties express agreement
2    authorizing injunctive relief if an event occurs, ahs
3    to be strictly enforced by the court. The court does
4    that in this case, the Machrovich case. So, we're
5    requesting injunctive relief with respect to the
6    Google Inc lawsuit as well, and we want Your Honor to
7    order Mr. Silvers to dismiss that lawsuit without
8    prejudice so we can resolve this dispute, and we can
9    have the opportunity to proceed with that lawsuit as
10   is our right to do. Again, the showing of irreparable
11   harm, expressly recognized by the agreement, and our
12   extreme likelihood of success on the merits supports
13   the injunction we request both to restore the website
14   and the proprietary content, the technology we've
15   developed to make the site for kids safe, and to
16   require, to bar any further interference with the
17   license agreement and the impending launch, to require
18   the dismissal without prejudice of the Google Inc.
19   action. Unless Your Honor has any questions, that's
20   my argument. I would note that Mr. Esrig is here
21   today, he's available to testify. I think our case is
22   clearly supported by the declarations. Your Honor
23   indicated that can you can rely on those in the order
24   and also McDonald v. Robertson case makes that clear.
25   I would like to conclude by showing Your Honor, if you

Page 26

1    permit me, a thirty second trailer that provides a
2    description of the feature that Stelor is about to
3    unveil. If Your Honor would permit me, it's on that
4    laptop. Any objections?
5        THE COURT: No objections. I just ask that, let
6    me ask the other side, also, if they have any
7    objections to the showing of the demonstrative exhibit
8    to the court, and does either side have any objections
9    to being placed in evidence.
10       MR. HARTMANN: No objection to that, Your Honor.
11   We're gonna use demonstrative exhibits as well, and I
12   don't have any problem with placing what they've shown
13   so far into evidence. I can't speak for Mr. Kaplan as
14   to whether or not he has any problem with my stuff,
15   but I assume you're willing to put it evidence.
16       MR. KAPLAN: I'd be happy to address any problem
17   with their stuff as it comes, and we move that into
18   evidence, the only issue is that we just need to make
19   arrangements to get a copy submitted to the court, if
20   that's okay.
21       THE COURT: I can admit it, and you can make me
22   in custody of it.
23       MR. KAPLAN: Great. There's also a plan, a floor
24   plan of the booth, that I might as well show to Your
25   Honor as well. I'll hand it to your bailiff. What do

Page 27

1    you want to mark them as?
2        THE COURT: I'll mark them as exhibits one and
3    two for purposes of our injunction motion, as the
4    floor plan being exhibit two.
5        MR. KAPLAN: I've mentioned, as well, that the
6    real estate for this show is very valuable. Stelor is
7    next to Dream Works, Disney, and Nickelodeon. Judge,
8    we're talking some of the hottest kid's properties
9    here so it's going to be substantial exposure,
10   substantial opportunity, in connection with this
11   launch, that just isn't gonna be able to be recreated
12   in the future. Judge, could Mr. Esrig approach with
13   the laptop?
14       THE COURT: Yes. Does the other side want to --
15       MR. HARTMANN: Yes.
16       THE COURT: --view this at the same time? Put it
17   up here. Do you want to make that as an exhibit?
18       MR. KAPLAN: Yes, please, Judge. Exhibit three.
19       THE COURT: Any objections?
20       MR. HARTMANN: No objections, Your Honor.
21       THE COURT: You can also keep custody of that.
22       MR. KAPLAN: Thank you, Judge.
23       MR. HARTMANN: Can I proceed?
24       THE COURT: Yes. Do you want to tender Mr. Esrig
25   for cross-examination?

Page 28

1        MR. KAPLAN: I'm happy to do whatever the court
2    pleases. He's here, I had advised Mr. Hartmann that
3    Mr. Esrig would be here. Mr. Hartmann had advised me
4    that he intended to call no one, but I'd be happy to
5    have Mr. Esrig be cross-examined if Mr. Hartmann's
6    going to decide to do that notwithstanding his prior
7    representation that he wouldn't.
8        MR. HARTMANN: If I wanted to call him, your
9    Honor, I would have called him. I don't think it's
10   necessary to cross-examine Mr. Esrig. I think that
11   the record that we have is what we're traveling on.
12       THE COURT: Very well.
13       MR. HARTMANN: We're content to do that. I want
14   to go back just a little bit and give you a little bit
15   of historical overview because I think the court needs
16   to understand. We laid it out a little bit in our
17   brief and Mr. Silvers's declaration, but it all
18   started with this book, Googles from Goo, which Mr.
19   Silvers wrote when he was incarcerated in an effort to
20   keep connected with his family members. It kind of
21   blossomed in there, so when his conviction was
22   overturned and he found himself out, he pursued this,
23   and his family pursued this, and they published a
24   book. They started selling books, and they started to
25   develop a line of products and so on. This is one of

Page 29

1    the stuffed animals.  This is one of the Googles.
2    It's a family of characters.  It started out with four
3    of them.  I actually have a picture of Mr. Silver
4    surrounded by the Googles, and I left it in Miami,
5    probably just as well because he doesn't have as much
6    hair as he has in the picture, and I don't want to
7    mislead the court.  I think the one thing we all agree
8    on in this room, we had a rocky relationship, we've
9    been here, this is our second time.  Everybody agrees
10   that this is what they call sticky.  Kids love this
11   stuff, and if there were a trial of this case down the
12   road, the jury's gonna see a video tape of a live show
13   with the Googles up there, and I don't know if the
14   court, like me, got pulled into the Barney phenomenon,
15   and had to go catch a Barney concert and hang out with
16   the kids and watch that stuff, but there's an
17   attraction there that's so indefinable, and the kids
18   sort of storm the stage at the end of this concert
19   just to touch the Googles, it's almost like Beatle
20   mania among the younger crowd.  So I'd like to put
21   these into evidence so the court can see them or look
22   at them, if you don't mind.
23       THE COURT:  Defense exhibit one and two.
24       MR. KAPLAN:  The only objection that I have is,
25   let me get it on the record, that is not a Stelor

Page 30

1    figure.  It was something that was created --
2        MR. HARTMANN:  Let me clarify.  Exhibit one would
3    be, defense, the book.  Exhibit two would be the
4    stuffed figure which is not a Stelor Productions
5    licensed product.  This was done by a prior licensee.
6    In fact, Mr. Silvers had a prior licensee, and it was
7    in July or June of 2002 that the license agreement
8    with Stelor took effect.  Now, I just want to talk a
9    little bit, Your Honor, about what a license
10   relationship is because some of the cases that are
11   cited are dealing with buying and selling widgets,
12   and, you know, there are contract issues in those
13   cases, and we cited those, but the reason we cited the
14   Burger King cases is that the licensor/licensee
15   relationship is not just your basic commercial
16   relationship.  What you have in this case, Stelor was
17   our exclusive licensee.  Our guy gave him his Googles
18   IP, his intellectual property, his trademarks, his
19   copyrights, all this.  He said you guys are the guys.
20   You go and develop it, and you make me money.  It's
21   almost like I'm renting this to you, as long as you
22   live with your license agreement, as long as you
23   comply with that, then you have the exclusive rights
24   to use and exploit this.  I own it.  You don't own
25   anything, and that's what the license agreement says,

Page 31

1    but it's not really a completely even relationship
2    because the licensor can give the license or he can
3    take it away, and that's what you see in all the
4    franchises.  So Burger King affirms a franchisee,
5    there's a license that's involved, intricately
6    involved in that.  The owner of that Burger King
7    restaurant down the street has a license to use those
8    Burger King trademarks, and when the franchise was
9    terminated, the license was terminated as well, and
10   that's what's being litigated in the Burger King case,
11   but the licensee's use depends upon them complying
12   with the terms of the license agreement.  That's an
13   absolutely essential factor.  It's not like a normal
14   type of agreement where you have the normal type of
15   breach issues.  If the licensee does not comply with
16   the license agreement, then it's expressly
17   contemplated in the agreement that the license can be
18   terminated.  And I have a little note before you with
19   a lot smaller subjects but it would help me, and I
20   think help the court because I'm gonna run through
21   some of these materials, as well.  They're all things
22   that are attached to the affidavits or pleas.  I have
23   provided a copy already to Mr. Kaplan.
24       THE COURT:  Did you say this is already in the
25   court file?

Page 32

1        MR. HARTMANN:  Yes.  Those are copies of things
2    that are already in the court file with respect to
3    exhibits to declarations or attachments to our
4    pleadings.  Now, as you can see there, paragraph nine,
5    it has the express format for here's what would be the
6    basis for a termination, and then paragraph ten it has
7    certain post termination rights, it's really almost
8    like a prenuptial agreement, it's like a marriage.  In
9    a way, this relationship is like a marriage, and it's
10   an agreement that says here's the basis for one of us
11   getting a divorce, that's paragraph nine.  Then
12   paragraph ten is, if one us gets a divorce, because of
13   paragraph nine, paragraph ten applies and the governs
14   what happens post termination.  That is important
15   information, Your Honor, because that gives Stelor a
16   six month period to sell off their existing inventory
17   of licensed product, and they can use the Googles IP.
18   We would have been in here on an injunction stopping
19   them, like Burger King does when they terminate
20   people, right away, asking the court on our behalf to
21   enter a preliminary injunction, but we didn't do that
22   because they do have limited rights to use the IP in
23   this post termination period.  That's there as a
24   safeguard because the parties contemplate going into
25   this that termination is a specific possibility.  Now

1   what you see in the cases that were cited by Mr.
2   Kaplan, you don't find that those are based on
3   terminated contracts, generally speaking.  The cases I
4   see had to be supportive of our position.  In a lot of
5   those cases, in the Saven case, for example, that the
6   agreement existed, there was an agreement for the
7   right to publish this book.  Nobody terminated that
8   agreement.  So, it's different.  The rule of law that
9   we're citing is specifically based on when you have a
10  terminated agreement, can the terminee compel specific
11  performance and undo the termination.  That's really
12  what they're trying to do, Judge.  It's not a status
13  quo, it's a mandatory injunction.  They want to undo
14  what's already happened, go back, and they want to
15  define the status quo as April 27th, it's not.  It's
16  May 23rd.  I mean, what we really have, Your Honor, is
17  this was a license relationship, but on April 27th
18  this is what happened.  It was terminated.  The
19  parties got a divorce, and what they're asking you to
20  do by this injunction, is Scotch tape us back
21  together, and the courts say that doesn't work.  What
22  works is to take this claim, when they're traveling on
23  a wrongful termination claim, you don't tape them back
24  together.  You go ahead, you have a trial, and you
25  determine if there was in fact a wrongful termination,

1   and then you assess damages against the party who
2   wrongfully terminated, if that's the case.  That's
3   where the Burger King cases are particularly
4   instructive because we could have been Burger King
5   suing them fro a preliminary injunction because they
6   are using our marks.  If you, the website that they
7   claim was shut down, go back to chambers, Your Honor,
8   and punch in StelorProductions.com, you'll go right to
9   the website.  It's the same website that was running
10  through our domain name.  It's just you get there a
11  different way now.  Their website's functional.
12  Everything that they were doing before, they're doing.
13  What they lost was one of the doors to that domain, to
14  their website, and that's the Googles.com domain name,
15  which our client registered.  Now, what's interesting
16  about that, they're complaining to the court that that
17  is locked down and shut down, etcetera, etcetera.
18  What happened was Stelor sent a copy of this lawsuit
19  to the registrar for that domain name, and that's what
20  locked it down.  We've been trying to get it unlocked.
21  We can't.  We'll probably be back there next week
22  asking the court to enter an order against someone
23  called Go Daddy to unlock this thing because right
24  now, no one's using it.  It sitting there.  They
25  refuse to undo it.  The issue --

1        THE COURT:  Can you run that last point by me
2   again?
3        MR. HARTMANN:  Well, it is confusing, i didn't
4   understand some of the things that Mr. Kaplan said.
5   When you have a domain name, you register it with the
6   registrar.  In this case, the registrar is called Go
7   Daddy.  When you register the domain name, when you
8   register it you have an owner, who basically has
9   control over it, and then you can have an
10  administrative contact that the owner can designate
11  and say that person can go in there and point it to
12  whatever direction they want.  That's really what the
13  key is here.  Prior to termination, when you went to
14  Googles.com, it pointed to the Stelor website.  After
15  the termination, Mr. Silvers pointed it away from the
16  Stelor website.  They filed a lawsuit.  They provided
17  the lawsuit to Go Daddy.  So Go Daddy knows.  Go Daddy
18  shut down the domain name.  Now, when you go there,
19  you get an advertisement for Go Daddy.  That's not
20  what we want.  That's not what they want.  They're the
21  ones who caused this administrative lock down as it's
22  called, and we're trying to get Go Daddy to release it
23  to anybody, but right now, no one can use it because
24  of the administrative rules that the registrar,
25  itself, has.  But, Judge, I listened to a lot of talk

1   about Mr. Silvers breached this and Mr. Silvers
2   breached that, and honestly this case is not about
3   whether Mr. Silvers breached anything.  This is about
4   whether or not he validly terminated the license
5   agreement.  I think Mr. Kaplan said that, and I think
6   that because that's what this case is about, under the
7   case law, their remedy is damages and not injunctive
8   relief, and I see that throughout the cases, even the
9   ones that they cite.  In other words, when you're
10  trying to require specific performance of a terminated
11  agreement, that's different than trying to require
12  specific performance of an existing agreement.  In the
13  FLA case, it looked like it court was full.  We're
14  trying to work this out, we haven't agreed to a
15  renewal yet, but we're working on it.  There were
16  extraordinary circumstances for the court to go ahead
17  and enter an injunction while they did that.  We're
18  not trying to work anything out here, Judge.  This is
19  a divorce, and I'm gonna go through the reasons why
20  that divorce occurred, and, you know, Mr. Silvers was
21  justified  It may appear that we're being arrogant
22  because we're saying hey, we can cut you off and you
23  can't do anything to stop us.  You just have to sue us
24  for damages.  We can hit you.  You can't hit back.
25  You just have to sue for damages.  This is not

1  something that was done arrogantly. It was done with
2  careful consideration. Mr. silvers invested three
3  years with Stelor. This is his dream, this project.
4  He's put enormous energy into it. In fact, the first
5  lawsuit was based on the fact that he had too much
6  energy and was bothering them too much. Mr. Esrig
7  testified that he called a hundred times a day and was
8  driving him crazy. The real issue is whether the
9  court, by means of an injunction, can un-terminate the
10  agreement, and stick us back together and coerce us to
11  coexist. I mean, this is like a marriage and they're
12  asking the court to tell the husband to go home and
13  have conjugal relations with your wife. You can't do
14  that. you can't coerce people to do that kin do thing.
15  So, that's why the courts say, no, if you did it
16  wrong, if you didn't go by the rules, you have a claim
17  for damages. Now, there's some threshold issues I'm
18  not gonna spend a lot of time on. They addressed them
19  in the binder we saw there. I still think the
20  pleadings are defective in terms of subject matter
21  jurisdiction and that there are standing issues, we're
22  gonna file a motion to dismiss in that regard. So,
23  I'd like to use my time today on more substantive
24  issues. Now, Mr. Kaplan conceded that they probably
25  have to meet a higher standard, and that standard is

1  that it's a clear and convincing probability that
2  they're likely to prevail. Judge, they're not gonna
3  be able to meet that standard. The list of breaches
4  of this agreement goes on and on and on. What I've
5  done, what I'm gonna do now, in the next few minutes,
6  I'm gonna go over the breaches that were subject to
7  the notice of termination, were breach of either the
8  license or the letter agreement, and then were
9  reconfirmed, supposed to be cured in the settlement
10  agreement, and weren't. Their brief does have other
11  breaches for which notice wasn't given, and which
12  weren't directly in the settlement agreement.
13  Frankly, we did that to show the court, but this is
14  just a pattern of a licensee that despite having what
15  you'd think would be high motivation to live up to
16  it's obligations under the license agreement, and all
17  the other agreements, either can't or won't. We're
18  mystified as to why they would jerk our guy around for
19  five thousand bucks. It's crazy, isn't it? If they
20  really have this going. If it's not all smoke and
21  mirrors, which we don't know. The list of breaches
22  here, Judge, goes on and on and on. Let me start with
23  the options. That's in the letter agreement. When
24  the license agreement was entered into in June of
25  2002, that's tab A, the parties entered into a letter

1  agreement we call it, it's like a consulting
2  agreement, and in that, they agreed to compensate Mr.
3  Silvers by, among other things, giving him options in
4  the corporation's stock. In fact, the agreement says,
5  they shall provide an option agreement, not a promise
6  that you'll get options someday, that's what the
7  contract says, they are supposed to provide him with a
8  written, enforceable agreement that says you have
9  these options. All right? Now, they've reached that,
10  they never did it. June 2002, that was in the notice,
11  they were told you're in default, get this together.
12  They didn't. So we terminated them. I'm gonna come
13  back to all the notices you sent back. In the
14  settlement agreement, they, again, said yes, we will
15  get this done. We will get you th option agreement,
16  and to this day, we don't have it. The settlement
17  agreement was entered into in January. We terminated
18  them on April 27th. Judge, how much longer do we have
19  to go and wait before we give up and say this is
20  enough. We need a divorce. Compensation goes to the
21  heart of any kind of agreement here. That's number
22  one, that was, you can get into a fight as well,
23  they had a good excuse for it, and in fact, Mr
24  Kaplan's cure letter, which I think is tab 7 in the
25  notebook, there's still more excuses, well we moved to

1  the LLC and that was only so and so. Just recently,
2  we went to the Secretary of State in Delaware, that
3  LLC ahs been there since June '02. So, you know,
4  enough is enough. They promised back in June '02 they
5  better figure out how to comply with that agreement or
6  they run the risk of termination. Now, what's
7  particularly incredible about the letter agreement is,
8  tab B, in paragraph 1C it says, if they don't pay me,
9  pursuant to the agreement above, the options, if they
10  don't compensate me with that, I can terminate the
11  license agreement. That's what the letter agreement
12  says, and there are no notice of --
13      MR. KAPLAN: You can do that, just, anytime.
14      MR. HARTMANN: There's no protections there.
15  Now, license agreement has protections. It has a six
16  month safety net to recoup their investment by using
17  the IP, but there's no such provision in the letter
18  agreement. So, we've had three years of excuses form
19  Stelor, since June '02, it's now almost June '05. We
20  don't have an option agreement. What's my client
21  supposed to do, Judge? How patient is he supposed to
22  be? At what point can he draw the line? We gave them
23  notice back in November. They're in breach. They
24  didn't even have to on that particular issue. The
25  other key, I think most important, is the audit. The

1  audit is probably the most material provision in any
2  license agreement because you're relying on the
3  licensee to go out and develop your stuff, sell it,
4  and pay you a royalty on it.  That's supposed to be a
5  money tree for you.  They're supposed to pick off your
6  percentage of the trees and send it over and you put
7  them in the bank.  But if you're in the blind, how do
8  you know that what they're doing's confident, and how
9  do you know that they're being fair and paying you
10  what they should pay you?  So you have an audit.  We
11  requested an audit again back in November, several
12  months ago.  First they said no, you're not entitled
13  to an audit, then maybe you are, then we got questions
14  about well, what's the scope of the audit.  And we
15  said gee, take a look at the license agreement.  It
16  specifically defines the scope of the audit, and
17  that's the problem.  Stelor doesn't look at the
18  license agreement, they don't give it any respect.
19  The e-mails that we attached reflect that we asked for
20  a date for that audit, five, six times, Judge.  We'd
21  get responses, well how about this.  Never, ever did
22  we get a date, and even the cure letter that we got,
23  tab 7, Mr. Kaplan's law firm says by the way, we're
24  waiting for you to send us a letter before we give you
25  a date for the audit, well, come on.  We've been

1  waiting for months and months and months.  We need to
2  have a date.  We can't do this unless you give us a
3  date.  In fact, I think Mr. Kaplan's firm's letter
4  says, specifically, tab 7 there, as soon as you give
5  us a list of what documents you want to look at then
6  we'll cooperate.  It's, like, another condition.  It's
7  an if.  Judge, they're obligated to do this.  They
8  don't get to impose conditions on us.  We're tired of
9  getting conditions.  Out client has had enough of
10  these people.  He's waited a long time.  He's given
11  them a lot of rope, they keep hanging themselves.
12  Another critical breach, and you know, Your Honor, I
13  think that these things all are things that are going
14  to go to trial.  I think that the proper thing to do
15  here is deny the injunction and have a trial and let
16  the jury sort out who's right or wrong in this, and by
17  the way, we'll offer right now, let's expedite the
18  trial.  Let's have a trial in six months, two or three
19  months of discovery, have one month of experts if
20  necessary and let's go to trial, let's do it.  My
21  client's more than happy to do that.  To put the
22  context of the audit into perspective you need to know
23  about the merchandising that we've discovered, and
24  that particularly relates to I-Tunes (phonetic) and
25  Cafe Press (phonetic).  There's also the website,

1  which is a form of merchandising because those six
2  hundred thousand registered users, they have
3  commercial value, and we don't know whether that's
4  been monetized, and those ten thousand kids on the
5  domain name everyday, those are people who come to
6  that website.  That's extremely valuable.  My client
7  can convert that in a short period of time to six
8  figure income with very little sweat.  Just having
9  that traffic, your website is extremely valuable in
10  today's internet industry.  So, I don't know what
11  they've done to monetize that.  Probably nothing, and
12  that's a problem, that they've done nothing to
13  monetize that, but that's another story.  In terms of
14  the contents, my client learned that they were selling
15  these times on Cafe Press, and you can go to
16  CafePress.com and you can get your Googles hat, you
17  can get your Googles coffee mug, and I'll put this
18  into evidence after, you know, doing some
19  housekeeping, Your Honor, but you can see that on the
20  Googles coffee mug, that's got all the Googles
21  characters.  Those are Steve Silver's characters.
22  Those are his original rendering of those characters.
23  It's got the website on there.  Here's a nice baseball
24  shirt, same thing.  Here is a mouse pad, one of my
25  favorites, the mouse pad.  This is Mr. Silvers's

1  rendering of a spaceship, now, what is particularly
2  interesting, and if you look at the declaration we
3  filed with Kevin LeBossier (phonetic) on the exhibits
4  to that, the website specifically says, I meant to
5  bring you a notebook, but this is exhibit B to the
6  LeBossier declaration.  Two interesting things about
7  that.  On the second page there, it specifically says
8  form Stelor Productions.  Now, Mr. Esrig filed a
9  declaration saying it's unauthorized, it's
10  counterfeit, something like that, but when you look at
11  that it sure appears that Stelor Productions provided
12  them with the artwork to put on this merchandise.
13  They didn't create some kind of corporate espionage to
14  get it.  It's been out there since 2004.  We spent
15  about eighty-five bucks on this merchandise, the money
16  has to go somewhere.  Never has it showed up on a
17  royalty statement and we can't get an audit to figure
18  it out because they won't give us a date.  I think
19  even more compelling, Your Honor, is the I-Tunes
20  merchandising, and that's in the Kevin Lebossier
21  declaration along with the web pages, and what you
22  have is you have about thirty songs.  I mentioned
23  before that the Googles started out with this live
24  show.  It was thirty songs.  I think fifteen are in
25  English, fifteen in Spanish, there's a Cd in each

1 language. You can go to I-Tunes, you can search, you
2 find these songs, and you can download them, and you
3 pay, or you can buy the Cd, and you pay, and if you
4 look in our notebook, we have nine, we have the
5 I-Tunes stuff. You'll see that the success of those
6 songs has been substantial. They're in the top seller
7 list in the UK and the Netherlands. We have
8 information that it's a top five song in Spain, and we
9 also provide in the notebook a receipt that was
10 provided to Mr. Silver, showing that somebody
11 purchased, somebody downloaded those songs from
12 I-Tunes in August of '04. We never knew about that.
13 We never got paid a royalty on that. We never got a
14 sale reported to us, and that takes me to the issue of
15 the royalty statements, and this is another key
16 material provision that is in the license agreement,
17 which is also in the settlement agreement, which they
18 were provided with notice on. The royalty statement's
19 very specific, Judge. Take you to a paragraph of the
20 agreement, tab A, paragraph three lays out the
21 requirement for a royalty statement. It says you've
22 got to give us the details on how many units there
23 are, where they are, what the product numbers are, and
24 even if there's no sales, you have to report all this
25 stuff because you have tell us what countries the

1 activity is going on. Now, if you go to our tab ten
2 in the notebook, you're going ot see what Stelor calls
3 a royalty statement, Judge. It's a joke. Mr. Esrig,
4 I think in July of 2004, signed all the royalty
5 statements for 2002 and 2003. Then in November of
6 2003, he signed the royalty statements for the last
7 quarter of 2003, even though it wasn't even over yet.
8 These are nonconforming royalty statements. They are
9 in breach of the agreement. They don't provide the
10 type of information that they have to. I don't know
11 whether they're lazy, or they don't care, or they
12 can't do it, or they can't do it, I don't know, but
13 Mr. Silvers has had enough. Since June 2002 they
14 haven't given one conforming royalty statement, and
15 the agreement specifically says in paragraph three,
16 tab 1, even if there's not a sale, you've got to tell
17 us. If Mr. Esrig is out there giving this stuff away
18 he's got to tell us about it, and he hasn't done it.
19 Now, what's interesting about the cure letter as we
20 call it, that was sent from Mr. Kaplan's firm on April
21 29th, they enclose a royalty statement for the first
22 quarter of '05. Again, it's not conforming, does not
23 address the information that they're required to in
24 the agreement. It does not list the countries, and
25 it's not certified as it's required to be under the

1 agreement. We also have the problem of you won't find
2 a royalty statement at all there for the last two
3 quarters of 2004. Now, if we're gonna hear from Mr.
4 Kaplan in rebuttal, or something from Mr. Esrig that
5 we weren't selling this stuff, we were just giving it
6 away. Judge, we want a divorce. They can't just go
7 out there and give our stuff away, that's not the
8 deal. In fact, under the agreement, they have a
9 specific obligation to exploit and utilize that value
10 of the IP with commercial reasonable standards.
11 Giving stuff away is not commercial and reasonable.
12 Now, we talked about the samples. Yes, we go two of
13 the CDSA. That's about it. We haven't got any other
14 samples of any other merchandise, and we haven't had
15 samples like you just saw. That is basically a sample
16 of the Googles IP that you just saw, the trailer.
17 That's a method by which the Googles IP is being used
18 to promote and sell licensed product. We're entitled
19 to see that. We're entitled to be provided with the
20 samples. In the letter we got, the cure letter, after
21 the termination, it was still if you withdraw the
22 termination notice then we'll let you come over and
23 see the samples. Another condition. Conditions,
24 conditions. Judge, they're not allowed to impose
25 conditions on us. They have an absolute obligation to

1 do this stuff. They haven't done it. They haven't
2 done it since June '02. Frankly, they should have
3 been terminated long ago. I want to talk about the
4 notice issue because they're making a big deal of
5 that, and the interplay between the three agreements.
6 Keep in mind, we have a license agreement and a letter
7 agreement in June 2002. We were wear in the first
8 lawsuit because the parties disputed about who was
9 doing what, and there were lawsuits, and we filed a
10 counter claim, and then we had to settle. It's in the
11 notebook here, Judge, we've gone by the book in
12 terminating them. Under the license agreement, while,
13 before the suit was filed, I think, certainly while it
14 was pending, we gave them a notice of termination,
15 it's tab 4, it's not hidden purpose. We gave them a
16 notice of breach, and this is what paragraph nine of
17 the license agreement says, you really have to look at
18 that, Your Honor. It says that if we believe they're
19 breaching, we have to give them notice and they have
20 sixty days to cure. In tab 4 that's what we did, and
21 it was November '04. They did not cure. So then we
22 went to step two, and we gave them a notice of
23 termination. That's the next step. When we reached
24 the settlement agreement, Mr. Silvers withdrew the
25 notice of termination, without prejudice, of course,

1  but he never withdrew the notice of breach.  That was
2  still there.  It was still active.  They were still on
3  notice that they needed to cure, and, *frankly, what*
4  *the settlement agreement's about, Judge*, it's kind of
5  giving them extra time to cure this stuff because if
6  you look in the settlement agreement, you'll see in
7  the whereas clause, and certain provisions there, it
8  specifically talks about as long as the license
9  agreement is in effect it contemplates that there
10  would be a termination if Stelor does not comply with
11  the settlement, and it talks about if Stelor complies
12  with every provision of the settlement agreement,
13  then, the breaches shall be cured.  Well, nobody was
14  saying they were cured because notice of breach was
15  still alive.  It was still out there.  It was
16  specifically not withdrawn by Mr. Silver so we would
17  not have to reinvent the wheel on the sixty day
18  notice.  Now, it's a also very important to note that
19  what they're asking you to do is reinvent the wheel.
20  They're asking you to put in a provision, in the
21  settlement agreement, that has a sixty day notice of
22  cure provision.  It ain't there, Judge.  The parties
23  didn't discuss it, it wasn't agreed to.  There are
24  some time tables for them to do things, and everything
25  else will be a reasonable time.  A reasonable time

1  went by, they didn't get these things done.  It was
2  time to terminate those.  The idea, really here, was
3  Stelor had another chance to cure their breaches under
4  the two agreements, the license agreement and the
5  letter agreement, and that's all codified, if you
6  will, in the settlement agreement, and as long as they
7  comply with those provisions in the settlement
8  agreement, that would be deemed a cure, but they
9  didn't comply.  So, they never cured.  We don't have
10  to go and start another sixty day notice, Judge.  We
11  didn't agree to that.  It's not in any of the
12  documents that you've seen in front of you.  They just
13  want to add this, they want you to add that provision
14  to the settlement agreement, obviously, because it
15  helps them.  Now, the one other area that's in the
16  settlement agreement that's new, that wasn't in the
17  license agreement or the letter agreement.  It's a new
18  breach, if you will, and that is Stelor's obligation
19  to pay advance royalties to Mr. Silvers.  The deal
20  there was they were gonna pay six thousand dollars a
21  month for advance royalties, to be credited against
22  future royalties that he would be paid by Stelor.  As
23  reflected in the declaration, they were late all the
24  time, and Mr. Kaplan's right, they did send a check to
25  the *wrong party on one occasion.*

1      THE COURT:  Let me interrupt you for a moment,
2  Mr. Hartmann, so I can understand this.  As I
3  understand it, it's your contention that the
4  settlement agreement, paragraph three, wherein Silvers
5  withdraws his notice of termination of the license
6  agreement, and reaffirms his obligations under the
7  license agreement, but that does not pertain to
8  November 12th, 2004 that you're characterizing his
9  notice of breach.
10      MR. HARTMANN:  That's correct.  That's what the
11  license agreement characterizes it and that's what the
12  letter says.  If you look at it, it says notice of
13  breach.
14      MR. KAPLAN:  Your Honor?
15      THE COURT:  It says in the letter, according to
16  your tab 4, that Mr. Silvers will exercise his right
17  to terminate unless Stelor cures the following
18  breaches within sixty days, and, to your contention,
19  that's not a notice of terminating him?
20      MR. HARTMANN:  No, no.  You've got to go to
21  paragraph nine.  It's a two step process.  Step one is
22  tab 4.  You're in breach, you have sixty days to cure.
23      THE COURT:  What's the paragraph in the license
24  agreement?
25      MR. HARTMANN:  Paragraph nine.  They're Roman

1  Numerals, Judge.
2      THE COURT:  Right, so--Where's the January 12th?
3      MR. HARTMANN:  That's tab 5 in our notebook.
4  That's after they failed to cure, within sixty days,
5  we sent the termination notice.  Certainly, the
6  license was operative between tab 5, tab 4 and tab 5
7  letters, because they had the right to cure within the
8  sixty days.  If they did everything was honky-dory.
9  It's, the --
10      THE COURT:  So, is it your position, let me see
11  if I understand your position.  It's your position
12  that settlement agreement return the situation to the
13  position it was on January 12th, which is, sixty
14  days had elapsed from the notice of breach, but no
15  notice of termination letter had been issued.  So,
16  that in the wake of this settlement agreement, the
17  only thing that was necessary to terminate at that
18  point was, on no notice, to issue the termination
19  letter?
20      MR. HARTMANN:  No.  What was necessary was for
21  Stelor to breach the settlement agreement.
22      THE COURT:  But your pretension is that the
23  breach letter had already been sent on November 12th?
24      MR. HARTMANN:  The notice of breach that was
25  required before, yes.  Cure period, it had already

1    expired.

2        THE COURT: So, the settlement agreement, in

3    effect, meant that there was no cure period, the cure

4    period had already lapsed, and so the parties returned

5    to the situation that existed on January 12th?  That

6    is, notice of breach had been delivered, sixty days

7    had lapsed, and therefore, there is no remaining time

8    on which to allow the plaintiff to cure any defects

9    because the sixty day period had already passed.

10       MR. HARTMANN: No, Your Honor.  The settlement

11   agreement, let's start out with the whereas clause,

12   and you'll see exactly what I'm talking about.  In the

13   whereas clause, it's on the first page, tab 3 of the

14   settlement agreement, says quote, "Whereas, Silvers,

15   on January 13th, sent a notice of termination of the

16   license."  That's the same term that's used in

17   paragraph three, a notice of termination in January.

18   That's what he would do.

19       THE COURT: I fully understand.

20       MR. HARTMANN: You don't understand?

21       THE COURT: I fully understand.

22       MR. HARTMANN: Okay.  Now, if you go down, it

23   says whereas the parties intent.  At the full

24   performance by each party under this obligation that's

25   under this agreement.

1        THE COURT: Where are you reading?

2        MR. HARTMANN: The whereas clause, second from

3    the bottom, on page one, tab3 of the settlement.  This

4    was the deal, as long as they were performing under

5    the settlement, that would constitute a cure, and when

6    they fully performed under the settlement agreement,

7    it would be cured.  So it's the breaches of the

8    settlement agreement that allowed us the right to

9    terminate them.  And I think that the governor, to the

10   extent that you're concerned that there's no governor.

11   We can kind of unilaterally pull the trigger on him.

12   There is a provision here, I'll find it in a second,

13   where the parties were limited in the sense that they

14   had to work in good faith.  There's a complaints

15   department.  We also set up channels so that the

16   parties can talk directly because that was a bone of

17   contention, but, I mean, as reference here somewhere,

18   the idea is that the parties had, 'cause if in

19   Florida, you don't have that obligation anyway, and

20   that is the obligation of good faith--So, the parties

21   accepted, but they had to operate in good faith, and

22   you know, they did, for a time.  Very last page, page

23   ten.  I mean, the position, Your Honor, is that my

24   client can't sit around forever waiting, waiting,

25   waiting.  We've been waiting since June '02, and we

1    waited since the settlement agreement.  We had a

2    notice for the audit, things like that, out there

3    since November.  We've had a notice of breach out

4    there since November and we're still dealing with the

5    same problem.  At what point is the court gonna say

6    no, Mr. Silvers, you're gonna have to say four weeks,

7    two days, and six hours more you have to wait, and

8    where do you draw the line here?  We were reasonable

9    here.  We gave it a lot of thought.  You know, we just

10   decided, the client decided, let's get a divorce.

11   Let's go on, let's do it ourselves, see what we can do

12   ourselves.  Enough is enough.  As for some of the

13   irreparable harm issues raised, the reason we didn't

14   address that in the brief is that in the Burger King

15   cases, and the like cases, remedy to have is damages,

16   and whenever you have a remedy of damages, you don't

17   have irreparable harm.  I just want to address some of

18   the things.  First of all, go back to your chambers,

19   type in StelorProductions.com.  You'll see their

20   website.  That's the same website they've always had.

21   The sam website you would get if we had our domain

22   name open, and you went to Googles.com, you went

23   immediately to their website.

24       THE COURT: I don't think I'm permitted to do

25   that.  I can only review evidence that's in the

1    record.

2        MR. HARTMANN: Okay.  I just didn't understand

3    what they were saying when they said they were shut

4    down.  They're perfectly capable of doing business.

5    This technology they have is perfectly capable of

6    being utilized some other way than using our Googles

7    IP.  If they have six hundred thousand registered

8    users, they're perfectly capable of using that

9    information to generate some kind of business, it's

10   just not gonna be with our little guys, our little

11   characters.  We don't want them to have them anymore.

12   We're entitled to get them back and see what we can do

13   with them ourselves.  They do have their safety net,

14   under the agreement, paragraph ten, where they're

15   allowed fro six months to use that intellectual

16   property to the extent that they are the certain

17   requirements they have, which they haven't met, yet,

18   but the to the extent that they're continuing to

19   modify their project, that's why we didn't sue them,

20   and ask the court to shut down from going to the trade

21   show.  We're trying to figure out, you know, what they

22   can do within the parameters of these post termination

23   protections that they have.  That's specifically there

24   to help them avoid irreparable harm.  On the

25   irreparable harm issue, you know, if we sue Google,

1    that's irreparable harm, Judge. You've got to look at
2    the settlement agreements specifically on that because
3    Mr. Kaplan just misquoted that. What the agreement
4    specifically says, paragraph eighteen, tab three of my
5    notebook, "The parties hereby agree that there is
6    adequate remedy of law in the event that either party
7    negotiates or settles the disputes with Google Inc.
8    without the other party." The disputes, the disputes,
9    when you look at the settlement agreement, have to do
10   with PTO proceedings, patent trademark office
11   proceedings, that Stelor filed against Google, Google
12   filed against my client, there was a bunch of mess up
13   there, everybody was suing everybody, and I think all
14   those cases have gone away. In fact, we have a
15   problem with that because the opposition, apparently,
16   was dismissed, you know, Stelor was supposed to be
17   handling that, and the opposition was dismissed. We
18   didn't put them on notice of that so I'm not traveling
19   on that today, and I'm a little bit unsure about how
20   it was dismissed, and the circumstances there. I
21   don't want to hang our head on that, but this, Your
22   Honor, talks about attempt to negotiate with Google
23   Inc. My client's not negotiating with Google, my
24   client's suing. We're trying to protect our turf.
25   What happened is Google Inc. filed a trademark

1    registry seeking to go into using their marks for
2    class sixteen, which includes children's books, just
3    like that one up there, and we say that's our turf.
4    You cannot take your Google Inc. trademark and tread
5    on our turf, and we're filing, filed a lawsuit to
6    protect our turf. That was paragraph eighteen that
7    Mr. Kaplan told you supported you granting an
8    injunction in this case. It's absolutely inapplicable
9    to this Google Inc. lawsuit. This refers to the
10   disputes, which are referenced to throughout the
11   agreement as the PTO proceedings, and it refers to the
12   negotiation for settling of those disputes which is
13   not what a lawsuit's about. We have filed a lawsuit.
14   We're not negotiating. We're not settling. If that
15   point in time ever comes, whether or not Stelor has an
16   interest in that will be an issue to be resolved, but
17   for purposes of the injunction, nobody's agreed to
18   have an injunctive relief based on filing a lawsuit
19   against Google Inc. and to ask this court to keep us
20   from filing a lawsuit sounds extraordinary. Judge, I
21   know you've been very generous with your time and have
22   already missed lunch. I think the case could be
23   resolved based on the legal parameters of the Burger
24   King case and the State of Florida cases. I think the
25   difference between the cases they're citing and saying

1    those reversed them and that disproved the cases. I
2    looked at them in the notebook they handed me this
3    morning. Form what I could see in those cases, it was
4    not like our case. those cases did not involve a
5    terminated agreement. In fact, the McDonald's case,
6    McDonald's was the plaintiff and McDonald's got an
7    injunction against the defendant using the McDonald's
8    trademarks. So, I don't understand how that reverses
9    the Burger King case. Now, Mr. Silver hasn't seen a
10   dollar in three years. He's bent over backwards. He
11   hasn't seen samples. He hasn't had-- He hasn't had a
12   fair royalty statement that supports the settlement,
13   he didn't get his option agreement. He hasn't gotten
14   all the stuff he bargained for back in 2002. Here we
15   are 2005, it's time, Judge, you know, they're
16   divorced, and don't think the court can order them to
17   get back into bed together. It's not going to happen.
18   I don't think that's why the case law is the way it
19   is. It recognizes the futility of doing all that.
20   Now, you know, we can go back and forth into total
21   quagmire, as to who's right and who's wrong on this
22   contract. I think because what they're trying to do
23   is go back and recreate the status quo of a few weeks
24   ago. That's a mandatory injunction. They're trying
25   to make us do something that we wouldn't otherwise do.

1    They're not trying to prevent us from doing something.
2    We already did it. They're trying to make us do
3    something. They have a heightened standard, and with
4    all this he said, she said, breach of contract, oh, we
5    promise to give you the option agreement, oh, we would
6    have given you the audit if you had given us a list.
7    They have an excuse for everything. For you to enter
8    a preliminary injunction based on that kind of
9    equivocal, and I do believe it's equivocal, I think
10   that we were thinking about moving for a continuance
11   to take discovery on this issue so we could firm it
12   up, but we decided to go ahead with it. I think there
13   is some urgency here, but was Mr. Silvers right when
14   he terminated them? Are they going to prove today,
15   based on this record, that by clear and convincing
16   probability of likelihood of success, and I just don't
17   see that. There's two sides to the story, and at the
18   worst situation it's a close call, but, frankly, we
19   think we have the far better side of that, and we're
20   confident about going to trial. We think it is an
21   issue for trial, and we would ask that the court
22   expedite that trial, and let's get it done. Thank
23   you, and any questions if you want to go ahead and
24   ask. I know I don't have to invite you.
25        THE COURT: On to reply.

1      MR. KAPLAN:  Thank you, Your Honor.  I think the

2  divorce analogy that Mr. Hartmann kept using is very

3  apt, but a spouse ripping up a paper doesn't make a

4  couple divorce.  My understanding is that you have to

5  have a court order before nay divorce is effective,

6  and that's exactly what they're trying to avoid here,

7  any court determination about the validity of their

8  termination before they can seize the property and put

9  Stelor out of business they've engaged in self help,

10  they've taken unilateral action as if their

11  declaration of a default of a termination means that

12  the agreement is terminated, it's not.  The argument

13  begs the question, Your Honor has to assess the

14  validity of the termination, and I think Your Honor is

15  characterization of their position on the notice issue

16  was exactly on point.  If you accept their

17  characterization, parties were in breach at the time

18  the settlement agreement was entered into, and they

19  could terminate at any time, if we made one slip-up,

20  if we forgot to send a check, if a check got lost in

21  the mail, any of the numerous uncertainties or

22  confusions that could have occurred over what Mr.

23  Hartmann admits is a complicated agreement, quagmire,

24  as he put it, where two parties have a history of a

25  pretentious relationship, that can't be the case.

1      Even if they're gonna take that position, and even if

2  Your Honor could ignore the express provisions of the

3  settlement agreement, which would draw the notice of

4  termination and go one step further.  It would draw

5  the notice, and Mr. Silvers reaffirms his obligations

6  under the license agreement, having reaffirmed his

7  obligations under the license agreement, he can't take

8  the position that there was still a breach, that he

9  still was released from performing certain

10  obligations, including the critical obligation of

11  notice, and if they're gonna make that then certainly

12  there's a waiver under these facts of a prior notice

13  of termination, and I cited those cases in footnote

14  four of my reply.  It's like a mortgage where the

15  lender issues a default notice, and then there's a

16  resolution and a reinstatement, those case are all

17  clear that the lender can't bend willy-nilly,

18  foreclose based on a prior default.  They gotta issue

19  a new default, re accelerate, and that's clearly what

20  is required here, too.  There's nothing in that

21  settlement agreement that contemplates, this is Mr.

22  Hartmann's phrase, that there would still be a

23  termination under the prior letters if the breaches

24  were not cured.  I think he's taking a highly

25  technical position about what the notice of

1  termination is under the license agreement.  Referring

2  back to the license agreement, the notice of

3  termination is sixty days written notice to the party

4  that the termination will occur.  The notice of

5  termination is the November letter.  That is what was

6  withdrawn under the settlement, and not only that,

7  remember the lawsuit, the prior lawsuit modified the

8  express language of the settlement agreement and

9  refers to the January 13th notice of termination and

10  does not, is silent on the November 12th notice of

11  breach letter.  He points to the general whereas

12  clause in the beginning of the agreement.  Those

13  whereas clauses also make clear that the parties wish

14  to resolve all of the foregoing disputes, and remember

15  this was accompanied by a mutual dismissal with

16  prejudice of the lawsuit raising all of these claims.

17  They counter-claimed the prior lawsuit, so there's a

18  dismissal with prejudice that's got res judicata

19  effect over them trying to raise all of these prior

20  breaches as well.  Then there's --

21      THE COURT:  Where's that dismissal with prejudice

22  one?

23      MR. KAPLAN:  It's attached to Mr. Ezrig's

24  declaration.  I apologize, I misspoke, it's a

25  dismissal without prejudice.  It is without prejudice.

1      MR. HARTMANN:  Settlement agreement, paragraph

2  twenty.

3      MR. KAPLAN:  And the dismissals are attached

4  behind exhibit D, but clearly, Judge, if they were

5  gonna leave this open, they would have kept the

6  lawsuit alive for the court to continue to monitor and

7  enforce the settlement which wasn't done.  And again,

8  the express provision in paragraph three of the

9  settlement makes clear that Silvers withdraws his

10  notice of termination with the license agreement.  It

11  doesn't refer to a specific date, November 12th or the

12  January 3rd letter, that's in the general provision of

13  the whereas clause.  It refers to the notice of

14  termination of the license agreement.

15      THE COURT:  Where are you getting this?

16      MR. KAPLAN:  I'm getting to paragraph three of

17  the settlement agreement, which is behind tab two in

18  my binder, you're looking at his binder.  He withdrew.

19  The whereas clause of the settlement agreement only

20  speaks to the January 13th notice of termination, and

21  where the paragraph three of that settlement agreement

22  he's silent on a date.  You would think that the

23  reference again, to the notice of termination would

24  pertain to January 13th, previously referred to notice

25  of termination.  It's characterized the same way.  Two

Page 65

```
 1   points, Judge, any uncertainty about that is clearly
 2   addressed by the next phrase of paragraph three, Mr.
 3   Silvers reaffirms his obligations under the license
 4   agreement, not subject to compliance with this
 5   agreement, there's no paradox there.  He unilaterally,
 6   he entirely, and without reservation, reaffirms his
 7   obligations under the license agreement.
 8         THE COURT:  That's, at best, ambiguous as to
 9   whether or not he need to provide another sixty day
10   notice of breach.
11         MR. KAPLAN:  I don't admit that, Judge, and the
12   reason I don't admit it is because when you refer back
13   to the license agreement and article nine, which is
14   the termination provision.  That provision makes clear
15   what a notice of termination is, it includes the sixty
16   day period.  So, by definition under the license
17   agreement, if the notice of termination is withdrawn,
18   the notice can only be retriggered by providing that
19   sixty day notice in writing with an opportunity to
20   cure, and that's exhibit A to our complaint, page four
21   of the license agreement, article nine.
22         THE COURT:  It appears that we are dancing on the
23   head of the term notice, and it appears me that the
24   license agreement when it speaks to the term notice,
25   talks about what you are now characterizing as notice
```

Page 66

```
 1   of breach.  It seems unfortunate that the settlement
 2   agreement talks about notice of settlement, excuse me,
 3   notice of termination, and the express context of what
 4   you are now saying is not notice of breach, that is
 5   January 13th letter.  Let me restate that for everyone
 6   so we can be very clear on what I'm saying.  I'm
 7   saying that it's unfortunate that the settlement
 8   agreement talks about January 13th letter being notice
 9   of termination.  What you're now saying, and what the
10   license agreement in paragraph nine seems to reflect,
11   is that the January 13th letter is not the notice of
12   termination called for in the license agreement,
13   rather, it is a, the January 13th letter seems to be
14   more a termination letter with the notice of
15   termination being November 12th letter.
16         MR. KAPLAN:  Judge, I think there's one thing
17   that also supports our position, too.  The January 13th
18   letter expressly references the November 12th 2004
19   letter, and I think it's clear that it's a, you have
20   to accept their position, it's a two part project.
21         THE COURT:  Would you run that by me again?
22         MR. KAPLAN:  Yeah.  The January 13th 2005 letter,
23   it's exhibit, it's attached exhibit C to the
24   complaint, the April 27th 2005 letter.
25         THE COURT:  Is that in any of the tabs?  Is the
```

Page 67

```
 1   January 13th letter in your binder?
 2         MR. KAPLAN:  Yeah.  That's tab five in the silver
 3   binder.  That letter, in the first paragraph, that's
 4   the last sentence, references the November 12th 2004
 5   letter, recognizes that that's a critical part of the
 6   termination process.
 7         THE COURT:  That again, talks about notice of
 8   breach.
 9         MR. KAPLAN:  But if you look at the November 12th
10   letter, it talks about termination.  That's tab --
11         THE COURT:  I agree with you.  I agree with you,
12   in some regards, sadly, the terminology that was used
13   in the settlement agreement, there is argument on the
14   other side that it specifically says the January 13th
15   letter is withdrawn, the notice of settlement, excuse
16   me, it says that the January 13th letter is a notice
17   of termination, and then it goes on to say that the
18   notice of termination is withdrawn, but it doesn't
19   talk about what really is the notice of termination
20   letter, which is the November 12th letter.
21         MR. KAPLAN:  But it does say, in that same
22   provision, that Silvers reaffirms his obligations
23   under the license agreement.
24         THE COURT:  I understand that.  That strike s me
25   as being very ambiguous.
```

Page 68

```
 1         MR. HARTMANN:  Judge, let me verify that if I can
 2   on behalf of Silvers, he did because he sent out, he
 3   did live up to his obligation because he had already
 4   put them on notice.  That's what he was obligated to
 5   do, and he did that back in November.  And I think he
 6   court is on to something with paragraph nine A, where
 7   the letter that goes out is a notice to the other
 8   party in event of breach, and that's the November
 9   letter.  Notice in the event of breach.  That's why we
10   called it in the index of breach letter.  The January
11   letter was, frankly, they were terminated at the end
12   of sixty days.  We sent them a letter as a formality
13   and a courtesy, but it's not required under the
14   agreement to send them a second letter in sixty days.
15         THE COURT:  Well, that's an interesting point,
16   and let me talk about that point for a moment.  If
17   yours says that at the end of sixty days that it was
18   terminated and no letter was required to actually
19   terminate it, then your settlement agreement
20   reinstated, actually did nothing because you're saying
21   that at the end of the sixty day period, which had
22   already expired by the time a settlement agreement was
23   reached, that means that the settlement agreement
24   restored the situation to a termination situation.
25         MR. KAPLAN:  A pre-termination situation,
```

1  correct?
2      THE COURT:  No, not pre-termination.  By your
3  statement, you're saying that it restored it to a
4  termination statement because sixty days had expired.
5      MR. KAPLAN:  Judge, in the settlement agreement,
6  excuse me, simply states that the settlement complies
7  with their obligations under the settlement agreement
8  that had reached their need to be cured.  So it's
9  specifically saying that we're gonna suspend that
10  termination, and see if you guys can comply with the
11  settlement, and if you don't, then it's gonna be
12  termination mode again, but if you do, it won't be.
13  That's the deal that the parties had gotten.
14      THE COURT:  It doesn't say that, and besides, it
15  ain't gonna say that.
16      MR. KAPLAN:  It doesn't say that it's gonna be
17  terminated.  The settlement agreement doesn't, there's
18  no reference to termination in the settlement
19  agreement.  If you don't comply with an obligation in
20  this agreement, it's gonna be terminated effective
21  immediately without notice.
22      MR. HARTMANN:  They wanted --
23      MR. KAPLAN:  Wait a minute, don't interrupt.
24  It's my rebuttal.  Let's assume, Judge, that the
25  settlement agreement didn't say anything about

1  withdrawing the prior termination letters, either of
2  them, it's silent about that.  It does reaffirm
3  Silvers's obligations under the license agreement.
4  They can't, there's no way they could come before this
5  court and say that by entering into that settlement we
6  didn't waive the prior termination.  That we continued
7  to accept Stelor's performance under this settlement
8  agreement for three months, moving forward, we did all
9  of those things that we've outlined in our
10  declaration.  They can't say that we did all that and
11  had the right, if they slipped up in any way, to
12  terminate them immediately without notice.  At the
13  minimum, if there's a good faith obligation, which
14  they reference, you've got to apply some reasonable
15  notice provision in there.  That comes right out of
16  their own Burger King cases.  This, the situation that
17  we're in now, clearly, isn't warranted under any of
18  these agreements, and it's not a situation where he
19  has to sit around forever and wait, like Mr. Hartmann
20  argues.  It's a sixty day notice provision under the
21  license agreement.  That's the most he has to sit
22  around.  We're dealing with a multimillion dollar
23  property here, Judge.  They can't legitimately, even
24  if you do find there's an ambiguity, we've got prevail
25  on a waiver argument under these circumstances, look

1  at the cases.  There's clearly a likelihood of success
2  on that, and I don't think, again, I think that the
3  settlement agreement clearly reaffirms Silvers's
4  obligations under the license agreement.  By doing
5  that, he reaffirms his obligation to provide notice.
6  You can't, this court, with Silvers having reaffirmed
7  his obligation without exception under the license
8  agreement, how can we go back and pick and choose,
9  which of the provisions under the license agreement
10  were in effect or not in effect?  We can't.  It's got
11  to be all of the provisions in the license agreement
12  including the notice provision.  That's the only way
13  to give effect to that phrase in the settlement
14  agreement, and especially since the defaults that
15  they're talking about, at least the ones in their
16  April 27th letter, occurred in April, therefore
17  occurred after the period that the settlement
18  agreement was entered into.  Those aren't covered by
19  the prior notice of default, even if it was in effect.
20  They can't rely on those.  It's not a rolling default
21  period.  If they're going to try and assert new
22  defaults, which is what they do in that April letter,
23  and you can look at it, it's exhibit C to the
24  complaint.  The first thing is failed to provide
25  interest in the LLC.  That didn't happen until March

1  2005.  In reference to paragraph nine of the
2  settlement agreement, failed to pay monthly
3  installments on royalty advances, under paragraph ten
4  A of the settlement agreement, and, again, they
5  accepted payments in April and before as we
6  documented.  Failed to pay April 1st monthly advance
7  on royalties for insurance coverage.  Failed to
8  cooperate in the audit.  Judge, I showed you the e-mail
9  from Gail McQuilkin, renewing the request for an audit
10  at the end of April.  There's no breach there anyhow,
11  and with respect to the sample of licensed products,
12  again, Ms. McQuilkin was at Stelor's offices in
13  February of '05.  So these are all post settlement
14  agreement defaults, and even if that prior letter
15  stayed in effect, and I don't think it did, it doesn't
16  cover the defaults they're traveling under now.  It's
17  a new set of defaults, so they've got to provide
18  notice of those new defaults, and, again, I don't want
19  to lose sight of the fact here, that we provided
20  evidence in this record with respect to each and
21  everyone of these alleged defaults.  They're totally
22  unfounded.  There's no factual basis for these
23  defaults even if you find that they didn't have to
24  provide any notice and can terminate the agreement
25  effective immediately.  So, we're gonna prevail even

Page 73

```
1     if we get into the specifics of the defaults, just
2     their disregarding the paragraphs of the agreements or
3     record evidence, which we really have.  The insurance,
4     we provided the certificates.  The April 1st payment,
5     I showed you the e-mail acknowledging that it was
6     sent.  The insurance coverage issue, Silvers is
7     required to document for us what he spends every month
8     for insurance, health insurance, and we have fifteen
9     days to provide him the reimbursement, and we never
10    got that from him.  So there's no, these are a bunch
11    of trumped up defaults.  Ms. McQuilkin in her e-mail,
12    which I referenced, said they were silly.  There's no
13    substance to any of this, and there's no notice
14    either.  Silvers made a blanket reaffirmation of all
15    of his obligations under the license agreement.  If he
16    wants raise a new set of defaults, then he's got
17    provide notice of them, and he hasn't done that.
18    Unless, until he satisfies that requirement, you can't
19    put their whole company out of business, jeopardize
20    the whole launch, and again, Mr. Hartmann admitted
21    that they haven't contested the fact of irreparable
22    harm, only the law.  If they wanted to start it they
23    should have come in here and sought an injunction
24    under McDonald's case.  That's what they should have
25    done, but they didn't.  They're trying to prevent any
```

Page 74

```
1     judicial scrutiny of the problem here, and an
2     expedited trial, six months isn't expedited.  Six
3     months from now Stelor's out of business.  One month
4     from now Stelor's out of business.  These are narrow
5     issues, if there's any doubt in Your Honor's mind,
6     consolidate this preliminary injunction hearing with
7     the final trial and let's set it thirty days down the
8     road or shorter.  We'll engage in expedited discovery.
9     There's probably two witnesses, Mr. Esrig and Mr.
10    Silvers, and let's get the thing tried, but there's no
11    notice here.  There's a clear requirement under the
12    contracts and if you only look at the defaults alleged
13    in the April letter, and that's the basis for this
14    termination, there's no notice of any of those, and
15    they're not covered by the prior default letter even
16    if Your Honor's gonna conclude it somehow remained in
17    effect, which I don't think they can legitimately take
18    that position based on the agreement and based on
19    their conduct after the agreement was entered into.
20          THE COURT:  One minute until I respond, one
21    minute.
22          MR. HARTMANN:  If you look at tab four, which is
23    the November notice of breach letter, and tab six,
24    which is the second termination letter, you will find
25    that those letters have, as a basis for termination,
```

Page 75

```
1     the option, the agreement that we didn't get, the
2     audit that we never got, the royalty reports that we
3     complained about, the samples that we complained
4     about, and you won't find in the first letter anything
5     about the royalty advances because that happened later
6     in the settlement, but we are not creating a whole new
7     world of defaults, in fact, we put things into brief
8     as I confessed, Your Honor, to show an overarching
9     pattern by Stelor, but you heard me argue today about
10    the points that violate the settlement agreement, that
11    are in those default, in the notice letters, the
12    termination, it's all there.  We're not making new
13    demands.  Now, the final termination letter has extra
14    things that we're not traveling on today.  The
15    insurance, it looks like they had it all the time,
16    they just didn't tell us.  The document they gave us
17    showed us that they got insurance, and I didn't get up
18    here and argue that that was a breach, and whether or
19    not that was in the termination letter, it wasn't in
20    the notice letter because we're not relying on that,
21    we're relying on the key provisions, which are not
22    technical they're material provisions, audit, royalty
23    statements, option agreement, which is compensation,
24    samples, those are key provisions to any
25    licensor/licensee relationship.  Now, Judge, we had,
```

Page 76

```
1     you know, I think we had a duty when we entered in the
2     settlement agreement to allow Stelor reasonable time
3     to cure those breaches, I mean, I don't think we ever
4     trying to say aha, gotcha the day after the settlement
5     agreement had been terminated, but we didn't have to
6     go back and do a notice of breach which is what the
7     agreement requires.  I mean, we're required to comply
8     with the agreements, Silvers verified he would do
9     that, he had already done that.  There wasn't anything
10    more to do.  They're really trying to get you to draft
11    a new provision in the settlement agreement that says,
12    if you want to sue us, or you want to terminate us
13    based on a breach in the settlement, you have to give
14    us notice and sixty days to cure.  That ain't in the
15    agreement, Judge, and the reason is we never would
16    agree to that.  Now, maybe we would have agreed to
17    some other provision, but they didn't ask, and we
18    wanted the stuff to get done quick and we're on them a
19    lot, we're asking them for this, we're asking them for
20    that, it didn't get done, so that's where we're at.
21    Thank you, Judge.
22          MR. KAPLAN:  Judge, if I could just make one
23    quick point?  Hold them to the terms of the April 27th
24    letter.  Now, I ask, Your Honor, to look at Mr.
25    Esrig's declaration, paragraph twenty-eight, in
```

Page 77

1   detail, why each of those alleged defaults is
2   unfounded. Mr. Esrig's here, if there's any question
3   he'll testify about that as well. It's all laid out
4   in that declaration. We're not asking you to put a
5   new provision in the settlement, we're asking you to
6   enforce the express provisions in the license
7   agreement that Mr. Silvers reaffirmed, and I'm happy
8   to put Mr. Esrig right now, and we'll over each of
9   those breaches and tell you why they didn't occur, but
10  I know Your Honor's got that in the declaration, even
11  if you haven't had a chance to read it yet. I hope
12  you'll take the matter under advisement, and you have
13  an opportunity to do that.
14       THE COURT: Very well.
15       MR. BAILIFF: As recording keeping, housekeeping
16  matters, we have two offered exhibits that I didn't
17  get. The mug and the shirt.
18       MR. HARTMANN: Your Honor, I don't feel compelled
19  to make these part of the record. Demonstrative
20  exhibits are to demonstrate things and they don't
21  necessarily have to be evidence, I mean, it's up to
22  the court. Do you want them?
23       MR. KAPLAN: I think they were used as
24  demonstrative, that's more appropriate.
25       THE COURT: Any objection to taking them all

Page 78

1   back?
2        MR. KAPLAN: I just want to make sure the court
3   understands our position on that that Stelor didn't
4   authorize Cafe Press to sell these products. We
5   didn't know about it. We didn't authorize it. Judge,
6   if you please, I had prepared a draft for court
7   recommendation. If Your Honor would permit me I'd
8   like to submit it to you as well.
9        THE COURT: Sure.
10       MR. KAPLAN: We would like to submit a purposed R
11  and R. Thank You, Your Honor.
12       MR. HARTMANN: Thank you, Judge.
13       (Thereupon, the hearing concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 79

1                    CERTIFICATE
2   STATE OF   FLORIDA )
                       ) SS.
3   COUNTY OF ST. LUCIE )
4        I, PHILIP MAY, A NOTARY PUBLIC AND REPORTER OF
    THE STATE OF FLORIDA, DO HEREBY CERTIFY THAT THE
5   FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE
    HEARING AS REPORTED BY AND BEFORE ME AT THE TIME,
6   PLACE AND THE DATE HEREIN BEFORE FORTH.
7
         I DO FURTHER CERTIFY THAT I AM NEITHER A RELATIVE
8   NOR EMPLOYEE NOT ATTORNEY NOR COUNSEL OF ANY OF THE
    PARTIES TO THIS ACTION, AND THAT I AM NEITHER A
9   RELATIVE NOR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, AND
    THAT I AM NOT FINANCIALLY INTERESTED IN THE ACTION.
10
         WITNESS MY HAND AND OFFICIAL SEAL IN THE CITY OF
11  FORT LAUDERDALE, COUNTY OF BROWARD, STATE OF FLORIDA,
    THIS 1ST, DAY OF JUNE, 2005.
12
13
14
15  BY:
16  PHILIP MAY
    REPORTER
17
18
19
20
21                    TIC/TR
22
23
24
25