UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a            CASE NO. 05-80393-CIV-HURLEY
Delaware corporation, f/k/a STELOR        Magistrate Hopkins
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

**APPENDIX TO SILVERS' OBJECTION TO**
**REPORT AND RECOMMENDATION**

3339/101/254488.1

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 • TEL. (305) 372-1800

Dockets.Justia.com

**APPENDIX TO SILVERS' OBJECTION TO
REPORT AND RECOMMENDATION**

INDEX

A.    License Agreement

B.    Consulting Agreement

C.    Audit Request dated November 5, 2004

D.    Notice of Breach dated November 12, 2004

E.    Silvers' Letter Dated January 13, 2005 Regarding Termination

F.    Settlement Agreement

G.    Silvers' Letter Dated April 27, 2005 Regarding Termination

H.    Stelor's Post-Termination Letter Dated April 29, 2005

I.    Declaration of Keva Labossiere dated May 20, 2005

J.    Composite - Stelor Royalty Statements

K.    Stelor Advertising Samples Not Provided to Silvers

L.    Declaration of Gail A. McQuilkin dated June 17, 2005

M.    Declaration of Paul Worsham dated June 15, 2005

N.    Declaration of Russell Tewksbury dated June 17, 2005

O.    Declaration of Steven A. Silvers dated May 20, 2005

P.    Supplemental Declaration of Keva Labossiere dated May 25, 2005

Q.    Composite - Delaware Secretary of State Entity Details for Stelor Productions, LLC and [Stelor] Certificate of Conversion from a Corporation to a Limited Liability Company

R.    CafePress.com e-mail regarding Contact Information

S.    Declaration of Steven A. Esrig dated May 22, 2005

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 · TEL. (305) 372-1800

CASE NO. 05-80393-CIV-HURLEY/Hopkins

Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.
*Co-Counsel for Defendant*
200 S.E. First Street, Suite 708
Miami, FL 33131
Telephone: (305) 374-1920
Adam T. Rabin, Esq.

KOZYAK TROPIN & THROCKMORTON, P.A.
*Counsel for Defendant*
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

By: _____

Kenneth R. Hartmann
Florida Bar No: 664286
Gail A. McQuilkin
Florida Bar No. 969338

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of Appendix to Silvers' Objection to Report and Recommendation was hand-delivered this 17th day of June, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq., Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove, Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

By: _____

Kenneth R. Hartmann

3339/101/254488.1

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 • TEL. (305) 372-1800

# EXHIBIT "A"

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (**LICENSOR**), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (**LICENSEE**), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

**WHEREAS**, LICENSOR is the sole and exclusive owner of the **GOOGLES** characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

**WHEREAS**, LICENSOR is the sole and exclusive owner of the **GOOGLES** trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

**WHEREAS**, LICENSOR has the power and authority to grant to **LICENSEE** the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

**WHEREAS**, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

**WHEREAS**, LICENSEE desires to obtain from **LICENSOR** an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

**WHEREAS**, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

A.      LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to **LICENSOR**), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

3



(iv)        the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v)        except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.  LICENSEE represents and warrants that:

(i)        the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)        the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii)        it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.        Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.        LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A.        The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.        The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.        Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A.        Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.        Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII.  INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation.  The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX.  TERMINATION

A.    Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

5

B. LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C. Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A. LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES.  THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof.  The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV.  FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.



## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII  AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of **LICENSEE** and/or with the consent of **LICENSOR**, which shall not be unreasonably withheld or delayed. By way of example and not limitation, **LICENSEE** may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and      executed      between      the      above      mentioned      parties



IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                STELOR PRODUCTIONS, INC.

Steven A. Silvers                                By: _____
Title: Owner/LICENSOR                            Printed Name: _____ Steven A. Esrib
Dated: 5/09/02                                   Title: _____ President
                                                 Dated: 5/9/02

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
                    5/9/02



## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo, (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc.) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

same terms and conditions provided for herein, unless **LICENSOR** provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

**LICENSEE** shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*Succession*
*Rights of Survivor*

5/9/02

*In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.*

_Steven A. Silvers_
5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

# EXHIBIT "B"

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

    This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    Engagement of Consultant.

    a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

    b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

    c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    Relationship of Parties. The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

    3.    <u>Duties of Consultant.</u>  Consultant's duties hereunder are as follows:

        **a.**    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing on all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

        **b.**    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

        **c.**    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and /or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

        **d.**    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

    4.    <u>Duties of Company.</u>

a.      Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.      Term and Termination.

a.      Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.      Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.      Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.      Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.      Proprietary Information; Proprietary Rights.

a.      In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedules of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

b.     The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.     The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company.  Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.     <u>Limitations of Liability</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.     <u>Miscellaneous</u>.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida.  This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument.  This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder.  This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS     Date 5/09/02

Stelor Productions, Inc.

By: _____ Date 5/9/02
Name: Steven A. Esrig   Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

4

# EXHIBIT "C"

Kozyak Tropin & Throckmorton, P.A.

2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Overnight Delivery
Federal Express Tracking No. 7903-2948-5586

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:     Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products. In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.     All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent, that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.     All sublicenses;

3.     All copyright and trademark registration applications and registrations;

4.     All domain name registrations;

5.     All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.     Proof of insurance as required under Paragraph XIV.

Page 2

In addition, Mr. Silvers is requesting that a number of samples of all Licensed Products manufactured, or in production be produced during this audit.

You, or your counsel, should schedule and coordinate the audit through us by providing us with a date and location.

Very truly yours,

Gail A. McQuilkin

c:    Steven Silvers
      Kenneth R. Hartmann, Esq.

/245617.1

# EXHIBIT "D"

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

    Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

    We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

    a.    Failure to pay royalties under paragraph III (A);

    b.    Failure to provide a written certified royalty statement under paragraph III (C);

    c.    Failure to provide a list of all sub licenses under paragraph III (C);

    d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

    e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

    f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

    g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

    h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

     i.     Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

     j.     Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

     k.     Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

     l.     Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

     a.     Failure to pay Mr. Silvers consultancy fees and expenses;

     b.     Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

     c.     Making unauthorized statements and representations on behalf of Mr. Silvers; and

     d.     Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:     Steven A. Silvers
       Laurence Hefter

/245615.1

# EXHIBIT "E"

LAW OFFICES .

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0655
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2


Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:      Steven A. Silvers
        Laurence Hefter
        Yano A. Rubinstein
        William Borchard

/248587.1

# EXHIBIT "F"

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by Stelor Productions, Inc. ("Stelor") and Steven A. Silvers ("Silvers"). Stelor and Silvers are collectively referred to herein as "the Parties."

WHEREAS, Stelor brought a complaint in the United States District Court for the Southern District of Florida (Case No. 04-80954-CIV-HURLEY) against Silvers alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers brought a counter-complaint against Stelor alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers on January 13, 2005 sent a notice of termination of the Licensing, Distribution and Manufacturing Agreement to Stelor;

WHEREAS, Stelor has invested substantial time, effort, and money in developing a business involving the GOOGLES IP and fully intends to continue developing and commercializing such business, including sub-licensing some or all of the GOOGLES IP;

WHEREAS, the Parties intend that full performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other Party, and

WHEREAS, the Parties wish to resolve all of the foregoing disputes to their mutual satisfaction.

//

//

SILVERS _____        - 1 -        STELOR_____

THEREFORE, the Parties hereby agree as follows:

1. <u>Domain Name Administration:</u>

    a. Silvers shall give Stelor, as the administrative contact for the GOOGLES IP domain names, the right to control the DNS records and make changes to the administrative contact information for all GOOGLES IP domain names, and shall advise the domain name registrar known as godaddy.com to this effect. Silvers will provide proof that Stelor has such rights no later than February 15, 2005. Silvers shall cooperate with any other request from Stelor regarding necessary administrative issues relating to the domain names, and all communications by Silvers, relating to domain names, shall be through Kozyak Tropin and Throckmorton ("KTT").

    b. KTT will create and control a domain name renewal database to ensure timely renewal of domain names owned by Silvers, and will communicate with Stelor's counsel regarding any deadlines or other administrative issues.

2. <u>Pending and Future Actions Relating to the GOOGLES IP:</u>  Silvers will cooperate with Stelor and Stelor's counsel in all respects in pending and future trademark and domain name dispute proceedings filed by Stelor, including but without limitation, providing any and all documents and other evidence needed to support Stelor's position.

3. <u>The License, Distribution and Manufacturing Agreement:</u>  Silvers withdraws his notice of termination of the License Agreement, and reaffirms his obligations under

SILVERS _____    - 2 -    STELOR_____

the License Agreement.

4. <u>Post-Settlement Communications:</u>    Silvers shall communicate with Stelor solely through KTT.

5. <u>USPTO Correspondent of Record:</u>    Silvers shall change the correspondent on all GOOGLES IP trademark applications and registrations to the name of Stelor's counsel no later than February 15, 2005, and shall not change the correspondent in the future as long as the Licensing, Manufacturing and Distribution Agreement is in effect. Stelor's counsel shall copy KTT with all correspondence to and from the USPTO

6. <u>Sale or Assignment of the GOOGLES IP:</u>  KTT and Stelor's counsel shall include each other in any and all negotiations and discussions with Google Inc. that relate to resolving the pending trademark and domain name disputes or the sale or assignment of the GOOGLES IP.

7. <u>Domain Name Renewal Expenses:</u>    Stelor agrees to reimburse Silvers for documented expenses incurred to date in renewing GOOGLES IP domain names. Future GOOGLES IP domain name renewal expenses will be reimbursed by Stelor. All requests for reimbursement will be submitted by KTT to Stelor, and all payments by Stelor will be sent to Silvers through KTT.

8. <u>Options Acknowledgement:</u> Stelor agrees that it will confirm in writing that no additional options have been granted that would obligate it to provide such options under the now expired Letter Agreement.

9. <u>LLC Acknowledgement:</u> The Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC. Any options granted

SILVERS                                  - 3 -                              STELOR_____

to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC.

10. Royalty Advances:

    a.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor shall advance Silvers $60,000 a year against future royalties.  The advance will be made in equal monthly installments payable on the first of each month beginning February 1, 2005.

    b.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor will provide Silvers with an additional monthly advance on expected future royalties equivalent to that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), as long as such coverage is offered. Such advance will not exceed $1,000 per month.

    c.  Stelor will reimburse Silvers for insurance premiums through the expiration of the "Letter Agreement," not to exceed $4,000. Such reimbursements will be provided to Silvers within 15 days of Stelor receiving evidence of paid premiums.

11. Recoupment and Termination of Royalty Advances:   Royalties advanced under this Agreement will be recaptured by Stelor once royalty payments exceed the amount specified in paragraph 8. Such deductions will not exceed 20% of any given royalty payment.

12. Royalty Statements:   Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due.

SILVERS                        - 4 -                  STELOR_____

13. <u>Trademark Registrations:</u>   Stelor shall provide to Silvers through KTT proof that all applications and registrations for trademarks and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement filed by or on behalf of Stelor show Silvers as the owner.

14. <u>Audit:</u>  Stelor shall cooperate in the audit of the books and records of Stelor by Aronson and Company onsite at Stelor Productions as per section IV of the Licensing, Distribution and Manufacturing Agreement.  Any information obtained by the auditor will be restricted to KTT , on an "attorneys' eyes only" basis and the identity of any licensee, sub-licensee, vendor, or any other third-party shall remain confidential.

15. <u>Licensed Products Samples:</u>   Stelor shall provide Silvers through KTT samples of any Licensed Product that is being offered for sale.

16. <u>USPTO Correspondence:</u>   Stelor's counsel shall keep KTT advised as to the status of any pending or future trademark or domain name disputes filed by Stelor against Google Inc. by copying KTT on all pleadings and correspondence, and by giving notice to KTT of any other trademark or domain name disputes filed against Google Inc.

17. <u>Reservation of Jurisdiction:</u>   The Parties agree to submit to the exclusive continuing jurisdiction of the United States District Court, Southern District of Florida, for enforcement of all provisions of this Agreement.  In the event that a dispute arises concerning the obligations of any Party under this Agreement, the Parties agree to submit any such dispute to this court for resolution.  The successful or prevailing party (as determined by the Court) shall be entitled to recover its reasonable attorneys'

fees and other costs incurred in that litigation from the unsuccessful or non-prevailing party in addition to any other relief to which the prevailing party might be entitled.

18. <u>Injunctive Relief</u>: The Parties hereby agree that there is no adequate remedy of law in the event that either party negotiates or settles the disputes with Google Inc. without the other party. In the event that either party attempts to negotiate with Google Inc. without the other party's participation, that shall be a breach of this Agreement, and such breach will create irreparable harm, and that injunctive relief will be necessary to maintain the rights of the non-breaching party. Accordingly, each party agrees to such injunctive relief.

19. <u>Joint Settlement Negotiations with Google Inc.</u>:

    a.  In view of the current existence of litigation and proceedings in the TTAB, jointly referred to as "Litigation", the parties recognize the need to resolve this Litigation reasonably such that Stelor can continue to develop and promote its business.

    b.  Due to the present status of development of Stelor's business, any event that causes Stelor to delay offering its web-based service to the public will cause severe injury to Stelor. Silvers therefore agrees that, in the event of a settlement with Google Inc., he will not object to Stelor's continued use of the googles.com domain to transition to a new domain name. The length of time of such transition will be at Stelor's sole discretion.

    c.  In the event of a monetary, stock, or similar settlement with Google Inc., Such sale will include a complete sale or assignment of the GOOGLES IP, The proceeds from that settlement shall be divided as follows:

Silvers shall receive 70% of the first $30 million; 50% of the next $20 million; 30% of the next $30 million; 20% of the next $20 million; 10% of the next $20 million and 5% of any amount over $120 million, with the remainder in each case going to Stelor Silver's total share of the proceeds shall not exceed $50 Million in any event.

d. Nothing in this provision creates an affirmative action by either party to enter any settlement with Google Inc., or to sell or assign the GOOGLES IP to Google Inc. Silvers understands and agrees that he cannot sell or assign the GOOGLES IP to Google Inc. without obtaining Stelor's written approval. Both parties agree that they will negotiate in good faith.

20. Confidentiality and Disposition of this Action:

a. The settlement shall not be provided to the court unless necessary to enforce rights, and then under seal. A Joint Stipulated motion to withdraw actions shall be filed no later than Friday, January 28, 2005. The fact that a settlement has been reached and all terms and obligations shall be confidential except to the extent necessary to advise Google Inc. that the parties have resolved all differences.

b. The complaint and counterclaim shall be dismissed without prejudice.

21. Exclusive Authority/No Assignment:

a. Stelor and Silvers represent and warrant that no other person or entity has or had any interest in the Claims, demands, obligations, or causes of action

released as part of this Agreement, that they have the sole right and exclusive authority to execute this Agreement and receive the considerations specified herein, and that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any of the Claims, demands, obligations, or causes of action released as part of this Agreement.

b.  The signatories to this Agreement each warrant that they have the power to bind the person or entity on whose behalf they signed, and will hold harmless any party to this Agreement for any attorney fees, costs, expenses, or damages incurred or paid as a result of finding that such person or entity lacks such authority, or does not have sole right to the Claims that are the subject of this Agreement, or that any such Claim has been assigned.

22. <u>Voluntary Agreement</u>:  Stelor and Silvers each represent that the Agreement is freely and voluntarily entered into, with the independent advice of each party's attorneys and they have not been induced to execute this Agreement by reason of the disclosure or non-disclosure of any fact or representation not set forth in this Agreement.

23. <u>Non-disparagement</u>:  Each Party, on behalf of itself, its officers, directors, attorneys, agents, and employees, agrees not to make or publish, either orally or in writing, any disparaging statements concerning the other Party or its current and former officers, directors, attorneys, agents, shareholders, or employees.

24. <u>Entire Agreement</u>:  This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous contracts, agreements, promises

SILVERS                    - 8 -                    STELOR_____

and understandings, with the exception of the License, Distribution and

Manufacturing Agreement as well as the Letter Agreement previously entered into by

the parties.  This Agreement may not be altered, modified or otherwise changed in

any respect except by writing, duly executed by Stelor and Silvers.  No

representations, circumstances or conditions existing before the Agreement shall be

used in any way by any party to the Agreement to modify the Agreement.

25. <u>Joint Preparation</u>:   Stelor and Silvers declare that they have read this Agreement, and

know and understand its contents, and they each comprehend and agree to all its

terms, conditions, and meanings and their significance; all signatories and their

counsel have cooperated in the drafting and preparation of this Agreement, and this

Agreement therefore shall not be construed against any signatory.  The Agreement

shall not be construed against any of them based upon any claim of unequal

sophistication or bargaining power.

26. <u>Governing Law</u>:   This Agreement shall be deemed to be made under, shall be

construed in accordance with, and shall be governed by the laws of the State of

Florida.

27. <u>Duplicate Originals</u>:  This Agreement may be executed in duplicate originals, each of

which is equally admissible in evidence in an action to enforce this Agreement, and

each original shall fully bind each party who has executed it.

28. <u>Facsimile Signatures</u>:   The signatures required for the execution of this Agreement

may be transmitted by facsimile, and any such signature shall be deemed a duplicate

original, and may be admitted in evidence and shall fully bind the party and person

making such signature.

SILVERS _____

- 9 -

STELOR_____

29. <u>Effective Date</u>:  The Effective Date of this agreement shall be the date on which all

Parties have signed this Agreement.

30. <u>Each Party Agrees to operate in good faith as to the terms of this agreement</u>.

[Signature Page Follows]



THE FOREGOING IS AGREED TO BY:

DATED: January ___, 2005      Stelor Productions, Inc.

                                  By: _____

                                  Its: _____

DATED: January 28, 2005      Steven A. Silvers

                                  By: _Steven A. Silvers_

APPROVED AS TO FORM AND CONTENT:

DATED: January ___, 2005      Summers Rubinstein, P.C.

                                  By: _____

                                  Yano L. Rubinstein, Esq.

                                  Attorneys for Stelor Productions, Inc.

DATED: January 28, 2005      Kozyak, Tropin & Throckmorton, P.A.

                                  By: _____

                                  Gail McQuilkin, Esq.

                                  Attorneys for Steven A. Silvers

# EXHIBIT "G"

LAW OFFICES

# KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
garn@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7929-0844-8480

April 27, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

        Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

On November 12, 2004, we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached. Because Stelor did not cure those breaches, on January 13, 2005 we served on Stelor a notice of termination of the License Agreement, a copy of which is attached.

On January 28, 2005, Stelor and Silvers entered into a Settlement Agreement in which Silvers agreed to withdraw his notice of termination provided Stelor perform its obligations under the Settlement Agreement.  Stelor, however, has:

- failed to provide Silvers with unit interests in Stelor LLC under paragraph 9;

- failed to pay Silvers monthly installments on royalty advances on the first of every month under paragraph 10 (a);

- failed to pay on April 1, 2005 the monthly advance on royalties required by Silver to maintain his insurance coverage through the Aurora Collection under paragraph 10 (b);

- failed to cooperate in the audit of the books and records of Stelor under paragraph 14;  and

- failed to provide Silvers samples of Licensed Products that are being offered for sale under paragraph 15.

Furthermore, although Stelor has provided a written statement that it is not offering any

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 12, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchandise of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

251939.1

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:     Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.     Failure to pay royalties under paragraph III (A);

b.     Failure to provide a written certified royalty statement under paragraph III (C);

c.     Failure to provide a list of all sub licenses under paragraph III (C);

d.     Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.     Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.     Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

g.     Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

h.     Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

    i.    Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

    j.    Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

    k.    Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

    l.    Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

    a.  Failure to pay Mr. Silvers consultancy fees and expenses;

    b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

    c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

    d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuillkin

c:    Steven A. Silvers
     Laurence Hefter

7245015.1

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

     Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2

Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
     Laurence Hefter
     Yano A. Rubinstein
     William Borchard

/248587.1

# EXHIBIT "H"

04/29/2005  15:45    3058585852⌐_          BURLINGTON WEIL

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: DBLONSKY@BWSKB.COM  WWW.BWSKB.COM

April 29, 2005

**VIA FACSIMILE AND U.S. MAIL**

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

Re:    Silvers/Stelor

Dear Gail:

I write in response to your letter dated April 27, 2005 to Steven Esrig of Stelor Productions purporting to terminate the License Agreement. It is the position of Stelor that the License Agreement and the Settlement Agreement remain enforceable and binding documents and that the purported grounds for termination are all invalid and improper. We will respond to each of those grounds in turn.

First, Stelor has only recently converted to an LLC and Mr. Silvers has been provided an option letter for unit interests, to which he has not responded.

Second, monthly installments on royalty advancements have been paid. Indeed, enclosed are copies of royalty advancement checks for April and May that we are prepared to release upon withdrawal of the notice of termination.

Third, monthly advances on royalties to maintain insurance coverage have also been paid. Enclosed are checks for April and May that we are prepared to release upon withdrawal of the notice of termination. It must be noted, however, that, despite demand, Mr. Silvers has never confirmed the amount of insurance to be paid. As a show of good faith, Stelor has nonetheless paid the maximum each month, but such confirmation must be provided forthwith.

Fourth, Stelor has cooperated in the audit of the books and records. In fact, just a week ago, on April 22, 2005, you sent an email to Kevin Kaplan stating that "[t]he auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." We have received no such letter. Whenever Stelor receives such a letter, it will cooperate.

Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn and it is understood that the agreements remain in place.

Gail A. McQuilkin, Esq.
April 29, 2005
Page 2

Finally, no royalties are owed to your client and the advances paid far exceed royalties that have been accumulated. A royalty statement is enclosed reflecting full payment of any amounts due. To the extent that there are any concerns, they can be raised with us. However, there is simply no basis for termination. Instead, the continuing failure of Mr. Silvers to meet his obligations under paragraph 2 of the Settlement Agreement, which has been the subject of prior correspondence, is a breach that he needs to be cured immediately.

Mr. Silvers is obliged to honor the License Agreement and the Settlement Agreement. We hereby demand receipt of written notice by Noon on Monday, May 2, 2005 that the notice of termination has been withdrawn and that Mr. Silvers agrees to abide by his contractual agreements. We also demand written assurance that Mr. Silvers will make no efforts to interfere in any manner with the business of Stelor. Furthermore, Mr. Silvers needs to agree to the submission to the federal court of a consent decree confirming the enforceability of the agreements and the rights that have been conveyed to Stelor. Failing receipt of such notice and assurances, Stelor will initiate an action seeking to enforce the agreements through declaratory and injunctive relief.

All rights and remedies are reserved. Govern yourselves accordingly.

Sincerely,

Daniel Blonsky

DFB:gr
Enclosures
cc: Client (w/ encls.)
    Kevin C. Kaplan, Esq. (w/ encls.)

04/29/2005  15:45    3058585261                    BURLINGTON WEIL

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20885

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0987
7-216-520

2751

04/28/05

Y TO THE
DER OF    Silvers Entertainment Group                                $ **5,000.00

Five Thousand and 00/100**************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MO    Advance Against Royalty April 05

⑈002751⑈ ⑈052002166⑈    ⑈17597405⑈

---

ELOR PRODUCTIONS, INC.
    Silvers Entertainment Group                    04/28/05              2751
04/28/05                        Bill #roymay                              5,000.00

Citibank Checkin   Advance Against Royalty April 05                        5,000.00

PAGE 05

04/29/2005  15:45    3058585261                    BURLINGTON WEIL

2752

**STELOR PRODUCTIONS, INC.**
PO BOX 5000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0957
7-216-520

04/28/05

PAY TO THE
ORDER OF    Silvers Entertainment Group                    $ **5,000.00

Five Thousand and 00/100******************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO    Advance Against Royalty May 05

⑆002752⑆ ⑈052002166⑈    ⑆1759740⑆

---

STELOR PRODUCTIONS, INC.                    04/28/05    2752
    Silvers Entertainment Group                    5,000.00
    04/28/05                Bill #royapril

Citibank Checkin  Advance Against Royalty May 05                    5,000.00



04/29/2005 15:45    305858526    BURLINGTON WEIL

2753

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20038-0967
7-216-520

04/28/05

Y TO THE
DER OF    Silvers Entertainment Group    $ **1,000.00

One Thousand and 00/100********************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MD    Royalty/insurance advance, Apr '05

⑈002753⑈ ⑈052002166⑈    ⑈175974050⑈

---

LOR PRODUCTIONS, INC.

Silvers Entertainment Group                          04/28/05         2753
04/28/05                    Bill #052005                          1,000.00

Citibank Checkin  Royalty/insurance advance, Apr '05                      1,000.00



04/29/2005  15:45    305858526.              BURLINGTON WEIL

2755

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

AY TO THE
RDER OF    Silvers Entertainment Group                                      $ **1,000.00

One Thousand and 00/100******************************************************************* DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

IEMO    Royalty/insurance advance May '05

⑈002755⑈ ⑆052002166⑇ ⑈17597405⑈

---

**ELOR PRODUCTIONS, INC.**
    Silvers Entertainment Group                              04/28/05              2755
04/28/05                    Bill #042005                                         1,000.00

Citibank Checkin  Royalty/insurance advance May '05                              1,000.00

04/29/2005  15:45    3058585261                BURLINGTON WEIL                                PAGE  08

## Royalty Statement
## Silvers Entertainment Group
### January 1, 2005 – March 31, 2005

| Transaction | Net Revenue | Royalty Rate | Royalty Amount | Pre-paid Royalty Balance |
|---|---|---|---|---|
| February advance against royalties | | | $5,000 | $5,000 |
| February advance against royalties for insurance premiums | | | $1,000 | $6,000 |
| Net revenue from licensed properties (iTunes) | $47.35 | 6% | $2.84 | $5,997.16 |
| Net revenue from derivative properties (iTunes) | $1.47 | 3% | $0.04 | $5,997.12 |
| March advance against royalties | | | $5,000 | $10,997.12 |
| March advance against royalties for insurance premiums | | | $1,000 | $11,997.12 |

# EXHIBIT "I"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.
Case No. 05-80393-CIV-HURLEY/Hopkins

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

       Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

       Defendant.

_____/

## DECLARATION OF KEVA LABOSSIERE

My name is Keva Labossiere and I make this declaration based on my own personal knowledge. I am a legal assistant at the law firm of Kozyak Tropin and Throckmorton, P.A., with offices at 2525 Ponce de Leon, 9th Floor, Coral Gables, FL 33134.

I . Description of Research Conduted on Googles.com's
On-line Store at CafePress.com

1. On May 16, 2005, I visited the CafePress.com website at www.cafepress.com.

2. CafePress.com is an online marketplace that allows companies, such as Stelor Productions, to sell customized merchandise online, i.e. apparel, using CafePress.com's unique print on demand and e-commerce services, with no upfront costs and inventory. Attached hereto as **Exhibit "A"** is a copy of CafePress.com's Company Overview.

3.      At the CafePress.com homepage, I entered the word "googles" into the search engine field and was directed to to the "Googles.com Online Store." Once there, I was able to select from fourteen (14) products.  A copy of the available products and other product information as presented on the Googles.com Storefront is attached hereto as **Exhibit "B".**

4.      At that Googles.com Storefront, I purchased the following four (4) items: (i) Googles (word) black cap; (ii) Googles baseball jersey; (iii) Googles (TM )Mug; and (iv) Mousepad ("Merchandise").  Attached hereto as **Exhibit "C"** is a copy of the receipt from the purchase described above.

5.      On May 18, 2005, I received the Googles.com merchandise and presented it to Ken Hartmann.

## II.  Description Of Research Conducted On Apple iTunes Music Store

6.      On May 10, 2005, I downloaded the Apple iTunes Music Store software ("Apple iTunes Music Store") to my  computer desktop from the website, www.itunes.com.

7.      Apple iTunes is a music download store with more than 1.5 Million songs to preview, buy and download.    Attached hereto as **Exhibit "D"** is a copy of the download features available to Apple iTunes subscribers.

8.      In the Apple iTunes Music Store, I selected "Children's Music," conducted a "Power Search"  where I then entered "googles" in the "Song" field  and "Children's Music" in the "Genre" field.   The power search resulted in the One GooWorld/The Googles from Goo ("One Goo World") album being displayed.  I then clicked on the album's title which opened an album detail page for One Goo World.

Also displayed on the album detail page were: (i) the Release Date (of the album); (ii) Top Artist Downloads (from the album); (iii) and a "See All" icon, which when selected displayed the two (2) Googles albums available on iTunes. That is: "One GooWorld" and "Un Goomundo/The Googles from Goo" (the Spanish version of One Goo World)." The number of tracks available on each album is fifteen (15). Attached hereto as Composite **Exhibit "E"** are "Print Screen" snapshots of the iTunes pages displayed from that search.

9.    The release date given for One GooWorld is "Jul 15, 2004" and the publisher mark is noted as "(p) 2004   Stelor Productions." The release date given for "Un Goomundo" is "Sep 14, 2004" and the publisher mark is noted as "(p) 2004 AWAL." (*See* Exhibit "E"). AWAL  is the abbreviation for Artist Without A Label. Attached hereto as **Exhibit "F"** is  AWAL's  "About Us"  page  which is displayed on its website, www.awal.com.

10.    At that iTunes Music Store I purchased "One GooWorld" and "Un Goomundo/The Googles from Goo." Attached hereto as **Exhibit "G"** is the receipt for that purchase. The total price was $19.98.

11.    On May, 20, 2005, I provided  Mr. Hartmann with a compact disc of the downloaded music.

12.    On May 17, 2005, I visited the website Absolutely.net to establish  how One Goo World was performing on the music charts. Absloutely.net is an online entertainment magazine that also provides information on the sales of music albums worldwide. It's website address is www.absolutely.net.

13.    On Absolutely.net, One Goo World is listed in the Netherlands as No. 3 out of 6 Top Albums in Children Music.    Track no. 13, "Zoomin'" is listed as no. 29 in UK's 100 Top Songs in Children Music 3, and track no. 4, "I Feel Good About Myself is ranked , no. 65 in UK 100 Top Songs in Children's Music 7.    Attached hereto as composite **Exhibit "H"** is a printout of Absolutely.net's on-line chart listing ranked by the categories previously described.

**I HEREBY DECLARE** under penalty of perjury, I declare that I have read the foregoing declaration and that the facts stated in it are true

Dated: May 20, 2005.

Keva Labossiere

3339.101/253396.1

4

# EXHIBIT "A"



Shop, sell or create what's on your mind.

Your Account | Sign In | Cart: 0 items

Home > **About Us**

**Company Overview**

Historical Timeline

The Team

Press Center

Work at CafePress.com

Contact Us

## Shipping creativity since 1999.



CafePress.com is an online marketplace that offers sellers complete e-commerce services to independently create and sell a wide variety of products, and offers b unique merchandise across virtually every topic. Launched in 1999, CafePress.co has empowered individuals, organizations and businesses to create, buy and sell customized merchandise online using the company's unique print-on-demand an commerce services. Today, CafePress.com is a growing network of over 2 millior members who have unleashed their creativity to transform their artwork and ide into unique gifts and new revenue streams.

Our members have created over 8 million original designs on more than 70 customizable products ranging from apparel, home and office accessories to mus and data CDs and books to prints, posters and cards.

Powering independently-run shops as well as syndicated and corporate stores, w manage every aspect of doing business online, including storefront development hosting, order management, fulfillment, secure payment processing, and quality customer service - enabling anyone to open a free shop with no upfront costs an inventory to manage. CafePress.com is a privately owned, profitable company ba in San Leandro, California.

## CafePress.com Services

**CafePress.com® Marketplace**: In the CafePress.com Marketplace, a dynamic retail experience, visitors will find over 8 million unique items created by membe around the globe. No matter what your passion, there's a product for you.

**Create & Sell**[SM]: Through the CafePress.com Create & Sell service, customers a able to open an online shop to transform their artwork and ideas into new reven streams and diverse products - all with no upfront costs and no inventory to mar

**Create & Buy**[SM]: The CafePress.com Create & Buy service empowers people to personalize their own gifts. Customers can add their own personal touch to more 70 products - all with a few clicks of the mouse.

CafePress.com : About Us

## Independent Shopkeepers & Major Accounts

CafePress.com is a global and growing network of over 2 million independent shopkeepers and members in addition to syndicated and corporate stores. CafePress.com has over 35 major accounts, including ASPCA, United Media, Dilb Get Fuzzy, Phil Collins and STARTREK.COM. In addition, CafePress.com has strat agreements with licensors that include more than 80 properties.

## Fun Facts

- Whats Your Passion?™ — politics, babies, music, pets, sci-fi, knitting — th something for everyone at CafePress.com
- The CafePress.com web site averages over 6 million unique visits per mon
- Approximately 1000 new, independent shops join the CafePress.com netw each day
- Over 1.5 million orders have been shipped to customers spanning the glob
- Roughly 14,000 new, unique items are added each day
- The most popular item is the white t-shirt; nearly half a million white t-shi were purchased in the first five years

 Download Fast Facts

To view and print PDF documents, you will need to install the Adobe Acrobat Reader, which can be downloaded for free through Adobe's web site.

About Us | Press Center | Corporate Solutions | Community | Help | Contact Us

All Content Copyright © 1999-2005 CafePress.com. All rights reserved. Use of this web site constitutes acceptance of the Terms of Service. Privacy Policy | Intellectual Property Policy



CALL US TOLL
1-877-809-
click for service !

# EXHIBIT "B"

**cafepress.**com

Cart & ___out | **Help** | Order Status | Shop Home

Back to Googles.com.



**Hey Kids! Hey Adults! Hey Everyone!!** Get your Googles merchandise here at our new store, with all-new merchandise. Also, use our feedback form to email us product suggestions. We know you will enjoy getting these products for yourself and your favorite people!



Googles GooShip Snap Bib
$6.99



Googles Infant/Toddler T-Shirt
$9.99



Googles (word) Black Cap
$15.99



Googles (word) Wall Clock
$11.99



Googles (TM) T-Shirt - White
$15.99



Googles (word) White T-Shirt
$15.99







Googles.com Online Store : CafePress.com

Page 2 of 2

Googles (word) Golf Shirt
$19.99

Googles Baseball Jersey
$17.99

Googles (word) Baseball Jersey
$18.99



Googles (TM) Sweatshirt
$24.99

Googles (TM) Mug
$13.99

Googles (word) Mug
$12.99

Mousepad
$10.99

Googles (word) Mousepad
$12.99

(C) 2002 Googles.com from Stelor Productions, Inc.

This shop is powered by CafePress.com.
Copyright © 1999-2005 CafePress.com. All rights reserved.
Privacy Policy | Trademark & Copyright Information

# EXHIBIT "C"

KEVA LABOSSIERE - Thanks for You      Press.com Order (Order# 15506967)                                Page 1

**From:** &lt;donotreply@cafepress.com&gt;
**To:** &lt;kjl@kttlaw.com&gt;
**Date:** 5/16/2005 1:13:40 PM
**Subject:** Thanks for Your CafePress.com Order (Order# 15506967)

Thanks for your recent purchase from CafePress.com!

Your Order Number is 15506967.

You will receive another email with tracking information once your order has shipped.

The details of your order are listed below:

Ship To:
Kenneth R. Hartmann
2525 Ponce de Leon
9th Floor
Coral Gables, FL  33134

305/372-1800
kjl@kttlaw.com

Items:
1 x Googles (word) Black Cap @ $15.99 = $15.99
1 x Googles (TM) Mug @ $13.99 = $13.99
1 x Googles Baseball Jersey @ $17.99 = $17.99
1 x Mousepad @ $10.99 = $10.99
==========================================
Subtotal: 58.96
Shipping: 24.50
TOTAL: 83.46

Using the Credit Card *******2071

REMINDER: All overnight and 2-Day orders will ship next business day.

Print and save this email in case you have any questions regarding your order.
Please note, if you've placed an order for multiple products, there are times
when items are shipped separately due to product parcel configurations.
If you have any questions, please contact our Customer Service Department:

- On the Web at http://www.cafepress.com/cp/info/help/.
- Phone toll-free at 1-877-809-1659

Thanks for shopping at CafePress.com!

- The CafePress.com Team
------------------------------------
CafePress.com
http://www.cafepress.com
------------------------------------


--------------------------------------------------------------------------
Open a Shop. Choose from 70+ customizable products ranging from apparel, home

KEVA LABOSSIERE - Thanks for Yo | Press.com Order (Order# 15506967) | Page 2

and office accessories to music and data CDs and books to prints, posters and cards.

-------------------------------------------------------------------------------

# EXHIBIT "D"



# The #1 music download store.

**Discover iTunes**

iTunes Jukebox

Import Music

Create Playlists

Share & Stream

Burn CDs

Sync with iPod

**iTunes Music Store**

Easy to Buy

Discover Music

Share Your Taste

Audiobooks


For Mac and Windows


Next Free Single: 05/17

## Key Features

Open 24/7 on Macs and Windows PCs, the iTunes Music Store has become a smash hit, with music lovers purchasing over 400 million songs worldwide to date. Check out hot exclusives and download a new free single every week. Rate other music lovers' iMixes and upload your own to the store.



**More Than 1.5 Million Songs to Preview, Buy and Download**
Featuring hundreds of thousands of songs from major music companies including EMI, Sony/BMG, Universal, and Warner Bros, the iTunes Music Store offers more than 100,000 new tracks from independent artists and record labels. You'll also find more than 150 exclusive tracks from such artists as Eminem, Gwen Stefani, Bob Marley and Andrea Bocelli, to name just a few. What's more, you'll also find and dozens of out-of-print Motown singles and jazz albums from the Verve Vault, both available digitally for the first time.

**Just 99¢ a Song, Plus Generous Personal Use Rights**
The iTunes Music Store lets you quickly find, purchase and download the music you want for just 99¢ per song. You can burn individual songs onto an unlimited number of CDs for your personal use, listen to songs on an unlimited number of iPods and play songs on up to five Macintosh computers or Windows PCs. And the iTunes software works so smoothly on both platforms that you can share music with any combination of Macs and Windows PCs on a local area network — regardless of whether you're running iTunes on a Mac or PC.



**Browse Music in the Store or from Your Own Library**
You can cruise the store by genre — including Rock, Jazz, Latin, New Age, Inspirational, Opera, R&B/Soul, Reggae and Soundtracks — or by artist or album. Double-click on track listings to hear 30-second, high-quality samples and to see digital album art. Or you can search by entering the name of an artist or composer, or the title of a song — or even part of the title — and clicking the Search button. Even easier, just click a Quick Link on an artist in your library to see the band's entire repertoire. When you find something you like, buy it instantly or save the store preview in a playlist on your Mac or PC.



**Make and Share Musical Discoveries**
Want some help discovering great new music? The iTunes Music Store features crisply-written editorial content, complete with links to music. You can drag and create links to any store page, and even share your new-found favorites with friends by emailing them a link to a sound sample, artist or

- Purchase and download songs or albums with music videos; then watch the videos full screen on your Mac or PC 
- View additional artist photos 
- Browse music by subgenre
- Enhanced Essentials area offers additional ways to discover new music
- "Artist Alerts" notify you when we add music from your favorite artists to the iTunes Music Store
- Search iMixes by title
- More than 1.5 million tracks
- Find out what's playing on more than 1,000 radio stations
- View movie trailers
- Use your AOL account
- Watch music videos
- Share music with up to five Macs and PCs
- Publish an iMix on the store

album page. Even better, you can share the playlists you make as an iMix on the store. Rate playlists from other music lovers to move them up and down the charts. See if you rate as a five-star music mixer.

### Discover and Explore
Celebrity playlists will help you discover and explore new music. View playlists hand-picked by celebrities and with one click own all their recommendations. Read what they say about what inspired their playlists. Already have a few of their recommended tracks? No problem: simply use the Buy Now button next to the songs that you don't have. Top Songs and Top Albums lists on the home page let you know what's hot, and you'll find Top Downloads lists and related music suggestions throughout the store. Did you hear a song on the radio but don't know what it is? Now you can find out what's playing on more than 1,000 stations around the US and buy that catchy tune.



And here's something brand new: some singles and albums now come with a bonus music video. Purchase and download the song or album, and you also get a music video you can watch full screen any time you want.

### Have a Favorite Artist?
If you just love the work of U2, The Beautiful South, Joss Stone or Charlie Parker, you'd probably like to know when one of their songs or albums arrive at the iTunes Music Store. Then you'll be anxious to try out a new store feature. With "Artist Alerts," you'll receive email as soon as music from your favorite artists get added to the Store. It's a great way to stay informed.

### Videos and Movie Trailers
If you have a broadband connection, you can check out the exclusive full-length music videos that you can watch right in the store. If you like what you see, just buy the tune immediately. Or check out the latest movie trailers in full screen, and buy songs from the soundtrack or an associated audiobook. iTunes includes a well-stocked library of best-selling audiobooks — 11,000 titles and counting.

The iTunes Music Store offers everything you need to grow your music collection with ease, give music to friends and family, and expand your musical knowledge in the process. And it's all waiting for you inside the world's best digital jukebox.

#1 music download store according to Nielsen SoundScan.

- Tell a friend about an album via email with cover art
- More than 11,000 audiobooks
- Save store previews in a playlist to purchase later
- Allowance accounts
- Gift certificates

### iTunes Gift Certificates

Just the thing for your favorite college student, a friend or a special occasion, iTunes Gift Certificates (from $10 to $200) are available directly through iTunes or (if you don't have iTunes) the Apple Store.

**Buy Gift Certificates**

### Today's Top Songs
1. **Hollaback Girl**
   Gwen Stefani
2. **Feel Good Inc (Single Edit)**
   Gorillaz
3. **Don't Phunk With My Heart**
   Black Eyed Peas
4. **Incomplete**
   Backstreet Boys
5. **Mr. Brightside**
   The Killers

**Top 100 Songs**

### Today's Top Albums
1. **Stand Up (Bonus Video Version)**
   Dave Matthews Band
2. **Make Believe**
   Weezer
3. **With Teeth**
   Nine Inch Nails
4. **Gimme Fiction**
   Spoon
5. **In Between Dreams (iTunes Version)**
   Jack Johnson

**Top 100 Albums**

Home > iTunes > Music Store

Copyright © 2005 Apple Computer, Inc. All rights reserved.

# COMPOSITE

# EXHIBIT "E"



| | Song Name | Time | Artist | Album | Genre | Price | |
|---|---|---|---|---|---|---|---|
| 1 | Tiene Que Ser una Cosa de Goo | 3:25 | The Googles from ... | Un Goomundo | Latin | $0.99 | BUY SONG |
| 2 | Arboles | 3:44 | The Googles from ... | Un Goomundo | Latin | $0.99 | BUY SONG |
| 3 | El GooBop | 1:47 | The Googles from ... | Un Goomundo | Latin | $0.99 | BUY SONG |
| 4 | One GooWorld | 2:30 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 5 | GooNight | 3:31 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 6 | Responsibility | 2:15 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 7 | It's Gotta Be a Goo Thing | 3:22 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 8 | Recycle... Don't Litter | 2:16 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 9 | Trees | 3:41 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 10 | GooBop | 1:43 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 11 | Rain | 3:01 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 12 | GooFriends | 2:20 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 13 | Zoomin' | 2:47 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 14 | I Feel Good About Myself | 1:58 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 15 | Goobye | 2:06 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 16 | GooMorning | 1:56 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |
| 17 | We're the Googles | 0:46 | The Googles from ... | One GooWorld | Children's M... | $0.99 | BUY SONG |

17 songs





# EXHIBIT "F"

**MISSION STATEMENT**

Our goals are simple. Connect artists and fans directly, create and facilitate economic prosperity, creative freedom and ownership for artists while allowing listeners to explore and discover great new music in the smartest possible way. Our mission is to create an artist-friendly environment where creative communities of music fans can interact with and discover great new music and artists. AWAL also provides useful and vital industry information allowing for self-management techniques and direction.music and artists.

**ABOUT AWAL**

Artists are selected by a panel of industry professionals and a board of advisors, promoting quality over quantity.

We, as a new digital industry and company, do not have time to operate at the leisurely 3-5 year pace of traditional strategic planning. The reason for urgency? An explosive combination of faster, cheaper computing power, the ubiquity of the Internet and the availability of readily available capital and entrepreneurs determined to spend it.

Our industry is changing. We can now mediate relationships between artists and their audiences without ever needing to reduce the music to a fixed media. Soon there will be no reason why recorded music ever has to take a physical form. The current industry assets are tied up in manufacturing, packaging and distribution of the physical media. Other entertainment products (movies, books and magazines) are just waiting for the right technologies for delivery.

A recent quote at an online music forum; "music will be the first and single-most important traditional entertainment product on the web because of its low bandwidth requirements and its unique ability to be customized. We need to stop thinking about selling round things. We will be selling songs, albums, multi-song packages, compilations, services, subscriptions, streaming and on and on....".

The Internet allows for an organic way for an Artist to create a community and relationship with fans that is unlike the normal major label/record store/bin-search mentality.

AWAL has at its core, an advisory board made up of professional artists and technicians from all aspects of the industry.

**How it Works**

AWAL will create a new and vibrant user interface for Artist, incorporating Artist's current activity into the AWAL Artists Web Page. AWAL will work with Artist to maintain this site for duration of the relationship. The goal of AWAL is to increase user and fan base of Artist and will provide certain free services to Artist when appropriate, such as; marketing, promotion, PR, creative consulting, distribution, affiliate programs, International distribution etc... The AWAL site has become a tool and "first look" for many major label A&R executives and several AWAL artists have moved on to sign with other labels as a result of their presence here.

**AWAL plans to create a unique approach by building a company that is run by its artists.**

AWAL has successfully launched AWAL Japan (http://awaljapan.co.jp/index_m.html), and other mirrored international sites, and we are working with major distribution outlets both digital and offline, to provide the best opportunities for our network of artists and fans all over the world.

**Submitting Music .**

For now - please send your CD's "snail mail" to the address at the bottom of the page. We listen to everything!

**EXECUTIVE BIOS**

**Denzyl Feigelson, Founder, and President**

Denzyl was one of the earliest advocates of music and the Internet, founding Artists Without a Label in early '95. Mr. Feigelson is also the founder of hanaflowers.com and Awal Japan - a Japanese co-venture with AWAL Japan. Denzyl also brings over 20 years of music industry experience working with and managing artists as diverse as Paul Simon, Kenny Loggins, Ladysmith Black Mambaso, Johnny Clegg, John Tesh, Gypsy Kings, Alice Cooper, Luther Vandross & The Pointer Sisters. In the 80's he was influential in helping to establish African artists in the west and helped to facilitate the initial recording sessions for Paul Simon's "Graceland" CD - one of the top selling albums of the decade..

**Michael-Patrick M.Moroney, Board and SVP**

Mr. Moroney has launched some of the most significant interactive Internet sites and services in the 1990's, first as a Producer for Ikonic Interactive and later as a Producer for DAWG, the Digital Artists and Writers Group and at ISL Consulting where he was an Executive Producer responsible for the development and launch of new Internet services for Chevron, NationsBanc Montgomery Securities, Amnesty International/Excite, Banc Boston and Bankers Trust. At these companies and over the last 7 years, Mr. Moroney produced new music services for Virgin Records, MCA and TimeWarner and has also pioneered the development of interactive television programming

("Hal's Legacy," "Roots and Wings") and helped to prototype Time Inc's "News on Demand". Michael was also the co-founder and President of ArtistOne.com - one of the web's first music services.

**CONTACT INFORMATION**

PO Box 879 Ojai, CA 93024

Tel: 805-640-7399

Fax: 805-646-6077

email: **info@awal.com**

# EXHIBIT "G"

## KEVA LABOSSIERE - Your receipt #9372538022

**From:**   iTunes Music Store <do_not_reply@apple.com>
**To:**     <kjl@kttlaw.com>
**Date:**   5/19/2005 8:33 PM
**Subject:** Your receipt #9372538022

 iTunes

Receipt

**Billed To:**
Kenneth Hartmann
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134

**Order Number:** M64770801
**Receipt Date:** 05/19/05
**Order Total:** $19.98
**Billed To:** American Express

| Item Number | Description | Unit Price |
|---|---|---|
| Q0015 | One GooWorld | $9.99 |
| Q0015 | Un Goomundo | $9.99 |

| | | |
|---|---|---|
| Subtotal: | | $19.98 |
| Tax: | | $0.00 |
| Order Total: | | $19.98 |

**Those who bought your selections also bought:**



**Has Been**
William Shatner



**Off the Wall**
Michael Jackson



**Frank's Wild Years**
Tom Waits

**Please retain for your records.**
Please See Below For Terms And Conditions Pertaining To This Order.

**Apple Computer Inc.**
You can find the iTunes Music Store Terms of Sale and Sales Policies by launching your iTunes application
and clicking on Terms of Sale or Sales Policies.

Answers to frequently asked questions regarding the iTunes Music Store can be found at
http://www.apple.com/support/itunes/

Apple respects your privacy.
Information regarding your personal information can be viewed at http://www.apple.com/legal/privacy/.

Copyright © 2005 Apple Computer, Inc. All rights reserved.

EXHIBIT "H"

# Absolutely.net

**contact abso**



| Web Search | | Buy Poster |
|---|---|---|

**EXCLUSIVE: Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.**

## Netherlands 6 Top Albums in Children's Music

Goo

**Homepage**

**What's New**

**Movie Reviews**

**Photo Gallery**

**Download Music** NEW!

**Wallpaper**

**Screensaver**

**Contact Celeb**

Click on the title to buy and download music.
You need iTunes sofware from Apple to play the music.
**Download Here**

Site S

**Page: 1**



### 1. Baby Genius: Best of... The IQ Builder! - Baby Genius

*Baby Genius: Best of... The IQ Builder! by Baby Genius*

**Artist:** Baby Genius
**Album:** Baby Genius: Best of... The IQ Builder!
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 2. Classical Vitamins - Baby Genius

*Classical Vitamins by Baby Genius*

**Artist:** Baby Genius
**Album:** Classical Vitamins
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 3. One GooWorld - The Googles from Goo

*One GooWorld by The Googles from Goo*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 4. Kidz Bop Christmas - Kidz Bop Kids

*Kidz Bop Christmas by Kidz Bop Kids*

**Artist:** Kidz Bop Kids

ADVERTI

Absolutely Music Download: Netherlands 6 Top Albums in Children's Music                     Page 2 of 2




For Our Children
Various Artists
New $13.99!


Classical Music for Chil...
Johann Sebastian Bach
New $3.98!
Used $1.99!


Classic Disney
Various Artists
New $42.99!


Music Has The Right To C...
Boards of Canada
New $10.99!


Circus Music from the Bi...
Merle Evans Circus Band
New $7.98!


Sea Music
Dan Zanes & Festival Five Folk
New $13.99!

(Prices May Change)

**Album:** Kidz Bop Christmas
**Copyright:** 2003 Razor & Tie
**Released Date:** 2002
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 5. Smart Play With Classical - Heidi Brende

*Smart Play With Classical by Heidi Brende*

**Artist:** Heidi Brende
**Album:** Smart Play With Classical
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 6. TRAVEL SONG SING ALONGS - Kevin Roth

*TRAVEL SONG SING ALONGS by Kevin Roth*

**Artist:** Kevin Roth
**Album:** TRAVEL SONG SING ALONGS
**Copyright:** 2004 STAR GAZER PRODUCTIONS
**Released Date:** 26 February 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800

**Page: 1**



I am a:
Man

Age:
18 to

Zip/Postal :

Find someo

ma
intimate c

**Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us**





©2005 Absolutely Celebrity Network

# Absolutely.net

**contact abs**



ASHLEY    MARY-KATE

AND GET YOUR FREE SONY PSP!

Web Search    Buy Poster

**EXCLUSIVE: Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.**

## UK 100 Top Songs in Children's Music 3

**Click on the title to buy and download music.**
**You need iTunes sofware from Apple to play the music.**
**Download Here**

**Go**

**Homepage**

**What's New**

**Movie Reviews**

**Photo Gallery**

**Download Music** NEW!

**Wallpaper**

**Screensaver**

**Contact Celeb**

Page: **1 2 3 4 5 6 7 8 9 10**

**Site S**



### 21. Being Jewish Is Fun - Judy Caplan Ginsburgh

*Being Jewish Is Fun by Judy Caplan Ginsburgh from the album Havdalah Pajama*

**Artist:** Judy Caplan Ginsburgh
**Album:** Havdalah Pajama
**Copyright:** 2000 Judy Caplan Ginsburgh
**Released Date:** 26 July 2000
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 22. The Cuckoo Waltz - Verne Langdon

*The Cuckoo Waltz by Verne Langdon from the album Circus Clown Calliope!/Circus Clown Calliope!, Vol.2*

**Artist:** Verne Langdon
**Album:** Circus Clown Calliope!/Circus Clown Calliope!, Vol.2
**Copyright:** 1999 Electric Lemon
**Released Date:** 26 October 1999
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 23. The Lion and the Mouse - Michael Mish

*The Lion and the Mouse by Michael Mish from the album Aesop's Fables*

**Artist:** Michael Mish
**Album:** Aesop's Fables
**Copyright:** 2003 MishMashMusic
**Released Date:** 05 June 2003
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 24. Frosty the Snowman - Kidz Bop Kids

ADVERTI

Absolutely Music Download: UK 100 Top Songs in Children's Music 3                    Page 2 of 3



*Frosty the Snowman by Kidz Bop Kids from the album Kidz Bop Christmas*

**Artist**: Kidz Bop Kids
**Album**: Kidz Bop Christmas
**Copyright**: 2003 Razor & Tie
**Released Date**: 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800


A Child's Celebration of...
Various Artists
New $13.99!


Classic Disney
Various Artists
New $42.99!


The Mozart Effect - Musi...
Leopold Mozart
New $10.98!
Used $3.99!


Smithsonian Folkways Chi...
Various Artists
New $10.99!


Scooby-Doo's Snack Track...
Various Artists
New $14.99!
Used $9.50!


For Our Children
Various Artists



## 25. The Syllable I Stress - Los McCroskey

*The Syllable I Stress by Los McCroskey from the album ¿Cómo? Fun, New Songs for Learning Spanish and Loving God*

**Artist**: Los McCroskey
**Album**: ¿Cómo? Fun, New Songs for Learning Spanish and Loving God
**Copyright**: 2002 McCroskey Music
**Released Date**: 12 February 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



## 26. My First Child - Carla Lynne Hall

*My First Child by Carla Lynne Hall from the album My First Child CD Single*

**Artist**: Carla Lynne Hall
**Album**: My First Child CD Single
**Copyright**: 2004 Moxie Entertainment
**Released Date**: 18 April 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



## 27. Amy - Celeste Krenz, Linda W. Purdy

*Amy by Celeste Krenz, Linda W. Purdy from the album Pirates & Cowboys, More Songs for You & Me*

**Artist**: Celeste Krenz, Linda W. Purdy
**Album**: Pirates & Cowboys, More Songs for You & Me
**Copyright**: 2003 Mountain Creek Records
**Released Date**: 05 January 2003
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



## 28. It's Raining, It's Pouring - Rain, Rain, Go Away - David Jacobi - Aimee Fischer

*It's Raining, It's Pouring - Rain, Rain, Go Away by David Jacobi - Aimee Fischer from the album Favorite Nursery Rhymes*

**Artist**: David Jacobi - Aimee Fischer
**Album**: Favorite Nursery Rhymes
**Copyright**:
**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



## 29. Zoomin' - The Googles from Goo

*Zoomin' by The Googles from Goo from the album One GooWorld*

**Artist**: The Googles from Goo
**Album**: One GooWorld
**Copyright**: 2004 Stelor Productions
**Released Date**: 05 July 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 30. Dudley, a Llama With Attitude - Diane White-Crane

*Dudley, a Llama With Attitude by Diane White-Crane from the album Songs for Llama Lovers*

**Artist**: Diane White-Crane
**Album**: Songs for Llama Lovers
**Copyright**: 2000 Orchard
**Released Date**: 07 March 2000
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800

Page: **1 2 3 4 5 6 7 8 9 10**

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us

**classmates.com**  **Where Did You Graduate From?**

| AL | AK | AZ | AR | CA | CO | CT | DC | DE | FL | GA | HI | ID | IL | IN | IA | KS |
| KY | LA | MA | MD | ME | MI | MN | MS | MO | MT | NE | NV | NH | NJ | NM | NY | NC |
| ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |

**Choose A State**

Find
frier

©2005 Absolutely Celebrity Network

# Absolutely.net

**contact abso**



WeightWatchers
Online weight loss from the name you trust.
GO NO

**Web Search**     **Buy Poster**

**EXCLUSIVE:** Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## UK 100 Top Songs in Children's Music 7

**Click on the title to buy and download music.**
**You need iTunes sofware from Apple to play the music.**
**Download Here**

Go(

**Homepage**
**What's New**
**Movie Reviews**
**Photo Gallery**
**Download Music** NEW!
**Wallpaper**
**Screensaver**
**Contact Celeb**

**Site S**

Page: **1 2 3 4 5 6 7 8 9 10**



### 61. Bubble Bath - Bill Pere

*Bubble Bath by Bill Pere from the album Songs for Kids With Common Scents*

**Artist:** Bill Pere
**Album:** Songs for Kids With Common Scents
**Copyright:** 2004 KidThink Music
**Released Date:** 12 May 2004
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 62. Twinkle, Twinkle Little Star / Funkel, Funkel Kleiner Stern - Sing and Learn

*Twinkle, Twinkle Little Star / Funkel, Funkel Kleiner Stern by Sing and Learn from the album Sing and Learn German*

**Artist:** Sing and Learn
**Album:** Sing and Learn German
**Copyright:** 2003 Global Village Kids
**Released Date:** 21 December 2003
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 63. Supercalifragilisticexpialidocious - Alvin and The Chipmunks

*Supercalifragilisticexpialidocious by Alvin and The Chipmunks from the album Alvin and the Chipmunks: Greatest Hits - Still Squeaky after All These Years*

**Artist:** Alvin and The Chipmunks
**Album:** Alvin and the Chipmunks: Greatest Hits - Still Squeaky after All These Years
**Copyright:** 1999 Capitol
**Released Date:** 21 September 1999
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800

ADVERTI




Sea Music
Dan Zanes &
Festival Five
Folk
New $13.99!


Classical Music
for Chil...
Johann
Sebastian Bach
New $3.98!
Used $1.99!


Lullaby
Favorites
Tina Malia
New $6.98!


A Child's
Celebration of...
Various Artists
New $13.99!


Circus Music
from the Bi...
Merle Evans
Circus Band
New $7.98!


Music Has The
Right To C...
Boards of
Canada
New $10.99!

(Prices May Change)



### 64. Americans We - Richard Whitmarsh & South Shore Concert Band

*Americans We by Richard Whitmarsh & South Shore Concert Band from the album Vol. 6 Live in Concert at the 1991 Cfa Convention - Part 1: Sounds of the Circus - Circus Marches*

**Artist:** Richard Whitmarsh & South Shore Concert Band
**Album:** Vol. 6 Live in Concert at the 1991 Cfa Convention - Part 1: Sounds of the Circus - Circus Marches
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 65. I Feel Good About Myself - The Googles from Goo

*I Feel Good About Myself by The Googles from Goo from the album One GooWorld*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 66. Spiders and Snakes - Two of a Kind

*Spiders and Snakes by Two of a Kind from the album Going On an Adventure*

**Artist:** Two of a Kind
**Album:** Going On an Adventure
**Copyright:** 2002 Two of a Kind
**Released Date:** 15 May 2002
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 67. School Time Blues - David Raitt

*School Time Blues by David Raitt from the album Boys & Girls Club, Vol.1: This Club Rocks! - Spirited Songs for the Whole Family*

**Artist:** David Raitt
**Album:** Boys & Girls Club, Vol.1: This Club Rocks! - Spirited Songs for the Whole Family
**Copyright:** 2000 Russian River Records
**Released Date:** 1999
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 68. Hey, Diddle Diddle - David Jacobi - Aimee Fischer

*Hey, Diddle Diddle by David Jacobi - Aimee Fischer from the album Favorite Nursery Rhymes*

**Artist:** David Jacobi - Aimee Fischer
**Album:** Favorite Nursery Rhymes
**Copyright:**

WINI
WINI
WINI
You
wo
FR
gas
a ye

Click
to cl

'See offe
& 2005 Every

Absolutely Music Download     K 100 Top Songs in Children's Music 7
Page 3 of 3

**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 69. Listen to Your Grandpa – Julie Ingram

*Listen to Your Grandpa by Julie Ingram from the album Kids...That's What It's All About*

**Artist**: Julie Ingram
**Album**: Kids...That's What It's All About
**Copyright**: 2002 Long Shot Records
**Released Date**: 31 December 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 70. Puddle Stomping – Bo Diddley

*Puddle Stomping by Bo Diddley from the album Moochas Gracias*

**Artist**: Bo Diddley
**Album**: Moochas Gracias
**Copyright**:
**Released Date**: 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800

Page: **1 2 3 4 5 6 7 8 9 10**

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us

| Vonage-Official site | Vonage VoIP Phone Service | Unlimited long distance | VOIP |
|---|---|---|---|
| Vonage broadband phone service | Great rates with many free features | Unlimited to US/Canada a $24.99/month | Great rates with many features |
| Calling plans start at just $14.99 | | | service, starting at just |
| http://vonage.com/ | http://vonage.com/ | http://vonage.com/ | http://vonage.com/ |

Spon

©2005 Absolutely Celebrity Network

# COMPOSITE EXHIBIT "J"

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 6/1/02 to 6/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts To Customers | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____   Date 11/17/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/02 to 9/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts To Customers | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____   Date 11/18/03

**Steve Silver's Royalty Schedule**

Country: All Countries
Period: 1/1/03 to 3/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature

Date 11/12/03

**Steve Silver's Royalty Schedule**

Country: All Countries
Period: 10/1/02 to 12/31/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature

Date 11/17/03

FROM : SILVERS ENT                FAX NO. : 5617849959              May. 19 2005 12:16PM  P4

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/03 to 9/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _[signature]_     Date 11/2/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 4/1/03 to 6/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| May-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Jun-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _[signature]_     Date 11/2/03

FROM : SILVERS ENT                           FAX NO. : 5617849959              May. 19 2005 12:16PM  P5

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 1/1/04 to 3/31/04

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature                                     Date 4/28/04

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 10/1/03 to 12/31/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature                                     Date 12-23-03

**Steve Silver's Royalty Schedule**

Country: All Countries
Period: 4/1/04 to 6/30/04

| Month | Description | Item | | | | | | | | | | | | Comm. Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |

Total:

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____   Date  7-1-04

Proprietary and Confidential

# EXHIBIT "K"







**The Global Marketplace for Leveraging Brand Equity**

[TO ATTEND]    TO EXHIBIT    CONFERENCE & EVENTS    C

**REAL PEOPLE. REAL PROFITS. REAL RESULTS.**

Home
General Information
Visitor Information
 › To Attend
 › Exhibitor List
 › Print Exhibitor List
 › Floor Plan
Exhibitor Information
 › To Exhibit
 › Attendee Overview
 › Marketing Plan
 › Floor Plan
 › Ancillary Marketing
 › Exhibitors Only
Conference & Events
 › Pricing & Registration
 › Seminar Overview
 › At-A-Glance
 › Speaking
   Opportunities
 › Special Events
Press Information
 › Request Press
   Material
 › Media Information
 › Press Releases
Hotel & Travel
Contact Us

**525 Exhibitors.**

**5,700 Properties, Brands and Original Designs available for licensing.**

**20,000+ Manufacturers, Retailers, Marketers and Licensing Professionals.**

**Trend-spotting, Networking, Education, Deal-making.**

**Explore opportunities in wireless and digital entertainment at the Mobile & Digital Licensing Summit, co-located with Licensing 2005 International**

**WHERE BRANDS ARE BUILT AND DISCOVERED YEAR AFTER YEAR.**

See the Licensing International
[Photo Gallery]



Produced by:



Show Sponsored by:



Official Publication:



# EXHIBIT "L"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

      Plaintiff,
                                  Case No. 05-80393-CIV-HURLEY
v.

STEVEN A. SILVERS, a Florida resident,

      Defendant.

_____

## DECLARATION OF GAIL A. MCQUILKIN

I, GAIL A. MCQUILKIN, declare under penalty of perjury that the following is based upon my personal knowledge and is true and correct, and that all emails and letters attached as Exhibits are true and correct copies.

1.    I am a partner and managing shareholder in the firm of Kozyak Tropin & Throckmorton, counsel for defendant, Steven A. Silvers ("Silvers").    I was also counsel for Silvers in the prior action before this Court entitled <u>Stelor Productions, Inc. v. Steven A. Silvers</u>, Civil Action No. 04-80954 (the "District Court Action").

2.    I am the attorney who has been primarily involved in the dispute between Silvers and Stelor Productions ("Stelor"), and the person with the most personal knowledge of the communications between this office and Stelor's counsel.

3.    I was unable to attend the May 23, 2005 preliminary injunction hearing before Magistrate Judge Hopkins due to a prearranged trip out of the country from May 13 – 31.   Prior to my departure on this trip, I had a telephone conversation with Stelor's counsel, Kevin Kaplan, in which I informed him that I was leaving to go out of the country.  Mr. Kaplan asked me if I was attending the hearing.  I informed him that I was not, but that my partner Ken Hartmann would be there.  On the morning of the hearing, Stelor filed a lengthy declaration from its

1

president, Steven Esrig, and one from Mr. Kaplan, containing a few emails from me that they represented to be the bulk of my communications regarding Stelor's performance under the Settlement Agreement. Esrig also attributed several unsubstantiated statements to me, which were untrue. And, as shown below, these emails were but a small fraction of the dozens of emails I had exchanged with Mr. Kaplan, and Stelor's prior counsel, asking for Stelor to comply with the Settlement Agreement.

4.    This declaration is submitted in support of Silvers' Objection to the Magistrate Judge's Report and Recommendation, and to provide the Court with the true facts that support Silvers' lawful right to terminate the License Agreement.

## I.    <u>Silvers Initial Right To Terminate the License Agreement</u>

5.    Paragraph V (A) and (C) of the License Agreement between Silvers and Stelor Productions ("Stelor") gives Silvers, the Licensor, the right upon 30 days notice to audit the books and records of Stelor. *See* Exhibit A. On November 5, 2004, I sent notice to Stelor that Silvers wanted the audit and sought for a date that the audit can take place. *See* Exhibit B. On or about November 10, 2004, Stelor's counsel informed me that Stelor would not permit the audit.

6.    The License Agreement also gives Silvers the contractual right to terminate the License Agreement once he provides Stelor with notice that it is in breach, and gives Stelor 60 days to cure the breach. *See* Exhibit C. On November 12, 2004, I sent Stelor the requisite 60-day notice of its numerous breaches of the License Agreement, the failure to permit the audit being just one of many breaches. *See* Exhibit D. This letter was not "notice of termination of the License Agreement" but notice to Stelor that it had 60 days to cure its breaches as required under the License Agreement, in order to remain as licensee. In fact, this provision gives Silvers 60-days to consider whether he will exercise the option to terminate.

7.    Stelor failed to cure a single breach within the 60-day cure period. On January

2

11, 2005, Silvers exercised his right to terminate the License Agreement, and on January 13, 2005, I sent Stelor a notice of termination of the License Agreement advising it that the post-termination provisions now controlled. *See* Exhibit E.

## II.    The Settlement Agreement

8.      Once terminated, Stelor's counsel approached me to negotiate a settlement.  I worked with Stelor's then counsel, Yano Rubinstein, Esq., to negotiate the dispute, including the pending claims each party had filed against the other in the District Court Action.  I participated in drafting the Settlement Agreement between the parties that was executed on January 28, 2005. *See* Exhibit F.

9.      In the Settlement Agreement, the parties preserved their positions and claims asserted in the District Court Action.  As reflected in the fifth WHEREAS clause in the Settlement Agreement, the parties intended that only by virtue of Stelor's <u>full performance</u> of its obligations under the Settlement Agreement would Stelor's breaches of the License Agreement be considered cured.

10.     Consistent with this intent, in paragraph 3 of the Settlement Agreement, Silvers agreed to "withdraw his notice of termination of the Licensing Agreement." Stelor acknowledges that the notice of termination of the License Agreement is the January 13, 2005 letter.  Silvers *never* agreed to withdraw his 60-day notice to Stelor regarding its breaches or to provide Stelor with a second 60-day cure period if it did not perform under the Settlement Agreement.  Silvers agreement to withdraw the termination was premised entirely upon Stelor's full performance under the Settlement Agreement.   That is why there is no release provision in the Settlement Agreement or a provision requiring Silvers to give additional notice to Stelor of its failure to perform, or an additional cure period.  The Settlement Agreement is terminable at will, and if terminated the parties are simply restored to their pre-settlement position.

3

11. Esrig's sworn statement that this dispute was "entirely resolved by the parties, pursuant to the Confidential Settlement Agreement," and by virtue of "a stipulation of dismissal with prejudice" of the District Court Action, is patently false. Silvers agreed to dismiss his claims against Stelor **without prejudice** to protect his right to re-file an action against Stelor if necessary. And that is what this Court expressly ordered. *See* Exhibit G.

### III. Stelor Refuses To Adhere to The Settlement Agreement

#### A. The Audit

12. Esrig's sworn statement that the first time I asked for an audit after the Settlement Agreement was April 22, 2005 is completely false. Starting February 1, 2005 - two days after the Settlement Agreement was signed – until April 26, 2005, the day before Silvers reinstated the termination, I repeatedly asked for an audit date. Stelor either refused to respond, or stonewalled.

13. On February 1, 2005, I sent an email to Mr. Rubinstein, Stelor's counsel, asking him to, among other things, provide a date for the audit. *See* Exhibit H. Two weeks later on February 15, 2005 I sent another email to Mr. Rubinstein asking him whether he had confirmed a date for the audit. *See* Exhibit I. Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

14. I received no response confirming an audit date. A week later on February 22, 2005, I sent an email to Mr. Rubinstein asking him for, among other things, a date for the audit. *See* Exhibit J. Another week passed without a response to my request for an audit date.

15. On or around March 1, 2005, I learned that Mr. Rubinstein was no longer representing Stelor, and that I should communicate with Mr. Kaplan, Stelor's then local counsel. On March 2, 2005 I sent an email to Mr. Kaplan advising him that Stelor needed to provide a date for the audit. *See* Exhibit K. Portions of the email are redacted to protect confidential

4

litigation strategy relating to Google, Inc.

16.    On March 5, 2005, I received a response from Mr. Kaplan that Stelor will provide an audit date prior to March 15. *See* Exhibit L.

17.    On that same day I sent a reply email letting Mr. Kaplan know that they must comply with the audit request immediately, giving him three days to provide us with an audit date. *See* Exhibit M. Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

18.    Stelor did not provide me with an audit date within three days, and did not provide an audit date by March 15, 2005 as stated by Mr. Kaplan in his March 5, 2005 email. Over the next five days I called Mr. Kaplan about the audit but he would not confirm a date. On March 22, 2005, I sent another email to Mr. Kaplan again asking for a date for the audit. *See* Exhibit N.    Stelor continued to stonewall, and rather than cooperate and provide me with an audit date, Mr. Kaplan responded to me that he wanted to see a document that would confirm the scope of the audit. *See* Exhibit O.  That same day I responded to Mr. Kaplan informing him that the scope of the audit is set out in the License Agreement. *See* Exhibit P.

19.    Tired of Stelor's stonewalling, I told Mr. Kaplan in a telephone conversation that the audit would take place on April 26, 2005 and asked for confirmation that the auditor would be permitted onsite at Stelor.  He told me he would check with Stelor and get back to me.  On or about April 10, 2005, I had a telephone conversation with Mr. Kaplan in which he informed me "Stelor was going through some personnel changes" and April 26, 2005 would not work, but did not suggest alternate dates.  It had now been almost 90 days since the Settlement Agreement was executed and Stelor was still refusing to cooperate with the audit.

20.    While I was patiently waiting for Stelor to cooperate with the audit, I was working on a draft complaint against Google, Inc. for trademark infringement.  I needed Stelor's

5

cooperation in providing me information about the work it did to develop the Gootopia Website and related projects. As reflected in my email to Mr. Kaplan dated April 7, 2005, by this date Stelor had not provided me this information. *See* Exhibit Q.

21.    On or about April 11, 2005 I had a telephone conversation with Mr. Kaplan in which I told him that Silvers would reinstitute the termination of the License Agreement if Stelor continued to refuse to adhere to its obligations under the Settlement Agreement, including providing me with a date for the audit. That evening, I received an email directly from Esrig in which in advised me that the Stelor board was not interested in "adherence to the license and settlement agreement" and that that he would be happy to see us "finance Mr. Silvers' next lawsuit with Stelor." He also informed me that only when I provide them with a copy of the draft complaint against Google, Inc. I had drafted would Stelor comply with their obligations to Silvers under the Settlement Agreement. *See* Exhibit R.

22.    On April 12, 2005, in response to Mr. Esrig's email, I sent a lengthy email to Mr. Kaplan explaining that: (a) I had no obligation to provide my work product to them; (b) why a complaint of this magnitude takes time to develop; (c) asking that Esrig not contact me directly; (d) asking Stelor to please comply with its obligations under the Settlement Agreement; and (e) once again for Stelor to cooperate by providing me information I needed to prepare the complaint. *See* Exhibit S. Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

23.    On April 13, 2005, I sent an email to Mr. Kaplan again asking for a response for the audit date letting him know that Silvers was very frustrated with Stelor's non-performance. *See* Exhibit T.

24.    On Friday April 22, 2005, I sent an email to Mr. Kaplan once again attempting to persuade him to provide a date for the audit by suggesting possible dates. *See* Exhibit U.    That

6

same day Mr. Kaplan responded that he now had several boxes of information from Stelor for the complaint, but completely ignored my question about the audit dates. *See* Exhibit V. I promptly replied to Mr. Kaplan's email asking about the audit dates. *See* Exhibit W. Mr. Kaplan responded by saying he had passed this on to Esrig, but giving no indication what that meant. *See* Exhibit X.

25. On Monday April 25, 2005, I received an email from Mr. Kaplan that contained no response to my last request for an audit date. *See* Exhibit Y. Promotly, I responded to Mr. Kaplan again asking for the audit date. *See* Exhibit Y. I received an email response from Mr. Kaplan that once again ignored my question about the audit date, but demanding to know when the complaint I was drafting would be ready. *See* Exhibit Y. On April 26, 2005, I received a lengthy email from Mr. Kaplan but it made no mention of an audit date. *See* Exhibit Z.

B.    Samples of Licensed Product

26. Paragraph VI-C of the License Agreement requires that before commencement of the manufacture and sale of Licensed Product, Stelor shall provide Silvers with a reasonable number of samples of all such Licensed Product and all related advertising and promotional materials. *See* Exhibit AA. Licensed Product is defined in comprehensive terms. *See* Exhibit AA, page 2.

27. Stelor's repeated failure to provide samples of Licensed Product and advertising and promotional materials to Silvers was one of the many breaches that led Silvers to terminate the License Agreement.

28. Under paragraph 15 of the Settlement Agreement, Stelor agreed to cure this breach and provide Silvers with samples of the products it was offering for sale. *See* Exhibit F.

29. On March 2, 2005, I sent an email to Mr. Kaplan asking him for the samples. *See* Exhibit BB, page 2. On March 5, 2005, Mr. Kaplan sent an email to me stating, "there are no

7

such samples, as Stelor is not yet offering any product for sale." *See* Exhibit CC.   Skeptical of

the truth of that statement, I responded to Mr. Kaplan that Stelor needed to provide us with that

statement signed under oath. *See* Exhibit DD.

      30.    On March 8, 2005, Esrig provided a sworn declaration that Stelor had no products

offered for sale "except for the music available on [I]tunes." *See* Exhibit FF.  Because Stelor had

never reported such sales on any royalty statement, I asked Stelor to provide proper royalty

statements for the last two quarters of 2004 to reflect the Itunes sales.   When Stelor failed to

provide such royalty statements, Silvers tried to uncover the sales through Itunes.  He discovered

that the Googles music was one of the world's most downloaded children's songs. *See* Exhibit

EE.  Yet, Stelor had not reported a single penny of sales or provided Silvers with any statements

as required under the License Agreement.

      31.    And, contrary to Esrig's sworn statement, Silvers discovered that Stelor had been

offering Googles merchandise for sale online through Cafepress.com since 2002 yet he had never

been provided a single sample of the merchandise.  On March 9, 2005, I notified Mr. Kaplan

about the discrepancy between Esrig's sworn statement and what we had discovered.  *See*

Exhibit GG.  Portions of the email are redacted to protect confidential litigation strategy relating

to Google, Inc.

      32.    On or about March 20, 2005, Silvers discovered that Stelor had placed an

advertisement relating to its appearance at the upcoming 2005 International Licensing Show in

which it references the launch of a totally new web site.  On March 23, 2005, I called Mr. Kaplan

and asked him why Silvers had not been provided with the advertisement.  Mr. Kaplan asked me

to send him the advertisement, which I did.  *See* Exhibit HH.  I received no response.

      33.    Other than two CDs and one color folder, I received no samples of Licensed

Product from Stelor.  Esrig's sworn statement that Mr. Kaplan advised me on April 26, 2005

8

that samples were in his office for review is absurd. Mr. Kaplan's April 26, 2005 email refers to the information I had been waiting for from Stelor to complete the general allegations in the draft complaint against Google, Inc. *See* Exhibit Z. The relevant email exchange between Mr. Kaplan and myself is attached as Exhibits W, Y and Z.

       C.      <u>Reimburse Silvers For Past Health Insurance Payments</u>

      34.     Paragraph 10(c) of the Settlement Agreement required Stelor to reimburse Silvers for health insurance payments he had made to Aurora Collections during his tenure as consultant to Stelor within 15 days of providing some form of proof of payment. See Exhibit F. Because Silvers did not have canceled checks, Brian Blumquist of Aurora Collections complied a very detailed chart listing the payments made by Silvers to Aurora. On February 15, 2005, I sent Mr. Rubinstein an email attaching the chart. *See* Exhibit II. I received no confirmation that payment would be made. On February 22, 2005, I sent an email to Mr. Rubinstein asking him to please confirm that payment to reimburse Silvers would be sent by the end of the month. See Exhibit JJ. Still, no payment.

      35.     After I learned that Mr. Kaplan had replaced Mr. Rubinstein as Stelor's counsel, I sent an email to him on March 2, 2005 again attaching the chart of payments provided by Aurora Collections and asking when reimbursement for these payments would be sent. *See* Exhibit KK.

      36.     On March 3, 2005, I sent an email to Mr. Kaplan again asking him when we would receive the payment to reimburse Silvers for the insurance premium payments. *See* Exhibit LL. On March 5, 2005, Mr. Kaplan responded to my email by saying that "Stelor finds the chart confusing" and asking for additional proof of payment. *See* Exhibit MM.

      37.     On March 5, 2005, I sent an email to Mr. Kaplan refuting that the chart is confusing, and giving Stelor 3 additional days to comply with this provision of the Settlement Agreement. *See* Exhibit NN.

9

38.     In mid-March, Mr. Kaplan told me that Stelor now wanted a statement from Brian Blumquist confirming that Silvers had made these payments. On April 1, 2005, I provided to Mr. Kaplan a copy of a letter Mr. Blumquist sent to me electronically. *See* Exhibit OO. The letter invited Mr. Kaplan or Stelor to call him if they needed additional information.

39.     Continuing to stonewall, Mr. Kaplan added another condition, requesting that he be provided an actual signed letter even though the letter was clearly an electronic communication. I responded to Mr. Kaplan that he should call Mr. Blumquist to verify this letter. This email exchange is attached as Exhibit PP.

D.      Advance Royalty Payments

40.     Under paragraph 10 (a) and (b) of the Settlement Agreement, Stelor was required to pay Silvers by the first of the month beginning February 1, 2005, two monthly royalty advances:  one for $5,000 and one to cover the cost of Silvers' health care premiums. *See* Exhibit F.

(i)     The $5,000 Monthly Advance

41.     Immediately after the Settlement Agreement was executed, on February 1, 2005, I sent an email to Mr. Rubinstein telling him to have all checks for Silvers made out to Silvers Entertainment Group. *See* Exhibit QQ. On February 7, 2005, I received a check from Stelor for the $5,000 royalty advance required under paragraph 10(a) of the Settlement Agreement - the check was made out to Steven Silvers rather than Silvers Entertainment Group as instructed by me six days earlier. I called Mr. Rubinstein and he instructed me to send the check back to Stelor to the attention of Mike Sagan. *See* Exhibit RR.

42.     By February 22, 2005, I had yet to receive the first payment Stelor was obligated to make under paragraph 10(a). On February 22, 2005, I sent an email to Mr. Rubinstein asking

10

him to confirm that February's payment was sent, and that we would have the March payment on time. *See* Exhibit SS.

43.    After learning the Mr. Kaplan had replaced Mr. Rubinstein, on March 2, 2005, I sent an email to him advising him that Stelor had not sent the $5000 checks for February and March. *See* Exhibit TT. I followed this email with another email on March 3, 2005 making the same inquiry. *See* Exhibit UU.

44.    On the afternoon of March 3, 2005, I finally received the $5,000 payments for February and March.

45.    On April 5, 2005, five days late, I received the April $5,000 payment. A copy of the Federal Express package containing the check is attached as Exhibit VV. The check, however, was once again made out to Steven Silvers, not Silvers Entertainment Group as previously requested. On April 7, 2005, I sent an email to Mr. Kaplan asking the status of the payments owed to Silver. *See* Exhibit WW. On April 8, 2005, I sent an email to Mr. Kaplan again asking about the payment and asking why Stelor continues to make out the checks to Silvers in his own name, rather than as we instructed twice before. *See* Exhibit XX.

46.    On April 8, 2005 I received an email from Stelor's administrative person stating that a replacement check would be sent out. *See* Exhibit YY

47.    On April 11, 2005, I received an email from Esrig stating that Stelor would not make the payments owed to Silvers unless I provided them a copy of the complaint I was drafting against Google, Inc. *See* Exhibit ZZ.

11

(ii)    The Health Insurance Premium Payment

48.    Esrig's sworn statement that Silvers was required to provide Stelor with evidence of paid premiums before Stelor is obligated to make the second payment under paragraph 10 (b) of the Settlement Agreement is intentionally misleading. There is no such language in paragraph 10(b). *See* Exhibit F. Furthermore, we advised Stelor on February 15, 2005 what the current premium was. *See* Exhibit AAA.

49.    After learning that Mr. Kaplan had replaced Mr. Rubinstein, on March 2, 2005, I sent an email to him with the chart prepared by Aurora Collections showing the current premium amounts and advising him that we had not received payment for February or March. *See* Exhibit BBB. On March 3, 2005, I sent another email to Mr. Kaplan asking for response on the status of the payments. See Exhibit CCC. That afternoon I received checks from Stelor for the two missing $5,000 payments, but nothing for the health care premiums. On March 5, 2005, I sent an email to Mr. Kaplan advising him that we had not received the 10(c) payment. *See* Exhibit DDD.

50.    On or around the beginning of April, Mr. Kaplan informed me that Stelor now determined that they would require Silvers to sign a declaration that he needed $1,000 per month to maintain his health insurance coverage before they would make the payments. On April 5, 2005, I sent Mr. Kaplan that declaration. *See* Exhibit EEE.

51.    On April 7, 2005, I sent an email to Mr. Kaplan asking him the status of the checks. *See* Exhibit FFF. I received no response.

52.    On April 8, 2005, I sent an email to Mr. Kaplan again asking for the February, March and now April insurance premium payments. *See* Exhibit GGG.

53.    On April 11, 2005, I received an email from Esrig stating that Stelor would not make the payments owed to Silvers unless I provided them a copy of the complaint I was

12

drafting against Google, Inc. *See* Exhibit HHH.

54. On April 14, 2005, Stelor finally sent the payments owing for February and March, but neglected to send the April payment. On April 17, 2005, I sent Mr. Kaplan an email confirming that I received two payments but that Stelor owed another payment for April. *See* Exhibit III. I received no response to my email.

     E.    <u>Stelor Has Refused to Perform Other Obligations Under the Settlement</u>

55. Stelor has not provided to me Silvers' unit interest in Stelor LLC as required under paragraph 9 of the Settlement Agreement.

56. Stelor has not provided to me certified royalty statements for the third and fourth quarter of 2004 as required under paragraph III-A of the License Agreement.

**IV.**    <u>**Silvers Reinstates His Termination of The Licensed Agreement**</u>

57. By April 26, 2005, more than 90 days had passed and Stelor had not cooperated with the audit (in fact, it had been over 4 months since our initial audit request), and had simply refused to cure its breaches of the License Agreement by full performance under the Settlement Agreement. Accordingly, Silvers exercised his right to reinstate his notice that the License Agreement is terminated. On April 27, 2005, I sent a letter to Stelor similar to the one I had sent on January 13, 2005, to advise Stelor that the License Agreement was terminated and the post-termination provisions controlled. See Exhibit JJJ.

58. True to Stelor's past performance of refusing to comply with its obligations until the License Agreement is terminated, Stelor's counsel sent a letter to me on April 29, 2005 offering to perform **if** Silvers withdrew the termination. *See* Exhibit KKK.

    Dated: June 15, 2005

                                                 Gail A. McQuilkin

3339.101/254343.1

13

========================================================================

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this __17__ day of June, 2005, to:  Kevin C. Kaplan, Daniel F. Blonsky and David Zack at Burlington Weil Schwiep Kaplan & Blonsky, P.A., 2699 S. Bayshore Drive, Penthouse A, Miami, FL  33133.

3339.101/254343.1

14

# Exhibit  A

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

# Exhibit  B

Kozyak Tropin & Throckmorton, P.A

2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Overnight Delivery
Federal Express Tracking No. 7903-2948-5586

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland  20874

      Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

      We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement").  Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the  control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products.  In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.      All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent,  that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.      All sublicenses;

3.      All copyright and trademark registration applications and registrations;

4.      All domain name registrations;

5.      All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.      Proof of insurance as required under Paragraph XIV.

Page 2

In addition, Mr. Silvers is requesting that a number of samples of all Licensed Products manufactured, or in production be produced during this audit.

You, or your counsel, should schedule and coordinate the audit through us by providing us with a date and location.

Very truly yours,

Gail A. McQuilkin

c:    Steven Silvers
      Kenneth R. Hartmann, Esq.

/245617.1

Exhibit  C



## VIII. INTELLECTUAL PROPERTY PROTECTION

A.     LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.     LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.     LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.     LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.     Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE's current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A.     Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.



# Exhibit  D

LAW OFFICES

### KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
<u>AWB#7927-7747-7745</u>

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

     Re:     Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

    a.     Failure to pay royalties under paragraph III (A);

    b.     Failure to provide a written certified royalty statement under paragraph III (C);

    c.     Failure to provide a list of all sub licenses under paragraph III (C);

    d.     Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

    e.     Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

    f.     Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

    g.     Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

    h.     Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

i.    Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

j.    Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

k.    Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

l.    Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

a.  Failure to pay Mr. Silvers consultancy fees and  expenses;

b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter

/245615.1

# Exhibit  E

LAW OFFICES

# KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2

Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Yano A. Rubinstein
      William Borchard

/248587.1

Exhibit F

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by Stelor Productions, Inc. ("Stelor") and Steven A. Silvers ("Silvers"). Stelor and Silvers are collectively referred to herein as "the Parties."

WHEREAS, Stelor brought a complaint in the United States District Court for the Southern District of Florida (Case No. 04-80954-CIV-HURLEY) against Silvers alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers brought a counter-complaint against Stelor alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers on January 13, 2005 sent a notice of termination of the Licensing, Distribution and Manufacturing Agreement to Stelor;

WHEREAS, Stelor has invested substantial time, effort, and money in developing a business involving the GOOGLES IP and fully intends to continue developing and commercializing such business, including sub-licensing some or all of the GOOGLES IP;

WHEREAS, the Parties intend that full performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other Party, and

WHEREAS, the Parties wish to resolve all of the foregoing disputes to their mutual satisfaction.

/ /

/ /

SILVERS_____                           1                           STELOR_____

THEREFORE, the Parties hereby agree as follows:

1. <u>Domain Name Administration:</u>

    a. Silvers shall give Stelor, as the administrative contact for the GOOGLES IP domain names, the right to control the DNS records and make changes to the administrative contact information for all GOOGLES IP domain names, and shall advise the domain name registrar known as godaddy.com to this effect. Silvers will provide proof that Stelor has such rights no later than February 15, 2005. Silvers shall cooperate with any other request from Stelor regarding necessary administrative issues relating to the domain names, and all communications by Silvers, relating to domain names, shall be through Kozyak Tropin and Throckmorton ("KTT").

    b. KTT will create and control a domain name renewal database to ensure timely renewal of domain names owned by Silvers, and will communicate with Stelor's counsel regarding any deadlines or other administrative issues.

2. <u>Pending and Future Actions Relating to the GOOGLES IP:</u>  Silvers will cooperate with Stelor and Stelor's counsel in all respects in pending and future trademark and domain name dispute proceedings filed by Stelor, including but without limitation, providing any and all documents and other evidence needed to support Stelor's position.

3. <u>The License. Distribution and Manufacturing Agreement:</u>  Silvers withdraws his notice of termination of the License Agreement, and reaffirms his obligations under

SILVERS_____

2

STELOR_____ 

the License Agreement.

4. <u>Post-Settlement Communications:</u>   Silvers shall communicate with Stelor solely

through KTT.

5. <u>USPTO Correspondent of Record:</u>   Silvers shall change the correspondent on all

GOOGLES IP trademark applications and registrations to the name of Stelor's

counsel no later than February 15, 2005, and shall not change the correspondent in the

future as long as the Licensing, Manufacturing and Distribution Agreement is in

effect.  Stelor's counsel shall copy KTT with all correspondence to and from the

USPTO

6. <u>Sale or Assignment of the GOOGLES IP:</u>  KTT and Stelor's counsel shall include

each other in any and all negotiations and discussions with Google Inc. that relate to

resolving the pending trademark and domain name disputes or the sale or assignment

of the GOOGLES IP.

7. <u>Domain Name Renewal Expenses:</u>   Stelor agrees to reimburse Silvers for

documented expenses incurred to date in renewing GOOGLES IP domain names.

Future GOOGLES IP domain name renewal expenses will be reimbursed by Stelor.

All requests for reimbursement will be submitted by KTT to Stelor, and all payments

by Stelor will be sent to Silvers through KTT.

8. <u>Options Acknowledgement:</u> Stelor agrees that it will confirm in writing that no

additional options have been granted that would obligate it to provide such options

under the now expired Letter Agreement.

9. <u>LLC Acknowledgement:</u> The Parties acknowledge that Stelor Inc., a Delaware "C"

Corporation, is in the process of converting to a Delaware LLC. Any options granted

SILVERS_____                                    3                         STELOR_____ 

to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC.

10. <u>Royalty Advances:</u>

    a.   For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor shall advance Silvers $60,000 a year against future royalties. The advance will be made in equal monthly installments payable on the first of each month beginning February 1, 2005.

    b.   For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor will provide Silvers with an additional monthly advance on expected future royalties equivalent to that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), as long as such coverage is offered. Such advance will not exceed $1,000 per month.

    c.   Stelor will reimburse Silvers for insurance premiums through the expiration of the "Letter Agreement," not to exceed $4,000. Such reimbursements will be provided to Silvers within 15 days of Stelor receiving evidence of paid premiums.

11. <u>Recoupment and Termination of Royalty Advances:</u>   Royalties advanced under this Agreement will be recaptured by Stelor once royalty payments exceed the amount specified in paragraph 10. Such deductions will not exceed 20% of any given royalty payment.

12. <u>Royalty Statements:</u>   Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due.



13. <u>Trademark Registrations:</u>  Stelor shall provide to Silvers through KTT proof that all

applications and registrations for trademarks and domain names with the "GOO"

prefix or identified as Googles IP in the License Agreement filed by or on behalf of

Stelor show Silvers as the owner.

14. <u>Audit:</u>  Stelor shall cooperate in the audit of the books and records of Stelor by

Aronson and Company onsite at Stelor Productions as per section IV of the

Licensing, Distribution and Manufacturing Agreement.  Any information obtained by

the auditor will be restricted to KTT , on an "attorneys' eyes only" basis and the

identity of any licensee, sub-licensee, vendor, or any other third-party shall remain

confidential.

15. <u>Licensed Products Samples:</u>   Stelor shall provide Silvers through KTT samples of

any Licensed Product that is being offered for sale.

16. <u>USPTO Correspondence:</u>   Stelor's counsel shall keep KTT advised as to the status of

any pending or future trademark or domain name disputes filed by Stelor against

Google Inc. by copying KTT on all pleadings and correspondence, and by giving

notice to KTT of any other trademark or domain name disputes filed against Google

Inc.

17. <u>Reservation of Jurisdiction:</u>  The Parties agree to submit to the exclusive continuing

jurisdiction of the United States District Court, Southern District of Florida, for

enforcement of all provisions of this Agreement.  In the event that a dispute arises

concerning the obligations of any Party under this Agreement, the Parties agree to

submit any such dispute to this court for resolution.  The successful or prevailing

party (as determined by the Court) shall be entitled to recover its reasonable attorneys'

SILVERS_____                                        STELOR_____ 

fees and other costs incurred in that litigation from the unsuccessful or non-prevailing party in addition to any other relief to which the prevailing party might be entitled.

18. <u>Injunctive Relief:</u> The Parties hereby agree that there is no adequate remedy of law in the event that either party negotiates or settles the disputes with Google Inc. without the other party. In the event that either party attempts to negotiate with Google Inc. without the other party's participation, that shall be a breach of this Agreement, and such breach will create irreparable harm, and that injunctive relief will be necessary to maintain the rights of the non-breaching party. Accordingly, each party agrees to such injunctive relief.

19. <u>Joint Settlement Negotiations with Google Inc.:</u>

    a.   In view of the current existence of litigation and proceedings in the TTAB, jointly referred to as "Litigation", the parties recognize the need to resolve this Litigation reasonably such that Stelor can continue to develop and promote its business.

    b.   Due to the present status of development of Stelor's business, any event that causes Stelor to delay offering its web-based service to the public will cause severe injury to Stelor. Silvers therefore agrees that, in the event of a settlement with Google Inc., he will not object to Stelor's continued use of the googles.com domain to transition to a new domain name. The length of time of such transition will be at Stelor's sole discretion.

    c.   In the event of a monetary, stock, or similar settlement with Google Inc., Such sale will include a complete sale or assignment of the GOOGLES IP, The proceeds from that settlement shall be divided as follows:

SILVERS_____                                 6                          STELOR_____ 

Silvers shall receive 70% of the first $30 million; 50% of the next $20 million; 30% of the next $30 million; 20% of the next $20 million; 10% of the next $20 million and 5% of any amount over $120 million, with the remainder in each case going to Stelor. Silver's total share of the proceeds shall not exceed $50 Million in any event.

d. Nothing in this provision creates an affirmative action by either party to enter any settlement with Google Inc., or to sell or assign the GOOGLES IP to Google Inc. Silvers understands and agrees that he cannot sell or assign the GOOGLES IP to Google Inc. without obtaining Stelor's written approval. Both parties agree that they will negotiate in good faith.

20. <u>Confidentiality and Disposition of this Action:</u>

a. The settlement shall not be provided to the court unless necessary to enforce rights, and then under seal. A Joint Stipulated motion to withdraw actions shall be filed no later than Friday, January 28, 2005. The fact that a settlement has been reached and all terms and obligations shall be confidential except to the extent necessary to advise Google Inc. that the parties have resolved all differences.

b. The complaint and counterclaim shall be dismissed without prejudice.

21. <u>Exclusive Authority/No Assignment:</u>

a. Stelor and Silvers represent and warrant that no other person or entity has or had any interest in the Claims, demands, obligations, or causes of action



released as part of this Agreement, that they have the sole right and

exclusive authority to execute this Agreement and receive the

considerations specified herein, and that they have not sold, assigned,

transferred, conveyed, or otherwise disposed of any of the Claims,

demands, obligations, or causes of action released as part of this

Agreement.

b.  The signatories to this Agreement each warrant that they have the power

to bind the person or entity on whose behalf they signed, and will hold

harmless any party to this Agreement for any attorney fees, costs,

expenses, or damages incurred or paid as a result of finding that such

person or entity lacks such authority, or does not have sole right to the

Claims that are the subject of this Agreement, or that any such Claim has

been assigned.

22. <u>Voluntary Agreement</u>:  Stelor and Silvers each represent that the Agreement is freely

and voluntarily entered into, with the independent advice of each party's attorneys

and they have not been induced to execute this Agreement by reason of the disclosure

or non-disclosure of any fact or representation not set forth in this Agreement.

23. <u>Non-disparagement</u>:  Each Party, on behalf of itself, its officers, directors, attorneys,

agents, and employees, agrees not to make or publish, either orally or in writing, any

disparaging statements concerning the other Party or its current and former officers,

directors, attorneys, agents, shareholders, or employees.

24. <u>Entire Agreement</u>:  This Agreement constitutes the entire agreement between the

parties and supersedes all prior and contemporaneous contracts, agreements, promises

SILVERS_____                                   STELOR 

and understandings, with the exception of the License, Distribution and Manufacturing Agreement as well as the Letter Agreement previously entered into by the parties. This Agreement may not be altered, modified or otherwise changed in any respect except by writing, duly executed by Stelor and Silvers. No representations, circumstances or conditions existing before the Agreement shall be used in any way by any party to the Agreement to modify the Agreement.

25. <u>Joint Preparation</u>:   Stelor and Silvers declare that they have read this Agreement, and know and understand its contents, and they each comprehend and agree to all its terms, conditions, and meanings and their significance; all signatories and their counsel have cooperated in the drafting and preparation of this Agreement, and this Agreement therefore shall not be construed against any signatory. The Agreement shall not be construed against any of them based upon any claim of unequal sophistication or bargaining power.

26. <u>Governing Law</u>:   This Agreement shall be deemed to be made under, shall be construed in accordance with, and shall be governed by the laws of the State of Florida.

27. <u>Duplicate Originals</u>:   This Agreement may be executed in duplicate originals, each of which is equally admissible in evidence in an action to enforce this Agreement, and each original shall fully bind each party who has executed it.

28. <u>Facsimile Signatures</u>:   The signatures required for the execution of this Agreement may be transmitted by facsimile, and any such signature shall be deemed a duplicate original, and may be admitted in evidence and shall fully bind the party and person making such signature.

SILVERS_____                                      STELOR____ 

29. <u>Effective Date</u>:  The Effective Date of this agreement shall be the date on which all

Parties have signed this Agreement.

30. <u>Each Party Agrees to operate in good faith as to the terms of this agreement</u>.

[Signature Page Follows]

SILVERS_____                                         STELOR_____ 

THE FOREGOING IS AGREED TO BY:

DATED: January _28_, 2005     Stelor Productions, Inc.

                              By: _____

                              Its: _____

DATED: January ___, 2005     Steven A. Silvers

                              By: _____

APPROVED AS TO FORM AND CONTENT:

DATED: January _28_, 2005     Summers Rubinstein, P.C.

                              By: _____

                              Yano L. Rubinstein, Esq.

                              Attorneys for Stelor Productions, Inc.

DATED: January ___, 2005     Kozyak, Tropin & Throckmorton, P.A.

                              By: _____

                              Gail McQuilkin, Esq.

                              Attorneys for Steven A. Silvers

SILVERS_____                                      STELOR 

# Exhibit  G

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-80954-CIV-HURLEY

STELOR PRODUCTIONS, INC.,
      plaintiff,

vs.

STEVEN A. SILVERS,
      defendant.

_____/



**CLOSED CASE**

## ORDER OF FINAL DISMISSAL WITHOUT PREJUDICE AND CLOSE-OUT

**THIS CAUSE** is before the court upon the parties' joint stipulation for dismissal without prejudice filed February 8, 2005. Having considered the stipulation, it is hereby

**ORDERED AND ADJUDGED:**

1. This case is **DISMISSED WITHOUT PREJUDICE,** with each side to bear its own costs and attorneys' fees.

2. There being nothing further for the court to resolve, it is further ordered that the Clerk of the Court shall enter the case as **CLOSED** and terminate all pending motions as **MOOT**.

**DONE** and **SIGNED** in Chambers at West Palm Beach, Florida this _17_ day of February, 2005.

Daniel T. K. Hurley
United States District Judge

Copies furnished:
Adam T. Rabin, Esq.
Kenneth R. Hartmann, Esq.
Yano Rubinstein, Esq.



FILED by _____ MC _____ D.C.
ELECTRONIC

**Feb 8 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

STELOR PRODUCTIONS, INC.,
a Delaware corporation,

      Plaintiff,

v.

STEVEN A. SILVERS,
a resident of Palm Beach County, Florida

      Defendant.

CASE NO. 04-80954-CIV-HURLEY
Magistrate Judge James M. Hopkins

_____

**JOINT STIPULATION FOR DISMISSAL,
WITHOUT PREJUDICE, OF ALL CLAIMS**

    Plaintiff, Stelor Productions, Inc. and Defendant Steven A. Silvers, hereby jointly stipulate,

pursuant to Fed.R.Civ.P.41(a)(1), to the dismissal, without prejudice, of all claims asserted by each

party against the other party in this action.

    Respectfully submitted,

Adam T. Rabin
DIMOND KAPLAN & ROTHSTEIN, PA
200 S.E. First Street, Suite 708
Miami, FL 33131
T: 305-374-1920
Co-Counsel for Defendant

Kenneth R. Hartmann  (FBN: 664286)
Gail A. McQuilkin  (FBN: 969338)
KOZYAK TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
T: 305-372-1800  /  F: 305-372-3508
Counsel for Defendant

Yano L. Rubinstein, Esq.
SUMMERS RUBINSTEIN
580 California Street, 16th Floor
San Francisco, California 94104
Counsel for Plaintiff

3339/101/249255.1

Exhibit  H

## GAIL A MCQUILKIN - settlement

**From:**   GAIL A MCQUILKIN
**To:**   Yano Rubinstein
**Date:**   2/1/2005 8:52 AM
**Subject:**   settlement

Yano -

 A few housekeeping items.

1. Who is going to be the correspondent for Stelor for the trademark registrations - Hefter or you?

2. All payments paid directly to Silvers need to be made out to Silvers Entertainment Group, Inc.

3. How is the insurance premium payments going to be handles?  Paid directly to Aurora?

4. It is probably a good idea for me to have a contact person at Stelor regarding the payments who can call me as well if there are issues or problems.  I also need to ask about Silvers 1099 for 2004.  Probably a good idea to send it to me.

5. Domain names.  There are several "GOO" domain names that Stelor registered through a registrar different than godaddy.com   To create the database for renewals we need to have all the "GOO" related domain names registered at Godaddy.  I'm not sure how to make this change.  It might be a good idea for me to speak to a person at Stelor who has responsibility for this.  That way I can also informed directly if there are admin issues that need to be addressed by Silvers.

 6. We need a date for the auditor to go to Stelor.  We should talk about what we want from the auditor that will help us with Inc.

7. We need to file a joint stipulation of dismissal.  I drafted one already and will send it to you under a different e-mail.

Call me later when you have time.  I am leaving to go out of town this evening but have my cell.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  I

Page 1 of 1

## GAIL A MCQUILKIN - items

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Yano Rubinstein |
| **Date:** | 2/15/2005 11:13 AM |
| **Subject:** | items |

Hi Yano -

Did you confirm a date to go to Stelor to look at documents?  Also,
Let me know.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  J

## GAIL A MCQUILKIN - stuff

**From:**    GAIL A MCQUILKIN
**To:**      Yano Rubinstein
**Date:**    2/22/2005 11:27 AM
**Subject:** stuff

Yano -

   I have not heard back from Esrig and I need to get answers to some things.  Can you run interference?

1. Confirm that we are getting a check for these at the end of this month

      Feb and March payment
      reimbursement for the insurance premiums
      reimbursement for the domain name renewals

2. A date to go there next week (I really need to get this scheduled asap).

3. What information we are sending to Bridges now

4. Need a letter from Aurora terminating Steve's coverage so he can convert to an individual plan under NHP. The wording on this needs to be careful so we need to discuss.

Can you find this out and then call me later today.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  K

**From:**   GAIL A MCQUILKIN
**To:**   kkaplan@bwskb.com
**Date:**   3/2/2005 4:42:32 PM
**Subject:**   Googles

Kevin -

Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is **not** to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to **send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.** This really needs to get done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

**REDACTED**

GAIL A MCQUILKIN - Googles
Page 2

**REDACTED**

Talk to you soon.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  L

| From: | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
|---|---|
| To: | <GAM@kttlaw.com> |
| Date: | 3/5/2005 10:17:04 AM |
| Subject: | Googles |

Gail,

I have the following information in response to your recent email.

1. I understand you received the checks.

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement.

5. Stelor will confirm in writing that no one's available options have increased.

6. Stelor will provide written confirmation.

7. Stelor will provide a date prior to March 15, 2005.

8. There are no such samples, as Stelor is not yet offering any product for sale.

9. Stelor will provide proof regarding the applications, registrations and names.

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges. I will get back to you on that quickly.

Kevin

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*******************************************

Exhibit  M

## GAIL A MCQUILKIN - Re: Googles

From:       GAIL A MCQUILKIN
To:         Kevin C. Kaplan
Date:       3/5/2005 11:12 AM
Subject:    Re: Googles

Kevin -

<div align="center">REDACTED</div>

He is giving them three buisness days to get into compliance.

1. I understand you received the checks.  **Yes we did.**

2. Stelor finds the chart confusing.  Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement. **There is nothing in the least bit confusing about the chart.  Stelor has three days to get us the check.  FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb (which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.  **They have three days.**

4. Stelor has no record of receiving the receipts.  Please provide us with copies, and Stelor will provide the reimbursement.  **He has provided these three times already.  They have three days to pay.**

5. Stelor will confirm in writing that no one's available options have increased.  **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation.  **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005.  **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations and names. **They have three days**

10. By the same token, Stelor requires proof that Silvers changed the correspondent information.  As of my last conversation with Larry Hefter, he was unaware that had been done.  Please provide us with this proof as soon as possible. **There is nothing in the agreement that obligates us to do this, and everything was changed electronically so there is nothing to provide.  Stelor knows how to go online to the USPTO office to view the changes.  It will take all of ten minutes to do this.  I talked to Larry and showed him the e-mail I had sent him, and he knows about the changes.**

<div align="center">REDACTED</div>

# Exhibit  N

## GAIL A MCQUILKIN - dates for audit

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     3/22/2005 11:55 AM
**Subject:**  dates for audit

Kevin -

    We need to set up the date for the auditor to go to Stelor.  These are they dates they have open.  Let me know today which dates works best.  Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st , or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  O

## GAIL A MCQUILKIN - RE: dates for audit

**From:** "Kevin C. Kaplan" <kkaplan@bwskb.com>
**To:** "GAIL A MCQUILKIN" <GAM@kttlaw.com>
**Date:** 3/23/2005 9:24 AM
**Subject:** RE: dates for audit

Gail,

Can you send me over the documents confirming the scope of your proposed audit.  Is there an engagement letter or other correspondence?  We'll call you at 11 today.

Kevin

*******************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

  Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@abwlaw.com

*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

# Exhibit  P

## GAIL A MCQUILKIN - RE: dates for audit

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 3/23/2005 9:47 AM |
| **Subject:** | RE: dates for audit |

The scope of the audit based on Silvers' rights under the license agreement is : "Stelor's books and records and all other dcouments and material in the possession of or under the control of Stelor with respect to the subject matter of the License Agreement." I think that just about covers everything that Stelor has relating to the Googles project. FYI - based on our settlement, the results of the audit are for attorney eyes only. The only way we can disclose anything to Inc. is upon our agreement.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 03/23/05 9:22 AM >>>

Gail,


Can you send me over the documents confirming the scope of your proposed audit. Is there an engagement letter or other correspondence? We'll call you at 11 today.


Kevin


*********************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

   Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@abwlaw.com


*******************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

---

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Tuesday, March 22, 2005 11:55 AM
**To:** Kevin C. Kaplan
**Subject:** dates for audit


Kevin -

    We need to set up the date for the auditor to go to Stelor.  These are they dates they have open.  Let me know today which dates works best.  Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st, or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  Q

## GAIL A MCQUILKIN - information from Stelor

**From:**    GAIL A MCQUILKIN
**To:**      kkaplan@bwskb.com
**Date:**    4/7/2005 5:01 PM
**Subject:** information from Stelor

Kevin -

   Esrig said he would get me a disc with all the presentation stuff.  I need it asap so I can work that information into the complaint.  Also, remember to get from him samples of confusion evidence.  Thanks.

Gail.

Checks??????????????????

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  R

## GAIL A MCQUILKIN - Latest threats

**From:**    Steven Esrig <steven@stelorproductions.com>
**To:**      <gam@kttlaw.com>, Marty Jeffery <marty@stelorproductions.com>
**Date:**    4/11/2005 6:05 PM
**Subject:** Latest threats
**CC:**      "Kevin C. Kaplan" <kkaplan@bwskb.com>

Gail,

Just got off the phone with Kevin. Do you think we can possibly move beyond the posturing and ridiculous threats and get on to business?-I am willing to go out on a limb in spite of my Boards position regarding adherence to our license and settlement agreement but I am just as willing to run my business and let you finance Mr. Silvers next lawsuit with Stelor.
I am deeply concerned that these silly little turf wars could cost all of us the big picture.
In other words, do you plan to proceed as a co-counsel or counsel for Steven A. Silvers only. Marty and I look forward to a phone call from you at your earliest convenience.

Steve

Ps-you promised us your "work of art" last Friday. We will take care of all Silvers outstanding checks upon receipt of the complaint. I have authorized Kevin to release the checks he is holding to you as well when we receive the draft complaint.

STEVEN A. ESRIG



301.963.0000

Exhibit  S

## GAIL A MCQUILKIN - follow up

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 4/12/2005 4:35 PM |
| **Subject:** | follow up |

Kevin -

I appreciate our conversation today. As you requested here is an update on the complaint. This must be kept extremely confidential .

Because this complaint will draw intense scrutiny from the court and the media, it must be as factually accurate and legally sound as possible. I am doing an enormous amount of research to make sure that happens.

All of this takes tremendous time to do. But my practice has always been to research a case thoroughly before signing my name to a complaint - I'm probably one of the few attorneys who takes the obligations of Rule 11 to heart. Trust me, it pays off in the end.

While it may seem like this is dragging, a good complaint can take weeks or months. But we should have a good first draft soon. I am working on nothing else this week. I really need your help to get me the information from your client that I have been promised so I can weave it into the facts. I cannot understand why this has not been provided.

I hope your client understands that it is my client's intellectual property rights that are at issue so I take this case very seriously. Although we are "co-counsel" on this, I am not working for your client and do not feel obligated to perform based on their time line, nor should the drafting of this complaint have any bearing on their obligation to perform under the settlement. By no means am I holding up sending you the draft because of the owed payments. It is the distraction of dealing with these issues that is holding me up. No one wants

this complaint filed more than my client.

And, as much as I enjoy speaking with the good folks over there, please let your client know that I cannot under the rules of professional conduct have direct communications, even e-mail, with any of them unless I have express authority from you.

Finally, you know how important I feel it is for us to stay aligned. This is easily accomplished if your client will just comply with the settlement, especially the financial part. I don't make threats or posture, my time is too expensive to waste on that. I communicate only what I must when I must to protect my clients interests. I agree that this has gotten silly, and I am sure the board would rather focus its discussions on the upcoming launch and trade show than obsessing over these rather small advances to my client. I have spent considerable time getting my client to focus on what your client has and will accomplish rather than what they have not done, although his list in that regard is long. He really is very happy with the project and excited about the launch and upcoming show. He knows the success of the project is the result of the work and investment made by everyone over there. But, he needs to feel he is being treated fairly, and frankly it doesn't take much by your client to instill that in him.

Please get your client to pay my guy what is owed so I can dedicate all my efforts on this complaint.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  T

## GAIL A MCQUILKIN - please get me a response to where we are, my client is

**From:**     GAIL A MCQUILKIN
**To:**        kkaplan@bwskb.com
**Date:**      4/13/2005 11:10 AM
**Subject:**   please get me a response to where we are, my client is

going nuts over this and I can't hold him off another day.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  U

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit

Kevin -

   The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  V

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint.  Are you available Monday afternoon to come over and look?


******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com



******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit


Kevin -

   The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Exhibit  W

## GAIL A MCQUILKIN - RE: audit

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 4/22/2005 4:20 PM |
| **Subject:** | RE: audit |

I'd have to clear off some appointments but it may be possible.  What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint.  Are you available Monday afternoon to come over and look?


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

# Exhibit  X

**GAIL A MCQUILKIN - RE: audit**

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | "GAIL A MCQUILKIN" <GAM@kttlaw.com> |
| **Date:** | 4/22/2005 5:27 PM |
| **Subject:** | RE: audit |

I've forwarded it on to Steve, but haven't heard back yet.  He may come down Monday too.

*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com

*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 4:21 PM
**To:** Kevin C. Kaplan
**Subject:** RE: audit

I'd have to clear off some appointments but it may be possible.  What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA

Exhibit  Y

## GAIL A MCQUILKIN - RE: Inc

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | "GAIL A MCQUILKIN" <GAM@kttlaw.com> |
| **Date:** | 4/25/2005 9:46 AM |
| **Subject:** | RE: Inc |

And, when will the complaint be in circulation?

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*******************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Monday, April 25, 2005 9:44 AM
**To:** Kevin C. Kaplan
**Subject:** Re: Inc

Kevin -

    No, I cannot be there tomorrow.  Please let me know what is in the boxes so I can at least determine if it is relevant.  I need the date for the audit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/25/05 9:21 AM >>>
Gail,

Steve plans to be in Miami tomorrow.  Can you meet at our office at 2:00 p.m.?  Please confirm.  We will have the Stelor information for your review.  We expect you will have a draft of the complaint for our review.

In terms of schedule, I am leaving town on Friday for vacation.  Stelor and I plan to have the complaint filed (or

ready to be filed) before I leave.  Please help us with that goal by circulating your draft.

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
   Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

Exhibit  Z

**From:**      GAIL A MCQUILKIN
**To:**        kkaplan@bwskb.com
**Date:**      4/26/2005 8:19:54 PM
**Subject:**   Re: Stelor/Silvers/Inc

Kevin -

   I cannot get into this with you right now.  I assure you I will get back to you and Stelor by Friday.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/26/05 12:35 PM >>>
Gail,


As we discussed, we were impressed and pleased when we received your recent email describing the
extensive efforts you have made in preparing a draft complaint.  No doubt the complaint will reflect the
substance of your work.  In the meantime, however, we still have not received a draft of the complaint, and
our continued requests that you circulate a draft have been ignored.


As I have advised you, the Stelor information is in my office, and we have been attempting to set up a time
for you to review it.  Steve committed the resources of his people to assemble this information, which took
three people in excess of three weeks.  I am also prepared immediately to input into the draft complaint
any missing information or sections relating to Stelor's work.  To do that, obviously, I need to have the
draft to see what you believe is missing and where it needs to go.


This process needs to be completed, and the complaint needs to be filed promptly.  In fact, you yourself
emphasized the urgency of getting this filed we when the TTAB dismissed the opposition more than a
month ago.  At that time, you committed to having a complaint prepared within the week!  To say the least,
we need to see the draft now.  If you have some reason for refusing to circulate it to us, please advise us
immediately.  Otherwise, please circulate the draft to us today.  We have welcomed and will continue to
welcome your input and work on the anticipated litigation.  We understand that, to date, you have done the
lion's share of the work on the complaint, but that was at your election.  You wanted to revise the initial
draft we provided you, and we had no objection to your doing that.  As I say, we recognize and very much
appreciate the hard work you have apparently done.  But, it is no good to anyone unless the draft gets
circulated, finalized, and filed.


As we see it, there is no conceivable reason for you to continue to "withhold" the complaint, or for that
matter, for its filing to be delayed any further.  Yet, you continue to sit on the draft, without any apparent
reason.  The situation concerns us, and we have reached the point where - either your version needs to
be circulated and we can collaborate on completing it - or we will simply move forward to prepare and file
our own version of the complaint this week.  Please make no mistake, the License and Settlement
Agreements clearly provide that any such lawsuit is to be filed by Stelor.  Your client has an explicit duty to
"cooperate with Stelor and Stelor's counsel in all respects" but the proceedings are to be "filed by Stelor".

Settlement ¶ 2.


Please continue to cooperate with us by promptly providing your draft.


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm
of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The
information is intended to be for the use of the individual or entity named above. If you are not the
intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited.

# Exhibit  AA

(iv)        the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party, and

(v)        except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.  LICENSEE represents and warrants that

(i)        the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)        the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii)        it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.        Disclaimer of Warranties  EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D        LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith

## VI.  NOTICES, QUALITY CONTROL, AND SAMPLES

A.        The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices

B.        The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.        Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII.  NOTICES AND PAYMENT

A        Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B        Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.



## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Goodian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document. (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product ideas or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory . Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term  This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the

10



# Exhibit BB

Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*****************************************
CONFIDENTIALITY NOTE: This electronic message transmission contains
information from the law firm of Aragon, Burlington, Weil, Schwiep,
Kaplan & Blonsky, PA, which may be confidential or privileged. The
information is intended to be for the use of the individual or entity
named above. If you are not the intended recipient, please immediately
delete this e-mail and be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited.


-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

    Here are the issues we need to resolve under the settlement
agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The
checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his
insurance premiums during the life of the consulting agreement. The
only two payments Stelor is not to reimburse him for are Dec 2004 and
Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1.
He is now owed for March 2005 too. By my calculation the total it comes
to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so
that he can continue with health care coverage. Silvers is trying to
convert to an individual plan through NHP, Aurora's insurance company.
That will reduce the premiums by a couple hundred dollars a month. But
to do that Aurora needs to send to Neighborhood Health Partnership on
Aurora official letter head, addressed to "Premium Services" informing
them that April 1, 2005, Aurora will no longer be offering health
insurance benefits to "ANY" of their employees, and that they have
informed Steven A. Silvers of this event and that he has 63 days within
which to secure a non-group conversion policy. This really needs to get
done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He
submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to
1,000 options for Stelor stock under Stelor stock option plan, and

another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6.   Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7.   Audit.  We need a date for the auditor to go to Stelor.  As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8.   Stelor needs to provide us with samples of all products they are offering for sale.

9.   Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter.  We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password.  Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server).  We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

**REDACTED**

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit CC

**From:**    "Kevin C. Kaplan" <kkaplan@bwskb.com>
**To:**      <GAM@kttlaw.com>
**Date:**    3/5/2005 10:17:04 AM
**Subject:** Googles

Gail,

I have the following information in response to your recent email.

1.  I understand you received the checks.

2.  Stelor finds the chart confusing.  Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3.  Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4.  Stelor has no record of receiving the receipts.  Please provide us with copies, and Stelor will provide the reimbursement.

5.  Stelor will confirm in writing that no one's available options have increased.

6.  Stelor will provide written confirmation.

7.  Stelor will provide a date prior to March 15, 2005.

8.  There are no such samples, as Stelor is not yet offering any product for sale.

9.  Stelor will provide proof regarding the applications, registrations and names.

10.  By the same token, Stelor requires proof that Silvers changed the correspondent information.  As of my last conversation with Larry Hefter, he was unaware that had been done.  Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges.  I will get back to you on that quickly.

Kevin

*****************************************

Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*****************************************

Exhibit DD

## GAIL A MCQUILKIN - Re: Googles

From:     GAIL A MCQUILKIN
To:       Kevin C. Kaplan
Date:     3/5/2005 11:12 AM
Subject:  Re: Googles

Kevin -

<center>REDACTED</center>

He is giving them three buisness days to get into compliance.

1. I understand you received the checks. **Yes we did.**

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement. **There is nothing in the least bit confusing about the chart. Stelor has three days to get us the check. FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb (which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so. **They have three days.**

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement. **He has provided these three times already. They have three days to pay.**

5. Stelor will confirm in writing that no one's available options have increased. **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation. **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005. **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations and names. **They have three days**

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible. **There is nothing in the agreement that obligates us to do this, and everything was changed electronically so there is nothing to provide. Stelor knows how to go online to the USPTO office to view the changes. It will take all of ten minutes to do this. I talked to Larry and showed him the e-mail I had sent him, and he knows about the changes.**

<center>REDACTED</center>

Exhibit  EE

# **CERTIFICATION**

Pursuant to the January 28, 2004 Settlement Agreement between and among Stelor Productions, Inc. ("Stelor") and Steven Silvers, Stelor hereby certifies as follows:

1.    Stelor has not increased the amount of the stock options created under the original stock option plan.

2.    No royalty payments from Stelor to Mr. Silvers are owed or outstanding as of December 31, 2004.

3.    Stelor does not presently offer any products for sale except the music available on itunes.

I declare under penalty of perjury that the foregoing statements are true and correct.

_3.8-05_
Date

_____
Steven A. Esrig, President

Exhibit  FF

# Absolutely.net

contact absolutely



| | **Web Search** | | **Buy Poster** |

EXCLUSIVE: Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## Netherlands 6 Top Albums in Children's Music

**Homepage**

**What's New**

**Movie Reviews**

**Photo Gallery**

**Download Music** NEW!

**Wallpaper**

**Screensaver**

**Contact Celeb**

Click on the title to buy and download music.
You need iTunes sofware from Apple to play the music.
### Download Here

# Google

| |
| **Site Search** |

ADVERTISEMENT

STOP PAYING 99¢ PER SONG

Listen to, download & transfer an unlimited amount of music.

Usher

Toby Keith

Gwen Stefani

Johnny Cash

Green Day

Kanye West

napster TO GO

TRY IT FOR FREE

Page: **1**



### 1. Baby Genius: Best of... The IQ Builder! - Baby Genius

*Baby Genius: Best of... The IQ Builder! by Baby Genius*

**Artist:** Baby Genius
**Album:** Baby Genius: Best of... The IQ Builder!
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 2. Classical Vitamins - Baby Genius

*Classical Vitamins by Baby Genius*

**Artist:** Baby Genius
**Album:** Classical Vitamins
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 3. One GooWorld - The Googles from Goo

*One GooWorld by The Googles from Goo*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 4. Kidz Bop Christmas - Kidz Bop Kids

*Kidz Bop Christmas by Kidz Bop Kids*

**Artist:** Kidz Bop Kids
**Album:** Kidz Bop Christmas
**Copyright:** 2003 Razor & Tie
**Released Date:** 2002



**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 5. Smart Play With Classical - Heidi Brende

*Smart Play With Classical by Heidi Brende*

**Artist:** Heidi Brende
**Album:** Smart Play With Classical
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 6. TRAVEL SONG SING ALONGS - Kevin Roth

*TRAVEL SONG SING ALONGS by Kevin Roth*

**Artist:** Kevin Roth
**Album:** TRAVEL SONG SING ALONGS
**Copyright:** 2004 STAR GAZER PRODUCTIONS
**Released Date:** 26 February 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800

**Page:** 1



The Mozart Effect - Musi...
Leopold Mozart
New $10.98!
Used $3.99!



Children's Favorites
Favorites Series
New $6.98!



For Our Children
Various Artists
New $13.99!



Papa's Dream
Los Lobos With Lalo Guerrero
New $11.99!
Used $7.99!



Stay Awake
Various Artists
New $13.98!
Used $8.99!



Classical Music for Chil...
Johann Sebastian Bach

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us





Target the position.

Post A Job
CLICK HERE TO
FIND OUT MORE

©2005 Absolutely Celebrity Network

Absolutely Music Download: UK 100 Top Songs in Children's Music 3          Page 1 of 5



# Absolutely.net

contact absolutely

Add FREE New Emotion Icons for your Email

OK

| Web Search | Buy Poster |

EXCLUSIVE: Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## UK 100 Top Songs in Children's Music 3

**Homepage**

**What's New**

**Movie Reviews**

**Photo Gallery**

**Download Music** NEW!

**Wallpaper**

**Screensaver**

**Contact Celeb**

Click on the title to buy and download music.
You need iTunes sofware from Apple to play the music.
**Download Here**



Page: **1 2 3 4 5 6 7 8 9 10**

# Google

| Site Search |

ADVERTISEMENT



Whose body is this?

Answer to get $100 FREE!

**Angelina Jolie**

**Jennifer Lopez**

**Britney Spears**

*See offer details
© 2005 AnyFreeGift.com



### 21. Being Jewish Is Fun - Judy Caplan Ginsburgh

*Being Jewish Is Fun by Judy Caplan Ginsburgh from the album Havdalah Pajama*

**Artist:** Judy Caplan Ginsburgh
**Album:** Havdalah Pajama
Copyright: 2000 Judy Caplan Ginsburgh
Released Date: 26 July 2000
Published Date: Sat, 29 Jan 2005 03:39:19 -800



### 22. The Cuckoo Waltz - Verne Langdon

*The Cuckoo Waltz by Verne Langdon from the album Circus Clown Calliope!/Circus Clown Calliope!, Vol.2*

**Artist:** Verne Langdon
**Album:** Circus Clown Calliope!/Circus Clown Calliope!, Vol.2
Copyright: 1999 Electric Lemon
Released Date: 26 October 1999
Published Date: Sat, 29 Jan 2005 03:39:19 -800



### 23. The Lion and the Mouse - Michael Mish

*The Lion and the Mouse by Michael Mish from the album Aesop's Fables*

**Artist:** Michael Mish
**Album:** Aesop's Fables
Copyright: 2003 MishMashMusic
Released Date: 05 June 2003
Published Date: Sat, 29 Jan 2005 03:39:19 -800



### 24. Frosty the Snowman - Kidz Bop Kids

*Frosty the Snowman by Kidz Bop Kids from the album Kidz Bop Christmas*




Circus Music
from the Bi...
Merle Evans
Circus Band
New $7.98!


Children Of
Eden
Stephen
Schwartz
New $26.99!


Classic Disney
Various Artists
New $42.99!


Classical Music
for Chil...
Johann
Sebastian Bach
New $3.98!
Used $1.99!


Smithsonian
Folkways Chi...
Various Artists
New $10.99!


Stay Awake
Various Artists
New $13.98!
Used $8.98!

(Prices May Change)
Privacy Information

**Artist**: Kidz Bop Kids
**Album**: Kidz Bop Christmas
**Copyright**: 2003 Razor & Tie
**Released Date**: 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 25. The Syllable I Stress - Los McCroskey

*The Syllable I Stress by Los McCroskey from the album Â¿CÃ³mo? Fun, New Songs for Learning Spanish and Loving God*

**Artist**: Los McCroskey
**Album**: Â¿CÃ³mo? Fun, New Songs for Learning Spanish and Loving God
**Copyright**: 2002 McCroskey Music
**Released Date**: 12 February 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 26. My First Child - Carla Lynne Hall

*My First Child by Carla Lynne Hall from the album My First Child CD Single*

**Artist**: Carla Lynne Hall
**Album**: My First Child CD Single
**Copyright**: 2004 Moxie Entertainment
**Released Date**: 18 April 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 27. Amy - Celeste Krenz, Linda W. Purdy

*Amy by Celeste Krenz, Linda W. Purdy from the album Pirates & Cowboys, More Songs for You & Me*

**Artist**: Celeste Krenz, Linda W. Purdy
**Album**: Pirates & Cowboys, More Songs for You & Me
**Copyright**: 2003 Mountain Creek Records
**Released Date**: 05 January 2003
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 28. It's Raining, It's Pouring - Rain, Rain, Go Away - David Jacobi - Aimee Fischer

*It's Raining, It's Pouring - Rain, Rain, Go Away by David Jacobi - Aimee Fischer from the album Favorite Nursery Rhymes*

**Artist**: David Jacobi - Aimee Fischer
**Album**: Favorite Nursery Rhymes
**Copyright**:
**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 29. Zoomin' - The Googles from Goo

*Zoomin' by The Googles from Goo from the album One GooWorld*

**Artist**: The Googles from Goo
**Album**: One GooWorld
**Copyright**: 2004 Stelor Productions
**Released Date**: 05 July 2004

**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 30. Dudley, a Llama With Attitude - Diane White-Crane

*Dudley, a Llama With Attitude by Diane White-Crane from the album Songs for Llama Lovers*

**Artist:** Diane White-Crane
**Album:** Songs for Llama Lovers
**Copyright:** 2000 Orchard
**Released Date:** 07 March 2000
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800

**Page:** 1 2 3 4 5 6 7 8 9 10

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us



©2005 Absolutely Celebrity Network

# Absolutely.net

## Netherlands 6 Top Albums in Children's Music



3. One GooWorld - The Googles from Goo

*One GooWorld by The Googles from Goo*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800

# Absolutely.net

## UK 100 Top Songs in Children's Music 3



### 29. Zoomin' - The Googles from Goo

*Zoomin' by The Googles from Goo from the album One GooWorld*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800

# Exhibit  GG

## GAIL A MCQUILKIN - Kevin -

**From:**    GAIL A MCQUILKIN
**To:**    kkaplan@bwskb.com
**Date:**    3/9/2005 6:15 PM
**Subject:**    Kevin -

Kevin -

copy of pages from www.absolutely.net that shows that the Googles CD is ranked by nation as the most popular downloaded childrens CD,

offered for sale (despite Esrig's sworn statement of no products offered for sale, go to www.cafepress.com/googles)

Let's talk tomorrow.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  HH

GAIL A MCQUILKIN - the ad that appeared in the pre-show publication                                    Page 1

**From:**          GAIL A MCQUILKIN
**To:**            kkaplan@bwskb.com
**Date:**          3/23/2005 1:43:23 PM
**Subject:**       the ad that appeared in the pre-show publication


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com



# Exhibit  II

## GAIL A MCQUILKIN - here is the record of the helath insurance payments -

**From:** GAIL A MCQUILKIN
**To:** Yano Rubinstein
**Date:** 2/15/2005 1:44 PM
**Subject:** here is the record of the helath insurance payments -

deduct the Dec and Jan payments because they do not apply.  Stelor needs to pay Steve for Feb forward.

Call me when you can.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**The Aurora Collection Inc**
RE:   Insurance Premiums – Neighborhood Health Partnership
      Paid by:   Steven A Silvers

| Month/Year | Date Rec'd | Check No./Reference | Amount Paid |
|---|---|---|---|
| April 2003 | April/2003 | Per Bank Statement | $144.07 |
| May 2003 | May/2003 | Per Bank Statement | $144.07 |
| June 2003 | June/2003 | Per Bank Statement | $144.07 |
| July 2003 | July/2003 | Per Bank Statement | $144.07 |
| Aug 2003 Sept 2003 | Aug 01/2003 | Per Bank Statement | $288.14 |
| Oct 2003 Nov 2003 Dec 2003 | Oct 09/2003 | Bank Ck#67030727 | $432.21 |
| Jan 2004 | Jan 07/2004 | Per Bank Statement | $144.07 |
| Feb 2004 | Feb 10/2004 | Per Bank Statement | $144.07 |
| Mar 2004 | Mar 09/2004 | Per Bank Statement | $144.07 |
| Apr 2004 | Apr 06/2004 | Per Bank Statement | $275.00 |
| May 2004 | May 06/2004 | Per Bank Statement | $275.00 |
| June 2004 | June 04/2004 | Per Bank Statement | $275.00 |
| July 2004 | July 04/2004 | Per Bank Statement | $275.00 |
| Aug 2004 | Aug 05/2004 | Per Bank Statement | $275.00 |
| Sept 2004 | Sept 01/2004 | Per Bank Statement | $275.71 |
| April thru August | Sept 01/2004 | Per Bank Statement | $ 3.55 |
| Oct 2004 | Sept 30/2004 | Per Bank Statement | $275.71 |
| Nov 2004 | Nov 03/2004 | Per Bank Statement | $275.71 |
| Dec 2004 | Nov 29/2004 | Per Bank Statement | $603.72 |
| Jan 2005 | Dec 20/2004 | Ck# 1034 | $603.72 |
| Feb 2005 | Jan 20/2005 | Ck# 1037 | $603.72 |
|  |  |  |  |
| TOTAL |  |  | **$5,745.68** |

# Exhibit  JJ

## GAIL A MCQUILKIN - RE: stuff

**From:**    GAIL A MCQUILKIN
**To:**      Yano Rubinstein
**Date:**    2/22/2005 1:53 PM
**Subject:** RE: stuff

make it around 5:30, I have a conference call at 5.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Yano Rubinstein" <yano@sumrub.com> 2/22/2005 12:37:45 PM >>>
OK, I will call you around 5 PM your time.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Tuesday, February 22, 2005 8:28 AM
**To:** yano@sumrub.com
**Subject:** stuff

Yano -

    I have not heard back from Esrig and I need to get answers to some things.  Can you run interference?

1.  Confirm that we are getting a check for these at the end of this month

    Feb and March payment
    reimbursement for the insurance premiums
    reimbursement for the domain name renewals

2.  A date to go there next week (I really need to get this scheduled asap).

3.  What information we are sending to Bridges now

4.  Need a letter from Aurora terminating Steve's coverage so he can convert to an individual plan under NHP.
The wording on this needs to be careful so we need to discuss.

Can you find this out and then call me later today.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  KK

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Aragon, Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

    Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is not to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination.  This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy. This really needs to get done asap for everyone's benefit.

4. Silvers is owed  for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

**REDACTED**

Talk to you soon.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit LL

**GAIL A MCQUILKIN - Googles**

---

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     3/3/2005 1:40 PM
**Subject:**  Googles

---

Kevin -

No checks arrived today.  Can you find out what is going on.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  MM

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | <GAM@kttlaw.com> |
| **Date:** | 3/5/2005 10:17:04 AM |
| **Subject:** | Googles |

Gail,

I have the following information in response to your recent email.

1. I understand you received the checks.

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement.

5. Stelor will confirm in writing that no one's available options have increased.

6. Stelor will provide written confirmation.

7. Stelor will provide a date prior to March 15, 2005.

8. There are no such samples, as Stelor is not yet offering any product for sale.

9. Stelor will provide proof regarding the applications, registrations and names.

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges. I will get back to you on that quickly.

Kevin

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*******************************************

# Exhibit  NN

## GAIL A MCQUILKIN - Re: Googles

**From:** GAIL A MCQUILKIN
**To:** Kevin C. Kaplan
**Date:** 3/5/2005 11:12 AM
**Subject:** Re: Googles

Kevin -

REDACTED

He is giving them three buisness days to get into compliance.

1. I understand you received the checks. **Yes we did.**

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement. **There is nothing in the least bit confusing about the chart. Stelor has three days to get us the check. FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb (which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so. **They have three days.**

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement. **He has provided these three times already. They have three days to pay.**

5. Stelor will confirm in writing that no one's available options have increased. **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation. **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005. **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations and names. **They have three days**

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible. **There is nothing in the agreement that obligates us to do this, and everything was changed electronically so there is nothing to provide. Stelor knows how to go online to the USPTO office to view the changes. It will take all of ten minutes to do this. I talked to Larry and showed him the e-mail I had sent him, and he knows about the changes.**

REDACTED

# Exhibit  OO

## GAIL A MCQUILKIN - letter from Blumquist

**From:**    GAIL A MCQUILKIN
**To:**      kkaplan@bwskb.com
**Date:**    4/1/2005 5:13 PM
**Subject:** letter from Blumquist

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# THE AURORA COLLECTION INC
P O Box 260545
Pembroke Pines, FL 33026

April 01, 2005

Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, MD 20874

To Whom It May Concern:

RE:   Steven A Silvers
      Medical Insurance Issue

On behalf of The Aurora Collection, Inc. and as the Chairman
of the Board of this Company, I hereby confirm the fact that as
of November 30, 2004, the Company had received from Steven
A. Silvers an amount of $4,538.24.

This amount of $4,538.24, in addition to those funds received
by The Aurora Collection, Inc. from Stelor Productions, Inc.,
were applied to Mr. Silvers' monthly insurance premiums due
Neighborhood Health Partnership.

I trust you will find this information satisfactory to your needs.
Should you have any further inquiry regarding this matter,
please feel free to contact me directly at (850)443-1022.

Respectfully submitted,

Brian C. Blomquist
Chairman of the Board

# Exhibit PP

Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:18 PM >>>

Do you have a signed letter?


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

---

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:14 PM
**To:** Kevin C. Kaplan
**Subject:** letter from Blumquist




Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:40 PM
**To:** Kevin C. Kaplan
**Subject:** RE: letter from Blumquist

give me a freakin' break.  He e-mailed this to us.  He put his telephone number in the letter, call him if you want to verify.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:18 PM >>>

Do you have a signed letter?


*****************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com



*****************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

---

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:14 PM
**To:** Kevin C. Kaplan

## GAIL A MCQUILKIN - RE: letter from Blumquist

**From:**     GAIL A MCQUILKIN
**To:**       Kevin Kaplan
**Date:**     4/1/2005 5:40 PM
**Subject:**  RE: letter from Blumquist

give me a freakin' break.  He e-mailed this to us.  He put his telephone number in the letter, call him if you want to verify.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:18 PM >>>

Do you have a signed letter?


*********************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*********************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**GAIL A MCQUILKIN - RE: letter from Blumquist**

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | "GAIL A MCQUILKIN" <GAM@kttlaw.com> |
| **Date:** | 4/1/2005 5:44 PM |
| **Subject:** | RE: letter from Blumquist |

Forward me the email from him which includes the letter as an attachment.

*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com

*******************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:40 PM
**To:** Kevin C. Kaplan
**Subject:** RE: letter from Blumquist

give me a freakin' break. He e-mailed this to us. He put his telephone number in the letter, call him if you want to verify.

Gail A. McQuilkin, Esq.

# GAIL A MCQUILKIN - RE: letter from Blumquist

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 4/1/2005 6:02 PM |
| **Subject:** | RE: letter from Blumquist |

i can't.  Call him to verify.  He is a nice person.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:43 PM >>>

Forward me the email from him which includes the letter as an attachment.


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com



*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**Subject:** letter from Blumquist

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  QQ

## GAIL A MCQUILKIN - settlement

**From:**    GAIL A MCQUILKIN
**To:**      Yano Rubinstein
**Date:**    2/1/2005 8:52 AM
**Subject:** settlement

Yano -

A few housekeeping items.

1. Who is going to be the correspondent for Stelor for the trademark registrations - Hefter or you?

2. All payments paid directly to Silvers need to be made out to Silvers Entertainment Group, Inc.

3. How is the insurance premium payments going to be handles? Paid directly to Aurora?

4. It is probably a good idea for me to have a contact person at Stelor regarding the payments who can call me as well if there are issues or problems. I also need to ask about Silvers 1099 for 2004. Probably a good idea to send it to me.

5. Domain names. There are several "GOO" domain names that Stelor registered through a registrar different than godaddy.com  To create the database for renewals we need to have all the "GOO" related domain names registered at Godaddy. I'm not sure how to make this change. It might be a good idea for me to speak to a person at Stelor who has responsibility for this. That way I can also informed directly if there are admin issues that need to be addressed by Silvers.

6. We need a date for the auditor to go to Stelor. We should talk about what we want from the auditor that will help us with Inc.

7. We need to file a joint stipulation of dismissal. I drafted one already and will send it to you under a different e-mail.

Call me later when you have time. I am leaving to go out of town this evening but have my cell.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  RR

## GAIL A MCQUILKIN - to who at stelor should I send back the check?

**From:**    GAIL A MCQUILKIN
**To:**       Yano Rubinstein
**Date:**    2/7/2005 4:04 PM
**Subject:**  to who at stelor should I send back the check?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - RE: to who at stelor should I send back the check?

**From:**     "Yano Rubinstein" <yano@sumrub.com>
**To:**       "'GAIL A MCQUILKIN'" <GAM@kttlaw.com>
**Date:**     2/7/2005 5:22 PM
**Subject:**  RE: to who at stelor should I send back the check?

Mike Sagan

Yano Rubinstein
SUMMERS RUBINSTEIN P.C.
580 California Street
16th Floor
San Francisco, CA 94104

tel: 415.439.4816
fax: 415.651.9853
cel: 415.819.6817

email: yano@sumrub.com

www.sumrub.com

The contents of this e-mail, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you received this e-mail message in error, please contact the sender by reply e-mail. Please also permanently delete all copies of the original e-mail and any attached documentation. Thank you.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Monday, February 07, 2005 1:05 PM
**To:** yano@sumrub.com
**Subject:** to who at stelor should I send back the check?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit SS

## GAIL A MCQUILKIN - stuff

**From:**     GAIL A MCQUILKIN
**To:**       Yano Rubinstein
**Date:**     2/22/2005 11:27 AM
**Subject:**  stuff

Yano -

I have not heard back from Esrig and I need to get answers to some things.  Can you run interference?

1. Confirm that we are getting a check for these at the end of this month

   Feb and March payment
   reimbursement for the insurance premiums
   reimbursement for the domain name renewals

2. A date to go there next week (I really need to get this scheduled asap).

3. What information we are sending to Bridges now

4. Need a letter from Aurora terminating Steve's coverage so he can convert to an individual plan under NHP. The wording on this needs to be careful so we need to discuss.

Can you find this out and then call me later today.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  TT

From:       GAIL A MCQUILKIN
To:         kkaplan@bwskb.com
Date:       3/2/2005 4:42:32 PM
Subject:    Googles

Kevin -

Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is **not** to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to **send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.** This really needs to get done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

<div align="center">REDACTED</div>

**REDACTED**

Talk to you soon.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  UU

**GAIL A MCQUILKIN - i did receive the fed ex this afternoon - problem**

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 3/3/2005 3:58 PM |
| **Subject:** | i did receive the fed ex this afternoon - problem |

we are suppose to recevie a check each month for the insurance premium. We did not get the March payment for that. Is Stelor sending that along with the reimbursements for prior premiums? When will we get that? I don't mean to be a pest, its just that we really want to get this all cleaned up so we can focus on the bigger picture. Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:14 PM
**To:** Kevin C. Kaplan
**Subject:** letter from Blumquist

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  VV



From  Origin ID  (301)963.3636
Steven Eng
STEG OR PRODUCTIONS, INC
14701 MOCKINGBIRD DRIVE

DARNESTOWN, MD 20874

SHIP TO:  (305)372-1800    BILL SENDER
Gail McQuilkin

2525 Ponce de Leon
9th floor
Coral Gables, FL 33134

Ship Date: 04/04/05
Actual Wgt 1 LB
System# 1503360INET2000
Account# S········

Delivery Address Bar Code

PRIORITY OVERNIGHT

TRK# 7928 8821 9092      0791

33134    -FL-US

XH JDMA

MIA

TUE
Deliver By
05APR05
A?

FedEx Express

The World On Time®

Express

FedEx®

# Exhibit  WW

## GAIL A MCQUILKIN - information from Stelor

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     4/7/2005 5:01 PM
**Subject:**  information from Stelor

Kevin -

   Esrig said he would get me a disc with all the presentation stuff.  I need it asap so I can work that information into the complaint.  Also, remember to get from him samples of confusion evidence.  Thanks.

Gail.



Checks????????????????????

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit XX

## GAIL A MCQUILKIN - silvers

**From:**    GAIL A MCQUILKIN
**To:**      kkaplan@bwskb.com
**Date:**    4/8/2005 10:44 AM
**Subject:** silvers

Kevin -

   Can you please resolve these pending issues -

Settlement Agreement:

1.   Check for reimbursement of health insurance payments

2.  Checks for Feb, March and April advance against royalties for health insurance

3. Reimbursement for domain name renewal costs

4.  Options

5.  All checks are to be made out to Silvers Entertainment Group. THe check we received for April was made out to Steven Silvers.  Why do we have to keep telling Stelor this?

License Agreement:

1.  Royalty statements are due for the 3d and 4th quarter of 2004, and first quarter of 2005.

2.  We need to see the Products Liability Insurance has Silvers names as an insured.

3.  We need to see all promotional materials Stelor intends to use.

4.  Stelor is suppose to place on all materials the phrase "created by Steven A. Silvers."  Stelor persists on placing those words in tiny font and using the phrase "based on a concept created by" rather than "created by" as required.  We went though this once before and Stelor agreed to change it, but still they keep doing it.

5.  There are still issues relating to the list of trademarks and domain names, but I will address those with Larry Hefter.

I need the materials from Stelor to add to the complaint asap.  Esrig said he was going to come here next week.  I think that is a good idea because I need to see this presentation, and we need to talk about the upcoming trade show and how to use it to our advantage.

Let me know about all this.

Gail.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134

# Exhibit  YY

**From:**     GAIL A MCQUILKIN
**To:**       julie@stelorproductions.com
**Date:**     4/9/2005 2:42:34 PM
**Subject:**  Re: Silvers royalty advance check



Not a problem at all.  Let me know about the health insurance.  Going forward the simplist way to do this is to combine the 5k and 1k amounts into one 6k check.  In case you do not know this, these payments are an advance against future royalties.  Make sure you are booking these correctly and keeping track of the amounts so that when royalties begin to be paid by Stelor they are offset by these amounts.  Thanks for your help.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Julie" <julie@stelorproductions.com> 04/09/05 10:17 AM >>>
Gail,



I just got your email at home.  I had already left the office for the day yesterday when you sent your email- I can have the check there on Tuesday morning - will that be alright?  I'll ask Steve about the health insurance.

Thanks for understanding!  You have a great weekend yourself!

Regards,



Julie
----- Original Message -----
From: "Gail A. McQuilkin, Esq." <gam@kttlaw.com>
To: "Julie DePue" <julie@stelorproductions.com>
Sent: Friday, April 08, 2005 6:15 PM
Subject: Re: Silvers royalty advance check



No problem, stuff happens.  You can send it for Monday delivery.  There should also be a check for $1000 to cover his health care premiums.  Ask Steve if you can send that too.  Thanks.  Have a good weekend.
-----Original Message-----
From: "Julie DePue" <julie@stelorproductions.com>
Date: Fri, 08 Apr 2005 17:48:42
To:<gmcquilkin@tmo.blackberry.net>
Subject: Silvers royalty advance check

Dear Gail,

 Steve just told me about the error on Silvers check  I am so sorry!  Its completely my fault  I have been sort of put back into the accountants chair rather abruptly and just went a little too fast through my tasks.

 Id be happy to cut another check and send it Fed Ex Saturday delivery if you want.  Please let me know as soon as you can, and where youd like it sent

GAIL A MCQUILKIN - Re Silvers royal advance check

Sorry for the trouble,

Julie DePue
Stelor Productions

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
(305)372-1800 office
(305)372-3508 fax
gam@kttlaw.com

Exhibit ZZ

## GAIL A MCQUILKIN - Latest threats

**From:**     Steven Esrig <steven@stelorproductions.com>
**To:**       <gam@kttlaw.com>, Marty Jeffery <marty@stelorproductions.com>
**Date:**     4/11/2005 6:05 PM
**Subject:**  Latest threats
**CC:**       "Kevin C. Kaplan" <kkaplan@bwskb.com>

Gail,

Just got off the phone with Kevin. Do you think we can possibly move beyond the posturing and ridiculous threats and get on to business?-I am willing to go out on a limb in spite of my Boards position regarding adherence to our license and settlement agreement but I am just as willing to run my business and let you finance Mr. Silvers next lawsuit with Stelor.
I am deeply concerned that these silly little turf wars could cost all of us the big picture.
In other words, do you plan to proceed as a co-counsel or counsel for Steven A. Silvers only. Marty and I look forward to a phone call from you at your earliest convenience.

Steve

Ps-you promised us your "work of art" last Friday. We will take care of all Silvers outstanding checks upon receipt of the complaint. I have authorized Kevin to release the checks he is holding to you as well when we receive the draft complaint.

STEVEN A. ESRIG



301.963.0000

# Exhibit  AAA

# Exhibit  BBB

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Aragon, Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

Here are the issues we need to resolve under the settlement agreement:

1.  Silvers is owed two checks for $5000 each for Feb and March.  The checks going forward need to be to me by the 1st of the month.

2.  Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement.  The only two payments Stelor is not to reimburse him for are Dec 2004 and Jan 2005.  Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too.  By my calculation the total it comes to $5,141.96.

3.  Health insurance termination.   This is very critical to Silvers so that he can continue with health care coverage.  Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month.  But to do that Aurora needs to send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.  This really needs to get done asap for everyone's benefit.

4.  Silvers is owed  for domain name registration renewals.  He submitted the receipts for these to Stelor already for $318.00.

5.  Options.  Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase.  Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6.  Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7.  Audit.  We need a date for the auditor to go to Stelor.  As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8.  Stelor needs to provide us with samples of all products they are offering for sale.

9.  Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter.  We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password.  Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server).  We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

## REDACTED

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit CCC

## GAIL A MCQUILKIN - Googles

**From:**    GAIL A MCQUILKIN
**To:**      kkaplan@bwskb.com
**Date:**    3/3/2005 1:40 PM
**Subject:** Googles

Kevin -

No checks arrived today.  Can you find out what is going on.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  DDD

## GAIL A MCQUILKIN - Re: Googles

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin C. Kaplan |
| **Date:** | 3/5/2005 11:12 AM |
| **Subject:** | Re: Googles |

Kevin -

<div align="center">REDACTED</div>

He is giving them three buisness days to get into compliance.

1. I understand you received the checks. **Yes we did.**

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement. **There is nothing in the least bit confusing about the chart. Stelor has three days to get us the check. FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb (which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so. **They have three days.**

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement. **He has provided these three times already. They have three days to pay.**

5. Stelor will confirm in writing that no one's available options have increased. **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation. **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005. **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations and names. **They have three days**

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible. **There is nothing in the agreement that obligates us to do this, and everything was changed electronically so there is nothing to provide. Stelor knows how to go online to the USPTO office to view the changes. It will take all of ten minutes to do this. I talked to Larry and showed him the e-mail I had sent him, and he knows about the changes.**

<div align="center">REDACTED</div>

# Exhibit  EEE

## GAIL A MCQUILKIN - Silvers declaration

**From:**    GAIL A MCQUILKIN
**To:**      kkaplan@bwskb.com
**Date:**    4/5/2005 5:17 PM
**Subject:** Silvers declaration

Kevin -

Can we now get the checks you are holding.  The attachment to the declaration is the chart you already have. Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

DECLARATION

I, Steven A. Silvers, declare and state under the penalty of perjury, that:

1.   I paid to Aurora Collections, Inc. the amounts reflected in the attached chart to cover the costs of insurance premiums through November 30, 2004.

2.   I require $1000 per month to cover the costs of my health insurance coverage which should be considered an advance against future royalties per the Settlement Agreement.

Dated:   April 5, 2005

Executed by: _Steven A. Silvers_

Steven A. Silvers

Exhibit  FFF

## GAIL A MCQUILKIN - information from Stelor

**From:**      GAIL A MCQUILKIN
**To:**        kkaplan@bwskb.com
**Date:**      4/7/2005 5:01 PM
**Subject:**   information from Stelor

Kevin -

Esrig said he would get me a disc with all the presentation stuff.  I need it asap so I can work that information into the complaint.  Also, remember to get from him samples of confusion evidence.  Thanks.

Gail.

 Checks???????????????????

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit GGG

## GAIL A MCQUILKIN - silvers

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     4/8/2005 10:44 AM
**Subject:**  silvers

---

Kevin -

Can you please resolve these pending issues -

Settlement Agreement:

1.  Check for reimbursement of health insurance payments

2.  Checks for Feb, March and April advance against royalties for health insurance

3. Reimbursement for domain name renewal costs

4.  Options

5.  All checks are to be made out to Silvers Entertainment Group. THe check we received for April was made out to Steven Silvers.  Why do we have to keep telling Stelor this?

License Agreement:

1.  Royalty statements are due for the 3d and 4th quarter of 2004, and first quarter of 2005.

2.  We need to see the Products Liability Insurance has Silvers names as an insured.

3.  We need to see all promotional materials Stelor intends to use.

4.  Stelor is suppose to place on all materials the phrase "created by Steven A. Silvers."  Stelor persists on placing those words in tiny font and using the phrase "based on a concept created by" rather than "created by" as required.  We went though this once before and Stelor agreed to change it, but still they keep doing it.

5.  There are still issues relating to the list of trademarks and domain names, but I will address those with Larry Hefter.

I need the materials from Stelor to add to the complaint asap.  Esrig said he was going to come here next week.  I think that is a good idea because I need to see this presentation, and we need to talk about the upcoming trade show and how to use it to our advantage.

Let me know about all this.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134

# Exhibit  HHH

**GAIL A MCQUILKIN - Latest threats**

| | |
|---|---|
| **From:** | Steven Esrig <steven@stelorproductions.com> |
| **To:** | <gam@kttlaw.com>, Marty Jeffery <marty@stelorproductions.com> |
| **Date:** | 4/11/2005 6:05 PM |
| **Subject:** | Latest threats |
| **CC:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |

Gail,

Just got off the phone with Kevin. Do you think we can possibly move beyond the posturing and ridiculous threats and get on to business?-I am willing to go out on a limb in spite of my Boards position regarding adherence to our license and settlement agreement but I am just as willing to run my business and let you finance Mr. Silvers next lawsuit with Stelor.
I am deeply concerned that these silly little turf wars could cost all of us the big picture.
In other words, do you plan to proceed as a co-counsel or counsel for Steven A. Silvers only. Marty and I look forward to a phone call from you at your earliest convenience.

Steve

Ps-you promised us your "work of art" last Friday. We will take care of all Silvers outstanding checks upon receipt of the complaint. I have authorized Kevin to release the checks he is holding to you as well when we receive the draft complaint.

STEVEN A. ESRIG



301.963.0000

# Exhibit III

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 4/17/2005 4:37:40 PM |
| **Subject:** | Re: Inc |

Kevin -

   Got the checks.  Still down one though, *ando of course there are the other issues.*  I am availble for a call tomorrow.  Do we have the CD or materials from Stelor yet?


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "kevin kaplan" <kkaplan@bwskb.com> 04/17/05 4:00 PM >>>
Gail,

I've left you a bunch of messages but haven't heard back. Please confirm you received the checks, and let me know when you're available for a call tomorrow. Steve has some issues to discuss.  By the way, for efficiency of our ongoing communications, I have no problem with Steve talking to you directly and authorize you to talk to him directly even if I am unavailable.

Kevin

*****************************************

Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*****************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.


Sent wirelessly via BlackBerry from T-Mobile.

# Exhibit JJJ

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7929-0844-8480

April 27, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

On November 12, 2004, we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached. Because Stelor did not cure those breaches, on January 13, 2005 we served on Stelor a notice of termination of the License Agreement, a copy of which is attached.

On January 28, 2005, Stelor and Silvers entered into a Settlement Agreement in which Silvers agreed to withdraw his notice of termination provided Stelor perform its obligations under the Settlement Agreement.  Stelor, however, has:

- failed to provide Silvers with unit interests in Stelor LLC under paragraph 9;

- failed to pay Silvers monthly installments on royalty advances on the first of every month under paragraph 10 (a);

- failed to pay on April 1, 2005 the monthly advance on royalties required by Silver to maintain his insurance coverage through the Aurora Collection under paragraph 10 (b);

- failed to cooperate in the audit of the books and records of Stelor under paragraph 14;  and

- failed to provide Silvers samples of Licensed Products that are being offered for sale under paragraph 15.

Furthermore, although Stelor has provided a written statement that it is not offering any

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 12, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchandise of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

251939.1

# Exhibit  KKK

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: DBLONSKY@BWSKB.COM   WWW.BWSKB.COM

April 29, 2005

**VIA FACSIMILE AND U.S. MAIL**

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

Re:    Silvers/Stelor

Dear Gail:

I write in response to your letter dated April 27, 2005 to Steven Esrig of Stelor Productions purporting to terminate the License Agreement. It is the position of Stelor that the License Agreement and the Settlement Agreement remain enforceable and binding documents and that the purported grounds for termination are all invalid and improper. We will respond to each of those grounds in turn.

First, Stelor has only recently converted to an LLC and Mr. Silvers has been provided an option letter for unit interests, to which he has not responded.

Second, monthly installments on royalty advancements have been paid. Indeed, enclosed are copies of royalty advancement checks for April and May that we are prepared to release upon withdrawal of the notice of termination.

Third, monthly advances on royalties to maintain insurance coverage have also been paid. Enclosed are checks for April and May that we are prepared to release upon withdrawal of the notice of termination. It must be noted, however, that, despite demand, Mr. Silvers has never confirmed the amount of insurance to be paid. As a show of good faith, Stelor has nonetheless paid the maximum each month, but such confirmation must be provided forthwith.

Fourth, Stelor has cooperated in the audit of the books and records. In fact, just a week ago, on April 22, 2005, you sent an email to Kevin Kaplan stating that "[t]he auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." We have received no such letter. Whenever Stelor receives such a letter, it will cooperate.

Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn and it is understood that the agreements remain in place.

Gail A. McQuilkin, Esq.
April 29, 2005
Page 2

Finally, no royalties are owed to your client and the advances paid far exceed royalties that have been accumulated. A royalty statement is enclosed reflecting full payment of any amounts due. To the extent that there are any concerns, they can be raised with us. However, there is simply no basis for termination. Instead, the continuing failure of Mr. Silvers to meet his obligations under paragraph 2 of the Settlement Agreement, which has been the subject of prior correspondence, is a breach that he needs to be cured immediately.

Mr. Silvers is obliged to honor the License Agreement and the Settlement Agreement. We hereby demand receipt of written notice by Noon on Monday, May 2, 2005 that the notice of termination has been withdrawn and that Mr. Silvers agrees to abide by his contractual agreements. We also demand written assurance that Mr. Silvers will make no efforts to interfere in any manner with the business of Stelor. Furthermore, Mr. Silvers needs to agree to the submission to the federal court of a consent decree confirming the enforceability of the agreements and the rights that have been conveyed to Stelor. Failing receipt of such notice and assurances, Stelor will initiate an action seeking to enforce the agreements through declaratory and injunctive relief.

All rights and remedies are reserved. Govern yourselves accordingly.

Sincerely,

Daniel Blonsky

DFB:gr
Enclosures
cc: Client (w/ encls.)
    Kevin C. Kaplan, Esq. (w/ encls.)

BURLINGTON · WEIL · SCHWIEP · KAPLAN &BLONSKY, P.A.

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE ORDER OF  Silvers Entertainment Group                          $ **5,000.00

Five Thousand and 00/100********************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO  Advance Against Royalty April 05

⑈002751⑈ ⑆052002166⑆ ⑈17597405⑈

STELOR PRODUCTIONS, INC.
Silvers Entertainment Group                    04/28/05              2751
04/28/05                    Bill #roymay                              5,000.00

Citibank Checkin  Advance Against Royalty April 05                    5,000.00



2752

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE
ORDER OF     Silvers Entertainment Group                          $ **5,000.00

Five Thousand and 00/100************************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO   Advance Against Royalty May 05

⑈002752⑈ ⑆0520021366⑆   ⑈175974057⑈

⑆TELOR PRODUCTIONS, INC.
    Silvers Entertainment Group                04/28/05        2752
    04/28/05                    Bill #royapril                   5,000.00

Citibank Checkin  Advance Against Royalty May 05                      5,000.00



2753

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

**CITIBANK, F.S.B.**
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE
ORDER OF   Silvers Entertainment Group                                        $ **1,000.00

One Thousand and 00/100************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO   Royalty/insurance advance, Apr '05

⑈002753⑈ ⑆052002166⑆   ⑈175974051⑈

ELOR PRODUCTIONS, INC.
      Silvers Entertainment Group                          04/28/05            2753
   04/28/05                        Bill #052005                              1,000.00

Citibank Checkin  Royalty/insurance advance, Apr '05                          1,000.00



2755

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE
ORDER OF___Silvers Entertainment Group_____  $ **1,000.00

One Thousand and 00/100***************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO   Royalty/insurance advance May '05

⑈002755⑈ ⑆052002166⑆ ⑈175974405⑈

---

STELOR PRODUCTIONS, INC.
    Silvers Entertainment Group              04/28/05       2755
04/28/05             Bill #042005                 1,000.00

Citibank Checkin  Royalty/insurance advance May '05           1,000.00



**Royalty Statement**
**Silvers Entertainment Group**
**January 1, 2005 – March 31, 2005**

| Transaction | Net Revenue | Royalty Rate | Royalty Amount | Pre-paid Royalty Balance |
|---|---|---|---|---|
| February advance against royalties | | | $5,000 | $5,000 |
| February advance against royalties for insurance premiums | | | $1,000 | $6,000 |
| Net revenue from licensed properties (iTunes) | $47.35 | 6% | $2.84 | $5,997.16 |
| Net revenue from derivative properties (iTunes) | $1.47 | 3% | $0.04 | $5,997.12 |
| March advance against royalties | | | $5,000 | $10,997.12 |
| March advance against royalties for insurance premiums | | | $1,000 | $11,997.12 |

# EXHIBIT "M"

IN UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

CASE NO. 05-80393-CIV-HURLEY
Magistrate Hopkins

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

## DECLARATION OF PAUL WORSHAM

I, Paul Worsham, make this Declaration based on personal knowledge.

1.  I reside in Potomac, Maryland (Montgomery County) and make this Declaration from my own personal knowledge.

2. I was introduced to Steven A. Esrig in 2001. I was asked by Esrig in the fall of 2001 to help with internet-related aspects of the Googles project, including the website Googles.com. I produced a draft plan for the "information technology" aspects of the project around that time, and it included ideas for online merchandising of products with various Googles images and logos.

3. By the middle of 2002, I had my own account with Cafepress and was experienced in setting up a Cafepress online store. CafePress.com is an online marketplace that allows sellers to independently create and sell a wide variety of products branded with the sellers name and logo through an independent online store. I told Esrig about Cafepress.com and suggested this would be a good place to market "Googles" merchandise.

1

4. In July 2002, I was assisting Esrig with graphics work relating to the Googles project. See Email dated July 30, 2002 attached as Exhibit A. At that time, a person named Salil Kumar from the company Spinning Doors was helping Esrig with the Googles web site design, hosting, and webmaster work. I did not have access to update the Googles.com website. The updates to the website were done by people that worked for Spinning Doors. Esrig told me that he had found Spinning Doors through one of the people involved with Stelor Productions.

5.    While I was working with Esrig in July, 2002, he asked me to set up an account at Cafepress.com so that Stelor could market and sell merchandise with the Googles name and logo. He directed me to work with Salil Kumar to set up a link from the Googles web site to Cafepress.com. Attached is an email exchange from July 26-27, 2002 between myself, Esrig and Salil Kumar about the Cafepress idea. Exhibit B.

6. During August 2002, the Googles-themed Cafepress shop was established. As part of the configuration of the account and the shop, I went to Esrig's house and sat with him in his home office while we worked on a Googles-themed Cafepress account using his personal computer. I helped set up the initial Cafepress account for Esrig using an email address provided at googles.com, with Esrig's approval.

7.    I spoke to Esrig often about the Cafepress project during the design phase. Attached as Exhibit C is an email dated August 1, 2002 I sent to Esrig while I worked on the Cafepress.com project.    Esrig also approved the markup amount for each item from the base price charged by Cafepress. Attached as Exhibit D is an email dated August 5, 2002 from Esrig to me asking me to call him at 301-419-6363 in response to an email I sent him on August 2, 2002 that referenced a Cafepress newsletter.

2

8. On August 7, 2002, Esrig sent me an email attaching the artwork for the Cafepress project. Exhibit E. Esrig also gave me a CD with all of the Googles artwork that I used for the Cafepress project and other activities. Esrig asked me to design a "Googles" word logo to use in addition to the artwork for the Cafepress merchandise that would be sold in the Googles store. Attached as Exhibit F is a copy of the Googles store from the Cafepress.com web site. The images and logos that appear are the ones I helped create and uploaded to Cafepress.com at Esrig's direction. Esrig approved the merchandise from Cafepress that he wanted to brand and sell with the "Googles" name and logos.

9. In September, 2002 I worked with Esrig and Salil Kumar to establish a link on the googles.com web site to the Googles-themed CafePress store. A link was established to http://www.cafeshops.com/googles (cafeshops.com is operated by CafePress.com). Attached as Exhibit G is an email exchange from September 12-13, 2002 between myself, Esrig and Salil Kumar about working on the link between googles.com and Cafeshops.com/googles.

10. In mid-September, 2002 Esrig asked me to send him the information on how to log in to the Googles store at Cafepress.com. Attached as Exhibit H is the email I sent on September 16, 2002 in response to Esrig's request. At a later date, I assisted Esrig at his home office with changing the information on the Cafepress account to his name and contact information. Esrig provided me with his personal email at Stelor Productions to enter into the Cafepress account information, along with validating the telephone number and address on the account.

11. In or around October 2002, I was in Esrig's home office for a discussion on the Googles project when we logged into the Cafepress account and viewed information on a large order for Googles merchandise. We discussed that Cafepress indicated that there was a problem with the order. I assisted Esrig in investigating the problem. The sale did not go through because Cafepress

3

could not obtain credit card authorization for the buyer's credit card, and that the order would not be shipped.

12. After the October-November 2002 timeframe, I did not log into or assist with the Googles store Cafepress account.

**I HEREBY DECLARE** under penalty of perjury that I have read the foregoing Declaration and that the facts stated in it are true, and that all the emails attached are true and correct copies.

Dated this 15th day of June, 2005.

_Paul Worsham_
Paul Worsham

4

# Exhibit  A

| | |
|---|---|
| **From:** | "Steven Esrig" <egginternational@hotmail.com> |
| **To:** | <paul@zz8.com> |
| **Date:** | 7/30/2002 10:13:35 PM |
| **Subject:** | Re: Revised Googles Artwork files |

>From: "Paul Worsham" <paul@zz8.com>
>To: <egginternational@hotmail.com>
>Subject: Revised Googles Artwork files
>Date: Mon, 29 Jul 2002 23:51:42 -0400
>
>Steve,
>
>I have edited one of the images and put it online in this folder, as we
>discussed last night:
>
>   http://googlesmail.com/steve/  (you should see at least the file named:
>GOO_01_PWc.jpg )
>
>Note that the original image was a 1 megabyte file, and this image was
>reduced to a lower resolution for faster uploading/downloading.  But I will
>work a higher resolution for the next images.
>
>Let me know what you think of the erasing/replacing work on the image.
>
>
>Paul
>

I tried calling on both lines just now-they worked fine!-but the shoes and
stickers arena tad too small-can they be made bigger in proportion?
Call soon!

_____

Chat with friends online, try MSN Messenger: http://messenger.msn.com

# Exhibit  B

**From:**     "Paul  Worsham" <paul@zz8.com>
**To:**        "Salil Kumar" <salil@s-d.biz>, "Paul Worsham" <paul@zz8.com>, "Steven Esrig"
<egginternational@hotmail.com>
**Date:**     7/27/2002 10:04:53 AM
**Subject:**  RE: requirements specification for Googles.com - first draft

All - my message is being rejected due to some issue with Salil's address.
I am trying again, but may have to remove his address in order to get it
sent.  Below is what I wrote yesterday:

--------------

Hello Salil,

Thank you for the draft document.  I have reviewed it, and will re-review it
tomorrow.  Steve and I will also need to have some discussions on the
overall Googles online approach (vision, strategy, goals, and timelines).

You should try the Cafe Press website again - it was up when I visited it
just now: http://www.cafepress.com


Paul


-----Original Message-----
From: Salil Kumar [mailto:salil@s-d.biz]
Sent: Friday, July 26, 2002 5:55 AM
To: Paul Worsham; Steven Esrig
Cc: Arun
Subject: requirements specification for Googles.com - first draft


Hi Paul, Steve:

Attached is a first draft of the requirements specification document for
redesign of Googles.com. This document strives to formalize the process of
defining the requirements and is based on various emails and discussions
that we have had recently. Our intention is to work with you to agree upon
the accurate set of functionality needed for googles.com as soon as
possible.


REGARDING TIME AND COST:

Please note that the time and cost sections in this document are initial
estimates. I would like to emphasize that we are flexible and committed to
coming up with a mutually agreeable time frame and cost for the entire
project.

I will try to call you regarding this Friday (26th) morning (your early
afternoon) - hopefully you will have a chance to look through this before
that.

Thanks

Salil

(SpinningDoors)


CC:          "Arun" <arun@s-d.biz>

# Exhibit  C

**From:**    "Paul Worsham" <paul@FreedomStudio.com>
**To:**      <egginternational@hotmail.com>
**Date:**    8/1/2002 6:06 PM
**Subject:** FW: CafePress.com:  Back to School Products Are HERE!

Steve - I will probably order myself a "Googles" bag once I get the stuff online in a test "CafePress" shop.  I'll also give you the link once I do that, probably by Saturday.  You can see from the information below that they have a focus on the same vertical (Kids) as Googles.com!

Paul.

-----Original Message-----
**From:** CafePress.com [mailto:reply@cafepress.com]
**Sent:** Thursday, August 01, 2002 3:24 PM
**To:** admin@usa999.com
**Subject:** CafePress.com: Back to School Products Are HERE!



**August 2002**

## In This Issue

**Back to School Products**
**Premium Shops**
**Shipping Promotion**

**What's New**

Check out the upcoming store promotions in the Toolbox of your member account. Promotions until the end of September have been announced.

**August Contest Winner**

Congratulations Cat! Cat Hope is our Stamp of the Month Contest winner for August.



If you're interested in submitting your entry for our Stamp of the Month

### Back to School Products

Our new Back to School products are here! The new products are:

- Backpack (black)
- Metro Bag (black)
- Unistrap Bag (black)
- Briefcase (black)
- Yellow Messenger Bag
- Ash Grey Hoodie
- Black Cotton Cap
- Retro Lunch Box
  *Coming later this month!*

*The black cotton caps and black bags are customized using a 4" x 2" patch with an embroidered edge.*

Check out these must-haves for Back to School by visiting the Product Center at: http://www.cafepress.com/cp/info/products

Get ready for Back to School and add these new products to your store TODAY!

### Introducing CafePress.com Premium Shops

CafePress.com Premium Shops allow you to take your online store to the next level with complete store customization options. Offer multiple page stores with product categories and subcategories. Plus, add as many products to your store as you like.

Contest, click here to learn how.

**Member Testimonial**

*"Let me thank you for even existing! The past few days I've been working a bit on setting up stores with you, and enjoying it! This is a great service you offer."*

Kurt T. Francis, BangkokAtoZ

**CafePress.com Forum**

 Have ideas for new products? Need help promoting your store? Checkout the CafePress.com Forum and discuss with CP staff and members ways to grow your online store.

Join in the Discussions

Try out the new Premium Shops service for FREE! For a limited time, all CafePress.com members receive a 15-day FREE trial of the Premium Shops service. Just login to your account and add a new store. When adding a new store, be sure to choose the Premium Store feature. After your trial, Premium Shops are as low as $5 per month.

See how other members are using the Premium Shops Service:
http://www.cafeshops.com/teamkamm
http://www.cafeshops.com/usaaf
http://www.cafeshops.com/rudy_park
http://www.cafeshops.com/pawshopzone

For more information on Premium Shops, visit
http://www.cafepress.com/cp/info/sell/premium.aspx

## Shipping Promotion

CafePress.com is having a Back to School shipping promotion! Until August 25, your customers receive FREE shipping when they spend $50 or more. For more details, check out the promotional banner on your store.

Let your customers know about the FREE shipping promotion with banners and buttons! Get your promotional banners and buttons at:
http://www.cafepress.com/cp/members/toolbox/banners_pr.aspx

If you wish to cancel your subscription to this newsletter, click here.
© Copyright 1999-2002 CafePress.com. All rights reserved. Privacy

# Exhibit  D

| | |
|---|---|
| **From:** | "Steven Esrig" <egginternational@hotmail.com> |
| **To:** | <paul@zz8.com> |
| **Date:** | 8/5/2002 12:51:19 PM |
| **Subject:** | Re: Your voicemails / domain name ALERT |

>From: "Paul Worsham" <paul@zz8.com>
>To: <egginternational@hotmail.com>
>Subject: Your voicemails / domain name ALERT
>Date: Fri, 2 Aug 2002 00:51:36 -0400
>
>CafeNewsletter :: August 200212:00 am
>
>Steve,
>
>Just retrieved your voicemail from earlier tonight.  Did you know that
>Googles.NET will expire in 1 week (currently registered to Aurora)?
>Googles.org was registered by someone in Michigan on May 9, 2002.
>
>If you want Googles.net, you can either pay up for another year and get it
>transferred, or use the SnapNames.com service ($79) to lock it now.  They
>will pick up the name the minute it expires and register it in your name.
>I
>would do that - my brother used SnapNames to get JunkFax.com for his law
>practice (anti-junk faxing cases), and it worked.  You would not get
>Googles.net on August 9 - it would happen whenever the name gets deleted.
>SnapNames only takes one "reservation" per domain name, so if you pay $79
>then they will not take another person's $79 for the same name.
>
>- - - - Other - - - -
>
>I wanted to give a little more detail about how a "Googles ISP" would work.
>It could be part of the subscription-type of services that you are
>interested in - and I have ideas that would work for Googles.  Here are
>some
>basic workable scenarios:
>
>1.) Googles.Net Express - $19.99 per month, includes nationwide filtered
>kid-friendly internet dialup access, and 5 email addresses
>2.) Googles.Net Basic Club - $21.99 per month, includes internet access, 5
>email accounts, and members-only newsletter
>3.) Googles.Net Gold Club - $29.99 per month - Same as Googles.Net club,
>plus get a CD when you sign up, and a plush toy every month for first 3
>months.  After that, the price drops down to $21.99 per month (Basic Club
>price).  But Gold Club members would get first access to new (and help
>test)
>Googles Games and other website features.
>4.) Google.Net Full Access - $17.99 per month, includes nationwide internet
>dialup access, 5 emails, no filtering
>
>So, let me know if you want to move on setting up a pilot Googles ISP
>service using Googlesmail.com, or a new domain such as 2Goo.com or
>Googles2.com.  It would cost $10 to add Googles2.com to have nationwide
>dialup access.  The basic service wholesale cost is about $8.50 per month
>including the credit card processing fee, so charging $19.99 or a similar
>AOL-and-MSN-range price would allow for a good margin.  Filtering (or
>kid-friendly filtering) costs an additional $3.00 per month, and can be

>automatically bundled in if we don't want to offer anyone non-filtered
>service.
>
>The main costs to run the Googles2 service above the $8.50 per month are
>the
>people time to manage the accounts, and after 2 years of running an ISP it
>can be profitable with that type of margin per account.  With 1,000 members
>the gross before expenses would be $10,000 per month.
>
>- - - -
>
>Finally, checking ATT.COM just now for toll-free numbers, I did not find
>any
>with the full "GOOGLES" spelled out, as in 1-888-GOOGLES.  I did find
>866-Google1 and 866-Google0 (ends in zero).  Numbers such as 1-8**-GooKids
>or 1-8**-Gootime were not available.
>
>
>Paul


Please call as soon as you receive this!-I just returned and need to speak
with you!!!
Page 301-419-6363

_____

Chat with friends online, try MSN Messenger: http://messenger.msn.com

# Exhibit E

**From:**      "Steven Esrig" <egginternational@hotmail.com>
**To:**        <paul@zz8.com>
**Date:**      8/7/2002 12:55:51 AM
**Subject:**   art

rrrrr

_____

Chat with friends online, try MSN Messenger: http://messenger.msn.com

GAIL A MCQUILKIN   Cover.jpeg



Exhibit  F

**cafepress**.com

Cart & | ...out | Help | Order Status | Shop Home

Back to Googles.com.



**Hey Kids! Hey Adults! Hey Everyone!!** Get your Googles merchandise here at our new store, with all-new merchandise. Also, use our feedback form to email us product suggestions. We know you will enjoy getting these products for yourself and your favorite people!



Googles GooShip Snap Bib
$6.99



Googles Infant/Toddler T-Shirt
$9.99



Googles (word) Black Cap
$15.99



Googles (word) Wall Clock
$11.99



Googles (TM) T-Shirt - White
$15.99



Googles (word) White T-Shirt
$15.99







Googles (word) Golf
Shirt
$19.99

Googles Baseball Jersey
$17.99

Googles (word) Baseball
Jersey
$18.99



Googles (TM)
Sweatshirt
$24.99

Googles (TM) Mug
$13.99

Googles (word) Mug
$12.99

Mousepad
$10.99

Googles (word)
Mousepad
$12.99

(C) 2002 Googles.com from Stelor Productions, Inc.

This shop is powered by CafePress.com.
Copyright © 1999-2005 CafePress.com. All rights reserved.
Privacy Policy | Trademark & Copyright Information

# Exhibit  G

| From: | "Salil Kumar" <salil@s-d.biz> |
|---|---|
| To: | "Steven Esrig" <sesrig@stelorproductions.com>, "Paul Worsham" <paul@ujazz.com> |
| Date: | 9/13/2002 6:00:01 PM |
| Subject: | RE: Googles.com work |

Hi Paul/Steve:

As you may have noticed, the shopping links have been updated.

I would like to schedule some time with you tomorrow (Sat.) morning for a
phone conference. My colleague Alka Soni, who is managing the overall design
efforts would like to go over the theme for each site. Since Alka is based
in Germany, I think the best time for all of us is probably after 9am
pacific time. Please let me know if you can make it tomorrow - if not, we
can try to find another time good for all of us.

Thanks

Salil
-----Original Message-----
From: Paul Worsham [mailto:paul@ujazz.com]
Sent: Thursday, September 12, 2002 8:01 PM
To: arun@s-d.biz; Steven Esrig
Cc: Salil Kumar
Subject: Googles.com work


Salil/Arun,

1) It looks like the shops link for the CafePress site is not working (it
was up this afternoon).  I think that is due to their moving to a different
domain for hosting (they are not "dot gone", as they have a real business
model... and I like the shirt they sent to me yesterday!).

Please change the shopping links that we just added on Googles.com to go to
this link:

  http://www.cafeshops.com/googles

This is a priority, since we'd really like to see if people buy the designs
(I will be adding more as fast as I can).


2) Also, it is a GO! with Steve on your awesome designs... and the winner
is:

  http://s-d.biz/googles/goog2.0a1/design/googlesclient/home3.htm

  (Note: GewRue's eyes need to move differently - he is the gray one)

However, we would like to listen to the theme and idea behind each of the
sites, as envisioned by your designer(s).  I liked the little icons above
the links on design #1.

3) Note that one of the most common things that people do when the get to a
site is "search", so we will need that functionality and space on the home

page once there is enough content to search.  The search function should be easy to find - probably on top.


Paul




**CC:**         "Alka Soni" <alka@s-d.biz>, "Arun" <arun@s-d.biz>

# Exhibit  H

**From:** "Paul Worsham" <paul@ujazz.com>
**To:** "Steve Esrig" <sesrig@stelorproductions.com>
**Date:** 9/16/2002 7:54:11 PM
**Subject:** CafePress.com account info

Steve,

The CafePress.com store can be logged in at this web address:

http://www.cafepress.com

and the account info is:

Account Name/
Email Address: pworsham@googles.com
Password: arun


As of 7:00pm today, there have not been any sales.


Paul

# EXHIBIT "N"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

        Plaintiff,                          Case No. 05-80393-CIV-HURLEY

v.

STEVEN A. SILVERS, a Florida resident,

        Defendant.

_____

## DECLARATION OF RUSSELL TEWKSBURY

    I, Russell Tewksbury, declare under penalty of perjury that the following is based upon my personal knowledge and is true and correct:

    1.    I am an Internet Strategist and technology consultant, writer and lecturer with more than a decade of related experience. I have lectured about Internet technologies at key industry conferences in Europe, the Caribbean and throughout North America. My writings have been published in technology & communications journals/publications, distributed in more than one hundred countries. I am listed in a number of Marquis' Who's Who publications, including, but not limited to: Who's Who in the World; Who's Who in America and Who's Who in the Media and Communications.

    2.    I personally know Steven A. Silvers, and via public Whois look-up, have reviewed the domain name registration information for the googles.com domain name. I have also reviewed limited information (IP address and server data) pertaining to the Gootopia Website operated by Stelor Productions.

    3.    I submit this declaration in support of Steven A. Silvers' Motion to Strike Steven A. Esrig's Declaration, and Objection to Magistrate's Report and Recommendation.

1

4.      It is my understanding Stelor licensed from Silvers the right to use certain trademarks and characters called the "Googles." It is my understanding Stelor created and developed a Website that Stelor refers to as the "Gootopia Website." It is my understanding Stelor incorporated the licensed property in the content of the Gootopia Website.

5.      It is my understanding Stelor is the owner, creator and operator of the Gootopia Website. According to public Whois information, it appears Stelor Productions, Inc. entered into a Web hosting agreement with Verio Inc. for a Virtual Private Server (VPS) shared-hosting account.

6.      It is my understanding Stelor Productions, Inc. Gootopia Website is hosted on a Verio Virtual Private Server shared-hosting account. The current name servers for the Gootopia Website are: *ns1.secure.net* and *ns2.secure.net*. Verio, Inc, assigned Stelor an IP address of 128.121.122.247 for Stelor's VPS account where the Gootopia Website is currently hosted (ARIN & RIPE IP search). The Gootopia Website server type is Apache/ 1.3.33 (Unix) mod_jk/1.2.5 PHP/4.3.11 (Name Intelligence, Inc. Whois database Look-Up for googles.com).

7.      When Stelor created their Verio Web hosting account, Stelor was given a user-login and password for their VPS server and Verio's customer administrative backroom and product control panel. The user-login and password to Stelor's Verio VPS server provides secure access for Stelor to their Gootopia Website and enables Stelor to control the content of their Website. Unless Stelor gave their Verio VPS user-login and password information to a third party, only they and Verio possess password-access to the VPS server where Stelor's Gootopia website is hosted. Stated another way, unless Stelor has given their user-login and password to Silvers, he does not have administrative access the server that hosts the Gootopia Website, nor does he have any control over the content on the Gootopia Website.

8.      Any person wanting to view the Gootopia Website on the Internet can do so by

2

simply entering the numeric IP address 128.121.122.247; the user will be connected to the Gootopia Website.

9.      A Whois search reveals Silvers Ent. Group, Inc. listed as the registrant for the Googles.com domain name.  As the lawful registrant for the Googles.com domain name, only Silvers should direct the DNS records that associate the Googles.com domain name with any particular IP address or name server(s).

10.     Up until recently, Silvers maintained the DNS records for the Googles.com domain name to point to Verio's name servers (ns1.secure.net and ns2.secure.net), which in turn directed website visitors to the IP address associated with Stelor's Gootopia Website.  Simply stated, when a person typed in the domain name googles.com, they were connected to Stelor's Gootopia Website.

11.     It is my understanding when Silvers terminated the license agreement with Stelor, he logged into his Godaddy.com domain name account and directed the DNS records of the Googles.com domain name to point to a different IP address (Web server) hosting a Website he controls.

12.     Esrig's testified that because Silver directed the DNS records away from the Gootopia Website "Silvers shut down the (Gootopia) Website." It is my understanding Silvers was not a party to the Web hosting agreement between Stelor and Verio, Inc.  That being the case, only Stelor and Verio had access to the (password protected) Gootopia Website, which Stelor created.  Only Verio or Stelor has the ability to shut down the Gootopia Website.  Access to the VPS server that hosts the Gootopia Website is an issue between Stelor and Verio, Inc. Unless Verio suspended Stelor's VPS account, the Gootopia Website remained accessible via IP address once Silvers pointed the DNS for his googles.com domain name to a different IP address (Web server) hosting a Website he controls.

3

13.     Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Stelor no longer has access to the (Gootopia) Website." As previously stated, Stelor's access to the Gootopia Website is an issue between Stelor and Verio. Even if Verio suspended Stelor's VPS account –denying Stelor access to their VPS server, Silvers has no authority or ability to direct Verio to do anything relating to Stelor's account or access thereto. In addition, Stelor should have access to their Gootopia Website content through back-up copies. It is normal and customary for a Website developer to have back-up copies of their Website. Finally, Stelor has the option to contract with another Web hosting company (other than Verio) to host their Gootopia Website.

14.     Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Silvers redirected the Website." This statement is incorrect. Silvers redirected the DNS for the Googles.com domain name to point to an IP address (Web server) under his control. Silver's action does not prohibit or restrict Stelor's ability to access, modify, alter or delete any content on their Gootopia Website.

15.     Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Stelor can't operate the (Gootopia) Website without the googles.com domain name." That is incorrect. Stelor does not *need* the googles.com domain name to operate the Gootopia Website. The Gootopia Website exists completely independent of any domain name. If, by the word "operate," Esrig means to imply people can't access the Gootopia Website via the Internet, that is incorrect. All that his needed for the Gootopia Website to be accessible via the Internet, is a Web hosting account (Web server) and a publicly accessible IP address. If the preference is to have a domain name associated with the Gootopia Website, Stelor can register a multitude of other domain names and have those point to the Gootopia Website.

16.     Esrig testified that because Silver directed the DNS records away from the

4

Gootopia Website "Silvers took the Website (Gootopia) content." That is incorrect. Unless Stelor gave Silvers password access to their Verio VPS server where their Gootopia Website was hosted, Silvers is not able to remove or in any other way restrict Stelor's access to their Gootopia Website content. Only Stelor has that control.

17.    Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Stelor can't demonstrate the site to anyone." That is incorrect. Stelor has multiple options to demonstrate the Gootopia Website. It can do so over the Internet using an IP address, or any other domain name it chooses. Or, it can demonstrate off-line on a local computer or from a DVD or CD-Rom.

Dated:  June 17, 2005

Russell Tewksbury

254545.1

# EXHIBIT "O"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a           CASE NO. 05-80393-CIV-HURLEY
Delaware corporation, f/k/a STELOR      Magistrate Hopkins
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

## DECLARATION OF STEVEN A. SILVERS

I, Steven Silvers, make this Declaration based on personal knowledge.

1.     I reside in Palm Beach County, and have a business address at 8983 Okeechobee

Blvd., Suite 202, PMB 203, West Palm Beach, FL 33411.

2.     Throughout the 1980s, I developed an animated character concept designed to appeal

to children.  In 1996, I published the book "Googles and the Planet of Goo," which I authored.  I

wrote the book while incarcerated for a conviction on federal charges as a way to stay connected to

my children.  Exhibit "A" shows the front and back covers, and some pages from the book.

3.  The book features a family of Gootians, alien creatures from another planet who are

forced to come to earth.  The characters are cute, lovable and smart; they use a unique vocabulary

and espouse maxims for life on earth (or any other planet), all designed to further the "edutainment"

and development of young children.  Our motto since early on has been "Teaching children of today,

visions of tomorrow."

4.      I have marketed and promoted the characters through a variety of mediums.  The characters staged live appearances and musical shows; plush toys were developed as well as stickers for school notebooks and the like.

5.      In 1997, I registered the domain name Googles.com to promote the characters and related products on the internet, and operated a website for that purpose.  The same year I obtained a federal trademark registration for "Googles" for use with children books.  I have subsequently registered hundreds of domain names and trademarks for the characters and related "Goo" terms, for use with children's education and entertainment, and related products.

6.      I have also created, and overseen the creation of, numerous songs featuring the characters and Googles themes.  I own numerous copyrights for Googles related drawings and literary works.  I also own design patents for a "Googles" shoe, the GooShoe, and alien figurines, The Googles.

7.      In May 2002, after my then licensee experienced unrelated problems, I licensed the intellectual property described above ("Googles IP") to Stelor Productions, Inc.  (Exhibit "B").  I have not been advised of Stelor Productions, Inc.'s assignment of its rights under the License Agreement to Stelor Productions, L.L.C. and have not consented to such a transfer.  I first learned that Stelor Productions, L.L.C. claims the status of licensee when served with this lawsuit.  Both Stelor entities are referred to herein as "Stelor."

8.      In May, 2002, as additional consideration for the License Agreement, I entered into a Letter Agreement with Stelor for consulting services.  The Letter Agreement (Exhibit "C") specifically provides that, if Stelor fails to compensate me for consulting services as required, I may terminate the License Agreement; Exhibit "C," ¶ 1(c).

9.      Under the Letter Agreement, ¶1(b), Stelor is required to provide a written agreement granting me 1,000 options for Stelor stock, with the number of options to increase if Stelor's option plan changes.  Stelor has not provided this agreement to me.  In fact, Stelor has even refused to provide me a copy of its then existing option plan, or any option plan, which is necessary to determine if I am entitled to more options.

10.     Under the Letter Agreement, Stelor is also required to compensate me by paying my health insurance premiums.  As of the date of the Settlement Agreement discussed below, Stelor had failed to do so, paying only a portion of what it owed.

11.     Under the Letter Agreement, Stelor is required to reimburse my expenses, including domain name registration fees and consulting related travel.  As of the date of the Settlement Agreement discussed below, Stelor had failed to do this.

12.     Under the License Agreement, Stelor is allowed to market and sell products and services utilizing the Googles IP ("Licensed Products").  Related requirements include: providing samples of Licensed Products for my inspection and maintaining "high quality"; paying royalties for such sales; providing detailed royalty statements each quarter; and permitting me to audit Stelor's books and records.  Stelor is also required to identify and provide me with a quarterly list of all sublicenses it grants regarding Licensed Products.

13.     Stelor markets and sells a variety of Licensed Products.  Stelor has since at least 2004 been marketing Googles-based music through Itunes, by which a customer pays to download songs contained in the two Googles compact discs, "The Googles From Goo/One GooWorld" and "Un GooMunndo/The Googles From Goo," (total of 30 songs).  For example, attached as Exhibit "D" is a receipt an associate provided to me reflecting the purchase and download of the entire "One

3

GooWorld" compact disc in August, 2004. Stelor never provided a royalty statement reflecting any sales for 2004 or paid any royalties for such sales. In fact, Stelor has consistently maintained that there have been no sales of Licensed Products.

14.     Stelor is also merchandising various Googles-related items, such as clothing, coffee mugs, hats, mouse pads, etc. through an internet store called CafePress.com. I learned of this in 2004. Stelor has never provided a royalty statement reflecting any sales of this Licensed Product or pay any royalties for such sales. Stelor never provided samples of this merchandise. However, I recently inspected the Googles merchandise sold on CafePress.com. Incredibly, Stelor is placing a notice on the merchandise where Stelor claims it is the copyright owner of my characters and drawings, for which I hold the copyrights.

15.     Most significantly, Stelor has used the Googles IP to attract users to its websites, and developed a valuable database of customers and potential customers for the Licensed Products. None of this commercial activity has been reflected in any royalty statements, and I have received no royalties for this. Because I have been denied an audit, I cannot determine whether Stelor, as is typical in the internet industry, monetizes the traffic channeled through the Googles IP domain names, and the information derived from such traffic.

16.     In connection with the Licensed Products described above, as of the date of the Settlement Agreement, Stelor had not:

        a.     Provided any detailed royalty statements, as specified in the License Agreement. In fact, Stelor has not provided any statements at all for the 3rd and 4th quarters of 2004; copies of Stelor's non-royalty statements which do not comply with the License Agreement, III(C), are attached as Exhibit "E."

4

b.      Paid any royalties;

c.      Provided me with all samples of the Licensed Product; and

d.      Provided any information regarding sublicenses for the Licensed Product described above. (If Stelor failed to obtain such sublicenses while allowing others to market and sell Licensed Product, then it is failing to protect the Googles IP as required by the License Agreement).

17.     After learning, on my own, of Stelor's commercial efforts, I requested an audit. Correspondence reflecting my initial request, on November 5, 2004, and the repeated requests by my attorneys, is attached as Exhibit "F." Stelor initially refused to allow an audit, and then admitted I was entitled to the audit but objected to my choice of accountant and imposed a series of other conditions. As of today, six months after I requested it, Stelor claims it will permit an audit but still has refused to provide a date for the audit.

18.     Under the License Agreement, Stelor is required to protect the Googles IP. In this regard, Stelor failed to renew several of the licensed domain name registrations, allowing others to obtain registration rights for these domain names. And, Stelor failed to oppose other partys' federal registration of the "Googles" mark for a variety of goods.

19.     Stelor is required under the License Agreement to obtain product liability insurance and include me as a named insured. It did not do so.

20.     As a result of Stelor's failure to abide by the License Agreement and the Letter Agreement's compensation requirements, I gave notice of Stelor's default, which allows Stelor to cure prior to actual termination of the License Agreement. A copy of my attorney's letter dated November 12, 2004 is attached as Exhibit "G."

5

21.      Stelor had a 60-day period to cure its defaults. It failed to do so. Accordingly, I terminated the License Agreement on January 13, 2005. (Exhibit "H").

22.      Prior to the first termination , Stelor sued me. The suit was frivolous. However, when Stelor promised to cure its defaults, and pay advances against future royalties, we settled the case. The Settlement Agreement (filed under seal) reflects Stelor's promise to cure many of the defaults. In return, I withdrew the termination. I did not agree to, and did not withdraw the notice of default, because Stelor had yet to cure the defaults.

23.      The Settlement Agreement is dated January 28, 2005. Stelor did cure some defaults; it paid the expenses and insurance premiums it owed under the Letter Agreement, although it delayed doing so. It cleaned up some of the registrations for the Googles IP. However, as of April 27, 2005, Stelor had still failed to:

      a.      Pay any royalties;

      b.      Provide proper royalty statements, or any statements for the last two quarters of 2004 and the first quarter of 2005;

      c.      Provide a date for me to audit Stelor's books and records despite my attorneys' repeated requests, spanning six months (Exhibit "F");

      d.      Obtain insurance, naming me as an insured;

      e.      Provide an agreement for my stock options, or provide Stelors' stock option plan;

      f.      Pay the health insurance premium compensation of the settlement (a royalty advance) due on April 1, 2005. Stelor had also failed to timely pay for the past due health insurance

compensation, far exceeding the time requirements of the Settlement Agreement before finally paying;

g.      Provide samples of any Licensed Product (other than the two Googles' music compact discs, provided after the Settlement Agreement), in violation of the License Agreement.

h.      Provide copies of any pleadings or materials filed with or received from the USPTO, as required by the Settlement Agreement.

24.    By April 27, 2005, I concluded that Stelor's failure to respect its obligations was no longer tolerable. Stelor has repeatedly breached the License Agreement, Letter Agreement and now the Settlement Agreement. I have been denied an audit for almost six (6) months. I see Licensed Product on the market, and am aware of sales yet Stelor pays no royalties, and provides non-conforming royalty statements. I have other opportunities to exploit the Googles IP, and expect to generate substantial income immediately. I therefore terminated the License Agreement on April 27, 2005. (Exhibit "I").

25.    After the License Agreement was terminated, Stelor belatedly tried to cure its numerous defaults. (Exhibit "J"). It provided the first ever royalty statement reflecting income (although it was not certified as required, and like past statements is not in conformity with the License Agreement). It claimed to have sent a letter (not received by me) agreeing in principle to a grant of options, but Stelor has never provided a contract or a written plan. It offered to produce samples of the Licensed Product for the first time. It belatedly sent copies of checks (not the actual checks) for advance royalties and overdue health insurance premiums. It obtained insurance after the termination. (Exhibit "K"). This is all too little, too late. I want to divorce Stelor, and I am entitled to do so under the agreements.

7

**I HEREBY DECLARE** under penalty of perjury that I have read the foregoing Declaration and that the facts stated in it are true.

Dated: May 20, 2005

_____
Steven A. Silvers

3339/101/253342.1

# EXHIBIT "A"





# GOOGLES

# AND

# THE

# PLANET OF GOO

## VOLUME I

### by:  Steven A. Silvers

---

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey  07083**

Printed in the United States
of America by:

**Morris Publishing**
**3212 E. Highway 30**
**P.O. Box 2110**
**Kearney, Nebraska  68847**

**First Printing:  May, 1996**

ISBN: 1-57502-184-6

Library of Congress Catalog Card No.: 96-94384

The Googles logo,   children's books, and illustrations are the products and trademark of:

**The Googles Children's Workshop, Inc.**

An affiliate of:

**SAS Entertainment Group.**

Produced, published, and distributed by:

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey 07083**
**(908) 688-3995**

Copyright 1995 by:  **Steven A. Silvers**

Written by:  **Steven A. Silvers**

Cover design & layout
by:  **Kenneth R. Rayburn**

Cover artwork & solar system
illustration by:  **Hendrick A. Gil**

Edited by:  **Cindy Greenfield**

**ALL RIGHTS RESERVED.**  No portion of this book may be used or reproduced in any manner without the expressed written permission from the publisher.  For further information, kindly forward your inquiry to the address noted above.

# DEDICATION

This children's book and the entire Googles edutainment concept is dedicated to my two wonderful children.

**Renee** is the beautiful daughter I've had the wonderful pleasure and enjoyable experience of having raised into womanhood as a single parent.

While **Joshua**, on the other hand, is the son I've always yearned for and truly hope I will one day get to know.

This work is dedicated to the both of you.

Love, Dad!

# SPECIAL THANKS TO:

My dad

**Michael L. Silvers**

and

my dearest friend,

**Marsha Perry Genaro,**

for

without their efforts, dedication, and perserverance this wonderful children's edutainment book would not have been published.

# AUTHOR'S NOTE

## SOMETHING NEW & REFRESHING! SOMETHING EXCITING & EDUTAINING!

That is what parents and children are saying about our innovative children's edutainment reading book.

The Googles concept was created as a means to provide children with a fun-filled method of expanding their vocabulary.

In this first of several Googles adventures, your child will learn and recognize many new words.

Along with vocabulary enrichment your child will also learn, through application of the imagination, identifiable lessons in conceptual awareness and social interaction.

To further assist your child in learning new words, a dictionary appendix is conveniently provided at the end of each

book which corresponds to the *italicized* words in the original text. This method of learning prevents the child from the tedious task of having to refer to a regular dictionary to find the meaning of the new words he/she is about to learn.

A phonetic pronunciation of each *italicized* word is also provided.

We sincerely hope your child will enjoy reading all about the adventures of Googles, Giggles, and Goggles from the imaginary planet of Goo.

We welcome your comments and/or suggestions about our innovative children's edutainment reading and vocabulary enrichment learning technique.

Kindly direct your correspondence to:

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey  07083**

# CHAPTER 1

---

## Googles Comes To Earth

Once upon a *millennium* ago there was a planet called Goo.  On this planet lived three little creatures who would one day visit Earth where they would learn and play with the many children there.

Before we begin our journey to this far away planet and the story of how the Gootians: Googles, Giggles, and Goggles came to visit Earth, we must first learn something about the solar system as it

Steven A. Silvers                                    2

exists today.

The universe is composed of all things that exist in the world, including the sun, moons, stars and planets contained in it.

There are nine planets in our solar system: Mercury, Venus, Earth, Mars, Jupiter, Saturn, Uranus, Neptune, Pluto, and the (imaginary) planet of Goo.

To further understand the *composition* of the solar system and how far away your new friend, Googles, has traveled to visit us, please refer to the *illustration* provided on the last page of this book.





A CHILDREN'S EDUTAINMENT BOOK

GOOGLES™

# EXHIBIT "B"

# LICENSE, DISTRIBUTION
## AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

2

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

(iv)        the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v)        except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.   LICENSEE represents and warrants that:

(i)        the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)        the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii)        it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.   Disclaimer of Warranties.  EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.   LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI.  NOTICES, QUALITY CONTROL, AND SAMPLES

A.   The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.   The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.   Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII.  NOTICES AND PAYMENT

A.   Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.   Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

4

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.     LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.     LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.     LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.     LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.     Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A .     Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B.    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X.  POST TERMINATION RIGHTS

A.    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI.  INFRINGEMENTS

A.    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII.  INDEMNITY

A.    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.

B.     LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.     With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.     IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.     EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV.  FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and executed between the above mentioned parties

8



IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                    STELOR PRODUCTIONS, INC.

Steve A. Silvers                                     By: _____
Title: Owner/LICENSOR                                Printed Name: _Steven A. Esrib_
Dated: _5/09/02_                                     Title: _President_
                                                     Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the

same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*Succession*
*Rights of Survivor*

5/9/02

In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

5/09/02          5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

# EXHIBIT "C"

# Exhibit B

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.  <u>Engagement of Consultant.</u>

a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    <u>Relationship of Parties.</u> The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    <u>Duties of Consultant.</u>   Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday.  Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and /or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    <u>Duties of Company.</u>

a.     Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.     Term and Termination.

a.     Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.     Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.     Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.     Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.     Proprietary Information; Proprietary Rights.

a.     In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

b.    The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.    The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.    Limitations of Liability. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.    Miscellaneous.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

_____    Date 5/09/02
STEVEN A. SILVERS

Stelor Productions, Inc.

By_____    Date 5/9/02
Name: Steven A. Esrig    Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

# EXHIBIT "D"



# COMPOSITE EXHIBIT "E"

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 6/1/02 to 6/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/2/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/02 to 9/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/18/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 1/1/03 to 3/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6% | 0 |
| Feb-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6% | 0 |
| Mar-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____  Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 10/1/02 to 12/31/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6% | 0 |
| Nov-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6% | 0 |
| Dec-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____  Date 11/13/03

FROM : SILVERS ENT                    FAX NO. : 5617849959                    May. 19 2005 12:16PM   P4

## Steve Silver's Royalty Schedule

**Country:** All Countries
**Period:** 7/1/03 to 9/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| **Total** | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature  Date 11/2/03

## Steve Silver's Royalty Schedule

**Country:** All Countries
**Period:** 4/1/03 to 6/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| May-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Jun-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| **Total** | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature  Date 11/2/03

**Steve Silver's Royalty Schedule**

Country: All Countries
Period: 1/1/04 to 3/31/04

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|-------|-------------|------|--------------|------------|------------------|----------------------------|----------------------------|-----------|-------------------------|------------|---------|------------------|----------------|--------------|-----------------|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature: _____   Date: 4/28/04

---

**Steve Silver's Royalty Schedule**

Country: All Countries
Period: 10/1/03 to 12/31/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|-------|-------------|------|--------------|------------|------------------|----------------------------|----------------------------|-----------|-------------------------|------------|---------|------------------|----------------|--------------|-----------------|
| Oct-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature: _____   Date: 12-23-03

FROM : SILVERS ENT

FAX NO. : 5617849959

May. 19 2005 12:17PM P6

**Steve Silver's Royalty Schedule**

Country: All Countries

Period: 4/1/04 to 6/30/04

| Model | Description | | | | | | | | | | | | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total: | | | | | | | | | | | | | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _[signature]_

Date 7-1-04

Baxter Proprietary and Confidential

# EXHIBIT "F"

Ozyak Tropin & Throckmorton, P

2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Overnight Delivery
Federal Express Tracking No. 7903-2948-5586

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:   Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products. In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.   All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent, that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.   All sublicenses;

3.   All copyright and trademark registration applications and registrations;

4.   All domain name registrations;

5.   All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.   Proof of insurance as required under Paragraph XIV.

Page 2

In addition, Mr. Silvers is requesting that a number of samples of all Licensed Products manufactured, or in production be produced during this audit.

You, or your counsel, should schedule and coordinate the audit through us by providing us with a date and location.

Very truly yours,

Gail A. McQuilkin

c:     Steven Silvers
       Kenneth R. Hartmann, Esq.

/245617.1

From:       GAIL A MCQUILKIN
To:         kkaplan@bwskb.com
Date:       3/2/2005 4:42:32 PM
Subject:    Googles

Kevin -

Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is **not** to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to **send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.** This really needs to get done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

<div align="center">REDACTED</div>

**REDACTED**

Talk to you soon.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**From:**      "Kevin C. Kaplan" <kkaplan@bwskb.com>
**To:**        <GAM@kttlaw.com>
**Date:**      3/5/2005 10:17:04 AM
**Subject:**   Googles

Gail,

I have the following information in response to your recent email.

1. I understand you received the checks.

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement.

5. Stelor will confirm in writing that no one's available options have increased.

6. Stelor will provide written confirmation.

7. Stelor will provide a date prior to March 15, 2005.

8. There are no such samples, as Stelor is not yet offering any product for sale.

9. Stelor will provide proof regarding the applications, registrations and names.

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible.

## REDACTED

Kevin

*****************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*****************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Aragon, Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

    Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is not to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination.   This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy. This really needs to get done asap for everyone's benefit.

4. Silvers is owed  for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options.  Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6.  Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

## REDACTED

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - Re: Googles

**From:**    GAIL A MCQUILKIN
**To:**      Kevin C. Kaplan
**Date:**    3/5/2005 11:12 AM
**Subject:** Re: Googles

Kevin -

<div align="center">REDACTED</div>

1. I understand you received the checks. **Yes we did.**

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement. **There is nothing in the least bit confusing about the chart.  Stelor has three days to get us the check. FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb (which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so. **They have three days.**

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement. **He has provided these three times already. They have three days to pay.**

5. Stelor will confirm in writing that no one's available options have increased. **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation. **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005. **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations and names. **They have three days**

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible. **There is nothing in the agreement that obligates us to do this, and everything was changed electronically so there is nothing to provide. Stelor knows how to go online to the USPTO office to view the changes. It will take all of ten minutes to do this. I talked to Larry and showed him the e-mail I had sent him, and he knows about the changes.**

<div align="center">REDACTED</div>

REDACTED

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 3/5/2005 10:15:01 AM >>>
Gail,

I have the following information in response to your recent email.

1. I understand you received the checks.

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement.

5. Stelor will confirm in writing that no one's available options have increased.

6. Stelor will provide written confirmation.

7. Stelor will provide a date prior to March 15, 2005.

8. There are no such samples, as Stelor is not yet offering any product for sale.

9. Stelor will provide proof regarding the applications, registrations and names.

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges. I will get back to you on that quickly.

Kevin

*****************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,

Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*******************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains
information from the law firm of Aragon, Burlington, Weil, Schwiep,
Kaplan & Blonsky, PA, which may be confidential or privileged. The
information is intended to be for the use of the individual or entity
named above. If you are not the intended recipient, please immediately
delete this e-mail and be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited.


-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

    Here are the issues we need to resolve under the settlement
agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The
checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his
insurance premiums during the life of the consulting agreement. The
only two payments Stelor is not to reimburse him for are Dec 2004 and
Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1.
He is now owed for March 2005 too. By my calculation the total it comes
to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so
that he can continue with health care coverage. Silvers is trying to
convert to an individual plan through NHP, Aurora's insurance company.
That will reduce the premiums by a couple hundred dollars a month. But
to do that Aurora needs to send to Neighborhood Health Partnership on
Aurora official letter head, addressed to "Premium Services" informing
them that April 1, 2005, Aurora will no longer be offering health
insurance benefits to "ANY" of their employees, and that they have
informed Steven A. Silvers of this event and that he has 63 days within
which to secure a non-group conversion policy. This really needs to get
done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He
submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to
1,000 options for Stelor stock under Stelor stock option plan, and

another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6.  Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

**REDACTED**

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN – dates for audit

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 3/22/2005 11:55 AM |
| **Subject:** | dates for audit |

Kevin –

  We need to set up the date for the auditor to go to Stelor. These are they dates they have open. Let me know today which dates works best. Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st, or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

**GAIL A MCQUILKIN - RE: dates for audit**

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | "GAIL A MCQUILKIN" <GAM@kttlaw.com> |
| **Date:** | 3/23/2005 9:24 AM |
| **Subject:** | RE: dates for audit |

Gail,

Can you send me over the documents confirming the scope of your proposed audit.   Is there an engagement letter or other correspondence?  We'll call you at 11 today.

Kevin

*****************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

  Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@abwlaw.com

*****************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Tuesday, March 22, 2005 11:55 AM

**To:** Kevin C. Kaplan
**Subject:** dates for audit


Kevin –

   We need to set up the date for the auditor to go to Stelor.  These are they dates they have open.  Let me know today which dates works best.  Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st, or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - RE: dates for audit

**From:**    GAIL A MCQUILKIN
**To:**      Kevin Kaplan
**Date:**    3/23/2005 9:47 AM
**Subject:** RE: dates for audit

The scope of the audit based on Silvers' rights under the license agreement is : "Stelor's books and records and all other dcuments and material in the possession of or under the control of Stelor with respect to the subject matter of the License Agreement." I think that just about covers everything that Stelor has relating to the Googles project. FYI - based on our settlement, the results of the audit are for attorney eyes only.

<div align="center">

REDACTED

</div>

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 03/23/05 9:22 AM >>>

Gail,


Can you send me over the documents confirming the scope of your proposed audit. Is there an engagement letter or other correspondence? We'll call you at 11 today.



Kevin


*******************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

  Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

**GAIL A MCQUILKIN - audit**

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 4/22/2005 1:34 PM |
| **Subject:** | audit |

Kevin -

   The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - RE: audit

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 4/22/2005 4:20 PM |
| **Subject:** | RE: audit |

I'd have to clear off some appointments but it may be possible.  What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint.  Are you available Monday afternoon to come over and look?


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit


Kevin -

The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit. He needs to schedule the date for his visit. Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit. Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

GAIL A MCQUILKIN - RE: audit

**From:**     "Kevin C. Kaplan" <kkaplan@bwskb.com>
**To:**       "GAIL A MCQUILKIN" <GAM@kttlaw.com>
**Date:**     4/22/2005 5:27 PM
**Subject:**  RE: audit

I've forwarded it on to Steve, but haven't heard back yet. He may come down Monday too.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 4:21 PM
**To:** Kevin C. Kaplan
**Subject:** RE: audit

I'd have to clear off some appointments but it may be possible. What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA

2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint. Are you available Monday afternoon to come over and look?


********************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


********************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit


Kevin -

   The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - Re: Inc

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 4/25/2005 9:43 AM |
| **Subject:** | Re: Inc |

Kevin -

No, I cannot be there tomorrow. Please let me know what is in the boxes so I can at least determine if it is relevant. I need the date for the audit. Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/25/05 9:21 AM >>>
Gail,

Steve plans to be in Miami tomorrow. Can you meet at our office at 2:00 p.m.? Please confirm. We will have the Stelor information for your review. We expect you will have a draft of the complaint for our review.

In terms of schedule, I am leaving town on Friday for vacation. Stelor and I plan to have the complaint filed (or ready to be filed) before I leave. Please help us with that goal by circulating your draft.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

# EXHIBIT "G"

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

*Via Federal Express*
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.    Failure to pay royalties under paragraph III (A);

b.    Failure to provide a written certified royalty statement under paragraph III (C);

c.    Failure to provide a list of all sub licenses under paragraph III (C);

d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

     i.     Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

     j.     Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

     k.     Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

     l.     Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

     a.     Failure to pay Mr. Silvers consultancy fees and expenses;

     b.     Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

     c.     Making unauthorized statements and representations on behalf of Mr. Silvers; and

     d.     Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:     Steven A. Silvers
      Laurence Hefter

1145615.1

# EXHIBIT "H"

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0566
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2

Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuillkin

c:    Steven A. Silvers
      Laurence Hefter
      Yano A. Rubinstein
      William Borchard

1248587.1

# EXHIBIT "I"

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7929-0844-8480

April 27, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

      Re:   Silvers/Stelor License Agreement

Dear Mr. Esrig:

On November 12, 2004, we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached. Because Stelor did not cure those breaches, on January 13, 2005 we served on Stelor a notice of termination of the License Agreement, a copy of which is attached.

On January 28, 2005, Stelor and Silvers entered into a Settlement Agreement in which Silvers agreed to withdraw his notice of termination provided Stelor perform its obligations under the Settlement Agreement. Stelor, however, has:

- failed to provide Silvers with unit interests in Stelor LLC under paragraph 9;

- failed to pay Silvers monthly installments on royalty advances on the first of every month under paragraph 10 (a);

- failed to pay on April 1, 2005 the monthly advance on royalties required by Silver to maintain his insurance coverage through the Aurora Collection under paragraph 10 (b);

- failed to cooperate in the audit of the books and records of Stelor under paragraph 14; and

- failed to provide Silvers samples of Licensed Products that are being offered for sale under paragraph 15.

Furthermore, although Stelor has provided a written statement that it is not offering any

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 12, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchandise of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

251939.1

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

   a.    Failure to pay royalties under paragraph III (A);

   b.    Failure to provide a written certified royalty statement under paragraph III (C);

   c.    Failure to provide a list of all sub licenses under paragraph III (C);

   d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

   e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

   f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

   g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

   h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

      i.      Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

      j.      Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

      k.      Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

      l.      Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

      This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

      a.  Failure to pay Mr. Silvers consultancy fees and expenses;

      b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

      c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

      d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

      Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

                                     Very truly yours,

                                       Gail A. McQuilkin

c:     Steven A. Silvers
       Laurence Hefter

/245615.1

LAW OFFICES
## KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON · 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0556
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:     Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2


Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Yano A. Rubinstein
      William Borchard

/248587.1

# EXHIBIT "J"

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: DBLONSKY@BWSKB.COM  WWW.BWSKB.COM

April 29, 2005

## VIA FACSIMILE AND U.S. MAIL

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

  Re: Silvers/Stelor

Dear Gail:

  I write in response to your letter dated April 27, 2005 to Steven Esrig of Stelor Productions purporting to terminate the License Agreement. It is the position of Stelor that the License Agreement and the Settlement Agreement remain enforceable and binding documents and that the purported grounds for termination are all invalid and improper. We will respond to each of those grounds in turn.

  First, Stelor has only recently converted to an LLC and Mr. Silvers has been provided an option letter for unit interests, to which he has not responded.

  Second, monthly installments on royalty advancements have been paid. Indeed, enclosed are copies of royalty advancement checks for April and May that we are prepared to release upon withdrawal of the notice of termination.

  Third, monthly advances on royalties to maintain insurance coverage have also been paid. Enclosed are checks for April and May that we are prepared to release upon withdrawal of the notice of termination. It must be noted, however, that, despite demand, Mr. Silvers has never confirmed the amount of insurance to be paid. As a show of good faith, Stelor has nonetheless paid the maximum each month, but such confirmation must be provided forthwith.

  Fourth, Stelor has cooperated in the audit of the books and records. In fact, just a week ago, on April 22, 2005, you sent an email to Kevin Kaplan stating that "[t]he auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." We have received no such letter. Whenever Stelor receives such a letter, it will cooperate.

  Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn and it is understood that the agreements remain in place.

Gail A. McQuilkin, Esq.
April 29, 2005
Page 2

Finally, no royalties are owed to your client and the advances paid far exceed royalties that have been accumulated.  A royalty statement is enclosed reflecting full payment of any amounts due.  To the extent that there are any concerns, they can be raised with us.  However, there is simply no basis for termination.  Instead, the continuing failure of Mr. Silvers to meet his obligations under paragraph 2 of the Settlement Agreement, which has been the subject of prior correspondence, is a breach that he needs to be cured immediately.

Mr. Silvers is obliged to honor the License Agreement and the Settlement Agreement. We hereby demand receipt of written notice by Noon on Monday, May 2, 2005 that the notice of termination has been withdrawn and that Mr. Silvers agrees to abide by his contractual agreements. We also demand written assurance that Mr. Silvers will make no efforts to interfere in any manner with the business of Stelor. Furthermore, Mr. Silvers needs to agree to the submission to the federal court of a consent decree confirming the enforceability of the agreements and the rights that have been conveyed to Stelor. Failing receipt of such notice and assurances, Stelor will initiate an action seeking to enforce the agreements through declaratory and injunctive relief.

All rights and remedies are reserved.  Govern yourselves accordingly.

Sincerely,

Daniel Blonsky

DFB:gr
Enclosures
cc: Client (w/ encls.)
    Kevin C. Kaplan, Esq. (w/ encls.)

WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

04/29/2005  15:45    3058585261                          BURLINGTON WEIL                          PAGE  04

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20885

CITIBANK, F.S.B.
WASHINGTON, DC 20038-0967
7-216-520

2751

04/28/05

'TO THE
DER OF    Silvers Entertainment Group                                    $ **5,000.00

Five Thousand and 00/100******************************************************************  DOLLARS

    Silvers Ent. Group
    8983 Okeechobee Blvd
    PMB 203 Suite 202
    West Palm Beach, FL 33411

MO    Advance Against Royalty April 05

    ⑆002751⑆ ⑆052002166⑆    ⑆175974051⑆

---

LOR PRODUCTIONS, INC.
    Silvers Entertainment Group                          04/28/05          2751
04/28/05                          Bill #roymay                              5,000.00

Citibank Checkin  Advance Against Royalty April 05                          5,000.00



04/29/2005  15:45    3058585261                    BURLINGTON WEIL                    PAGE  05

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

2752

04/28/05

TO THE
ORDER OF    Silvers Entertainment Group                              $ ***5,000.00

Five Thousand and 00/100*************************************************************    DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MO    Advance Against Royalty May 05



⑆002752⑆ ⑆052002166⑆    ⑆175974051⑆

---

LOR PRODUCTIONS, INC.
    Silvers Entertainment Group                          04/28/05        2752
    04/28/05                      Bill #royapril                          5,000.00



    (  )



Citibank Checkin  Advance Against Royalty May 05                          5,000.00



04/29/2005  15:45    3058585261                    BURLINGTON WEIL                          PAGE  06

2753

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0667
7-216-520

04/28/05

TO THE
ER OF    Silvers Entertainment Group                                              $ **1,000.00

One Thousand and 00/100*************************************************************************  DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MO    Royalty/insurance advance, Apr '05

⑆002753⑆ ⑆052002166⑆     ⑆175974050⑆

---

_OR PRODUCTIONS, INC.
   Silvers Entertainment Group                      04/28/05            2753
04/28/05                    Bill #052005                               1,000.00

Citibank Checkin  Royalty/insurance advance, Apr '05                       1,000.00



04/29/2005  15:45    3058585261                BURLINGTON WEIL                PAGE  07

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC  20036-0967
7-216-520

2755

04/28/05

Y TO THE
DER OF    Silvers Entertainment Group                                    $ **1,000.00

One Thousand and 00/100***********************************************************    DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MO    Royalty/insurance advance May '05

⑈002755⑈ ⑆052002166⑆ ⑈17597405⑈

---

LOR PRODUCTIONS, INC.
   Silvers Entertainment Group                          04/28/05              2755
04/28/05                     Bill #042005                                  1,000.00


Citibank Checkin  Royalty/insurance advance May '05                        1,000.00



### Royalty Statement
### Silvers Entertainment Group
### January 1, 2005 – March 31, 2005

| Transaction | Net Revenue | Royalty Rate | Royalty Amount | Pre-paid Royalty Balance |
|---|---|---|---|---|
| February advance against royalties | | | $5,000 | $5,000 |
| February advance against royalties for insurance premiums | | | $1,000 | $6,000 |
| Net revenue from licensed properties (iTunes) | $47.35 | 6% | $2.84 | $5,997.16 |
| Net revenue from derivative properties (iTunes) | $1.47 | 3% | $0.04 | $5,997.12 |
| March advance against royalties | | | $5,000 | $10,997.12 |
| March advance against royalties for insurance premiums | | | $1,000 | $11,997.12 |

# EXHIBIT "K"

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | CSR TF STELO-1 | DATE (MM/DD/YYYY) 04/28/05 |
|---|---|---|

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|

PRODUCER
DI Insurance Exchange, Inc.
751 Rockville Pike, #1A
Rockville MD 20852
Phone:301-279-5500   Fax:301-424-2829

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Hartford Fire Insurance Co. | |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

INSURED

Stelor Productions
Greg Langsford
14701 Mockingbird Drive
Darnestown MD 20874

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE ☒ OCCUR | 42SBABW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $300000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY ☒ PRO-JECT ☐ LOC | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | 42SBABW8494 | 04/25/05 | 04/25/06 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN   EA ACC<br>AUTO ONLY:        AGG | $<br>$ |
| A | | **EXCESS/UMBRELLA LIABILITY**<br>☐ OCCUR ☐ CLAIMS MADE<br>☐ DEDUCTIBLE<br>X RETENTION   $10,000 | 42SBABW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS ☐ OTH-ER ☐ | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Certificate holder is additional insured as respects operations by the insured.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| STESTEV<br><br>Steven A. Silvers | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATIO DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 10 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES |

# EXHIBIT "P"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.
Case No. 05-80393-CIV-HURLEY/Hopkins

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

        Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

        Defendant.
_____/

## SUPPLEMENTAL DECLARATION OF KEVA LABOSSIERE

My name is Keva Labossiere and I make this declaration based on my own personal knowledge. I am a legal assistant at the law firm of Kozyak Tropin and Throckmorton, P.A., with offices at 2525 Ponce de Leon, 9th Floor, Coral Gables, FL 33134.

Description of Research Conducted on Stelor Productions Website

1.     On May 24 and 25, 2005, I visited the website for the Plaintiff, Stelor Productions, LLC ("Stelor"), at www.stelorproductions.com.

2.     At the Stelor website, I was greeted by an introduction page, which I skipped, and was then directed to the Stelor home page which displays the following graphic icons, "See & Hear About Gootopia!" and "Meet the Googles from Goo." Attached hereto as **Exhibit "A"** is a copy of Stelor's homepage.

3.     "See and Hear About Gootopia!" is an interactive tour which instructs potential users on how to use the website, www.googles.com. Attached hereto as **Exhibit "B"** is the "Goo Tour" introduction page. "Gootopia" is, as described by Stelor,

"a magical environment of imagination and adventure" and is proposed to be a "state-of-the-art-child-safe realm on the Internet."

4.      The "Meet the Googles from Goo" graphic icon allows users to click on a characters such as "GooBoo," and read a brief description about the character. A copy of the "GooBoo" description page is attached hereto as **Exhibit "C"**.

5.      On the "Stelor Properties Page," attached hereto as **Exhibit "D"**, I was able to download the iTunes software and proceed to the iTunes Music Store where I was given the ability to purchase "One Goo World, The Googles from Goo." The iTunes purchasing process is described in detail in my previous declaration dated May 20, 2005.

6.      Also listed on the "Stelor Properties Page" is the sentence, "Gootopia is coming soon to: www.googles.com." When you click on www.googles.com, a "GoDaddy – Coming Soon!" page with subheading "This Web Page is parked free, courtesy of GoDaddy.com!" Attached hereto as **"Exhibit "E"** is a copy of that page.

7.      GoDaddy.com is the world's largest domain name registrar and is the flagship company of The Go Daddy Group, Inc. Attached hereto as **"Exhibit "F"** is copy of the "About GoDaddy.com" information page which is displayed on its website.

8.      GoDaddy.com has put an "administrative lock" on the Googles.com domain name and corresponding website due to Stelor's filing this action. See **Exhibit "G."**

**I HEREBY DECLARE** under penalty of perjury, I declare that I have read the foregoing declaration and that the facts stated in it are true

Dated: May 25, 2005

_____
Keva Labossiere

3339.101/253396.1

# EXHIBIT "A"

:... Stelor Productions ..::



www.stelorproductions.com

about us          properties          features          stelor staff          careers          cont

home
about us
properties
features
stelor staff
careers
contact us

## See & Hear About



Click to see Tour!

## Meet the Googles from Goo™
### Click Here



---

### STELOR NEWS

- **Find Law On-Line**
- **Washington Post**
- **10e20**
- **The Business Gazette**
- **Washington Times**
- **MSNBC**
- **Internet News**

stelor productions.com 2005

Stelor Productions © 2005
The Googles from Goo are a creation of Steven A. Silve

privacy policy          terms of use          crec

# EXHIBIT "B"

# Gootopia Tour

 

## Chapter Index

Welcome to the Gootopia Tour! Here you can find out what's what and learn how Gootopia works. The tour is broken up into chapters. Use the buttons below to play, pause, stop, and move forward and back between chapters. You can also use the index to go directly to a specific section in a chapter. Choose a section, or just hit the play button to start.



### Chapter 1
Control Game Items

Basic Navigation

### Chapter 2
Control Description

Subpages

### Chapter 3
Quizzes

GooPoints

### Chapter 4
Content Review

Hidden Items

Help Screens

Navigating Subpages

### Chapter 5
Counters

Counters Puzzle

### Chapter 6
Crack the Computer

Internet Radio

ePuzzing

Chapter Control

### Chapter 7
Photo Submissions

Hidden Mickeys

# EXHIBIT "C"



www.stelorproductions.com

# STELOR PRODUCTIONS

| about us | properties | features | stelor staff | careers | cont |

## See & Hear About



Click to see Tour!

home
about us
properties
features
stelor staff
careers
contact us

## Meet the Googles from Goo™



GooBoo

**STELOR NEWS**

- **Find Law On-Line**
- **Washington Post**
- **10e20**
- **The Business Gazette**
- **Washington Times**
- **MSNBC**
- **Internet News**

stelor productions.com 2005

Stelor Productions © 2005
The Googles from Goo are a creation of Steven A. Silve

| privacy policy | terms of use | crec |

# EXHIBIT "D"



www.stelorproductions.com

stelorPROPERTIES

about us     properties     features     stelor staff     careers     cont.



Hear and purchase the Googles
*One GooWorld* at iTune



home

about us

properties

features

stelor staff

careers

contact us

### The Googles from Goo™

Our mission at Stelor is to instill trust. Therefore, *all of our properties are nonviolent, nonpolitical, and pose no threat to any religious beliefs. It's a tall order, and requires us to create assets that are 'out of this world.'* The Googles are just that: a group of pudgy, furry, four-eyed aliens from the planet Goo™. They have journeyed light-years in the GooShip to teach children valuable lessons about science and the environment, raise self-esteem, and lower anxiety. *The Googles from Goo™* property is targeted towards children 2-12 years old and includes music, a website utilizing education through entertainment, and animated video.

Gootopia is coming soon to: **www.googles.com**

stelor productions.com 2005                    **privacy policy**          **terms of use**          cred

# EXHIBIT "E"

 **Coming Soon!**  www.googles.com

**This Web page is parked free, courtesy of GoDaddy.c**

▶ Save on: Domain names, Web hosting, email accounts, secure SSL certificates, ecommerce products AND MORE!

 **$3.99** NO QTY LIMIT Get a new domain name, transfer or renewal for only $3.99* with each and every new non-domain product you buy!

## Domain Names
.COMs just **$8.95***/yr

▶ Compare us: Learn more...

**Search for a domain name NOW!**

www.[_____] [.com ▾] [GO]

.com .us .biz .info .net .org .ws .name .tv .cc .de .jp .be .at .uk .nz .cn .tw
*Plus ICANN fee of 25 cents per domain name year.

## Domain Transfers
From **$7.95*** Includes FREE 1-year extension

▶ NEW! Rapid Transfer System!

**ICANN ACCREDITED**

▶ Get more FREE with each and every domain name! Learn more...

## Turbo-Charg
## Web Hosti

**NEW! Premium Plans**

## Plans from
**$3.95/mo**

▶ FREE Setup and Emai
▶ FREE 24/7 Live Suppo
▶ New! Virtual-Dedicate
   Dedicated Servers! Cl

▶ Learn more about: Private domain registrations, domain backordering PLUS, buy used domain names, bulk domain prices slashed AND MORE

## Click 'n build your own site online, in just minutes

**Includes Hosting & Email FREE!**

**Complete creative packages from $2.49/month!**

▶ Choose the plan that's right for you!



**Big** or **Small** BUSINESS

**GoDaddy.com has everything you need to succeed on the Web**

▶ I'm interested in: Selling products online, securing my site, hosting, reseller programs

## THE DOMAIN N AFTERMARKE
The smart choice for buying and sell

**Discover the Web's p domain auction si**

▶ Lowest commissions, largest audience
▶ Powerful search tools
▶ 24/7 expert assistanc
▶ Plus, join now for just $4.95/yr!
   Learn more here
See Today's Featured D

  **Radio Go Daddy is on the air!**
Live every Wednesday at 7 pm (PST) / 10 pm (EST). 
Listen online; or tune in on Sirius and XM satellite radio, and select AM stations.
Miss the live broadcast? Download the show.

▶ Visit RadioGoDaddy.com to: Listen to the Previous Show, Strange Domains, and More!
▶ Visit GoDaddy.com for: New product releases, 24/7 Technical Support, 24/7 Domain Support, career opportunities, OR view full product catalog

Copyright © 1999 - 2005 Go Daddy Software, Inc. All rights reserved.

# EXHIBIT "F"

Low cost domain names, domain ...sfers, web hosting, email accounts, and ... much more.   Page 1 of 2



BobParsons.com
US Marine cleared! Flight
attendants raise money baring
it all on calendar in online
store. Response to famous
hacker gone straight.


Radio
Go Daddy

#1 in domain name registration! Make the s...

**My Account**  **Support**  **My Cart**  **Check...**

| Domain Names ▾ | Hosting & Servers ▾ | Web Site Builders ▾ | Email Accounts ▾ | SSL Certificates ▾ | Ecommerce Pr... |

My Account / Logout   Company Info   Why our prices are so low   10-Point Value Plan   What's New!   FAQ   Link To Us   ICANN AC...

## Company Information

- ▶ About Us
- ▶ Bob Parsons' Blog
- ▶ President's Page
- ▶ Radio Go Daddy
- ▶ Partnership Opportunities
- ▶ Testimonials
- ▶ Go Daddy in the News
- ▶ 10-Point Value Plan
- ▶ Privacy Policy
- ▶ Secure Ordering
- ▶ Anti-Spam Policy
- ▶ Jobs & Benefits
- ▶ Why Our Prices Are So Low
- ▶ Link your Site to GoDaddy.com

**View Our Catalog ▶**

# About GoDaddy.com

GoDaddy.com is the world's largest domain name registrar and is the flagship company of The Go D...
Group, Inc.

The Go Daddy Group of companies also includes **Wild West Domains, Inc.**, a reseller of domains a...
domain-related products and services; **Domains by Proxy**, a private registration service; **Starfield
Technologies**, a research and development affiliate; and **Blue Razor Domains**, a membership-bas...
registrar.

As an ICANN-accredited domain registrar, Go Daddy has more names under management than any
registrar, offers products at prices up to 70% less than the competition and supports them all with wo...
24/7 live customer service.

We are the sole developer and proprietor of our technology, do not license any products from others,
not outsource or offshore any of our operations. This enables us to provide better support and ensure
advanced and competitively-priced products and services available today.

Founded by Bob Parsons in 1997, The Go Daddy Group has grown to include more than 8 million do...
under management. We offer a complete product line, including comprehensive hosting solutions, W...
creation tools, Secure SSL certificates, personalized email with spam and anti-phishing filtering, e-cc...
tools and more.

Go Daddy is widely recognized for its success, having been ranked #8 on the 2004 Inc. 500 list of th...
fastest-growing privately held companies; #35 on the 2004 Deloitte Technology Fast 500 (growing 8,...
percent!); and having won the CNET Editor's Choice award in 2001, the Name Intelligence Largest N...
Award in both 2002 and 2003 as well as the #1 Best Overall Registrar in 2003. Go Daddy also won t...
Corporate Excellence Award for fastest growing privately-held company in 2003 and Most Innovative
Company in 2004.

Go Daddy has become the world's #1 choice for domains by providing innovative, competitively-price...
products, delivering the highest quality customer service, and by always appreciating and listening to
customers!

| Business Address | Telephone Numbers | Other Resources |
| --- | --- | --- |
| 14455 N. Hayden Rd.<br>Suite 219<br>Scottsdale, AZ 85260 | Domains: (480) 505-8899<br>Fax Number: (480) 505-8844<br>24/7 Support: (480) 505-8877<br>Billing: (480) 505-8855<br><br>Billing Call Center Hours:<br>Mon-Fri 5:30AM-9:30PM<br>Sat-Sun 7:30AM-9:30PM PST | www.supportwebsite<br>Spam Abuse Report<br>Civil Subpoena Polic<br>press@godaddy.com<br>Email a Support Rep |


▶ 24/7 Sales and Support: (480) 505-8877   ▶ Billing Questions? Call (480) 505-8855   ▶ Free e-News!  Enter email address

Home | About Us | Catalog | Cart | Payment Options | Legal | Report Spam | Careers | Site Index | Whois | Affiliates | Lin...



We now accept




# EXHIBIT "G"

>
> >From: "Domain Disputes" <domaindisputes@godaddy.com>
> >To: "'Steven Silvers'" <gewrue@hotmail.com>
> >Subject: RE: Inquiry
> >Date: Thu, 12 May 2005 11:07:09 -0700
> >
> >Mr. Silvers,
> >
> >We are currently reviewing the legal documents that we have received.  I
> >locked a few domains yesterday while working on this issue and realized I
> >could not complete the review at that time.  I have been again working on
> >this issue this morning.
> >
> >The paperwork I have was filed on May 5 in the District Court for
>Southern
> >District of Florida.  In the Prayer for Relief it states: "(a) a
> >preliminary
> >and permanent injunction enjoining Defendant Steven A Silvers from taking
> >any action in violation of or contrary to the terms of the Licensing
> >Agreement or the Settlement Agreement and affirmatively requiring him to
> >restore the domain names and website to Stellor's control."
> >
> >The normal process I would take is to restore the domains and lock them
> >until a final court order is received.  This is what I am in the process
>of
> >doing.
> >
> >Please feel free to contact me with any questions.
> >
> >Regards,
> >Pam Holland
> >Domain Services Manager
> >Go Daddy Software, Inc.
> >

# KENNETH R HARTMANN - googles.com, and others

| | |
|---|---|
| **From:** | "Pam" <pholland@godaddy.com> |
| **To:** | <khartmann@kttlaw.com>, "'Stephen H. Sturgeon'" <shs@sturgeonassociates.com> |
| **Date:** | 5/12/2005 6:35 PM |
| **Subject:** | googles.com, and others |

Gentlemen,

I have locked 78 domains that are listed below in reference to case No 05-80393, filed May 5, 2005, in the District Court for the Southern District of Florida. No changes have been made to these domains in reference to the administrative email address or the DNS. We will unlock the domains when we are in receipt of a court order to do so. Please fax this order or any other documents to 480.624.2542.

Please make sure your clients understand that I will be in correspondence with you as needed or requested, and our Customer Support Team can not assist them in this matter. This matter must process through our department.

Unfortunately, I will be out of the office this afternoon, but feel free to contact me as needed. I will be back in the office approximately 8am PST Friday.

Regards,
Pam Holland
Domain Services Manger
Go Daddy Software, Inc.


Domains Locked:
  GOOBEANIES.COM
  GOOBEANIES.NET
  GOOBOP.COM
  GOOGLEMAIL.NET
  GOOGLES.BIZ
  GOOGLES.COM
  GOOGLES.INFO
  GOOGLES.NAME
  GOOGLES.NET
  GOOGLES.US
  GOOGLES.WS
  GOOGLESADVENTURE.COM
  GOOGLESADVENTURES.COM
  GOOGLESFROMGOO.COM
  GOOGLESFROMGOO.INFO
  GOOGLESFROMGOO.NET
  GOOGLESMAIL.COM
  GOOGLESMAIL.NET
  GOOGLESMANIA.COM

GOOGLESMUSIC.COM
GOOHOP.COM
GOOKID.COM
GOOKIDS.COM
GOOKIDS.NET
GOOKIDSMAIL.COM
GOOKIDSMAIL.NET
GOOKIDSRGOORIFFIC.COM
GOOKIDZ.COM
GOOKIDZ.NET
GOOKIDZMAIL.COM
GOOKIDZMAIL.NET
GOOMAIL.NET
GOOMANIA.COM
GOOMUSIC.COM
GOOPETS.COM
GOOPETZ.COM
GOORIFFICENTERTAINMENT.COM
GOORIFFICENTERTAINMENT.NET
GOOSHIP.COM
GOOSHOES.COM
GOOSTUFF.COM
GOOTOPIA.COM
GOOTOPIA.BIZ
GOOTOPIA.INFO
GOOTOYS.COM
GOOTOYS.NET
GOOTUNES.COM
GOOWARE.COM
GOOWEAR.COM
OOGLESADVENTURE.COM
OOGLESFROMGOO.COM
OOGLESFROMGOO.NET
OOGOOS.COM
OOGOOS.NET
PLANETGOO.NET
PLANETOFGOO.COM
PLANETOFGOO.NET
THEGOOCREW.COM
THEGOOGLES.COM
THEGOOGLESADVENTURE.COM
THEGOOGLESADVENTURES.COM
THEGOOGLESFROMGOO.COM
THEGOOGLESFROMGOO.INFO
THEGOOGLESFROMGOO.NET

THEGOOGLESMAIL.COM
THEGOOGLESMAIL.NET
THEGOOKIDSMAIL.COM
THEGOOKIDSMAIL.NET
THEGOOKIDZMAIL.COM
THEGOOKIDZMAIL.NET
THEOOGLES.COM
THEOOGLES.NET
THEOOGLESFROMGOO.COM
THEOOGLESFROMGOO.NET
THEOOGOOS.COM
THEOOGOOS.NET
THEPLANETOFGOO.COM
THEPLANETOFGOO.NET

# COMPOSITE
# EXHIBIT "Q"

Page 1 of 1



# State of Delaware
## The Official Website for the First State

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search Delaware | _____ | Go |     Citizen Services | Business Services | Visitor Info

---

Department of State: Division of Corporations

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions   View Search Results

---

## Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 3495292 | Incorporation Date / Formation Date: | 02/25/2002 (mm/dd/yyyy) |
| Entity Name: | STELOR PRODUCTIONS, LLC | | |
| Entity Kind: | LIMITED LIABILITY COMPANY (LLC) | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | CORPORATION SERVICE COMPANY | | |
| Address: | 2711 CENTERVILLE ROAD SUITE 400 | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19808 |
| Phone: | (302)636-5401 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information   Submit



Back to Entity Search

To contact a Delaware Online Agent click here.

---

2005 10:05 FROM:WEST&FEINBERG,PC    301-951-1525    TO.  598 9000    P.002

## STATE OF DELAWARE
### CERTIFICATE OF CONVERSION
### FROM A CORPORATION
### TO A LIMITED LIABILITY COMPANY
### PURSUANT TO SECTION 266
### OF THE DELAWARE GENERAL
### CORPORATION LAW

### (STELOR PRODUCTIONS INC.
### TO
### STELOR PRODUCTIONS, LLC)

1. The name of the corporation immediately prior to filing this Certificate is Stelor Productions Inc.

2. The date the Certificate of Incorporation was filed on is February 25, 2002.

3. The original name of the corporation as set forth in the Certificate of Incorporation is Stelor Productions, Inc.

4. The name of the limited liability company as set forth in the formation is Stelor Productions, LLC.

5. The conversion has been approved in accordance with the provisions of Section 266.

6. The conversion shall be effective as of 11:59 p.m. on ___March 14___, 2005.

IN WITNESS WHEREOF, the undersigned officer of Stelor Productions Inc. has signed this Certificate on this 7th day of ___March___, 2005.

Stelor Productions Inc.

By: _____
Steven A. Esrig, President and
Chief Executive Officer

Steven A. Esrig

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:19 PM 03/14/2005
FILED 02:19 PM 03/14/2005
SRV 050210946 - 3495292 FILE

# EXHIBIT "R"

# KENNETH R HARTMANN - Re: Googles Trademark

| | |
|---|---|
| **From:** | "Ryan Ellison" <rellison@cafepress.com> |
| **To:** | <GAM@kttlaw.com> |
| **Date:** | 6/7/2005 5:18 PM |
| **Subject:** | Re: Googles Trademark |
| **CC:** | "Candice Carr" <ccarr@cafepress.com> |

Dear Gail A. McQuilkin, Esq.

Thank you for your June 7, 2005 notification regarding the possible infringement of your client's rights by a user of our service. In accordance with our Intellectual Property Rights Policy, we have removed the user's images from their shop.

Pursuant to your request and in accordance with our Privacy Policy, below please find the contact information for the user of our service so you may contact them directly regarding your concerns.

**Steven Esrig**
**14701 Mockingbird Drive**
**Darnestown, Maryland 20874**
**Phone: 301 963-3636**
**Email:** sesrig@stelorproductions.com

We appreciate that you contacted us. Please let us know if we can be of further assistance.

Sincerely,

**Ryan Ellison**
**Content Usage Associate**
(510) 877-1574 (O)
(510) 372-0144 (F)

.........................................................................................

**cafepress**.com  Let your **individuality** shine.
**Make**, **buy** or **sell** what's on your mind.
Over 8 million **unique gifts** with more fresh daily.

---------------------------------------------------------------

The contents of this message, together with any attachments, are intended only
 for the use of the individual or entity to which they are addressed and may
contain information that is confidential and exempt from disclosure. If you are

not the intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this message, or any attachment, is strictly
prohibited.
If you have received this message in error, please notify the original sender
immediately by telephone or by return E-mail and delete this message, along
with
any attachments, from your computer. Thank you.

# EXHIBIT "S"

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  05-80393 CIV HURLEY/HOPKINS

STELOR PRODUCTIONS, L.L.C., a
Delaware limited liability company,
f/k/a STELOR PRODUCTIONS, INC.,

        Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

        Defendant.

_____/

## DECLARATION OF STEVEN A. ESRIG

I, Steven A. Esrig, hereby declare as follows:

1.     I am the President and CEO of Stelor Productions, L.L.C. ("Stelor").  I have been employed by Stelor since its inception, and I have held my current position for more than two years.  The facts stated herein are based upon my own personal knowledge and/or on corporate records and documents maintained by Stelor in the ordinary course of business.

2.     Pursuant to the License, Distribution and Manufacturing Agreement ("License Agreement") dated June 1, 2002 between the parties, *Stelor* has an exclusive license in all of the intellectual property associated with the GOOGLES characters.  *See* License Agreement, Verified Complaint ("Cmpl.")  Ex. A, at 1 & Schedule A.  The term of the License is 30 years, with an option for 10 additional years.

3.     Stelor's exclusive license under the License Agreement specifically extends to websites and domain names including:  GOOGLES.COM.

**STELOR'S LAUNCH**

4.      Pursuant to the License Agreement, Plaintiff has developed a proprietary, child-safe website – www.googles.com.  Already, the googles.com website has been enjoying tens of thousands of hits each day, and there are more than 600,000 registered users.

5.      The website was originally developed by Silvers in 1997, and has been in operation for nearly eight years.  I began working on the development of the project in 2001 as a consultant, and have been involved ever since.  Stelor has continued to develop the property and to run the website since its formation and execution of the License Agreement in 2002.  In addition to devoting all of my waking hours to the Project, and the continued work of Stelor's staff, more than $4 million dollars has been invested by Stelor in the Project's development.

6.      As the culmination of these efforts, Stelor is set to launch in four weeks a major development in the website and its products.  Stelor's entire business hinges on the success of the upcoming launch.  This is the culmination of the more than $4 million dollars and four years of development efforts in which Stelor has invested.  All of Stelor's resources have been committed to the launch, and unless the launch proceeds, Stelor's business will likely be destroyed.  We are out of business if the website is not immediately reactivated.

7.      The launch is of a new interactive feature for the website, called Gootopia.  The key aspect of the website is Stelor's successful development of a proprietary security system for the Internet.  If children are going to interact with each other and the world, it has to be in an environment that is safe.  It has to be virtually impenetrable and yet accessible (to children).  Stelor programmers have successfully created a proprietary way of doing this and it is to be the center piece of the upcoming launch of the new interactive feature, called Gootopia, on its existing website.

2

8.     All of Stelor's products are designed for use on this website. The format will allow maximum contact between children and the characters. Web casts, broadcasts, live shows, and narrow casts have been created to reach children worldwide. Show formats involve interactivities like huge web based scavenger hunts, multi-person gaming, and free advice from renowned experts for kids. The site will take them to hundreds of other safe locations approved by their guardians. The site also features safe chat, email, and original music.

9.     Although Gootopia is a new development, the critical component of the launch is the existing site--googles.com. Stelor's exclusive access to that site is the heart of its business and the License Agreement. Given the thousands of daily hits on our googles.com site, the fundamental concept is to build from the success of the existing website, inviting its regular visitors to try the new, safe features of Gootopia. Stelor's launch cannot successfully proceed without the foundation of the googles.com website, the ongoing traffic that site enjoys, and the more than 600,000 registered users to date.

10.    Stelor's efforts to promote this launch have reached a critical point. In addition to the millions of dollars and years of development already invested, Stelor has recently spent almost $200,000 in one vital pre-launch activity alone. Stelor is a Platinum Exhibitor with the Licensing Show in New York City, June 21-24, 2005. Stelor's immediate neighbors include: Disney, Nickelodeon, and DreamWorks Entertainment. Hours have gone into the preparation of the booth (design panels included) and 14 people have been trained to interact with the thousands of industry leaders attending. Live Google Characters will be in the parade and attending the show. Stelor has engaged a number of the top PR firms in the US to maximize our exposure. And one of the most recognized IP representatives has been engaged to bring us in touch with only the top licensees.

## THE IRREPARABLE HARM SILVERS HAS CAUSED

11.     Silvers' conduct following commencement of this action, however, has brought the development of Stelor's business to a screeching halt.   Incredibly, Silvers shut down the googles.com website.  He has redirected the site and taken Plaintiff's proprietary intellectual property.  Stelor no longer has access to our site, and our site is no longer in operation.

12.     Silvers has redirected our website to point to a meaningless advertising page. When a user goes to the website now, a screen appears stating "Coming Soon!" followed by a block of unrelated advertising.  A true and correct copy of the page is attached as Exhibit "A" hereto.

13.     The number of hits on the website has dropped to zero!  The over 600,000 people who had successfully registered are no longer available.  The 1,800 new names Stelor had gathered from an initial Gootopia Tour Demo (in just 8 days) are gone as well.  We are unable to even tell them where we have gone, as we always emphasize the Googles not Stelor Productions on the site.  Stelor simply cannot proceed with its launch without access to this website.

14.     Silvers' extreme, wrongful actions threaten the very viability of Stelor's business. Silvers has essentially put Stelor out of business.  Without our website content, Stelor cannot display its product and meet with potential licensees.  We cannot demonstrate our product to our users and their customers.  We cannot launch and protect pending expansions to our brand. Advertisements that have been placed promoting the website for an upcoming trade show have been rendered useless and, as a result, Stelor's reputation has been damaged and it has lost industry goodwill.  Moreover, its ability to prepare and submit materials for that trade show has been compromised.  Yesterday, Stelor was actively advancing the business on all fronts.  Today, we can do nothing.

15.     Furthermore, Stelor developed the content and exclusively operated the website devoted to the "Googles" characters, offering a variety of services and features geared to delighting children and their parents. The website is the public's window into the Googles' world. Being able to operate and modify this website is among Stelor's most important priorities. Yesterday, the website was filled with intellectual property and content created by Stelor. Today, as a result of Silvers' dishonesty and maliciousness, the intellectual property has been taken from Stelor's control and the website has been destroyed, replaced with a message created by Silvers, presumably.

16.     Unless Stelor immediately regains access to the website and can proceed with its launch without further interference, its business will likely be destroyed and it will suffer indeterminate and immeasurable losses. Besides destroying our existing business, the unique opportunity available to Stelor just weeks ago will be entirely lost, along with the incalculable business that would have flowed from that opportunity.

17.     In short, Stelor has invested all of its available resources into this effort and the approaching launch. It lacks the financial ability to stay afloat unless the launch proceeds now. Absent immediate action, Stelor's entire investment of over $4 million and the incalculable revenues from the launch will be lost.

18.     Nor is there any conceivable reason for Mr. Silvers' actions, other than his apparent desire to pursue a lawsuit against Google, Inc. himself. Google, Inc. is attempting to move into the children's market, infringing the rights of the senior googles.com mark and domain name. Pursuant to the Settlement Agreement and License Agreement, the exclusive right to bring an infringement action against Google, Inc. belongs to Stelor, although Silvers is obligated to cooperate and would enjoy a handsome percentage of any recovery. License

Agreement ¶ VIII(A); Settlement Agreement ¶¶ 2, 18 & 19.  Paragraph 18 of the Settlement Agreement, moreover, specifically authorizes and requires injunctive relief, should either party attempt independently to proceed against Google, Inc.  Incredibly, that is exactly what Silvers has done, filing his own lawsuit against Google, Inc. just days after his unlawful termination of Stelor's license. The Google, Inc. action is pending in this district under Case No. 05-80387-CIV-RYSKAMP/VITUNAC.

19.     Silvers is fully aware of Stelor's launch, and has continued to express his approval of Stelor's project.  On April 12, 2005 – just days before Mr. Silvers' purported termination letter – his counsel advised that Silvers "really is very happy with the project and excited about the launch and upcoming show.  He knows the success of the project is the result of the work and investment made by everyone over there."  Email from Gail McQuilkin, attached hereto as Ex. "B".  In fact, if Stelor's launch is successful, Silvers stands to benefit substantially based on his continuing financial interest in the business.

20.     Importantly, Silvers also understands the irreparable harm he can cause by purporting to terminate the Agreements and seize the related property before the Court can decide the issues.  Indeed, Silvers previously wrote "to assure Stelor, with the exception of a material breach by Stelor *and ruled as such by a court of competent jurisdiction (as required by our existing agreements* at which time all rights shall revert back to me . . . , that at such time *and only at such time* shall I then determine what would be in the best interest of my Intellectual Property . . . . This shall once and for all alleviate any fear or concern by [Stelor] that I would do something to intentionally harm 'my dream'."  A true and correct copy of Silvers' November 5, 2003 Official Notice is attached hereto as Exhibit "C" (emphasis added); the quoted section is on page 4, and is marked in the margin.

21.    Silvers, however, has intentionally set out to cause the very harm he promised he would never cause.

## SILVERS NEVER PROVIDED THE REQUIRED NOTICE OF TERMINATION OR OPPORTUNITY TO CURE UNDER THE LICENSE AGREEMENT

22.    As this Court is aware, the parties have a history of disputes regarding the License Agreement, which required Stelor to file a prior lawsuit before this Court on or about October 18, 2004. While that lawsuit was pending, Defendant Silvers purported to terminate the License Agreement by letter dated January 13, 2005. Cmpl. Ex. C. Importantly, at the time, Defendant Silvers himself recognized that, under the License Agreement, he was required to provide 60 days notice of termination and an opportunity to cure, before termination could become effective. The parties' rights and the procedural requirements for termination are specifically set forth in Paragraph IX of the License Agreement, which provides: **"Right to Terminate on Notice.** This Agreement may be terminated by either party upon *sixty (60) days written notice* to either party in the event of a material provision of this Agreement by the other party, provided that, during the *sixty (60) day period,* the breaching party fails to cure such breach." Cmpl. Ex. A (emphasis added). Thus, prior to sending his January termination letter, Mr. Silvers' counsel sent a letter in or about November 12, 2004 detailing the alleged breaches. Cmpl. Ex. C.

23.    That dispute, however, was entirely resolved by the parties, pursuant to the Confidential Settlement Agreement executed on January 28, 2005 ("Settlement Agreement"), which has been filed under seal in this action. In connection with that Settlement Agreement, the parties filed a stipulation of dismissal with prejudice in the prior lawsuit, and that lawsuit was accordingly dismissed with prejudice. *See* Stipulation of Dismissal and Order, attached hereto as Exhibit "D".

24.     Among other provisions in the Settlement Agreement, it provides in paragraph 3 that: "Silvers withdraws his notice of termination of the License Agreement, and reaffirms his obligations under the License Agreement." In addition, paragraph 24 of the Settlement Agreement confirms that the License Agreement remains in full force and effect, and is not superseded by the Settlement Agreement.

25.     Critically, therefore, the Termination provision contained in Paragraph IX of the License Agreement continues to apply. That provision could not be more clear: it expressly and explicitly requires *60 DAYS NOTICE IN WRITING* and an opportunity to cure, before the License Agreement can be terminated.

26.     Defendant Silvers failed to provide any advance notice, let alone the required 60 days' written notice, of the alleged termination or any opportunity to cure. Instead, he purported to terminate the License Agreement by letter dated April 27, 2005 ("Termination Letter"), effective immediately. Cmpl. Ex. C. Silvers provided no opportunity to cure. In fact, Silvers rejected Stelor's tender of payments – including an advance payment for May – and no payments were late in any event. *See* Cmpl. Exs. D & E. Indeed, as the Verified Complaint and Emergency Motion filed by Stelor describe, Silvers instantaneously engaged in a course of conduct to seize control of the intellectual property granted exclusively to Stelor under the License Agreement.

27.     Silvers' purpose can be nothing other than to destroy Stelor's business, and avoid having to share an anticipated recovery from Google, Inc.

## THE CLAIMED BREACHES ARE TOTALLY UNFOUNDED

28.     In fact, the five alleged breaches referenced in the Termination Letter are entirely unfounded and pretextual in any event, and were not even 60 days old as of the date of the April

27th Letter.  The reality is that Stelor has devoted tremendous effort to ensure its compliance with the Agreements, but Silvers – not Stelor – has consistently and repeatedly failed to perform the express conditions precedent to Stelor's performance.  If any party had a basis for termination, it was Stelor!

       a.     For example, Silvers claims Stelor failed to provide unit interests in Stelor LLC under Paragraph 9 of the Settlement Agreement.  That requirement addressed a pending change in Stelor's corporate structure from a Delaware corporation to a Delaware limited liability company.  The conversion, however, was not even completed until March 15, 2005!  Stelor is still preparing, but has not completed the LLC Membership Unit Certificates, the Membership Unit Restricted Stock Agreements and the Membership Unit Option Agreements.  We have not issued these documents to any shareholder or option holder.  Section 9 does not include a time frame for compliance, but Stelor expected and intended to provide Mr. Silvers an LLC Option Agreement as soon as and at the same time as those documents were provided to all other option holders.  Silvers' suggestion that he was unaware of, and never consented to, Stelor's conversion to a limited liability company is incredible.  He specifically acknowledged the change in Paragraph 9 of the Settlement Agreement.  His counsel, indeed, remarked during her visit to Stelor's offices in February of 2005 that the change was an excellent idea!  (Also, no owner of any membership interest in Stelor resides in Florida. Mr. Silvers has options, but no membership interest.)

       b.     Similarly, Silvers claims Stelor failed to pay monthly installments on royalty advances under paragraph 10(a) of the Settlement Agreement.  That

provision requires a $5,000 payment on the first of each month beginning February 1, 2005. Silvers neglects to mention that the payments have been made and accepted by Silvers for February and March. In fact, those payments were not delivered until April 14, 2005, because Silvers failed to satisfy the express conditions precedent to Stelor's performance under the Settlement Agreement. Of course, Silvers readily accepted those payments. Our counsel's cover letter forwarding the checks on April 14 is attached as Exhibit "E" hereto, along with Silvers' counsel's acknowledgment of having received and accepted the checks as Exhibit "F". With respect to the April payment, as Silvers' counsel also confirmed, it was actually paid in *early* April, but Silvers required it to be re-cut, made out to Silvers Entertainment rather than himself! A true and correct copy of the exchange of emails between Stelor and Ms. McQuilkin is attached hereto as Exhibit "G". Silvers then rejected the re-cut April payment when it was tendered on April 29, 2005, along with the May 2005 payment. *See* Cmpl. Exs. D & E.

       c.      With respect to the allegation that Stelor failed to pay the amount required by Silvers to maintain his insurance coverage, those payments were made along with the royalty advances as described above. In addition, Silvers has only himself to blame for any claimed delay related to those payments: paragraph 10(b) of the Settlement Agreement requires Stelor to pay only "that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), . . . not [to] exceed $1,000 per month." Paragraph 10(c), moreover, makes clear that "Such reimbursements will be provided to Silvers within 15 days of Stelor

receiving evidence of paid premiums." Stelor has repeatedly requested that basic and readily obtainable information from Silvers. To date, however, Silvers has failed and refused to provide the required "evidence of paid premiums". Accordingly, Stelor is not obligated to make any such payment to Silvers, even though Stelor has previously gone ahead in good faith and done so.

d. Silvers next claims that Stelor failed to cooperate in an audit of books and records of Stelor under paragraph 14. Again, Silvers provided no required notice or opportunity to cure. In fact, Silvers' counsel advised in early April that they would defer the audit. Silvers did not renew his request for the audit until his counsel sent an email dated April 22, 2005 – *5 DAYS BEFORE THE TERMINATION LETTER!* A true and correct copy of the email is attached hereto as Exhibit "H". The email, moreover, advises that the "auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." It then asks for "a date in the next two weeks". Silvers, however, never provided the auditors' letter and refused to give Stelor two weeks to provide a date. Instead, apparently having tried to set Stelor up, his Termination Letter was sent 5 business days' later.

e. In addition, Silvers obviously failed to provide the required notice for his claim that Stelor has failed to provide samples of Licensed Products that are being offered for sale. Silvers' counsel, however, herself reviewed those samples when she visited Stelor's offices in Maryland in February of 2005. In fact, she took samples back with her. We made those samples available yet again to Silvers, when our counsel advised Silvers' counsel by email dated April 26,

2005 – a day before the termination letter – that the samples were in his office and available for review by Silvers' counsel. Silvers' counsel responded that "I cannot get into this with you right now. I assure you I will get back to you and Stelor by Friday." A true and correct copy of those emails is attached hereto as Exhibit "I"[1]. That response, apparently, was totally disingenuous. Silvers' counsel "got back to" us that Friday by sending the Termination Letter.

     f.     Finally, to the extent Silvers' claims it failed to provide accurate royalty information, again the required notice was obviously not provided. In addition, Stelor has prepared a royalty report to Silvers for the first quarter of 2005. The report was completed at the end of April, and was included in the letter to Silvers' counsel dated April 29, 2005. Cmpl. Ex. D. Additionally, to the extent Silvers claims that Stelor's prior written statement regarding royalties was inaccurate, Stelor has advised Silvers' counsel that it was only just made aware that an on-line shop at CafePress.com was carrying Googles merchandise, without Stelor's authorization or knowledge. We were previously unaware of the existence of this shop, and suspect that it was established by someone outside of Stelor using our company information. After further analysis, we discovered the shop was established in September of 2002 and had sold one (1) coffee cup in December, 2002, for $10.99. On March 31, 2005, we purchased two (2) of each item from the shop to review the quality of the merchandise. These items – again – are with our counsel and were made available to Silvers' counsel for review, as

---

[1] Certain of the emails with Silvers' counsel have been redacted, since at the time the parties were working jointly to initiate litigation against Google, Inc. Their communications in that regard are privileged and confidential.

referenced in the April 26th email.  Ex. G.  Stelor has received no revenue from this outlet; accordingly, no royalty payments would be due in any event.

      g.    Silvers claims – for the first time in his Declaration and Opposition served on Friday, May 20, 2005 – that Stelor did not have required insurance in place until after his termination.  That is false.  True and correct copies of Stelor's certificates of insurance for the periods July 1, 2004 to July 1, 2005, and thereafter, are attached as Exhibit "J" hereto.

      h.    Finally, to the extent Silvers raises various allegations related to a Letter Agreement dated June 1, 2002, that Agreement expired by its own terms on or about November 30, 2004 (after the stated term of 30 months)!  Par. 5(a), Cmpl. Ex. B.

29.    Nevertheless, notwithstanding the clear notice provisions in the License Agreement, and the total lack of factual foundation for the claimed defaults, Silvers sent the Termination Letter and has engaged in a course of conduct designed to steal all the GOOGLES intellectual property, as well as Stelor's own proprietary material to which Silvers has no right under any circumstances.

I declare under penalties of perjury that the foregoing is true and correct.  Dated this 22nd day of May, 2005.

Steven A. Esrig

Coming Soon!                                                                                    Page 1 of 2



# Coming Soon!

www.googles.com

This Web page is parked free, courtesy of GoDa

▸ **Save on:** Domain names, Web hosting, email accounts, secure SSL certificates, ecommerce products A



**$3.99** no qty limit  Get a new domain name, transfer or renewal for only $3.99 with each and every new non-domain product you buy!

## Domain Names
.COMs just **$8.95*/yr**

▸ **Compare us:** Learn more...

## Domain Transfers
From **$7.95*** Includes FREE 1-year extension

▸ **NEW!** Rapid Transfer System!
ICANN ACCREDITED

**Search for a domain name NOW!**

www. [                    ] [.com ▾] [ GO ]
.com .us .biz .info .net .org .ws .name .tv .cc .de .jp .be .at .uk .nz .cn .tw
*Plus ICANN fee of 25 cents per domain name year.

▸ **Get more FREE** with each and every domain name! Learn more...

Tur
Wel

NEW
Pla
**$3.**
▸ FREE
Email
▸ FREE
Supp
▸ New!
Dedic
Dedic
Click

▸ **Learn more about:** Private domain registrations, domain backordering **PLUS**, buy used domain nam
prices slashed AND MORE!

### Click 'n build your own site online, in just minutes
Includes Hosting & Email FREE!
**Complete creative packages from $2.49/month!**
▸ Choose the plan that's right for you!



## Big or Small BUSINESS

### GoDaddy.com has everything you need to succeed on the Web
▸ I'm interested in: Selling products online,
securing my site, hosting, reseller programs

DOM
AFTER

Disco
premier
▸ Lowest
largest
▸ Powerfu
▸ 24/7 ex
▸ Plus, jo
just $4.
Lear
See To

### Radio Go Daddy is on the air!
Live every Wednesday at 7 pm (PST)/10 pm (EST).
Listen online; or tune in on Sirius and XM satellite radio, and select AM station

Coming Soon!                                                    Page 2 of 2



Miss the live broadcast? <u>Download the show.</u>

▶ **Visit RadioGoDaddy.com to:** <u>Listen to the Previous Show</u>, <u>Strange Domains</u>, and <u>More!</u>
▶ **Visit GoDaddy.com for:** <u>New product releases</u>, <u>24/7 Technical Support</u>, <u>24/7 Domain Support</u>, care
OR <u>view full product catalog</u>

Copyright © 1999 - 2005 Go Daddy Software, Inc. All rights reserved.

## Kevin C. Kaplan

**From:** GAIL A MCQUILKIN [GAM@kttlaw.com]
**Sent:** Tuesday, April 12, 2005 4:35 PM
**To:** Kevin C. Kaplan
**Subject:** follow up

Kevin -

I appreciate our conversation today. As you requested here is an update
be kept extremely confidential and I am leaving out names for that purpose.

Finally, you know how important I feel it is for us to stay aligned. This is easily accomplished if your client will just comply with the settlement, especially the financial part. I don't make threats or posture, my time is too expensive to waste on that. I communicate only what I must when I must to protect my clients interests. I agree that this has gotten silly, and I am sure the board would rather focus its discussions on the upcoming launch and trade show than obsessing over these rather small advances to my client. I have spent considerable time getting my client to focus on what your client has and will accomplish rather than what they have not done, although his list in that regard is long. He really is very happy with the project and excited about the launch and upcoming show. He knows the success of the project is the result of the work and investment made by everyone over there. But, he needs to feel he is being treated fairly, and frankly it doesn't take much by your client to instill that in him.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Stelor Productions, Inc.
Attn: Steve Esrig, CEO/President & Board of Directors
14701 Mockingbird Drive
Darnestown, Maryland 20874

November 5, 2003

Re:    Official Notice

Dear Steve and Stelor Board Members:

Pursuant to our recent conversation on Saturday, November 1, 2003,
and my promise to you, prior to embarking upon any adversarial course
of action, that I would give you and the Stelor Board the courtesy of
laying out to you the material breaches of our existing agreements that I
am now alleging and for which are in need of your immediate attention.

Additionally, I am seeking clarification of certain portions of our
existing agreements that need to be addressed immediately as well.

After meeting with you several weeks ago, it is my understanding that
Stelor has taken a position that I have a duty to provide Stelor with the
password interests/rights to my "public" domain names surrounding
the Googles' Intellectual Property, especially that of www.googles.com.

It is also my understanding that you have "verbally" informed me that
until this matter is properly resolved that I shall receive no further
compensation as required by the existing Consulting and Licensing
Agreements executed between Stelor and myself dated May 9, 2002.

As I recall, your exact words to me when we last met, was that I've been
"officially cut off" from any further compensation and that your hands
were tied regarding this matter.  You even mentioned that the Board
was adamant about you giving me a check for  my August Consulting
Fees and that as a result of your doing so, you lost your signature
powers to write any more checks to me or anyone else thereafter.

Contrary to what you or the Board may be thinking at this time, I
would like to find a common ground, if at all possible, to  swiftly resolve

these and other matters surrounding my existing agreements with Stelor, both fairly and expeditiously.

Accordingly, my legal position is as follows:

1). Stelor shall agree to immediately provide me with my September and October consulting fees, currently in arrears and as called for by the Consulting Agreement with Stelor. Stelor shall continue to make timely payments to me, as called for, through the remainder of the Consulting Agreement period, barring any bona fide future breaches that Stelor may hereafter allege and for which have been deemed "material" in scope and ruled as such by a court of competent jurisdiction as called for in the Consulting Agreement,

2). Stelor shall agree to continue to pay, as required, my insurance premiums through the remainder of the Consulting Agreement with the same caveat as noted at [letter #1 above];

3). Stelor shall agree to provide me with all required "Royalty Statements" as noted in my Licensing Agreement, regardless of whether or not there are royalties due and owed to me as the Agreement clearly sets forth. Since I've yet to receive any such statements, it is advised that "all" past statements be properly provided to Mr. Silvers as mandated within the next 30 days. This, as you are well aware, can be construed as a material breach by me according to the existing Licensing Agreement with Stelor,

4). Stelor shall agree to immediately reimburse me for the total funds that I've allocated for registration fees and renewal registration fees of the Googles.com and related Googles' domain names, since the execution of the Agreements and as required by Stelor to perfect. I have, on numerous occasions, requested that these fees to be reimbursed to me, both verbally and in e-mail format and I've yet to receive any such reimbursements for said fees due and owed to me. This figure is now pushing $2,000.00 to date (all of which can be substantiated via invoice data).

-2-

5).    Stelor shall agree to immediately update the Googles.com web site noting me as the "creator of the Googles from Goo" as it once appeared and without explanation has since been removed and as of this writing is still not listed anywhere on the Googles.com web site.    I believe this caveat is also clearly outlined in our existing Licensing Agreement that is currently in place between me and Stelor.

6).    Stelor shall agree to immediately transfer the 19 domain names that were agreed upon to be transferred to me upon the execution of the Asset Purchase Agreement between Stelor and Aurora and as of this date still remain under Stelor Productions' control.  These names, as you are fully aware, belong to me with Stelor being listed as the Administrative and Technical contacts and I listed as the Registrant and Billing contact.    I have repeatedly requested, in e-mail format and verbally to you on many occasions that Stelor needed to transfer these (19) domain name to my "Godaddy" domain hosting account.

I have also informed you, personally, that certain domain names have been left to expire without my ever having the benefit of knowing which ones Stelor had arbitrarily allowed to expire and how I recently found out they are no longer available to be renewed due to some other individual(s) having already renewed them.  This was done without my ever having knowledge of any of this or my being made privy to any of this. An explanation on this matter is seriously warranted.

7).    I have recently found out that Stelor has registered the names www.goopets.com  and www.goopetz.com.  The exact dates of these registrations are:  created on July 9, 2003 (less than 4 months ago) and they were registered through GoDaddy.com, and the Registrant is noted as:  Stelor Productions and the Adm. and Tech contacts are noted as: Steven A. Esrig.  This is another material breach of the Agreement because it calls for ALL domain names, including any that have the "Goo" or "Googles" prefix to be registered in my name, NOT Stelor's and I am to be listed as the Registrant, NOT STELOR or you.  You knew this to be true and yet you or someone in your organization with your blessings registered these domain names, because they had to be paid for with your credit card or Stelor's credit card, very well knowing

-3-

this to be in violation of our existing agreements. No excuses on this one. We're talking only a few months ago. I'm terribly disappointed in this move. You talk about a trust factor. What shall I say about this? I have the printed copies of the Registration Forms that I took off the Internet if you care to review them.

These are the initial main issues that we need to immediately resolve so that the Googles' project can continue on its course of, hopeful, success for all parties concerned.

I am likewise further informing Stelor as follows:

1). You and the Board have expressed a concern that I may attempt, now or perhaps at some point in the future, to exercise my authority, given the fact that I currently control the Googles.com and other Googles' related domain names that I own. Authority that may include the shutting down of the Googles.com web site.

2). I am willing, assuming that we can amicably resolve the aforementioned issues, to assure Stelor, with the exception of a material breach by Stelor and ruled as such by a court of competent jurisdiction (as required in our existing agreements) at which time all rights shall revert back to me as called for in our existing agreements, that at such time and only at such time shall I then determine what would be in the best interest of my Intellectual Property and the rights associated with same. Having said this, I am willing to have this caveat reduced to writing and added as an addendum to his existing agreements. This shall once and for all alleviate any fear or concern by you or the Board that I would do something to intentionally harm "my dream".

Further listed below are clarifications regarding the existing agreements executed between myself and Stelor. They are noted as follows:

1). I would like a clarification as to the clause noted at [page 2, number 3.c.] of my Consulting Agreement, regarding a "right of first refusal".... It appears that this clause is in conflict with the one just above it at [page 2, number 3.b.]. These two clauses are in direct conflict with one another. On one hand it stipulates that I can not engage in any business if such business competes in any material way

-4-

with Stelor's ongoing business dealings surrounding the Googles' project as it relates to children. However, in the second clause it gives the rights to make available to Stelor, on a "right of first refusal" basis other projects that I may create or develop by myself or with other third parties or that I may acquire or joint venture with other third parties, which shall be presented to Stelor and within 120 days Stelor shall either accept or reject such other projects presented by me. However, the agreement doesn't clarify what rights Silvers may have in the event that Stelor shall decline to participate in any of the Intellectual Properties presented to Stelor for which it chooses to reject or decline nor does it stipulate in the event that Stelor decides to accept, under what terms and conditions and how long Stelor may have to develop and bring to market such other Intellectual Properties presented to them by me. These two clauses are at best ambiguous; thus in need of clarification.

I shall be seeking the following clarification. In the event that I bring to Stelor a project that I have either developed or joint ventured with another party, or that I shall represent on behalf of another party, and within 120 days of such formal presentation, Stelor is unable to fund, market, develop and bring to market said project within a reasonable period of time thereafter, not to exceed six (6) months from time of introduction to complete the contractual phase of the project with certain performance caveats then Stelor shall agree that I shall have the right to take the project elsewhere without owing Stelor any further obligation. This goes for any and all projects whether they are related to preschool children or older children.

2). I would further like a clarification as to the clause in my Consulting Agreement noted at: [Number 2. Relationship of Parties....wherein it stipulates that "during the term of this agreement, Licensor shall not initiate or maintain any relationship or conversations with Licensee's current or prospective clients, vendors, any company relationships with the media (press etc.) without prior express written request by Licensee]. I maintain that I have previously had both business and personal relationships with several of Stelor's current clients and vendors, prior to the execution of both the existing

-5-

Consulting and Licensing Agreements with Stelor. These relationships should not be part and partial to this clause or at best, should I choose to communicate with any of these relationships on a personal basis whether in person or via other current means of communication that I shall not be prevented from doing so. It is hard to conceive that such a "gag order" would be enforceable given the circumstances of this issue. All I'm requesting is a clarification of this clause so that I may continue to maintain my personal relationships with those individuals that could be construed as current vendors or clients of Stelor without further fearing retaliation by Stelor for my doing so. This seems ludicrous, at best, especially in view of the fact that I have been granted, by Stelor, the title of "Executive Creative Consultant" according to the existing Consulting Agreement and as such I am being granted the ability to offer my creative input to the Stelor and thus I should not be prevented from having conversations with those directly and/or indirectly involved with the creative process in bringing to market the successful launching of the "Googles from Goo" intellectual property. It should be duly noted that this caveat is also listed in Mr. Silvers Licensing Agreement at: [page 5, at VIII. E].   I shall agree that my conversations with such entities covered by this clause be strictly related to personal and unrelated Googles business unless otherwise authorized.

4).    I would also like a further clarification as to the clause in my existing Licensing Agreement noted at: [page 7, Indemnity clause, at letter C.], wherein it clearly stipulates that I shall have the express right, in the event that Stelor shall decline to pursue upon notice by me, to properly protect and defend against other such third parties or entities, any trademark, patent, or any other intellectual property rights afforded me in order to protect my intellectual property known as the Googles from such other violators. It seems clear that according to this clause that I shall have the right, at my "sole expense to defend if necessary, or file suit if desired, made by or filed against another party...." Thus, should I inform Stelor of a concern that I may have surrounding the proper protection of his intellectual property rights, and should Stelor decline to institute such proceedings against such third party or parties, then I, at my sole expense, shall have the right to defend and pursue such claims and/or suits.

-6-

It has been brought to my attention that Stelor does not share the same legal view in this regard. Thus the need for a clarification of this issue as well. I shall agree that should I decide to bring suit against any third party or other entity that may become or shall threaten the existence of the Googles' intellectual property and all of its surrounding rights, that I will timely inform the Board of my intentions and in the event Stelor is not able nor interested in pursuing such litigation, then Stelor shall waive all rights to same and shall have no further obligation to fund such litigation. However, in the event that Stelor shall inform me of it's intentions to move forward with such litigation within a reasonable period of time, then I shall respect Stelor's position and either try and work something mutually agreeable between all parties concerned or in the event there is a favorable judgment and outcome of such litigation then Silvers shall agree to provide Stelor, after all reasonable expenses have been allocated, a participation, to be shared with all of it's shareholders, of 20% of my net proceeds of any such litigation.

5). I would like an updated clarification as to the status of the pending trademark filings and applications that have or should have been perfected on my behalf and I am further seeking copies of all such filings for my records and for which I believe I am entitled to with an understanding by Stelor that any and all future filings should be copied and immediately forwarded to me for my review and input.

As the Licensor of the Googles from Goo intellectual property, I believe that I am entitled to copies of any and all legal documents executed on my behalf by Stelor in a timely fashion. To date, I've received no such copies.

6). According to my existing Consulting Agreement, Stelor has agreed to provide me with health insurance coverage during the term of my Agreement. The clause reads at [page 1 of said Consulting Agreement, at number 1.b.] that: "Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300.00 per month during the term of this Agreement." I am questioning why, if the "existing health plan is still being made available by Aurora" that I have had to pay an

-7-

assessed increase of $144.00 each month when it clearly stipulates in the agreement that Stelor shall reimburse the Aurora Collection for the existing health plan if available during the term of this agreement? Why have I had to allocate each month for the past eleven (11) months now, the sum of $144.00 when clearly I shouldn't have had to do so? I am seeking reimbursement of all such funds that I've laid out and for which I clearly should not have had to do so and for the remainder of the Agreement that Stelor will take care of the full coverage as called for by the Agreement.

7).    Last on this clarification list is the issue of "Reversionary Rights". I have brought to your attention on many occasions, supported by documentation and as clearly noted in our existing Agreements and those executed between Stelor and Aurora the highly sensitive issue of reversionary rights, when and if there is a "material" breach found in my favor by a court of competent jurisdiction and as clearly outlined in our Licensing Agreement. However, the issue here is that Stelor has seen fit to grant this right to both myself and Aurora. Thus, clearly creating a conflict. Please note that my Licensing Agreement was executed on May 9, 2002. In this Agreement Stelor granted me "Reversionary Rights" noted therein at:    [page 6, at X. Post Termination Rights, letter C.] wherein it states: "Upon the expiration or "termination" of this Agreement, "all the license rights of Licensee under this Agreement shall forthwith terminate and immediately revert to Licensor and Licensee, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to Licensor."

Of course this reversionary right only goes into effect if and when a material breach is alleged by me and such is ruled in my favor by a court of competent jurisdiction as the existing Agreement mandates.

However, in an Agreement signed and executed between Stelor and Aurora dated just 14 days after I executed my Licensing Agreement with Stelor, the exact date is May 23, 2002, Stelor proceeded to grant

-8-

Stelor the same "Reversionary Rights" which was otherwise unlawful to do so.

Please note the clause at: [page 6, of the Stelor/Aurora Asset Purchase Agreement, at number 11. Reversionary Rights, wherein it reads as follows: "In the event that Buyer (Stelor) is unwilling or unable to fulfill its financial obligations to Steven A. Silvers under the terms of any of Sellers' (Aurora) agreements with Silvers that are assumed by Buyer as a result of this transaction, Buyer will give written notice to Seller. If the breach is not cured or waived by Silvers within a reasonable period of time after receiving written notification by Silvers and Seller thereafter assumes such liability to Silvers, all rights assigned herein by Seller to Buyer shall revert back to Seller without obligation by Seller to Buyer. Buyer shall execute such documents as are necessary to affect the intent of this clause concerning reversionary rights without unreasonable delay."

Accordingly, it seems patently confirmed that these two agreements are in clear conflict with one another and it is my stern position that in the event of an alleged breach between myself and Stelor; for which I should prevail, that my "reversionary rights" clearly supercede those granted to Aurora by Stelor.

I hereby seek clarification as to why these "Reversionary Rights" were granted to Aurora when, in fact, they were granted to me fourteen (14) days prior to the execution of any Agreement with Aurora?

In closing, I would like to reiterate the fact that I prefer not to assert any adversarial position at this time with Stelor. I only desire what I am entitled to according to the mandates outlined in our Agreements. Nothing more and nothing less. If after reading and reviewing this letter with your Corporate Counsel, they choose not to advise you to do the right thing as called for and as I've clearly outlined in this lengthy letter, then I am fully prepared to seek a formal breach against Stelor for the many violations I've cited above and we will let the chips fall where they fall. This is not to be taken as any threat. I'm tired of all of this anxiety that I've had to endure all of these months and it's time to

-9-

put an end to it once and for all.

I would also state that once you take the "visionary" out of the "vision" you are doomed to fail.

I assure you, if you place me in an "active" role, that I am fully prepared to execute come the first of the year, and place me in charge of the creative process of the project, allowing me to do what I do best, and working with all those you have thus far entrusted, except me, with the creative process and the creative delivery of the project, within (6) months time you will see miracles unfold. I can guarantee this! If you choose to continue to exclude me from the creative process, as has been the case these past 17 months, then the consequences will fall on your shoulders not mine. Either way, I'm fully prepared to act. I hope and trust you choose the former chartered course of action.

In Stelor's response to this letter kindly be specific as to addressing each and every clause as requested by me so that we can have a clear understanding as to Stelor's position regarding the issues outlined above.

Should you care to contact me to discuss this matter further I can be reach at: 954-445-6788, otherwise I shall expect your reply within the next 10 days as I'm leaving to go out of the country on November 15, and I won't be returning until December 25, 2003.

In the event that I don't have your response within the next 10 days as requested, then my options will be limited and I shall proceed accordingly.

-10-

Also, please take notice that my new mailing address has once again changed and you should direct all future correspondence to me at:

Steven A. Silvers
8983 Okeechobee Blvd.
Suite #202, PMB 203
West Palm Beach, FL 33411-1826

Sincerely,

Steven A. Silvers

*This document is being sent in accordance with our Agreement requirements dated May 9, 2002 by way of FedEx (Tracking Number: 842190092180.)

-11-

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-80954-CIV-HURLEY

STELOR PRODUCTIONS, INC.,
    plaintiff,

vs.

STEVEN A. SILVERS,
    defendant.

_____/

**CLOSED CASE**

## ORDER OF FINAL DISMISSAL WITHOUT PREJUDICE AND CLOSE-OUT

**THIS CAUSE** is before the court upon the parties' joint stipulation for dismissal without prejudice filed February 8, 2005. Having considered the stipulation, it is hereby

**ORDERED AND ADJUDGED:**

1. This case is **DISMISSED WITHOUT PREJUDICE**, with each side to bear its own costs and attorneys' fees.

2. There being nothing further for the court to resolve, it is further ordered that the Clerk of the Court shall enter the case as **CLOSED** and terminate all pending motions as **MOOT.**

**DONE** and **SIGNED** in Chambers at West Palm Beach, Florida this _17_ day of February, 2005.

Daniel T. K. Hurley
United States District Judge

Copies furnished:
Adam T. Rabin, Esq.
Kenneth R. Hartmann, Esq.
Yano Rubinstein, Esq.



FILED by ___MC___ D.C.
ELECTRONIC

**Feb 8 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, INC.,
a Delaware corporation,

      Plaintiff,

v.

STEVEN A. SILVERS,
a resident of Palm Beach County, Florida

      Defendant.

_____

CASE NO. 04-80954-CIV-HURLEY
Magistrate Judge James M. Hopkins

## JOINT STIPULATION FOR DISMISSAL,
## WITHOUT PREJUDICE, OF ALL CLAIMS

    Plaintiff, Stelor Productions, Inc. and Defendant Steven A. Silvers, hereby jointly stipulate,

pursuant to Fed.R.Civ.P.41(a)(1), to the dismissal, without prejudice, of all claims asserted by each

party against the other party in this action.

    Respectfully submitted,

Adam T. Rabin
DIMOND KAPLAN & ROTHSTEIN, PA
200 S.E. First Street, Suite 708
Miami, FL 33131
T: 305-374-1920
Co-Counsel for Defendant

Kenneth R. Hartmann  (FBN: 664286)
Gail A. McQuilkin  (FBN: 969338)
KOZYAK TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
T: 305-372-1800  /  F: 305-372-3508
Counsel for Defendant

Yano L. Rubinstein, Esq.
SUMMERS RUBINSTEIN
580 California Street, 16th Floor
San Francisco, California 94104
Counsel for Plaintiff

3339/101/249255.1



**BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.**

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: KKAPLAN@BWSKB.COM    WWW.BWSKB.COM

April 14, 2005

**VIA HAND-DELIVERY**

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

   Re: Stelor Productions, Inc. v. Silvers,
     <u>Case No. 04-80954-CIV-HURLEY/HOPKINS</u>

Dear Gail:

   Attached please find the three Stelor checks.

       Sincerely,

       Kevin C. Kaplan

KCK:mjp
Enclosure



**STELOR PRODUCTIONS, INC.**
P.O. BOX 2000
GAITHERSBURG, MD 20885

2621

03/07/05

PAY TO THE
ORDER OF    Kozyak Tropin & Throckmorton Trust Accoun    $ ***2,000.00

Two Thousand and 00/100*************************************    DOLLARS

CITIBANK, F.S.B.
WASHINGTON, DC 20005-0007
7218-830

Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL  33134

MEMO  TRUST ACCOUNT- Royalty/insurance advanc

⑆00 26 2 1⑆ ⑆05 200 2 166⑆

**STELOR PRODUCTIONS, INC.**
Kozyak Tropin & Throckmorton Trust Accoun
02/28/05                          Bill #roy

2621

2,000.00

03/07/05

⑆ 175977⑆05⑆

STELOR PRODUCTIONS, INC.
PO BOX 3001
GAITHERSBURG, MD 20885

262

03/07/05

PAY TO THE
ORDER OF   Kozyak Tropin & Throckmorton Trust Accoun

Three Hundred Eighteen and 00/100**************************************   $ **318.00

DOLLARS

Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL  33134

MEMO   TRUST ACCOUNT Domain name registrations

⑈00 26 23⑈ ⑈05 200 2 166⑈

STELOR PRODUCTIONS, INC.
Kozyak Tropin & Throckmorton Trust Accoun
02/28/05                                      Bill #DOMAIN

2623

318.00

03/07/05

⑈ 1 759 1 40 50⑈



STELOR PRODUCTIONS, INC.

PAY TO THE
ORDER OF  Kozyak Tropin & Throckmorton Trust Accoun

Four Thousand and 00/100***************************

Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134

MEMO  TRUST ACCOUNT Insurance Reimbursement

2622

03/07/05

4,000.00

STELOR PRODUCTIONS, INC.
Kozyak Tropin & Throckmorton Trust Accoun
02/28/05                                Bill #INS

Citibank Checkin  TRUST ACCOUNT Insurance Reimbursemen

4,000.00

## Kevin C. Kaplan

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN [gam@kttlaw.com] |
| **Sent:** | Sunday, April 17, 2005 4:38 PM |
| **ว:** | Kevin C. Kaplan |
| **Subject:** | Re: Inc |

Kevin -

   Got the checks.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "kevin kaplan" <kkaplan@bwskb.com> 04/17/05 4:00 PM >>>
Gail,

I've left you a bunch of messages but haven't heard back. Please confirm you received the
checks, and let me know when you're available for a call tomorrow. Steve has some issues
to discuss.  By the way, for efficiency of our ongoing communications, I have no problem
with Steve talking to you directly and authorize you to talk to him directly even if I am
unavailable.

Kevin

*************************************

Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
   Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the
law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or
privileged. The information is intended to be for the use of the individual or entity
named above. If you are not the intended recipient, please immediately delete this e-mail
and be aware that any disclosure, copying, distribution or use of the contents of this
information is prohibited.


Sent wirelessly via BlackBerry from T-Mobile.

1

**Kevin C. Kaplan**

---

**From:**    GAIL A MCQUILKIN [GAM@kttlaw.com]
**Sent:**    Friday, April 08, 2005 10:44 AM
**To:**    Kevin C. Kaplan
**Subject:** silvers

Kevin -

Can you please resolve these pending issues -

Settlement Agreement:

1.  Check for reimbursement of health insurance payments

2.  Checks for Feb, March and April advance against royalties for health insurance

3. Reimbursement for domain name renewal costs

4. Options

5.  All checks are to be made out to Silvers Entertainment Group. THe check we received for April was made out to Steven Silvers.  Why do we have to keep telling Stelor this?

License Agreement:

1.  Royalty statements are due for the 3d and 4th quarter of 2004, and first quarter of 2005.

2.  We need to see the Products Liability Insurance has Silvers names as an insured.

3.  We need to see all promotional materials Stelor intends to use.

4.  Stelor is suppose to place on all materials the phrase "created by Steven A. Silvers."  Stelor persists on placing those words in tiny font and using the phrase "based on a concept created by" rather than "created by" as required.  We went though this once before and Stelor agreed to change it, but still they keep doing it.

5.  There are still issues relating to the list of trademarks and domain names, but I will address those with Larry Hefter.

Let me know about all this.

Gail.

5/21/2005

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

5/21/2005

**Subject: Re: Silvers royalty advance check**
**Date: Saturday, April 9, 2005 2:42 PM**
**From: GAIL A MCQUILKIN <gam@kttlaw.com>**
**To: <julie@stelorproductions.com>**

Not a problem at all. Let me know about the health insurance. Going forward the
simplist way to do this is to combine the 5k and 1k amounts into one 6k check. In case
you do not know this, these payments are an advance against future royalties. Make sure
you are booking these correctly and keeping track of the amounts so that when royalties
begin to be paid by Stelor they are offset by these amounts. Thanks for your help.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Julie" <julie@stelorproductions.com> 04/09/05 10:17 AM >>>
Gail,

I just got your email at home.  I had already left the office for the day
yesterday when you sent your email- I can have the check there on Tuesday
morning - will that be alright?  I'll ask Steve about the health insurance.

Thanks for understanding!  You have a great weekend yourself!

Regards,

Julie
----- Original Message -----
From: "Gail A. McQuilkin, Esq." <gam@kttlaw.com>
To: "Julie DePue" <julie@stelorproductions.com>
Sent: Friday, April 08, 2005 6:15 PM
Subject: Re: Silvers royalty advance check


No problem, stuff happens.  You can send it for Monday delivery.  There
should also be a check for $1000 to cover his health care premiums.  Ask
Steve if you can send that too.  Thanks.  Have a good weekend.
-----Original Message-----
From: "Julie DePue" <julie@stelorproductions.com>
Date: Fri, 08 Apr 2005 17:48:42
To:<qmcquilkin@tmo.blackberry.net>
Subject: Silvers royalty advance check

Dear Gail,

 Steve just told me about the error on Silvers check  I am so sorry!  Its
completely my fault  I have been sort of put back into the accountants chair
rather abruptly and just went a little too fast through my tasks.

 Id be happy to cut another check and send it Fed Ex Saturday delivery if
you want.  Please let me know as soon as you can, and where youd like it
sent.

 Sorry for the trouble,

 Julie DePue

Stelor Productions

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
(305)372-1800 office
(305)372-3508 fax
gam@kttlaw.com

# Stelor Productions
## Transactions by Vendor
### January through December 2005

05/2005

| Type | Date | Num | Memo | Clr | Amount |
|------|------|-----|------|-----|--------|
| **Kozyak Tropin & Throckmorton, PA.** | | | | | |
| Bill Pmt -Check | 03/07/05 | 2821 | TRUST ACCOUNT- Royalty/Insurance advance | * | 2,000.00 |
| Bill Pmt -Check | 03/07/05 | 2822 | TRUST ACCOUNT Insurance Reimbursement | * | 4,000.00 |
| Bill Pmt -Check | 03/07/05 | 2823 | TRUST ACCOUNT Domain name registrations | * | 318.00 |
| | | | | | |
| **Silvers Entertainment Group** | | | | | |
| Check | 02/11/05 | 2555 | VOID: Advances Against Future Royalties-Feb05 | √ | 0.00 |
| Bill Pmt -Check | 02/28/05 | 2587 | VOID: consulting | √ | 0.00 |
| Bill Pmt -Check | 03/08/05 | 2824 | Advance against Royalty, Feb 05 | √ | 5,000.00 |
| Bill Pmt -Check | 03/08/05 | 2825 | Advance against Royalty, Mar 05 | √ | 5,000.00 |
| Check | 04/08/05 | 2711 | Advance Against Royalties | * | 5,000.00 |
| Bill Pmt -Check | 04/28/05 | 2751 | Advance Against Royalty April 05 | | 5,000.00 |
| Bill Pmt -Check | 04/28/05 | 2752 | Advance Against Royalty May 05 | | 5,000.00 |
| Bill Pmt -Check | 04/28/05 | 2753 | Royalty/Insurance advance, Apr '05 | | 1,000.00 |
| Bill Pmt -Check | 04/28/05 | 2755 | Royalty/Insurance advance May '05 | | 1,000.00 |
| | | | | | |
| **Steven A. Silvers** | | | | | |
| Check | 02/01/05 | 2627 | VOID: Advances Against Future Royalties | √ | 0.00 |
| Bill Pmt -Check | 04/04/05 | 2685 | VOID: Advances against future royalties | √ | 0.00 |
| | | | | | |
| | | | | | 33,318.00 |

**Kevin C. Kaplan**

**From:**    GAIL A MCQUILKIN [GAM@kttlaw.com]
**Sent:**    Friday, April 22, 2005 1:35 PM
**To:**    Kevin C. Kaplan
**Subject:** audit

Kevin -

  The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

4/29/2005

**Kevin C. Kaplan**

From:        GAIL A MCQUILKIN [gam@kttlaw.com]
Sent:        Tuesday, April 26, 2005 8:20 PM
To:          Kevin C. Kaplan
  ıbject:    Re: Stelor/Silvers/Inc

Kevin -

    I cannot get into this with you right now.  I assure you I will get back to you and
Stelor by Friday.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/26/05 12:35 PM >>>
Gail,


As we discussed, we were impressed and pleased when we received your recent email




`s I have advised you, the Stelor information is in my office, and we have been attempting
 ɔ set up a time for you to review it.

*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the
law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or
privileged. The information is intended to be for the use of the individual or entity
named above. If you are not the intended recipient, please immediately delete this e-mail
and be aware that any disclosure, copying, distribution or use of the contents of this
information is prohibited.

NOV-17-2004(WED) 16:45    GUILD INSURANCE BROKERS    (FAX)204 728 1515    P. 002/002

# AVIVA INSURANCE COMPANY OF CANADA

## CERTIFICATE OF INSURANCE

This is to certify that the following policies have been issued by the Insuring Company and are in full force and effect as of the date of this certificate and in favour of Named Insured:

Team Tools Ltd. and Ultra Media Inc. et al
PO Box 20162
Brandon MB R7A 6Y8

If the insurance provided under the said policy(s) is altered, cancelled or changed in a manner as to affect this certificate of insurance the Insuring Company hereby agrees to give fifteen (15) days written notice of such alteration, change or cancellation to:

Steven A. Silvers & Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, MD 20874
Attention: Julie DePue or Marty Jeffery

| Policy Number | Policy Term | Kind of Insurance or Operations Covered | Limits of Liability or Amount Insured | |
|---|---|---|---|---|
| CMP81108401 | July 1, 2004 to July 1, 2005 | Commercial General Liability | $2,000,000 | Each occurrence limit |
| | | | $2,000,000 | Products-Completed Operations Hazard Aggregate Limit |

Note: Steven A. Silvers and Stelor Productions, Inc. is hereby added as additional insured but only with respect to the vicarious liability of the Named Insured.

Canadian Currency Clause Applies

This document is furnished as a matter of courtesy and only as information of the fact that Policies have been concurrently prepared. It is not a contract, confers no right upon any person and imposes no liability on the insuring company.

AVIVA Insurance Company of Canada          November 17, 2004          900 - 201 Portage Avenue
                                                    Dated                 Winnipeg, Manitoba R3B 3K6

Authorized Representative
Guild Insurance Brokers Inc.

**ACORD. CERTIFICATE OF LIABILITY INSURANCE**

CSR 7    DATE (MM/DD/YYYY) 04/28/05

| PRODUCER | |
|---|---|
| The Insurance Exchange, Inc.<br>751 Rockville Pike, #1A<br>Rockville MD 20852<br>Phone: 301-279-5500  Fax:301-424-2829 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A: Maryland Fire Insurance Co. | |
| Stolec Productions<br>Mrs. Langford<br>21701 Mockingbird Drive<br>Darnestown MD 20874 | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

**COVERAGES**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE  X  OCCUR | 42SBAZMW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $2,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $2,000,000 |
| | | | | | | GENERAL AGGREGATE | $4,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X  PRO-JECT  LOC | | | | PRODUCTS - COMP/OP AGG | $4,000,000 |
| A | | **AUTOMOBILE LIABILITY**<br>ANY AUTO<br>ALL OWNED AUTOS<br>SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | 42SBAZMW8494 | 04/25/05 | 04/25/06 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$ |
| A | | **EXCESS/UMBRELLA LIABILITY**<br>OCCUR  CLAIMS MADE<br><br>DEDUCTIBLE<br>X RETENTION  $10,000 | 42SBAZMW8494 | 04/25/05 | 04/25/06 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS  OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Certificate holder is additional insured as respects operations by the insured.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| STESIEV<br><br>Steven A. Silvers<br>BSB 203<br>9993 Okeechobee Blvd., Ste 202<br>West Palm Beach FL 33411 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL **10** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)                © ACORD CORPORATION 1988