UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a           CASE NO. 05-80393-CIV-HURLEY
Delaware corporation, f/k/a STELOR      Magistrate Hopkins
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

## SILVERS' OBJECTION TO
## REPORT AND RECOMMENDATION

Defendant, Steven A. Silvers ("Silvers"), objects to the Report and Recommendation dated

June 3, 2005 ("R&R"), recommending the motion for preliminary injunction motion filed by Stelor

Productions, LLC ("Stelor") be granted.   The R&R recommends that Silvers' termination of a

License Agreement with Stelor be undone, and that Silvers be compelled to specifically perform

under the License Agreement and related Settlement Agreement with Stelor.   The recommended

injunction would allow Stelor, despite Silvers' termination, to continue to use Stelor's intellectual

property without complying with its obligations under the license.

It is critical that the Court conduct a *de novo* review of the facts and applicable law because

the R&R, if adopted, would rewrite the contractual terms between the parties, relieve Stelor of its

obligations as a licensee, and gut Silvers' ownership and contractual rights as a licensor, including

his ultimate right as the owner of his intellectual property to terminate Stelor as a licensee based on

Stelor's defective performance. The Magistrate misconstrued vital terms in the License Agreement

and misperceived Stelor's performance under the Settlement Agreement, which was designed to give



Stelor additional time to cure the numerous breaches that prompted Silvers to terminate the license in the first place many months ago.  And, the Magistrate's findings are based on misleading testimony - - if not outright perjury - - which Stelor submitted at the last minute.[1]

Furthermore, in recommending the injunction, the Magistrate failed to properly apply the rule of law which controls here - - a terminated licensee's claim for wrongful termination can *only* be remedied by damages; injunctive relief is unavailable.  The Magistrate also erred by applying the wrong standard for a mandatory injunction and in recommending an injunction which is overbroad.

### Essential Background Facts

A.    The License Agreement

Silvers is the owner of trademarks, copyrights, patents, and related intellectual property ("Googles IP") based on an animated story named "Googles From The Planet Goo." In 2002, Silvers licensed to Stelor the exclusive rights to develop and commercialize this concept.   A copy of the License Agreement is found in the Appendix as Exhibit "A."[2]

Although not artfully drafted, the License Agreement contains several key unambiguous provisions:

III.    COMPENSATION

A.   In consideration of the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the term of this Agreement, a royalty in the amount recited in "Schedule A". . . .

B.   The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds ("the Royalty Period") and

---

[1]Silvers has filed concurrently a Motion to Strike the Declaration of Steven A. Esrig detailing his false and misleading testimony.

[2]Silvers' exhibits to this Objection are compiled in an Appendix, filed concurrently herewith.  All references to "Exhibit ___" relate to the exhibits in the Appendix.

2

shall be payable no later than thirty (30) days after the termination of the proceeding full calendar quarter . . . .

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor.  Such royalty statement shall be certified as accurate by a duly authorized office of Licensee, reciting on a country-by-country basis, the stock    number, item, units, sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licenced Product. **Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period.** The Licensee hereby further agrees to provide the LICENSOR with a list of all of its sub licensees added during the current royalty period.

IV.    <u>AUDIT</u>

A.        LICENSOR shall the right, at its own expense, to have a nationally recognized certified public accounting firm, **upon at least thirty (30) days written notice** and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

VI. <u>NOTICES, QUALITY CONTROL, AND SAMPLES</u>

C.    **Prior to the commencement of manufacture and sale of the Licensed Products,** LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and all promotional and advertising material associated therewith.

License Agreement, Exhibit "A," (emphasis supplied).

These three provisions form the core of all license agreements:  a royalty payment to the licensor; the licensor's ability to audit its licensee; and the licensor's quality control over the goods and service bearing his trademarks ("Licensed Product").  These provisions take on even more

3

significance because Stelor is Silvers' exclusive licensee. Silvers has entrusted his valuable intellectual property to Stelor, and must completely rely on Stelor to responsibly develop the property, commercialize it, and make money for Silvers.

As detailed below, Stelor repeatedly failed to perform its obligations under these three provisions, and many other provisions of the License Agreement. Silvers' termination was based on these breaches among others.

B.     The Consulting Agreement

At the time the parties entered into the License Agreement, Stelor retained Silvers to serve as a consultant, as reflected by the Letter Agreement dated June 1, 2002 (Exhibit "B") ("Consulting Agreement"). The Consulting Agreement required Stelor to compensate Silvers by, *inter alia*, providing a written agreement granting Silvers options for Stelor's stock; Stelor was also required to reimburse Silvers for expenses related to his consulting services. Id., ¶1(b). Significantly, if Stelor breached the compensation provisions of the Letter Agreement, without curing in 30 days, Silvers is entitled to "immediately terminate" the License Agreement without notice. Id., ¶1(c). Three years have passed, yet Stelor has never provided the required options agreement to Silvers, instead offering a variety of excuses. Silvers' termination is based on this breach as well.

C.     Audit Request and Stelor's Refusal

Stelor kept Silvers in the dark about its commercialization of the Googles IP from the inception of the license. After Silvers retained counsel, on November 5, 2004 he requested an audit pursuant to the License Agreement (Exhibit "C"). Stelor must arrange for the audit and provide a date within 30 days (Exhibit "A," ¶IV). Despite Silvers' absolute right to the audit, Stelor refused to permit it (Exhibit "L," ¶5).

4

D.    The Notice of Breach, Stelor's Failure to Cure, and the Termination

On November 12, 2004, Silvers sent Stelor a notice of breach letter setting forth the litany

of breaches by Stelor under both the License Agreement and Consulting Agreement (Exhibit "D").

Stelor had 60 days to cure its breaches under the License Agreement (Exhibit "A," ¶IX(A)). The

cure period for breach of the Consulting Agreement had long passed. Because Stelor failed to cure

even one of the breaches within 60 days, Silvers advised Stelor on January 13, 2005 that the License

Agreement was terminated (Exhibit "E").

E.    The Settlement Agreement

At the time Silvers originally terminated Stelor, Silvers and Stelor were embroiled in a

lawsuit in this Court related to claims each brought against the other.   On January 28, 2005, the

parties entered into a Settlement Agreement (Exhibit "F").   Stelor was required to cure the most

critical breaches under the License Agreement and Consulting Agreement, and agreed to additional

obligations, including paying advance royalties to Silvers. *Id.*, ¶10. The obligations of Stelor to

Silvers under the Settlement Agreement included permitting Silvers an audit, *Id.*, ¶14; providing

Silvers samples of the Licensed Product Stelor is offering for sale, *Id.*, ¶15; and certification that no

royalties are owed, *Id.*, ¶12.

In connection with the Settlement Agreement, Silvers agreed to defer the termination, and

give Stelor an opportunity to remain his licensee by curing the outstanding breaches. But, while he

"withdrew" his termination dated January 13, 2005, *Id.*, ¶3, and p. 1 Recitals (withdrawal refers only

to January 13, 2005 letter), Silvers did <u>not</u> withdraw his Notice of Breach Letter dated November

12, 2004. The parties acknowledged that Stelor's existing breaches as set forth in the Notice of

Breach Letter would be deemed cured <u>only if</u> Stelor performed its obligations under the Settlement

5

Agreement: "The parties intend that **full** performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other." (Exhibit "F," page 1). Defective performance by Stelor, obviously, left the already noticed breaches uncured and, in light of Silvers' November 12, 2004 Notice of Breach, the table was set for reinstating the termination with no further notice.

After Stelor breached the Settlement Agreement, and failed to cure the breaches of the License Agreement despite having notice for five months, on April 27, 2005 Silvers again notified Stelor the License Agreement was terminated (Exhibit "G"). Two days later, Stelor belatedly sought to "cure" its breaches by blaming Silvers for its defective performance, then offering to make the outstanding payments, offering an audit, offering to provide samples, and providing an incomplete and non-conforming royalty statement (Exhibit "H"). This letter, aside from constituting an outright admission that Stelor had not cured its breaches as of the April 27, 2005 termination, is typical of Stelor's non-performance of its obligations. Instead of simply doing what it has agreed to do, and is obligated to do, Stelor insists on imposing new conditions on Silvers in order to perform.

### The R&R

Stelor brought this action, claiming the termination was wrongful, and sought a preliminary injunction that would "undo" the termination, and compel Silvers to specifically perform the agreements, in effect allowing Stelor to continue using Silvers' intellectual property despite the termination.

The R&R suggests the mandatory injunction requested by Stelor be entered. In so concluding, the Magistrate misconstrued the License Agreement and Settlement Agreement, grafting an additional notice requirement on Silvers as a condition to termination. This new requirement

6

follows the erroneous conclusion that Stelor has "fully complied" with the Settlement Agreement. The Magistrate's findings, and logic, can be summarized as follows:

        (I)      If Stelor fully complied with the Settlement Agreement, all breaches set out in the Notice of Breach Letter are deemed to be cured.

        (ii)     Stelor fully complied with the Settlement Agreement.

        (iii)    Therefore, all breaches were cured, and the April 27, 2005 termination must be based on <u>new</u> breaches subsequent to the date of the Settlement Agreement.

        (iv)    Silvers must, and did not, provide a new notice and cure period for the "new" breaches prior to terminating the license.

R&R at pp. 13-23.

### The Flaws in the R&R

The lynchpin in the R&R's analysis is the premise that Stelor "fully performed" its obligations in the Settlement Agreement. As explained in detail below, that finding is contradicted by largely undisputed evidence. And, if Stelor did not fully perform, the formula invoked by the R&R falls apart, because the existing breaches cannot be deemed cured, and it is undisputed Silvers provided notice and a cure period for those breaches.

### Snapshot of Stelor's Breaches as of April 27, 2005 Termination

The Magistrate found, incredibly, that Stelor had "fully performed" under the Settlement Agreement. R&R at 22. In fact, as of April 27, 2005, Stelor had not cured most of the breaches underlying and referenced in the Settlement Agreement, and had also failed to perform additional obligations it had under the Settlement Agreement. Indeed, prior to the April 27, 2005 termination, Stelor flat out advised Silvers it would not comply with the agreements (Exhibit "L," ¶21). (Stelor

7

board not interested in "adherence to the license and settlement agreement;" go ahead and sue us).

Below, we detail Stelor's breaches of the audit, royalty reporting and sample requirements; these

defects are all set out in the Notice of Breach Letter and incorporated in the Settlement Agreement,[3]

and are the basis for Silvers' termination.

**Audit:** Silvers requested the audit on November 5, 2004 (Exhibit "C"). Under the License

Agreement, Silvers has an absolute right to the audit; Stelor must provide a date for the audit within

30 days of Silvers' request (Exhibit "A," ¶4). Stelor refused (Exhibit "L," ¶5). Silvers put Stelor

on notice of this breach in the Notice of Breach Letter (Exhibit "D"). In the Settlement Agreement,

Stelor agreed to cure this breach (Exhibit "F," ¶14). Stelor never provided a date for the audit,

despite repeated requests by Silvers' counsel. (Exhibit "L," ¶¶12-25). Not counting numerous

phone calls, we requested a date <u>nine</u> times by email; Stelor repeatedly stonewalled or sought to

impose additional conditions before allowing the audit. *Id.* As of April 27, 2005, more than five

months after Silvers requested it, Stelor had still not provided a date for the audit. Based on this

breach of the License Agreement and Settlement Agreement, Silvers again invoked his right to

terminate (Exhibit "G"). After the termination, Stelor offered excuses for its breach, and tried to

impose more conditions for the audit (Exhibit "H") ("Whenever Stelor receives such a letter [from

Silvers' auditor] it will cooperate"). Even after the termination, all Stelor could muster is another

condition to impose on Silvers as a requirement for Stelor to "cooperate." As of today, seven months

---

[3]The Magistrate erroneously considered Stelor's post-termination attempt to cure (Exhibit "H") to determine the propriety of Silvers' termination two days earlier (Exhibit "G"). As detailed *infra*, the Magistrate compounded this error by misreading Stelor's belated cure attempt as remedying the audit, royalty payment, royalty reporting and sample breaches. Actually the belated cure attempt is compelling evidence that, as of April 27, 2005, Stelor had <u>not</u> fully performed under the Settlement Agreement.

8

after Silvers requested it, Stelor has still not provided a date for the audit. Based on this record, the Magistrate erred in finding Stelor has "fully complied" with its obligation to allow Silvers an audit.

**Royalties and Statements.** Silvers gave Stelor an exclusive license because he wants to - - and should - - make money commercializing his intellectual property. Stelor has not paid a cent in royalties since inception of the license. Yet, it is undisputed Stelor has commercialized the project by selling "Googles" merchandise and "GooTunes" on the internet through the CafePress.com and Itunes websites (Exhibit "I"). Sales of GooTunes have been very good. *Id.* The License Agreement requires Stelor to provide quarterly reports detailing these and other activities relating to "Googles'" goods and services, even if there are no sales (Exhibit "A," ¶III).

Stelor has <u>never</u> complied with the reporting requirement. Since inception, Stelor provided non-conforming statements after they were due, or provided nothing at all (Exhibits "J," "O," ¶16(a)). Stelor did not even provide a report for the last two quarters of 2004. *Id.* The reports Stelor did provide indicate <u>no</u> activity, describe <u>no</u> Licensed Products and have no country-by-country breakdown. *Id.* Yet, Stelor has marketed Licensed Product over the internet and in foreign countries since 2002 (merchandise) and mid-2004 (GooTunes) (Exhibit "O," ¶¶13-15). The Magistrate clearly erred in finding Stelor "fully performed" its royalty reporting obligation.

The Magistrate erred by relying on a royalty report provided <u>after</u> the termination, (R&R, p. 20), to determine whether Silvers' termination was proper, but worse, the inadequate information Stelor supplied in the post-termination report was credited by the Magistrate based on the sworn testimony of Steven Esrig, Stelor's president, "disavowing any knowledge of CafePress sales." *Id.* Esrig stated in his sworn declaration to the Court the following:

9

> "[Stelor] was only just made aware that an on-line shop at Cafepress.com was carrying Googles merchandise, without Stelor's authorization or knowledge. We were previously unaware of the existence of this shop, and suspect that it was established by someone outside of Stelor using our company information.

This testimony, we now know, is demonstrably false. Esrig personally set up the CafePress account, provided the Googles IP graphics to the CafePress website, priced the product, paid the bills for the "space" on the CafePress website and was the designated account contact. *See* Decl. of Paul Worsham, Exhibit "M." We recently confirmed this information ourselves with CafePress.com (Exhibit "R"). Taking the true facts into consideration, the R&R should find that "if such sales were authorized, it would be reasonable to expect Plaintiff to account for the sales in a royalty statement. R&R, pp. 20-21 (our paraphrasing).

And the R&R makes no mention of a compelling fact demonstrating Stelor's breach of the royalty reporting requirement - - Stelor's sales, since mid-2004 of GooTunes music on Itunes (Exhibits "I," "O," ¶13). Silvers located a receipt reflecting the sale of a GooTunes compact disc in August, 2004. This evidence has never been explained by Esrig, despite his lengthy declaration, so Stelor's excuse for this breach remains a mystery. We do know such sales have not been reported to Silvers (for that matter, Stelor reported no sales for the period June 2002 - December 2004) before or after the termination. The August 2004 Itunes receipt, *Id.,* is clear evidence that Stelor has breached the royalty reporting requirements. What other sales have not been reported? We do not know because Silvers cannot conduct an audit . . . .

Finally, the Magistrate erroneously determined Stelor had <u>paid</u> the required royalty advances to Silvers. The Magistrate believed these payments were merely late, accepting at face value Esrig's testimony that Silvers "rejected" the payments, and concluded this breach was not material. R&R

10

at pp. 18-19 ("Although Plaintiff's payments may have been untimely, they were made to Defendant"). But Stelor had not made these payments to Silvers as of the April 27, 2005 termination (Exhibit "O," ¶23). It merely offered to make payments, after the termination, if Silvers complied with new conditions (Exhibit "H"). Stelor has still not made the payments as of today, seven (7) weeks after the termination. At present, Stelor owes Silvers advance royalties for April, May and June 2005. Yet, per the R&R, this is merely a "technical" breach because the Magistrate erroneously concluded the payments were made late when, in fact, they were not made at all. R&R, pp. 19-20.

Silvers put Stelor on notice of the royalty reporting defect in his Notice of Breach Letter (Exhibit "D"). Under the Settlement Agreement, Stelor agreed to cure the breach (Exhibit "F," ¶15). Stelor did not. Stelor's uncured breach, as well as Stelor's failure to pay the advance royalties justifies Silvers' April 27, 2005 termination of the license. After the termination, Stelor provided a report for the first quarter of 2005 (Exhibit "H"). This report, in addition to not curing the defects in the June 2002 through December 2004 reports, is also non-conforming and incomplete. For example, Stelor treats the GooTunes as a "derivative," when it is clearly a Licensed Product calling for a higher royalty. Moreover, the reported sales are grossly inconsistent with the huge success of GooTunes (Exhibit "I"). And, Stelor's 2005 report conceals the sale of Licensed Products through the Cafepress.com website. Despite these undisputed facts, the R&R concludes Stelor "fully performed" this requirement.

**Samples.** Stelor is required to provide Silvers with "samples of all Licensed Products which [Stelor] intends to manufacture and sell and of all promotional and advertising material associated therewith." (Exhibit "A," ¶¶VI(b) and (c)). The reason for the sample requirement is the need of the Licensor (Silvers) to ensure the quality of goods and services which use the Googles IP; without

11

such quality control, any license is meaningless and could be attacked as legally invalid.[4]  And, to accomplish this purpose, Stelor must provide the samples "prior to" using the Googles IP with Licensed Products and related promotional materials.  *Id.*

Stelor has not provided a <u>single</u> sample to Silvers, other than jewel cases for the two GooTunes compact discs (Exhibit "O," ¶23(g)).[5]  This breach was set out in the Notice of Breach Letter, as a basis for termination (Exhibit "D").  Stelor again agreed to provide samples in the Settlement Agreement (Exhibit "F," ¶15).  In addition to repeated requests by telephone, we requested the samples by email three times (Exhibit "L," ¶¶26-33).  Stelor actually claimed there were no samples.  *Id.*  We then pointed Stelor to merchandise and advertisements discovered by Silvers, for which there had to be samples.  *Id.*  Still no samples were provided as of April 27, 2005 (Exhibit "G").  Silvers had to purchase CafePress.com merchandise himself to check for quality (Exhibit "O," ¶14).  Stelor belatedly offered samples after the termination (Exhibit "H"), but to this day has not provided any.  Nor does Silvers know what samples Stelor is teasing him with.

---

[4]Another purpose is to ensure Stelor's compliance with the related requirement that the Licensed Products include "all appropriate legal notices" (Exhibit "A," ¶VI(A). Stelor has consistently breached this provision since inception.  For example, Stelor registered trademarks and domains in <u>its</u> name, or Esrig's name, instead of Silvers' name (Exhibit "O").  And, even now, Stelor's page on the CafePress website claims a copyright in graphic images for which Silvers owns the copyright.  *Id.*, ¶14.

[5]These are the samples apparently described in the dubious Esrig Declaration, ¶28(e).  Esrig conveniently failed to identify the samples, or disclose that he never provided samples of the GooTunes product <u>before</u> selling it, or that Stelor has never, prior to implementation, provided samples of its website, trade show merchandise, advertising copy, all of which uses the Googles IP.  Example of samples Silvers has collected on his own, after the fact, which were omitted in Esrig's Declaration, are at Exhibit "K."  Additional samples Stelor never showed Silvers were submitted by Stelor to the Magistrate and entered as evidence of the preliminary injunction hearing.

12

Incredibly, Stelor's big "launch" is planned to begin in just a few days, and Stelor has not provided a single sample of merchandise, advertising or website content to Silvers related to that!!

The Magistrate erred in finding Stelor had "fully complied" with the sample requirement. Moreover, the R&R dilutes Stelor's sample obligations and encourages Stelor to continue to flaunt its obligations under the license.

**Consulting Agreement.**  As of April 27, 2005, Stelor had cured its breach of failing to reimburse Silvers' consulting expenses, albeit missing the deadline in the Settlement Agreement (Exhibit "O," ¶23). But, Stelor had not - - and still has not - - provided Silvers with the options agreement, as required by the Settlement Agreement. Compensation is a material term of any agreement. Stelor's breach of the options agreement requirement is, in itself, sufficient grounds to terminate the license. And the Consulting Agreement specifically gives Silvers that right (Exhibit "B," ¶1(c)). The Magistrate erred in finding Stelor has "fully complied" with the Settlement Agreement in light of its failure to provide the options agreement since <u>June 2002</u>! The Magistrate apparently bought Stelor's latest excuse that its delay results from converting to a limited liability company. R&R at p. 21. Yet, Stelor has failed to provide the options since June, 2002, when the obligation initially arose. And Stelor's limited liability company was formed in <u>2002</u>, (Exhibit "Q"), so waiting until 2005 is inexcusable.

### The R&R Misconstrues the Agreements

The R&R also found Stelor could breach the Settlement Agreement with impunity based on erroneous reading of the agreement. The R&R faults the Settlement Agreement as having no deadlines for Stelor's performance. R&R at 21-22. Thus, the R&R concludes, Stelor's defaults cannot breach the Settlement Agreement, because no deadlines for Stelor's performance had passed

13

as of the April 27, 2005 termination. Such an interpretation results in Stelor having <u>no</u> obligations whatsoever; Stelor's breaches are all excused because, in the future, someday, Stelor might cure. This was not the intent of the parties. And, aside from whether "Stelor has not performed yet" translates to "Stelor fully performed," an illogical leap, the no deadlines interpretation misconstrues the Settlement Agreement. The deadlines for Stelor's performance had already passed - - that is what led to the original termination. The lack of deadlines in the Settlement Agreement reflects the party's intent that Silvers could terminate the license at will based on Stelor's non-performance of the Settlement Agreement (Exhibit "L," ¶¶8-11). And, to the extent the Court needs deadlines, the License Agreement provides them.[6] Silvers gave Stelor more than three months to perform its obligations under the Settlement Agreement before finally terminating the license. Even if deadlines should be written into the Settlement Agreement - - and they should not - - Stelor missed every one of them. Rather than vitiate Silvers' right to enforce Stelor's obligations under the Settlement Agreement, the R&R should view Stelor's performance in light of whether it cured the breaches within a reasonable time. Clearly it has not.

The R&R's imposition of an additional notice and cure requirement also misconstrues the plain terms of the parties' agreements. The R&R grafts onto the Settlement Agreement a requirement that Silvers provide notice to Stelor, and a cure period for any breaches of the Settlement Agreement; according to the R&R, this requirement is grounded in the License Agreement. R&R at 27. Actually, the parties specifically omitted a notice and cure provision from the Settlement Agreement because Silvers had already met this requirement under the License

---

[6]For example, the audit has a 30 day deadline; the samples must be provided "prior to" use by Stelor; the royalty reports are due each quarter, and so on.

14

Agreement. In the Settlement Agreement, Silvers' withdrew his termination of the license, but did not withdraw the November 12, 2004 Notice of Breach Letter( Exhibit "F," ¶3 and Recitals). (Silvers withdrew the January 2005 letter regarding termination; Notice of Breach Letter <u>not</u> withdrawn). The Settlement Agreement is designed to preserve the positions and claims of the parties as of the settlement date (Exhibit "L," ¶¶8-11). Thus, the parties agreed to dismiss the then pending action <u>without</u> prejudice.[7] *Id.* The parties intended for Stelor to have another chance to stave off termination, but to maintain the status quo as of January 28, 2005, and all their rights to return to that status quo, if Stelor did not cure. *Id.* The Settlement Agreement, in effect, allowed either party to return to the pre-settlement status quo at their will. *Id.* That status quo included Silvers' Notice of Breach Letter dated November 12, 2004, and the expired cure period.

The "new" notice requirement imposed by the R&R does not make sense. Under this logic, Stelor can (and did) continue to breach the License Agreement and Settlement Agreement with no consequences. Silvers would be powerless to protect and control his intellectual property, as each "new" breach by Stelor starts a "new" period before Silvers can terminate. For example, Stelor breached the audit requirement in November 2004. Silvers put Stelor on notice and, after 60 days, terminated the license. Stelor agreed in the Settlement Agreement to provide the audit. It didn't. The R&R would require Silvers to provide another breach notice and another 60 days cure period, simply because Stelor was now continuing to obstruct the audit, while breaching the Settlement Agreement. To avoid this process - - which could go on and on, the Settlement Agreement expressly states that Stelor's original breach (which has been noticed and the cure period expired) is not

---

[7]The Esrig Declaration filed by Stelor the day of the hearing misrepresented this to the Magistrate by testifying under oath the case was dismissed <u>with</u> prejudice; Stelor sought to create the inaccurate impression the Settlement Agreement resolved the dispute. Obviously, it did not.

15

deemed to be cured if Stelor breaches the Settlement Agreement. No "new" notice and cure period is required.

### Preliminary Injunction Standard

The Magistrate erred by failing to apply the proper standard for a preliminary injunction because Stelor seeks a mandatory injunction. Rather than preserve the status quo - - in which the License Agreement is terminated - - the requested injunction reverses the termination and, further, requires Silvers to specifically perform the terminated agreement. This is a classic mandatory injunction, requiring Stelor to meet its burden for injunction relief under a higher standard than "substantial likelihood" standard applied by the Magistrate.[8]

### The Elements of a Preliminary Injunction

The R&R finds Stelor is likely to prevail on the merits based on the erroneous conclusion, discussed above, that Stelor "fully complied" with the Settlement Agreement.

But the R&R also goes astray by concluding Stelor would suffer irreparable harm absent an injunction. Indeed, a terminated licensee's sole remedy for wrongful termination is an action for damages, and irreparable harm cannot arise as a matter of law.[9] As put by Professor McCarthy: "the remedy for a franchisee who alleges that she was wrongfully terminated is money damages, not the continued unauthorized use of the franchisor's trademarks. *McCarthy on Trademarks* (West 4th Ed.) at §25:31, pp. 25-66, 67. Silvers emphasized this rule in response to Stelor's motion, thus, the R&R's off-base remark that "Silvers does not refute Stelor's claim of irreparable harm" is puzzling.

---

[8]To avoid duplication, Silvers adopts and incorporates herein his Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, pp. 9-10.

[9]To avoid duplication, Silvers refers to and adopts his Memorandum in Opposition to Plaintiff's Motion for preliminary Injunction, pp. 6-8.

16

But, now that we have reviewed Stelor's "evidence" of irreparable harm contained in the Esrig Declaration filed the day of the hearing, relied upon heavily by the Magistrate, we can refute it even more.

Simply put, Stelor misled the Magistrate. As explained in the Declaration of Russell Tewksbury (Exhibit "N"), Stelor misled the Magistrate about internet technology by claiming Silvers, in reclaiming his domain names after the termination, had "taken Stelor's propriety or intellectual property," and that "our site is no longer operational;" Stelor told the Magistrate it could not "display its product,""meet with potential licensees," and that its "website had been destroyed."[10] This is all patently false. Stelor's Gootopia website was accessible to users after the termination, through its own domain name (Exhibit "P"). Stelor could also use another domain name for users' access. While using a different domain name may be inconvenient for Stelor, it has no bearing on the content or operation of its website, proprietary information for the website, the ability to display its website to interested persons, or Stelor's access to the website (Exhibit "N"). The Gootopia website Stelor operates is accessible to Stelor and internet users without Silvers' domain name. *Id.* Given that Stelor holds itself out as a technology driven, web-based company, one can only conclude Esrig's misrepresentation were intentionally designed to mislead the Magistrate in order to artificially inflate its "irreparable harm."

The balance of harm is not a black and white issue. Of course Stelor is adversely impacted by the termination. But Silvers, as licensor, is also significantly effected by being denied the right to terminate his errant licensee. And this hardship is usually deemed to outweigh the hardship on the terminated licensee. *See McCarthy, supra,* §25:31, pp. 25-68, *et seq.* (improper to allow

---

[10]Steven Esrig Declaration, ¶¶11-14, *see* Appendix, (Exhibit "S").

17

terminated franchisee to use franchisor's mark; trademark owner's harm outweighs that of terminated license holder). This is because the trademark owner in such a situation cannot exercise quality control and take other steps to ensure the mark is used consistently and appropriately. *Id.*

The R&R turns trademark law on its head by recommending an injunction against the trademark owner, allowing the terminated licensee to continue using the licensor's marks. As put by Professor McCarthy: "Clearly, a terminated franchisee who is infringing on the franchisor's trademark is not entitled to a preliminary injunction requiring the franchisor to continue doing business." *McCarthy, supra*, §25:31, ¶¶25-66. (citing *Original Great American Chocolate Cookie Co. v. River Valley Cookies*, 970 F.2d 273 (7th Cir. 1992)). Notably, in the *Burger King* cases and its cousins, the franchisor seeks to enjoin the terminated franchisor, and bears the burden of demonstrating success on the merits. In those cases, the defense of wrongful termination is given short shrift when the issue is whether the terminated party may use the franchisor's marks while the action is pending. Here, Stelor is the terminated licensee, seeking to undo the termination so it can use the Googles IP. As movant, <u>Stelor</u> bears the burden of proof, even though its basis for relief is the inevitable wrongful termination issue. Yet, if Silvers were the movant, and sought to enjoin Stelor from using his Googles IP, all he would have to make is "some type of showing that [Silvers] properly terminated the contract purporting to authorize the trademarks' use." *McDonald's Corp. v. Robertson*, 147 F.3d 1300 (11th Cir. 1998). Even though Silvers does not have the burden here, the evidence of record constitutes "some type of showing" that termination was proper. Thus, allowing Stelor to continue as licensee and use the Googles IP against the owner's wishes is an inappropriate result.

18

## The Recommended Preliminary Injunction is Overbroad

The Magistrate, no doubt based on the misinformation contained in Esrig's testimony, would compel Silvers to "return control and use of the Googles.com website and content to Stelor . . ." R&R, p. 34.[11] Silvers cannot do this, because he has no control over Stelor's website or its content. Only Stelor does! (Exhibit "N"). All Silvers controls is the googles.com domain name which is simply one of many ways an internet user can access Stelor's website. And under the license,[12] Stelor's rights are limited to <u>use</u> of the domain name, not <u>control</u>. Stelor is like a tenant, with the right to use space it has rented. It has no right to control the building. Thus, the Magistrate's intent to restore the status quo prior to the termination goes too far - - because it appears to grant control of the domain names to Stelor. Stelor had no such control before the termination, it is beyond peradventure how it can obtain "control" via an injunction, which is necessarily limited to Stelor's rights as licensee and the status of the domains before the termination.

Moreover, the suggested injunction has been implemented in a Temporary Restraining Order which has been applied in a manner far beyond the pre-termination status of Silvers' domain names. The domain registrar for the domain names has, based on the order, put an administrative lock on 77 other domains never used by Stelor, depriving Silvers of his right as owner to use the domain names. Any injunction therefore, should be limited solely to the googles.com domain and should compel Silvers to allow Stelor to <u>use</u> the domain names, not <u>control</u> it.

---

[11]Stelor usually calls its website "Gootopia."

[12]Actually, the License Agreement does not encompass domain names, and gives Stelor no rights in any of Silvers' domain names. Without waiving this position, Silvers has no objection for purposes of the injunction motion to treating the googles.com domain name as a licensed property.

19

## CONCLUSION

The Court should not adopt the R&R based on a *de novo* review of the evidence and applicable case law. Stelor's motion for preliminary injunction should be denied, and the issue of wrongful termination should be left for trial and damages, if any. At minimum, the Court should refer the matter back to the Magistrate to reconsider in light of his reliance on the misleading testimony of Stelor's president and the erroneous factual and legal findings.

Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.    KOZYAK TROPIN & THROCKMORTON, P.A.
Co-Counsel for Defendant    Counsel for Defendant
200 S.E. First Street, Suite 708    2525 Ponce de Leon, 9th Floor
Miami, FL 33131    Coral Gables, Florida 33134
Telephone: (305) 374-1920    Telephone: (305) 372-1800
Adam T. Rabin, Esq.

By: _____
Kenneth R. Hartmann
Florida Bar No: 664286
Gail M. McQuilkin
Florida Bar No. 969338

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was ~~mailed~~ this hand-delivered _____ day of June, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq., Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove, Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

By: _____
Kenneth R. Hartmann

3339/101/254174.1

20