UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  05-80393 CIV HURLEY/HOPKINS

STELOR PRODUCTIONS, L.L.C., a
Delaware limited liability company
f/k/a STELOR PRODUCTIONS, INC.,

        Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

        Defendant.

_____/



**NIGHT BOX
FILED**

JUL 0 1 2005

CLARENCE MADDOX
CLERK. USDC / SDFL / FTL

## PLAINTIFF'S OPPOSITION TO SILVERS' OBJECTION
## TO REPORT AND RECOMMENDATION

Plaintiff STELOR PRODUCTIONS, L.L.C. ("Stelor"), by and through undersigned counsel, hereby opposes Defendant's Objection to Report and Recommendation ("Report"):

## I. INTRODUCTION

The Magistrate's Report is thorough, well-reasoned and correct.  It should be adopted by this Court and the recommended injunction entered.  As the Magistrate analyzed in detail, Defendant Silvers' claims that Stelor breached a License Agreement between the parties are simply unfounded.  Silvers' termination of the License Agreement was rash and improper, and obviously motivated by his desire to pursue a trademark infringement action against Google, Inc. – the internet giant – although that right belongs to Stelor under the Agreements.  (DE 24 at 3). Entry of an injunction is required to prevent irreparable injury to the Plaintiff.

Stelor has the exclusive right to control, use and protect the valuable Googles intellectual property.  The googles.com domain name (and the corresponding www.googles.com internet address) is a critical component of that property, and the foundation of the business Stelor has spent three years and $4 million developing.  The hundreds of thousands of "hits" on that address each day, and the existing base of 600,000 registered users, are what attract the investment capital and potential licensees required for Stelor's business to develop.  Without the user base and ongoing traffic associated with the www.googles.com address – which no other address available to Stelor could produce – the business is simply not commercially viable.

CASE NO. 05-80393 CIV HURLEY/HOPKINS

As a result of last week's successful trade show in New York, interest from potential licensees and promoters is at an unprecedented height, as are the prospects for Stelor's ongoing business. If access to the www.googles.com internet address is lost, all of the momentum and success from the trade show will have been for naught, and irreparable harm will clearly occur.

To discredit the Magistrate's findings, Silvers now resorts to the extreme tactic of claiming Stelor and its CEO, Steven Esrig, misled the Magistrate, misrepresented facts, and presented perjured testimony. They did not. Silvers' late-filed declarations are incomplete half-truths that distort and mischaracterize the testimony accurately provided by Mr. Esrig. Silvers' barrage of new material, moreover, simply does not contradict the fundamental facts on which the Magistrate relied. The declarations also undermine the procedure of referral to the Magistrate. Silvers had a full and fair opportunity to argue the issues before the Magistrate. Having failed to do so, he should not be permitted to re-write the record now.

Silvers' objections should be overruled, and the Magistrate's recommendation adopted. Stelor's Motion for Preliminary Injunction should be granted, and Silvers' enjoined as recommended by the Magistrate.

## II. FACTUAL BACKGROUND

Defendant Silvers is the creator of the Googles from Goo, a set of characters and stories to entertain and educate children. Plaintiff Stelor is the exclusive licensee of that property, pursuant to the License Agreement executed in 2002 (with a 40 year term (DE 1, Ex. A, Sched. A)). Although Stelor has just begun to earn revenue, Stelor has already paid Silvers hundreds of thousands of dollars in consulting fees and advances against future (but unearned) royalties. Supplemental Declaration of Steven A. Esrig ("Supp. Esrig Decl."), filed herewith, ¶ 3.

### A.     The Parties' History.

The parties' relationship, however, has been contentious. Silvers' persistent interference with Plaintiff's business, including Stelor's legal efforts to protect the intellectual property, forced Stelor to file a prior lawsuit for breach of contract in October 2004 ("Prior Action"), Case No. 04-80954.

Silvers' response to the Prior Action was to send written notice on November 12, 2004, claiming that Stelor was in default of various of its obligations. (DE 1, Ex. C). The letter was purely a litigation tactic, sent as a pretense for a baseless counterclaim to terminate the License Agreement filed by Silvers three days later. (Prior Action, DE 14). A "formal" termination letter followed on January 13, 2005.

2

CASE NO.  05-80393 CIV HURLEY/HOPKINS

Two weeks later, on January 28, 2005, believing the dispute had been resolved, Stelor entered into the Settlement Agreement, the Prior Action was dismissed,[1] and Silvers reinstated the License Agreement.  As the Magistrate found, "Under the Settlement Agreement, Silvers withdrew his notice of termination of the License Agreement, and reaffirmed his obligations under the License Agreement." (DE 24 at 6, ¶ 10).  The parties proceeded to operate under the Agreements, in fact working together through counsel to prepare a trademark infringement action against Google, Inc.  The parties were in constant contact during that process, until the end of April, when Silvers' counsel became incommunicative.

With no prior notice, Silvers then unilaterally terminated the License Agreement by letter dated April 27, 2005.  (DE 1, Ex. C).  Silvers' letter violated the express provision in the License Agreement requiring, before termination, written notice of a breach and a 60 day cure period:

> **Right to Terminate on Notice.**  This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

(DE 1, Ex. A, ¶ IX(A)).  As the Report makes clear, one of the obligations Silvers expressly reaffirmed in the Settlement Agreement was this obligation "to provide notice of material breaches and 60 days cure period prior to termination." (DE 24 at 17).   Silvers' April 27, 2005 letter provided neither, purporting to terminate "effective immediately." (DE 24 at 6, ¶ 11).

**B.**    **Silvers' Termination of the Agreements and Shut Down of the Website.**

Following his termination, Silvers by his own admission stopped complying with the Agreements (DE 13 at 5) ("Silvers is admittedly not complying with the License Agreement because he is no longer bound by it").  He unilaterally filed an action against Google, Inc., pending as case no. 05-80387-CIV-RYSKAMP – "a right which, under the License Agreement, belongs to Plaintiff." (DE 24 at 3; DE 1, Ex. A, ¶¶ VIII & XI).  He also redirected the googles.com domain name, shutting down Stelor's website.  And, he did so, even though he had previously promised Stelor and its board that he would never take such drastic action until a court had ruled on the issue. (DE 16, Ex. C).

---

[1] Silvers correctly notes the dismissal was without prejudice, but claims that Stelor intentionally misled the Magistrate that the dismissal was with prejudice.  That is wrong.  Not only was the dismissal an Exhibit to Mr. Esrig's Declaration (DE 16, Ex. D), but when the issue came up during the hearing, counsel for Stelor reviewed the dismissal with the Magistrate and confirmed it was without prejudice. (DE 26 at 63-64).

CASE NO. 05-80393 CIV HURLEY/HOPKINS

As a result of Silvers' actions, Stelor lost access to the www.googles.com address, the cornerstone of its entire business. Stelor also lost access to proprietary information and data that was stored on a secure server at Verio Inc. *See* Declaration of Martin I. Jeffery ("Jeffery Dec."), filed herewith, ¶¶ 13-31. As the Magistrate thus found, the website located at www.googles.com had been redirected, and no longer contained Stelor's information. (DE 24 at 6, ¶ 12).

**C.    The WWW.GOOGLES.COM Address Is Critical to Stelor's Continued Business.**

The Magistrate properly understood the critical and continuing importance of the www.googles.com internet address to Stelor, and recognized that continued disruption of Stelor's access to the site would result in irreparable harm to Stelor's business. The reason is that the www.googles.com address has a proven ability to attract users to the address, and has already enabled Stelor to build a registered user base of more than 600,000 in number. Each day, moreover, the site attracts tens, if not hundreds, of thousands of additional users.[2]

The existing registered user base and continued traffic on the www.googles.com site are the key factors in attracting investment capital, potential licensees, and generally promoting Stelor's business. Without that user base and traffic, which no other internet address available to Stelor can provide, the business is simply not commercially viable. Indeed, as a result of Silvers' actions in redirecting the domain name and shutting down the website, Stelor lost an investor who had previously committed to invest. Stelor was advised that the investor would "look at us again when we got control of our site." Without access to www.googles.com Stelor's entire business is at risk. Jeffery Dec. ¶ 9; Supp. Esrig Dec. ¶ 38.

For these reasons, moreover, Stelor has always emphasized the "googles.com" domain name in its marketing efforts.[3] Consistent with that approach, Stelor's displays and promotional materials at the recent trade show highlighted the critical importance of the www.googles.com name. The featured piece of Stelor's entire booth referenced www.googles.com in bold letters and colors. The promotional material for the show similarly featured the www.googles.com

_____

[2] On May 1, 2005 – before Silvers re-directed the domain name – the site had 108,053 hits! By June 1, 2005, the number of hits had dropped to 8. On June 10, 2005, when the site was actually restored after entry of the TRO, the number of hits reached 20,774. As of June 22, 2005, during the trade show, the number of hits surged to 135,173. Jeffery Dec. ¶ 7, Ex. A; Supp. Esrig Dec. ¶ 36, Ex. N.

[3] Silvers uses the term "Gootopia Website" in the Objection. That term nowhere appears in Mr. Esrig's declaration, and as set forth below is a mischaracterization by Silvers.

CASE NO. 05-80393 CIV HURLEY/HOPKINS

domain name. Jeffery Dec. ¶ 10, Exs. B & C; Supp. Esrig Dec. ¶ 39, Exs. O & P. Silvers' claims that Stelor did not use the domain name in connection with the show are patently wrong.

Stelor successfully commenced its launch at the trade show in New York held by the Licensing Industry Merchandisers' Association (LIMA) during the week of June 21, 2005. Interest from potential licensees and promoters is now at an unprecedented height, as are the prospects for the ongoing development of Stelor's business. Stelor plans formally to "unveil" the new developments to its website this fall. In addition to Stelor's proprietary technology that will make the site "kids safe", Stelor has also developed 160 additional characters and related story-lines. Stelor has chosen the fall because it expects its license relationships will be established and the website will then have the maximum impact. Any disruption in Stelor's access to the www.googles.com address, however, will irreparably harm the ongoing development of this business. Jeffery Dec. ¶¶ 3-4; Supp. Esrig Dec. ¶¶ 32-33.

### III. SILVERS LATE-FILED DECLARATIONS SHOULD NOT BE CONSIDERED

In addition to the total lack of merit to the assertions by Silvers (himself a convicted felon) of perjured testimony, his late-filed declarations are procedurally improper. Silvers had a full opportunity to present his evidence and arguments to the Magistrate. He chose not to include this information, and he should not be permitted to do so now.

In reviewing objections to a Magistrate's report and recommendation,

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

28 U.S.C. § 636(b)(1). As the Court emphasized in *U.S. v. Raddatz*, 447 U.S. 667, 675 (1980), "[n]ormally, the judge, on application, will consider the record which has been developed before the magistrate and make his own determination on the basis of that record, without being bound to adopt the findings and conclusions of the magistrate." *Id.* at 675. As *Raddatz* emphasized, requiring otherwise "would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts. We cannot 'impute to Congress a purpose to paralyze with one hand what it sought to promote with the other.'" *Id.*

Following these standards, the courts have sharply delineated the situations in which a district court reviewing a magistrate judge's report and recommendation should accept any

CASE NO.  05-80393 CIV HURLEY/HOPKINS

additional evidence.  In *Drew v. Dept. of Corr.*, 297 F.3d 1278, 1290 n.4 (11th Cir. 2002), the Court agreed that a party's "failure to present the evidence to the magistrate judge" would authorize the district court to exercise its discretion and "decline to consider the evidence at all." Allowing the seriatim presentation of evidence is wasteful of court resources and defeats the purpose of referring matters to a magistrate judge in the first place.

> The purpose of the Federal Magistrate's Act is to relieve courts of unnecessary work.  It would defeat this purpose if the district court was required to hear matters anew on issues never presented to the magistrate.  *Parties must take before the magistrate, not only their "best shot but all of their shots."*

*Borden v. Secretary of Health and Human Services*, 836 F.2d 4, 6 (1st Cir. 1987) (emphasis added; citations omitted).  Not only is piecemeal presentation of evidence wasteful, but it unfairly burdens the opposing party, encourages the withholding of evidence, and rewards careless preparation of papers for the magistrate judge:

> [P]ermitting such piecemeal presentation of evidence is exceptionally wasteful of the time of both the magistrate and district judges, the former having been compelled to write an arguably useless report based on less than the universe of relevant evidence and the latter being deprived of the benefit of the magistrate judge's considered view of the entire record. . . . [And], there would be instances in which parties would be encouraged to withhold evidence, particularly evidence which might be embarrassing as well as helpful on the merits, in the expectation of using it before the district judge only if they failed to prevail before the magistrate judge on a more abbreviated showing.

*Morris v. Amalgamated Lithographers of America*, Local 1, 994 F. Supp. 161, 163 (S.D.N.Y. 1998); *see also Virgin Ent. Ltd. v. Virgin Cuts, Inc.*, 149 F. Supp. 2d 220 (E.D. Va. 2000) (citing *Morris*).  "[A] party may not 'hold back' in the proceeding before the magistrate, hoping to submit additional affidavits or exhibits to the district judge in objection to the magistrate's determination."  *Callas v. Trane CAC, Inc.*, 776 F. Supp. 1117, 1119 (W.D. Va. 1990), *aff'd.* 940 F.2d 651 (4th Cir. 1991)

Applying these standards here, Silvers' late-filed declarations should not be considered. The Magistrate's May 12, 2005 Order set an evidentiary hearing and advised that the Magistrate was inclined, "[d]ue to the expedited nature of this matter", to accept declarations into evidence. (DE 8, ¶ 5).  Silvers proceeded within this framework, submitting his own declarations and an extensive opposition memo.  (DEs 11-13).  Of course, to prejudice Stelor, he waited until Friday, May 20, 2005 – one business day before the May 23rd hearing – to serve his papers.

Stelor promptly responded to Silvers' last-minute papers, filing its Reply and the counter declarations of Mr. Esrig and Mr. Kaplan immediately the next business day – the day of the hearing.  At the start of the hearing before the Magistrate, Stelor's counsel specifically addressed the timing of that filing; Silvers' counsel made no objection and asked for no additional opportunity to review or respond to Stelor's filings. (DE 26 at 3:17-18; :23-25).

Mr. Esrig himself was also present at the hearing.  Counsel for Stelor offered several times during the course of argument to have Mr. Esrig testify as to the contents of his Declaration, answer any questions from the Court, or be cross-examined by Silvers' counsel.  If Mr. Esrig had testified at the evidentiary hearing, rather than by declaration, the effect would have been exactly the same.  Silvers' counsel declined to cross-examine, advising the Magistrate that: If I wanted to call him, your Honor, I would have called him.  I don't think it's necessary to cross-examine Mr. Esrig. *I think that the record that we have is what we're traveling on. . . . We're content to do that.*"  (DE 26 at 28:8-13) (emphasis added).

Unlike Stelor's representative, Silvers did not attend the hearing.  Nevertheless, Silvers chose to proceed, with his counsel advising the Magistrate that they had "thought about getting a continuance, and then we said let's just go ahead and do it." (DE 26 at 2).

Two days after the hearing, Silvers supplemented the record by filing an additional declaration from Ms. Labossiere.  (DE 21).  Silvers also submitted a proposed report and recommendation, essentially providing supplemental argument, on May 25, 2005.  (DE 20).  Then – like Stelor – he waited for the Magistrate to issue a Report.

As these facts demonstrate, Silvers engaged in a deliberate strategy with respect to the presentation of his case in opposition to the injunction.  Having made these choices, Silvers cannot now be permitted to supplement the record, filing three additional declarations, including a 58 paragraph declaration with 63 exhibits from another of his lawyers (who also chose not to attend the hearing) and a supposed internet expert.  Having elected not to present this evidence to the Magistrate, Silvers cannot legitimately ask this Court to consider it now.  He was required to take before the Magistrate not only his "best shot but all of [his] shots." *Borden,* 836 F. 2d at 6.

## IV.  MR. ESRIG'S TESTIMONY IS ENTIRELY ACCURATE

Silvers' attempt to discredit Stelor's CEO – Steven Esrig – is totally unfounded in any event.  Silvers' extreme strategy of claiming Mr. Esrig's testimony is misleading and perjured reflects the obvious weakness of Silvers' position.  As detailed below, none of his assertions are in any way accurate.  Mr. Esrig did not know that an on-line shop was carrying Googles

CASE NO. 05-80393 CIV HURLEY/HOPKINS

merchandise, and Mr. Esrig did not commission Silvers' new "surprise" witness – Paul Worsham – to set up the shop. The entire Cafepress issue is immaterial, moreover, since the only reported sale through the shop was a single coffee mug resulting in a $2.00 commission in December 2002. Nor did Mr. Esrig falsely testify about something called the "Gootopia Website", a term that nowhere appears in Mr. Esrig's declaration. Supp. Esrig. Dec. ¶¶ 6-9, 41.

A.   **Cafepress.com.**

The newly filed declaration from Paul Worsham presents an inaccurate fragment of a story of a relationship that Stelor ended in the fall of 2002. In fact, as Mr. Worsham admits at the conclusion of his declaration, he had no contact whatsoever with Mr. Esrig, Stelor or the purported Googles store at Cafepress *"[a]fter the October-November 2002 timeframe."* (DE 40, ¶ 12). Indeed, all of the alleged events referenced in the declaration occurred before then, more than two and a half years ago.

The reason for the abrupt end of all contact was because Stelor terminated any relationship with Mr. Worsham by letter dated October 3, 2002. Supp. Esrig. Dec. ¶ 7, Ex C. Stelor had been attempting to work with Mr. Worsham, who had presented a comprehensive plan for the development of Stelor's entire intellectual technology infrastructure. By the fall of 2002, though, Mr. Esrig and other members of Stelor's board believed Mr. Worsham to be unreliable and untrustworthy, and refused to have any further dealings with him of any type. In fact, many of the problems with Mr. Worsham resulted from his close relationship and apparent friendship with Silvers. Thus, rather than taking direction from Stelor, Mr. Worsham continually initiated unauthorized work at Silvers' direction, as Silvers continued to try and meddle with Stelor's business. Cafepress was one example. *Id.*

In the midst of the ongoing IT work, Mr. Worsham at one point advised Mr. Esrig that *Worsham* had set up an online store at Cafepress, and wanted to sell googles merchandise through it. Stelor, however, was not at all interested in having such a store, and especially not interested in working with Mr. Worsham at that point. In fact, Stelor had received an email on September 30, 2002 advising of fraudulent activity with the Cafepress account. *Id.* ¶ 7, Ex. C. Accordingly, Stelor advised Mr. Worsham in writing to take no action whatsoever on Stelor's behalf, including maintaining any Cafepress account for googles. *Id.*

Apparently, Mr. Worsham did not follow the instruction, and proceeded without authorization to maintain the Cafepress account. As Mr. Esrig testified in his initial declaration, until recently he remained unaware that the account had in fact been maintained, or that googles

CASE NO.  05-80393 CIV HURLEY/HOPKINS

products were being sold, notwithstanding the express instructions to Mr. Worsham not to maintain the account.  To the extent Mr. Worsham's declaration fails to explain why he had no further contact with Stelor after the fall of 2002, and how he failed to comply with Stelor's explicit instructions that he take no action, his declaration – and not Mr. Esrig's – is clearly misleading.[4]  *Id.* ¶ 8.

The entire Cafepress.com issue, moreover, is a sidelight at best.  The information that Stelor recently obtained from Cafepress after learning about the site, confirms that the only completed order as of April 2005, was of a single coffee mug priced at $10.99, allegedly generating a commission of $2.00, no share of which was ever remitted to Stelor.  *Id.* ¶ 9, Ex. D.

**B.    Silvers' Mislabeled "Gootopia" Website.**

Silvers has also set up a straw-man argument by introducing a term – "Gootopia Website" – which does not appear anywhere in Mr. Esrig's declaration.  As Mr. Esrig's declaration clearly explains, the address of the proprietary, child-safe website developed by Stelor is www.googles.com.  In certain of its promotional materials, Stelor has referred to the new, interactive features being added to the website as "Gootopia".  "Gootopia" is also used by Stelor as a general name for the fictional world that appears at the googles.com address, and related software applications.  The website, however, has always been at the www.googles.com address.  Esrig Dec. ¶¶ 7 & 9; Supp. Esrig. Dec. ¶ 41; Jeffery Dec. ¶ 12.  As set forth above, *supra* at 4-5, Stelor's marketing efforts have always focused on the googles.com domain name.  The name was featured on Stelor's booth at the recent trade show, and in its promotional materials.  Access to the www.googles.com internet address is critical to the success of Stelor's ongoing business.

Silvers apparently claims that Esrig's declaration is misleading because it claims that Stelor's business depends on access to that googles.com address.  If Silvers' point is that the content on Stelor's website could be accessed through a different internet address, that point was already addressed (and rejected) by the Magistrate.  (DE 24 at 26).  Silvers' suggestion that

---

[4] Also incredibly suspicious is the fact that Mr. Worsham – using a business card listing himself as B.J. Worsham – came to Stelor's booth at the recent trade show, misrepresenting himself as a potential licensee, and using that ruse to obtain proprietary Stelor information that obviously should not have been given to him.  *Id.* ¶ 8, Ex. C.

CASE NO.  05-80393 CIV HURLEY/HOPKINS

Stelor would suffer no harm by using a different address is entirely unsubstantiated, and in no way makes Mr. Esrig's declaration "misleading".

Indeed, the Magistrate recognized that another address could be used, but he understood the critical importance of the googles.com internet address to Stelor's business.  Thus, the Magistrate relied on the evidence showing 600,000 registered users of the googles.com website, and the existence of tens, if not hundreds, of thousands of hits on that address on a daily basis. (DE 24 at 26).  Without that foundation of existing users and ongoing traffic, the business will not succeed.  Thus, the Magistrate recommended the injunction to prevent the irreparable harm Stelor would suffer without access to the www.googles.com address.  (DE 24 at 26-27).

In addition, Silvers' technical argument – based on a declaration from his supposed internet expert – that he merely redirected the googles.com domain name away from Stelor's dedicated server is simply not accurate.  As detailed in the Declaration of Mr. Jeffery, Stelor's Senior Vice President responsible for the Company's website and technical operations, Silvers' actions shut down the website and prevented Stelor from having access even to its own proprietary data.  Jeffery Dec. ¶¶ 13-31.  The technical cause of the disruption to the website, moreover, is largely irrelevant.  The bottom line is that Stelor's continued access to that address is critical for the viability of its business.  *Id.* ¶ 13.

## V.  THE MAGISTRATE PROPERLY RECOMMENDED THE INJUNCTION

The Magistrate properly found that Stelor had demonstrated the requirements for injunctive relief, and correctly recommended that the injunction be entered.

### A.     Stelor Demonstrated a Substantial Likelihood of Success on the Merits.

The Magistrate correctly addressed the two key issues underlying Stelor's showing of a substantial likelihood of success.  As explained in the Report,

> the basis of the parties' dispute on this issue centers on whether the Defendant complied with the notice requirement of the termination clause of the License Agreement.  (DEs 13, 18).  Furthermore, Plaintiff asserts that, even had the Plaintiff breached the Settlement or License Agreement ... there were no *material* breaches of the contract, thus Defendant's termination of the License Agreement was not proper.

(DE 24 at 13) (emphasis original).  The Report fully addressed these issues in turn, identifying and then analyzing the parties' respective contentions with respect to notice and each alleged breach in a comprehensive ten-page section of the Report.  (DE 24 at 13-23).  The Report then concluded, properly, that "Plaintiff has demonstrated that a contract likely exists, and that

CASE NO.  05-80393 CIV HURLEY/HOPKINS

Defendant's actions are in breach of the License Agreement." (*Id.*)  As set forth in the Magistrate's Conclusions of Law, therefore, "[t]here is a substantial likelihood that Plaintiff will succeed on the merits of its breach of contract claim and declaratory action." (*Id.* at 32).  That holding is correct.

> ### *1.    Silvers Failed to Comply with the Agreements' Express Notice Provision.*

Undeniably, the License Agreement contains a termination clause, expressly requiring written notice in the event of a breach and a 60 day cure period:

> **Right to Terminate on Notice.**  This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

(DE 1, Ex. A, ¶ IX(A)).  "Under the Settlement Agreement, Silvers withdrew his notice of termination of the License Agreement, and reaffirmed his obligations under the License Agreement." (DE 24 at 6, ¶ 10).  One of the obligations that Silvers thereby expressly reaffirmed was "to provide notice of material breaches and 60 days cure period prior to termination." (DE 24 at 17).  There is no carve-out or reservation of rights with respect to that important protection.

The need for this notice provision is evident.  The parties entered into a complicated, long-term relationship (a 30 year term, automatically renewed for 10 years (DE 1, Ex. A at 10 ("Schedule A"))) pursuant to the License Agreement.  There are numerous obligations owed by each of the parties to the other, and an obvious risk exists that the parties will, at certain stages of the relationship, disagree about whether the requirements of the Agreements were met.  The notice provision, therefore, imposes a clear obligation on a party believing that a breach has occurred to provide written notice detailing the alleged breach and allowing a 60 day period for it to be cured.[5]  The cure period also enables a party to seek judicial intervention in the interim, if a disagreement appears insoluble.  This notice procedure is clearly required to ensure that the Licensor (the Licensee can terminate for any reason on 30 days' notice, ¶ IX(B)) cannot trump up a breach, and terminate the license at will whenever it suits him – which is exactly what Silvers has done.  The provision is plainly designed to protect Stelor, as the licensee, and ensure

---

[5] As the provision governing notices in the License Agreement expressly provides, moreover, this notice "shall be in writing and delivered personally to the other designated party . . . or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service."  License Agreement ¶ VII (DE 1, Ex. A).  Email communications between counsel, obviously, do not satisfy this notice requirement.

CASE NO. 05-80393 CIV HURLEY/HOPKINS

that the value of the multiple years and many millions of dollars it invests in developing the property under the Agreement is not jeopardized, at least before Stelor has an opportunity to cure an alleged breach. Supp. Esrig. Dec. ¶ 18.

Silvers undeniably failed to satisfy this express requirement. As a matter of law, therefore, Silvers' termination is invalid, and Stelor is substantially likely to succeed on the merits.[6]

### 2.    *Silvers' November 2004 Letter Does Not Satisfy the Notice Requirement.*

Nor can Silvers legitimately argue that a five-month-old November 12, 2004 default letter satisfied the notice requirement, enabling him to terminate the Agreements any time thereafter. That notice was sent as a litigation tactic after Stelor filed the Prior Action, and followed a few days later by a baseless counterclaim parroting the content of the letter and seeking to terminate the License Agreement. (Prior Action, DE 14). The "formal" termination letter followed on January 13, 2005. The parties, of course, resolved that dispute, and executed the Settlement Agreement, whereby Silvers expressly withdrew the January termination letter and "reaffirmed his obligations under the License Agreement", including the obligation to provide notice and an opportunity to cure prior to termination. (DE 24 at 17).

Silvers' reliance on the November letter does not square with that provision. Indeed, Silvers simply ignores his reaffirmation of the notice provisions in the License Agreement. Instead, Silvers would rely on a general provision in one of the whereas clauses in the introductory paragraphs of the Settlement Agreement, which states that "the Parties intend that full performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other Party." (DE 4 at 1). That provision, however, does not support Silvers' position that any failure by Stelor to perform in any way under the Settlement Agreement would authorize Silvers "at will" and without any notice to immediately end the parties' relationship.

---

[6] The cases cited in Stelor's Reply at 7 demonstrate that the courts have strictly enforced these notice requirements. *E.g., Florida Recycling Servs. v. Greater Orlando Auto Auction, Inc.,* 898 So. 2d 129 (Fla. 5th DCA 2005) (holding that notice and cure provisions in parties' agreement must be enforced); *Gaylis v. Caminis,* 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984) (enforcing notice and cure provisions in contract for purchase of townhouse); *Mori v. Matsushita Elec. Corp.,* 380 So. 2d 461, 463 (Fla. 3d DCA 1980) (refusal to allow required cure period constitutes anticipatory breach); *Alliance Metals, Inc. v. Hinely Indus., Inc.,* 222 F.3d 895, 905 (11th Cir. 2000) (enforcing notice and cure provision in employment contract).

CASE NO. 05-80393 CIV HURLEY/HOPKINS

Silvers' argument, if accepted, would mean that – 5 years from now, 25 years from now, or at any time during the 40 year term of the Agreements – Silvers could immediately terminate without notice if Stelor missed a payment, failed to send a royalty statement, or failed to perform (according to Silvers) any other obligation under the Agreements. Clearly, that position cannot be right.[7]

In addition, Silvers' actions in entering into the Settlement Agreement, accepting payments in mid April, and otherwise moving forward with the relationship clearly constitute a waiver of and estoppel to assert the prior notice of default, even if not expressly withdrawn in the Settlement Agreement. *See Rissman v. Kilbourne,* 643 So. 2d 1136, 1139 (Fla. 1st DCA 1994) (mortgagee estopped from claiming past due payments); *Smith v. Landy,* 402 So. 2d 441, 441 (Fla. 3d DCA 1981) (acquiescence to late payments estopped mortgagee from accelerating debt and foreclosing).

### 3.    *The Breaches Alleged by Silvers Are Unfounded and Immaterial.*

As the Magistrate's thorough analysis demonstrates, the allegations of default by Silvers are entirely unfounded in any event – a pretext to justify his wrongful termination, done to enable him to bring the action against Google, Inc. all by himself. As a threshold matter, Silvers apparently recognizes that certain of his alleged defaults were preposterous. He thus limits the discussion in his Objection to three obligations Stelor purportedly breached: "the audit, royalty reporting and sample requirements." As Silvers confirms, those "are the basis for [his] termination". Objection at 8.[8]

**a.    The Audit Allegation.** Silvers claims his termination – without notice – was justified by Stelor's failure to provide dates for an audit. Silvers attempts to bolster this argument through the late-filed declaration of his lawyer, Gail McQuilkin. That declaration devotes nearly a dozen paragraphs to this issue and 18 exhibits – information Silvers now seeks to present, notwithstanding his decision to withhold it from the Magistrate. Even with this

---

[7] Silvers' argument is also misplaced because, as a practical matter, the November Letter does not provide notice of the defaults that Silvers claimed as a basis for termination in his April 27, 2005 letter. Rather, as the Magistrate recognized (DE 24 at 22), the primary defaults specified in the April Letter refer to obligations newly imposed on Stelor under the Settlement Agreement.

[8] Accordingly, Stelor does not address the alleged failure to provide unit interest in Stelor LLC or the so-called procedural arguments (i.e., the lack of subject matter jurisdiction and standing), which the Magistrate properly rejected.

barrage of new information, however, the Magistrate's findings on the audit issue remain absolutely correct.

The Magistrate correctly found that "in April [of 2005], Defendant's counsel deferred the audit, and then renewed the request for audit on April 22, 2005." (DE 24 at 15, ¶ 4). As Mr. Esrig explained in his declaration (DE 16 at 11, ¶ 28(d)): "In fact, Silvers' counsel advised in early April that they would defer the audit. Silvers did not renew his request for the audit until his counsel sent an email dated April 22, 2005 – *5 DAYS BEFORE THE TERMINATION LETTER!*" Notwithstanding the multiple paragraphs and exhibits on this issue in Ms. McQuilkin's declaration, she does not deny that she advised in early April that Silvers was deferring the audit. She did. And, she did so for tactical reasons as the result of a joint discussion between the parties – who were then working together to prepare the action against Google, Inc. In fact, at the end of a March 23, 2005 email, *she confirms that she had agreed to postpone the audit.* Supp. Esrig. Dec. Ex. E.

Rather than address this issue directly, Ms. McQuilkin mischaracterizes Mr. Esrig's testimony on this point, asserting that "Esrig's sworn statement that the first time I asked for an audit after the Settlement Agreement was April 22, 2005 is completely false." (DE 43, ¶ 12). Obviously, that is not what Mr. Esrig testified. He testified instead that, *after* deferring the requested audit in early April, "Silvers did not *renew* his request" until Ms. McQuilkin's email on the 22nd. The only testimony here that is misleading is Ms. McQuilkin's.

In fact, there is a striking time gap in the communications from Ms. McQuilkin about the audit, which directly supports Mr. Esrig's testimony. Ms. McQuilkin attaches a March 23, 2005 email to her Declaration (DE 43, Ex. P), relating to the audit. She then attaches a series of emails addressing various issues over the following weeks (DE 43, Exs. Q – T), but none of those in any way reference the audit. An April 8, 2005 email (included in a different section of the declaration, DE 43, Ex. XX) exhaustively listing the "pending issues" under the Agreements that Silvers' counsel believed needed to be resolved, makes no mention whatsoever of an audit. The next communication relating to the audit is the same April 22, 2005 email that Mr. Esrig referenced in and attached to his declaration. (DE 43, Ex. U; DE 16, Ex. H). Thus, during the period Mr. Esrig testified the audit was deferred, there is not a single communication from Ms. McQuilkin (even among the 18 relevant exhibits in her late-filed declaration) referring to the audit. Clearly in her mind too – as confirmed by her March 23rd email – the audit was deferred. The Magistrate's findings on this issue are correct, and should be adopted in full.

CASE NO. 05-80393 CIV HURLEY/HOPKINS

    b.    **Royalties and Statements.**  Silvers' April 27 Termination Letter claims that Stelor failed to pay monthly royalty advances pursuant to the Settlement Agreement, and that Stelor falsely stated in March 2005 that it was not offering any products (other than its music) for sale, and no past royalties were due.  The Magistrate addressed each of these points in detail, and found that no material breaches had occurred.  Those findings were correct, and remain so, notwithstanding Silvers' effort to recast the issues and raise new arguments through his late-filed declarations.

    In his Objection, Silvers now claims that Stelor "<u>never</u> complied with the reporting requirement" under the License Agreement, failing since inception to provide proper royalty statements.  Objection at 9.  That argument, which was not raised before the Magistrate, ignores the express provision in paragraph 12 of the Settlement Agreement, titled <u>Royalty Statements</u>, which provides: "Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due."  Accordingly, since Stelor provided that confirmation, no royalty statements are required for the prior periods.[9]  Statements are only required, pursuant to paragraph III of the License Agreement, beginning with the first quarter of 2005.  (DE 1, Ex. A).

    The confirmation of no royalties was also correct.  Supp. Esrig Dec. ¶¶ 4-5, Ex. A.  The purchase by Silvers' un-named "associate" of the googles music on itunes on August 31, 2004 was first known to Stelor when it received an initial statement for itunes downloads dated February 25, 2005.  Stelor included those revenues in the royalty statement provided to Silvers on April 29, 2005 (DE 16, Ex. D), which was (as the Magistrate confirmed (DE 24 at 20)) timely provided pursuant to ¶ III(B) of the License Agreement, within 30 days of the expiration of the first quarter of 2005 (DE 1, Ex. A).  Supp. Esrig Decl. ¶ 5.

    As set forth above, supra at 8-9, Silvers' desperate attempt to discredit Mr. Esrig's testimony regarding the CafePress website is also totally unfounded.  Mr. Esrig's testimony is accurate:  he had instructed Mr. Worsham in writing ***not*** to maintain any such story, and he was unaware until just recently that Mr. Worsham had disregarded that instruction, or that CafePress had apparently sold a single coffee mug, generating a $2.00 commission in December of 2002.  Supp. Esrig. Dec. ¶ 8.

_____

[9] Nevertheless, to put an end to the unfounded issue Silvers has attempted to raised about missing royalty statements, Stelor went ahead and provided royalty statements for the last two quarters of 2004.  Supp. Esrig Dec. ¶ 26, Ex. K.

CASE NO. 05-80393 CIV HURLEY/HOPKINS

Nor can Silvers legitimately use his own refusal to accept Stelor's tenders of performance – including making the royalty advances – to attack the Magistrate's report. Stelor's April 29 letter (DE 1, Ex. D) clearly tendered performance. *See Bowers v. Medina,* 418 So. 2d 1068, 1069 (Fla. 3d DCA 1982) ("requirement of tender . . . means a readiness, willingness and ability in good faith to perform"). Silvers' counsel unequivocally rejected that tender in her May 2, 2005 letter. (DE 1, Ex. E) ("Mr. Silvers has terminated the License and intends to go in a different direction."). Having repudiated the Agreements and refused to accept Stelor's performance, Silvers has excused any further performance by Stelor. *See Seaside Community Dev. Corp. v. Edwards,* 573 So. 2d 142, 145-46 (Fla. 1st DCA 1991) (repudiation relieves non-breaching party of duty to tender performance); *Gaylis v. Caminis,* 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984) (same); *Holston v. Bernal,* 407 So. 2d 332, 333 (Fla. 3d DCA 1981) (same). Nor does the law require Stelor to undertake a futile act. *See C.U. Assocs, Inc. v. R.B. Grove, Inc.,* 472 So. 2d 1177, 1179 (Fla. 1985).

    **c.**    **Samples.** Silvers attacks the Magistrate's finding that Stelor complied with its requirement to provide samples by allowing Silvers' counsel herself to inspect samples at Stelor's offices, and offering to make them available for review again at the offices of Stelor's counsel in April. (DE 24 at 16). Again, notwithstanding the new information and late-filed declarations, Silvers does not contradict these findings. Nowhere in the extensive declaration of Ms. McQuilkin does she deny that she went to Stelor's offices in February 2005, that she reviewed samples and promotional materials then, and that she even took some back with her.

Similarly, Silvers' Objection fails even to address the offer Stelor made on April 26, 2005 to make the samples available again for inspection at counsel's offices. Of course, since Silvers' counsel never bothered to come and look, she has no foundation for testifying what was or was not there. (DE 43, ¶ 33). In fact, the materials Stelor offered to provide "documented" the entire history of Stelor's development. Supp. Esrig Dec. ¶ 10.

Silvers also attempts to distort the requirements relating to samples under the Agreements. Paragraph VI(C) of the License Agreement provides as follows:

> Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at not cost to LICENSOR, a reasonable number of samples of Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

CASE NO. 05-80393 CIV HURLEY/HOPKINS

The provision does not give Silvers any right to exercise quality control over the products Stelor markets, as he claims. Objection at 11. It merely permits him to provide "input", which Stelor is in no way required even to accept. Silvers' counsel herself confirmed that, remarking in a revealing email that: "According to the license agreement Stelor is to provide these to Silvers for his "input." *There is nothing in the agreement that says Stelor has to listen or do anything with his input but this keeps Silvers happy. Silvers will communicate his "input" only to me."* Supp. Esrig Dec. ¶ 13, Ex. E (emphasis added). Accordingly, as this candid email confirms, there is no substance whatsoever to the provision allowing Silvers to provide "input". Silvers' counsel just wanted to keep her client appeased! This admission confirms that the requirement is essentially immaterial, and that Silvers' position is, in fact, a sham.[10]

The Magistrate's findings were correct. Nowhere in the mountain of new material submitted by Silvers does he provide any information that in any way contradicts those findings.

     **d.**    **Consulting Agreement.**  Finally, Silvers claims that Stelor failed to comply with a now-expired Consulting Agreement by failing to provide Silvers with an option agreement. Stelor, however, sent Silvers a formal Option Letter dated December 10, 2004, advising that the Board of Directors of Stelor had approved a grant to Silvers of 1,000 options at $10.00 per share. Supp. Esrig Dec. ¶ 15, Ex. F (attaching the Letter and the federal express confirmation confirming Silvers himself signed for the package). The Letter asked Silvers to execute and return it to Stelor to confirm his agreement with those terms and acceptance of the options.

That Silvers would continue to make this claim is simply disingenuous. Indeed, Stelor has repeatedly reminded Silvers about this Letter and asked him to provide an executed copy. Supp. Esrig. Dec. ¶ 15. Silvers and his counsel have refused even to respond to this issue, choosing instead to try and preserve a totally unfounded claim.

     **e.**    **The Alleged Breaches Are Clearly Not Material.**  As the Magistrate properly held, moreover, the breaches alleged by Silvers are not material in any event. (DE 24 at 17-23). Silvers' own counsel acknowledged as much in her email of April 12, 2005, when she

---

[10] As Silvers also knows full well, the only "product" Stelor is presently selling is its music on itunes. Accordingly, there really are no "samples", but only promotional materials and designs that Stelor has developed, which do not even fall within the definition of samples to be submitted to Silvers. Nevertheless, Stelor has continued to provide Silvers with access to this material. Supp. Esrig. Dec. ¶¶ 14, 22-24.

labeled the issues "silly" and recognized that the parties should be focusing "on the upcoming launch and trade show [rather] than obsessing over *these rather small advances to my client."* (DE 16, Ex. B) (emphasis added).

Silvers' unfounded claim regarding allegedly un-accounted-for sales through CafePress also highlights the lack of materiality here. The single alleged sale through CafePress – even if it did trigger a royalty (never received by Stelor) – is so de minimis as to prevent any realistic claim of a material breach. *See* supra at 8-9.

As the cases discussed by the Magistrate highlight, no material breach occurred here. *See Atlanta Jet v. Liberty Aircraft Servs., LLC,* 866 So. 2d 148, 150 (Fla. 4th DCA 2004); *Sublime, Inc. v. Boardman's Inc.,* 849 So. 2d 471 (Fla. 4th DCA 2003). The absence of any "time is of the essence" provision in any of the Agreements eliminates any argument with respect to late payments, especially given Silvers' continued refusal to accept Stelor's ongoing efforts to perform under the Agreements. Supp. Esrig. Dec. ¶¶ 19-29. In fact, the License Agreement expressly addresses the possibility of late payments, providing that they "shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due." (DE 1, Ex. A, ¶ III(F)). Accordingly, Stelor has demonstrated a substantial likelihood of success on the argument that no material breach occurred.

**B.    The Magistrate Properly Found That Stelor Would Suffer Irreparable Injury Unless The Injunction Issues.**

The Magistrate also properly concluded that Stelor has established irreparable harm.

*1.    Silvers Never Contested Stelor's Factual Showing of Irreparable Harm.*

Silvers labels as "off-base" the Magistrate's finding that Silvers did not refute the claim of irreparable harm. (DE 46 at 16). None of the papers submitted by Silvers before the Magistrate, however, in any way contested Stelor's *factual* showing of irreparable harm. Silvers chose instead to rely on a purely legal argument that injunctive relief was unwarranted, which was properly rejected as discussed below. Silvers did suggest at the hearing that "the Plaintiff's website information can be accessed through the Stelor Productions website". (DE 24 at 26). The Magistrate considered and properly rejected that argument, though, noting the critical importance of the googles.com internet address to the success of the launch. (*Id.*) Silvers tries to re-tool this argument with support from a supposed "internet expert". It remains without merit.

As detailed above, supra at 4-5, the www.googles.com address is critical to Stelor's business. The daily traffic and registered user base for the site are the essential keys to the

CASE NO.  05-80393 CIV HURLEY/HOPKINS

development and success of Stelor's business.  Silvers' suggestion that a different address would work just as well is entirely unfounded and without any substantiation whatsoever.  Without the www.googles.com internet address, Stelor's business will likely not succeed.

### 2.    *The Magistrate Properly Rejected Silvers' Legal Argument*

The Magistrate properly rejected Silvers' argument that Stelor's only relief is an action for damages.  Analyzing Silvers' cases, the Magistrate concluded they were distinguishable, and that injunctive relief was legally appropriate because "the contract was not properly terminated, and is, in fact, still in effect," and Stelor has demonstrated irreparable harm.  (DE 24 at 27-29).  The Magistrate properly relied on controlling Eleventh Circuit precedent, holding that loss of profits, goodwill, customers and reputation constitutes irreparable harm requiring injunctive relief.  *E.g., McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1310 (11th Cir. 1998) (threat of lost profits and damage to reputation, where no realistic way to determine damages, constitutes irreparable harm); *U.S. v. Bowman,* 341 F.3d 1228, 1237 (11th Cir. 2003) (potential harm to business from loss of goodwill and inability to sell its products constitutes irreparable harm); *Florida Businessmen for Free Enterprise v. City of Hollywood,* 648 F.2d 956, 958 & n.2 (11th Cir. 1981) ("A substantial loss of business may amount to irreparable injury if the amount of lost profits is difficult or impossible to calculate"); *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1449 (11th Cir. 1991) (damage to a business resulting from "the loss of customers and goodwill is an 'irreparable' injury").  *See also Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.* 60 F.3d 27 (2d Cir. 1995) (upholding injunction requiring licensor to license to the plaintiff rights to publish a children's book and to refrain from licensing books to others).  The Magistrate also noted that the Eleventh Circuit in *Robertson* had rejected the suggestion in the *Burger King* cases, on which Silvers attempted to rely, that the validity of a purported termination was irrelevant to a request for injunctive relief.  (DE  24 at 28 n.6).  Other than boldly claiming the decision "turns trademark law on its head", Silvers cites to no new cases, and offers no distinction of the controlling Eleventh Circuit decisions on which the Magistrate relied.

### C.    The Magistrate Properly Held That The Balance Of Hardship Justifies The Injunction.

Notwithstanding the volumes of late-filed declarations, Silvers still cannot point to any harm he would suffer from the injunction.  He makes a vague claim in his Objection to be "significantly effected by being denied the right to terminate his errant licensee", and claims that hardship "is usually deemed to outweigh the hardship on the terminated licensee."  Objection at

CASE NO.  05-80393 CIV HURLEY/HOPKINS

17.  He does not even attempt, however, to make any showing whatsoever of exactly what the "effect" on him is.  There is none.

Indeed, as recently as April 12, 2005 – just days before the termination – Silvers expressed through counsel his happiness with the project and excitement about the launch.  (DE 11 at ¶ 19, Ex. B).  Silvers also specifically recognized the extreme and irreparable harm he would cause to Stelor if he attempted to terminate Stelor's rights and seize the intellectual property before a court could address the issue.  (DE 16 at ¶ 20, Ex. C at 4).  He "assured" Stelor in writing that he would not do that.  *Id.*  In fact, if Stelor's launch is successful, Silvers stands to benefit handsomely based on his continuing financial interest in the business.  (DE 16 at ¶ 18).

For this reason, the Magistrate also properly held that no security should be required.[11]

**D.    The Magistrate Applied the Proper Standard for a Prohibitory Injunction.**

The Magistrate rejected Silvers' contention that this injunction seeks to alter the status quo, and should be subject to a heightened standard.  As succinctly explained by the Magistrate, the injunction merely seeks to preserve the status quo of the parties' relationship under the Agreements.  Report at 31.  Enjoining Silvers from breaching his obligations under those Agreements is clearly prohibitory in nature, not mandatory.

## VI. CONCLUSION

The Magistrate's Report is well reasoned, comprehensive and correct.  It should be adopted by this Court.  Stelor has demonstrated a substantial likelihood of success on its claim that Silvers wrongly terminated the Agreements, and the recommended injunction is required to protect Stelor from irreparable harm during the pendency of this action.  Silvers late-filed declarations are an improper attempt to raise issues that he was required to present to the Magistrate.  Silvers' attempt to discredit the testimony of Stelor's CEO through those declarations is entirely unfounded in any event.  Mr. Esrig's testimony is accurate, and the Magistrate's findings fully supported by the record.

Accordingly, Silvers' Objections should be overruled in their entirety and the injunction recommended by the Magistrate entered by this Court.

---

[11] The Magistrate also found that the public interest will not be harmed by the injunction. Silvers did not dispute that before the Magistrate, and raises no issue in his Objection either.

CASE NO.  05-80393 CIV HURLEY/HOPKINS

Respectfully submitted,

BURLINGTON, WEIL, SCHWIEP,
  KAPLAN & BLONSKY, P.A.
Attorneys for Plaintiff
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261

By: _____
       Kevin C. Kaplan, Esq.
       Florida Bar No. 933848
       David J. Zack, Esq.
       Florida Bar No. 641685

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true copy of the foregoing is being served by US Mail this 1st day of July May 2005, upon Gail A. McQuilkin, Esq. and Kenneth Hartmann, Esq., Kozyak Tropin & Throckmorton, P.A., counsel for Defendant, 2525 Ponce de Leon, 9th Floor, Miami, Florida 33134; and Adam T. Rabin, Esq., Dimond Kaplan & Rothstein, P.A., Trump Plaza, 525 S. Flagler Drive, Suite 200, West Palm Beach, Florida 33401.

_____
       Kevin C. Kaplan
       David J. Zack