UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80393 CIV HURLEY/HOPKINS

STELOR PRODUCTIONS. L.L.C., a
Delaware limited liability company,
f/k/a STELOR PRODUCTIONS, INC.,

        Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

        Defendant.

_____/

**MIAMI BOX
FILED**

JUL 0 1 2005

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

## <u>NOTICE OF FILING DECLARATION OF MARTIN JEFFREY</u>

    PLEASE TAKE NOTICE that Plaintiff, by and through undersigned counsel, hereby files

the Declaration of Martin Jeffrey.

                    Respectfully submitted,

                    BURLINGTON, WEIL, SCHWIEP,
                     KAPLAN & BLONSKY, P.A.
                    Attorneys for Plaintiff
                    Office in the Grove, Penthouse A
                    2699 South Bayshore Drive
                    Miami, Florida 33133
                    Tel: 305-858-2900
                    Fax: 305-858-5261

        By: _____
                    Kevin C. Kaplan, Esq.
                    Florida Bar No. 933848
                    David J. Zack, Esq.
                    Florida Bar No. 641685

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

Dockets.Justia.com

CASE NO.  05-80393 CIV HURLEY/HOPKINS

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true copy of the foregoing is being served by U.S. Mail this 1st day of July, 2005, upon Gail A. McQuilkin, Esq. and Kenneth Hartmann, Esq., Kozyak Tropin & Throckmorton, P.A., counsel for Defendant, 2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 and Adam T. Rabin, Esq., Dimond Kaplan & Rothstein, P.A., Trump Plaza, 525 S. Flagler Drive, Suite 200, West Palm Beach, Florida 33401.

Kevin C. Kaplan
David J. Zack

2

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  05-80393 CIV HURLEY/HOPKINS

STELOR PRODUCTIONS, L.L.C., a
Delaware limited liability company,
f/k/a STELOR PRODUCTIONS, INC.,

      Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

      Defendant.

_____/

## DECLARATION OF MARTIN I. JEFFERY

I, Martin I. Jeffery, hereby declare as follows:

1.     I am over the age of 21 and am the Senior Vice President of Stelor Productions, LLC.  I am responsible for the technical and creative aspects of Stelor's business, including the development and operation of the www.googles.com website and its content.  I also work along with Steven Esrig, Stelor's CEO, in connection with the other aspects of the company's operation, including marketing.   The facts stated herein are based upon my own personal knowledge and/or on corporate records and documents maintained by Stelor in the ordinary course of business.

### THE CRITICAL IMPORTANCE TO STELOR OF
### THE WWW.GOOGLES.COM INTERENT ADDRESS

2.     Stelor has the exclusive right to control, use and protect the valuable Googles intellectual property.  The googles.com domain name (and the corresponding www.googles.com internet address) is a critical component of that property, and the foundation of the business Stelor has spent three years and $4 million developing.

CASE NO.  05-80393 CIV HURLEY/HOPKINS

3.      The general business plan of Stelor is to "launch" the new content and technology

it has developed for its website, and thereby expand the base of users for the website and attract

licensees and additional investors for the business.  The launch successfully commenced at the

trade show in New York held by the Licensing Industry Merchandisers' Association (LIMA)

during the week of June 21, 2005.  Stelor is now using the momentum from that show to

continue to implement this plan during the weeks and months to come.  Interest from potential

licensees and promoters is at an unprecedented height, as are the prospects for the ongoing

development of Stelor's business.  Any interruption in access to the www.googles.com internet

address now, after the successful trade show, will be even more disastrous to Stelor's business.

4.      Stelor plans formally to "unveil" the new developments to its website this fall.  In

addition to Stelor's proprietary technology that will make the site "kids safe", Stelor has also

developed interactive story-lines.  Stelor has chosen the fall because we expect our license

relationships will be established and the website will then have the maximum impact.

5.      The website is essential to our business because all of our Googles programming

content is created to be interactive.  Children will be directed from the cartoons, live shows, web

casts, publications, and any other medium to go to our website at the www.googles.com internet

address.  They are asked, for example, to go to the "Frolic Forest" on www.googles.com, so they

can find lost or imaginary animals, solve group puzzles or be recognized as GooKids for prizes.

This form of interaction, from the Googles character to www.googles.com is a pillar in our

product concept.

6.      In addition to the general importance of the website to us, though, it is critical that

our website be located at the www.googles.com internet address.  Our business simply could not

survive if we lost access to that address, and were forced to display the content on our website

CASE NO. 05-80393 CIV HURLEY/HOPKINS

through a different domain name or internet address. The reason is that the www.googles.com address has a proven ability to attract users to the address, and has already enabled Stelor to build a registered user base of more than 600,000 in number. Each day, moreover, the site attracts tens and frequently hundreds of thousands of additional users.

7.      The recent history of usage on the site is instructive. On May 1, 2005 – before Silvers re-directed the domain name – the site had 108,053 hits! By June 1, 2005, the number of hits had dropped to 8. Once Stelor's access to the address was restored following entry of this Court's Order on June 9, 2005, the number of hits began to increase. On June 10, 2005, when the site was actually restored, the number of hits reached 20,774. As of June 22, 2005, during the trade show, the number of hits surged to 135,173. A true and correct copy of the Googles Usage Statistics report is attached as Exhibit A hereto.

8.      A different internet address simply would not have this ongoing volume of traffic. Any prolonged disruption of Stelor's access to the www.googles.com address, moreover, would likely result in the loss of Stelor's existing users. Stelor simply has no way to migrate those users to a different internet address, and hope to keep them as users. A user who has been repeatedly accessing our address, will obviously be frustrated when the website at that address goes dark or changes, and the user has to search to try and find the site at a new address. The risk that users will simply give up, and never try again, is severe, especially if access to our site continues to be disrupted.

9.      The existing registered user base and continued traffic on the www.googles.com address are critical points in all of our discussions with potential licensees, investors and in our general promotion of the business. This performance history related specifically to the www.googles.com address has proved to be a key factor in attracting investment capital and

CASE NO.  05-80393 CIV HURLEY/HOPKINS

potential licensees.    Without the user base and ongoing traffic associated with the www.googles.com address, our business is simply not commercially viable.  Indeed, as a result of Mr. Silvers' actions in redirecting the domain name and shutting down our website, Stelor lost an investor who had previously committed to invest.  Stelor was advised that the investor would "look at us again when we got control of our site."  Without access to www.googles.com Stelor's entire business is at risk.

10.    For these reasons, Stelor has always emphasized the "googles.com" domain name in its marketing efforts.   Consistent with that approach, Stelor's displays and promotional materials at the recent trade show firmly demonstrate the critical importance of the www.googles.com name.    Thus, the featured piece of Stelor's entire booth referenced www.googles.com in bold letters and colors, as the photographs attached as Exhibit B show. The promotional material for the show similarly featured the www.googles.com domain name. Samples are attached as Composite Exhibit C.  To the extent Silvers' claims that we did not feature the googles.com name at our show, he is simply wrong.

11.    I have reviewed the Declaration of Mr. Tewksbury, and to the extent he suggests Stelor could simply use a different internet address to display our website, he entirely fails to understand the devastating effect that would have on our business as set forth above.

12.    In his declaration, Mr. Tewksbury also repeatedly speaks of a website called Gootopia.   There is no such entity as a "Gootopia Website".  The site www.googles.com is the only website in existence.  'Gootopia' is the name we use for a software application.  It is the program that allows user access to many activities via www.googles.com.  The program also transports children to over 300 hundred unrelated children's Internet sites.  If Silvers' suggestion is that Stelor could provide access to its website through a different internet address, for example

4

CASE NO. 05-80393 CIV HURLEY/HOPKINS

gootopia.com, the above paragraphs of my declaration clearly explain why as a practical matter that change would be devastating to the business of Stelor.

## SILVERS' ACTIONS SHUT DOWN STELOR'S WEBSITE

13.     Mr. Tewksbury also tries to make a technical argument in his declaration that Stelor's www.googles.com website was not really shut down by Mr. Silvers. It was. And, as set forth above, Stelor's continued access to that address is critical for the viability of our business. What caused the disruption to the web site between May 4 and June 10, 2005 ("Blackout Period"), therefore, is largely academic.

14.     Mr. Tewksbury's technical argument, in any event, is wrong. The fact remains that during the Blackout Period, Stelor lost access to the www.googles.com domain name. There is no real dispute about that. Silvers admittedly "redirected" that domain name away from the data files on a dedicated server we maintained at Verio, Inc. (Tewksbury Dec. ¶ 11). The content for Stelor's website had been maintained on that server. GoDaddy – the registrar for the domain name – then "locked down" the domain name once the lawsuit was filed, preventing anyone, including Silvers, from making any further changes to it.

15.     As a result of Mr. Silvers' actions, however, Stelor also lost access to the data files that had been stored on the dedicated server because Verio no longer recognized Stelor as a valid administrator. Thus, Stelor itself was unable to obtain access to its website, and access for users could not have been provided, even through an alternate internet address due to the configuration of the apache server. Again, as set forth above, forcing Stelor to display its website through any internet address other than www.googles.com would result in devastating harm to our business in any event. Whether Stelor could or could not have used a different address during the Blackout Period, therefore, is all but irrelevant here.

CASE NO.  05-80393 CIV HURLEY/HOPKINS

16.     When Mr. Tewksbury's technical argument is boiled down, what he essentially says is that Stelor's lost access to the data files on the dedicated web server at Verio was not Silvers' fault, but Verio's fault. The situation was the direct result of Silvers' actions.

17.     Mr. Tewksbury focuses in his declaration on the role of Verio Inc.  In fact, though, changes made by Silvers in the DNS were made first at Verio.  As soon as Verio restored the regional DNS data, Mr. Silvers then made changes at a higher level, GoDaddy.com.  GoDaddy.com is where the domain name is registered, and GoDaddy.com must be told by the person or entity that has administrative access for the account where to direct the domain name.  As the WHOIS information available through GoDaddy.com confirms, the domain name is and has been throughout this process pointed to two generic servers at Verio Inc (referred to as NS1.SECURE.NET and NS2.SECURE.NET).  Mr. Tewksbury refers to these servers in paragraph 6 of his declaration at the "servers for the Gootopia Website." There is no such site.

18.     Mr. Tewksbury's observation (¶ 6) that Verio assigned our website the IP address 128.121.122.247 does not speak to the reason we had difficulty accessing our data. The problem was because the apache web server, which handles all http connections coming to www.googles.com, was configured in such a way that IP address connections are pointed back to www.googles.com.  This was done for security reasons to prevent malicious users from searching our website directory structure. Thus, upon inputting the IP 128.121.122.247, a user is taken to where the googles.com DNS is set.  Since Silvers made Verio redirect the DNS to his server, we lost access to our data even through that IP address.

19.     In addition, Mr. Tewksbury mistakenly claims that Stelor has a web hosting agreement with Verio.  In fact, Stelor's agreement is with Spinning Doors, and Spinning Doors

CASE NO.  05-80393 CIV HURLEY/HOPKINS

in turn has an agreement with Verio to use the dedicated Apache server.

20.    The Apache server has an account name of "Googmps".  It also has an internet protocol or "IP" address assigned to it of 128.121.122.247, as referenced in Mr. Tewksbury's declaration.

21.    In short, the way the process works is GoDaddy.com directs the googles.com domain name to the Verio DNS servers.  Verio DNS servers point the domain name to the IP address assigned to the dedicated Apache server under the Googmps account.  That is where Stelor's proprietary data files are located.

22.    Mr. Tewksbury suggests that Silvers redirected the www.googles.com domain name by simply logging into his Godaddy.com domain name account, and instructing GoDaddy.com to point the domain name to a different IP address than the generic servers at Verio.  Decl. ¶ 11.

23.    In fact, however, that is not what happened at all.  Instead, Silvers improperly communicated with someone inside Verio, and improperly persuaded them to redirect the googles.com domain name *internally.*

24.    Thus, on or about May 3, 2005, SpinningDoors received an email from an employee of Verio, stating that Verio had received a request from another customer requesting that Verio redirect the traffic from googles.com away from Stelor's dedicated server under the googmps account, and instead to direct it to a different dedicated server at Verio.  The representative of SpinningDoors asked the Verio employee the name of the person who had requested the redirection.  The Verio employee replied with an email stating that the name of the individual was Steven A. Silvers.  True and correct copies of these emails between SpinningDoors and Verio, and subsequently forwarded to us, are attached hereto as Exhibit D.

CASE NO.  05-80393 CIV HURLEY/HOPKINS

25.    Silvers did not simply instruct GoDaddy to re-direct the domain name away from the Verio generic servers, as Mr. Tewksbury suggests.  Rather, Silvers interfered with Verio's relationship with Stelor (through SpinningDoors) and had Verio redirect the domain name via DNS servers to a *different* web server.  The change was not made through GoDaddy.com.

26.    Silvers' actions were highly improper, as Mr. Tewksbury's own declaration suggests in paragraph 12.  Mr. Tewksbury emphasizes that Silvers was not a party to the web hosting agreement between Verio and SpinningDoors.  Thus, Silvers had no right to cause Verio to tamper with the DNS records of the googles.com domain name to point Verio's web server to a different server.

27.    On behalf of Stelor, SpinningDoors immediately advised Verio that the requested change was improper and was not authorized.  A true and correct copy of the May 3, 2005 email back to Verio is included with Exhibit D.  Nevertheless, it was done.  Verio later told us that an inexperienced technical person "did what they shouldn't have done" as the result of pressure from Mr. Silvers and his lawyer.

28.    As a result of that re-direction, moreover, Stelor immediately lost all access to its dedicated Apache server.  Mr. Tewksbury, wrongly assuming that Silvers made the change through GoDaddy.com, suggests that anyone wanting to access the googles website (he again mistakenly refers to it as the "Gootopia Website") could simply enter the IP address 128.121.122.247.

29.    During the Blackout Period, however, there was no user access through that IP address.  The actions Silvers caused to be taken internally at Verio disrupted the web access.  Stelor repeatedly tried to access the information on its dedicated Apache server throughout the

CASE NO. 05-80393 CIV HURLEY/HOPKINS

Blackout Period and was unable to do so. Mr. Tewksbury's testimony on this point is pure speculation. Obviously, he did not try to access the site during the Blackout Period, or he would have known this.

30.    Stelor, of course, immediately undertook to communicate with Verio as soon as the site was shut down. Stelor was unable to access some of the data files because Verio had closed the account. Until the www.googles.com domain name was formally redirected at both the GoDaddy.com and the Verio DNS levels on or about June 10, 2005, Web access to the data files on Stelor's dedicated Apache server was unavailable.

31.    For Mr. Tewksbury to suggest that this situation was between Stelor and Verio is simply inaccurate. The problem did occur internally at Verio, but was caused by Mr. Silvers, and his improper tampering with internal Verio accounts. He is directly responsible for the Blackout Period. Stelor did advise Verio that it should not have cooperated with Silvers, but Silvers should never have tried to have Verio take this improper action in the first place.

32.    The disruption to our business during the Blackout Period was incredibly severe. We lost time needed to gather families for a pre-registration offer, an essential prerequisite to our launch. We had received 1800 family names up to the point we were shut down, and absolutely none until after the court ordered restart. As of today we are now up to 3000. The disruption also created unrest and uncertainty for our staff, and seriously impacted our morale. Nevertheless, with our small staff, we continued to work to maximize our $200,000.00 investment for the Licensing Show in New York. We created art and collateral materials for the show and hoped that this action would result in our access to the www.googles.com domain

CASE NO. 05-80393 CIV HURLEY/HOPKINS

name being restored. We would not have been effective in New York if it had not. We were

constantly reminded throughout that show that that www.googles.com domain name is the thing

that separates us from the pack of new entries.

I declare under penalties of perjury that the foregoing is true and correct. Dated this

day of June, 2005.

_____
Martin I. Jeffery

10

# EXHIBIT A



| Daily Statistics for June 2005 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Day** | **Hits** | | **Files** | | **Pages** | | **Visits** | | **Sites** | | **KBytes** | |
| 1 | 8 | 0.00% | 8 | 0.00% | 6 | 0.00% | 4 | 0.00% | 4 | 0.00% | 398 | 0.00% |
| 2 | 9 | 0.00% | 6 | 0.00% | 7 | 0.00% | 5 | 0.00% | 6 | 0.00% | 243 | 0.00% |
| 3 | 14 | 0.00% | 9 | 0.00% | 8 | 0.00% | 5 | 0.00% | 5 | 0.00% | 466 | 0.00% |
| 4 | 4 | 0.00% | 0 | 0.00% | 2 | 0.00% | 1 | 0.00% | 2 | 0.00% | 0 | 0.00% |
| 5 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| 6 | 3 | 0.00% | 2 | 0.00% | 3 | 0.00% | 1 | 0.00% | 1 | 0.00% | 9 | 0.00% |
| 7 | 22 | 0.00% | 21 | 0.00% | 16 | 0.00% | 10 | 0.00% | 9 | 0.00% | 938 | 0.00% |
| 8 | 12 | 0.00% | 7 | 0.00% | 8 | 0.00% | 5 | 0.00% | 6 | 0.00% | 466 | 0.00% |
| 9 | 23 | 0.00% | 11 | 0.00% | 13 | 0.00% | 7 | 0.00% | 6 | 0.00% | 148 | 0.00% |
| 10 | 20774 | 1.09% | 16589 | 1.21% | 10734 | 1.19% | 4374 | 1.23% | 4223 | 1.71% | 1083299 | 1.42% |
| 11 | 83279 | 4.35% | 62950 | 4.59% | 39396 | 4.36% | 15333 | 4.32% | 13786 | 5.57% | 3593923 | 4.71% |
| 12 | 87083 | 4.55% | 63575 | 4.63% | 38427 | 4.26% | 14808 | 4.17% | 13425 | 5.42% | 3473051 | 4.55% |
| 13 | 126220 | 6.59% | 95254 | 6.94% | 61697 | 6.83% | 24412 | 6.88% | 21545 | 8.70% | 5731724 | 7.52% |
| 14 | 133633 | 6.98% | 101107 | 7.37% | 64690 | 7.16% | 25707 | 7.24% | 22349 | 9.02% | 5737268 | 7.52% |
| 15 | 135122 | 7.06% | 99596 | 7.26% | 64593 | 7.15% | 25427 | 7.16% | 22047 | 8.90% | 5630774 | 7.38% |
| 16 | 132534 | 6.92% | 96199 | 7.01% | 63463 | 7.03% | 25192 | 7.09% | 22029 | 8.89% | 5375575 | 7.05% |
| 17 | 123884 | 6.47% | 88960 | 6.48% | 58672 | 6.50% | 23012 | 6.48% | 20292 | 8.19% | 4874150 | 6.39% |
| 18 | 100974 | 5.28% | 71931 | 5.24% | 46744 | 5.18% | 18136 | 5.11% | 16199 | 6.54% | 3822917 | 5.01% |
| 19 | 90718 | 4.74% | 63149 | 4.60% | 42544 | 4.71% | 16521 | 4.65% | 15013 | 6.06% | 3354667 | 4.40% |
| 20 | 127467 | 6.66% | 90063 | 6.56% | 61623 | 6.82% | 24681 | 6.95% | 21683 | 8.75% | 5054757 | 6.63% |
| 21 | 134302 | 7.02% | 94231 | 6.87% | 64066 | 7.09% | 25200 | 7.10% | 22444 | 9.06% | 5067389 | 6.65% |
| 22 | 135173 | 7.06% | 95045 | 6.93% | 63391 | 7.02% | 24862 | 7.00% | 21834 | 8.82% | 5161916 | 6.77% |

# EXHIBIT B





# EXHIBIT C





# The Googles from Goo

THE GOOGLES FROM GOO provide compelling educational products designed to enlighten, entertain, and develop children's skill levels.

- ◆ THE GOOGLES FROM GOO will teach children about science and the earth around them.
- ◆ THE GOOGLES FROM GOO will help children build self-esteem.
- ◆ THE GOOGLES FROM GOO music and video will be available in English and Spanish.

PRODUCTS/SERVICES UNDER DEVELOPMENT INCLUDE NOT TO MENTION OPPORTUNITIES IN THE FOLLOWING AREAS:

- ◆ Books
- ◆ Science based play kits
- ◆ Broadcast video
- ◆ Music - 38 original songs to date
- ◆ Interactive entertainment
- ◆ Arts and Crafts
- ◆ Stationery
- ◆ Internet site with games and music
- ◆ Apparel and accessories
- ◆ Toys (soft, electronic, games, puzzles)
- ◆ Live shows
- ◆ Infant stimulation products



www.googles.com

www.stelorproductions.com

For more information on the
THE GOOGLES FROM GOO
partnering opportunities contact:
Steven A. Esrig • President and CEO
sesrig@stelorproductions.com

Stelor Productions
P.O. Box 8000
Gaithersburg, MD 20883
(301) 963-0000

























EXHIBIT D

```
     STEVEN  A.  ESRIG

       301.963.0000
```

```
------ Forwarded Message
From: Alka Soni <alka@s-d.biz>
Date: Tue, 3 May 2005 22:34:42 +0200
To: <steven@stelorproductions.com>
Subject: FW: [IDS-7820061] Domain request | googles.com
```

Dear Steve,

Please find below the communication relay between Verio and SpinningDoors on the Domain move issue.

As I just mentioned to you I did a quick check and found that the googles.com and googles.biz site have been replaced or rather have some other fileset behind them. Most probably Mr.Silvers has already affected the move.

Best regards

Alka
+49/221-1307380.

```
-----Original Message-----
From: Alka Soni [mailto:alka@s-d.biz]
Sent: Dienstag, 3. Mai 2005 22:12
To: 'Jessica Hansen'
Subject: RE: [IDS-7820061] Domain request | googles.com
```

Dear Jessica,

Thank you for your email.

After speaking with my Client I have gained the following understanding of the situation.

My Client Stelor productions states that this request to move the domain name is actually unauthorized and illegal as they are the licensees.

I would suggest that Verio does not remove or move the domain from our Servers, but instead instructs Mr. Steven A. Silvers to communicate with my client and his lawyers directly on this matter.

Best regards

Alka Soni

```
-----Original Message-----
From: Jessica Hansen [mailto:support@veriohosting.com]
```

1

```
Sent: Dienstag, 3. Mai 2005 21:43
To: alka@s-d.biz
Subject: Re: [IDS-7820061] Domain request | googles.com
```

Hello Alka,

Thank you for your prompt reply.  We appreciate that you wish to confirm this request with your client.  The request was made by Steven A. Silvers.

Please let me know if you have additional questions.  Thank you for choosing Verio.

Regards,
Jessica
Verio VPS

YOUR MESSAGE ==================================

I actually do not authorize this at the moment. I will get back to you after checking with my customer. Could you perhaps let me know who has requested this?

```
-----Original Message-----
From: Jessica Hansen [mailto:support@veriohosting.com]
Sent: Dienstag, 3. Mai 2005 20:20
To: alka@s-d.biz
Subject: Re: [IDS-7820061] Domain request | googles.com
```

Hello SpinningDoors Inc,

We have received a request from another Verio customer to add googles.com to their account.  Please let us know if you authorize us to remove googles.com from your account "googmps".

Please let me know if you have any questions.  Thank you for your prompt attention to this matter.

Regards,
Jessica
Verio VPS

------ End of Forwarded Message

2