UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,              Case No. 05-80393-CIV-HURLEY
     Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,
     Defendant.

_____

## DEFENDANT'S REPLY TO STELOR'S RESPONSE TO MOTION FOR ATTORNEYS' FEES AND EXPENSES, AND RULE RULE 11 SANCTIONS

This is not a case where the plaintiff made an honest mistake about diversity. Stelor intentionally concealed the identity of its members to conceal that diversity did not exist. This is the third time that Steven Esrig has filed a sworn statement in this case that contains perjured testimony. The other instances will be addressed below. In this latest Declaration, Esrig swears under oath that no member of Stelor Productions, LLC other than this one (unidentified) sub-member resides in Florida. The truth is that Stelor's Chairman of the Board, and significant investor, Henry D. Epstein, resides in Lake City, Florida. A copy of public records showing Mr. Epstein's Florida address, Florida voter's registration information, Florida car registrations and Florida driver's license is attached as Composite Exhibit A. Esrig tried to conceal this when he filed a prior sworn statement listing the citizenship of each member but not the identity, and leaving off the actual state of residence for Mr. Epstein and other investors residing in Florida. *See* Exhibit B.

Silvers and his counsel have now confirmed that Stelor maintains computer records that contain the name and residence of each investor/member, and that these records clearly show that Mr. Eptein resides in Lake City, Florida. Considering that Stelor's own computer records list Mr.

1

Epstein's address as Lake City, Florida – which we have confirmed through public records, and that Mr. Epstein is well-known to Esrig because he is Stelor's Chairman of the Board, it is inconceivable the Esrig had no knowledge that Mr. Epstein resides in Florida. Further, we recently obtained information that another significant Stelor investor/member resides in Florida. Mr. Igor Gruendl, the managing member of Gruendl Enterprises, LLC, maintains his primary residence in Sarasota, Florida. *See* Composite Exhibit C. These recent discoveries certainly explain why Stelor went to great lengths to conceal the identity of its members - once we had this information it did not take long for us to investigate and discover the truth.

This is not the first time Esrig has filed a false statement in this action. As the Court may recall, this action began with a hearing on Stelor's motion for injunctive relief. On the day of the hearing Stelor filed a Declaration of Esrig as its only evidence to support its motion. Silvers' counsel was already en route to the hearing when this Declaration was served and did not see it until it was handed out in a notebook at the hearing. The Declaration contained mostly emotional argument, and unsubstantiated and dubious statements intended to refute each basis Silvers had for terminating the License Agreement. The Court, however, relied entirely upon those statements in support of its Report and Recommendation to enjoin Silvers.

It took us considerable time following the hearing but we eventually discovered evidence that showed Esrig lied in his Declaration when he disavowed knowledge of any licensed products being offered for sale, and made false statements intending to mislead the Court regarding the harm Stelor would suffer without injunctive relief. For example, in his sworn statement, Esrig falsely stated, among other things, that he had only recently learned that Googles merchandise was being sold through Cafepress.com, and disavowed any knowledge of how that account was opened. After considerable investigation we obtained evidence that showed that not only did Esrig know since 2002 that Googles merchandise was being sold through Cafepress.com, he was

2

instrumental in setting up the Cafepress.com account, selected the merchandise and approved the art work for the Googles Cafepress.com Web site. In support of a Motion to Strike Esrig's Declaration, we filed the Declaration of Paul Worsham that attached a series of emails from Esrig directing Mr. Worsham and others to design the Googles store at Cafepress.com. *See* Exhibit D.

We also discovered that Esrig falsely testified about Stelor's irreparable harm it would suffer without access to the www.googles.com domain name. Esrig swore under oath that control over this domain name was vital and necessary for Stelor to demonstrate the Googles Web site at the International Licensing Show, and to its impeding "launch." Although Stelor provided no evidence to substantiate Esrig's testimony, these statements were relied upon by the Court and forced us to retain an Internet expert, Russell Tewksbury, to show that Esrig's statement was blatantly false; it could operate perfectly using any of the other domain names it owns. *See* Exhibit D at Exhibit C. We then discovered that Stelor never actually intended to use the www.googles.com domain name at the Licensing Show and had long ago printed advertising material directing visitors to use the domain name www.stelor.net to view the "new" Googles Web site. In fact, Stelor did not use the googles.com domain name for any practical purpose at the Licensing Show and barely mentioned it in promotional materials, despite obtaining a TRO requiring Silvers to give it access to that domain name. *See* Defendant's Supplement To Motion To Strike attached as Exhibit E.

These and other false statements by Esrig and others at Stelor caused Silvers to lose control of his domain names[1] and intellectual property, and forced him and his counsel to expend tremendous time and resources to obtain the information needed to discredit Esrig, and defeat the

---

[1] Silvers never licensed the domain names to Stelor in the first place. And, although the Court has dismissed this case, and the previous orders directing the registrar to transfer the domain names to Stelor's control are now vacated, the registrar has refused to transfer them back to Silvers. Of course, Stelor has not made one change to the Googles Web site since that time, and it remains exactly as it was months before Silvers terminated the license.

3

injunction. *See* Silvers Opposition to the Report and Recommendation, attached as Exhibit F. And, up until the Court ordered Stelor to provide evidence of diversity jurisdiction, Stelor contentiously fought the diversity issue arguing to the Court that Silvers' suggestion that diversity did not exist was "absurd," which unnecessarily perpetuated this litigation for five, intensely-litigated months. As it turns out, because the Court lacked subject matter jurisdiction from the outset, all the judicial labor in this case, and Silvers' legal expenses were for naught.

The Court has the jurisdiction to award Silvers his attorneys' fees and costs, and should do so under the prevailing party provision of the contract Stelor sought to enforce, or on its own initiative as sanctions against Stelor and its counsel for this abusive conduct.[2]

## ARGUMENT IN REPLY TO STELOR'S OPPOSITION

A.    This Court Has Jurisdiction To Award Fees and Costs

Stelor's suggestion that this Court lacks the jurisdiction to award fees because it lacked subject matter to decide its claims is just wrong. The Eleventh Circuit addressed this exact issue in *Schafler v. Fairway Park Condominium Assoc.*, 147 Fed.Appx. 113, 114 n.1 (11th Cir. 2005). Just as here, in that case the plaintiff's action was dismissed for lack of subject matter jurisdiction. Upon review of the district court's order awarding fees, the Eleventh Circuit swiftly dealt with plaintiff's argument that the district court lacked jurisdiction to award and determine the amount of attorneys' fees because it previously had dismissed the case for lack of jurisdiction, holding that "this argument has no merit." *Id.* This same argument has met a similar fate in other Circuits. *See Lanphere Enterprises, Inc. v. Jiffy Lube International, Inc.*, 138 Fed.Appx. 20, 25 (2005 WL 1279227)(dismissal for lack of subject matter jurisdiction does not deprive district court of jurisdiction to award attorneys' fees); *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d. 877

---

[2] Silvers disputes that he is not seeking an award of fees or sanctions against Stelor's counsel. Under well established law, Stelor's counsel had a duty to make a reasonable inquiry regarding diversity before this action was filed. The fact that the lack of diversity was easily ascertained from Stelor's own records, and Stelor's counsel condoned the filing of a verified statement that intentionally omitted the identity of Stelor's members speaks volumes as to their involvement in this scheme to conceal the truth.

4

(9th Cir. 2000)(fact that plaintiff's complaint dismissed for lack of diversity jurisdiction did not deprive district court of jurisdiction to award defendants attorneys' fees under state law); *Citizens For A Better Environment v. Steel Company*, 230 F.3d 923 (7th Cir. 2000)(district court's lack of jurisdiction over suit did not negate its jurisdiction over request for attorneys' fees); *Smartt v. First Union National Bank*, 245 F.Supp.2d 1229 (M.D. Fla. 2003)(district court awarded fees where case dismissed for lack of diversity jurisdiction); *Hussey Copper, Ltd. v. Oxford Financial Group*, 121 F.R.D. 252 (W.D. Pennsylvania 1987)(district court awarded attorneys' fees after case dismissed where plaintiff knew diversity jurisdiction lacking); *Itel Containers International Corp. v. Puerto Rico Marine Management, Inc.*, 108 F.R.D. 96 (D. New Jersey 1985)(district court awarded attorneys' fees after case dismissed for lack of diversity jurisdiction).

Furthermore, a federal court always maintains the inherent authority to impose sanctions for improper conduct of those who appear before it. *See Chambers v. HASCO, Inc.*, 501 U.S. 32, 45-46 (1991). If this were not the case, then a litigant could never be held accountable for the legal expenses they cause a defendant to incur to defeat a claim improperly filed in a district court that lacked federal subject matter jurisdiction.

B.    Whether Silvers Is The Prevailing Party Is Determined Under Florida Law

Silvers is not ignoring federal law; it simply does not apply here. Stelor sued Silvers alleging state law breach of contract claims. It is well established by the federal courts that in diversity cases the determination of whether a defendant is entitled to attorneys' fees is governed by the contract sued upon, and the state law's interpretation of "prevailing party." *See Sure-Snap Corp. v. State of Vermont*, 983 F.2d 1015, 1017-18 (11th Cir. 1993)(federal courts apply state law when ruling on the interpretation of contractual attorney fee provisions). *See also Trans Coastal Roofing Company, Inc. v. David Boland Inc.*, 309 F.3d 758 (11th Cir. 2002)(court applies the substantive law of Florida to determine entitlement to attorneys' fees in diversity cases.);

5

*American Family Life Assurance Company v. United States Fire Company*, 885 F.2d 826 (11th Cir. 1989)(when federal jurisdiction is based on diversity, court looks to state law to determine entitlement to fees); *All Underwriters v. Weisberg*, 222 F.3d 1309 (11th Cir. 2000)(ability to collect attorneys' fees is substantive in nature and federal court must look to Florida law to determine if there is legal right to recover.); *Perkins State Bank v. Connolly*, 632 F.2d 1306 (5th Cir. 1980)(in diversity cases federal court must follow policy of state law to determine right to recover attorneys' fees).

Every case cited by Stelor for its argument that Silvers is not a "prevailing party" involved claims that arose under federal statutes, not state law or diversity jurisdiction. When a case is based on federal question jurisdiction, and then dismissed for lack of subject matter jurisdiction, it is appropriate to look the federal substantive law sued upon to determine if a defendant is entitled to an award of attorneys' fees. For example, in *Laborers Local*, a primary case Stelor relies upon, the plaintiff brought its claims under ERISA, 29 U.S.C. § 1132(g)(1). The only basis defendant had for an award of fees was that statute. The court dismissed the action because defendant was not an "employer" as defined by that statute. It then concluded that because defendant could not be sued under that statute, it could not rely on it as a basis to recover fees. *Laborers Local*, 827 F.2d at 1458. The issue was not whether the district court had jurisdiction to award fees, but whether defendant had a statutory basis for an award.

Likewise, in *Daugherty v. The Westminister Schools*, plaintiff brought an action under 42 U.S.C. § 1988 (Title IX). After the matter was dismissed, the Court looked to the "prevailing party" language of that statute to determine whether defendant was entitled to an award of fees. The Court determined that the statute did not define "prevailing party" in a way that would allow defendant to recover its fees. *Daugherty*, 174 F.R.D. at 121. This is the same situation in each case cited by Stelor – the federal statute did not provide a basis for defendant to recover fees.

6

In diversity cases alleging breach of contract, however, the district court looks to whether there is a contractual provision that provides for attorneys' fees, and state law to interpret that provision. But even in diversity cases where the federal court applies federal substantive law to interpret contractual provisions, a defendant is considered the prevailing party when the case is dismissed for lack of jurisdiction. *See TBI, Inc. v. Communication Consulting Services, Inc.*, 2004 WL 2609200 (N.D. Ill.)(under prevailing party provision of contract, defendant prevailed where case was dismissed for lack of subject matter jurisdiction.)

Here, Silvers' entitlement to an award of attorneys' fees is contained in the Settlement Agreement Stelor sought to enforce, which provides that the "successful or prevailing party" is entitled to attorneys' fees. As set forth in our Motion, under Florida law Silvers is the "prevailing party" by virtue of the dismissal.

C.      Silvers Does Not Need To Prevail On The Merits Of The Underlying Claim

It is not necessary that Silvers prevail on the ultimate merits of the case to be entitled to an award of attorneys' fees; all that is required is that he prevail on any significant issue. *See Moritz v. Hoyt Enterprises, Inc.*, 604 So.2d 807, 810 (Fla. 1992)(the test is whether the party succeeded on any significant issue in the litigation, citing to U.S. Supreme Court case law). *See also Wendy's Inter., Inc. v. Nu-Cape Construction, Inc.*, 169 F.R.D. 680 (M.D. Fla. 1996)(to be prevailing party must show that party succeeded on some significant issue.)

Stelor's argument that it was the prevailing party because is obtained limited temporary injunctive relief is ridiculous. Stelor sought but lost the injunctive relief it requested. The fact that the entire case is now null and void for lack of diversity jurisdiction does not change the fact that for purposes of an award of attorneys' fees, under Florida law a defendant had prevailed on a significant issue when plaintiff fails to prevail on a motion preliminary injunction and the case is dismissed. *See Baratta v. Valley Oak Homeowners' Assoc. at the Vineyards, Inc.*, 891 So.2d

7

1063, 1064 (Fla. 2d DCA 2004)(defendant is the prevailing party where case dismissed although plaintiff obtained temporary injunction.)    Moreover, Silvers prevailed on the second most hotly contested issue – whether the matter should be dismissed for lack of diversity jurisdiction.  That issue would not have been litigated at all had Stelor been honest about the lack of diversity from the onset.

      D.     <u>The Court May Award Sanctions Under § 57.105 and Rule 11 On Its Own Initiative</u>

Florida Statutes, §57.105 and Federal Rule 11 both recognize the Court's  inherent authority to award attorneys' fees as sanctions by providing that the Court may enter sanctions "on its own initiative."  See §57.105(1) and Rule 11(c)(1)(B).  In fact, some of the cases cited by Stelor recognize that the district court has inherent power to award attorneys' fees as sanctions. *See First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501-11 (6th Cir. 2002); *In re Kirk-Murphy Holding, Inc.*, 313 B.R. 918 (N.D. Fla. Bank. 2004).

The district courts use the authority to impose sanctions to dissuade the exact conduct displayed by Stelor in this case.  In *Itel Containers Int'l Corp. v. Puerto Rico Marine Mgt.*, 108 F.R.D. 96 (D.N.J. 1985), a case involving a situation nearly identical to this one, the district court used its inherent authority to impose Rule 11 sanctions against a party who willfully concealed the lack of subject matter jurisdiction.  In *Itel*, the party deliberately drafted documents so as to conceal the fact that there was no diversity.  108 F.R.D. at 99.  The district court, finding that the this party and its counsel consciously and intentionally drafted the document as part of a "pattern" and "strategy of concealment and deception to court, imposed Rule 11 for the abusive conduct. The Court should reach the same result here.

The standard for awarding sanctions is not bad faith, but whether it was "reasonable" to engage in the conduct at issue.  *See* Rule 11 (b); *Westmoreland v. CBS, Inc.*, 770 F.2d 1169 (D.C.Cir. 1985); *see also Cooter & Gell v. Hartmarx Corporation*, 496 U.S. 384, 393

(1990)(regarding attorneys "Rule 11 imposes a duty on attorneys to certify that they have conducted reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable and not interposed for any improper purpose.")

Stelor and its counsel had a strategy of concealment, as they intentionally misrepresented that diversity existed until the Court required them to provide supporting evidence – which they could not. And, like the party in *Itel*, Stelor and its counsel forged this pattern and strategy of concealment when it filed Esrig's verified statement but omitted the actual identity of Stelor's investors/members. Had this information been provided initially, this matter could have been terminated quickly. Instead, Stelor filed repeated false verified statements and concocted documents to support its deception. There is nothing reasonable about this conduct.

Now that Stelor's tactics have been exposed it cannot immunize itself by relying on the "safe harbor" provisions of these statutes. Stelor's conduct made it impossible to serve a motion on Stelor because Silvers we had no basis for knowing that its allegations of diversity were false until Stelor finally admitted this (although it omitted the entire truth). While we suspected there was no diversity, w filed the motion to dismiss simply because Stelor failed to allege the names and citizenship of each member in the Complaint. Had we been able to verify at that time that in fact there was no basis to allege diversity, we would have demanded that Stelor dismiss the complaint or face sanctions. Stelor refused to amend the Complaint, or provide the identity of its investors/member, then filed a false statement intended to conceal the lack of diversity and prohibit Silvers from having the information he needed to challenge diversity. It was procedurally impossible after the case was dismissed by the Court to give Stelor a 21-day "safe harbor" notice to dismiss the case.

E.    It Is Irrelevant To A Fee Award That Silvers Engaged His Counsel On Contingency

The fact that Silvers and his counsel have agreed to a contingency fee arrangement is not

9

relevant to an award of fees. The purpose of §57.105 (and Rule 11) is to discourage baseless claims and stonewall defenses in civil litigation by placing a price tag through attorneys' fees awards on losing parties who engage in these activities. *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1227 (11th Cir. 2003). Accordingly, recovery of attorneys' fees is permitted in situations where the client's attorney has received payment from another source other than the client, and where the client is not charged for the legal services they receive. *Schafler v. Fairway Park Condominium Assoc.*, 147 Fed.Apppx.113, 114 (11th Cir. 2005) *citing Fairely v. Patterson*, 493 F.2d 598, 605-06 (5th Cir. 1974) and *Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1291 (5th Cir. 1981); *Shahawy v. Lee*, 208 F.3d 1009 (11th Cir. 2000)(defendant entitled to attorneys' fees award even though it was fully indemnified by third party).

The only case cited by Stelor is inapplicable. *Burger King v. Mason*, 710 F.2d 1480 (11th Cir. 1983), involved a request by *Burger King* to be reimbursed for the reasonable value of work performed by its in-house counsel. The court declined this request finding that the in-house counsel had acted solely as a liaison and had not performed any legal work in directly defending the matter. That is a far cry from the proposition that a defendant is unable to recover his attorneys' fees when he has a contingent fee agreement.

F.    The Fees Incurred by Silvers Were The Result Of Stelor's Conduct

The attorneys' fees incurred by Silvers would have been minimal had Stelor been truthful. Stelor and its counsel were duty-bound to ascertain that the district court had jurisdiction before it filed this case. Not only did Stelor ignore this duty, it filed this action knowing that diversity was lacking, and when called upon to prove diversity, concealed the truth. Stelor also lead the district court astray at the injunction hearing by the false statements to create the impression Silvers had no basis to terminate the license, and about the harm it would suffer without control over Silvers' domain names, which were never part of the license in the first place. These false and

10

unsubstantiated statements caused Silvers and his counsel to incur hundreds of hours of work in defending against the injunction, and pressing the Court to dismiss the case. It is not surprising that Stelor's counsel has not expended the same number of hours as Silvers' counsel has in this case because Stelor's legal strategy is simply to make up the facts and fabricate its evidence.[3]

G.    The Court May Award Silvers All Expenses Incurred In This Action

The Court's discretion to award Silvers his expenses incurred in defending this action is not limited by 28 U.S.C. § 1920. Federal Rules 54 expressly provides without limitation that "costs other than attorneys' fees shall be allowed as a matter of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d)(1). Likewise, Rule 11 provides that, in addition to attorneys' fees, the Court may direct Stelor to pay all "other expenses incurred as a direct result of the violation." And, Florida statute § 57.105 provides that Mr. Silver is entitled to recover for all "other losses", in addition to attorneys' fees, he has incurred by virtue of Stelor's improper conduct. Considering the battle Silvers had to endure to defeat the injunction motion, including the costs to hire an expert and conduct discovery to impeach Esrig and expose the truth, the expenses Silvers is requesting be awarded to him are highly reasonable.

## CONCLUSION

Silvers respectfully requests that this Court grant Silvers an award of fees and costs as the prevailing party. In the alternative, Silvers requests that the Court impose an award of attorneys' fees and costs as sanctions against Stelor.

---

[3] Stelor's expert does not challenge the reasonableness of Silvers' counsel's hourly rate.

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

Respectfully submitted this 9th day of December, 2005.

Adam T. Rabin  (FBN: 985635)
DIMOND KAPLAN & ROTHSTEIN, PA
525 S. Flagler Drive, Suite 200
West Palm Beach, Florida  33401
T: 561-671-2110 / F: 561-671-1951

Gail A. McQuilkin  (FBN: 969338)
Kenneth R. Hartmann  (FBN: 664286)
KOZYAK TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
T: 305-372-1800 / F: 305-372-3508

===========================================================================

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 9th day of December, 2005, via first class mail and e-mail on the following:

Kevin C. Kaplan, Esq.
Burlington Weil Schwiep Kaplan & Blonsky
2699 S. Bayshore Drive, Penthouse, Miami, Florida  33133
E-mail: kkaplan@bwskb.com

3339/103/260313.1

12

Exhibit  A

| | |
|---|---|
| Watercraft | |
| Voter Registration | 1 Found |
| Hunting/Fishing Permit | None Found |
| Bankruptcies | None Found |
| Tax Liens & Judgments | 2 Found |
| UCC Filings | None Found |
| Possible Properties Owned | 2 Found |
| Possible Relatives | 1st Degree - 7 Found<br>2nd Degree - None Found<br>3rd Degree - None Found |

## Address Summary:

| Address | County | Dates | Maps |
|---|---|---|---|
| 1525 SE INGLEWOOD AVE, LAKE CITY FL 32025-6748 | COLUMBIA | Mar 2003 - Oct 2005 | Map |
| 184 SW QUINCY TER, LAKE CITY FL 32024-4380 | COLUMBIA | Sep 2005 | Map |
| 1525 S E ENGLEWOOD AVE, LAKE CITY FL 32025 | COLUMBIA | Jan 2004 | Map |
| 2711 INGLEWOOD DR, LAKE CITY FL 32025-6721 | COLUMBIA | Dec 1997 - Jan 2004 | Map |
| RR 2 BOX 5636, FORT WHITE FL 32038-9613 | COLUMBIA | Dec 2002 - 2004 | Map |
| 116 N MARION ST, LAKE CITY FL 32055-3931 | COLUMBIA | Dec 2002 - 2004 | Map |
| 4 SHADY HILL SQ, CAMBRIDGE MA 02138-2036 | MIDDLESEX | Oct 1985 - Oct 2000 | Map |
| 40 CENTRAL PARK S # 6D, NEW YORK NY 10019-1633 | NEW YORK | May 1977 - Oct 2000 | Map |
| RR 15 BOX 3648, LAKE CITY FL 32024-7812 | COLUMBIA | Apr 1999 | Map |
| 7405 PINEHURST PKWY, CHEVY CHASE MD 20815-3138 | MONTGOMERY | Feb 1995 - Dec 1998 | Map |
| 1300 QUINCE ORCHARD BLVD, GAITHERSBURG MD 20878-4106 | MONTGOMERY | May 1977 - Jan 1997 | Map |
| RR 2 BOX 158, FORT WHITE FL 32038 | COLUMBIA | Mar 1995 - May 1995 | Map |
| 440 CENTRAL PARK W, NEW YORK NY 10025-4308 | NEW YORK | Sep 1993 | Map |
| PENRIL CORP, GAITHERSBURG MD 20878 | MONTGOMERY | Feb 1991 | Map |
| 145 WILMA RD, EASTHAM MA 02642-1932 | BARNSTABLE | Nov 1988 - Mar 1989 | Map |

## Previous And Non-Verified Address(es):

HENRY DAVID EPSTEIN - 1525 SE INGLEWOOD AVE, LAKE CITY FL 32025-6748, COLUMBIA COUNTY (Mar 2003 - Oct 2005)
  **Property Ownership Information for this Address**
    **Property:**
      Parcel Number - 05-4S-17-07805-000
      Lot Number - 1
      Name Owner 1 - TANNENBAUM BETTY L
      Address - 1525 SE INGLEWOOD AVE, LAKE CITY FL 32025-6748, COLUMBIA COUNTY
      Owner's Address - 1525 SE INGLEWOOD AVE, LAKE CITY FL 32025-6748, COLUMBIA COUNTY
      Land Usage - SFR
      Total Value - $102,097
      Land Value - $23,541
      Improvement Value - $78,556
      Land Size - 24,780
      Building Size - 3,350
      Year Built - 1960
      Sale Price - $0
      Legal Description - LOT 1 & N1/2 OF LOT 2 BLOCK 3 LAKEWOOD S/D. LIFE ESTATE ORB 777-2365

HENRY DAVID EPSTEIN - 184 SW QUINCY TER, LAKE CITY FL 32024-4380, COLUMBIA COUNTY (Sep 2005)
  **Property Ownership Information for this Address**
    **Property:**
      Parcel Number - 27-3S-16-02311-010
      Book - 001042
      Page - 000959
      Name Owner 1 - TANNENBAUM, DOUGLAS P & DONITA A
      Address - 184 SW QUINCY TER, LAKE CITY FL 32024-4380, COLUMBIA COUNTY

[None Found]

## ▦ Driver's License Information:

Name: HENRY D EPSTEIN
DL Number: xxxx-xxx-xx-xxx-x
State: Florida
License Address: 1525 S E ENGLEWOOD AVE, LAKE CITY FL 32025, COLUMBIA COUNTY
DOB: 04/05/1927
Sex: M
Race: W
Expiration Date: 04/05/2006
Issue Date: 02/02/2000
License Type: Non-Commercial - Regular Operator License
Height: 6'02

Name: HENRY D EPSTEIN
DL Number: xxxx-xxx-xx-xxx-x
State: Florida
License Address: 2711 INGLEWOOD DR, LAKE CITY FL 32025-6721, COLUMBIA COUNTY
DOB: 04/05/1927
Sex: M
Race: W
Expiration Date: 04/05/2006
Issue Date: 02/02/2000
License Type: Non-Commercial - Regular Operator License
Height: 6'02

## 🚘 Motor Vehicles Registered To Subject:

*Vehicle:*
   Description: Tan 2000 Lincoln Town Car Executive - Sedan 4 Door
   License Plate: F57BAV
   License Plate Type: Car & Pickup Tags (County Name)
   VIN: 1LNHM81W3YY894626
   State of Origin: Florida
   Vehicle Use: Private
   Mileage: 338
   Title Number: 0081876747
   Title Date: 10/05/2000
   Title Status: Original New
   Decal Year: 2006
   Engine Size: 281
   Number of Cylinders: 8
   Body: Sedan 4 Door
   Record Type: Current
   Expiration Date: 04/05/2006
   *Owner(s)*
      Name: EPSTEIN HENRY D DOB: 04/05/1927 Age: 78 Sex: Male
      DL #: xxxxxxxxxxxxx
      Address: 1525 SE INGLEWOOD AVE LAKE CITY FL 32025, COLUMBIA COUNTY

   *Registrant(s)*
      Name: EPSTEIN HENRY D DOB: 04/05/1927 Age: 78 Sex: Male
      DL #: xxxxxxxxxxxxx
      Address: 1525 SE INGLEWOOD AVE LAKE CITY FL 32025, COLUMBIA COUNTY

   *Lien Holder*
      None

## 🚗 Florida Accidents:

[None Found]

## 🔫 Concealed Weapons Permit:

[None Found]

## 🏛 People at Work:

Name: HENRY EPSTEIN
Title: DIRECTOR2
SSN: 038-14-xxxx

 **Professional License(s):**
[None Found]

 **FAA Certifications:**
[None Found]

 **FAA Aircrafts:**
[None Found]

 **Watercraft:**
[None Found]

 **Voter Registration:**
Name: HENRY DAVID EPSTEIN
Address: 3 RIVERS, FORT WHITE FL 32038
DOB: 04/05/1927
Gender: Male
Ethnicity: White
Registration Date: 08/13/1993
Political Party: Other
State of Registration: Florida
Status: Active

Exhibit  B

3999.101

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80393 CIV HURLEY/HOPKINS

STELOR PRODUCTIONS, L.L.C., a
Delaware limited liability company,
f/k/a STELOR PRODUCTIONS, INC.,

          Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

          Defendant.

_____/

## PLAINTIFF'S VERIFIED MEMORANDUM OF LAW
## IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

Plaintiff Stelor Productions, LLC hereby opposes on the following grounds Defendant

Steven A. Silvers' ("Silvers") motion to dismiss ("Motion") (DE19):

### INTRODUCTION

Silvers moves to dismiss, arguing (1) that Stelor cannot satisfy the $75,000 amount in

controversy requirement, (2) that diversity of citizenship has not properly been alleged, and (3)

that Stelor lacks standing because it assigned its rights under the applicable License Agreement

by changing from a corporation to a limited liability company. These arguments are entirely

without merit. First, Silvers ignores the standard for determining the amount in controversy in

an action seeking injunctive relief. Under that standard, based on the value to the plaintiff of the

requested injunction, the amount in controversy requirement is clearly satisfied. Second,

diversity of citizenship properly exists. As set forth in the declaration of Steven Esrig (DE16),

filed in connection with Stelor's motion for preliminary injunction, and the supplemental listing

attached as Exhibit "A" hereto, none of the limited partners of Stelor resides in Florida. Third,

Silvers himself expressly consented in a written agreement to Stelor's change to a limited liability company. Accordingly, Silvers' Motion should be denied.

<div align="center">ARGUMENT</div>

A.    **Stelor Satisfies The Amount In Controversy Requirement.**

Without citing a single case, Silvers argues that Stelor cannot satisfy the amount in controversy requirement as a matter of law, based on a limitation of liability provision in the License Agreement. The amount in controversy requirement in actions for injunctive relief, however, is evaluated based on the value of the benefit flowing to the plaintiff from the requested injunction. *See Morrison v. Allstate Indemnity Co.*, 228 F.3d 1255, 1268 (11th Cir. 2000); *Occidental Chem. Corp. v. Bullard*, 995 F.2d 1046, 1047-48 (11th Cir. 1993). "In other words, the value of the requested injunctive relief is the monetary value of the benefit that would flow to the plaintiff if the injunction were granted." *Morrison*, 228 F.3d at 1268. That is a liberal standard, moreover, to be measured from the Plaintiff's perspective. *Id.*

Based on the allegations in the Complaint (DE1), that standard is clearly satisfied here. The benefits flowing to Stelor from the injunction – the termination of Silvers' interference, the continuation of the License Agreement, and the development of Stelor's business – will substantially exceed $75,000. Cmpl. ¶¶ 4, 23-24, 32. Indeed, as the Magistrate clearly recognized in his June 3, 2005 Report and Recommendation (DE25) at 32, the injunction is required to prevent the immeasurable damage that would otherwise occur to Stelor, as alleged, Cmpl. ¶¶ 4, 23-24, 32. Silvers entirely ignores that standard, however, instead analyzing the case as if it were exclusively an action for damages. For this reason, Silvers' Motion is simply unfounded – if not disingenuous – and should be denied.

In addition, the amount-in-controversy requirement would still be satisfied even if this were solely an action for damages. Assuming *arguendo* that the limitation of liability provision

<div align="center">2</div>

cited by *Silvers* is enforceable – which, as set forth below, it is not – Stelor may still recover damages equal to the amounts paid to Silvers for the prior year. And, what amounts were paid is a factual issue not appropriate for resolution on a motion to dismiss. *See D.L. Day v. Taylor,* 400 F.3d 1272, 1275-76 (11th Cir. 2005) (affidavits cannot properly be considered on motion to dismiss, unless the motion is converted into a motion for summary judgment with notice to plaintiff and an opportunity for plaintiff to submit affidavits and engage in discovery). To the extent Silvers improperly relies on a previously-filed declaration (DE11) to try and resolve this factual issue, Stelor disputes his position. The payments to Silvers over the past year actually exceed $75,000.00.[1] Also, since the Settlement Agreement (previously entered into by the parties and filed under seal along with the Complaint (DE4)) provides for prevailing party attorneys' fees and costs, *see* ¶ 17, those amounts should be considered for purposes of the amount in controversy requirement. *See Federated Mutual Ins. Co. v. McKinnon Motors, LLC,* 329 F. 3d 805, 808 n.4 (11th Cir 2003). At the present rate, the recoverable fees and costs themselves are likely to exceed the jurisdictional threshold.

Finally, Silvers is barred from enforcing the limitation of liability provision anyway: his misconduct entirely frustrated the provision's purpose. *See* Fla. Stat. 672.719 (provision unenforceable "where circumstances cause an exclusive or limited remedy to fail of its essential purpose"); *Typographical Serv., Inc. v. Itek Corp.,* 721 F.2d 1317, 1320 (11th Cir. 1983).

**B.    Diversity Of Citizenship Also Exists.**

Silvers' suggestion that jurisdiction over this matter may be improper is also without merit. Diversity exists, as no owner of any membership interest in Stelor resides in Florida. Stelor has already confirmed that as a matter of record in the previously filed Declaration of

---

[1] Mr. Esrig, Stelor's CEO, has verified the accuracy of this statement and of Stelor's other factual contentions in this Memorandum.

3

Steven Esrig (DE16), ¶ 28(a).  In addition, Stelor attaches as Exhibit "A" hereto a listing (verified by Steven Esrig) of the citizenship of each of its members, which satisfies the requirement of *Rolling Greens MHP, LP. V. Comcast SCH Holdings L.L.C.,* 374 F.3d 1020, 1022 (11th Cir. 2004), that "a party must list the citizenship of all the members of the limited liability company." *Id.*[2]  To the extent Silvers contends that Stelor must also specifically allege "the identity of each member", the *Rolling Greens* decision does not require that, and Silvers has no right to know the identity of the members of this private company.

**C.     Silvers Expressly Consented To Stelor's Change To An LLC.**

Silvers' argument that Stelor – having changed to a limited liability company – lacks standing to pursue this action is preposterous.  Silvers himself acknowledged and consented to that change in the Settlement Agreement.  *See* ¶ 9.  Silvers simply ignores the Settlement Agreement's express provision, titled "LLC Acknowledgement", which provides as follows: "[t]he Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC.  Any options granted to Silvers from the Stelor, Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC."  In fact, one of the defaults alleged by Silvers in his April 27, 2005 letter purporting to terminate the License Agreement was that Stelor failed to provide him the LLC interests.  Cmpl. Ex. C.  Silvers thereby assumed and admitted that the conversion was valid, and *is* thus precluded from contending otherwise now.

In addition, the License Agreement specifically contemplates such assignments, providing that the Agreement "shall be binding upon, and shall inure to the benefit of the parties

---

[2] In analyzing a jurisdictional challenge, the district court may consider extrinsic evidence such as Mr. Esrig's declaration and his verifications of the Complaint and of the facts in this memorandum. *See Morrison v. Amway Corp.,* 323 F.3d 920, 925 & n. 5 (11th Cir. 2003).

hereto, their heirs, administrators, successors and assigns." Cmpl. Ex. A, ¶ XVII. The Agreement further provides that Stelor has the express right to make such an assignment, "in connection with a transfer of substantially all of [its] assets." *Id.* ¶ XXI.

Analyzing this provision, the Magistrate held in his June 3, 2005 Report and Recommendation (DE25) as follows: "It is clear this provision contemplates a change in corporate structure such as occurred in the transition from Stelor Productions, Inc. to Stelor Production, LLC, and requires no consent on the part of the Defendant to assign the License Agreement." Report at 9.

Under these circumstances, as the Magistrate properly held, Silvers' attempt to claim that Stelor has somehow improperly assigned its rights to another entity is entirely unfounded. That Silvers would continue to make this argument, moreover, highlights his utter disregard or misapprehension of the explicit terms of the Agreements.

## CONCLUSION

For the foregoing reasons, Silvers' Motion is entirely without merit and should be denied.

> BURLINGTON, WEIL, SCHWIEP,
>   KAPLAN & BLONSKY, P.A.
> Attorneys for Plaintiff
> Office in the Grove, Penthouse A
> 2699 South Bayshore Drive
> Miami, Florida 33133
> Tel: 305-858-2900
> Fax: 305-858-5261
>
>
> By: /s/ Kevin C. Kaplan
>     Kevin C. Kaplan, Esq.
>     Florida Bar No. 933848
>     David J. Zack, Esq.
>     Florida Bar No. 641685

5

## VERIFICATION

This sworn verification is made pursuant to 28 U.S.C. § 1746. I, STEVEN A. ESRIG, Chief

Executive Officer and President of STELOR PRODUCTIONS, L.L.C., declare under penalties of

perjury that the facts stated in the foregoing Memorandum of Law in Opposition to Defendant's

Motion to Dismiss are true and correct, including the information regarding the citizenship of

Stelor's members as listed in Exhibit "A" hereto.

Dated this 13th day of June, 2005.

By: _____
      Steven A. Esrig
      Chief Executive Officer/President
      Stelor Productions, L.L.C.

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true copy of the foregoing is being served by Telefax

and United States mail this 13th day of June 2005, upon Gail A. McQuilkin, Esq. and Kenneth

Hartmann, Esq., Kozyak Tropin & Throckmorton, P.A., counsel for Defendant, 2525 Ponce de

Leon, 9th Floor, Miami, Florida 33134; and Adam T. Rabin, Esq., Dimond Kaplan & Rothstein,

P.A., Trump Plaza, 525 S. Flagler Drive, Suite 200, West Palm Beach, Florida 33401.

/s/ Kevin C. Kaplan
Kevin C. Kaplan
David J. Zack

STELOR PRODUCTIONS, LLC
MEMBERS' CITIZENSHIPS

City, State/Country

Baden-Baden, Germany
Bottminger, Switzerland
Warren, PA
Montville, NJ
Christ Church, Barbados
Bridgetown, Barbados
Chevy Chase, MD
Darnestown, MD
Rockville, MD
Gaithersburg, MD
Burke, VA
Chicago, IL
Gaithersburg, MD
Toronto, Ontario, Canada
Toronto, Ontario, Canada
Gig Harbor, WA
Los Angeles, CA
Laytonsville, MD
Red Deer, Alberta, Canada
Montville, NJ
Rockville, MD
Toronto, Ontario, Canada
Solana Beach, CA
Brookeville, MD
Potomac, MD
San Francisco, CA
Highland Park, IL
Queensway, Gibraltar
Houston, TX
Lake Forest, IL
Owings Mills, MD
Gaithersburg, MD
Richmond, VA

Exhibit "A"

Exhibit  C

## DECLARATION OF DOMICILE

To the Clerk of the Circuit Court (County Controller) Manatee County, Florida.

This is my declaration of domicile in the State of Florida, that I am filing this day in accordance and in conformity with Section 222.17, Florida Statutes.

FOR DOMICILIARIES OF THE STATE OF FLORIDA:

I hereby declare that I reside in and maintain a place of abode at ___7305   OAK   RUN   LANE___ ,
___SARASOTA___ , ___34243___ (street and number)
     (city)          (zip code)          , Manatee County, Florida, which place of abode I

recognize and intend to maintain as my permanent home and, if I maintain another place or places of abode in some other state or states, I hereby declare that my above-described residence and abode in the State of Florida constitutes my predominant and principal home, and I intend to continue it permanently as such. I am, at the time of making this declaration, a bona fide resident of the State

of Florida residing at ___7305   OAK   RUN   LANE___ , ___SARASOTA___ , ___34243___ ,
                          (street and number)          (city)          (zip code)

Manatee County, Florida. I formerly resided at ___SARASOTA___ , ___SARASOTA___ County,
                                                    (city)

___FLORIDA___ , and the place or places where I maintain another or other place or places of abode are as follows:
   (state)
                    (Here list street address, city, county and state of any other place or places of abode.)

___Igor H Genovol___                                   _____
(Print Name)                                            (Print Name)

___FL DL SHOWN___

___[signature]___                                       _____
(Signature)                                             (Signature)

Sworn to and subscribed before me this __25th__ day of ___January___ , A.D. 19__99__ .
R.B. Shore, Clerk Circuit Court, Manatee County

By: ___Raquel Harry___
Signature and Title of Notarizing or
Attesting Official

BK 1582 PG 4433  DKT# 1202592
FILED AND RECORDED 01/25/99 10:52AM 1 of 1
R.B. SHORE CLERK OF CIRCUIT COURT MANATEE COUNTY FL

FOR DOMICILIARIES OF STATE OTHER THAN THE STATE OF FLORIDA:

I hereby declare that my domicile is in the State of _____ and that I intend to permanently continue and maintain my domicile in such state. At the time of making this declaration I am a bona fide resident of the State of _____ . My place of abode within the State of Florida, if any, is as follows: (Here list street address, city, and county of place of abode in Florida.)

(Person making declaration may also include such other and further facts with reference to any acts done or performed by such person which such person desires or intends not to be construed as evidencing any intention to establish his domicile within the State of Florida.)

                                          _____
                                                  (signature)

Sworn to and subscribed before me this _____ day of _____ , A.D. 19_____ .

_____
Signature and Title of Notarizing or
Attesting Official

THIS IS NOT AN APPLICATION FOR HOMESTEAD EXEMPTION

| Hunting/Fishing Permit | None Found |
| Bankruptcies | None Found |
| Tax Liens & Judgments | None Found |
| UCC Filings | None Found |
| Possible Properties Owned | 2 Found |
| Possible Relatives | 1st Degree - 2 Found<br>2nd Degree - None Found<br>3rd Degree - None Found |

## Address Summary:

| Address | County | Dates | Maps |
|---|---|---|---|
| 1525 EASTBROOK DR, SARASOTA FL 34231-3511 | SARASOTA | Sep 2005 - Oct 2005 | Map |

## Previous And Non-Verified Address(es):

IGOR H GRUENDL  - 1525 EASTBROOK DR, SARASOTA FL 34231-3511, SARASOTA COUNTY (Sep 2005 - Oct 2005)
   BROWN DARYL J  (941) 929-9034
   **Property Ownership Information for this Address**
      Property:
         Parcel Number - 0076-10-0012
         Name Owner 1 - GRUENDL, IGOR & CAROL
         Address - 1525 EASTBROOK DR, SARASOTA FL 34231-3511, SARASOTA COUNTY
         Owner's Address - 1525 EASTBROOK DR, SARASOTA FL 34231-3511, SARASOTA COUNTY
         Land Usage - SINGLE FAMILY RESIDENCE
         Sale Date - 09/19/2005
         Sale Price - $0
         Name of Seller - GRUENDL FAMILY TRUST
         Loan Amount - $0
         Loan Term - 0

## Possible Criminal Records:
[None Found]

## Sexual Offenses:
[None Found]

## Driver's License Information:
Name: IGOR HORST GRUENDL
DL Number: xxxx-xxx-xx-xxx-x
State: Florida
License Address: 1525 EASTBROOK DR, SARASOTA FL 34231-3511, SARASOTA COUNTY
DOB: 03/25/1961
Sex: M
Race: W
Expiration Date: 05/02/2008
Issue Date: 05/02/2002
License Type: Non-Commercial - Regular Operator License
Height: 5'11

## Motor Vehicles Registered To Subject:
Vehicle:
   Description: White 1997 Volvo 960 - Station Wagon
   License Plate: DCE9T
   License Plate Type: Protect Wild Dolphins
   VIN: YV1KW9606V1043093
   State of Origin: Florida
   Vehicle Use: Private
   Mileage: 89,551
   Title Number: 0073283038
   Title Date: 08/15/2005

Title Status: Original Used
Decal Year: 2006
Engine Size: 178
Number of Cylinders: 6
Body: Station Wagon
Record Type: Current
Expiration Date: 03/25/2006
*Owner(s)*
    Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
    DL #: xxxxxxxxxxxxx
    Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

    Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
    DL #: xxxxxxxxxxxxx
    Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Registrant(s)*
    Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
    DL #: xxxxxxxxxxxxx
    Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

    Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
    DL #: xxxxxxxxxxxxx
    Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Lien Holder*
    None

**Vehicle:**
Description: Gray 2002 Land Rover Discovery II SE - 4 Dr Wagon Sport Utility
License Plate: G13HCR
License Plate Type: Car & Pickup Tags (County Name)
VIN: SALTW12452A770010
State of Origin: Florida
Vehicle Use: Private
Mileage: 12
Title Number: 0085772826
Title Date: 06/11/2002
Title Status: Original New
Decal Year: 2006
Engine Size: 241
Number of Cylinders: 8
Body: 4 Dr Wagon Sport Utility
Record Type: Current
Expiration Date: 03/25/2006
*Owner(s)*
    Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
    DL #: xxxxxxxxxxxxx
    Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Registrant(s)*
    Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
    DL #: xxxxxxxxxxxxx
    Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Lien Holder*
    Holder: MACDILL FEDERAL CREDIT UNION
    Lien Date: 06/11/2002
    Address: PO BOX 89985, TAMPA FL 33689-0417

**Vehicle:**
Description: White 2001 BMW X5 3.0i - 4 Dr Wagon Sport Utility
License Plate: A06ZJY
License Plate Type: Car & Pickup Tags (County Name)
VIN: WBAFA53591LM89376
State of Origin: Florida
Vehicle Use: Private
Mileage: 6
Title Number: 0083542830
Title Date: 06/28/2001
Title Status: Lien Maint Only
Decal Year: 2006
Engine Size: 182
Number of Cylinders: 6
Body: 4 Dr Wagon Sport Utility
Record Type: Current

Expiration Date: 03/25/2006
*Owner(s)*
Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Registrant(s)*
Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Lien Holder*
None

## Florida Accidents:
[None Found]

## Concealed Weapons Permit:
[None Found]

## People at Work:
[None Found]

## Professional License(s):
[None Found]

## FAA Certifications:
[None Found]

## FAA Aircrafts:
[None Found]

## Watercraft:
[None Found]

## Voter Registration:
[None Found]

## Hunting/Fishing Permit:
[None Found]

## Bankruptcies:
[None Found]

## Tax Liens and Judgments:
[None Found]

## UCC Filings:
[None Found]

| | |
|---|---|
| People at Work | |
| Professional Licenses | None Found |
| FAA Certifications | None Found |
| FAA Aircrafts | None Found |
| Watercraft | None Found |
| Voter Registration | 1 Found |
| Hunting/Fishing Permit | 1 Found |
| Bankruptcies | None Found |
| Tax Liens & Judgments | None Found |
| UCC Filings | None Found |
| Possible Properties Owned | 10 Found |
| Possible Relatives | 1st Degree - 6 Found<br>2nd Degree - None Found<br>3rd Degree - None Found |

## Address Summary:

| Address | County | Dates | Maps |
|---|---|---|---|
| 1525 EASTBROOK DR, SARASOTA FL 34231-3511 | SARASOTA | Dec 2004 - Nov 2005 | Map |
| PO BOX 35336, PHOENIX AZ 85069-5336 | MARICOPA | Mar 2003 - Oct 2005 | Map |
| 7305 OAK RUN LN, SARASOTA FL 34243-4551 | MANATEE | Jan 1999 - Aug 2005 | Map |
| 11624 HUNTER LN NW, GIG HARBOR WA 98332-7861 | PIERCE | Sep 2002 - Aug 2005 | Map |
| 602 47TH ST, SARASOTA FL 34234-4522 | SARASOTA | May 2001 - Jul 2003 | Map |
| 4249 TENNYSON WAY, VENICE FL 34293-5244 | SARASOTA | Sep 2001 - Mar 2002 | Map |
| 602 46TH ST, SARASOTA FL 34234-4518 | SARASOTA | Jul 1994 - Mar 2001 | Map |
| 746 NW FORREST TRL NW, ATLANTA GA 30318-2518 | FULTON | Jul 1991 - Oct 2000 | Map |
| 826 STARLITE LN, PORT CHARLOTTE FL 33952 | CHARLOTTE | Sep 1995 | Map |
| 3428 FLAMINGO AVE, SARASOTA FL 34242-1004 | SARASOTA | Feb 1994 - Jul 1994 | Map |
| 6422 MIDAS PL, NORTH PORT FL 34287-2114 | SARASOTA | Sep 1993 | Map |
| 2850 DELK RD SE APT APT, MARIETTA GA 30067-5352 | COBB | Jul 1985 - Aug 1993 | Map |
| 1170 CHALFONT WALK NE, ATLANTA GA 30319-2800 | DEKALB | Jul 1985 - Dec 1992 | Map |
| 1901 WOOD ST, SARASOTA FL 34236 | SARASOTA | Nov 1992 | Map |
| 248 2ND ST W, NOKOMIS FL 34275-1509 | SARASOTA | Jun 1989 - Apr 1991 | Map |
| 1910 WOOD ST, SARASOTA FL 34236-7810 | SARASOTA | Sep 1990 - Dec 1990 | Map |
| 800 HUDSON AVE UNIT 102, SARASOTA FL 34236-7708 | SARASOTA | Jan 1990 - Feb 1990 | Map |
| 8401 E BONNIE ROSE AVE, SCOTTSDALE AZ 85250-6715 | MARICOPA | Jun 1985 | Map |
| 7117 E 3RD AVE, SCOTTSDALE AZ 85251-3821 | MARICOPA | Jun 1985 | Map |
| 2671 WOODGATE LN, SARASOTA FL 34231-6485 | SARASOTA | Apr 1985 | Map |
| 515 BLACKBURN BLVD, NORTH PORT FL 34287-1582 | SARASOTA | Apr 1985 | Map |

## Previous And Non-Verified Address(es):

CAROL A GRUENDL - 1525 EASTBROOK DR, SARASOTA FL 34231-3511, SARASOTA COUNTY (Dec 2004 - Nov 2005)
    BROWN DARYL J  (941) 929-9034
    **Property Ownership Information for this Address**
        Property:
            Parcel Number - 0076-10-0012
            Name Owner 1 - GRUENDL, IGOR & CAROL
            Address - 1525 EASTBROOK DR, SARASOTA FL 34231-3511, SARASOTA COUNTY
            Owner's Address - 1525 EASTBROOK DR, SARASOTA FL 34231-3511  SARASOTA COUNTY

Land Usage - SINGLE FAMILY RESIDENCE
Sale Date - 09/19/2005
Sale Price - $0
Name of Seller - GRUENDL FAMILY TRUST
Loan Amount - $0
Loan Term - 0

CAROL ANN GRUENDL - PO BOX 35336, PHOENIX AZ 85069-5336, MARICOPA COUNTY (Mar 2003 - Oct 2005)

CAROL A GRUENDL - 7305 OAK RUN LN, SARASOTA FL 34243-4551, MANATEE COUNTY (Jan 1999 - Aug 2005)
   KRINSK S  (941) 355-1788
   **Property Ownership Information for this Address**
        Property:
                Parcel Number - 19476.0075(3)
                Book - 001808
                Page - 006154
                Lot Number - 13
                Name Owner 1 - KRINSK SUSAN K
                Name Owner 2 - EGLE LAWRENCE E
                Address - 7305 OAK RUN LN, SARASOTA FL 34243-4551, MANATEE COUNTY
                Owner's Address - 7305 OAK RUN LN, SARASOTA FL 34243-4551, MANATEE COUNTY
                Land Usage - SFR
                Subdivision Name - OAKRUN
                Total Value - $528,838
                Land Value - $54,600
                Improvement Value - $474,238
                Land Size - 48,569
                Year Built - 1984
                Sale Date - 02/27/2003
                Sale Price - $651,300
                Name of Seller - GRUENDL IGOR H & CAROL A
                Legal Description - LOT 13 OAKRUN SUB PI#19476.0075/3

CAROL ANN GRUENDL - 11624 HUNTER LN NW, GIG HARBOR WA 98332-7861, PIERCE COUNTY (Sep 2002 - Aug 2005)
   **Property Ownership Information for this Address**
        Property:
                Parcel Number - 400091-017-0
                Name Owner 1 - GRUENDL TRUST
                Address - 11624 HUNTER LN NW, GIG HARBOR WA 98332-7861, PIERCE COUNTY
                Owner's Address - 32108 ALVARADO BLVD 381, UNION CITY CA 94587-4000, ALAMEDA COUNTY
                Land Usage - SINGLE FAMILY RESIDENCE
                Sale Date - 01/10/2005
                Sale Price - $0
                Name of Seller - GRUENDL IGOR H & CAROL A
                Loan Amount - $0
                Loan Term - 0

CAROL ANN GRUENDL - 602 47TH ST, SARASOTA FL 34234-4522, SARASOTA COUNTY (May 2001 - Jul 2003)

CAROL A GRUENDL - 4249 TENNYSON WAY, VENICE FL 34293-5244 SARASOTA COUNTY (Sep 2001 - Mar 2002)
   **Current phones listed at this address:**
        COPHER C  (941) 492-6998
        HALL CHAS K  (941) 493-0119
   **Property Ownership Information for this Address**
        Property:
                Parcel Number - 0448-01-0075
                Lot Number - 45
                Name Owner 1 - COOK GROVER C
                Name Owner 2 - HALL DOROTHEA M
                Address - 4249 TENNYSON WAY, VENICE FL 34293-5244, SARASOTA COUNTY
                Owner's Address - 4249 TENNYSON WAY, VENICE FL 34293-5244, SARASOTA COUNTY
                Land Usage - SFR
                Subdivision Name - WOODMERE LAKES UNIT 3
                Total Value - $152,600
                Land Value - $30,500
                Improvement Value - $122,100
                Land Size - 8,050
                Year Built - 2000
                Sale Date - 11/19/2002
                Sale Price - $197,100
                Name of Seller - COPHER CONSTANCE
                Legal Description - LOT 45 WOODMERE LAKES UNIT 3

CAROL A GRUENDL - 602 46TH ST, SARASOTA FL 34234-4518, SARASOTA COUNTY (Jul 1994 - Mar 2001)
   JANNEMAN RENE A  (941) 360-0002
   **Property Ownership Information for this Address**

FRUCIANO AUDREY  (941) 423-1832
**Property Ownership Information for this Address**
Property:
Parcel Number - 0790-01-3329
Lot Number - 329
Name Owner 1 - FRUCIANO SALVATORE
Name Owner 2 - FRUCIANO AUREY
Address - 515 BLACKBURN BLVD, NORTH PORT FL 34287-1582, SARASOTA COUNTY
Owner's Address - 28156 UNIVERSAL DR, WARREN MI 48092-2432, MACOMB COUNTY
Land Usage - MOBILE HOME LOT
Subdivision Name - HARBOR COVE
Total Value - $41,100
Land Value - $25,500
Improvement Value - $15,600
Building Size - 1,071
Year Built - 1972
Sale Price - $0
Legal Description - UNIT 329 HARBOR COVE ORI 1999015426

## Possible Criminal Records:
[None Found]

## Sexual Offenses:
[None Found]

## Driver's License Information:
Name: CAROL A GRUENDL
DL Number: xxxx-xxx-xx-xxx-x
State: Florida
License Address: 1525 EASTBROOK DR, SARASOTA FL 34231-3511, SARASOTA COUNTY
DOB: 03/14/1958
Sex: F
Race: W
Attention Flags: ORGAN DONOR
Expiration Date: 03/14/2012
Issue Date: 07/27/2005
License Type: Non-Commercial - Regular Operator License
Height: 5'07

Name: CAROL A GRUENDL
DL Number: xxxx-xxx-xx-xxx-x
State: Florida
License Address: 7305 OAK RUN LN, SARASOTA FL 34243-4551, MANATEE COUNTY
DOB: 03/14/1958
Sex: F
Race: W
Attention Flags: ORGAN DONOR
Expiration Date: 03/14/2003
Issue Date: 03/11/1997
License Type: Non-Commercial - Regular Operator License
Height: 5'07

## Motor Vehicles Registered To Subject:
Vehicle:
Description: White 1997 Volvo 960 - Station Wagon
License Plate: DCE9T
License Plate Type: Protect Wild Dolphins
VIN: YV1KW9606V1043093
State of Origin: Florida
Vehicle Use: Private
Mileage: 89,551
Title Number: 0073283038
Title Date: 08/15/2005
Title Status: Original Used
Decal Year: 2006
Engine Size: 178
Number of Cylinders: 6
Body: Station Wagon
Record Type: Current
Expiration Date: 03/25/2006

*Owner(s)*
Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Registrant(s)*
Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Lien Holder*
None

**Vehicle:**
Description: White 2001 BMW X5 3.0i - 4 Dr Wagon Sport Utility
License Plate: A06ZJY
License Plate Type: Car & Pickup Tags (County Name)
VIN: WBAFA53591LM89376
State of Origin: Florida
Vehicle Use: Private
Mileage: 6
Title Number: 0083542830
Title Date: 06/28/2001
Title Status: Lien Maint Only
Decal Year: 2006
Engine Size: 182
Number of Cylinders: 6
Body: 4 Dr Wagon Sport Utility
Record Type: Current
Expiration Date: 03/25/2006
*Owner(s)*
Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Registrant(s)*
Name: GRUENDL IGOR HORST DOB: 03/25/1961 Age: 44 Sex: Male
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

Name: GRUENDL CAROL A DOB: 03/14/1958 Age: 47 Sex: Female
DL #: xxxxxxxxxxxxx
Address: 1525 EASTBROOK DR SARASOTA FL 34231, SARASOTA COUNTY

*Lien Holder*
None

# Florida Accidents:
[None Found]

# Concealed Weapons Permit:
[None Found]

# People at Work:
Name: CAROL A GRUENDL
Title: MANAGER OR MEMBER
SSN: 263-47-xxxx
Company: GRUENDL ENTERPRISES, LLC
Address:

Exhibit  D

FILED by _MC_ D.C.
ELECTRONIC

Jun 17 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

      Plaintiff,                       Case No. 05-80393-CIV-HURLEY

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant.

---

### MOTION TO STRIKE DECLARATION OF STEVEN A. ESRIG, SET ASIDE MAGISTRATE'S FINDINGS AND REPORT AND RECOMMENDATION, AND TO VACATE TRO

Defendant, Steven A. Silvers, respectfully submits this motion to strike the sworn

Declaration of Steven A. Esrig filed in support of Stelor Productions' Motion for Preliminary

Injunction. Esrig's Declaration contains intentionally false, and perhaps perjured, testimony.

Because Esrig's testimony was the primary evidence considered by the Magistrate Judge at the

preliminary hearing, and extensively relied on in the Report and Recommendation recommending

preliminary injunctive relief, Silvers requests that the Court set aside the Magistrate Judge's

findings and Report and Recommendation, vacate the TRO implementing the injunctive relief, and

grant such other relied as may be appropriate.

I.      Relevant Background Facts

    Silvers owns a host of intellectual property, including trademarks, copyrights, and a

patent, relating to an animated concept he created called the "Googles From The Planet Goo."

Silvers also owns dozens of domain names, including "Googles".com. Silvers and Stelor entered

into a License Agreement in 2002 in which Silvers licensed to Stelor the use the "Googles"

trademark and related intellectual property.

1

The License Agreement requires Stelor to pay Silvers royalties from sales, provide certified statements showing sales regardless of whether there are sales, and provide Silvers with samples of all merchandise being offered for sale. For three years Stelor provided no royalties, certified royalty statements, very few samples of merchandise or advertising and promotional materials (despite appearing at two International Licensing shows), and generally just performed miserably under the License Agreement.

Silvers long suspected that Stelor was selling merchandise he did not know about, hiding sales, and perhaps diverting sales revenue. On November 5, 2004, Silvers exercised his contractual right to an audit. Stelor flat out refused to comply with the request. For that reason, and all the other breaches Stelor had committed over the past three years, Silvers put Stelor on notice that it had 60 days to cure the breaches or face termination. After Stelor failed to cure a single breach, on January 13, 2005, Silvers sent notice that he had terminated the License Agreement.

Immediately, Stelor offered to cure the breaches if Silvers would reinstate the License Agreement. On January 28, 2005, Silvers and Stelor entered into a Settlement Agreement under which Silvers agreed to reinstate the License Agreement, provided Stelor cured the breaches. Stelor was required to cooperate with the audit, provide samples of merchandise, and provide past royalty statements. Stelor was also required to make certain payments to Silvers on the first of every month going forward.

Again, Stelor refused to comply with Silvers' audit request and either delayed or simply refused to perform its other obligations under the Settlement Agreement. After 90 days of waiting for Stelor to perform, Silvers reinstated the January 13, 2005 termination. Two days later, Stelor sent a letter offering to perform if Silvers once again withdrew the termination notice. By now, Silvers had no interest in continuing a relationship with Stelor and was prepared to move forward

2

with a new more responsible licensee.

Realizing that the end had come, Stelor quickly filed this action claiming it had been wrongfully terminated, and requesting emergency injunctive relief to compel Silvers to reinstate the License Agreement. Although the Court denied the "emergency" nature of the motion, the Magistrate Judge set a hearing on the preliminary injunction request for May 23, 2005.

On the morning of the hearing, Stelor filed the sworn Declaration of Steven A. Esrig, president of Stelor. Silvers' counsel was already en route to the hearing when this Declaration was served and did not see it until it was handed out in a notebook at the hearing. The Declaration contained mostly emotional argument, and unsubstantiated and dubious statements intended to refute each basis Silvers had for terminating the License Agreement. Because we had not seen this declaration prior to the hearing, we were unable to offer evidence to challenge the credibility of this testimony.

We now, however, have very strong evidence that shows Esrig lied in his Declaration when he disavowed knowledge of any licensed products being offered for sale, made false statements intending to mislead the Court regarding the harm Stelor would suffer without injunctive relief, and made the patently false representation that Silvers had dismissed his prior claims against Stelor with prejudice.

A.    False Testimony Regarding CafePress.com

Esrig made the following statements in support of Stelor's position that it had not breached the License Agreement for failure to provide royalty reports or samples of "Googles" branded merchandise being offered for sale online through Cafepress.com:

> "Stelor has advised Silvers' counsel that it was only just made aware that an on-line shop at Cafepress.com was carrying "Googles" merchandise, without Stelor's authorization or knowledge. We were previously unaware of the existence of this shop, and suspect that it was established by someone outside of Stelor using our company information. After further analysis, we discovered the shop was established in September of 2002. . ."

3

Exhibit A is the sworn Declaration of Paul Worsham ("Worsham Decl.") with attached email correspondence to and from Esrig that shows Esrig not only knew about the "Googles" merchandise being offered for sale on Cafepress.com, he originated the CafePress.com account, approved the design, selected the merchandise, and directed people to create a link between the Cafepress.com website and the "Googles" website.

In July, 2002, Esrig asked Worsham to set up an account at Cafepress.com so that Stelor could market and sell merchandise with the "Googles" name and logo. Worsham Decl., ¶ 5. Esrig directed Worsham to work with Salil Kumar, an individual helping on the website design, to set up a link from the "Googles" website to Cafepress.com. Worsham Decl., ¶¶ 4, 5. Worsham attaches a July 26-27, 2002 email exchange between himself, Esrig, and Salil Kumar about the Cafepress idea. Worsham Decl., Ex. B.

The Googles-themed Cafepress shop was established by Esrig during August, 2002. Worsham Decl., ¶ 6. As part of the configuration of the account and the shop, Worsham went to Esrig's house and sat with him in his home office while they worked on a "Googles"-themed Cafepress account using Esrig's personal computer. Worsham Decl., ¶ 6. Esrig provided Worsham with the original email address at googles.com to use to set up the initial account. Worsham Decl., ¶ 6. Worsham consulted Esrig often during the design phase. Worsham's sent Esrig an email while he worked on the Cafepress project containing Cafepress web site material for Esrig's approval. Worsham Decl., Ex. C.

On August 7, 2002, Esrig sent an email to Worsham attaching the "Googles" artwork for the Cafepress project. Worsham Decl., ¶ 8. Esrig also gave him a CD with all of the "Googles" artwork that Worsham used for the Cafepress project. Worsham Decl.. ¶ 8. Esrig asked Worsham to design a "Googles" word logo to use in addition to the artwork for the Cafepress merchandise

4

that would be sold in the "Googles" store. Worsham Decl., ¶ 8. Esrig approved the merchandise from Cafepress that he wanted to brand and sell with the "Googles" name and logos, and approved the markup amount for each item from the base price charged by Cafepress. Worsham Decl., ¶¶ 7 and 8.

In September, 2002, Worsham worked with Esrig and Salil Kumar to establish a link on the "Googles" website to the Googles-themed Cafepress store. Worsham Decl., ¶ 9. A link was established to http://www.cafeshops.com/"Googles" (cafeshops is operated by Cafepress.com.) Worsham Decl.,¶ 9. Worsham attaches an email exchange from September 12-13, 2002 between himself, Esrig and Salil Kumar about working on the link between googles.com and Cafeshops.com/googles. Worsham Decl., Ex. G.

In mid-September, 2002, Esrig asked Worsham to send him the information on how to log in to the "Googles" store at Cafepress.com. Worsham Decl., ¶ 10. Worsham sent an email to Esrig in response with the log in information. Worsham Decl., Ex. H. At a later date, Worsham assisted Esrig at his home office with changing information on the Cafepress account to Esrig's name and contact information. Worsham Decl., ¶ 10. Esrig provided Worsham with his personal email at Stelor Productions to enter into the Cafepress account information, along with validating the telephone number and address on the account. Worsham Decl.,¶ 10.

In October, 2002, Worsham was in Esrig's home office for a discussion on the "Googles" project when they logged into the Cafepress account and viewed information on a large order for "Googles" merchandise. Worsham Decl., ¶ 10. Worsham and Esrig discussed that Cafepress indicated that there was a problem with the order, and Worsham assisted Esrig in investigating the problem. Worsham Decl., ¶ 10.

On June 7, 2005, Silvers' counsel contacted Cafepress and asked for information on the seller of "Googles" merchandise through the Cafepress.com/googles store. *See* Declaration of

5

Gail A. McQuilkin, Esq. attached as Exhibit B. In response, Ryan Ellison, a Cafepress Content Usage Associate, sent an email with the contact information for the user of the service. The contact person listed is Steven Esrig, complete with street and address, and telephone number.

B.    Testimony Regarding Harm To The Gootopia Website

Esrig's testimony regarding the harm to Stelor necessitating injunctive relief is largely hyperbolic and unsubstantiated, and the few facts set out in his Declaration are false. Esrig stated that by virtue of Silvers redirecting the googles.com domain name away from the Gootopia Website, Silvers had "shut down the website" and "taken control of the website content" and "Stelor no longer has access to the Gootopia website;" he offered no technical information to substantiate those claims. The fact is that none of what Esrig said is true. Silvers had no ability to cause such problems. Stelor controls the website.

Attached as Exhibit C is the Declaration of Russell Tewksbury, an Internet expert and consultant. He reviewed the testimony of Esrig, looked at Gootopia website, and Stelor's server information at Verio. Stelor contracted with Verio to host the Gootopia Website. When Stelor created their Verio Web hosting account, Stelor was given a user-login and password for their VPS server and Verio's customer administrative backroom and product control panel. Tewksbury Decl. at ¶ 6. The user-login and password to Stelor's Verio VPS server provides secure access for Stelor to their Gootopia Website and enables Stelor to control the content of their Website. *Id*. Unless Stelor gave their Verio VPS user-login and password information to a third party, only they and Verio possess password-access to the VPS server where Stelor's Gootopia website is hosted. *Id*. Stated another way, unless Stelor has given their user-login and password to Silvers, he cannot access the Gootopia Website or control the content on the Gootopia Website. *Id*.

Any person wanting to view the Gootopia Website on the Internet can do so by simply entering the numeric IP address 128.121.122.247; the user will be connected to the Gootopia

6

Website. Tewksbury Decl. at ¶ 7. Silvers Ent. Group, Inc. is the lawful registrant for the googles.com domain name, and only Silvers should direct the DNS records that associate the googles.com domain name with any particular IP address. Tewksbury Decl. at ¶ 8. Up until recently, Silvers maintained the DNS records for the googles.com domain name to point to Verio's name servers (ns1.secure.net and ns2.secure.net), which in turn directed website visitors to the IP address associated with Stelor's Gootopia Website. Thus, when a person typed in the domain name googles.com they were connected to Stelor's Gootopia Website. Tewksbury Decl. at ¶ 9.

When Silvers terminated the license agreement with Stelor, he logged into his Godaddy.com domain name account and directed the DNS records of the googles.com domain name to point to an IP address for a Website he controls. Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Silvers shut down the (Gootopia) Website." That is false and misleading. As Tewksbury explains, because Silvers was not a party to the Web hosting agreement between Stelor and Verio, only Stelor had access to the (password protected) Gootopia Website, which they created, and only Verio or Stelor has the ability to shut down the Gootopia Website. Tewksbury Decl. at ¶ 11.

Esrig testified that because Silvers directed the DNS records away from the Gootopia Website "Stelor no longer has access to the (Gootopia) Website." That is also false and misleading. Stelor's access to the Gootopia Website is an issue between Stelor and Verio, and Silvers has no authority or ability to direct Verio to do anything relating to Stelor's account or access thereto. Tewksbury Decl. at ¶ 12. In addition, even if Verio unilaterally decided to deny Stelor access to its server, Stelor should have access to their Gootopia Website content through back-up copies. *Id.* It is normal and customary for a Website developer to have multiple back-up copies of a Website. *Id.* Finally, Stelor always has the option to contract with another Web

7

hosting company (other than Verio) to host their Gootopia Website. *Id.*

Esrig's testimony that because Silvers directed the DNS records away from the Gootopia Website "Silvers redirected the Website" is false and misleading. Silvers redirected the DNS for the googles.com domain name to point to a Web server under his control. Tewksbury Decl. at ¶ 13. Silver's action does not prohibit or restrict Stelor's ability to access, modify, alter or delete any content on their Gootopia Website. *Id.*

Likewise, Esrig's testimony that because Silvers directed the DNS records away from the Gootopia Website "Stelor can't operate the (Gootopia) Website without the googles.com domain name." Stelor does not *need* the googles.com domain name to operate the Gootopia Website. Tewksbury Decl. at ¶ 14. The Gootopia Website exists completely independent of any domain name. *Id.* If, by the word "operate," Esrig means to imply people can't access the Gootopia Website via the Internet, that is also false. All that his needed for the Gootopia Website to be accessible via the Internet, is a Web hosting account and a publicly accessible IP address. *Id.* And, if the preference is to have a domain name for easier user access, Stelor can register a multitude of other domain names and have those point to the Gootopia Website. *Id.*

Esrig also falsely testified that because Silvers directed the DNS records away from the Gootopia Website "Silvers took the Website (Gootopia) content." Unless Stelor gave Silvers password access to their Verio VPS server where their Gootopia Website was hosted, Silvers is not able to remove or in any other way restrict Stelor's access to their Gootopia Website content. Tewksbury Decl. at ¶ 15. Only Stelor has that control. *Id.*

Further, Esrig falsely testified that because Silver directed the DNS records away from the Gootopia Website "Stelor can't demonstrate the site to anyone." Stelor has multiple options to demonstrate the Gootopia Website. Tewksbury Decl. at ¶ 16. It can do so over the Internet using an IP address, or any other domain name it chooses. *Id.* Or, it can demonstrate off-line on a local

8

computer or from a DVD or CD-Rom. *Id.*

The discrepancy between what Esrig testified to and what we now know to be true is significant. Stelor is a web-based business. It is inexplicable that Esrig would not know that changing the DNS records for the googles.com domain name has <u>zero</u> effect on the Gootopia Website. The only conclusion is that he knowingly made false statements to mislead the Magistrate Judge as the to the harm.

    C.    <u>Testimony That The Parties Had Dismissed Prior Claims With Prejudice</u>

Esrig also falsely testified that Silvers agreed to dismiss his claims against Stelor with prejudice. Esrig wanted the Magistrate Judge to believe that the Silvers had resolved all of his claims against Stelor when he entered into Settlement Agreement. But that testimony is patently false. Silvers never agreed to dismiss his claims with prejudice, the Settlement Agreement provides that the claims are to be dismissed "without prejudice" and that is what the Court ordered. See Exhibit D.

## CONCLUSION

Esrig's testimony is riddled with false testimony and intentional misrepresentations. The Magistrate Judge, however, relied heavily on this evidence in his findings that Stelor is likely to prevail on its wrongful termination claim, and that it will suffer irreparable harm. The Magistrate Judge found that because Esrig disavowed any knowledge of "Googles" merchandise being offered for sale, Stelor is likely to prevail against Silvers' claim that he had the right to terminate the License Agreement because Stelor failed to provide Silvers samples of such merchandise or account to Silvers for sales. He also gave that testimony great weight in finding that, if there are no sales as Esrig states, there is no reason for Stelor to provide a royalty statement to Silvers (notwithstanding that the License Agreement requires a quarterly statement regardless of sales.).

The Magistrate Judge likewise used this testimony in finding that the Stelor will suffer

9

irreparable harm. He found that Stelor would suffer harm from the "loss" of the Gootopia website, loss of control of the website contents, and could not function without the googles.com domain name. The only evidence of this is Esrig's false testimony.

Esrig's Declaration should be stricken in its entirety. Further, because the Magistrate's findings and Report and Recommendation are based almost entirely on Esrig's testimony, the Court should set aside the Magistrate Judges' findings and Report and Recommendation, and vacate the TRO.

|  |  |
|---|---|
|  | s/ Gail A. McQuilkin |
| Adam T. Rabin, Esq. | Kenneth R. Hartmann, Fl. Bar No. 664286 |
| DIMOND KAPLAN & ROTHSTEIN, P.A | Gail M. McQuilkin, Fl. Bar No. 969338 |
| 200 SE First Street, Suite 708 | KOZYAK TROPIN & THROCKMORTON, P.A. |
| Miami, FL 33131 | 2525 Ponce de Leon, 9th Floor |
| T: 305-374-1920 | Miami, Florida 33134 |
| Co-Counsel for Defendant | T: 305-372-1800 / F: 305-372-3508 |
|  | Counsel for Defendant |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 17th day of June, 2005, to: Kevin C. Kaplan, Daniel F. Blonsky and David Zack at Burlington Weil Schwiep Kaplan & Blonsky, P.A., 2699 S. Bayshore Drive, Penthouse A, Miami, FL 33133.

s/ Gail A. McQuilkin

3339/101/254478.1

10

# Exhibit  A

IN UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

       Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

       Defendant,
_____/

CASE NO. 05-80393-CIV-HURLEY
Magistrate Hopkins

## DECLARATION OF PAUL WORSHAM

I, Paul Worsham, make this Declaration based on personal knowledge.

1.  I reside in Potomac, Maryland (Montgomery County) and make this Declaration from my own personal knowledge.

2.  I was introduced to Steven A. Esrig in 2001. I was asked by Esrig in the fall of 2001 to help with internet-related aspects of the Googles project, including the website Googles.com. I produced a draft plan for the "information technology" aspects of the project around that time, and it included ideas for online merchandising of products with various Googles images and logos.

3.  By the middle of 2002, I had my own account with Cafepress and was experienced in setting up a Cafepress online store. CafePress.com is an online marketplace that allows sellers to independently create and sell a wide variety of products branded with the sellers name and logo through an independent online store. I told Esrig about Cafepress.com and suggested this would be a good place to market "Googles" merchandise.

1

4. In July 2002, I was assisting Esrig with graphics work relating to the Googles project. See Email dated July 30, 2002 attached as Exhibit A. At that time, a person named Salil Kumar from the company Spinning Doors was helping Esrig with the Googles web site design, hosting, and webmaster work. I did not have access to update the Googles.com website. The updates to the website were done by people that worked for Spinning Doors. Esrig told me that he had found Spinning Doors through one of the people involved with Stelor Productions.

5. While I was working with Esrig in July, 2002, he asked me to set up an account at Cafepress.com so that Stelor could market and sell merchandise with the Googles name and logo. He directed me to work with Salil Kumar to set up a link from the Googles web site to Cafepress.com. Attached is an email exchange from July 26-27, 2002 between myself, Esrig and Salil Kumar about the Cafepress idea. Exhibit B.

6. During August 2002, the Googles-themed Cafepress shop was established. As part of the configuration of the account and the shop, I went to Esrig's house and sat with him in his home office while we worked on a Googles-themed Cafepress account using his personal computer. I helped set up the initial Cafepress account for Esrig using an email address provided at googles.com, with Esrig's approval.

7. I spoke to Esrig often about the Cafepress project during the design phase. Attached as Exhibit C is an email dated August 1, 2002 I sent to Esrig while I worked on the Cafepress.com project. Esrig also approved the markup amount for each item from the base price charged by Cafepress. Attached as Exhibit D is an email dated August 5, 2002 from Esrig to me asking me to call him at 301-419-6363 in response to an email I sent him on August 2, 2002 that referenced a Cafepress newsletter.

2

8. On August 7, 2002, Esrig sent me an email attaching the artwork for the Cafepress project. Exhibit E. Esrig also gave me a CD with all of the Googles artwork that I used for the Cafepress project and other activities. Esrig asked me to design a "Googles" word logo to use in addition to the artwork for the Cafepress merchandise that would be sold in the Googles store. Attached as Exhibit F is a copy of the Googles store from the Cafepress.com web site. The images and logos that appear are the ones I helped create and uploaded to Cafepress.com at Esrig's direction. Esrig approved the merchandise from Cafepress that he wanted to brand and sell with the "Googles" name and logos.

9. In September, 2002 I worked with Esrig and Salil Kumar to establish a link on the googles.com web site to the Googles-themed CafePress store. A link was established to http://www.cafeshops.com/googles (cafeshops.com is operated by CafePress.com). Attached as Exhibit G is an email exchange from September 12-13, 2002 between myself, Esrig and Salil Kumar about working on the link between googles.com and Cafeshops.com/googles.

10. In mid-September, 2002 Esrig asked me to send him the information on how to log in to the Googles store at Cafepress.com. Attached as Exhibit H is the email I sent on September 16, 2002 in response to Esrig's request. At a later date, I assisted Esrig at his home office with changing the information on the Cafepress account to his name and contact information. Esrig provided me with his personal email at Stelor Productions to enter into the Cafepress account information, along with validating the telephone number and address on the account.

11. In or around October 2002, I was in Esrig's home office for a discussion on the Googles project when we logged into the Cafepress account and viewed information on a large order for Googles merchandise. We discussed that Cafepress indicated that there was a problem with the order. I assisted Esrig in investigating the problem. The sale did not go through because Cafepress

3

could not obtain credit card authorization for the buyer's credit card, and that the order would not be shipped.

12.  After the October-November 2002 timeframe, I did not log into or assist with the Googles store Cafepress account.

I HEREBY DECLARE under penalty of perjury that I have read the foregoing Declaration and that the facts stated in it are true, and that all the emails attached are true and correct copies.

Dated this _15th_ day of June, 2005.

Paul Worsham

4

# Exhibit  A

## to Declaration
## of Paul Worshaw

From:        "Steven Esrig" <egginternational@hotmail.com>
To:          <paul@zz8.com>
Date:        7/30/2002 10:13:35 PM
Subject:     Re: Revised Googles Artwork files

>From: "Paul Worsham" <paul@zz8.com>
>To: <egginternational@hotmail.com>
>Subject: Revised Googles Artwork files
>Date: Mon, 29 Jul 2002 23:51:42 -0400
>
>Steve,
>
>I have edited one of the images and put it online in this folder, as we
>discussed last night:
>
>   http://googlesmail.com/steve/  (you should see at least the file named:
>GOO_01_PWc.jpg )
>
>Note that the original image was a 1 megabyte file, and this image was
>reduced to a lower resolution for faster uploading/downloading.  But I will
>work a higher resolution for the next images.
>
>Let me know what you think of the erasing/replacing work on the image.
>
>
>Paul
>

I tried calling on both lines just now-they worked fine!-but the shoes and
stickers arena tad too small-can they be made bigger in proportion?
Call soon!

_____

Chat with friends online, try MSN Messenger: http://messenger.msn.com

# Exhibit  B

## to Declaration
## of Paul Worshaw

| | |
|---|---|
| **From:** | "Paul Worsham" <paul@zz8.com> |
| **To:** | "Salil Kumar" <salil@s-d.biz>, "Paul Worsham" <paul@zz8.com>, "Steven Esrig" <egginternational@hotmail.com> |
| **Date:** | 7/27/2002 10:04:53 AM |
| **Subject:** | RE: requirements specification for Googles.com - first draft |

All - my message is being rejected due to some issue with Salil's address.
I am trying again, but may have to remove his address in order to get it
sent. Below is what I wrote yesterday:

----------------

Hello Salil,

Thank you for the draft document. I have reviewed it, and will re-review it
tomorrow. Steve and I will also need to have some discussions on the
overall Googles online approach (vision, strategy, goals, and timelines).

You should try the Cafe Press website again - it was up when I visited it
just now: http://www.cafepress.com


Paul


----Original Message----
From: Salil Kumar [mailto:salil@s-d.biz]
Sent: Friday, July 26, 2002 5:55 AM
To: Paul Worsham; Steven Esrig
Cc: Arun
Subject: requirements specification for Googles.com - first draft


Hi Paul, Steve:

Attached is a first draft of the requirements specification document for
redesign of Googles.com. This document strives to formalize the process of
defining the requirements and is based on various emails and discussions
that we have had recently. Our intention is to work with you to agree upon
the accurate set of functionality needed for googles.com as soon as
possible.


REGARDING TIME AND COST:

Please note that the time and cost sections in this document are initial
estimates. I would like to emphasize that we are flexible and committed to
coming up with a mutually agreeable time frame and cost for the entire
project.

I will try to call you regarding this Friday (26th) morning (your early
afternoon) - hopefully you will have a chance to look through this before
that.

Thanks

Saiil

(SpinningDoors)


CC:          "Arun" <arun@s-d.biz>

# Exhibit  C

## to Declaration
## of Paul Worshaw

**From:**    "Paul Worsham" <paul@FreedomStudio.com>
**To:**      <egginternational@hotmail.com>
**Date:**    8/1/2002 6:06 PM
**Subject:** FW: CafePress.com: Back to School Products Are HERE!

Steve - I will probably order myself a "Googles" bag once I get the stuff online in a test "CafePress" shop. I'll also give you the link once I do that, probably by Saturday. You can see from the information below that they have a focus on the same vertical (Kids) as Googles.com!

Paul.

-----Original Message-----
**From:** CafePress.com [mailto:reply@cafepress.com]
**Sent:** Thursday, August 01, 2002 3:24 PM
**To:** admin@usa999.com
**Subject:** CafePress.com: Back to School Products Are HERE!



**August 2002**

## In This Issue

Back to School Products
Premium Shops
Shipping Promotion

**What's New**

Check out the upcoming store promotions in the Toolbox of your member account. Promotions until the end of September have been announced.

**August Contest Winner**

Congratulations Cat! Cat Hope is our Stamp of the Month Contest winner for August.



If you're interested in submitting your entry for our Stamp of the Month

### Back to School Products

Our new Back to School products are here! The new products are:

- Backpack (black)
- Metro Bag (black)
- Unistrap Bag (black)
- Briefcase (black)
- Yellow Messenger Bag
- Ash Grey Hoodie
- Black Cotton Cap
- Retro Lunch Box
  *Coming later this month!*

The black cotton caps and black bags are customized using a 4" x 2" patch with an embroidered edge.

Check out these must-haves for Back to School by visiting the Product Center at:
http://www.cafepress.com/cp/info/products

Get ready for Back to School and add these new products to your store TODAY!

### Introducing CafePress.com Premium Shops

CafePress.com Premium Shops allow you to take your online store to the next level with complete store customization options. Offer multiple page stores with product categories and subcategories. Plus, add as many products to your store as you like.

Contest, click here to learn how.

**Member Testimonial**

*"Let me thank you for even existing! The past few days I've been working a bit on setting up stores with you, and enjoying it! This is a great service you offer."*

Kurt T. Francis, BangkokAtoZ

**CafePress.com Forum**

 Have ideas for new products? Need help promoting your store? Checkout the CafePress.com Forum and discuss with CP staff and members ways to grow your online store.

Join in the Discussions

Try out the new Premium Shops service for FREE! For a limited time, all CafePress.com members receive a 15-day FREE trial of the Premium Shops service. Just login to your account and add a new store. When adding a new store, be sure to choose the Premium Store feature. After your trial, Premium Shops are as low as $5 per month.

See how other members are using the Premium Shops Service:
http://www.cafeshops.com/teamkamm
http://www.cafeshops.com/usaaf
http://www.cafeshops.com/rudy_park
http://www.cafeshops.com/pawshopzone

For more information on Premium Shops, visit
http://www.cafepress.com/cp/info/sell/premium.aspx

## Shipping Promotion

CafePress.com is having a Back to School shipping promotion! Until August 25, your customers receive FREE shipping when they spend $50 or more. For more details, check out the promotional banner on your store.

Let your customers know about the FREE shipping promotion with banners and buttons! Get your promotional banners and buttons at:
http://www.cafepress.com/cp/members/toolbox/banners_pr.aspx



If you wish to cancel your subscription to this newsletter, click here.
© Copyright 1999-2002 CafePress.com. All rights reserved. Privacy

# Exhibit  D

## to Declaration
## of Paul Worshaw

| From: | "Steven Esrig" <egginternational@hotmail.com> |
| To: | <paul@zz8.com> |
| Date: | 8/5/2002 12:51:19 PM |
| Subject: | Re: Your voicemails / domain name ALERT |

>From: "Paul Worsham" <paul@zz8.com>
>To: <egginternational@hotmail.com>
>Subject: Your voicemails / domain name ALERT
>Date: Fri, 2 Aug 2002 00:51:36 -0400
>
>CafeNewsletter :: August 200212:00 am
>
>Steve,
>
>Just retrieved your voicemail from earlier tonight.  Did you know that
>Googles.NET will expire in 1 week (currently registered to Aurora)?
>Googles.org was registered by someone in Michigan on May 9, 2002.
>
>If you want Googles.net, you can either pay up for another year and get it
>transferred, or use the SnapNames.com service ($79) to lock it now. They
>will pick up the name the minute it expires and register it in your name.
>I
>would do that - my brother used SnapNames to get JunkFax.com for his law
>practice (anti-junk faxing cases), and it worked.  You would not get
>Googles.net on August 9 - it would happen whenever the name gets deleted.
>SnapNames only takes one "reservation" per domain name, so if you pay $79
>then they will not take another person's $79 for the same name.
>
>- - - - Other - - - -
>
>I wanted to give a little more detail about how a "Googles ISP" would work.
>It could be part of the subscription-type of services that you are
>interested in - and I have ideas that would work for Googles.  Here are
>some
>basic workable scenarios:
>
>1.) Googles.Net Express - $19.99 per month, includes nationwide filtered
>kid-friendly internet dialup access, and 5 email addresses
>2.) Googles.Net Basic Club - $21.99 per month, includes internet access, 5
>email accounts, and members-only newsletter
>3.) Googles.Net Gold Club - $29.99 per month - Same as Googles.Net club,
>plus get a CD when you sign up, and a plush toy every month for first 3
>months.  After that, the price drops down to $21.99 per month (Basic Club
>price).  But Gold Club members would get first access to new (and help
>test)
>Googles Games and other website features.
>4.) Google.Net Full Access - $17.99 per month, includes nationwide internet
>dialup access, 5 emails, no filtering
>
>So, let me know if you want to move on setting up a pilot Googles ISP
>service using Googlesmall.com, or a new domain such as 2Goo.com or
>Googles2.com.  It would cost $10 to add Googles2.com to have nationwide
>dialup access.  The basic service wholesale cost is about $8.50 per month
>including the credit card processing fee, so charging $19.99 or a similar
>AOL-and-MSN-range price would allow for a good margin.  Filtering (or
>kid-friendly filtering) costs an additional $3.00 per month, and can be

>automatically bundled in if we don't want to offer anyone non-filtered
>service.
>
>The main costs to run the Googles2 service above the $8.50 per month are
>the
>people time to manage the accounts, and after 2 years of running an ISP it
>can be profitable with that type of margin per account.  With 1,000 members
>the gross before expenses would be $10,000 per month.
>
>- - - -
>
>Finally, checking ATT.COM just now for toll-free numbers, I did not find
>any
>with the full "GOOGLES" spelled out, as in 1-888-GOOGLES.  I did find
>866-Google1 and 866-Google0 (ends in zero).  Numbers such as 1-8**-GooKids
>or 1-8**-Gootime were not available.
>
>
>Paul


Please call as soon as you receive this!-I just returned and need to speak
with you!!!
Page 301-419-6363


Chat with friends online, try MSN Messenger: http://messenger.msn.com

# Exhibit  E

## to Declaration
## of Paul Worshaw

From:       "Steven Esrig" <egginternational@hotmail.com>
To:         <paul@zz8.com>
Date:       8/7/2002 12:55:51 AM
Subject:    art

rrrrr

Chat with friends online, try MSN Messenger: http://messenger.msn.com



# Exhibit F

## to Declaration
## of Paul Worshaw

cafepress.com
Cart | Your | Help | Order Status | Shop Home

Back to Googles.com.



**Hey Kids! Hey Adults! Hey Everyone!!** Get your Googles merchandise here at our new store, with all-new merchandise. Also, use our feedback form to email us product suggestions. We know you will enjoy getting these products for yourself and your favorite people!







Googles GooShip Snap Bib
$6.99

Googles Infant/Toddler T-Shirt
$9.99

Googles (word) Black Cap
$15.99







Googles (word) Wall Clock
$11.99

Googles (TM) T-Shirt - White
$15.99

Googles (word) White T-Shirt
$15.99







Googles (word) Golf
Shirt
$19.99

Googles Baseball Jersey
$17.99

Googles (word) Baseball
Jersey
$18.99







Googles (TM)
Sweatshirt
$24.99

Googles (TM) Mug
$13.99

Googles (word) Mug
$12.99





Mousepad
$10.99

Googles (word)
Mousepad
$12.99

(C) 2002 Googles.com from Stelor Productions, Inc.

This shop is powered by CafePress.com.
Copyright © 1999-2005 CafePress.com. All rights reserved.
Privacy Policy | Trademark & Copyright Information

# Exhibit  G

## to Declaration
## of Paul Worshaw

From:       "Salil Kumar" <salil@s-d.biz>
To:         "Steven Esrig" <sesrig@stelorproductions.com>, "Paul Worsham" <paul@ujazz.com>
Date:       9/13/2002 6:00:01 PM
Subject:    RE: Googles.com work

Hi Paul/Steve:

As you may have noticed, the shopping links have been updated.

I would like to schedule some time with you tomorrow (Sat.) morning for a
phone conference. My colleague Alka Soni, who is managing the overall design
efforts would like to go over the theme for each site. Since Alka is based
in Germany, I think the best time for all of us is probably after 9am
pacific time. Please let me know if you can make it tomorrow - if not, we
can try to find another time good for all of us.

Thanks

Salil
——Original Message——
From: Paul Worsham [mailto:paul@ujazz.com]
Sent: Thursday, September 12, 2002 8:01 PM
To: arun@s-d.biz; Steven Esrig
Cc: Salil Kumar
Subject: Googles.com work


Salil/Arun,

1) It looks like the shops link for the CafePress site is not working (it
was up this afternoon).  I think that is due to their moving to a different
domain for hosting (they are not "dot gone", as they have a real business
model... and I like the shirt they sent to me yesterday!).

Please change the shopping links that we just added on Googles.com to go to
this link:

  http://www.cafeshops.com/googles

This is a priority, since we'd really like to see if people buy the designs
(I will be adding more as fast as I can).


2) Also, it is a GO! with Steve on your awesome designs... and the winner
is:

  http://s-d.biz/googles/goog2.0a1/design/googlesclient/home3.htm

  (Note: GewRue's eyes need to move differently - he is the gray one)

However, we would like to listen to the theme and idea behind each of the
sites, as envisioned by your designer(s).  I liked the little icons above
the links on design #1.

3) Note that one of the most common things that people do when the get to a
site is "search", so we will need that functionality and space on the home

page once there is enough content to search.  The search function should be
easy to find - probably on top.


Paul



CC:              "Alka Soni" <alka@s-d.biz>, "Arun" <arun@s-d.biz>

# Exhibit  H

## to Declaration
## of Paul Worshaw

From:       "Paul Worsham" <paul@ujazz.com>
To:         "Steve Esrig" <sesrig@stelorproductions.com>
Date:       9/16/2002 7:54:11 PM
Subject:    CafePress.com account info

Steve,

The CafePress.com store can be logged in at this web address:

        http://www.cafepress.com

and the account info is:

    Account Name/
    Email Address: pworsham@googles.com
    Password: arun


As of 7:00pm today, there have not been any sales.


Paul

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

      Plaintiff,                               Case No. 05-80393-CIV-HURLEY

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant.

---

## DECLARATION OF GAIL A. MCQUILKIN

I, GAIL A. MCQUILKIN, declare under penalty of perjury that the following is based upon my personal knowledge and is true and correct, and that the email attached as Exhibit A is a true and correct copy.

1.      I am a partner and managing shareholder in the firm of Kozyak Tropin & Throckmorton, counsel for defendant, Steven A. Silvers ("Silvers"). I was also counsel for Silvers in the prior action before this Court entitled Stelor Productions, Inc. v. Steven A. Silvers, Civil Action No. 04-80954 (the "District Court Action").

2.      I am the attorney who has been primarily involved in the dispute between Silvers and Stelor Productions ("Stelor"), and the person with the most personal knowledge of the communications between this office and Stelor's counsel.

3.      On June 7, 2005, I sent an email to Cafepress.com inquiring as to the identity of the user of its service that established the "Googles" store on the Cafepress.com website.

4.      That afternoon, I received an email from Ryan Ellison, Content Usage Associate, providing me with the contact information of the user of the Cafepress.com service, a true and correct copy of which is attached as Exhibit A. The contact information is Steve Esrig, 14701

1

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

Mockingbird Drive, Darnestown, Maryland 20874, email: sesrig@stelorproductions.com, telephone 301-963-3636.

Dated: June 15, 2005

_____
Gail A. McQuilkin

/254534.1

2

# Exhibit  C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

        Plaintiff,                    Case No. 05-80393-CIV-HURLEY

v.

STEVEN A. SILVERS, a Florida resident,

        Defendant.

_____

## DECLARATION OF RUSSELL TEWKSBURY

    I, Russell Tewksbury, declare under penalty of perjury that the following is based upon my personal knowledge and is true and correct:

    1.    I am an Internet Strategist and technology consultant, writer and lecturer with more than a decade of related experience. I have lectured about Internet technologies at key industry conferences in Europe, the Caribbean and throughout North America. My writings have been published in technology & communications journals/publications, distributed in more than one hundred countries. I am listed in a number of Marquis' Who's Who publications, including, but not limited to: Who's Who in the World; Who's Who in America and Who's Who in the Media and Communications.

    2.    I personally know Steven A. Silvers, and via public Whois look-up, have reviewed the domain name registration information for the googles.com domain name. I have also reviewed limited information (IP address and server data) pertaining to the Gootopia Website operated by Stelor Productions.

    3.    I submit this declaration in support of Steven A. Silvers' Motion to Strike Steven A. Esrig's Declaration, and Objection to Magistrate's Report and Recommendation.

1

4.      It is my understanding Stelor licensed from Silvers the right to use certain trademarks and characters called the "Googles." It is my understanding Stelor created and developed a Website that Stelor refers to as the "Gootopia Website." It is my understanding Stelor incorporated . ie licensed property in the content of the Gootopia Website.

5.      It y understanding Stelor is the owner, creator and operator of the Gootopia Website. Accordi o public Whois information, it appears Stelor Productions, Inc. entered into a Web hosting agreement with Verio Inc. for a Virtual Private Server (VPS) shared-hosting account.

6.      It is my understanding Stelor Productions, Inc. Gootopia Website is hosted on a Verio Virtual Private Server shared-hosting account. The current name servers for the Gootopia Website are: *ns1.secure.net* and *ns2.secure.net*. Verio, Inc, assigned Stelor an IP address of 128.121.122.247 for Stelor's VPS account where the Gootopia Website is currently hosted (ARIN & RIPE IP search). The Gootopia Website server type is Apache/ 1.3.33 (Unix) mod_jk/1.2.5 PHP/4.3.11 (Name Intelligence, Inc. Whois database Look-Up for googles.com).

7.      When Stelor created their Verio Web hosting account, Stelor was given a user-login and password for their VPS server and Verio's customer administrative backroom and product control panel. The user-login and password to Stelor's Verio VPS server provides secure access for Stelor to their Gootopia Website and enables Stelor to control the content of their Website. Unless Stelor gave their Verio VPS user-login and password information to a third party, only they and Verio possess password-access to the VPS server where Stelor's Gootopia website is hosted. Stated another way, unless Stelor has given their user-login and password to Silvers, he does not have administrative access the server that hosts the Gootopia Website, nor does he have any control over the content on the Gootopia Website.

8.      Any person wanting to view the Gootopia Website on the Internet can do so by

2

simply entering the numeric IP address 128.121.122.247; the user will be connected to the Gootopia Website.

9.     A Whois search reveals Silvers Ent. Group, Inc. listed as the registrant for the Googles.com domain name. As the lawful registrant for the Googles.com domain name, only Silvers should direct the DNS records that associate the Googles.com domain name with any particular IP address or name server(s).

10.     Up until recently, Silvers maintained the DNS records for the Googles.com domain name to point to Verio's name servers (ns1.secure.net and ns2.secure.net), which in turn directed website visitors to the IP address associated with Stelor's Gootopia Website. Simply stated, when a person typed in the domain name googles.com, they were connected to Stelor's Gootopia Website.

11.     It is my understanding when Silvers terminated the license agreement with Stelor, he logged into his Godaddy.com domain name account and directed the DNS records of the Googles.com domain name to point to a different IP address (Web server) hosting a Website he controls.

12.     Esrig's testified that because Silver directed the DNS records away from the Gootopia Website "Silvers shut down the (Gootopia) Website." It is my understanding Silvers was not a party to the Web hosting agreement between Stelor and Verio, Inc. That being the case, only Stelor and Verio had access to the (password protected) Gootopia Website, which Stelor created. Only Verio or Stelor has the ability to shut down the Gootopia Website. Access to the VPS server that hosts the Gootopia Website is an issue between Stelor and Verio, Inc. Unless Verio suspended Stelor's VPS account, the Gootopia Website remained accessible via IP address once Silvers pointed the DNS for his googles.com domain name to a different IP address (Web server) hosting a Website he controls.

3

13.    Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Stelor no longer has access to the (Gootopia) Website." As previously stated, Stelor's access to the Gootopia Website is an issue between Stelor and Verio. Even if Verio suspended Stelor's VPS account –denying Stelor access to their VPS server, Silvers has no authority or ability to direct Verio to do anything relating to Stelor's account or access thereto. In addition, Stelor should have access to their Gootopia Website content through back-up copies. It is normal and customary for a Website developer to have back-up copies of their Website. Finally, Stelor has the option to contract with another Web hosting company (other than Verio) to host their Gootopia Website.

14.    Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Silvers redirected the Website." This statement is incorrect. Silvers redirected the DNS for the Googles.com domain name to point to an IP address (Web server) under his control. Silver's action does not prohibit or restrict Stelor's ability to access, modify, alter or delete any content on their Gootopia Website.

15.    Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Stelor can't operate the (Gootopia) Website without the googles.com domain name." That is incorrect. Stelor does not *need* the googles.com domain name to operate the Gootopia Website. The Gootopia Website exists completely independent of any domain name. If, by the word "operate," Esrig means to imply people can't access the Gootopia Website via the Internet, that is incorrect. All that his needed for the Gootopia Website to be accessible via the Internet, is a Web hosting account (Web server) and a publicly accessible IP address. If the preference is to have a domain name associated with the Gootopia Website, Stelor can register a multitude of other domain names and have those point to the Gootopia Website.

16.    Esrig testified that because Silver directed the DNS records away from the

4

Gootopia Website "Silvers took the Website (Gootopia) content." That is incorrect. Unless Stelor gave Silvers password access to their Verio VPS server where their Gootopia Website was hosted, Silvers is not able to remove or in any other way restrict Stelor's access to their Gootopia Website content. Only Stelor has that control.

17.     Esrig testified that because Silver directed the DNS records away from the Gootopia Website "Stelor can't demonstrate the site to anyone." That is incorrect. Stelor has multiple options to demonstrate the Gootopia Website. It can do so over the Internet using an IP address, or any other domain name it chooses. Or, it can demonstrate off-line on a local computer or from a DVD or CD-Rom.

Dated:  June 17, 2005

Russell Tewksbury

254545.1

5

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-80954-CIV-HURLEY

STELOR PRODUCTIONS, INC.,
        plaintiff,

vs.

STEVEN A. SILVERS,
        defendant.

_____/



**CLOSED CASE**

## ORDER OF FINAL DISMISSAL WITHOUT PREJUDICE AND CLOSE-OUT

THIS CAUSE is before the court upon the parties' joint stipulation for dismissal without prejudice filed February 8, 2005. Having considered the stipulation, it is hereby

**ORDERED AND ADJUDGED:**

1. This case is **DISMISSED WITHOUT PREJUDICE**, with each side to bear its own costs and attorneys' fees.

2. There being nothing further for the court to resolve, it is further ordered that the Clerk of the Court shall enter the case as *CLOSED* and terminate all pending motions as MOOT.

DONE and SIGNED in Chambers at West Palm Beach, Florida this _17_ day of February, 2005.

Daniel T. K. Hurley
United States District Judge

Copies furnished:
Adam T. Rabin, Esq.
Kenneth R. Hartmann, Esq.
Yano Rubinstein, Esq.

FILED by _MC_ D.C.
ELECTRONIC

**Feb 8 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, INC.,                CASE NO. 04-80954-CIV-HURLEY
a Delaware corporation,                  Magistrate Judge James M. Hopkins

     Plaintiff,

v.

STEVEN A. SILVERS,
a resident of Palm Beach County, Florida

     Defendant.

_____

## JOINT STIPULATION FOR DISMISSAL,
## WITHOUT PREJUDICE, OF ALL CLAIMS

     Plaintiff, Stelor Productions, Inc. and Defendant Steven A. Silvers, hereby jointly stipulate,

pursuant to Fed.R.Civ.P.41(a)(1), to the dismissal, without prejudice, of all claims asserted by each

party against the other party in this action.

     Respectfully submitted,

Adam T. Rabin                          Kenneth R. Hartmann  (FBN: 664286)
DIMOND KAPLAN & ROTHSTEIN, PA          Gail A. McQuilkin  (FBN: 969338)
200 S.E. First Street, Suite 708       KOZYAK TROPIN & THROCKMORTON, PA
Miami, FL 33131                        2525 Ponce de Leon, 9th Floor
T: 305-374-1920                        Coral Gables, Florida 33134
Co-Counsel for Defendant               T: 305-372-1800  /  F: 305-372-3508
                                       Counsel for Defendant

Yano L. Rubinstein, Esq.
SUMMERS RUBINSTEIN
580 California Street, 16th Floor
San Francisco, California 94104
Counsel for Plaintiff

3339/101/249255.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a                CASE NO. 05-80393-CIV-HURLEY
Delaware corporation, f/k/a STELOR           Magistrate Hopkins
PRODUCTIONS, INC.,

     Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

     Defendant,

_____/

## NOTICE OF FILING DECLARATION OF GAIL M. McQUILKIN

Defendant, Steven Silvers, hereby gives notice of filing the attached Declaration of Gail M. McQuilkin.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was hand-delivered this

_____ day of June, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq.,

Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove,

Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

                         Respectfully submitted,

DIMOND KAPLAN & ROTHSTEIN, P.A.     KOZYAK TROPIN & THROCKMORTON, P.A.
Co-Counsel for Defendant                            Counsel for Defendant
200 S.E. First Street, Suite 708                    2525 Ponce de Leon, 9th Floor
Miami, FL 33131                                     Coral Gables, Florida 33134
Telephone: (305) 374-1920                           Telephone: (305) 372-1800
Adam T. Rabin, Esq.

                       _____
                       Kenneth R. Hartmann
                       Florida Bar No: 664286
                       Gail M. McQuilkin
                       Florida Bar No. 969338

3339/101/254549.1

Exhibit  E

FILED by _MC_ D.C.
ELECTRONIC

**Jun 24 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.- MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

        Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

        Defendant.

CASE NO. 05-80393-CIV-HURLEY
Magistrate Hopkins

---

## DEFENDANT'S SUPPLEMENT TO MOTION
## TO STRIKE DECLARTION OF STEVEN A. ESRIG,
## AND OBJECTION TO MAGISTRATE'S
## REPORT AND RECOMMENDATION

Defendant, Steven A. Silvers ("Silvers") respectfully files this Supplement to Motion To Strike

Declaration of Steven A. Esrig, and Objection to the Magistrate's Report and Recommendation. We

obtained some of the materials used by Stelor at the trade show. *See* Exhibits A, B and C. These

materials show that Stelor never intended to use or needed the googles.com domain name for this trade

show, and that in fact, Stelor has barely promoted that domain name in association with the

"Gootopia" website. Further, Stelor never even intended to "launch" the Gootopia website before or

on the day of the trade show as Esrig testified. Bottom line: Stelor intentionally misled the Court

regarding the harm it would suffer unless injunctive relief was granted.

Esrig testified in his Declaration that Stelor planned to "launch" the Gootopia website on June

21, 2005, the first day of the International Licensing Show in New York City, and it needed control

and use of Silvers' googles.com website to do that. Esrig went on to say that absent an injunction

compelling Silvers to give Stelor that control, Stelor could not "demonstrate" the website at the trade

show, and was essentially out of business. After the Magistrate Judge recommended injunctive relief

1

in a Report and Recommendation to this Court, upon Stelor's motion, the Court entered a TRO implanting the injunctive relief, which essentially consisted of Silvers directing his domain name registrar to point the googles.com domain name back to Stelor's server.[1]

In support of our Motion to Strike Steven Esrig's Declaration (on grounds of perjured testimony among others), and Objection to the R&R, we submitted testimony from Russell Tewksbury, a recognized Internet expert. Mr. Tewksbury testified that Stelor does not need the googles.com domain to operate, demonstrate or launch the Gootopia website because it could do that using any other domain name it wants, and hence the harm to Stelor was illusionary.

The materials we obtained from the Stelor Productions booth at the trade show this week confirms that Esrig misled the Court. Stelor planned all along to use the domain name www.stelor.net to demonstrate and promote the "Gootopia" website. *See* Exhibit A. In fact, on this promotional website, there is no mention of the googles.com domain name in connection with the "Gootopia" website. *See* Exhibit B. Further, in other promotional materials given out by Stelor at the trade show, there is not one word associating the "googles.com" domain name with the "Gootopia website. *See* Exhibit B.

And, there was no big "launch" of anything on June 21. In fact, Stelor was promoting a "Gootopia launch and huge promotion . . . planned for Fall 2005!" (exclamation original).[2] *See* Exhibit C. Moreover, the "Gootopia" website demo tour featured within the stelor.net website is exactly the same demo tour that was available through Stelor Productions website well before the trade

---

1 The Court adopted the proposed order submitted by Stelor. That order was over broad and directed Silvers to do much more than point the googles.com domain name to Stelor's server. Silvers, however, complied the best he could and instructed his registrar to point the googles.com domain name to the server IP address Stelor provided.

2 A review of Stelor's archived websites reveals that since 2003, this "launch" has been promised every few months but never materializes.

2

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

show, and at the time Stelor requested injunctive relief. Stelor has not made a single change to that demo.

The Court should consider this evidence in connection with the Motion To Strike Steven Esrig's Declaration, and our Objection to the Magistrate's R&R.


Respectfully submitted,

**s/ Gail A. McQuilkin**

| | |
|---|---|
| Adam T. Rabin | Kenneth R. Hartmann, Fla. Bar No: 664286 |
| DIMOND KAPLAN & ROTHSTEIN, P.A. | Gail M. McQuilkin, Fla. Bar No. 969338 |
| Co-Counsel for Defendant | KOZYAK TROPIN & THROCKMORTON, P.A. |
| 525 S. Flagler Drive, Suit 200 | Counsel for Defendant |
| West Palm Beach, Florida 33401 | 2525 Ponce de Leon, 9th Floor |
| (561) 671-1920 | Miami, Florida 33134 |
| | (305) 372-1800 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail this 24th day of June, 2005, to: Kevin C. Kaplan, Daniel F. Blonsky and David Zack of Burlington Weil Schwiep Kaplan & Blonsky, P.A., 2699 S. Bayshore Drive, Penthouse A, Miami, FL 33133.


**s/ Gail A. McQuilkin**

3339/101/254575.1

3

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

Exhibit A

Your personal passport to:

# Information on the Biggest Kid's Event Ever!

This passport is your chance to participate in the **Kid's promo of the year!** You will find details and information on ways for your company to benefit. Plus! Great family discount packages, specials for your friends, business and much, much more.

Keep this card and then go to: www.stelor.net. *This is a limited offer and available only to:*

Enter this Password



---

Your personal passport to:

# Information on the Biggest Kid's Event Ever!

This passport is your chance to participate in the **Kid s promo of the year!** You will find details and information on ways for your company to benefit. Plus! Great family discount packages, specials for your friends, business and much, much more.


Keep this card and then go to: www.stelor.net. *This is a limited offer and available only to:*

Enter this Password



---

Your personal passport to:

# Information on the Biggest Kid's Event Ever!

This passport is your chance to participate in the **Kid s promo of the year!** You will find details and information on ways for your company to benefit. Plus! Great family discount packages, specials for your friends, business and much, much more.

Keep this card and then go to: www.stelor.net. *This is a limited offer and available only to:*

Enter this Password





---

Your personal passport to:

# Information on the Biggest Kid's Event Ever!

This passport is your chance to participate in the **Kid s promo of the year!** You will find details and information on ways for your company to benefit. Plus! Great family discount packages, specials for your friends, business and much, much more.

Keep this card and then go to: www.stelor.net. *This is a limited offer and available only to:*

Enter this Password





# Exhibit B





**Welcome to Ste**
We are glad to see you
interested in Stelor and
from Goo™. To answe
your most important qu
on the buttons below. Y
information about our c
characters, special offe
licensing opportunities.

**What d
want to**

- Conten
- Licensing
- About St
- Pre-regis



Content | Licensing News | About Stelor | Pre-register | Log Out

Stelor Productions © 2005
The Googles from Goo™ are a creation of Steven A. Silvers

# Content

  

### Security

Until Stelor Productions introduces its patent-pending security technology, PixKey™, safety on the Internet is just a marketing concept. Real security requires a *real* password. Click the computer to find out more.

### Music

GooKids learn basic concepts about science, the Earth, and kindness through our original music. There are song samples for you to hear by clicking on Jingles the Jukebox™ above. You can also purchase the Googles'™ first album, *One GooWorld*, at iTunes by clicking the 'Buy' link below.

Listen (Flash Player 7 required)
Buy (Download iTunes)

### Content

The grownups' version of th Gootopia™ tour is available clicking on the 'Demo' butto above. Please take a momer hear and see the basics of t wonderful program. Gootopia launch and the huge promot are planned for Fall 2005! A Googles™ activities, includi television, live shows, or we content will be interactive w Gootopia™.



### Characters

Stelor Productions has a universe of characters (over 160 to date) that this world! Each personality is created to enlighten and enrich children a smile on their faces. In the spirit of good will and family, you can trus characters to teach the basics of science, self-esteem, and wonderful preserve our Earth. Stories operate on several levels with age targets 6-9, and 9-12 years. Any character is capable of song, but The Google Goo™ personalities Oogle, Oggle, and Iggle are the main voices, w albums of original music already produced and ready for market. More stories and music are designed to carry a quality message; for examp song has the Googles™ singing about their love of fruit.

*As Stelor is a licensing company, we are always looking for other gr properties. If you have an idea or a creative property you would like t represented by Stelor, submit an outline to:*
information@stelorproductions.com.



Content | Licensing News | About Stelor | Pre-register | Home | Log Out

Stelor Productions © 2005
The Googles from Goo™ are a creation of Steven A. Silvers

# About Stelor

Legally we are Stelor Productions, LLC. We have spent the last four years preparing for the introduction of ... 'trusted-brand' concept of edutainment. Our first property, The Googles from Goo™, was selected because ... perfectly with our objective: conveying positive messages currently missing in most children's entertainment.

"Bringing children to their **best** selves," says our founder and CEO Steve Esrig, "is what we are really about. Everything else is just the means to that end."

To really 'be there' for kids, Stelor had to take on the very difficult challenges of Internet Security. This has b... accomplished through a very creative method that uses pictures to create extremely complex passwords tha... easy for kids to use. And it's fun!

The Pixkey™ concept will ensure the use of a password. "It's just the beginning of the state-of-the-art secur... measures being implemented," says CEO Esrig. "We and our partners are committed to protecting childhoo... children. It has meant stepping up to the expense and time commitment required to do it right."

Stelor currently employs over 20 people in Darnestown, MD. With the move to our new offices (summer 200... will staff-up to the first operating level of approximately 100 employees.

"As a licensing company, most of our work will involve creating great relationships," says Senior VP Marty J... "We are committed to maintaining quality products, and we are looking for licensees with the same objective..."

Stelor expects these creative relationships to develop and produce a positive shift in children's entertainme...

Stelor Productions, LLC
P.O. Box 8000
Gaithersburg, MD 20883

Phone: 301 963 0000
Fax: 301 990 3636
Email: info@stelorproductions.com
Visit us at: www.stelorproductions.com



Content | Licensing News | About Stelor | Pre-register | Home | Log Out

Stelor Productions © 2005
The Googles from Goo™ are a creation of Steven A. Silvers

# Exhibit C



## Our mission is to bring kids to their 'best selves'!

With the onslaught of action heroes and violence, too many young minds are focused on getting their own way at any cost. The Internet can be alluring too, pornography and gambling sites had well over 1 million hits from children aged 3 to 12 in just the last quarter.

Taking responsibility for what we say and how we present the information is just a beginning. To keep our children safe is an ongoing task that will require true leadership and the willing involvement of many great companies and interested individuals.

Stelor Productions is convinced that the long-term good that comes from taking the high road with our children's programing is both profitable and personally rewarding.

The children of the world are this planet's last hope. It is compensation beyond commerce.



# BRAND
## OPPORTUNITY

What makes the Stelor Brand so different is our commitment to preserving and enriching childhood. Everyone at Stelor is dedicated to the idea of providing only top quality content.

The Stelor Brand is managed to provide a reliable source of children's edutainment.

If you agree with our goal of encouraging kids to be their best selves. Contact us:

Stelor Productions, LLC
Post Office Box 8000
Gaithersburg, Maryland 20883

Ph: 301·963·0000  Fax: 301·990·3636
www.stelorproductions.com

# We are ^serious about having fun!





# SECURITY

The hard part was developing a system that kids could access while keeping them safe. Our state-of-the-art equipment and security system is of no use unless children (and adults) can go on the Internet with minimum hassle & maximum security.

Stelor Productions has developed proprietary, patent pending software to make security a reality not just a marketing ploy.

## Take the Cyber Shuttle

The everyday Internet our kids have grown accustomed to is like a taxi. They get in and it takes them anywhere they desire. Gootopia is more like a cyber shuttle. It will only stop at sites you have approved for your child. Our "I Agree" statement means we will keep it safe, just as you wish.



# CONTENT



What would you call a place that is fun, truly safe, has your own personal mail and instant messaging as well as the tools to teach you most anything you might like to learn?

We call it Gootopia.

# MUSIC

# CHARACTERS

Currently there are 150 characters making their home at Stelor Productions. Below are the lovable Googles from Goo™.

Other properties include a group from the frozen planet Brrr™, a bugle-faced bunch called the Zonklings™ and the craziest group ever to arrive on earth ... the Jabbles™.

Every member of the Stelor Stable is non-violent, non-ethnic, non-political & fun!

The Googles from Goo™ are based on an original concept by Steven A. Silvers



Exhibit  F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a      CASE NO. 05-80393-CIV-HURLEY
Delaware corporation, f/k/a STELOR     Magistrate Hopkins
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

## SILVERS' OBJECTION TO
## REPORT AND RECOMMENDATION

    Defendant, Steven A. Silvers ("Silvers"), objects to the Report and Recommendation dated

June 3, 2005 ("R&R"), recommending the motion for preliminary injunction motion filed by Stelor

Productions, LLC ("Stelor") be granted.   The R&R recommends that Silvers' termination of a

License Agreement with Stelor be undone, and that Silvers be compelled to specifically perform

under the License Agreement and related Settlement Agreement with Stelor.   The recommended

injunction would allow Stelor, despite Silvers' termination, to continue to use Stelor's intellectual

property without complying with its obligations under the license.

    It is critical that the Court conduct a *de novo* review of the facts and applicable law because

the R&R, if adopted, would rewrite the contractual terms between the parties, relieve Stelor of its

obligations as a licensee, and gut Silvers' ownership and contractual rights as a licensor, including

his ultimate right as the owner of his intellectual property to terminate Stelor as a licensee based on

Stelor's defective performance. The Magistrate misconstrued vital terms in the License Agreement

and misperceived Stelor's performance under the Settlement Agreement, which was designed to give

Stelor additional time to cure the numerous breaches that prompted Silvers to terminate the license in the first place many months ago. And, the Magistrate's findings are based on misleading testimony - - if not outright perjury - - which Stelor submitted at the last minute.[1]

Furthermore, in recommending the injunction, the Magistrate failed to properly apply the rule of law which controls here - - a terminated licensee's claim for wrongful termination can *only* be remedied by damages; injunctive relief is unavailable. The Magistrate also erred by applying the wrong standard for a mandatory injunction and in recommending an injunction which is overbroad.

### Essential Background Facts

A.    The License Agreement

Silvers is the owner of trademarks, copyrights, patents, and related intellectual property ("Googles IP") based on an animated story named "Googles From The Planet Goo." In 2002, Silvers licensed to Stelor the exclusive rights to develop and commercialize this concept. A copy of the License Agreement is found in the Appendix as Exhibit "A."[2]

Although not artfully drafted, the License Agreement contains several key unambiguous provisions:

III.    COMPENSATION

A. In consideration of the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the term of this Agreement, a royalty in the amount recited in "Schedule A". . . .

B. The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds ("the Royalty Period") and

---

[1]Silvers has filed concurrently a Motion to Strike the Declaration of Steven A. Esrig detailing his false and misleading testimony.

[2]Silvers' exhibits to this Objection are compiled in an Appendix, filed concurrently herewith. All references to "Exhibit ___" relate to the exhibits in the Appendix.

2

shall be payable no later than thirty (30) days after the termination of the proceeding full calendar quarter . . . .

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized office of Licensee, reciting on a country-by-country basis, the stock   number, item, units, sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licenced Product. **Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period.** The Licensee hereby further agrees to provide the LICENSOR with a list of all of its sub licensees added during the current royalty period.

IV.    AUDIT

A.    LICENSOR shall the right, at its own expense, to have a nationally recognized certified public accounting firm, **upon at least thirty (30) days written notice** and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

VI. NOTICES, QUALITY CONTROL, AND SAMPLES

C.    **Prior to the commencement of manufacture and sale of the Licensed Products,** LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and all promotional and advertising material associated therewith.

License Agreement, Exhibit "A," (emphasis supplied).

These three provisions form the core of all license agreements:  a royalty payment to the licensor; the licensor's ability to audit its licensee; and the licensor's quality control over the goods and service bearing his trademarks ("Licensed Product"). These provisions take on even more

3

significance because Stelor is Silvers' exclusive licensee. Silvers has entrusted his valuable intellectual property to Stelor, and must completely rely on Stelor to responsibly develop the property, commercialize it, and make money for Silvers.

As detailed below, Stelor repeatedly failed to perform its obligations under these three provisions, and many other provisions of the License Agreement. Silvers' termination was based on these breaches among others.

B.    The Consulting Agreement

At the time the parties entered into the License Agreement, Stelor retained Silvers to serve as a consultant, as reflected by the Letter Agreement dated June 1, 2002 (Exhibit "B") ("Consulting Agreement"). The Consulting Agreement required Stelor to compensate Silvers by, *inter alia*, providing a written agreement granting Silvers options for Stelor's stock; Stelor was also required to reimburse Silvers for expenses related to his consulting services. Id., ¶1(b). Significantly, if Stelor breached the compensation provisions of the Letter Agreement, without curing in 30 days, Silvers is entitled to "immediately terminate" the License Agreement without notice. Id., ¶1(c). Three years have passed, yet Stelor has never provided the required options agreement to Silvers, instead offering a variety of excuses. Silvers' termination is based on this breach as well.

C.    Audit Request and Stelor's Refusal

Stelor kept Silvers in the dark about its commercialization of the Googles IP from the inception of the license. After Silvers retained counsel, on November 5, 2004 he requested an audit pursuant to the License Agreement (Exhibit "C"). Stelor must arrange for the audit and provide a date within 30 days (Exhibit "A," ¶IV). Despite Silvers' absolute right to the audit, Stelor refused to permit it (Exhibit "L," ¶5).

<center>4</center>

D.    The Notice of Breach, Stelor's Failure to Cure, and the Termination

On November 12, 2004, Silvers sent Stelor a notice of breach letter setting forth the litany

of breaches by Stelor under both the License Agreement and Consulting Agreement (Exhibit "D").

Stelor had 60 days to cure its breaches under the License Agreement (Exhibit "A," ¶IX(A)). The

cure period for breach of the Consulting Agreement had long passed. Because Stelor failed to cure

even one of the breaches within 60 days, Silvers advised Stelor on January 13, 2005 that the License

Agreement was terminated (Exhibit "E").

E.    The Settlement Agreement

At the time Silvers originally terminated Stelor, Silvers and Stelor were embroiled in a

lawsuit in this Court related to claims each brought against the other.  On January 28, 2005, the

parties entered into a Settlement Agreement (Exhibit "F").  Stelor was required to cure the most

critical breaches under the License Agreement and Consulting Agreement, and agreed to additional

obligations, including paying advance royalties to Silvers. *Id.*, ¶10. The obligations of Stelor to

Silvers under the Settlement Agreement included permitting Silvers an audit, *Id.*, ¶14; providing

Silvers samples of the Licensed Product Stelor is offering for sale, *Id.*, ¶15; and certification that no

royalties are owed, *Id.*, ¶12.

In connection with the Settlement Agreement, Silvers agreed to defer the termination, and

give Stelor an opportunity to remain his licensee by curing the outstanding breaches. But, while he

"withdrew" his termination dated January 13, 2005, *Id.*, ¶3, and p. 1 Recitals (withdrawal refers only

to January 13, 2005 letter), Silvers did not withdraw his Notice of Breach Letter dated November

12, 2004. The parties acknowledged that Stelor's existing breaches as set forth in the Notice of

Breach Letter would be deemed cured only if Stelor performed its obligations under the Settlement

<div align="center">5</div>

Agreement: "The parties intend that **full** performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other." (Exhibit "F," page 1). Defective performance by Stelor, obviously, left the already noticed breaches uncured and, in light of Silvers' November 12, 2004 Notice of Breach, the table was set for reinstating the termination with no further notice.

After Stelor breached the Settlement Agreement, and failed to cure the breaches of the License Agreement despite having notice for five months, on April 27, 2005 Silvers again notified Stelor the License Agreement was terminated (Exhibit "G"). Two days _later_, Stelor belatedly sought to "cure" its breaches by blaming Silvers for its defective performance, then offering to make the outstanding payments, offering an audit, offering to provide samples, and providing an incomplete and non-conforming royalty statement (Exhibit "H"). This letter, aside from constituting an outright admission that Stelor had not cured its breaches as of the April 27, 2005 termination, is typical of Stelor's non-performance of its obligations. Instead of simply doing what it has agreed to do, and is obligated to do, Stelor insists on imposing new conditions on Silvers in order to perform.

### The R&R

Stelor brought this action, claiming the termination was wrongful, and sought a preliminary injunction that would "undo" the termination, and compel Silvers to specifically perform the agreements, in effect allowing Stelor to continue using Silvers' intellectual property despite the termination.

The R&R suggests the mandatory injunction requested by Stelor be entered. In so concluding, the Magistrate misconstrued the License Agreement and Settlement Agreement, grafting an additional notice requirement on Silvers as a condition to termination. This new requirement

6

follows the erroneous conclusion that Stelor has "fully complied" with the Settlement Agreement. The Magistrate's findings, and logic, can be summarized as follows:

(I)     If Stelor fully complied with the Settlement Agreement, all breaches set out in the Notice of Breach Letter are deemed to be cured.

(ii)    Stelor fully complied with the Settlement Agreement.

(iii)   Therefore, all breaches were cured, and the April 27, 2005 termination must be based on new breaches subsequent to the date of the Settlement Agreement.

(iv)    Silvers must, and did not, provide a new notice and cure period for the "new" breaches prior to terminating the license.

R&R at pp. 13-23.

## The Flaws in the R&R

The lynchpin in the R&R's analysis is the premise that Stelor "fully performed" its obligations in the Settlement Agreement. As explained in detail below, that finding is contradicted by largely undisputed evidence. And, if Stelor did not fully perform, the formula invoked by the R&R falls apart, because the existing breaches cannot be deemed cured, and it is undisputed Silvers provided notice and a cure period for those breaches.

### Snapshot of Stelor's Breaches as of April 27, 2005 Termination

The Magistrate found, incredibly, that Stelor had "fully performed" under the Settlement Agreement. R&R at 22. In fact, as of April 27, 2005, Stelor had not cured most of the breaches underlying and referenced in the Settlement Agreement, and had also failed to perform additional obligations it had under the Settlement Agreement. Indeed, prior to the April 27, 2005 termination, Stelor flat out advised Silvers it would not comply with the agreements (Exhibit "L," ¶21). (Stelor

7

board not interested in "adherence to the license and settlement agreement;" go ahead and sue us).

Below, we detail Stelor's breaches of the audit, royalty reporting and sample requirements; these

defects are all set out in the Notice of Breach Letter and incorporated in the Settlement Agreement,[3]

and are the basis for Silvers' termination.

**Audit**: Silvers requested the audit on November 5, 2004 (Exhibit "C"). Under the License

Agreement, Silvers has an absolute right to the audit; Stelor must provide a date for the audit within

30 days of Silvers' request (Exhibit "A," ¶4). Stelor refused (Exhibit "L," ¶5). Silvers put Stelor

on notice of this breach in the Notice of Breach Letter (Exhibit "D"). In the Settlement Agreement,

Stelor agreed to cure this breach (Exhibit "F," ¶14). Stelor never provided a date for the audit,

despite repeated requests by Silvers' counsel. (Exhibit "L," ¶¶12-25). Not counting numerous

phone calls, we requested a date nine times by email; Stelor repeatedly stonewalled or sought to

impose additional conditions before allowing the audit. *Id.* As of April 27, 2005, more than five

months after Silvers requested it, Stelor had still not provided a date for the audit. Based on this

breach of the License Agreement and Settlement Agreement, Silvers again invoked his right to

terminate (Exhibit "G"). After the termination, Stelor offered excuses for its breach, and tried to

impose more conditions for the audit (Exhibit "H") ("Whenever Stelor receives such a letter [from

Silvers' auditor] it will cooperate"). Even after the termination, all Stelor could muster is another

condition to impose on Silvers as a requirement for Stelor to "cooperate." As of today, seven months

---

[3]The Magistrate erroneously considered Stelor's post-termination attempt to cure (Exhibit "H") to determine the propriety of Silvers' termination two days earlier (Exhibit "G"). As detailed *infra*, the Magistrate compounded this error by misreading Stelor's belated cure attempt as remedying the audit, royalty payment, royalty reporting and sample breaches. Actually the belated cure attempt is compelling evidence that, as of April 27, 2005, Stelor had not fully performed under the Settlement Agreement.

8

after Silvers requested it, Stelor has still not provided a date for the audit. Based on this record, the Magistrate erred in finding Stelor has "fully complied" with its obligation to allow Silvers an audit.

**Royalties and Statements.** Silvers gave Stelor an exclusive license because he wants to - - and should - - make money commercializing his intellectual property. Stelor has not paid a cent in royalties since inception of the license. Yet, it is undisputed Stelor has commercialized the project by selling "Googles" merchandise and "GooTunes" on the internet through the CafePress.com and Itunes websites (Exhibit "I"). Sales of GooTunes have been very good. *Id.* The License Agreement requires Stelor to provide quarterly reports detailing these and other activities relating to "Googles'" goods and services, even if there are no sales (Exhibit "A," ¶III).

Stelor has <u>never</u> complied with the reporting requirement. Since inception, Stelor provided non-conforming statements after they were due, or provided nothing at all (Exhibits "J," "O," ¶16(a)). Stelor did not even provide a report for the last two quarters of 2004. *Id.* The reports Stelor did provide indicate <u>no</u> activity, describe <u>no</u> Licensed Products and have no country-by-country breakdown. *Id.* Yet, Stelor has marketed Licensed Product over the internet and in foreign countries since 2002 (merchandise) and mid-2004 (GooTunes) (Exhibit "O," ¶¶13-15). The Magistrate clearly erred in finding Stelor "fully performed" its royalty reporting obligation.

The Magistrate erred by relying on a royalty report provided <u>after</u> the termination, (R&R, p. 20), to determine whether Silvers' termination was proper, but worse, the inadequate information Stelor supplied in the post-termination report was credited by the Magistrate based on the sworn testimony of Steven Esrig, Stelor's president, "disavowing any knowledge of CafePress sales." *Id.* Esrig stated in his sworn declaration to the Court the following:

9

> "[Stelor] was only just made aware that an on-line shop at Cafepress.com was carrying Googles merchandise, without Stelor's authorization or knowledge. We were previously unaware of the existence of this shop, and suspect that it was established by someone outside of Stelor using our company information.

This testimony, we now know, is demonstrably false. Esrig personally set up the CafePress account, provided the Googles IP graphics to the CafePress website, priced the product, paid the bills for the "space" on the CafePress website and was the designated account contact. *See* Decl. of Paul Worsham, Exhibit "M." We recently confirmed this information ourselves with CafePress.com (Exhibit "R"). Taking the true facts into consideration, the R&R should find that "if such sales were authorized, it would be reasonable to expect Plaintiff to account for the sales in a royalty statement. R&R, pp. 20-21 (our paraphrasing).

And the R&R makes no mention of a compelling fact demonstrating Stelor's breach of the royalty reporting requirement - - Stelor's sales, since mid-2004 of GooTunes music on Itunes (Exhibits "I," "O," ¶13). Silvers located a receipt reflecting the sale of a GooTunes compact disc in August, 2004. This evidence has never been explained by Esrig, despite his lengthy declaration, so Stelor's excuse for this breach remains a mystery. We do know such sales have not been reported to Silvers (for that matter, Stelor reported no sales for the period June 2002 - December 2004) before or after the termination. The August 2004 Itunes receipt, *Id.,* is clear evidence that Stelor has breached the royalty reporting requirements. What other sales have not been reported? We do not know because Silvers cannot conduct an audit . . . .

Finally, the Magistrate erroneously determined Stelor had <u>paid</u> the required royalty advances to Silvers. The Magistrate believed these payments were merely late, accepting at face value Esrig's testimony that Silvers "rejected" the payments, and concluded this breach was not material. R&R

<center>10</center>

at pp. 18-19 ("Although Plaintiff's payments may have been untimely, they were made to Defendant!"). But Stelor had not made these payments to Silvers as of the April 27, 2005 termination (Exhibit "O," ¶23). It merely offered to make payments, after the termination, if Silvers complied with new conditions (Exhibit "H"). Stelor has still not made the payments as of today, seven (7) weeks after the termination. At present, Stelor owes Silvers advance royalties for April, May and June 2005. Yet, per the R&R, this is merely a "technical" breach because the Magistrate erroneously concluded the payments were made late when, in fact, they were not made at all. R&R, pp. 19-20.

Silvers put Stelor on notice of the royalty reporting defect in his Notice of Breach Letter (Exhibit "D"). Under the Settlement Agreement, Stelor agreed to cure the breach (Exhibit "F," ¶15). Stelor did not. Stelor's uncured breach, as well as Stelor's failure to pay the advance royalties justifies Silvers' April 27, 2005 termination of the license. After the termination, Stelor provided a report for the first quarter of 2005 (Exhibit "H"). This report, in addition to not curing the defects in the June 2002 through December 2004 reports, is also non-conforming and incomplete. For example, Stelor treats the GooTunes as a "derivative," when it is clearly a Licensed Product calling for a higher royalty. Moreover, the reported sales are grossly inconsistent with the huge success of GooTunes (Exhibit "I"). And, Stelor's 2005 report conceals the sale of Licensed Products through the Cafepress.com website. Despite these undisputed facts, the R&R concludes Stelor "fully performed" this requirement.

**Samples.** Stelor is required to provide Silvers with "samples of all Licensed Products which [Stelor] intends to manufacture and sell and of all promotional and advertising material associated therewith." (Exhibit "A," ¶¶VI(b) and (c)). The reason for the sample requirement is the need of the Licensor (Silvers) to ensure the quality of goods and services which use the Googles IP; without

11

such quality control, any license is meaningless and could be attacked as legally invalid.[4] And, to accomplish this purpose, Stelor must provide the samples "prior to" using the Googles IP with Licensed Products and related promotional materials. *Id.*

Stelor has not provided a <u>single</u> sample to Silvers, other than jewel cases for the two GooTunes compact discs (Exhibit "O," ¶23(g)).[5] This breach was set out in the Notice of Breach Letter, as a basis for termination (Exhibit "D"). Stelor again agreed to provide samples in the Settlement Agreement (Exhibit "F," ¶15). In addition to repeated requests by telephone, we requested the samples by email three times (Exhibit "L," ¶¶26-33). Stelor actually claimed there were no samples. *Id.* We then pointed Stelor to merchandise and advertisements discovered by Silvers, for which there had to be samples. *Id.* Still no samples were provided as of April 27, 2005 (Exhibit "G"). Silvers had to purchase CafePress.com merchandise himself to check for quality (Exhibit "O," ¶14). Stelor belatedly offered samples after the termination (Exhibit "H"), but to this day has not provided any. Nor does Silvers know what samples Stelor is teasing him with.

---

[4]Another purpose is to ensure Stelor's compliance with the related requirement that the Licensed Products include "all appropriate legal notices" (Exhibit "A," ¶VI(A). Stelor has consistently breached this provision since inception. For example, Stelor registered trademarks and domains in <u>its</u> name, or Esrig's name, instead of Silvers' name (Exhibit "O"). And, even now, Stelor's page on the CafePress website claims a copyright in graphic images for which Silvers owns the copyright. *Id.*, ¶14.

[5]These are the samples apparently described in the dubious Esrig Declaration, ¶28(e). Esrig conveniently failed to identify the samples, or disclose that he never provided samples of the GooTunes product <u>before</u> selling it, or that Stelor has never, prior to implementation, provided samples of its website, trade show merchandise, advertising copy, all of which uses the Googles IP. Example of samples Silvers has collected on his own, after the fact, which were omitted in Esrig's Declaration, are at Exhibit "K." Additional samples Stelor never showed Silvers were submitted by Stelor to the Magistrate and entered as evidence of the preliminary injunction hearing.

Incredibly, Stelor's big "launch" is planned to begin in just a few days, and Stelor has not provided a single sample of merchandise, advertising or website content to Silvers related to that!!

The Magistrate erred in finding Stelor had "fully complied" with the sample requirement. Moreover, the R&R dilutes Stelor's sample obligations and encourages Stelor to continue to flaunt its obligations under the license.

**Consulting Agreement.** As of April 27, 2005, Stelor had cured its breach of failing to reimburse Silvers' consulting expenses, albeit missing the deadline in the Settlement Agreement (Exhibit "O," ¶23). But, Stelor had not - - and still has not - - provided Silvers with the options agreement, as required by the Settlement Agreement. Compensation is a material term of any agreement. Stelor's breach of the options agreement requirement is, in itself, sufficient grounds to terminate the license. And the Consulting Agreement specifically gives Silvers that right (Exhibit "B," ¶1(c)). The Magistrate erred in finding Stelor has "fully complied" with the Settlement Agreement in light of its failure to provide the options agreement since <u>June 2002</u>! The Magistrate apparently bought Stelor's latest excuse that its delay results from converting to a limited liability company. R&R at p. 21. Yet, Stelor has failed to provide the options since June, 2002, when the obligation initially arose. And Stelor's limited liability company was formed in <u>2002</u>, (Exhibit "Q"), so waiting until 2005 is inexcusable.

### The R&R Misconstrues the Agreements

The R&R also found Stelor could breach the Settlement Agreement with impunity based on erroneous reading of the agreement. The R&R faults the Settlement Agreement as having no deadlines for Stelor's performance. R&R at 21-22. Thus, the R&R concludes, Stelor's defaults cannot breach the Settlement Agreement, because no deadlines for Stelor's performance had passed

13

as of the April 27, 2005 termination. Such an interpretation results in Stelor having <u>no</u> obligations whatsoever; Stelor's breaches are all excused because, in the future, someday, Stelor might cure. This was not the intent of the parties. And, aside from whether "Stelor has not performed yet" translates to "Stelor fully performed," an illogical leap, the no deadlines interpretation misconstrues the Settlement Agreement. The deadlines for Stelor's performance had already passed - - that is what led to the original termination. The lack of deadlines in the Settlement Agreement reflects the party's intent that Silvers could terminate the license at will based on Stelor's non-performance of the Settlement Agreement (Exhibit "L," ¶¶8-11). And, to the extent the Court needs deadlines, the License Agreement provides them.[6] Silvers gave Stelor more than three months to perform its obligations under the Settlement Agreement before finally terminating the license. Even if deadlines should be written into the Settlement Agreement - - and they should not - - Stelor missed every one of them. Rather than vitiate Silvers' right to enforce Stelor's obligations under the Settlement Agreement, the R&R should view Stelor's performance in light of whether it cured the breaches within a reasonable time. Clearly it has not.

The R&R's imposition of an additional notice and cure requirement also misconstrues the plain terms of the parties' agreements. The R&R grafts onto the Settlement Agreement a requirement that Silvers provide notice to Stelor, and a cure period for any breaches of the Settlement Agreement; according to the R&R, this requirement is grounded in the License Agreement. R&R at 27. Actually, the parties specifically omitted a notice and cure provision from the Settlement Agreement because Silvers had already met this requirement under the License

---

[6]For example, the audit has a 30 day deadline; the samples must be provided "prior to" use by Stelor; the royalty reports are due each quarter, and so on.

14

Agreement. In the Settlement Agreement, Silvers' withdrew his termination of the license, but did not withdraw the November 12, 2004 Notice of Breach Letter( Exhibit "F," ¶3 and Recitals). (Silvers withdrew the January 2005 letter regarding termination; Notice of Breach Letter not withdrawn). The Settlement Agreement is designed to preserve the positions and claims of the parties as of the settlement date (Exhibit "L," ¶¶8-11). Thus, the parties agreed to dismiss the then pending action without prejudice.[7] Id. The parties intended for Stelor to have another chance to stave off termination, but to maintain the status quo as of January 28, 2005, and all their rights to return to that status quo, if Stelor did not cure. Id. The Settlement Agreement, in effect, allowed either party to return to the pre-settlement status quo at their will. Id. That status quo included Silvers' Notice of Breach Letter dated November 12, 2004, and the expired cure period.

The "new" notice requirement imposed by the R&R does not make sense. Under this logic, Stelor can (and did) continue to breach the License Agreement and Settlement Agreement with no consequences. Silvers would be powerless to protect and control his intellectual property, as each "new" breach by Stelor starts a "new" period before Silvers can terminate. For example, Stelor breached the audit requirement in November 2004. Silvers put Stelor on notice and, after 60 days, terminated the license. Stelor agreed in the Settlement Agreement to provide the audit. It didn't. The R&R would require Silvers to provide another breach notice and another 60 days cure period, simply because Stelor was now continuing to obstruct the audit, while breaching the Settlement Agreement. To avoid this process - - which could go on and on, the Settlement Agreement expressly states that Stelor's original breach (which has been noticed and the cure period expired) is not

_____

[7]The Esrig Declaration filed by Stelor the day of the hearing misrepresented this to the Magistrate by testifying under oath the case was dismissed with prejudice; Stelor sought to create the inaccurate impression the Settlement Agreement resolved the dispute. Obviously, it did not.

15

deemed to be cured if Stelor breaches the Settlement Agreement. No "new" notice and cure period is required.

### Preliminary Injunction Standard

The Magistrate erred by failing to apply the proper standard for a preliminary injunction because Stelor seeks a mandatory injunction. Rather than preserve the status quo - - in which the License Agreement is terminated - - the requested injunction reverses the termination and, further, requires Silvers to specifically perform the terminated agreement. This is a classic mandatory injunction, requiring Stelor to meet its burden for injunction relief under a higher standard than "substantial likelihood" standard applied by the Magistrate.[8]

### The Elements of a Preliminary Injunction

The R&R finds Stelor is likely to prevail on the merits based on the erroneous conclusion, discussed above, that Stelor "fully complied" with the Settlement Agreement.

But the R&R also goes astray by concluding Stelor would suffer irreparable harm absent an injunction. Indeed, a terminated licensee's sole remedy for wrongful termination is an action for damages, and irreparable harm cannot arise as a matter of law.[9] As put by Professor McCarthy: "the remedy for a franchisee who alleges that she was wrongfully terminated is money damages, not the continued unauthorized use of the franchisor's trademarks. *McCarthy on Trademarks* (West 4th Ed.) at §25:31, pp. 25-66, 67. Silvers emphasized this rule in response to Stelor's motion, thus, the R&R's off-base remark that "Silvers does not refute Stelor's claim of irreparable harm" is puzzling.

---

[8]To avoid duplication, Silvers adopts and incorporates herein his Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, pp. 9-10.

[9]To avoid duplication, Silvers refers to and adopts his Memorandum in Opposition to Plaintiff's Motion for preliminary Injunction, pp. 6-8.

16

But, now that we have reviewed Stelor's "evidence" of irreparable harm contained in the Esrig Declaration filed the day of the hearing, relied upon heavily by the Magistrate, we can refute it even more.

Simply put, Stelor misled the Magistrate. As explained in the Declaration of Russell Tewksbury (Exhibit "N"), Stelor misled the Magistrate about internet technology by claiming Silvers, in reclaiming his domain names after the termination, had "taken Stelor's propriety or intellectual property," and that "our site is no longer operational;" Stelor told the Magistrate it could not "display its product," "meet with potential licensees," and that its "website had been destroyed."[10] This is all patently false. Stelor's Gootopia website was accessible to users after the termination, through its own domain name (Exhibit "P"). Stelor could also use another domain name for users' access. While using a different domain name may be inconvenient for Stelor, it has no bearing on the content or operation of its website, proprietary information for the website, the ability to display its website to interested persons, or Stelor's access to the website (Exhibit "N"). The Gootopia website Stelor operates is accessible to Stelor and internet users without Silvers' domain name. *Id.* Given that Stelor holds itself out as a technology driven, web-based company, one can only conclude Esrig's misrepresentation were intentionally designed to mislead the Magistrate in order to artificially inflate its "irreparable harm."

The balance of harm is not a black and white issue. Of course Stelor is adversely impacted by the termination. But Silvers, as licensor, is also significantly effected by being denied the right to terminate his errant licensee. And this hardship is usually deemed to outweigh the hardship on the terminated licensee. *See McCarthy, supra,* §25:31, pp. 25-68, *et seq.* (improper to allow

---

[10]Steven Esrig Declaration, ¶¶11-14, *see* Appendix, (Exhibit "S").

17

terminated franchisee to use franchisor's mark; trademark owner's harm outweighs that of terminated license holder). This is because the trademark owner in such a situation cannot exercise quality control and take other steps to ensure the mark is used consistently and appropriately. *Id.*

The R&R turns trademark law on its head by recommending an injunction against the trademark owner, allowing the terminated licensee to continue using the licensor's marks. As put by Professor McCarthy: "Clearly, a terminated franchisee who is infringing on the franchisor's trademark is not entitled to a preliminary injunction requiring the franchisor to continue doing business." *McCarthy, supra,* §25:31, ¶¶25-66. (citing *Original Great American Chocolate Cookie Co. v. River Valley Cookies,* 970 F.2d 273 (7th Cir. 1992)). Notably, in the *Burger King* cases and its cousins, the franchisor seeks to enjoin the terminated franchisor, and bears the burden of demonstrating success on the merits. In those cases, the defense of wrongful termination is given short shrift when the issue is whether the terminated party may use the franchisor's marks while the action is pending. Here, Stelor is the terminated licensee, seeking to undo the termination so it can use the Googles IP. As movant, Stelor bears the burden of proof, even though its basis for relief is the inevitable wrongful termination issue. Yet, if Silvers were the movant, and sought to enjoin Stelor from using his Googles IP, all he would have to make is "some type of showing that [Silvers] properly terminated the contract purporting to authorize the trademarks' use." *McDonald's Corp. v. Robertson,* 147 F.3d 1300 (11th Cir. 1998). Even though Silvers does not have the burden here, the evidence of record constitutes "some type of showing" that termination was proper. Thus, allowing Stelor to continue as licensee and use the Googles IP against the owner's wishes is an inappropriate result.

18

## The Recommended Preliminary Injunction is Overbroad

The Magistrate, no doubt based on the misinformation contained in Esrig's testimony, would compel Silvers to "return control and use of the Googles.com website and content to Stelor . . ." R&R, p. 34.[11] Silvers cannot do this, because he has no control over Stelor's website or its content. Only Stelor does! (Exhibit "N"). All Silvers controls is the googles.com domain name which is simply one of many ways an internet user can access Stelor's website. And under the license,[12] Stelor's rights are limited to <u>use</u> of the domain name, not <u>control</u>. Stelor is like a tenant, with the right to use space it has rented. It has no right to control the building. Thus, the Magistrate's intent to restore the status quo prior to the termination goes too far - - because it appears to grant control of the domain names to Stelor. Stelor had no such control before the termination, it is beyond peradventure how it can obtain "control" via an injunction, which is necessarily limited to Stelor's rights as licensee and the status of the domains before the termination.

Moreover, the suggested injunction has been implemented in a Temporary Restraining Order which has been applied in a manner far beyond the pre-termination status of Silvers' domain names. The domain registrar for the domain names has, based on the order, put an administrative lock on 77 other domains never used by Stelor, depriving Silvers of his right as owner to use the domain names. Any injunction therefore, should be limited solely to the googles.com domain and should compel Silvers to allow Stelor to <u>use</u> the domain names, not <u>control</u> it.

---

[11]Stelor usually calls its website "Gootopia."

[12]Actually, the License Agreement does not encompass domain names, and gives Stelor no rights in any of Silvers' domain names. Without waiving this position, Silvers has no objection for purposes of the injunction motion to treating the googles.com domain name as a licensed property.

19

## CONCLUSION

The Court should not adopt the R&R based on a *de novo* review of the evidence and applicable case law. Stelor's motion for preliminary injunction should be denied, and the issue of wrongful termination should be left for trial and damages, if any. At minimum, the Court should refer the matter back to the Magistrate to reconsider in light of his reliance on the misleading testimony of Stelor's president and the erroneous factual and legal findings.

Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.    KOZYAK TROPIN & THROCKMORTON, P.A.
Co-Counsel for Defendant    Counsel for Defendant
200 S.E. First Street, Suite 708    2525 Ponce de Leon, 9th Floor
Miami, FL 33131    Coral Gables, Florida 33134
Telephone: (305) 374-1920    Telephone: (305) 372-1800
Adam T. Rabin, Esq.

By: _____
    Kenneth R. Hartmann
    Florida Bar No: 664286
    Gail M. McQuilkin
    Florida Bar No. 969338

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was ~~mailed this~~ *hand-delivered*

13th day of June, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq., Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove, Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

By: _____
    Kenneth R. Hartmann

3339/101/254174.1

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

CASE NO. 05-80393-CIV-HURLEY
Magistrate Hopkins


## APPENDIX TO SILVERS' OBJECTION TO
## REPORT AND RECOMMENDATION


3339/101/254488.1

# APPENDIX TO SILVERS' OBJECTION TO
## REPORT AND RECOMMENDATION

### INDEX

A.    License Agreement

B.    Consulting Agreement

C.    Audit Request dated November 5, 2004

D.    Notice of Breach dated November 12, 2004

E.    Silvers' Letter Dated January 13, 2005 Regarding Termination

F.    Settlement Agreement

G.    Silvers' Letter Dated April 27, 2005 Regarding Termination

H.    Stelor's Post-Termination Letter Dated April 29, 2005

I.    Declaration of Keva Labossiere dated May 20, 2005

J.    Composite - Stelor Royalty Statements

K.    Stelor Advertising Samples Not Provided to Silvers

L.    Declaration of Gail A. McQuilkin dated June 17, 2005

M.    Declaration of Paul Worsham dated June 15, 2005

N.    Declaration of Russell Tewksbury dated June 17, 2005

O.    Declaration of Steven A. Silvers dated May 20, 2005

P.    Supplemental Declaration of Keva Labossiere dated May 25, 2005

Q.    Composite - Delaware Secretary of State Entity Details for Stelor Productions, LLC and
      [Stelor] Certificate of Conversion from a Corporation to a Limited Liability Company

R.    CafePress.com e-mail regarding Contact Information

S.    Declaration of Steven A. Esrig dated May 22, 2005

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 • TEL (305) 372-1800

CASE NO. 05-80393-CIV-HURLEY/Hopkins

Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.
*Co-Counsel for Defendant*
200 S.E. First Street, Suite 708
Miami, FL 33131
Telephone: (305) 374-1920
Adam T. Rabin, Esq.

KOZYAK TROPIN & THROCKMORTON, P.A.
*Counsel for Defendant*
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

By: _____
Kenneth R. Hartmann
Florida Bar No: 664286
Gail A. McQuilkin
Florida Bar No. 969338

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of Appendix to Silvers' Objection to Report and Recommendation was hand-delivered this 14th day of June, 2005, to: Kevin C. Kaplan, Esq., Daniel F. Blonsky, Esq. and David Zack, Esq., Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., Counsel for Plaintiff, Office in the Grove, Penthouse A, 2699 South Bayshore Drive, Miami, FL 33133.

By: _____
Kenneth R. Hartmann

3339/101/254488.1

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON, 9TH FLOOR, CORAL GABLES, FLORIDA 33134-6037 • TEL (305) 372-1800

# EXHIBIT "A"

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.



E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

(iv) ........... the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v) except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.  LICENSEE represents and warrants that:

(i) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii) the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii) it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.  <u>Disclaimer of Warranties</u>. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.  LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A.  The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.  The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.  Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A.  Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.  Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.



## VIII. INTELLECTUAL PROPERTY PROTECTION

A.     LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.     LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.     LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.     LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.     Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A     Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B.    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A.    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A.    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A.    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.

6



B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII. LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV. INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV. FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.



## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1 st, 2002, and executed between the above mentioned parties



IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                    STELOR   JDUCTIONS, INC.

Steven A. Silvers                    By: _____
Title: Owner/LICENSOR                Printed Name: _Steven A. Esrib_
Dated: _5/09/02_                     Title: _President_
                                     Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including ., but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

Succession
Rights of Survivor

5/9/02

In the event of the Death of Licensor all of the Licensor's rights under this agreement shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

*Steve A. Silvers*                          *signature*

5/09/02                                     5/9/02

*signature*

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

# EXHIBIT "B"

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultancy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    Engagement of Consultant.

     a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

     b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003.   All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

     c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    Relationship of Parties.  The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.  **Duties of Consultant.** Consultant's duties hereunder are as follows:

a.  Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.  During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.  Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and/or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.  Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.  **Duties of Company.**

2

a.     Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.     <u>Term and Termination.</u>

a.     Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.     Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.     Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.     Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.     <u>Proprietary Information; Proprietary Rights.</u>

a.     In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

b.    The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.    The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.    <u>Limitations of Liability</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.    <u>Miscellaneous</u>.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

_____    Date 5/09/02
STEVEN A. SILVERS

Stelor Productions, Inc.

By: _____    Date 5/9/02
Name: Steven A. Esrig  Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)    _____

_____
MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

4

# EXHIBIT "C"

Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Overnight Delivery
<u>Federal Express Tracking No. 7903-2948-5586</u>

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products. In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.     All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent, that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.     All sublicenses;

3.     All copyright and trademark registration applications and registrations;

4.     All domain name registrations;

5.     All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.     Proof of insurance as required under Paragraph XIV.

Page 2

In addition, Mr. Silvers is requesting that a number of samples of all Licensed Products manufactured, or in production be produced during this audit.

You, or your counsel, should schedule and coordinate the audit through us by providing us with a date and location.

Very truly yours,

Gail A. McQuilkin

c:    Steven Silvers
      Kenneth R. Hartmann, Esq.

I2A5617.1

# EXHIBIT "D"

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.    Failure to pay royalties under paragraph III (A);

b.    Failure to provide a written certified royalty statement under paragraph III (C);

c.    Failure to provide a list of all sub licenses under paragraph III (C);

d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

    i.    Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

    j.    Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

    k.    Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

    l.    Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

    a.  Failure to pay Mr. Silvers consultancy fees and expenses;

    b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

    c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

    d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter

/245015.1

# EXHIBIT "E"

LAW OFFICES

# KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON · 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. McQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:     Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2

Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:      Steven A. Silvers
        Laurence Hefter
        Yano A. Rubinstein
        William Borchard

/248587.1

# EXHIBIT "F"

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by Stelor Productions, Inc. ("Stelor") and Steven A. Silvers ("Silvers"). Stelor and Silvers are collectively referred to herein as "the Parties."

WHEREAS, Stelor brought a complaint in the United States District Court for the Southern District of Florida (Case No. 04-80954-CIV-HURLEY) against Silvers alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers brought a counter-complaint against Stelor alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers on January 13, 2005 sent a notice of termination of the Licensing, Distribution and Manufacturing Agreement to Stelor;

WHEREAS, Stelor has invested substantial time, effort, and money in developing a business involving the GOOGLES IP and fully intends to continue developing and commercializing such business, including sub-licensing some or all of the GOOGLES IP;

WHEREAS, the Parties intend that full performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other Party; and

WHEREAS, the Parties wish to resolve all of the foregoing disputes to their mutual satisfaction.

//

//

SILVERS _____        - 1 -                STELOR_____

THEREFORE, the Parties hereby agree as follows:

1.  Domain Name Administration:

    a.  Silvers shall give Stelor, as the administrative contact for the GOOGLES IP domain names, the right to control the DNS records and make changes to the administrative contact information for all GOOGLES IP domain names, and shall advise the domain name registrar known as godaddy.com to this effect. Silvers will provide proof that Stelor has such rights no later than February 15, 2005. Silvers shall cooperate with any other request from Stelor regarding necessary administrative issues relating to the domain names, and all communications by Silvers, relating to domain names, shall be through Kozyak Tropin and Throckmorton ("KTT").

    b.  KTT will create and control a domain name renewal database to ensure timely renewal of domain names owned by Silvers, and will communicate with Stelor's counsel regarding any deadlines or other administrative issues.

2.  Pending and Future Actions Relating to the GOOGLES IP:  Silvers will cooperate with Stelor and Stelor's counsel in all respects in pending and future trademark and domain name dispute proceedings filed by Stelor, including but without limitation, providing any and all documents and other evidence needed to support Stelor's position.

3.  The License, Distribution and Manufacturing Agreement:  Silvers withdraws his notice of termination of the License Agreement, and reaffirms his obligations under

SILVERS _____

- 2 -

STELOR _____

the License Agreement.

4. <u>Post-Settlement Communications:</u>  Silvers shall communicate with Stelor solely through KTT.

5. <u>USPTO Correspondent of Record:</u>  Silvers shall change the correspondent on all GOOGLES IP trademark applications and registrations to the name of Stelor's counsel no later than February 15, 2005, and shall not change the correspondent in the future as long as the Licensing, Manufacturing and Distribution Agreement is in effect.  Stelor's counsel shall copy KTT with all correspondence to and from the USPTO

6. <u>Sale or Assignment of the GOOGLES IP:</u>  KTT and Stelor's counsel shall include each other in any and all negotiations and discussions with Google Inc. that relate to resolving the pending trademark and domain name disputes or the sale or assignment of the GOOGLES IP.

7. <u>Domain Name Renewal Expenses:</u>  Stelor agrees to reimburse Silvers for documented expenses incurred to date in renewing GOOGLES IP domain names.  Future GOOGLES IP domain name renewal expenses will be reimbursed by Stelor.  All requests for reimbursement will be submitted by KTT to Stelor, and all payments by Stelor will be sent to Silvers through KTT.

8. <u>Options Acknowledgement:</u> Stelor agrees that it will confirm in writing that no additional options have been granted that would obligate it to provide such options under the now expired Letter Agreement.

9. <u>LLC Acknowledgement:</u> The Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC. Any options granted

SILVERS ____    - 3 -    STELOR_____

to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC.

10. Royalty Advances:

    a.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor shall advance Silvers $60,000 a year against future royalties. The advance will be made in equal monthly installments payable on the first of each month beginning February 1, 2005.

    b.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor will provide Silvers with an additional monthly advance on expected future royalties equivalent to that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), as long as such coverage is offered. Such advance will not exceed $1,000 per month.

    c.  Stelor will reimburse Silvers for insurance premiums through the expiration of the "Letter Agreement," not to exceed $4,000. Such reimbursements will be provided to Silvers within 15 days of Stelor receiving evidence of paid premiums.

11. Recoupment and Termination of Royalty Advances: Royalties advanced under this Agreement will be recaptured by Stelor once royalty payments exceed the amount specified in paragraph 8. Such deductions will not exceed 20% of any given royalty payment.

12. Royalty Statements: Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due.

SILVERS _____

- 4 -

STELOR _____

13. <u>Trademark Registrations:</u>  Stelor shall provide to Silvers through KTT proof that all applications and registrations for trademarks and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement filed by or on behalf of Stelor show Silvers as the owner.

14. <u>Audit:</u>  Stelor shall cooperate in the audit of the books and records of Stelor by Aronson and Company onsite at Stelor Productions as per section IV of the Licensing, Distribution and Manufacturing Agreement.  Any information obtained by the auditor will be restricted to KTT , on an "attorneys' eyes only" basis and the identity of any licensee, sub-licensee, vendor, or any other third-party shall remain confidential.

15. <u>Licensed Products Samples:</u>   Stelor shall provide Silvers through KTT samples of any Licensed Product that is being offered for sale.

16. <u>USPTO Correspondence:</u>  Stelor's counsel shall keep KTT advised as to the status of any pending or future trademark or domain name disputes filed by Stelor against Google Inc. by copying KTT on all pleadings and correspondence, and by giving notice to KTT of any other trademark or domain name disputes filed against Google Inc.

17. <u>Reservation of Jurisdiction:</u>  The Parties agree to submit to the exclusive continuing jurisdiction of the United States District Court, Southern District of Florida, for enforcement of all provisions of this Agreement.  In the event that a dispute arises concerning the obligations of any Party under this Agreement, the Parties agree to submit any such dispute to this court for resolution.  The successful or prevailing party (as determined by the Court) shall be entitled to recover its reasonable attorneys'

SILVERS                                    - 5 -                                    STELOR

fees and other costs incurred in that litigation from the unsuccessful or non-prevailing party in addition to any other relief to which the prevailing party might be entitled.

18. <u>Injunctive Relief</u>: The Parties hereby agree that there is no adequate remedy of law in the event that either party negotiates or settles the disputes with Google Inc. without the other party. In the event that either party attempts to negotiate with Google Inc. without the other party's participation, that shall be a breach of this Agreement, and such breach will create irreparable harm, and that injunctive relief will be necessary to maintain the rights of the non-breaching party. Accordingly, each party agrees to such injunctive relief.

19. <u>Joint Settlement Negotiations with Google Inc.</u>:

    a.  In view of the current existence of litigation and proceedings in the TTAB, jointly referred to as "Litigation", the parties recognize the need to resolve this Litigation reasonably such that Stelor can continue to develop and promote its business.

    b.  Due to the present status of development of Stelor's business, any event that causes Stelor to delay offering its web-based service to the public will cause severe injury to Stelor. Silvers therefore agrees that, in the event of a settlement with Google Inc., he will not object to Stelor's continued use of the googles.com domain to transition to a new domain name. The length of time of such transition will be at Stelor's sole discretion.

    c.  In the event of a monetary, stock, or similar settlement with Google Inc., Such sale will include a complete sale or assignment of the GOOGLES IP, The proceeds from that settlement shall be divided as follows:

SILVERS _____

- 6 -

STELOR_____

Silvers shall receive 70% of the first $30 million; 50% of the next $20 million; 30% of the next $30 million; 20% of the next $20 million; 10% of the next $20 million and 5% of any amount over $120 million, with the remainder in each case going to Stelor. Silver's total share of the proceeds shall not exceed $50 Million in any event.

    d.  Nothing in this provision creates an affirmative action by either party to enter any settlement with Google Inc., or to sell or assign the GOOGLES IP to Google Inc. Silvers understands and agrees that he cannot sell or assign the GOOGLES IP to Google Inc. without obtaining Stelor's written approval. Both parties agree that they will negotiate in good faith.

20. <u>Confidentiality and Disposition of this Action:</u>

    a.  The settlement shall not be provided to the court unless necessary to enforce rights, and then under seal. A Joint Stipulated motion to withdraw actions shall be filed no later than Friday, January 28, 2005. The fact that a settlement has been reached and all terms and obligations shall be confidential except to the extent necessary to advise Google Inc. that the parties have resolved all differences.

    b.  The complaint and counterclaim shall be dismissed without prejudice.

21. <u>Exclusive Authority/No Assignment:</u>

    a.  Stelor and Silvers represent and warrant that no other person or entity has or had any interest in the Claims, demands, obligations, or causes of action

SILVERS _____

- 7 -

STELOR _____

released as part of this Agreement, that they have the sole right and

exclusive authority to execute this Agreement and receive the

considerations specified herein, and that they have not sold, assigned,

transferred, conveyed, or otherwise disposed of any of the Claims,

demands, obligations, or causes of action released as part of this

Agreement.

    b.   The signatories to this Agreement each warrant that they have the power

to bind the person or entity on whose behalf they signed, and will hold

harmless any party to this Agreement for any attorney fees, costs,

expenses, or damages incurred or paid as a result of finding that such

person or entity lacks such authority, or does not have sole right to the

Claims that are the subject of this Agreement, or that any such Claim has

been assigned.

22. <u>Voluntary Agreement</u>:   Stelor and Silvers each represent that the Agreement is freely

and voluntarily entered into, with the independent advice of each party's attorneys

and they have not been induced to execute this Agreement by reason of the disclosure

or non-disclosure of any fact or representation not set forth in this Agreement.

23. <u>Non-disparagement</u>:  Each Party, on behalf of itself, its officers, directors, attorneys,

agents, and employees, agrees not to make or publish, either orally or in writing, any

disparaging statements concerning the other Party or its current and former officers,

directors, attorneys, agents, shareholders, or employees.

24. <u>Entire Agreement</u>:   This Agreement constitutes the entire agreement between the

parties and supersedes all prior and contemporaneous contracts, agreements, promises

SILVERS _____     - 8 -     STELOR_____

and understandings, with the exception of the License, Distribution and

Manufacturing Agreement as well as the Letter Agreement previously entered into by

the parties. This Agreement may not be altered, modified or otherwise changed in

any respect except by writing, duly executed by Stelor and Silvers. No

representations, circumstances or conditions existing before the Agreement shall be

used in any way by any party to the Agreement to modify the Agreement.

25. Joint Preparation:   Stelor and Silvers declare that they have read this Agreement, and

know and understand its contents, and they each comprehend and agree to all its

terms, conditions, and meanings and their significance; all signatories and their

counsel have cooperated in the drafting and preparation of this Agreement, and this

Agreement therefore shall not be construed against any signatory. The Agreement

shall not be construed against any of them based upon any claim of unequal

sophistication or bargaining power.

26. Governing Law:   This Agreement shall be deemed to be made under, shall be

construed in accordance with, and shall be governed by the laws of the State of

Florida.

27. Duplicate Originals:   This Agreement may be executed in duplicate originals, each of

which is equally admissible in evidence in an action to enforce this Agreement, and

each original shall fully bind each party who has executed it.

28. Facsimile Signatures:   The signatures required for the execution of this Agreement

may be transmitted by facsimile, and any such signature shall be deemed a duplicate

original, and may be admitted in evidence and shall fully bind the party and person

making such signature.

SILVERS _____    - 9 -    STELOR _____

29. <u>Effective Date</u>:  The Effective Date of this agreement shall be the date on which all

Parties have signed this Agreement.

30. <u>Each Party Agrees to operate in good faith as to the terms of this agreement</u>.

[Signature Page Follows]

THE FOREGOING IS AGREED TO BY:

DATED: January ___, 2005      Stelor Productions, Inc.

          By: _____

          Its: _____

DATED: January 28, 2005      Steven A. Silvers

          By: _Steven A. Silvers_

APPROVED AS TO FORM AND CONTENT:

DATED: January ___, 2005      Summers Rubinstein, P.C.

          By: _____

          Yano L. Rubinstein, Esq.

          Attorneys for Stelor Productions, Inc.

DATED: January 28, 2005      Kozyak, Tropin & Throckmorton, P.A.

          By: _____

          Gail McQuilkin, Esq.

          Attorneys for Steven A. Silvers

# EXHIBIT "G"

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON · 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7929-0844-8480

April 27, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

    Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

    On November 12, 2004, we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached. Because Stelor did not cure those breaches, on January 13, 2005 we served on Stelor a notice of termination of the License Agreement, a copy of which is attached.

    On January 28, 2005, Stelor and Silvers entered into a Settlement Agreement in which Silvers agreed to withdraw his notice of termination provided Stelor perform its obligations under the Settlement Agreement. Stelor, however, has:

- failed to provide Silvers with unit interests in Stelor LLC under paragraph 9;

- failed to pay Silvers monthly installments on royalty advances on the first of every month under paragraph 10 (a);

- failed to pay on April 1, 2005 the monthly advance on royalties required by Silver to maintain his insurance coverage through the Aurora Collection under paragraph 10 (b);

- failed to cooperate in the audit of the books and records of Stelor under paragraph 14; and

- failed to provide Silvers samples of Licensed Products that are being offered for sale under paragraph 15.

    Furthermore, although Stelor has provided a written statement that it is not offering any

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 12, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchandise of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

251939.1

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Estig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:   Silvers/Stelor License Agreement

Dear Mr. Estig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.    Failure to pay royalties under paragraph III (A);

b.    Failure to provide a written certified royalty statement under paragraph III (C);

c.    Failure to provide a list of all sub licenses under paragraph III (C);

d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

      i.      Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

      j.      Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

      k.      Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

      l.      Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

      a.  Failure to pay Mr. Silvers consultancy fees and expenses;

      b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

      c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

      d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:      Steven A. Silvers
       Laurence Hefter

/245615.1

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON · 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2

Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:      Steven A. Silvers
        Laurence Hefter
        Yano A. Rubinstein
        William Borchard

/248587.1

# EXHIBIT "H"

04/29/2005  15:45    3858585852

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: DBLONSKY@BWSKB.COM  WWW.BWSKB.COM

April 29, 2005

VIA FACSIMILE AND U.S. MAIL

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

Re:    Silvers/Stelor

Dear Gail:

I write in response to your letter dated April 27, 2005 to Steven Esrig of Stelor Productions purporting to terminate the License Agreement. It is the position of Stelor that the License Agreement and the Settlement Agreement remain enforceable and binding documents and that the purported grounds for termination are all invalid and improper. We will respond to each of those grounds in turn.

First, Stelor has only recently converted to an LLC and Mr. Silvers has been provided an option letter for unit interests, to which he has not responded.

Second, monthly installments on royalty advancements have been paid. Indeed, enclosed are copies of royalty advancement checks for April and May that we are prepared to release upon withdrawal of the notice of termination.

Third, monthly advances on royalties to maintain insurance coverage have also been paid. Enclosed are checks for April and May that we are prepared to release upon withdrawal of the notice of termination. It must be noted, however, that, despite demand, Mr. Silvers has never confirmed the amount of insurance to be paid. As a show of good faith, Stelor has nonetheless paid the maximum each month, but such confirmation must be provided forthwith.

Fourth, Stelor has cooperated in the audit of the books and records. In fact, just a week ago, on April 22, 2005, you sent an email to Kevin Kaplan stating that "[t]he auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." We have received no such letter. Whenever Stelor receives such a letter, it will cooperate.

Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn and it is understood that the agreements remain in place.

Gail A. McQuilkin, Esq.
April 29, 2005
Page 2

Finally, no royalties are owed to your client and the advances paid far exceed royalties that have been accumulated. A royalty statement is enclosed reflecting full payment of any amounts due. To the extent that there are any concerns, they can be raised with us. However, there is simply no basis for termination. Instead, the continuing failure of Mr. Silvers to meet his obligations under paragraph 2 of the Settlement Agreement, which has been the subject of prior correspondence, is a breach that he needs to be cured immediately.

Mr. Silvers is obliged to honor the License Agreement and the Settlement Agreement. We hereby demand receipt of written notice by Noon on Monday, May 2, 2005 that the notice of termination has been withdrawn and that Mr. Silvers agrees to abide by his contractual agreements. We also demand written assurance that Mr. Silvers will make no efforts to interfere in any manner with the business of Stelor. Furthermore, Mr. Silvers needs to agree to the submission to the federal court of a consent decree confirming the enforceability of the agreements and the rights that have been conveyed to Stelor. Failing receipt of such notice and assurances, Stelor will initiate an action seeking to enforce the agreements through declaratory and injunctive relief.

All rights and remedies are reserved. Govern yourselves accordingly.

Sincerely,

Daniel Blonsky

DFB:gr
Enclosures
cc: Client (w/ encls.)
    Kevin C. Kaplan, Esq. (w/ encls.)

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

04/29/2005  15:45  3085595261

2751

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20885

CITIBANK, F.S.B.
WASHINGTON, DC 200380967
7-216-520

04/28/05

TO THE
ER OF    Silvers Entertainment Group                                    $ **5,000.00

Five Thousand and 00/100****************************************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

IO    Advance Against Royalty April 05

⑈002751⑈ ⑈053002166⑈    ⑈175977405⑈

---

.OR PRODUCTIONS, INC.
    Silvers Entertainment Group                    04/28/05        2751
04/28/05                        Bill #roymay                    5,000.00

Citibank Checkin  Advance Against Royalty April 05                    5,000.00

04/29/2005  15:45   3058585525

2752

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

TO THE
ORDER OF    Silvers Entertainment Group                                    $ **5,000.00

Five Thousand and 00/100*********************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MO    Advance Against Royalty May 05

⑈002752⑈ ⑆052002166⑈   ⑈175974⑈05⑈

---

_OR PRODUCTIONS, INC.
    Silvers Entertainment Group                          04/28/05        2752
04/28/05                        Bill #royapril                        5,000.00

)

Citibank Checkin  Advance Against Royalty May 05                      5,000.00



04/29/2005  15:45     3035555251

2753

STELOR PRODUCTIONS, INC.
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20038-0867
7-216-520

04/28/05

TO THE
ER OF        Silvers Entertainment Group                                    $ **1,000.00

)ne Thousand and 00/100*************************************************************************
_____ DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

D   Royalty/insurance advance, Apr '05

⑈002753⑈ ⑆052002166⑆      ⑈1759740 5⑈

OR PRODUCTIONS, INC.
Silvers Entertainment Group                                        04/28/05          2753
04/28/05                    Bill #052005                                       1,000.00

itibank Checkin  Royalty/insurance advance, Apr '05                            1,000.00

BURLINGTON WEB

2755

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

TO THE
DER OF   Silvers Entertainment Group                          $ **1,000.00

One Thousand and 00/100******************************************************************

DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MD    Royalty/insurance advance May '05

⑈002755⑈ ⑆052002166⑆    ⑈1759740⑈

---

:OR PRODUCTIONS, INC.
   Silvers Entertainment Group      Bill #042005              04/28/05         2755
04/28/05                                                                    1,000.00

Citibank Checkin  Royalty/insurance advance May '05                          1,000.00



4/29/2005   15:45   5618555251

## Royalty Statement
## Silvers Entertainment Group
### January 1, 2005 – March 31, 2005

| Transaction | Net Revenue | Royalty Rate | Royalty Amount | Pre-paid Royalty Balance |
|---|---|---|---|---|
| February advance against royalties | | | $5,000 | $5,000 |
| February advance against royalties for insurance premiums | | | $1,000 | $6,000 |
| Net revenue from licensed properties (iTunes) | $47.35 | 6% | $2.84 | $5,997.16 |
| Net revenue from derivative properties (iTunes) | $1.47 | 3% | $0.04 | $5,997.12 |
| March advance against royalties | | | $5,000 | $10,997.12 |
| March advance against royalties for insurance premiums | | | $1,000 | $11,997.12 |

# EXHIBIT "I"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.
Case No. 05-80393-CIV-HURLEY/Hopkins

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

       Plaintiff,

vs.

STEVEN A. SILVERS, a Florida resident,

       Defendant.

_____/

## DECLARATION OF KEVA LABOSSIERE

My name is Keva Labossiere and I make this declaration based on my own personal knowledge. I am a legal assistant at the law firm of Kozyak Tropin and Throckmorton, P.A., with offices at 2525 Ponce de Leon, 9th Floor, Coral Gables, FL 33134.

### I . Description of Research Conduted on Googles.com's On-line Store at CafePress.com

1.    On May 16, 2005, I visited the CafePress.com website at www.cafepress.com.

2.    CafePress.com is an online marketplace that allows companies, such as Stelor Productions, to sell customized merchandise online, i.e. apparel, using CafePress.com's unique print on demand and e-commerce services, with no upfront costs and inventory. Attached hereto as **Exhibit "A"** is a copy of CafePress.com's Company Overview.

3.    At the CafePress.com homepage, I entered the word "googles" into the search engine field and was directed to to the "Googles.com Online Store." Once there, I was able to select from fourteen (14) products. A copy of the available products and other product information as presented on the Googles.com Storefront is attached hereto as **Exhibit "B"**.

4.    At that Googles.com Storefront, I purchased the following four (4) items: (i) Googles (word) black cap; (ii) Googles baseball jersey; (iii) Googles (TM )Mug; and (iv) Mousepad ("Merchandise"). Attached hereto as **Exhibit "C"** is a copy of the receipt from the purchase described above.

5.    On May 18, 2005, I received the Googles.com merchandise and presented it to Ken Hartmann.

## II. Description Of Research Conducted On Apple iTunes Music Store

6.    On May 10, 2005, I downloaded the Apple iTunes Music Store software ("Apple iTunes Music Store") to my computer desktop from the website, www.itunes.com.

7.    Apple iTunes is a music download store with more than 1.5 Million songs to preview, buy and download. Attached hereto as **Exhibit "D"** is a copy of the download features available to Apple iTunes subscribers.

8.    In the Apple iTunes Music Store, I selected "Children's Music," conducted a "Power Search" where I then entered "googles" in the "Song" field and "Children's Music" in the "Genre" field. The power search resulted in the One GooWorld/The Googles from Goo ("One Goo World") album being displayed. I then clicked on the album's title which opened an album detail page for One Goo World.

Also displayed on the album detail page were: (i) the Release Date (of the album); (ii) Top Artist Downloads (from the album); (iii) and a "See All" icon, which when selected displayed the two (2) Googles albums available on iTunes. That is: "One GooWorld" and "Un Goomundo/The Googles from Goo" (the Spanish version of One Goo World)." The number of tracks available on each album is fifteen (15). Attached hereto as Composite **Exhibit "E"** are "Print Screen" snapshots of the iTunes pages displayed from that search.

9.     The release date given for One GooWorld is "Jul 15, 2004" and the publisher mark is noted as "(p) 2004 Stelor Productions." The release date given for "Un Goomundo" is "Sep 14, 2004" and the publisher mark is noted as "(p) 2004 AWAL." (*See* Exhibit "E"). AWAL is the abbreviation for Artist Without A Label. Attached hereto as **"Exhibit "F"** is AWAL's "About Us" page which is displayed on its website, www.awal.com.

10.     At that iTunes Music Store I purchased "One GooWorld" and "Un Goomundo/The Googles from Goo." Attached hereto as **Exhibit "G"** is the receipt for that purchase. The total price was $19.98.

11.     On May, 20, 2005, I provided Mr. Hartmann with a compact disc of the downloaded music.

12.     On May 17, 2005, I visited the website Absolutely.net to establish how One Goo World was performing on the music charts. Absloutely.net is an online entertainment magazine that also provides information on the sales of music albums worldwide. It's website address is www.absolutely.net.

13.    On Absolutely.net, One Goo World is listed in the Netherlands as No. 3 out of 6 Top Albums in Children Music.    Track no. 13, "Zoomin'" is listed as no. 29 in UK's 100 Top Songs in Children Music 3, and track no. 4, "I Feel Good About Myself is ranked , no. 65 in UK 100 Top Songs in Children's Music 7.    Attached hereto as composite **Exhibit "H"** is a printout of Absolutely.net's on-line chart listing ranked by the categories previously described.

**I HEREBY DECLARE** under penalty of perjury, I declare that I have read the foregoing declaration and that the facts stated in it are true

Dated: May 20, 2005.

Keva Labossiere

3339.101/253396.1

4

# EXHIBIT "A"

# cafepress<sup>®</sup>.com

Shop, sell or create what's on your mind.

Your Account  |  Sign In  |  Cart: 0 Items

Home > About Us

**Company Overview**

Historical Timeline

The Team

Press Center

Work at CafePress.com

Contact Us

## Shipping creativity since 1999.



CafePress.com is an online marketplace that offers sellers complete e-commerce services to independently create and sell a wide variety of products, and offers b unique merchandise across virtually every topic. Launched in 1999, CafePress.cc has empowered individuals, organizations and businesses to create, buy and sell customized merchandise online using the company's unique print-on-demand an commerce services. Today, CafePress.com is a growing network of over 2 million members who have unleashed their creativity to transform their artwork and ide into unique gifts and new revenue streams.

Our members have created over 8 million original designs on more than 70 customizable products ranging from apparel, home and office accessories to mus and data CDs and books to prints, posters and cards.

Powering independently-run shops as well as syndicated and corporate stores, w manage every aspect of doing business online, including storefront development hosting, order management, fulfillment, secure payment processing, and quality customer service - enabling anyone to open a free shop with no upfront costs an inventory to manage. CafePress.com is a privately owned, profitable company ba in San Leandro, California.

## CafePress.com Services

**CafePress.com® Marketplace**: In the CafePress.com Marketplace, a dynamic retail experience, visitors will find over 8 million unique items created by membe around the globe. No matter what your passion, there's a product for you.

**Create & Sell<sup>SM</sup>**: Through the CafePress.com Create & Sell service, customers a able to open an online shop to transform their artwork and ideas into new reven streams and diverse products - all with no upfront costs and no inventory to mar

**Create & Buy<sup>SM</sup>**: The CafePress.com Create & Buy service empowers people to personalize their own gifts. Customers can add their own personal touch to more 70 products - all with a few clicks of the mouse.

## Independent Shopkeepers & Major Accounts

CafePress.com is a global and growing network of over 2 million independent
shopkeepers and members in addition to syndicated and corporate stores.
CafePress.com has over 35 major accounts, including ASPCA, United Media, Dilb
Get Fuzzy, Phil Collins and STARTREK.COM. In addition, CafePress.com has strat
agreements with licensors that include more than 80 properties.

## Fun Facts

- Whats Your Passion?$^{TM}$ — politics, babies, music, pets, sci-fi, knitting — th
  something for everyone at CafePress.com
- The CafePress.com web site averages over 6 million unique visits per mon
- Approximately 1000 new, independent shops join the CafePress.com netw
  each day
- Over 1.5 million orders have been shipped to customers spanning the glob
- Roughly 14,000 new, unique items are added each day
- The most popular item is the white t-shirt; nearly half a million white t-shi
  were purchased in the first five years

 Download Fast Facts

To view and print PDF documents, you will need to install the Adobe Acrobat Reader, which can be
downloaded for free through Adobe's web site.

All Content Copyright © 1999-2005 CafePress.com. All rights reserved. Use of this web site
constitutes acceptance of the Terms of Service. Privacy Policy | Intellectual Property Policy



CALL US TOLL
1-877-809-
xlick for service

# EXHIBIT "B"

Back to Googles.com.



**Hey Kids! Hey Adults! Hey Everyone!!** Get your Googles merchandise here at our new store, with all-new merchandise. Also, use our feedback form to email us product suggestions. We know you will enjoy getting these products for yourself and your favorite people!



Googles GooShip Snap
Bib
$6.99



Googles Infant/Toddler
T-Shirt
$9.99



Googles (word) Black Cap
$15.99



Googles (word) Wall
Clock
$11.99



Googles (TM) T-Shirt -
White
$15.99



Googles (word) White T-
Shirt
$15.99







Googles (word) Golf Shirt
$19.99

Googles Baseball Jersey
$17.99

Googles (word) Baseball Jersey
$18.99

  

Googles (TM) Sweatshirt
$24.99

Googles (TM) Mug
$13.99

Googles (word) Mug
$12.99

 

Mousepad
$10.99

Googles (word) Mousepad
$12.99

(C) 2002 Googles.com from Stelor Productions, Inc.

This shop is powered by CafePress.com.
Copyright © 1999-2005 CafePress.com. All rights reserved.
Privacy Policy | Trademark & Copyright Information

# EXHIBIT "C"

From:       <donotreply@cafepress.com>
To:         <kjl@kttlaw.com>
Date:       5/16/2005 1:13:40 PM
Subject:    Thanks for Your CafePress.com Order (Order# 15506967)

Thanks for your recent purchase from CafePress.com!

Your Order Number is 15506967.

You will receive another email with tracking information once your order has shipped.

The details of your order are listed below:

Ship To:
Kenneth R. Hartmann
2525 Ponce de Leon
9th Floor
Coral Gables, FL  33134

305/372-1800
kjl@kttlaw.com

Items:
1 x Googles (word) Black Cap @ $15.99 = $15.99
1 x Googles (TM) Mug @ $13.99 = $13.99
1 x Googles Baseball Jersey @ $17.99 = $17.99
1 x Mousepad @ $10.99 = $10.99
=======================================
Subtotal: 58.96
Shipping: 24.50
TOTAL: 83.46

Using the Credit Card *******2071

REMINDER: All overnight and 2-Day orders will ship next business day.

Print and save this email in case you have any questions regarding your order.
Please note, if you've placed an order for multiple products, there are times
when items are shipped separately due to product parcel configurations.
If you have any questions, please contact our Customer Service Department:

- On the Web at http://www.cafepress.com/cp/info/help/.
- Phone toll-free at 1-877-809-1659

Thanks for shopping at CafePress.com!

- The CafePress.com Team
--------------------------------------
CafePress.com
http://www.cafepress.com
--------------------------------------


-------------------------------------------------------------------------
Open a Shop. Choose from 70+ customizable products ranging from apparel, home

and office accessories to music and data CDs and books to prints, posters and cards.

-------------------------------------------------------------------------

# EXHIBIT "D"

Apple - iTunes - Music Store



**Discover iTunes**

iTunes Jukebox

Import Music

Create Playlists

Share & Stream

Burn CDs

Sync with iPod

**iTunes Music Store**

Easy to Buy

Discover Music

Share Your Taste

Audiobooks


For Mac and Windows


Next Free Single: 05/17

# The #1 music download store.

Open 24/7 on Macs and Windows PCs, the iTunes Music Store has become a smash hit, with music lovers purchasing over 400 million songs worldwide to date. Check out hot exclusives and download a new free single every week. Rate other music lovers' iMixes and upload your own to the store.



**More Than 1.5 Million Songs to Preview, Buy and Download**
Featuring hundreds of thousands of songs from major music companies including EMI, Sony/BMG, Universal, and Warner Bros, the iTunes Music Store offers more than 100,000 new tracks from independent artists and record labels. You'll also find more than 150 exclusive tracks from such artists as Eminem, Gwen Stefani, Bob Marley and Andrea Bocelli, to name just a few. What's more, you'll also find and dozens of out-of-print Motown singles and jazz albums from the Verve Vault, both available digitally for the first time.

**Just 99¢ a Song, Plus Generous Personal Use Rights**
The iTunes Music Store lets you quickly find, purchase and download the music you want for just 99¢ per song. You can burn individual songs onto an unlimited number of CDs for your personal use, listen to songs on an unlimited number of iPods and play songs on up to five Macintosh computers or Windows PCs. And the iTunes software works so smoothly on both platforms that you can share music with any combination of Macs and Windows PCs on a local area network — regardless of whether you're running iTunes on a Mac or PC.

**Browse Music in the Store or from Your Own Library**
You can cruise the store by genre — including Rock, Jazz, Latin, New Age, Inspirational, Opera, R&B/Soul, Reggae and Soundtracks — or by artist or album. Double-click on track listings to hear 30-second, high-quality samples and to see digital album art. Or you can search by entering the name of an artist or composer, or the title of a song — or even part of the title — and clicking the Search button. Even easier, just click a Quick Link on an artist in your library to see the band's entire repertoire. When you find something you like, buy it instantly or save the store preview in a playlist on your Mac or PC.



**Make and Share Musical Discoveries**
Want some help discovering great new music? The iTunes Music Store features crisply-written editorial content, complete with links to music. You can drag and create links to any store page, and even share your new-found



**Key Features**

- Purchase and download songs or albums with music videos; then watch the videos full screen on your Mac or PC
- View additional artist photos
- Browse music by subgenre
- Enhanced Essentials area offers additional ways to discover new music
- "Artist Alerts" notify you when we add music from your favorite artists to the iTunes Music Store
- Search iMixes by title
- More than 1.5 million tracks
- Find out what's playing on more than 1,000 radio stations
- View movie trailers
- Use your AOL account
- Watch music videos
- Share music with up to five Macs and PCs
- Publish an iMix on the store

Apple - iTunes - Music Store

album page. Even better, you can share the playlists you make as an iMix on the store. Rate playlists from other music lovers to move them up and down the charts. See if you rate as a five-star music mixer.

### Discover and Explore

Celebrity playlists will help you discover and explore new music. View playlists hand-picked by celebrities and with one click own all their recommendations. Read what they say about what inspired their playlists. Already have a few of their recommended tracks? No problem: simply use the Buy Now button next to the songs that you don't have. Top Songs and Top Albums lists on the home page let you know what's hot,



DAVE KOZ Celebrity Playlist

and you'll find Top Downloads lists and related music suggestions throughout the store. Did you hear a song on the radio but don't know what it is? Now you can find out what's playing on more than 1,000 stations around the US and buy that catchy tune.

And here's something brand new: some singles and albums now come with a bonus music video. Purchase and download the song or album, and you also get a music video you can watch full screen any time you want.

### Have a Favorite Artist?

If you just love the work of U2, The Beautiful South, Joss Stone or Charlie Parker, you'd probably like to know when one of their songs or albums arrive at the iTunes Music Store. Then you'll be anxious to try out a new store feature. With "Artist Alerts," you'll receive email as soon as music from your favorite artists get added to the Store. It's a great way to stay informed.

### Videos and Movie Trailers

If you have a broadband connection, you can check out the exclusive full-length music videos that you can watch right in the store. If you like what you see, just buy the tune immediately. Or check out the latest movie trailers in full screen, and buy songs from the soundtrack or an associated audiobook. iTunes includes a well-stocked library of best-selling audiobooks — 11,000 titles and counting.

The iTunes Music Store offers everything you need to grow your music collection with ease, give music to friends and family, and expand your musical knowledge in the process. And it's all waiting for you inside the world's best digital jukebox.

#1 music download store according to Nielsen SoundScan.

- Tell a friend about an album via email with cover art
- More than 11,000 audiobooks
- Save store previews in a playlist to purchase later
- Allowance accounts
- Gift certificates

### iTunes Gift Certificates

Just the thing for your favorite college student, a friend or a special occasion, iTunes Gift Certificates (from $10 to $200) are available directly through iTunes or (if you don't have iTunes) the Apple Store.

**Buy Gift Certificates**

### Today's Top Songs

1. **Hollaback Girl**
   Gwen Stefani
2. **Feel Good Inc (Single Edit)**
   Gorillaz
3. **Don't Phunk With My Heart**
   Black Eyed Peas
4. **Incomplete**
   Backstreet Boys
5. **Mr. Brightside**
   The Killers

**Top 100 Songs**

### Today's Top Albums

1. **Stand Up (Bonus Video Version)**
   Dave Matthews Band
2. **Make Believe**
   Weezer
3. **With Teeth**
   Nine Inch Nails
4. **Gimme Fiction**
   Spoon
5. **In Between Dreams (iTunes Version)**
   Jack Johnson

**Top 100 Albums**

Home > iTunes > Music Store

Copyright © 2005 Apple Computer, Inc. All rights reserved.

# COMPOSITE
# EXHIBIT "E"







# EXHIBIT "F"

## MISSION STATEMENT

Our goals are simple. Connect artists and fans directly, create and facilitate economic prosperity, creative freedom and ownership for artists while allowing listeners to explore and discover great new music in the smartest possible way. Our mission is to create an artist-friendly environment where creative communities of music fans can interact with and discover great new music and artists. AWAL also provides useful and vital industry information allowing for self-management techniques and direction..music and artists.

## ABOUT AWAL

Artists are selected by a panel of industry professionals and a board of advisors, promoting quality over quantity.

We, as a new digital industry and company, do not have time to operate at the leisurely 3-5 year pace of traditional strategic planning. The reason for urgency? An explosive combination of faster, cheaper computing power, the ubiquity of the Internet and the availability of readily available capital and entrepreneurs determined to spend it.

Our industry is changing. We can now mediate relationships between artists and their audiences without ever needing to reduce the music to a fixed media. Soon there will be no reason why recorded music ever has to take a physical form. The current industry assets are tied up in manufacturing, packaging and distribution of the physical media. Other entertainment products (movies, books and magazines) are just waiting for the right technologies for delivery.

A recent quote at an online music forum; "music will be the first and single-most important traditional entertainment product on the web because of its low bandwidth requirements and its unique ability to be customized. We need to stop thinking about selling round things. We will be selling songs, albums, multi-song packages, compilations, services, subscriptions, streaming and on and on....".

The Internet allows for an organic way for an Artist to create a community and relationship with fans that is unlike the normal major label/record store/bin-search mentality.

AWAL has at its core, an advisory board made up of professional artists and technicians from all aspects of the industry.

**How it Works**

AWAL will create a new and vibrant user interface for Artist, incorporating Artist's current activity into the AWAL Artists Web Page. AWAL will work with Artist to maintain this site for duration of the relationship. The goal of AWAL is to increase user and fan base of Artist and will provide certain free services to Artist when appropriate, such as; marketing, promotion, PR, creative consulting, distribution, affiliate programs, International distribution etc... The AWAL site has become a tool and "first look" for many major label A&R executives and several AWAL artists have moved on to sign with other labels as a result of their presence here.

**AWAL plans to create a unique approach by building a company that is run by its artists.**

AWAL has successfully launched AWAL Japan (http://awaljapan.co.jp/index_m.html), and other mirrored international sites, and we are working with major distribution outlets both digital and offline, to provide the best opportunities for our network of artists and fans all over the world.

**Submitting Music** .

For now - please send your CD's "snail mail" to the address at the bottom of the page. We listen to everything!

## EXECUTIVE BIOS

**Denzyl Feigelson, Founder, and President**

Denzyl was one of the earliest advocates of music and the Internet, founding Artists Without a Label in early '95. Mr. Feigelson is also the founder of hanaflowers.com and Awal Japan - a Japanese co-venture with AWAL Japan. Denzyl also brings over 20 years of music industry experience working with and managing artists as diverse as Paul Simon, Kenny Loggins, Ladysmith Black Mambaso, Johnny Clegg, John Tesh, Gypsy Kings, Alice Cooper, Luther Vandross & The Pointer Sisters. In the 80's he was influential in helping to establish African artists in the west and helped to facilitate the initial recording sessions for Paul Simon's "Graceland" CD - one of the top selling albums of the decade..

**Michael-Patrick M.Moroney, Board and SVP**

Mr. Moroney has launched some of the most significant interactive Internet sites and services in the 1990's, first as a Producer for Ikonic Interactive and later as a Producer for DAWG, the Digital Artists and Writers Group and at ISL Consulting where he was an Executive Producer responsible for the development and launch of new Internet services for Chevron, NationsBanc Montgomery Securities, Amnesty International/Excite, Banc Boston and Bankers Trust. At these companies and over the last 7 years, Mr. Moroney produced new

About | AWAL

("Hal's Legacy," "Roots and Wings") and helped to prototype Time Inc's "News on Demand". Michael was also the co-founder and President of ArtistOne.com - one of the web's first music services.

**CONTACT INFORMATION**

PO Box 879 Ojai, CA 93024

Tel: 805-640-7399

Fax: 805-646-6077

email: info@awal.com

COPYRIGHT 2005 ARTIST WITHOUT A LABEL
ALL RIGHTS RESERVED

EXHIBIT "G"

## KEVA LABOSSIERE - Your receipt #9372538022

**From:**   iTunes Music Store <do_not_reply@apple.com>
**To:**   <kjl@kttlaw.com>
**Date:**   5/19/2005 8:33 PM
**Subject:**   Your receipt #9372538022

 iTunes                              Receipt

**Billed To:**
Kenneth Hartmann
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134

**Order Number:** M64770801
**Receipt Date:** 05/19/05
**Order Total:** $19.98
**Billed To:** American Express

| Item Number | Description | Unit Price |
|---|---|---|
| Q0015 | One GooWorld | $9.99 |
| Q0015 | Un Goomundo | $9.99 |

| | | |
|---|---|---|
| Subtotal: | $19.98 |
| Tax: | $0.00 |
| Order Total: | $19.98 |

**Please retain for your records.**
Please See Below For Terms And Conditions Pertaining To This Order.

**Apple Computer Inc.**
You can find the iTunes Music Store Terms of Sale and Sales Policies by launching your iTunes application and clicking on Terms of Sale or Sales Policies.

Answers to frequently asked questions regarding the iTunes Music Store can be found at
http://www.apple.com/support/itunes/

**Those who bought your selections also bought:**



Has Been
William Shatner



Off the Wall
Michael Jackson



Frank's Wild Years
Tom Waits

Apple respects your privacy.
Information regarding your personal information can be viewed at http://www.apple.com/legal/privacy/.

Copyright © 2005 Apple Computer, Inc. All rights reserved.

EXHIBIT "H"

# Absolutely.net

contact abs



Shoot a Basket! Win a FREE iPod! CLICK TO SHOOT

| Web Search | | Buy Poster |
|---|---|---|

**EXCLUSIVE:** Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## Netherlands 6 Top Albums in Children's Music

**Homepage**

**What's New**

**Movie Reviews**

**Photo Gallery**

**Download Music** NEW!

**Wallpaper**

**Screensaver**

**Contact Celeb**

**Click on the title to buy and download music.**
**You need iTunes sofware from Apple to play the music.**
**Download Here**

Goo

Site S

**Page: 1**



### 1. Baby Genius: Best of... The IQ Builder! - Baby Genius

*Baby Genius: Best of... The IQ Builder! by Baby Genius*

**Artist**: Baby Genius
**Album**: Baby Genius: Best of... The IQ Builder!
**Copyright**:
**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 10:14:28 -800



### 2. Classical Vitamins - Baby Genius

*Classical Vitamins by Baby Genius*

**Artist**: Baby Genius
**Album**: Classical Vitamins
**Copyright**:
**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 10:14:28 -800



### 3. One GooWorld - The Googles from Goo

*One GooWorld by The Googles from Goo*

**Artist**: The Googles from Goo
**Album**: One GooWorld
**Copyright**: 2004 Stelor Productions
**Released Date**: 05 July 2004
**Published Date**: Sat, 29 Jan 2005 10:14:28 -800



### 4. Kidz Bop Christmas - Kidz Bop Kids

*Kidz Bop Christmas by Kidz Bop Kids*

**Artist**: Kidz Bop Kids

ADVERTI

Absolutely Music Download ... erlands 6 Top Albums in Children's ... sic





For Our
Children
Various Artists
New $13.99!



Classical Music
for Chil...
Johann
Sebastian Bach
New $3.98!
Used $1.99!



Classic Disney
Various Artists
New $42.99!



Music Has The
Right To C...
Boards of
Canada
New $10.99!



Circus Music
from the Bi...
Merle Evans
Circus Band
New $7.98!



Sea Music
Dan Zanes &
Festival Five
Folk
New $13.99!

(Prices May Change)

**Album**: Kidz Bop Christmas
**Copyright**: 2003 Razor & Tie
**Released Date**: 2002
**Published Date**: Sat, 29 Jan 2005 10:14:28 -800



### 5. Smart Play With Classical - Heidi Brende

*Smart Play With Classical by Heidi Brende*

**Artist**: Heidi Brende
**Album**: Smart Play With Classical
**Copyright**:
**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 10:14:28 -800



### 6. TRAVEL SONG SING ALONGS - Kevin Roth

*TRAVEL SONG SING ALONGS by Kevin Roth*

**Artist**: Kevin Roth
**Album**: TRAVEL SONG SING ALONGS
**Copyright**: 2004 STAR GAZER PRODUCTIONS
**Released Date**: 26 February 2004
**Published Date**: Sat, 29 Jan 2005 10:14:28 -800

**Page: 1**



I am a:
Man

Age:
18    to

Zip/Postal :

Find some...

ma
intimate-c

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us



classmates.com    Where Did You Graduate From?

AL AK AZ AR CA CO CT DC DE FL GA HI ID IL IN IA KS
KY LA MA MD ME MI MN MS MO MT NE NV NH NJ NM NY NC
ND OH OK OR PA RI SC SD TN TX UT VT VA WA WV WI WY

Choose
A State

Find
frier

©2005 Absolutely Celebrity Network

# Absolutely.net

contact abs(



| Web Search | | Buy Poster |

EXCLUSIVE: Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## UK 100 Top Songs in Children's Music 3

**Homepage**

Click on the title to buy and download music.
You need iTunes sofware from Apple to play the music.

**What's New**

**Download Here**

Go(

**Movie Reviews**

**Photo Gallery**

**Download Music** NEW!

Page: **1 2 3 4 5 6 7 8 9 10**

Site S

**Wallpaper**

**Screensaver**

**Contact Celeb**



### 21. Being Jewish Is Fun – Judy Caplan Ginsburgh

*Being Jewish Is Fun by Judy Caplan Ginsburgh from the album Havdalah Pajama*

**Artist**: Judy Caplan Ginsburgh
**Album**: Havdalah Pajama
**Copyright**: 2000 Judy Caplan Ginsburgh
**Released Date**: 26 July 2000
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 22. The Cuckoo Waltz – Verne Langdon

*The Cuckoo Waltz by Verne Langdon from the album Circus Clown Calliope!/Circus Clown Calliope!, Vol.2*

**Artist**: Verne Langdon
**Album**: Circus Clown Calliope!/Circus Clown Calliope!, Vol.2
**Copyright**: 1999 Electric Lemon
**Released Date**: 26 October 1999
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 23. The Lion and the Mouse – Michael Mish

*The Lion and the Mouse by Michael Mish from the album Aesop's Fables*

**Artist**: Michael Mish
**Album**: Aesop's Fables
**Copyright**: 2003 MishMashMusic
**Released Date**: 05 June 2003
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 24. Frosty the Snowman – Kidz Bop Kids

ADVERTI




A Child's Celebration of...
Various Artists
New $13.99!


Classic Disney
Various Artists
New $42.99!


The Mozart Effect - Musi...
Leopold Mozart
New $10.98!
Used $3.99!


Smithsonian Folkways Chi...
Various Artists
New $10.99!


Scooby-Doo's Snack Track...
Various Artists
New $14.99!
Used $9.50!


For Our Children

*Frosty the Snowman by Kidz Bop Kids from the album Kidz Bop Christmas*

**Artist**: Kidz Bop Kids
**Album**: Kidz Bop Christmas
**Copyright**: 2003 Razor & Tie
**Released Date**: 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 25. The Syllable I Stress - Los McCroskey

*The Syllable I Stress by Los McCroskey from the album Â¿CÃ³mo? Fun, New Songs for Learning Spanish and Loving God*

**Artist**: Los McCroskey
**Album**: Â¿CÃ³mo? Fun, New Songs for Learning Spanish and Loving God
**Copyright**: 2002 McCroskey Music
**Released Date**: 12 February 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 26. My First Child - Carla Lynne Hall

*My First Child by Carla Lynne Hall from the album My First Child CD Single*

**Artist**: Carla Lynne Hall
**Album**: My First Child CD Single
**Copyright**: 2004 Moxie Entertainment
**Released Date**: 18 April 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 27. Amy - Celeste Krenz, Linda W. Purdy

*Amy by Celeste Krenz, Linda W. Purdy from the album Pirates & Cowboys, More Songs for You & Me*

**Artist**: Celeste Krenz, Linda W. Purdy
**Album**: Pirates & Cowboys, More Songs for You & Me
**Copyright**: 2003 Mountain Creek Records
**Released Date**: 05 January 2003
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 28. It's Raining, It's Pouring - Rain, Rain, Go Away - David Jacobi - Aimee Fischer

*It's Raining, It's Pouring - Rain, Rain, Go Away by David Jacobi - Aimee Fischer from the album Favorite Nursery Rhymes*

**Artist**: David Jacobi - Aimee Fischer
**Album**: Favorite Nursery Rhymes
**Copyright**:
**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 29. Zoomin' - The Googles from Goo

Absolutely Music Download          100 Top Songs in Children's Music                     Page 3 of 3

*Zoomin' by The Googles from Goo from the album One GooWorld*

**Artist**: The Googles from Goo
**Album**: One GooWorld
**Copyright**: 2004 Stelor Productions
**Released Date**: 05 July 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 30. Dudley, a Llama With Attitude - Diane White-Crane

*Dudley, a Llama With Attitude by Diane White-Crane from the album Songs for Llama Lovers*

**Artist**: Diane White-Crane
**Album**: Songs for Llama Lovers
**Copyright**: 2000 Orchard
**Released Date**: 07 March 2000
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800

Page: **1 2 3 4 5 6 7 8 9 10**

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us

classmates·com   **Where Did You Graduate From?**

**Choose A State**          Find frien

©2005 Absolutely Celebrity Network

Absolutely Music Download    K 100 Top Songs in Children's Musi    Page 1 of 5

# Absolutely.net

contact abs



WeightWatchers
Online weight loss from the name you trust.
GO NO

| Web Search | | Buy Poster |

EXCLUSIVE: Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## UK 100 Top Songs in Children's Music 7

Click on the title to buy and download music.
You need iTunes sofware from Apple to play the music.
**Download Here**

Go(

Site S

**Homepage**
**What's New**
**Movie Reviews**
**Photo Gallery**
**Download Music** NEW!
**Wallpaper**
**Screensaver**
**Contact Celeb**

Page: 1 2 3 4 5 6 7 8 9 10



### 61. Bubble Bath - Bill Pere

*Bubble Bath by Bill Pere from the album Songs for Kids With Common Scents*

**Artist:** Bill Pere
**Album:** Songs for Kids With Common Scents
**Copyright:** 2004 KidThink Music
**Released Date:** 12 May 2004
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 62. Twinkle, Twinkle Little Star / Funkel, Funkel Kleiner Stern - Sing and Learn

*Twinkle, Twinkle Little Star / Funkel, Funkel Kleiner Stern by Sing and Learn from the album Sing and Learn German*

**Artist:** Sing and Learn
**Album:** Sing and Learn German
**Copyright:** 2003 Global Village Kids
**Released Date:** 21 December 2003
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 63. Supercalifragilisticexpialidocious - Alvin and The Chipmunks

*Supercalifragilisticexpialidocious by Alvin and The Chipmunks from the album Alvin and the Chipmunks: Greatest Hits - Still Squeaky after All These Years*

**Artist:** Alvin and The Chipmunks
**Album:** Alvin and the Chipmunks: Greatest Hits - Still Squeaky after All These Years
**Copyright:** 1999 Capitol
**Released Date:** 21 September 1999
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800

ADVERTI

Absolutely Music Download.    100 Top Songs in Children's Music    Page 2 of 3




Sea Music
Dan Zanes &
Festival Five
Folk
New $13.99!


Classical Music
for Chil...
Johann
Sebastian Bach
New $3.98!
Used $1.99!


Lullaby
Favorites
Tina Malia
New $6.98!


A Child's
Celebration of...
Various Artists
New $13.99!


Circus Music
from the Bi...
Merle Evans
Circus Band
New $7.98!


Music Has The
Right To C...
Boards of
Canada
New $10.99!

(Prices May Change)



### 64. Americans We - Richard Whitmarsh & South Shore Concert Band

*Americans We by Richard Whitmarsh & South Shore Concert Band from the album Vol. 6 Live in Concert at the 1991 Cfa Convention – Part 1: Sounds of the Circus - Circus Marches*

**Artist**: Richard Whitmarsh & South Shore Concert Band
**Album**: Vol. 6 Live in Concert at the 1991 Cfa Convention - Part 1: Sounds of the Circus - Circus Marches
**Copyright**:
**Released Date**: 02 December 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 65. I Feel Good About Myself - The Googles from Goo

*I Feel Good About Myself by The Googles from Goo from the album One GooWorld*

**Artist**: The Googles from Goo
**Album**: One GooWorld
**Copyright**: 2004 Stelor Productions
**Released Date**: 05 July 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 66. Spiders and Snakes - Two of a Kind

*Spiders and Snakes by Two of a Kind from the album Going On an Adventure*

**Artist**: Two of a Kind
**Album**: Going On an Adventure
**Copyright**: 2002 Two of a Kind
**Released Date**: 15 May 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 67. School Time Blues - David Raitt

*School Time Blues by David Raitt from the album Boys & Girls Club, Vol.1: This Club Rocks! - Spirited Songs for the Whole Family*

**Artist**: David Raitt
**Album**: Boys & Girls Club, Vol.1: This Club Rocks! - Spirited Songs for the Whole Family
**Copyright**: 2000 Russian River Records
**Released Date**: 1999
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 68. Hey, Diddle Diddle - David Jacobi - Aimee Fischer

*Hey, Diddle Diddle by David Jacobi - Aimee Fischer from the album Favorite Nursery Rhymes*

**Artist**: David Jacobi - Aimee Fischer
**Album**: Favorite Nursery Rhymes
**Copyright**:

WINI
WINI
WINI
You
WC
FR
gas
a ye

Click
to cl

'See offe
© 2005 Even

Released Date: 02 December 2004
Published Date: Sat, 29 Jan 2005 03:39:19 -800



### 69. Listen to Your Grandpa - Julie Ingram

*Listen to Your Grandpa by Julie Ingram from the album Kids...That's What It's All About*

**Artist**: Julie Ingram
**Album**: Kids...That's What It's All About
**Copyright**: 2002 Long Shot Records
**Released Date**: 31 December 2002
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800



### 70. Puddle Stomping - Bo Diddley

*Puddle Stomping by Bo Diddley from the album Moochas Gracias*

**Artist**: Bo Diddley
**Album**: Moochas Gracias
**Copyright**: .
**Released Date**: 2004
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800

Page: 1 2 3 4 5 6 7 8 9 10

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us

| Vonage-Official site | Vonage VoIP Phone Service | Unlimited long distance | VOIP |
|---|---|---|---|
| Vonage broadband phone service Calling plans start at just $14.99 http://vonage.com/ | Great rates with many free features http://vonage.com/ | Unlimited to US/Canada $24.99/month http://vonage.com/ | Great rates with many features service, starting at just http://vonage.com/ |

Spon

©2005 Absolutely Celebrity Network

# COMPOSITE
# EXHIBIT "J"

FROM : SILVERS ENT                    FAX NO. : 5617849959                May. 19 2005 12:15PM P2

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 6/1/02 to 6/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/17/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/02 to 9/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/18/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 4/1/03 to 3/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts To Customers | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____     Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 10/1/02 to 12/31/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts To Customers | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct 02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____     Date 11/17/03

FROM : SILVERS ENT                FAX NO. : 5617849959        May. 19 2005 12:16PM P4

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/03 to 9/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 4/1/03 to 6/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| May-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Jun-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 1/1/04 to 3/31/04

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _[signature]_    Date 4/28/04

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 10/1/03 to 12/31/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _[signature]_    Date 12-23-03

FROM : .SILVERS ENT                FAX NO. : 5617849959          May. 19 2005 12:17PM P6

Proprietary and Confidential

**Steve Silver's Royalty Schedule**

| Country: | All Countries | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period: | 4/1/04 | to | 6/30/04 | | | | | | | |
| Month | Description | | | | | | | | Royalty Rate | Amt. Of Royalty |
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |

**Total:**

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____

Date  7-1-04

# EXHIBIT "K"






**The Global Marketplace for Leveraging Brand Equity**

| TO ATTEND | TO EXHIBIT | CONFERENCE & EVENTS | C |

Home
General Information
Visitor Information
  > To Attend
  > Exhibitor List
  > Print Exhibitor List
  > Floor Plan
Exhibitor Information
  > To Exhibit
  > Attendee Overview
  > Marketing Plan
  > Floor Plan
  > Ancillary Marketing
  > Exhibitors Only
Conference & Events
  > Pricing & Registration
  > Seminar Overview
  > At-A-Glance
  > Speaking
    Opportunities
  > Special Events
Press Information
  > Request Press
    Material
  > Media Information
  > Press Releases
Hotel & Travel
Contact Us



REAL PEOPLE. REAL PROFITS. REAL RESULTS.

**525 Exhibitors.**

**5,700 Properties, Brands and Original Designs available for licensing.**

**20,000+ Manufacturers, Retailers, Marketers and Licensing Professionals.**

**Trend-spotting, Networking, Education, Deal-making.**

**Explore opportunities in wireless and digital entertainment at the Mobile & Digital Licensing Summit, co-located with Licensing 2005 International**

**WHERE BRANDS ARE BUILT AND DISCOVERED YEAR AFTER YEAR.**

See the [Photo Gallery]



**Produced by:**



**Show Sponsored by:**



**Official Publication:**



# EXHIBIT "L"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

     Plaintiff,                    Case No. 05-80393-CIV-HURLEY

v.

STEVEN A. SILVERS, a Florida resident,

     Defendant.

---

## DECLARATION OF GAIL A. MCQUILKIN

I, GAIL A. MCQUILKIN, declare under penalty of perjury that the following is based upon my personal knowledge and is true and correct, and that all emails and letters attached as Exhibits are true and correct copies.

1.     I am a partner and managing shareholder in the firm of Kozyak Tropin & Throckmorton, counsel for defendant, Steven A. Silvers ("Silvers").    I was also counsel for Silvers in the prior action before this Court entitled Stelor Productions, Inc. v. Steven A. Silvers, Civil Action No. 04-80954 (the "District Court Action").

2.     I am the attorney who has been primarily involved in the dispute between Silvers and Stelor Productions ("Stelor"), and the person with the most personal knowledge of the communications between this office and Stelor's counsel.

3.     I was unable to attend the May 23, 2005 preliminary injunction hearing before Magistrate Judge Hopkins due to a prearranged trip out of the country from May 13 – 31.   Prior to my departure on this trip, I had a telephone conversation with Stelor's counsel, Kevin Kaplan, in which I informed him that I was leaving to go out of the country. Mr. Kaplan asked me if I was attending the hearing.  I informed him that I was not, but that my partner Ken Hartmann would be there.  On the morning of the hearing, Stelor filed a lengthy declaration from its

1

president, Steven Esrig, and one from Mr. Kaplan, containing a few emails from me that they represented to be the bulk of my communications regarding Stelor's performance under the Settlement Agreement. Esrig also attributed several unsubstantiated statements to me, which were untrue. And, as shown below, these emails were but a small fraction of the dozens of emails I had exchanged with Mr. Kaplan, and Stelor's prior counsel, asking for Stelor to comply with the Settlement Agreement.

4.      This declaration is submitted in support of Silvers' Objection to the Magistrate Judge's Report and Recommendation, and to provide the Court with the true facts that support Silvers' lawful right to terminate the License Agreement.

## I.     Silvers Initial Right To Terminate the License Agreement

5.      Paragraph V (A) and (C) of the License Agreement between Silvers and Stelor Productions ("Stelor") gives Silvers, the Licensor, the right upon 30 days notice to audit the books and records of Stelor. *See* Exhibit A. On November 5, 2004, I sent notice to Stelor that Silvers wanted the audit and sought for a date that the audit can take place. *See* Exhibit B. On or about November 10, 2004, Stelor's counsel informed me that Stelor would not permit the audit.

6.      The License Agreement also gives Silvers the contractual right to terminate the License Agreement once he provides Stelor with notice that it is in breach, and gives Stelor 60 days to cure the breach. *See* Exhibit C. On November 12, 2004, I sent Stelor the requisite 60-day notice of its numerous breaches of the License Agreement, the failure to permit the audit being just one of many breaches. *See* Exhibit D.  This letter was not "notice of termination of the License Agreement" but notice to Stelor that it had 60 days to cure its breaches as required under the License Agreement, in order to remain as licensee.  In fact, this provision gives Silvers 60-days to consider whether he will exercise the option to terminate.

7.      Stelor failed to cure a single breach within the 60-day cure period.  On January

2

11, 2005, Silvers exercised his right to terminate the License Agreement, and on January 13, 2005, I sent Stelor a notice of termination of the License Agreement advising it that the post-termination provisions now controlled. *See* Exhibit E.

## II.    The Settlement Agreement

8.      Once terminated, Stelor's counsel approached me to negotiate a settlement. I worked with Stelor's then counsel, Yano Rubinstein, Esq., to negotiate the dispute, including the pending claims each party had filed against the other in the District Court Action. I participated in drafting the Settlement Agreement between the parties that was executed on January 28, 2005. *See* Exhibit F.

9.      In the Settlement Agreement, the parties preserved their positions and claims asserted in the District Court Action. As reflected in the fifth WHEREAS clause in the Settlement Agreement, the parties intended that only by virtue of Stelor's full performance of its obligations under the Settlement Agreement would Stelor's breaches of the License Agreement be considered cured.

10.     Consistent with this intent, in paragraph 3 of the Settlement Agreement, Silvers agreed to "withdraw his notice of termination of the Licensing Agreement." Stelor acknowledges that the notice of termination of the License Agreement is the January 13, 2005 letter. Silvers *never* agreed to withdraw his 60-day notice to Stelor regarding its breaches or to provide Stelor with a second 60-day cure period if it did not perform under the Settlement Agreement. Silvers agreement to withdraw the termination was premised entirely upon Stelor's full performance under the Settlement Agreement. That is why there is no release provision in the Settlement Agreement or a provision requiring Silvers to give additional notice to Stelor of its failure to perform, or an additional cure period. The Settlement Agreement is terminable at will, and if terminated the parties are simply restored to their pre-settlement position.

11.    Esrig's sworn statement that this dispute was "entirely resolved by the parties, pursuant to the Confidential Settlement Agreement," and by virtue of "a stipulation of dismissal with prejudice" of the District Court Action, is patently false.    Silvers agreed to dismiss his claims against Stelor **without prejudice** to protect his right to re-file an action against Stelor if necessary.    And that is what this Court expressly ordered.    *See* Exhibit G.

III.    **Stelor Refuses To Adhere to The Settlement Agreement**

A.    The Audit

12.    Esrig's sworn statement that the first time I asked for an audit after the Settlement Agreement was April 22, 2005 is completely false.    Starting February 1, 2005 - two days after the Settlement Agreement was signed – until April 26, 2005, the day before Silvers reinstated the termination, I repeatedly asked for an audit date.    Stelor either refused to respond, or stonewalled.

13.    On February 1, 2005, I sent an email to Mr. Rubinstein, Stelor's counsel, asking him to, among other things, provide a date for the audit.    *See* Exhibit H.    Two weeks later on February 15, 2005 I sent another email to Mr. Rubinstein asking him whether he had confirmed a date for the audit.    *See* Exhibit I.    Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

14.    I received no response confirming an audit date.    A week later on February 22, 2005, I sent an email to Mr. Rubinstein asking him for, among other things, a date for the audit.    *See* Exhibit J.    Another week passed without a response to my request for an audit date.

15.    On or around March 1, 2005, I learned that Mr. Rubinstein was no longer representing Stelor, and that I should communicate with Mr. Kaplan, Stelor's then local counsel.    On March 2, 2005 I sent an email to Mr. Kaplan advising him that Stelor needed to provide a date for the audit.    *See* Exhibit K.    Portions of the email are redacted to protect confidential

4

litigation strategy relating to Google, Inc.

16.    On March 5, 2005, I received a response from Mr. Kaplan that Stelor will provide an audit date prior to March 15. *See* Exhibit L.

17.    On that same day I sent a reply email letting Mr. Kaplan know that they must comply with the audit request immediately, giving him three days to provide us with an audit date. *See* Exhibit M. Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

18.    Stelor did not provide me with an audit date within three days, and did not provide an audit date by March 15, 2005 as stated by Mr. Kaplan in his March 5, 2005 email. Over the next five days I called Mr. Kaplan about the audit but he would not confirm a date. On March 22, 2005, I sent another email to Mr. Kaplan again asking for a date for the audit. *See* Exhibit N.    Stelor continued to stonewall, and rather than cooperate and provide me with an audit date, Mr. Kaplan responded to me that he wanted to see a document that would confirm the scope of the audit. *See* Exhibit O. That same day I responded to Mr. Kaplan informing him that the scope of the audit is set out in the License Agreement. *See* Exhibit P.

19.    Tired of Stelor's stonewalling, I told Mr. Kaplan in a telephone conversation that the audit would take place on April 26, 2005 and asked for confirmation that the auditor would be permitted onsite at Stelor. He told me he would check with Stelor and get back to me. On or about April 10, 2005, I had a telephone conversation with Mr. Kaplan in which he informed me "Stelor was going through some personnel changes" and April 26, 2005 would not work, but did not suggest alternate dates. It had now been almost 90 days since the Settlement Agreement was executed and Stelor was still refusing to cooperate with the audit.

20.    While I was patiently waiting for Stelor to cooperate with the audit, I was working on a draft complaint against Google, Inc. for trademark infringement. I needed Stelor's

5

cooperation in providing me information about the work it did to develop the Gootopia Website and related projects. As reflected in my email to Mr. Kaplan dated April 7, 2005, by this date Stelor had not provided me this information. *See* Exhibit Q.

21.    On or about April 11, 2005 I had a telephone conversation with Mr. Kaplan in which I told him that Silvers would reinstitute the termination of the License Agreement if Stelor continued to refuse to adhere to its obligations under the Settlement Agreement, including providing me with a date for the audit. That evening, I received an email directly from Esrig in which in advised me that the Stelor board was not interested in "adherence to the license and settlement agreement" and that that he would be happy to see us "finance Mr. Silvers' next lawsuit with Stelor." He also informed me that only when I provide them with a copy of the draft complaint against Google, Inc. I had drafted would Stelor comply with their obligations to Silvers under the Settlement Agreement. *See* Exhibit R.

22.    On April 12, 2005, in response to Mr. Esrig's email, I sent a lengthy email to Mr. Kaplan explaining that: (a) I had no obligation to provide my work product to them; (b) why a complaint of this magnitude takes time to develop; (c) asking that Esrig not contact me directly; (d) asking Stelor to please comply with its obligations under the Settlement Agreement; and (e) once again for Stelor to cooperate by providing me information I needed to prepare the complaint. *See* Exhibit S. Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

23.    On April 13, 2005, I sent an email to Mr. Kaplan again asking for a response for the audit date letting him know that Silvers was very frustrated with Stelor's non-performance. *See* Exhibit T.

24.    On Friday April 22, 2005, I sent an email to Mr. Kaplan once again attempting to persuade him to provide a date for the audit by suggesting possible dates. *See* Exhibit U.    That

6

same day Mr. Kaplan responded that he now had several boxes of information from Stelor for the complaint, but completely ignored my question about the audit dates. *See* Exhibit V. I promptly replied to Mr. Kaplan's email asking about the audit dates. *See* Exhibit W. Mr. Kaplan responded by saying he had passed this on to Esrig, but giving no indication what that meant. *See* Exhibit X.

25.     On Monday April 25, 2005, I received an email from Mr. Kaplan that contained no response to my last request for an audit date. *See* Exhibit Y. Promotly, I responded to Mr. Kaplan again asking for the audit date. *See* Exhibit Y. I received an email response from Mr. Kaplan that once again ignored my question about the audit date, but demanding to know when the complaint I was drafting would be ready. *See* Exhibit Y. On April 26, 2005, I received a lengthy email from Mr. Kaplan but it made no mention of an audit date. *See* Exhibit Z.

B.     Samples of Licensed Product

26.     Paragraph VI-C of the License Agreement requires that before commencement of the manufacture and sale of Licensed Product, Stelor shall provide Silvers with a reasonable number of samples of all such Licensed Product and all related advertising and promotional materials. *See* Exhibit AA. Licensed Product is defined in comprehensive terms. *See* Exhibit AA, page 2.

27.     Stelor's repeated failure to provide samples of Licensed Product and advertising and promotional materials to Silvers was one of the many breaches that led Silvers to terminate the License Agreement.

28.     Under paragraph 15 of the Settlement Agreement, Stelor agreed to cure this breach and provide Silvers with samples of the products it was offering for sale. *See* Exhibit F.

29.     On March 2, 2005, I sent an email to Mr. Kaplan asking him for the samples. *See* Exhibit BB, page 2. On March 5, 2005, Mr. Kaplan sent an email to me stating, "there are no

7

such samples, as Stelor is not yet offering any product for sale." *See* Exhibit CC. Skeptical of the truth of that statement, I responded to Mr. Kaplan that Stelor needed to provide us with that statement signed under oath. *See* Exhibit DD.

30. On March 8, 2005, Esrig provided a sworn declaration that Stelor had no products offered for sale "except for the music available on [I]tunes." *See* Exhibit FF. Because Stelor had never reported such sales on any royalty statement, I asked Stelor to provide proper royalty statements for the last two quarters of 2004 to reflect the Itunes sales. When Stelor failed to provide such royalty statements, Silvers tried to uncover the sales through Itunes. He discovered that the Googles music was one of the world's most downloaded children's songs. *See* Exhibit EE. Yet, Stelor had not reported a single penny of sales or provided Silvers with any statements as required under the License Agreement.

31. And, contrary to Esrig's sworn statement, Silvers discovered that Stelor had been offering Googles merchandise for sale online through Cafepress.com since 2002 yet he had never been provided a single sample of the merchandise. On March 9, 2005, I notified Mr. Kaplan about the discrepancy between Esrig's sworn statement and what we had discovered. *See* Exhibit GG. Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

32. On or about March 20, 2005, Silvers discovered that Stelor had placed an advertisement relating to its appearance at the upcoming 2005 International Licensing Show in which it references the launch of a totally new web site. On March 23, 2005, I called Mr. Kaplan and asked him why Silvers had not been provided with the advertisement. Mr. Kaplan asked me to send him the advertisement, which I did. *See* Exhibit HH. I received no response.

33. Other than two CDs and one color folder, I received no samples of Licensed Product from Stelor. Esrig's sworn statement that Mr. Kaplan advised me on April 26, 2005

that samples were in his office for review is absurd. Mr. Kaplan's April 26, 2005 email refers to the information I had been waiting for from Stelor to complete the general allegations in the draft complaint against Google, Inc. *See* Exhibit Z. The relevant email exchange between Mr. Kaplan and myself is attached as Exhibits W, Y and Z.

C.    Reimburse Silvers For Past Health Insurance Payments

34.    Paragraph 10(c) of the Settlement Agreement required Stelor to reimburse Silvers for health insurance payments he had made to Aurora Collections during his tenure as consultant to Stelor within 15 days of providing some form of proof of payment. See Exhibit F. Because Silvers did not have canceled checks, Brian Blumquist of Aurora Collections complied a very detailed chart listing the payments made by Silvers to Aurora. On February 15, 2005, I sent Mr. Rubinstein an email attaching the chart. *See* Exhibit II. I received no confirmation that payment would be made. On February 22, 2005, I sent an email to Mr. Rubinstein asking him to please confirm that payment to reimburse Silvers would be sent by the end of the month. See Exhibit JJ. Still, no payment.

35.    After I learned that Mr. Kaplan had replaced Mr. Rubinstein as Stelor's counsel, I sent an email to him on March 2, 2005 again attaching the chart of payments provided by Aurora Collections and asking when reimbursement for these payments would be sent. *See* Exhibit KK.

36.    On March 3, 2005, I sent an email to Mr. Kaplan again asking him when we would receive the payment to reimburse Silvers for the insurance premium payments. *See* Exhibit LL. On March 5, 2005, Mr. Kaplan responded to my email by saying that "Stelor finds the chart confusing" and asking for additional proof of payment. *See* Exhibit MM.

37.    On March 5, 2005, I sent an email to Mr. Kaplan refuting that the chart is confusing, and giving Stelor 3 additional days to comply with this provision of the Settlement Agreement. *See* Exhibit NN.

9

38.    In mid-March, Mr. Kaplan told me that Stelor now wanted a statement from Brian Blumquist confirming that Silvers had made these payments. On April 1, 2005, I provided to Mr. Kaplan a copy of a letter Mr. Blumquist sent to me electronically. *See* Exhibit OO. The letter invited Mr. Kaplan or Stelor to call him if they needed additional information.

39.    Continuing to stonewall, Mr. Kaplan added another condition, requesting that he be provided an actual signed letter even though the letter was clearly an electronic communication. I responded to Mr. Kaplan that he should call Mr. Blumquist to verify this letter. This email exchange is attached as Exhibit PP.

D.    Advance Royalty Payments

40.    Under paragraph 10 (a) and (b) of the Settlement Agreement, Stelor was required to pay Silvers by the first of the month beginning February 1, 2005, two monthly royalty advances: one for $5,000 and one to cover the cost of Silvers' health care premiums. *See* Exhibit F.

(i)    The $5,000 Monthly Advance

41.    Immediately after the Settlement Agreement was executed, on February 1, 2005, I sent an email to Mr. Rubinstein telling him to have all checks for Silvers made out to Silvers Entertainment Group. *See* Exhibit QQ. On February 7, 2005, I received a check from Stelor for the $5,000 royalty advance required under paragraph 10(a) of the Settlement Agreement - the check was made out to Steven Silvers rather than Silvers Entertainment Group as instructed by me six days earlier. I called Mr. Rubinstein and he instructed me to send the check back to Stelor to the attention of Mike Sagan. *See* Exhibit RR.

42.    By February 22, 2005, I had yet to receive the first payment Stelor was obligated to make under paragraph 10(a). On February 22, 2005, I sent an email to Mr. Rubinstein asking

him to confirm that February's payment was sent, and that we would have the March payment on time. *See* Exhibit SS.

43.     After learning the Mr. Kaplan had replaced Mr. Rubinstein, on March 2, 2005, I sent an email to him advising him that Stelor had not sent the $5000 checks for February and March. *See* Exhibit TT. I followed this email with another email on March 3, 2005 making the same inquiry. *See* Exhibit UU.

44.     On the afternoon of March 3, 2005, I finally received the $5,000 payments for February and March.

45.     On April 5, 2005, five days late, I received the April $5,000 payment. A copy of the Federal Express package containing the check is attached as Exhibit VV. The check, however, was once again made out to Steven Silvers, not Silvers Entertainment Group as previously requested. On April 7, 2005, I sent an email to Mr. Kaplan asking the status of the payments owed to Silver. *See* Exhibit WW. On April 8, 2005, I sent an email to Mr. Kaplan again asking about the payment and asking why Stelor continues to make out the checks to Silvers in his own name, rather than as we instructed twice before. *See* Exhibit XX.

46.     On April 8, 2005 I received an email from Stelor's administrative person stating that a replacement check would be sent out. *See* Exhibit YY

47.     On April 11, 2005, I received an email from Esrig stating that Stelor would not make the payments owed to Silvers unless I provided them a copy of the complaint I was drafting against Google, Inc. *See* Exhibit ZZ.

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

(ii)    The Health Insurance Premium Payment

48.    Esrig's sworn statement that Silvers was required to provide Stelor with evidence of paid premiums before Stelor is obligated to make the second payment under paragraph 10 (b) of the Settlement Agreement is intentionally misleading. There is no such language in paragraph 10(b). *See* Exhibit F. Furthermore, we advised Stelor on February 15, 2005 what the current premium was. *See* Exhibit AAA.

49.    After learning that Mr. Kaplan had replaced Mr. Rubinstein, on March 2, 2005, I sent an email to him with the chart prepared by Aurora Collections showing the current premium amounts and advising him that we had not received payment for February or March. *See* Exhibit BBB. On March 3, 2005, I sent another email to Mr. Kaplan asking for response on the status of the payments. *See* Exhibit CCC. That afternoon I received checks from Stelor for the two missing $5,000 payments, but nothing for the health care premiums. On March 5, 2005, I sent an email to Mr. Kaplan advising him that we had not received the 10(c) payment. *See* Exhibit DDD.

50.    On or around the beginning of April, Mr. Kaplan informed me that Stelor now determined that they would require Silvers to sign a declaration that he needed $1,000 per month to maintain his health insurance coverage before they would make the payments. On April 5, 2005, I sent Mr. Kaplan that declaration. *See* Exhibit EEE.

51.    On April 7, 2005, I sent an email to Mr. Kaplan asking him the status of the checks. *See* Exhibit FFF. I received no response.

52.    On April 8, 2005, I sent an email to Mr. Kaplan again asking for the February, March and now April insurance premium payments. *See* Exhibit GGG.

53.    On April 11, 2005, I received an email from Esrig stating that Stelor would not make the payments owed to Silvers unless I provided them a copy of the complaint I was

12

drafting against Google, Inc. *See* Exhibit HHH.

54.    On April 14, 2005, Stelor finally sent the payments owing for February and March, but neglected to send the April payment. On April 17, 2005, I sent Mr. Kaplan an email confirming that I received two payments but that Stelor owed another payment for April. *See* Exhibit III. I received no response to my email.

E.    Stelor Has Refused to Perform Other Obligations Under the Settlement

55.    Stelor has not provided to me Silvers' unit interest in Stelor LLC as required under paragraph 9 of the Settlement Agreement.

56.    Stelor has not provided to me certified royalty statements for the third and fourth quarter of 2004 as required under paragraph III-A of the License Agreement.

## IV.    Silvers Reinstates His Termination of The Licensed Agreement

57.    By April 26, 2005, more than 90 days had passed and Stelor had not cooperated with the audit (in fact, it had been over 4 months since our initial audit request), and had simply refused to cure its breaches of the License Agreement by full performance under the Settlement Agreement. Accordingly, Silvers exercised his right to reinstate his notice that the License Agreement is terminated. On April 27, 2005, I sent a letter to Stelor similar to the one I had sent on January 13, 2005, to advise Stelor that the License Agreement was terminated and the post-termination provisions controlled. See Exhibit JJJ.

58.    True to Stelor's past performance of refusing to comply with its obligations until the License Agreement is terminated, Stelor's counsel sent a letter to me on April 29, 2005 offering to perform **if** Silvers withdrew the termination. *See* Exhibit KKK.

Dated:  June 15, 2005

Gail A. McQuilkin

9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _17_ day of June, 2005, to: Kevin C. Kaplan, Daniel F. Blonsky and David Zack at Burlington Weil Schwiep Kaplan & Blonsky, P.A., 2699 S. Bayshore Drive, Penthouse A, Miami, FL 33133.

3339.101/254343.1

14

Exhibit A

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

2



# Exhibit B

Cozyak Tropin & Throckmorton, P.
2525 Ponce de Leon, 9ᵗʰ Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Overnight Delivery
Federal Express Tracking No. 7903-2948-5586

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

     Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

     We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products. In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.     All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent, that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.     All sublicenses;

3.     All copyright and trademark registration applications and registrations;

4.     All domain name registrations;

5.     All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.     Proof of insurance as required under Paragraph XIV.

Page 2


In addition, Mr. Silvers is requesting that a number of samples of all Licensed Products manufactured, or in production be produced during this audit.

You, or your counsel, should schedule and coordinate the audit through us by providing us with a date and location.

Very truly yours,

Gail A. McQuilkin

c:    Steven Silvers
      Kenneth R. Hartmann, Esq.

/245617.1

Exhibit  C



## VIII. INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time, during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties, including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A.    Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach



# Exhibit D

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 53134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

> Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.     Failure to pay royalties under paragraph III (A);

b.     Failure to provide a written certified royalty statement under paragraph III (C);

c.     Failure to provide a list of all sub licenses under paragraph III (C);

d.     Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.     Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.     Failure to provide samples of all Licensed Products you intend to manufacture and sell; and all promotional and advertising materials associated with those products under paragraph VI (C);

g.     Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

h.     Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

Page 2

i.       Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googlesgames.com, and googlegame.com, under paragraph VIII;

j.       Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

k.       Failure to oppose trademark applications for the name Google s, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

l.       Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

a.   Failure to pay Mr. Silvers consultancy fees and expenses;

b.   Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

c.   Making unauthorized statements and representations on behalf of Mr. Silvers; and

d.   Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:      Steven A. Silvers
        Laurence Hefter

/245615.1

Exhibit  E

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

      Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

      As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

      Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

      Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

      Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2


Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:     Steven A. Silvers
       Laurence Hefter
       Yano A. Rubinstein
       William Borchard

/248587.1

Exhibit F

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by Stelor Productions, Inc. ("Stelor") and Steven A. Silvers ("Silvers"). Stelor and Silvers are collectively referred to herein as "the Parties."

WHEREAS, Stelor brought a complaint in the United States District Court for the Southern District of Florida (Case No. 04-80954-CIV-HURLEY) against Silvers alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers brought a counter-complaint against Stelor alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers on January 13, 2005 sent a notice of termination of the Licensing, Distribution and Manufacturing Agreement to Stelor;

WHEREAS, Stelor has invested substantial time, effort, and money in developing a business involving the GOOGLES IP and fully intends to continue developing and commercializing such business, including sub-licensing some or all of the GOOGLES IP;

WHEREAS, the Parties intend that full performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other Party, and

WHEREAS, the Parties wish to resolve all of the foregoing disputes to their mutual satisfaction.

//

//

1

SILVERS_____                                         STELOR_____

THEREFORE, the Parties hereby agree as follows:

1. <u>Domain Name Administration:</u>

    a.  Silvers shall give Stelor, as the administrative contact for the GOOGLES IP domain names, the right to control the DNS records and make changes to the administrative contact information for all GOOGLES IP domain names, and shall advise the domain name registrar known as godaddy.com to this effect. Silvers will provide proof that Stelor has such rights no later than February 15, 2005. Silvers shall cooperate with any other request from Stelor regarding necessary administrative issues relating to the domain names, and all communications by Silvers, relating to domain names, shall be through Kozyak Tropin and Throckmorton ("KTT").

    b.  KTT will create and control a domain name renewal database to ensure timely renewal of domain names owned by Silvers, and will communicate with Stelor's counsel regarding any deadlines or other administrative issues.

2. <u>Pending and Future Actions Relating to the GOOGLES IP:</u>  Silvers will cooperate with Stelor and Stelor's counsel in all respects in pending and future trademark and domain name dispute proceedings filed by Stelor, including but without limitation, providing any and all documents and other evidence needed to support Stelor's position.

3. <u>The License. Distribution and Manufacturing Agreement:</u>  Silvers withdraws his notice of termination of the License Agreement, and reaffirms his obligations under

2

SILVERS_____

STELOR 

the License Agreement.

4. <u>Post-Settlement Communications:</u>   Silvers shall communicate with Stelor solely through KTT.

5. <u>USPTO Correspondent of Record:</u>   Silvers shall change the correspondent on all GOOGLES IP trademark applications and registrations to the name of Stelor's counsel no later than February 15, 2005, and shall not change the correspondent in the future as long as the Licensing, Manufacturing and Distribution Agreement is in effect.  Stelor's counsel shall copy KTT with all correspondence to and from the USPTO

6. <u>Sale or Assignment of the GOOGLES IP:</u>  KTT and Stelor's counsel shall include each other in any and all negotiations and discussions with Google Inc. that relate to resolving the pending trademark and domain name disputes or the sale or assignment of the GOOGLES IP.

7. <u>Domain Name Renewal Expenses:</u>   Stelor agrees to reimburse Silvers for documented expenses incurred to date in renewing GOOGLES IP domain names. Future GOOGLES IP domain name renewal expenses will be reimbursed by Stelor. All requests for reimbursement will be submitted by KTT to Stelor, and all payments by Stelor will be sent to Silvers through KTT.

8. <u>Options Acknowledgement:</u> Stelor agrees that it will confirm in writing that no additional options have been granted that would obligate it to provide such options under the now expired Letter Agreement.

9. <u>LLC Acknowledgement:</u> The Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC. Any options granted

SILVERS_____                        3                        STELOR 

to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of

unit interests under the LLC.

10. <u>Royalty Advances:</u>

    a.  For as long as the Licensing, Distribution and Manufacturing Agreement

        is in effect, Stelor shall advance Silvers $60,000 a year against future

        royalties. The advance will be made in equal monthly installments

        payable on the first of each month beginning February 1, 2005.

    b.  For as long as the Licensing, Distribution and Manufacturing Agreement

        is in effect, Stelor will provide Silvers with an additional monthly advance

        on expected future royalties equivalent to that amount required by Silvers

        to maintain his insurance coverage through the Aurora Collection, Inc. (or

        other insurance or medical provider of Silvers' choosing), as long as such

        coverage is offered. Such advance will not exceed $1,000 per month.

    c.  Stelor will reimburse Silvers for insurance premiums through the

        expiration of the "Letter Agreement," not to exceed $4,000. Such

        reimbursements will be provided to Silvers within 15 days of Stelor

        receiving evidence of paid premiums.

11. <u>Recoupment and Termination of Royalty Advances:</u>   Royalties advanced under this

Agreement will be recaptured by Stelor once royalty payments exceed the amount

specified in paragraph 10. Such deductions will not exceed 20% of any given royalty

payment.

12. <u>Royalty Statements:</u>   Stelor shall confirm in writing that no royalty payments are

outstanding, and thus no royalty statements are due.

SILVERS_____

4

STELOR



13. <u>Trademark Registrations:</u>  Stelor shall provide to Silvers through KTT proof that all applications and registrations for trademarks and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement filed by or on behalf of Stelor show Silvers as the owner.

14. <u>Audit:</u>  Stelor shall cooperate in the audit of the books and records of Stelor by Aronson and Company onsite at Stelor Productions as per section IV of the Licensing, Distribution and Manufacturing Agreement.  Any information obtained by the auditor will be restricted to KTT , on an "attorneys' eyes only" basis and the identity of any licensee, sub-licensee, vendor, or any other third-party shall remain confidential.

15. <u>Licensed Products Samples:</u>  Stelor shall provide Silvers through KTT samples of any Licensed Product that is being offered for sale.

16. <u>USPTO Correspondence:</u>  Stelor's counsel shall keep KTT advised as to the status of any pending or future trademark or domain name disputes filed by Stelor against Google Inc. by copying KTT on all pleadings and correspondence, and by giving notice to KTT of any other trademark or domain name disputes filed against Google Inc.

17. <u>Reservation of Jurisdiction:</u>  The Parties agree to submit to the exclusive continuing jurisdiction of the United States District Court, Southern District of Florida, for enforcement of all provisions of this Agreement.  In the event that a dispute arises concerning the obligations of any Party under this Agreement, the Parties agree to submit any such dispute to this court for resolution.  The successful or prevailing party (as determined by the Court) shall be entitled to recover its reasonable attorneys'

SILVERS_____

5

STELOR 

fees and other costs incurred in that litigation from the unsuccessful or non-prevailing party in addition to any other relief to which the prevailing party might be entitled.

18. <u>Injunctive Relief:</u> The Parties hereby agree that there is no adequate remedy of law in the event that either party negotiates or settles the disputes with Google Inc. without the other party. In the event that either party attempts to negotiate with Google Inc. without the other party's participation, that shall be a breach of this Agreement, and such breach will create irreparable harm, and that injunctive relief will be necessary to maintain the rights of the non-breaching party. Accordingly, each party agrees to such injunctive relief.

19. <u>Joint Settlement Negotiations with Google Inc.:</u>

    a.  In view of the current existence of litigation and proceedings in the TTAB, jointly referred to as "Litigation", the parties recognize the need to resolve this Litigation reasonably such that Stelor can continue to develop and promote its business.

    b.  Due to the present status of development of Stelor's business, any event that causes Stelor to delay offering its web-based service to the public will cause severe injury to Stelor. Silvers therefore agrees that, in the event of a settlement with Google Inc., he will not object to Stelor's continued use of the googles.com domain to transition to a new domain name. The length of time of such transition will be at Stelor's sole discretion.

    c.  In the event of a monetary, stock, or similar settlement with Google Inc., Such sale will include a complete sale or assignment of the GOOGLES IP, The proceeds from that settlement shall be divided as follows:

6

SILVERS_____

STELOR 

Silvers shall receive 70% of the first $30 million; 50% of the next $20 million; 30% of the next $30 million; 20% of the next $20 million; 10% of the next $20 million and 5% of any amount over $120 million, with the remainder in each case going to Stelor, Silver's total share of the proceeds shall not exceed $50 Million in any event.

d.   Nothing in this provision creates an affirmative action by either party to enter any settlement with Google Inc., or to sell or assign the GOOGLES IP to Google Inc. Silvers understands and agrees that he cannot sell or assign the GOOGLES IP to Google Inc. without obtaining Stelor's written approval. Both parties agree that they will negotiate in good faith.

20. Confidentiality and Disposition of this Action:

a.   The settlement shall not be provided to the court unless necessary to enforce rights, and then under seal. A Joint Stipulated motion to withdraw actions shall be filed no later than Friday, January 28, 2005. The fact that a settlement has been reached and all terms and obligations shall be confidential except to the extent necessary to advise Google Inc. that the parties have resolved all differences.

b.   The complaint and counterclaim shall be dismissed without prejudice.

21. Exclusive Authority/No Assignment:

a.   Stelor and Silvers represent and warrant that no other person or entity has or had any interest in the Claims, demands, obligations, or causes of action

SILVERS_____                    7                    STELOR_____ 

released as part of this Agreement, that they have the sole right and exclusive authority to execute this Agreement and receive the considerations specified herein, and that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any of the Claims, demands, obligations, or causes of action released as part of this Agreement.

b. The signatories to this Agreement each warrant that they have the power to bind the person or entity on whose behalf they signed, and will hold harmless any party to this Agreement for any attorney fees, costs, expenses, or damages incurred or paid as a result of finding that such person or entity lacks such authority, or does not have sole right to the Claims that are the subject of this Agreement, or that any such Claim has been assigned.

22. Voluntary Agreement:  Stelor and Silvers each represent that the Agreement is freely and voluntarily entered into, with the independent advice of each party's attorneys and they have not been induced to execute this Agreement by reason of the disclosure or non-disclosure of any fact or representation not set forth in this Agreement.

23. Non-disparagement:  Each Party, on behalf of itself, its officers, directors, attorneys, agents, and employees, agrees not to make or publish, either orally or in writing, any disparaging statements concerning the other Party or its current and former officers, directors, attorneys, agents, shareholders, or employees.

24. Entire Agreement:  This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous contracts, agreements, promises

SILVERS_____                                      STELOR 

and understandings, with the exception of the License, Distribution and
Manufacturing Agreement as well as the Letter Agreement previously entered into by
the parties. This Agreement may not be altered, modified or otherwise changed in
any respect except by writing, duly executed by Stelor and Silvers. No
representations, circumstances or conditions existing before the Agreement shall be
used in any way by any party to the Agreement to modify the Agreement.

25. <u>Joint Preparation</u>: Stelor and Silvers declare that they have read this Agreement, and
know and understand its contents, and they each comprehend and agree to all its
terms, conditions, and meanings and their significance; all signatories and their
counsel have cooperated in the drafting and preparation of this Agreement, and this
Agreement therefore shall not be construed against any signatory. The Agreement
shall not be construed against any of them based upon any claim of unequal
sophistication or bargaining power.

26. <u>Governing Law</u>: This Agreement shall be deemed to be made under, shall be
construed in accordance with, and shall be governed by the laws of the State of
Florida.

27. <u>Duplicate Originals</u>: This Agreement may be executed in duplicate originals, each of
which is equally admissible in evidence in an action to enforce this Agreement, and
each original shall fully bind each party who has executed it.

28. <u>Facsimile Signatures</u>: The signatures required for the execution of this Agreement
may be transmitted by facsimile, and any such signature shall be deemed a duplicate
original, and may be admitted in evidence and shall fully bind the party and person
making such signature.

9

SILVERS_____                                                    STELOR_____ 

29. <u>Effective Date</u>:  The Effective Date of this agreement shall be the date on which all

Parties have signed this Agreement.

30. <u>Each Party Agrees to operate in good faith as to the terms of this agreement</u>.

[Signature Page Follows]

SILVERS_____                STELOR\_\_\_\_ 

THE FOREGOING IS AGREED TO BY:

DATED: January 28, 2005          Stelor Productions, Inc.

                            By:    _____

                            Its:    _____

DATED: January ___, 2005          Steven A. Silvers

                            By:    _____

APPROVED AS TO FORM AND CONTENT:

DATED: January 28, 2005          Summers Rubinstein, P.C.

                            By:    _____

                            Yano L. Rubinstein, Esq.

                            Attorneys for Stelor Productions, Inc.

DATED: January ___, 2005          Kozyak, Tropin & Throckmorton, P.A.

                            By:    _____

                            Gail McQuilkin, Esq.

                            Attorneys for Steven A. Silvers

SILVERS_____                                                  STELOR_____

Exhibit  G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-80954-CIV-HURLEY**

STELOR PRODUCTIONS, INC.,
    plaintiff,

vs.

STEVEN A. SILVERS,
    defendant.
_____/

**CLOSED CASE**

### ORDER OF FINAL DISMISSAL WITHOUT PREJUDICE AND CLOSE-OUT

**THIS CAUSE** is before the court upon the parties' joint stipulation for dismissal without prejudice filed February 8, 2005. Having considered the stipulation, it is hereby

**ORDERED AND ADJUDGED:**

1. This case is **DISMISSED WITHOUT PREJUDICE,** with each side to bear its own costs and attorneys' fees.

2. There being nothing further for the court to resolve, it is further ordered that the Clerk of the Court shall enter the case as **CLOSED** and terminate all pending motions as **MOOT.**

**DONE** and **SIGNED** in Chambers at West Palm Beach, Florida this 14 day of February, 2005.

Daniel T. K. Hurley
United States District Judge

Copies furnished:
Adam T. Rabin, Esq.
Kenneth R. Hartmann, Esq.
Yano Rubinstein, Esq.

FILED by _MC_ D.C.
ELECTRONIC

Feb 8 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, INC.,
a Delaware corporation,

     Plaintiff,

v.

STEVEN A. SILVERS,
a resident of Palm Beach County, Florida

     Defendant.

CASE NO. 04-80954-CIV-HURLEY
Magistrate Judge James M. Hopkins

---

## JOINT STIPULATION FOR DISMISSAL, WITHOUT PREJUDICE, OF ALL CLAIMS

Plaintiff, Stelor Productions, Inc. and Defendant Steven A. Silvers, hereby jointly stipulate,

pursuant to Fed.R.Civ.P.41(a)(1), to the dismissal, without prejudice, of all claims asserted by each

party against the other party in this action.

Respectfully submitted,

Adam T. Rabin
DIMOND KAPLAN & ROTHSTEIN, PA
200 S.E. First Street, Suite 708
Miami, FL 33131
T: 305-374-1920
Co-Counsel for Defendant

Kenneth R. Hartmann  (FBN: 664286)
Gail A. McQuilkin  (FBN: 969338)
KOZYAK TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
T: 305-372-1800  /  F: 305-372-3508
Counsel for Defendant

Yano L. Rubinstein, Esq.
SUMMERS RUBINSTEIN
580 California Street, 16th Floor
San Francisco, California 94104
Counsel for Plaintiff

3339/101/249255.1

# Exhibit  H

## GAIL A MCQUILKIN - settlement

**From:**     GAIL A MCQUILKIN
**To:**       Yano Rubinstein
**Date:**     2/1/2005 8:52 AM
**Subject:**  settlement

Yano -

 A few housekeeping items.

1.  Who is going to be the correspondent for Stelor for the trademark registrations - Hefter or you?

2.  All payments paid directly to Silvers need to be made out to Silvers Entertainment Group, Inc.

3.  How is the insurance premium payments going to be handles?  Paid directly to Aurora?

4.  It is probably a good idea for me to have a contact person at Stelor regarding the payments who can call me as well if there are issues or problems.  I also need to ask about Silvers 1099 for 2004.  Probably a good idea to send it to me.

5.  Domain names.  There are several "GOO" domain names that Stelor registered through a registrar different than godaddy.com  To create the database for renewals we need to have all the "GOO" related domain names registered at Godaddy.  I'm not sure how to make this change.  It might be a good idea for me to speak to a person at Stelor who has responsibility for this.  That way I can also informed directly if there are admin issues that need to be addressed by Silvers.

6.  We need a date for the auditor to go to Stelor.  We should talk about what we want from the auditor that will help us with Inc.

7.  We need to file a joint stipulation of dismissal.  I drafted one already and will send it to you under a different e-mail.

Call me later when you have time.  I am leaving to go out of town this evening but have my cell.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  I

## GAIL A MCQUILKIN - items

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Yano Rubinstein |
| **Date:** | 2/15/2005 11:13 AM |
| **Subject:** | items |

Hi Yano -

Did you confirm a date to go to Stelor to look at documents?  Also,
Let me know.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  J

# GAIL A MCQUILKIN - stuff

**From:**    GAIL A MCQUILKIN
**To:**      Yano Rubinstein
**Date:**    2/22/2005 11:27 AM
**Subject:** stuff

Yano -

I have not heard back from Esrig and I need to get answers to some things. Can you run interference?

1. Confirm that we are getting a check for these at the end of this month

   Feb and March payment
   reimbursement for the insurance premiums
   reimbursement for the domain name renewals

2. A date to go there next week (I really need to get this scheduled asap).

3. What information we are sending to Bridges now

4. Need a letter from Aurora terminating Steve's coverage so he can convert to an individual plan under NHP. The wording on this needs to be careful so we need to discuss.

Can you find this out and then call me later today. Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit K

From:       GAIL A MCQUILKIN
To:         kkaplan@bwskb.com
Date:       3/2/2005 4:42:32 PM
Subject:    Googles

Kevin -

Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is **not** to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to **send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.** This really needs to get done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

REDACTED

REDACTED

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  L

From:       "Kevin C. Kaplan" <kkaplan@bwskb.com>
To:         <GAM@kttlaw.com>
Date:       3/5/2005 10:17:04 AM
Subject:    Googles

Gail,

I have the following information in response to your recent email.

1.  I understand you received the checks.

2.  Stelor finds the chart confusing.  Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3.  Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4.  Stelor has no record of receiving the receipts.  Please provide us with copies, and Stelor will provide the reimbursement.

5.  Stelor will confirm in writing that no one's available options have increased.

6.  Stelor will provide written confirmation.

7.  Stelor will provide a date prior to March 15, 2005.

8.  There are no such samples, as Stelor is not yet offering any product for sale.

9.  Stelor will provide proof regarding the applications, registrations and names.

10.  By the same token, Stelor requires proof that Silvers changed the correspondent information.  As of my last conversation with Larry Hefter, he was unaware that had been done.  Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges.  I will get back to you on that quickly.

Kevin

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*******************************************

Exhibit  M

GAIL A MCQUILKIN - Re: Googles

From:    GAIL A MCQUILKIN
To:      Kevin C. Kaplan
Date:    3/5/2005 11:12 AM
Subject: Re: Googles

Kevin -

REDACTED

He is giving them three buisness days to get into compliance.

1. I understand you received the checks. **Yes we did.**

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement. **There is nothing in the least bit confusing about the chart. Stelor has three days to get us the check. FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb (which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so. **They have three days.**

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement. **He has provided these three times already. They have three days to pay.**

5. Stelor will confirm in writing that no one's available options have increased. **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation. **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005. **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations and names. **They have three days**

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible. There is nothing in the agreement that obligates us to do this, and everything was changed electronically so there is nothing to provide. Stelor knows how to go online to the USPTO office to view the changes. It will take all of ten minutes to do this. I talked to Larry and showed him the e-mail I had sent him, and he knows about the changes.

REDACTED

# Exhibit  N

# GAIL A MCQUILKIN - dates for audit

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     3/22/2005 11:55 AM
**Subject:**  dates for audit

Kevin -

  We need to set up the date for the auditor to go to Stelor. These are they dates they have open. Let me know today which dates works best. Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st , or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  O

GAIL A MCQUILKIN - RE: dates for audit

| | |
|---|---|
| **From:** | "Kevin C. Kaplan" <kkaplan@bwskb.com> |
| **To:** | "GAIL A MCQUILKIN" <GAM@kttlaw.com> |
| **Date:** | 3/23/2005 9:24 AM |
| **Subject:** | RE: dates for audit |

Gail,

Can you send me over the documents confirming the scope of your proposed audit.  Is there an engagement letter or other correspondence?  We'll call you at 11 today.

Kevin

**********************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

  Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@abwlaw.com

**********************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

Exhibit P

## GAIL A MCQUILKIN - RE: dates for audit

**From:**     GAIL A MCQUILKIN
**To:**       Kevin Kaplan
**Date:**     3/23/2005 9:47 AM
**Subject:**  RE: dates for audit

The scope of the audit based on Silvers' rights under the license agreement is : "Stelor's books and records and all other dcouments and material in the possession of or under the control of Stelor with respect to the subject matter of the License Agreement." I think that just about covers everything that Stelor has relating to the Googles project. FYI - based on our settlement, the results of the audit are for attorney eyes only. The only way we can disclose anything to Inc. is upon our agreement.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 03/23/05 9:22 AM >>>

Gail,


Can you send me over the documents confirming the scope of your proposed audit. Is there an engagement letter or other correspondence? We'll call you at 11 today.


Kevin


*******************************************

Kevin C. Kaplan, Esq.

Aragon, Burlington, Weil

   Schwiep, Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@abwlaw.com

**************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Tuesday, March 22, 2005 11:55 AM
**To:** Kevin C. Kaplan
**Subject:** dates for audit

Kevin -

    We need to set up the date for the auditor to go to Stelor. These are they dates they have open. Let me know today which dates works best. Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st, or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  Q

**GAIL A MCQUILKIN - information from Stelor**

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 4/7/2005 5:01 PM |
| **Subject:** | information from Stelor |

Kevin -

   Esrig said he would get me a disc with all the presentation stuff.  I need it asap so I can work that information into the complaint.  Also, remember to get from him samples of confusion evidence.  Thanks.

Gail.

Checks????????????????????

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  R

## GAIL A MCQUILKIN - Latest threats

**From:** Steven Esrig <steven@stelorproductions.com>
**To:** <gam@kttlaw.com>, Marty Jeffery <marty@stelorproductions.com>
**Date:** 4/11/2005 6:05 PM
**Subject:** Latest threats
**CC:** "Kevin C. Kaplan" <kkaplan@bwskb.com>

Gail,

Just got off the phone with Kevin. Do you think we can possibly move beyond the posturing and ridiculous threats and get on to business?-I am willing to go out on a limb in spite of my Boards position regarding adherence to our license and settlement agreement but I am just as willing to run my business and let you finance Mr. Silvers next lawsuit with Stelor.
I am deeply concerned that these silly little turf wars could cost all of us the big picture.
In other words, do you plan to proceed as a co-counsel or counsel for Steven A. Silvers only. Marty and I look forward to a phone call from you at your earliest convenience.

Steve

Ps-you promised us your "work of art" last Friday. We will take care of all Silvers outstanding checks upon receipt of the complaint. I have authorized Kevin to release the checks he is holding to you as well when we receive the draft complaint.

STEVEN A. ESRIG



301.963.0000

Exhibit S

# GAIL A MCQUILKIN - follow up

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 4/12/2005 4:35 PM |
| **Subject:** | follow up |

Kevin -

I appreciate our conversation today. As you requested here is an update on the complaint. This must be kept extremely confidential.

Because this complaint will draw intense scrutiny from the court and the media, it must be as factually accurate and legally sound as possible. I am doing an enormous amount of research to make sure that happens.

All of this takes tremendous time to do. But my practice has always been to research a case thoroughly before signing my name to a complaint - I'm probably one of the few attorneys who takes the obligations of Rule 11 to heart. Trust me, it pays off in the end.

While it may seem like this is dragging, a good complaint can take weeks or months. But we should have a good first draft soon. I am working on nothing else this week. I <u>really</u> need your help to get me the information from your client that I have been promised so I can weave it into the facts. I cannot understand why this has not been provided.

I hope your client understands that it is my client's intellectual property rights that are at issue so I take this case very seriously. Although we are "co-counsel" on this, I am not working for your client and do not feel obligated to perform based on their time line, nor should the drafting of this complaint have any bearing on their obligation to perform under the settlement. By no means am I holding up sending you the draft because of the owed payments. It is the distraction of dealing with these issues that is holding me up. No one wants

this complaint filed more than my client.

And, as much as I enjoy speaking with the good folks over there, please let your client know that I cannot under the rules of professional conduct have direct communications, even e-mail, with any of them unless I have express authority from you.

Finally, you know how important I feel it is for us to stay aligned. This is easily accomplished if your client will just comply with the settlement, especially the financial part. I don't make threats or posture, my time is too expensive to waste on that. I communicate only what I must when I must to protect my clients interests. I agree that this has gotten silly, and I am sure the board would rather focus its discussions on the upcoming launch and trade show than obsessing over these rather small advances to my client. I have spent considerable time getting my client to focus on what your client has and will accomplish rather than what they have not done, although his list in that regard is long. He really is very happy with the project and excited about the launch and upcoming show. He knows the success of the project is the result of the work and investment made by everyone over there. But, he needs to feel he is being treated fairly, and frankly it doesn't take much by your client to instill that in him.

Please get your client to pay my guy what is owed so I can dedicate all my efforts on this complaint.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  T

## GAIL A MCQUILKIN - please get me a response to where we are, my client is

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 4/13/2005 11:10 AM |
| **Subject:** | please get me a response to where we are, my client is |

going nuts over this and I can't hold him off another day.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  U

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit


Kevin -

   The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit.  He needs to schedule the date for his visit.  Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  V

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint. Are you available Monday afternoon to come over and look?


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com



*******************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 1:35 PM
**To:** Kevin C. Kaplan
**Subject:** audit


Kevin -

  The auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit. He needs to schedule the date for his visit. Please give me a date in the next two weeks, other than April 28th and 29th which are not good for him, for the visit. Thanks.

# Exhibit  W

## GAIL A MCQUILKIN - RE: audit

**From:**   GAIL A MCQUILKIN
**To:**     Kevin Kaplan
**Date:**   4/22/2005 4:20 PM
**Subject:** RE: audit

I'd have to clear off some appointments but it may be possible.  What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/22/05 2:21 PM >>>

I have received several fedex boxes of information from Stelor addressing the questions you have raised in preparation of the complaint.  Are you available Monday afternoon to come over and look?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

Exhibit X

## GAIL A MCQUILKIN - RE: audit

**From:**    "Kevin C. Kaplan" <kkaplan@bwskb.com>
**To:**    "GAIL A MCQUILKIN" <GAM@kttlaw.com>
**Date:**    4/22/2005 5:27 PM
**Subject:**    RE: audit

I've forwarded it on to Steve, but haven't heard back yet.  He may come down Monday too.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington,
Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the
use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and
be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 22, 2005 4:21 PM
**To:** Kevin C. Kaplan
**Subject:** RE: audit

I'd have to clear off some appointments but it may be possible.  What about the audit dates?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA

Exhibit  Y

GAIL A MCQUILKIN - RE: Inc

**From:** "Kevin C. Kaplan" <kkaplan@bwskb.com>
**To:** "GAIL A MCQUILKIN" <GAM@kttlaw.com>
**Date:** 4/25/2005 9:46 AM
**Subject:** RE: Inc

And, when will the complaint be in circulation?

*********************************************

Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*********************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Monday, April 25, 2005 9:44 AM
**To:** Kevin C. Kaplan
**Subject:** Re: Inc

Kevin -

   No, I cannot be there tomorrow. Please let me know what is in the boxes so I can at least determine if it is relevant. I need the date for the audit. Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/25/05 9:21 AM >>>
Gail,

Steve plans to be in Miami tomorrow. Can you meet at our office at 2:00 p.m.? Please confirm. We will have the Stelor information for your review. We expect you will have a draft of the complaint for our review.

In terms of schedule, I am leaving town on Friday for vacation. Stelor and I plan to have the complaint filed (or

ready to be filed) before I leave.  Please help us with that goal by circulating your draft.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

# Exhibit  Z

**From:**      GAIL A MCQUILKIN
**To:**        kkaplan@bwskb.com
**Date:**      4/26/2005 8:19:54 PM
**Subject:**   Re: Stelor/Silvers/Inc

Kevin -

  I cannot get into this with you right now. I assure you I will get back to you and Stelor by Friday.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/26/05 12:35 PM >>>
Gail,


As we discussed, we were impressed and pleased when we received your recent email describing the
extensive efforts you have made in preparing a draft complaint. No doubt the complaint will reflect the
substance of your work. In the meantime, however, we still have not received a draft of the complaint, and
our continued requests that you circulate a draft have been ignored.


As I have advised you, the Stelor information is in my office, and we have been attempting to set up a time
for you to review it. Steve committed the resources of his people to assemble this information, which took
three people in excess of three weeks. I am also prepared immediately to input into the draft complaint
any missing information or sections relating to Stelor's work. To do that, obviously, I need to have the
draft to see what you believe is missing and where it needs to go.


This process needs to be completed, and the complaint needs to be filed promptly. In fact, you yourself
emphasized the urgency of getting this filed we when the TTAB dismissed the opposition more than a
month ago. At that time, you committed to having a complaint prepared within the week! To say the least,
we need to see the draft now. If you have some reason for refusing to circulate it to us, please advise us
immediately. Otherwise, please circulate the draft to us today. We have welcomed and will continue to
welcome your input and work on the anticipated litigation. We understand that, to date, you have done the
lion's share of the work on the complaint, but that was at your election. You wanted to revise the initial
draft we provided you, and we had no objection to your doing that. As I say, we recognize and very much
appreciate the hard work you have apparently done. But, it is no good to anyone unless the draft gets
circulated, finalized, and filed.


As we see it, there is no conceivable reason for you to continue to "withhold" the complaint, or for that
matter, for its filing to be delayed any further. Yet, you continue to sit on the draft, without any apparent
reason. The situation concerns us, and we have reached the point where - either your version needs to
be circulated and we can collaborate on completing it - or we will simply move forward to prepare and file
our own version of the complaint this week. Please make no mistake, the License and Settlement
Agreements clearly provide that any such lawsuit is to be filed by Stelor. Your client has an explicit duty to
"cooperate with Stelor and Stelor's counsel in all respects" but the proceedings are to be "filed by Stelor".

Settlement ¶ 2.


Please continue to cooperate with us by promptly providing your draft.


*********************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*********************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm
of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The
information is intended to be for the use of the individual or entity named above. If you are not the
intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited.

# Exhibit AA

(iv)        the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party, and

(v)        except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.    LICENSEE represents and warrants that

(i)        the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)       the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE, and

(iii)      it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.    Disclaimer of Warranties   EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.    LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A.    The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.    The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.    Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.



## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Goodian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document. (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMao", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory. Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the



Exhibit  BB

Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

**********************************************
CONFIDENTIALITY NOTE: This electronic message transmission contains
information from the law firm of Aragon, Burlington, Weil, Schwiep,
Kaplan & Blonsky, PA, which may be confidential or privileged. The
information is intended to be for the use of the individual or entity
named above. If you are not the intended recipient, please immediately
delete this e-mail and be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited.

-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

Here are the issues we need to resolve under the settlement
agreement:

1. Silvers is owed two checks for $5000 each for Feb and March. The
checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his
insurance premiums during the life of the consulting agreement. The
only two payments Stelor is not to reimburse him for are Dec 2004 and
Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1.
He is now owed for March 2005 too. By my calculation the total it comes
to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so
that he can continue with health care coverage. Silvers is trying to
convert to an individual plan through NHP, Aurora's insurance company.
That will reduce the premiums by a couple hundred dollars a month. But
to do that Aurora needs to send to Neighborhood Health Partnership on
Aurora official letter head, addressed to "Premium Services" informing
them that April 1, 2005, Aurora will no longer be offering health
insurance benefits to "ANY" of their employees, and that they have
informed Steven A. Silvers of this event and that he has 63 days within
which to secure a non-group conversion policy. This really needs to get
done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He
submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to
1,000 options for Stelor stock under Stelor stock option plan, and

Page 4 of 4

another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6.  Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7.  Audit. We need a date for the auditor to go to Stelor.  As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8.  Stelor needs to provide us with samples of all products they are offering for sale.

9.  Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter.  We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password.  Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server).  We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

<div align="center">

**REDACTED**

</div>

Talk to you soon.


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  CC

From:        "Kevin C. Kaplan" <kkaplan@bwskb.com>
To:          <GAM@kttlaw.com>
Date:        3/5/2005 10:17:04 AM
Subject:     Googles

Gail,

I have the following information in response to your recent email.

1.  I understand you received the checks.

2.  Stelor finds the chart confusing.  Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3.  Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4.  Stelor has no record of receiving the receipts.  Please provide us with copies, and Stelor will provide the reimbursement.

5.  Stelor will confirm in writing that no one's available options have increased.

6.  Stelor will provide written confirmation.

7.  Stelor will provide a date prior to March 15, 2005.

8.  There are no such samples, as Stelor is not yet offering any product for sale.

9.  Stelor will provide proof regarding the applications, registrations and names.

10.  By the same token, Stelor requires proof that Silvers changed the correspondent information.  As of my last conversation with Larry Hefter, he was unaware that had been done.  Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges.  I will get back to you on that quickly.

Kevin

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
   Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel:  (305) 858-2900
Fax:  (305) 858-5261
kkaplan@bwskb.com

*******************************************

# Exhibit  DD

## GAIL A MCQUILKIN - Re: Googles

From:      GAIL A MCQUILKIN
To:        Kevin C. Kaplan
Date:      3/5/2005 11:12 AM
Subject:   Re: Googles

Kevin -

REDACTED

He is giving them three buisness
days to get into compliance.

1.  I understand you received the checks.  **Yes we did.**

2.  Stelor finds the chart confusing.  Please just provide us with
receipts or proof of the actual payments, and Stelor will provide the
reimbursement.  **There is nothing in the least bit confusing about the chart.  Stelor has three days to
get us the check.  FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed
for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb
(which they did not) and March (which they did not).**

3.  Stelor is just trying to work through the pending issues with
Aurora, and is committed to taking care of this issue expeditiously.
Please allow Stelor a few more days to do so.  **They have three days.**

4.  Stelor has no record of receiving the receipts.  Please provide us
with copies, and Stelor will provide the reimbursement.  **He has provided these three times already.  They
have three days to pay.**

5.  Stelor will confirm in writing that no one's available options have
increased.  **Make it under oath, notarized, under penalty of perjury.**

6.  Stelor will provide written confirmation.  **Make it under oath, notarized and under penalty of perjury.**

7.  Stelor will provide a date prior to March 15, 2005.  **Three days to give us a date.**

8.  There are no such samples, as Stelor is not yet offering any product
for sale.  **Make it under oath, notarized, and under penalty of perjury.**

9.  Stelor will provide proof regarding the applications, registrations
and names.  **They have three days**

10.  By the same token, Stelor requires proof that Silvers changed the
correspondent information.  As of my last conversation with Larry
Hefter, he was unaware that had been done.  Please provide us with this
proof as soon as possible.  There is nothing in the agreement that obligates us to do this, and
everything was changed electronically so there is nothing to provide.  Stelor knows how to go
online to the USPTO office to view the changes.  It will take all of ten minutes to do this.  I talked
to Larry and showed him the e-mail I had sent him, and he knows about the changes.

REDACTED

Exhibit EE

# CERTIFICATION

Pursuant to the January 28, 2004 Settlement Agreement between and among Stelor Productions, Inc. ("Stelor") and Steven Silvers, Stelor hereby certifies as follows:

1.    Stelor has not increased the amount of the stock options created under the original stock option plan.

2.    No royalty payments from Stelor to Mr. Silvers are owed or outstanding as of December 31, 2004.

3.    Stelor does not presently offer any products for sale except the music available on itunes.

I declare under penalty of perjury that the foregoing statements are true and correct.

3.8-05
Date

Steven A. Esrig, President

Exhibit  FF



# Absolutely.net

contact absolutely

| | Web Search | | Buy Poster |
|---|---|---|---|

**EXCLUSIVE:** Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## Netherlands 6 Top Albums in Children's Music

Homepage
What's New
Movie Reviews
Photo Gallery
Download Music [NEW!]
Wallpaper
Screensaver
Contact Celeb

**Click on the title to buy and download music.**
**You need iTunes sofware from Apple to play the music.**
**Download Here**

**Page: 1**



### 1. Baby Genius: Best of... The IQ Builder! - Baby Genius

*Baby Genius: Best of... The IQ Builder! by Baby Genius*

**Artist:** Baby Genius
**Album:** Baby Genius: Best of... The IQ Builder!
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 2. Classical Vitamins - Baby Genius

*Classical Vitamins by Baby Genius*

**Artist:** Baby Genius
**Album:** Classical Vitamins
**Copyright:**
**Released Date:** 02 December 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 3. One GooWorld - The Googles from Goo

*One GooWorld by The Googles from Goo*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800



### 4. Kidz Bop Christmas - Kidz Bop Kids

*Kidz Bop Christmas by Kidz Bop Kids*

**Artist:** Kidz Bop Kids
**Album:** Kidz Bop Christmas
**Copyright:** 2003 Razor & Tie
**Released Date:** 2002

## Google

| |
|---|
| **Site Search** |

**ADVERTISEMENT**



**STOP PAYING 99¢ PER SONG**

Listen to, download & transfer an unlimited amount of music.

Usher
Toby Keith
Gwen Stefani
Johnny Cash
Green Day
Kanye West

napster TO GO

TRY IT FOR FREE



Published Date: Sat, 29 Jan 2005 10:14:28 -800



### 5. Smart Play With Classical - Heidi Brende

*Smart Play With Classical by Heidi Brende*

**Artist:** Heidi Brende
**Album:** Smart Play With Classical
**Copyright:**
Released Date: 02 December 2004
Published Date: Sat, 29 Jan 2005 10:14:28 -800



### 6. TRAVEL SONG SING ALONGS - Kevin Roth

*TRAVEL SONG SING ALONGS by Kevin Roth*

**Artist:** Kevin Roth
**Album:** TRAVEL SONG SING ALONGS
**Copyright:** 2004 STAR GAZER PRODUCTIONS
Released Date: 26 February 2004
Published Date: Sat, 29 Jan 2005 10:14:28 -800

Page: 1



The Mozart Effect - Musi...
Leopold Mozart
New $10.98!
Used $3.99!



Children's Favorites
Favorites Series
New $6.98!



For Our Children
Various Artists
New $13.99!



Papa's Dream
Los Lobos With Lalo Guerrero
New $11.99!
Used $7.99!



Stay Awake
Various Artists
New $13.98!
Used $8.99!



Classical Music for Chil...
Johann Sebastian Bach

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us



 **Target** the position.



©2005 Absolutely Celebrity Network

# Absolutely.net

contact absolutely



Add FREE New Emotion Icons for your Email

[ OK ]

| | Web Search | | Buy Poster |

EXCLUSIVE: Eisley's rich lyrical imagery, catchy hooks, & harmony will make your ears hum.

## UK 100 Top Songs in Children's Music 3

Click on the title to buy and download music.
You need iTunes sofware from Apple to play the music.
### Download Here

Homepage
What's New
Movie Reviews
Photo Gallery
Download Music NEW!
Wallpaper
Screensaver
Contact Celeb

Page: 1 2 3 4 5 6 7 8 9 10

Google

Site Search

ADVERTISEMENT



Whose body is this?

Answer to get $100 FREE!

Angelina Jolie

Jennifer Lope

Britney Spear

*See offer details
© 2005 AnyFreeGift.com



### 21. Being Jewish Is Fun - Judy Caplan Ginsburgh

*Being Jewish Is Fun by Judy Caplan Ginsburgh from the album Havdalah Pajama*

**Artist:** Judy Caplan Ginsburgh
**Album:** Havdalah Pajama
**Copyright:** 2000 Judy Caplan Ginsburgh
**Released Date:** 26 July 2000
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 22. The Cuckoo Waltz - Verne Langdon

*The Cuckoo Waltz by Verne Langdon from the album Circus Clown Calliope!/Circus Clown Calliope!, Vol.2*

**Artist:** Verne Langdon
**Album:** Circus Clown Calliope!/Circus Clown Calliope!, Vol.2
**Copyright:** 1999 Electric Lemon
**Released Date:** 26 October 1999
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 23. The Lion and the Mouse - Michael Mish

*The Lion and the Mouse by Michael Mish from the album Aesop's Fables*

**Artist:** Michael Mish
**Album:** Aesop's Fables
**Copyright:** 2003 MishMashMusic
**Released Date:** 05 June 2003
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800



### 24. Frosty the Snowman - Kidz Bop Kids

*Frosty the Snowman by Kidz Bop Kids from the album Kidz Bop Christmas*

5/17/2005

Absolutely Music - Download This...   Amazon.com ...





Circus Music
from the Bi...
Merle Evans
Circus Band
New $7.98!



Children Of
Eden
Stephen
Schwartz
New $26.99!



Classic Disney
Various Artists
New $42.99!



Classical Music
for Chil...
Johann
Sebastian Bach
New $3.98!
Used $1.99!



Smithsonian
Folkways Chi...
Various Artists
New $10.99!



Stay Awake
Various Artists
New $13.98!
Used $8.99!

(Prices May Change)
Privacy Information



Artist: Kidz Bop Kids
Album: Kidz Bop Christmas
Copyright: 2003 Razor & Tie
Released Date: 2002
Published Date: Sat, 29 Jan 2005 03:39:19 -800



## 25. The Syllable I Stress - Los McCroskey

*The Syllable I Stress by Los McCroskey from the album À¿CÃ³mo? Fun, New Songs for Learning Spanish and Loving God*

Artist: Los McCroskey
Album: À¿CÃ³mo? Fun, New Songs for Learning Spanish and Loving God
Copyright: 2002 McCroskey Music
Released Date: 12 February 2002
Published Date: Sat, 29 Jan 2005 03:39:19 -800



## 26. My First Child - Carla Lynne Hall

*My First Child by Carla Lynne Hall from the album My First Child CD Single*

Artist: Carla Lynne Hall
Album: My First Child CD Single
Copyright: 2004 Moxie Entertainment
Released Date: 18 April 2004
Published Date: Sat, 29 Jan 2005 03:39:19 -800



## 27. Amy - Celeste Krenz, Linda W. Purdy

*Amy by Celeste Krenz, Linda W. Purdy from the album Pirates & Cowboys, More Songs for You & Me*

Artist: Celeste Krenz, Linda W. Purdy
Album: Pirates & Cowboys, More Songs for You & Me
Copyright: 2003 Mountain Creek Records
Released Date: 05 January 2003
Published Date: Sat, 29 Jan 2005 03:39:19 -800



## 28. It's Raining, It's Pouring - Rain, Rain, Go Away - David Jacobi - Aimee Fischer

*It's Raining, It's Pouring - Rain, Rain, Go Away by David Jacobi - Aimee Fischer from the album Favorite Nursery Rhymes*

Artist: David Jacobi - Aimee Fischer
Album: Favorite Nursery Rhymes
Copyright:
Released Date: 02 December 2004
Published Date: Sat, 29 Jan 2005 03:39:19 -800



## 29. Zoomin' - The Googles from Goo

*Zoomin' by The Googles from Goo from the album One GooWorld*

Artist: The Googles from Goo
Album: One GooWorld
Copyright: 2004 Stelor Productions
Released Date: 05 July 2004

Absolutely Celebrity Network

Published Date: Sat, 29 Jan 2005 03:39:19 -800



### 30. Dudley, a Llama With Attitude - Diane White-Crane

*Dudley, a Llama With Attitude by Diane White-Crane from the album Songs for Llama Lovers*

**Artist**: Diane White-Crane
**Album**: Songs for Llama Lovers
**Copyright**: 2000 Orchard
**Released Date**: 07 March 2000
**Published Date**: Sat, 29 Jan 2005 03:39:19 -800

Page: 1 2 3 4 5 6 7 8 9 10

Homepage - What's New - Movie - Photo - Wallpaper - Screensaver - Contact Us



©2005 Absolutely Celebrity Network

# Absolutely.net

## Netherlands 6 Top Albums in Children's Music





## 3. One GooWorld - The Googles from Goo

*One GooWorld by The Googles from Goo*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 10:14:28 -800

# Absolutely.net

## UK 100 Top Songs in Children's Music 3



29. Zoomin' - The Googles from Goo

*Zoomin' by The Googles from Goo from the album One GooWorld*

**Artist:** The Googles from Goo
**Album:** One GooWorld
**Copyright:** 2004 Stelor Productions
**Released Date:** 05 July 2004
**Published Date:** Sat, 29 Jan 2005 03:39:19 -800

# Exhibit  GG

## GAIL A MCQUILKIN - Kevin -

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | kkaplan@bwskb.com |
| **Date:** | 3/9/2005 6:15 PM |
| **Subject:** | Kevin - |

Kevin -

copy of pages from www.absolutely.net that shows that the Googles CD is ranked by nation as the most popular downloaded childrens CD,

offered for sale (despite Esrig's sworn statement of no products offered for sale, go to www.cafepress.com/googles)

Let's talk tomorrow.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit HH

| From: | GAIL A MCQUILKIN |
|---|---|
| To: | kkaplan@bwskb.com |
| Date: | 3/23/2005 1:43:23 PM |
| Subject: | the ad that appeared in the pre-show publication |

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Sticky!
from Goo™ are here!
the coolest email address
reality. The original music in
games, the animation, the live show, the
of other media are set for launch!
and our licensees are planning to earn
on board by visiting us at booth 1027.
Contact: Steven A. Esrig • Stelor Productions • 301 • 963 • 0000

# Exhibit  II

## GAIL A MCQUILKIN – here is the record of the helath insurance payments –

**From:**    GAIL A MCQUILKIN
**To:**      Yano Rubinstein
**Date:**    2/15/2005 1:44 PM
**Subject:** here is the record of the helath insurance payments –

deduct the Dec and Jan payments because they do not apply.  Stelor needs to pay Steve for Feb forward.

Call me when you can.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# The Aurora Collection Inc

RE:  Insurance Premiums – Neighborhood Health Partnership
     Paid by:  Steven A Silvers

| Month/Year | Date Rec'd | Check No./Reference | Amount Paid |
|---|---|---|---|
| April 2003 | April/2003 | Per Bank Statement | $144.07 |
| May 2003 | May/2003 | Per Bank Statement | $144.07 |
| June 2003 | June/2003 | Per Bank Statement | $144.07 |
| July 2003 | July/2003 | Per Bank Statement | $144.07 |
| Aug 2003 Sept 2003 | Aug 01/2003 | Per Bank Statement | $288.14 |
| Oct 2003 Nov 2003 Dec 2003 | Oct 09/2003 | Bank Ck#67030727 | $432.21 |
| Jan 2004 | Jan 07/2004 | Per Bank Statement | $144.07 |
| Feb 2004 | Feb 10/2004 | Per Bank Statement | $144.07 |
| Mar 2004 | Mar 09/2004 | Per Bank Statement | $144.07 |
| Apr 2004 | Apr 06/2004 | Per Bank Statement | $275.00 |
| May 2004 | May 06/2004 | Per Bank Statement | $275.00 |
| June 2004 | June 04/2004 | Per Bank Statement | $275.00 |
| July 2004 | July 04/2004 | Per Bank Statement | $275.00 |
| Aug 2004 | Aug 05/2004 | Per Bank Statement | $275.00 |
| Sept 2004 | Sept 01/2004 | Per Bank Statement | $275.71 |
| April thru August | Sept 01/2004 | Per Bank Statement | $ 3.55 |
| Oct 2004 | Sept 30/2004 | Per Bank Statement | $275.71 |
| Nov 2004 | Nov 03/2004 | Per Bank Statement | $275.71 |
| Dec 2004 | Nov 29/2004 | Per Bank Statement | $603.72 |
| Jan 2005 | Dec 20/2004 | Ck# 1034 | $603.72 |
| Feb 2005 | Jan 20/2005 | Ck# 1037 | $603.72 |
| | | | |
| TOTAL | | | **$5,745.68** |

# Exhibit  JJ

## GAIL A MCQUILKIN - RE: stuff

**From:**      GAIL A MCQUILKIN
**To:**        Yano Rubinstein
**Date:**      2/22/2005 1:53 PM
**Subject:**   RE: stuff

make it around 5:30, I have a conference call at 5.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Yano Rubinstein" <yano@sumrub.com> 2/22/2005 12:37:45 PM >>>
OK, I will call you around 5 PM your time.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Tuesday, February 22, 2005 8:28 AM
**To:** yano@sumrub.com
**Subject:** stuff

Yano -

    I have not heard back from Esrig and I need to get answers to some things.  Can you run interference?

1.  Confirm that we are getting a check for these at the end of this month

        Feb and March payment
        reimbursement for the insurance premiums
        reimbursement for the domain name renewals

2.  A date to go there next week (I really need to get this scheduled asap).

3.  What information we are sending to Bridges now

4.  Need a letter from Aurora terminating Steve's coverage so he can convert to an individual plan under NHP.
The wording on this needs to be careful so we need to discuss.

Can you find this out and then call me later today.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  KK

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Aragon, Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

-----Original Message-----
From: GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
Sent: Wednesday, March 02, 2005 4:43 PM
To: Kevin C. Kaplan
Subject: Googles

Kevin -

    Here are the issues we need to resolve under the settlement agreement:

1.  Silvers is owed two checks for $5000 each for Feb and March.  The checks going forward need to be to me by the 1st of the month.

2.  Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement.  The only two payments Stelor is not to reimburse him for are Dec 2004 and Jan 2005.  Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too.  By my calculation the total it comes to $5,141.96.

3.  Health insurance termination.  This is very critical to Silvers so that he can continue with health care coverage.  Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month.  But to do that Aurora needs to send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.  This really needs to get done asap for everyone's benefit.

4.  Silvers is owed  for domain name registration renewals.  He submitted the receipts for these to Stelor already for $318.00.

5.  Options.  Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase.  Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6.  Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

<center>**REDACTED**</center>

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit LL

**GAIL A MCQUILKIN - Googles**

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     3/3/2005 1:40 PM
**Subject:**  Googles

Kevin -

No checks arrived today.  Can you find out what is going on.  Thanks.

Gail.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit MM

From:     "Kevin C. Kaplan" <kkaplan@bwskb.com>
To:       <GAM@kttlaw.com>
Date:     3/5/2005 10:17:04 AM
Subject:  Googles

Gail,

I have the following information in response to your recent email.

1. I understand you received the checks.

2. Stelor finds the chart confusing. Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4. Stelor has no record of receiving the receipts. Please provide us with copies, and Stelor will provide the reimbursement.

5. Stelor will confirm in writing that no one's available options have increased.

6. Stelor will provide written confirmation.

7. Stelor will provide a date prior to March 15, 2005.

8. There are no such samples, as Stelor is not yet offering any product for sale.

9. Stelor will provide proof regarding the applications, registrations and names.

10. By the same token, Stelor requires proof that Silvers changed the correspondent information. As of my last conversation with Larry Hefter, he was unaware that had been done. Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges. I will get back to you on that quickly.

Kevin

*******************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
 Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com

*******************************************

# Exhibit  NN

## GAIL A MCQUILKIN - Re: Googles

From:     GAIL A MCQUILKIN
To:       Kevin C. Kaplan
Date:     3/5/2005 11:12 AM
Subject:  Re: Googles

Kevin -

<center>REDACTED</center>

He is giving them three buisness days to get into compliance.

1. I understand you received the checks.  **Yes we did.**

2. Stelor finds the chart confusing.  Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.  **There is nothing in the least bit confusing about the chart.  Stelor has three days to get us the check.  FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb (which they did not) and March (which they did not).**

3. Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.  **They have three days.**

4. Stelor has no record of receiving the receipts.  Please provide us with copies, and Stelor will provide the reimbursement.  **He has provided these three times already.  They have three days to pay.**

5. Stelor will confirm in writing that no one's available options have increased.  **Make it under oath, notarized, under penalty of perjury.**

6. Stelor will provide written confirmation.  **Make it under oath, notarized and under penalty of perjury.**

7. Stelor will provide a date prior to March 15, 2005.  **Three days to give us a date.**

8. There are no such samples, as Stelor is not yet offering any product for sale. **Make it under oath, notarized, and under penalty of perjury.**

9. Stelor will provide proof regarding the applications, registrations and names. **They have three days**

10. By the same token, Stelor requires proof that Silvers changed the correspondent information.  As of my last conversation with Larry Hefter, he was unaware that had been done.  Please provide us with this proof as soon as possible. **There is nothing in the agreement that obligates us to do this, and everything was changed electronically so there is nothing to provide.  Stelor knows how to go online to the USPTO office to view the changes.  It will take all of ten minutes to do this.  I talked to Larry and showed him the e-mail I had sent him, and he knows about the changes.**

<center>REDACTED</center>

# Exhibit  OO

## GAIL A MCQUILKIN - letter from Blumquist

**From:**     GAIL A MCQUILKIN
**To:**       kkaplan@bwskb.com
**Date:**     4/1/2005 5:13 PM
**Subject:**  letter from Blumquist


Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# THE AURORA COLLECTION INC
## P O Box 260545
## Pembroke Pines, FL 33026

April 01, 2005


Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, MD 20874

To Whom It May Concern:

RE:  Steven A Silvers
     Medical Insurance Issue

On behalf of The Aurora Collection, Inc. and as the Chairman
of the Board of this Company, I hereby confirm the fact that as
of November 30, 2004, the Company had received from Steven
A. Silvers an amount of $4,538.24.

This amount of $4,538.24, in addition to those funds received
by The Aurora Collection, Inc. from Stelor Productions, Inc.,
were applied to Mr. Silvers' monthly insurance premiums due
Neighborhood Health Partnership.

I trust you will find this information satisfactory to your needs.
Should you have any further inquiry regarding this matter,
please feel free to contact me directly at (850)443-1022.


Respectfully submitted,



Brian C. Blomquist
Chairman of the Board

Exhibit  PP

Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:18 PM >>>

Do you have a signed letter?


*********************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*********************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:14 PM
**To:** Kevin C. Kaplan
**Subject:** letter from Blumquist



Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:40 PM
**To:** Kevin C. Kaplan
**Subject:** RE: letter from Blumquist


give me a freakin' break. He e-mailed this to us. He put his telephone number in the letter, call him if you want to verify.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:18 PM >>>

Do you have a signed letter?


***********************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


***********************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:14 PM
**To:** Kevin C. Kaplan

## GAIL A MCQUILKIN - RE: letter from Blumquist

**From:**    GAIL A MCQUILKIN
**To:**      Kevin Kaplan
**Date:**    4/1/2005 5:40 PM
**Subject:** RE: letter from Blumquist

give me a freakin' break.  He e-mailed this to us.  He put his telephone number in the letter, call him if you want to verify.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com
>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:18 PM >>>

Do you have a signed letter?


*******************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*******************************************

CONFIDENTIALITY NOTE:  This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

## GAIL A MCQUILKIN - RE: letter from Blumquist

**From:**     "Kevin C. Kaplan" <kkaplan@bwskb.com>
**To:**        "GAIL A MCQUILKIN" <GAM@kttlaw.com>
**Date:**      4/1/2005 5:44 PM
**Subject:**   RE: letter from Blumquist

Forward me the email from him which includes the letter as an attachment.

*********************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

  Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel: (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com

*********************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington,
Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the
use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and
be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Friday, April 01, 2005 5:40 PM
**To:** Kevin C. Kaplan
**Subject:** RE: letter from Blumquist

give me a freakin' break.  He e-mailed this to us.  He put his telephone number in the letter, call him if you want
to verify.

Gail A. McQuilkin, Esq.

## GAIL A MCQUILKIN - RE: letter from Blumquist

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Kevin Kaplan |
| **Date:** | 4/1/2005 6:02 PM |
| **Subject:** | RE: letter from Blumquist |

i can't.  Call him to verify.  He is a nice person.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

>>> "Kevin C. Kaplan" <kkaplan@bwskb.com> 04/01/05 5:43 PM >>>

Forward me the email from him which includes the letter as an attachment.


*********************************************

Kevin C. Kaplan, Esq.

Burlington, Weil, Schwiep,

   Kaplan & Blonsky, PA

2699 S. Bayshore Drive, Penthouse

Miami, Florida 33133

Tel:  (305) 858-2900

Fax: (305) 858-5261

kkaplan@bwskb.com


*********************************************

CONFIDENTIALITY NOTE: This electronic message transmission contains information from the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, PA, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please immediately delete this e-mail and be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.

**Subject:** letter from Blumquist

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  QQ

## GAIL A MCQUILKIN - settlement

| | |
|---|---|
| **From:** | GAIL A MCQUILKIN |
| **To:** | Yano Rubinstein |
| **Date:** | 2/1/2005 8:52 AM |
| **Subject:** | settlement |

Yano -

A few housekeeping items.

1. Who is going to be the correspondent for Stelor for the trademark registrations - Hefter or you?

2. All payments paid directly to Silvers need to be made out to Silvers Entertainment Group, Inc.

3. How is the insurance premium payments going to be handles?  Paid directly to Aurora?

4. It is probably a good idea for me to have a contact person at Stelor regarding the payments who can call me as well if there are issues or problems.  I also need to ask about Silvers 1099 for 2004.  Probably a good idea to send it to me.

5. Domain names.  There are several "GOO" domain names that Stelor registered through a registrar different than godaddy.com  To create the database for renewals we need to have all the "GOO" related domain names registered at Godaddy.  I'm not sure how to make this change.  It might be a good idea for me to speak to a person at Stelor who has responsibility for this.  That way I can also informed directly if there are admin issues that need to be addressed by Silvers.

6. We need a date for the auditor to go to Stelor.  We should talk about what we want from the auditor that will help us with Inc.

7. We need to file a joint stipulation of dismissal.  I drafted one already and will send it to you under a different e-mail.

Call me later when you have time.  I am leaving to go out of town this evening but have my cell.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  RR

## GAIL A MCQUILKIN - to who at stelor should I send back the check?

**From:**      GAIL A MCQUILKIN
**To:**        Yano Rubinstein
**Date:**      2/7/2005 4:04 PM
**Subject:**   to who at stelor should I send back the check?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## GAIL A MCQUILKIN - RE: to who at stelor should I send back the check?

**From:**    "Yano Rubinstein" <yano@sumrub.com>
**To:**    "'GAIL A MCQUILKIN'" <GAM@kttlaw.com>
**Date:**    2/7/2005 5:22 PM
**Subject:**    RE: to who at stelor should I send back the check?

Mike Sagan

Yano Rubinstein
SUMMERS RUBINSTEIN P.C.
580 California Street
16th Floor
San Francisco, CA 94104

tel: 415.439.4816
fax: 415.651.9853
cel: 415.819.6817

email: yano@sumrub.com

www.sumrub.com

The contents of this e-mail, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you received this e-mail message in error, please contact the sender by reply e-mail. Please also permanently delete all copies of the original e-mail and any attached documentation. Thank you.

**From:** GAIL A MCQUILKIN [mailto:GAM@kttlaw.com]
**Sent:** Monday, February 07, 2005 1:05 PM
**To:** yano@sumrub.com
**Subject:** to who at stelor should I send back the check?

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit SS

## GAIL A MCQUILKIN - stuff

**From:**    GAIL A MCQUILKIN
**To:**      Yano Rubinstein
**Date:**    2/22/2005 11:27 AM
**Subject:** stuff

Yano -

  I have not heard back from Esrig and I need to get answers to some things.  Can you run interference?

1.  Confirm that we are getting a check for these at the end of this month

    Feb and March payment
    reimbursement for the insurance premiums
    reimbursement for the domain name renewals

2.  A date to go there next week (I really need to get this scheduled asap).

3.  What information we are sending to Bridges now

4.  Need a letter from Aurora terminating Steve's coverage so he can convert to an individual plan under NHP.
The wording on this needs to be careful so we need to discuss.

Can you find this out and then call me later today.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  TT

From:       GAIL A MCQUILKIN
To:         kkaplan@bwskb.com
Date:       3/2/2005 4:42:32 PM
Subject:    Googles

Kevin -

Here are the issues we need to resolve under the settlement agreement:

 1. Silvers is owed two checks for $5000 each for Feb and March. The checks going forward need to be to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of the consulting agreement. The only two payments Stelor is **not** to reimburse him for are Dec 2004 and Jan 2005. Under the settlement he is to be reimbursed staring Feb. 1. He is now owed for March 2005 too. By my calculation the total it comes to $5,141.96.

3. Health insurance termination. This is very critical to Silvers so that he can continue with health care coverage. Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company. That will reduce the premiums by a couple hundred dollars a month. But to do that Aurora needs to **send to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event and that he has 63 days within which to secure a non-group conversion policy.** This really needs to get done asap for everyone's benefit.

4. Silvers is owed for domain name registration renewals. He submitted the receipts for these to Stelor already for $318.00.

5. Options. Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under Stelor stock option plan, and another 1,000 if anyone's available options increase. Before the settlement, Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time. As part of the settlement Stelor was to provide written confirmation that no additional options have been granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no royalty statements are due.

7. Audit. We need a date for the auditor to go to Stelor. As we discussed, the sooner the better, and we can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to Larry Hefter. We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password. Under the agreement Silvers agreed to give Stelor as the Admin contact the ability to control the DNS records (to select and change the server). We learned form Godaddy that it cannot do that so it is impossible to do. Yano and I agreed that if Stelor needs to change the server for the domain name, they will call me and I will have the records changed and that will satisfy this.

<center>REDACTED</center>

REDACTED

*Talk to you soon.*

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com