FILED by _____ D.C.
ELECTRONIC

Jan 12 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,                    Case No. 05-80393-CIV-HURLEY
    Plaintiff,
v.

STEVEN A. SILVERS, a Florida resident,
    Defendant.

## DEFENDANT'S SUPPLEMENT IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND EXPENSES, AND SANCTIONS

Considerable thought has been given to whether we should file a response to the statements made by Stelor and its counsel in its Reply to Silvers' Opposition to Motion to File Sur-Reply. We believe that by now it is patently obvious to the Court that Esrig has not a shed of credibility. But, it is also obvious and disturbing that Esrig remains undaunted in his willingness to perjure himself, and suborn the perjury of others. We will not belabor the obvious. There is, however, additional evidence we have recently uncovered that we believe the Court should have when considering the appropriateness of issuing an Order To Show Cause why sanctions should not issue against Stelor.

In its Reply, Stelor attaches a "police report" that purports to challenge the credibility of Michael Sagan, a former Stelor employee who Stelor suspects provided Silvers with Stelor's internal list of investors (Stelor does not deny the document exists).[1] Sadly, this "police report" is just another example of Esrig's propensity to perjurer himself. Through a little research we discovered that the redacted portions of this "police report" show that it is allegedly based on statements made by Rebecca Gardner, another former-Stelor employee. And, we discovered that

---

[1] Stelor labors under the false belief that it has some "right" to prevent Silvers from seeing documents relating to its operations, or its investors. To the contrary, Silvers has the absolute legal right to see each and every document in Stelor's possession as the licensor of his intellectual property. Had Stelor been forthright in allowing Silvers to audit it, all of this information would have been provided to Silvers two years ago.

1

Ms. Gardner testified in an administrative proceeding about this alleged incident. *See* Exhibit A. Not only does Ms. Gardner dispute the allegations, she is emphatic that Esrig told her to lie, told her to make these allegations against Mr. Sagan to the police, that she never made the statements written in this report, and that Esrig lied about the events. Need we say more?

It is maddening to have to expend the time and effort to continuously rebut the false statements made by Esrig. Silvers, however, intends to continue to challenge the credibility of Stelor's evidence and to supplement the record in support of his motion for attorneys' fees and sanctions because this conduct cannot be condoned. Accordingly, Silvers has noticed the deposition of Mr. Henry Epstein, will continue to take discovery, and will supplement the record as new evidence becomes known. In the meantime, Silvers respectfully requests that the Court enter an Order awarding Silvers his attorneys' fees and costs as the prevailing party.

Respectfully submitted this 12th day of January 2006.

| | |
|---|---|
| Adam T. Rabin (FBN: 985635)<br>DIMOND KAPLAN & ROTHSTEIN, PA<br>525 S. Flagler Drive, Suite 200<br>West Palm Beach, Florida 33401<br>T: 561-671-2110 / F: 561-671-1951 | s/ Gail A. McQuilkin<br>Gail A. McQuilkin (FBN: 969338)<br>Kenneth R. Hartmann (FBN: 664286)<br>KOZYAK TROPIN & THROCKMORTON, PA<br>2525 Ponce de Leon, 9th Floor<br>Miami, Florida 33134<br>T: 305-372-1800 / F: 305-372-3508 |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 12th day of January 2006, via first class mail and e-mail on the following:

Kevin C. Kaplan, Esq.
Burlington Weil Schwiep Kaplan & Blonsky
2699 S. Bayshore Drive, Penthouse, Miami, Florida 33133
E-mail: kkaplan@bwskb.com

s/Gail A S. McQuilkin

3339/103/261604.1

2

# Exhibit A

13        (Whereupon,
14            REBECCA GARDNER
15  was called as a witness, and after having been
16  previously sworn, was examined and testified as
17  follows:)
18            EXAMINATION
19     BY EXAMINER KNIGHT:
20     Q.  Okay, and you're a former coworker of Mr.
21  Sagan?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

256

1      A.  Yes, I am.
2      Q.  And what was your title or position with the
3   Employer?
4      A.  That would actually be a question for Mr.
5   Esrig.  It was never determined what my --
6      Q.  What did you --
7      A.  -- title was.
8      Q.  What did you do?
9      A.  You can basically say I was an assistant
10  accountant.  I worked with Mr. Sagan on a close basis.
11     Q.  Okay.  Did you report directly to him?
12     A.  Actually, I can't tell you who I reported to.
13     Q.  Okay.
14     A.  I believe it was Greg Langford, Head of
15  Operations.
16     Q.  Okay, and are you currently still employed
17  there?
18     A.  I am not.  I resigned.
19     Q.  Okay, okay.  And are you -- did you resign --
20  when did you resign?
21     A.  My last day was in March.  I can't give you

122

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

257

1  the exact date.
2     Q.  Okay.
3     A.  I don't have the paperwork with me.
4     Q.  Okay, okay. Can you take us back -- okay, it
5  has been established that Mr. Sagan's last day of work
6  was February 15, of '05. Were you present in the
7  workplace on that day?
8     A.  Yes, I was.
9     Q.  Okay. And can you shed some light on -- as
10 far as what happened that day, his last day of work?
11    A.  There had been a previous incident with Mr.
12 Biju Pandit, and I had believed the stories that were
13 going on that were fabricated against Mr. Pandit. Mr.
14 Sagan had been telling me, throughout the morning that
15 the stories were lies, that Mr. Pandit was a good man.
16 I'm getting to the point.
17    Q.  Okay, okay.
18    A.  Mr. Sagan and I had passed several different
19 notes back and forth, stating that Biju was a good
20 person. I had noticed throughout -- we went to lunch,
21 we came back -- and I had noticed that Mr. Sagan was

259

1  change the passwords on any of his computers. He
2  denied that, as well. Mike said, "Okay. I have a car
3  appointment. I'll be back." In that process, I called
4  Mr. Esrig and told him that Michael Sagan was in, that
5  the computer was not working -- which I was informed to
6  call him when he did come in -- I said, "Mr. Sagan has
7  left and he left with a file folder in his hand."
8     Q.  So that -- so who -- okay, who informed you
9  to call -- okay, wait a minute --
10    A.  Mr. Esrig had told me to call him if Mike
11 came back and there was a problem.
12    Q.  Okay, and you did that, okay.
13    A.  Yes, I did. So, in that process, I notified
14 Mr. Esrig that Mike had left with a folder and he left
15 the building. He said, "We need to stop him. We're
16 going to call the police." I was upset at the time,
17 granted, I was very upset.
18    Q.  Okay.
19    A.  So then the police arrived, and Mr. Esrig had
20 asked me if I would testify to the police that Mr.
21 Sagan tried to threaten me and his family. In that

258

1  making a disk at his computer. And I had mentioned it
2  to Mr. de Shontae, Mr. Paul de Shontae, which is a --
3  either an investor or a board of directors. He had
4  brought me into Mr. Esrig's office, and I told Mr.
5  Esrig what I had saw. So what happened was, he came
6  out and got the disk out of Mr. Sagan's desk, noticing
7  that there was a disk that had been -- was being
8  copied. He was copying his hard drive onto a disk.
9  Well, when Mr. Steven Esrig saw that this was
10 happening, he changed the password into Mr. Sagan's
11 computer.
12    Q.  Did you see that happen?
13    A.  Both myself, Mr. Kevin Burr, which is my
14 fiancé, and Dean De Pue was there. He actually had
15 asked Mr. Dean De Pue to change the password so that
16 nobody could access the computer. When Mike Sagan came
17 back, he tried several times to get into the system.
18 Mike asked me if I knew what was going on, and I denied
19 it. He also asked Kevin what was going on, and I
20 denied that, as well. He asked Dean De Pue, three
21 different times, if Mr. Esrig had informed him to

260

1  process, I went back into Marty Jeffrey's office with
2  him and Paul de Shontae, and notified Marty that Steven
3  Esrig had asked me to do this. While the police were
4  there, I spoke with them, and they had left. Mr. Esrig
5  was standing outside with his wife and other employees
6  of Stelor Productions.
7     Q.  Okay, what did you -- okay, this is when the
8  police was there. Did you -- what did you say to the
9  police?
10    A.  I denied the whole statement.
11    Q.  Denied the whole statement?
12    A.  I, I told them that he never threatened my
13 life, that Mr. Esrig lied.
14    Q.  So, wait a minute. So you're saying that you
15 were told to tell the police that --
16    A.  You're absolutely correct. I was told to
17 tell the police that Mr. Sagan -- he, he fabricated a
18 story over the phone. "This is what happened. I
19 called the police. You were irate. This is what
20 you're going to do, what -- the police are on their
21 way. When they get there, you are going to tell them

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

**Page 261**

1  that Mr. Sagan threatened your life and my life, as
2  well." He took me downstairs as soon as he arrived at
3  the property, and didn't ask how I was doing, didn't
4  give a damn -- excuse me, excuse me -- didn't give a --
5  didn't care about the fact of, you know, if I was upset
6  or not, but immediately said, "Where is Mike Sagan?"
7  And he's threatening to come (indiscernible) the
8  situation. By that time, Mike Sagan was already gone.
9  He had called the office twice. The first time, he
10 spoke to my fiancé. I'm not quite sure what was
11 discussed. The second time he called, I ripped the
12 phone out of my fiancé's hand and told Mr. Mike Sagan
13 not to come back to the office, that the police were
14 there to arrest him. I was the one that told Mike
15 Sagan not to come back to the office.
16    Q.  Okay.
17    A.  And that is why Mike Sagan never came to the
18 office. That night, I called him --
19    Q.  Okay, why did you tell him not to return to
20 the office?
21    A.  Because the police were there to arrest him.

**Page 263**

1     A.  As far as Michael Sagan not being allowed to
2  get into his computer, he was not allowed into his
3  computer because they were paranoid that he was sending
4  information to somebody, whoever knows. But Mr. Esrig
5  was the cause of the -- of the computer being stopped
6  up, and there was no problems with our systems that
7  day, because I was using my system all day.
8     Q.  Okay. But you said that he changed the
9  password based on your reports to him that you noticed
10 that Mr. Sagan was copying files.
11    A.  That's correct. I --
12    Q.  Okay. Is it reasonable for an Employer then
13 to protect its, its --
14    A.  Oh --
15    Q.  -- assets in that manner?
16    A.  Of course.
17    Q.  Okay.
18    A.  But, I mean, there's no reason for an
19 Employer to lie to the employee, either. There's no --
20 there's no reason for, you know, him to act the way
21 that, that he did. So --

**Page 262**

1  I told him I could not talk right not, but do not
2  return to the office.
3     Q.  Okay, so you're saying he never threatened
4  you, or he never told you about any threats?
5     A.  Michael Sagan never did anything threatening
6  towards me, or any of the employees, or any of the
7  owners of Stelor Productions.
8     Q.  Did you -- did you tell Marty -- is it Mr.
9  Jeffrey -- or Mr. Langford --
10    A.  Mr. Jeffrey.
11    Q.  Did you tell Mr. Jeffrey that there weren't
12 any threats?
13    A.  Mr. Marty Jeffrey walked up to me and said,
14 "Did Michael Sagan really do this?" And I said, "Can I
15 talk to you in your office, Marty?"
16    Q.  Okay.
17    A.  He brought me in. We sat there and I said,
18 "Marty, Steve has asked me to do this." Immediately,
19 Mr. Esrig notified him that I was -- I told him that
20 this did not happen.
21    Q.  Okay.

**Page 264**

1     Q.  Okay.
2     A.  When I first started -- let me just bring it
3  back a minute. I'm from New York.
4     Q.  Okay.
5     A.  I was guaranteed a position with Stelor
6  Productions, which I was very grateful for. I was
7  actually called, in New York, to come back to Maryland
8  to take over Michael Sagan's position. He had notified
9  me that Michael Sagan had quit, and that I would be
10 filling the position of accountant.
11         BY MR. SAGAN:
12    Q.  When was that date?
13    A.  That was in December or January. When I got
14 there, Michael Sagan was still in the position, and I
15 was informed that Michael Sagan did quit, but he told
16 him he'd like him to come back to work because he
17 needed his 1099 forms done. Now my, my understanding
18 was that I was going down there to take care of this
19 position.
20         BY EXAMINER KNIGHT:
21    Q.  Okay. Let me just go back to this -- I'm

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

6 of 8

265

1 looking at this police report.
2    A.  Yes.
3    Q.  And did you speak to a man -- I don't know
4 his name -- but an officer that day?
5    A.  I did speak to an officer that day, inside
6 Mr. Esrig's office.
7    Q.  Did you make a statement then -- I mean, this
8 is blocked out -- but it says: "On 2-15-05, Mr. Sagan
9 was downloading files. He is the comptroller and he
10 should not be downloading any files to his personal
11 disk. And I noticed that he was downloading financial
12 figures -- let me take a look at this -- and it says he
13 had been acting weird a couple days, and he kept saying
14 to you, 'are you going to quit; are you going to be my
15 spy?' -- and then he started driving off towards
16 (indiscernible) Road and was riding -- " Were you in
17 the car with him?
18    A.  Yes, I was in the car with Mr. Sagan.
19    Q.  Okay. Why did you ride off with Mr. -- was
20 this -- with who?
21    A.  It was Mr. Sagan.

266

1    Q.  Okay. Why did you get in the car with him?
2    A.  Mr. Sagan was very close -- we were very
3 close coworkers.
4    Q.  Did you -- okay.
5    A.  We -- I wanted to find out what was going on
6 within a company that is so deceiving.
7    Q.  Okay. But the police officer's report says,
8 "Before she got out of the car, she reached to take the
9 manila folder that she noticed, when -- it's a blank --
10 Mr. Sagan slapped the folders and began tugging at the
11 folders, saying that if she didn't leave the folders,
12 he would kill her and Esrig's -- "
13    A.  I have never filed a police report with
14 any --
15    Q.  Well, let me just have you take a look at
16 this. Okay?
17         MR. SAGAN: Can I find out -- who wrote that?
18 The police?
19         EXAMINER KNIGHT: Yes, sir. That's
20 Montgomery County.
21         BY EXAMINER KNIGHT:

267

1    Q.  Did you make those statements to the police
2 officer?
3    A.  No, I did not, ma'am.
4    Q.  So where -- did the police officer -- well,
5 how did the police officer --
6    A.  I was in the office with the police officers
7 at that time, and I had notified them that this never
8 happened. After that I was sent out of the office. I
9 was not -- Michael Sagan did nothing to threaten me.
10    Q.  Okay. But so you didn't -- so why would that
11 be -- why would the police put that in their report?
12    A.  I'm not quite sure why that happened. It was
13 -- it was brought up when we first got there, that
14 Michael Sagan was told -- that he threatened my life,
15 and that's when I denied the fact.
16    Q.  Okay.
17    A.  Yes, I was in the car with Mr. Sagan, and,
18 yes, Mr. Sagan did take a manila folder out of the
19 office with him.
20    Q.  Did you try to take the folder?
21    A.  No, I did not. As far as him threatening me,

268

1 or what was in the folder, I don't know. I still to
2 this day do not know. But if this man threatened me,
3 why would I be sitting next to him?
4    Q.  Okay. Well did, did the police officer
5 explain -- inform you how to obtain a protective order?
6    A.  I'm sorry? Did he obtain -- did he explain
7 to me how to obtain a protective order?
8    Q.  Correct.
9    A.  No, no, he did not, and I wouldn't have
10 needed one anyway. The only thing he said is, if I
11 changed my mind, I could go to Montgomery County Police
12 Department and --
13    Q.  But --
14    A.  -- file a report.
15    Q.  So you're saying that this Officer Ramsburg
16 (phonetic sp.) then, put incorrect or false information
17 in this?
18    A.  All I'm saying is I never said that --
19    Q.  But --
20    A.  -- Mr. Sagan threatened my life.
21    Q.  Okay.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

125

```
1            MR. SAGAN:  That has to be investigated.
2            MS. GARDNER:  Which I will be doing.
3            MR. SAGAN:  Okay.
4            EXAMINER KNIGHT:  All right.  I have no
5   further questions --
```